# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Case No. 21-cr-598-PLF-01 |
| | : | |
| TERENCE SUTTON and | : | Hon. Paul L. Friedman |
| ANDREW ZABAVSKY, | : | |
| | : | Status: October 4, 2021 |
| Defendants. | : | |

## TERENCE D. SUTTON, JR.'S MOTION TO MODIFY CONDITIONS OF RELEASE

Comes now Defendant Terence D. Sutton, Jr., through counsel HANNON LAW

GROUP, LLP, and respectfully requests that the Court modify his conditions of release.

## INTRODUCTION

Officer Terence D. Sutton, Jr., is a law enforcement officer with the Metropolitan Police

Department (MPD). He was released on his personal recognizance by the Honorable Magistrate

Judge Zia M. Faruqui on September 24, 2021, having been indicted for murder in the second

degree, conspiracy, and obstruction of justice, with the following relevant conditions [Dkt. 7]:

   a.   Reside at his own residence;

   b.   Stay away from the location of his previous assignment, the Fourth
        District Headquarters of the MPD;

   c.   Avoid all contact with 24 named MPD officers and 4 civilians listed in the
        United States Attorneys' Witness List;

   d.   Wear a non-removable Global Positioning System (GPS) bracelet that
        monitors, tracks, and stores his physical locations and movements;

   e.   Remain in home detention at all times except for employment; education;
        religious services; medical, substance abuse, or mental health treatment;
        attorney visits; court appearances; court-ordered obligations; or other
        activities approved in advance by the pretrial services office or supervising
        officer.

f.      Officer Sutton is permitted to travel to his mother's residence, with prior approval of Pretrial Services, and remain overnight observing home detention while at his mother's residence.

Officer Sutton now seeks modification of these conditions of release to the following:

a.      Placement in the custody of attorney Carmen D. Hernendez who agrees to (a) supervise Officer Sutton, (b) use every effort to assure his appearance at all court proceedings, and (c) notify the court immediately if Officer Sutton violates a condition of release or is no longer in the custodian's custody;

b.      Reside at the residence of attorney Carmen D. Hernendez; Ms. Hernendez will appear at the status hearing on October 4, 2021;

c.      Travel only in the State of Maryland and the District of Columbia, except Officer Sutton is permitted to travel to his mother's residence in Delaware, with prior approval of Pretrial Services, and remain overnight while at his mother's residence, and such other travel within the United States as Pretrial Services may approve.

d.      Stay away from the location of his previous assignment at the Fourth District Headquarters of MPD;

e.      Stay away from the 4 civilian witnesses identified in the U.S. Attorney's Witness List.

## STANDARD OF REVIEW

The District Court's review of the "Magistrate's decision is *de novo*, and the Court is free to use in its analysis any evidence or a rationale different than what the Magistrate relied upon." *United States v. Karni*, 298 F. Supp. 2d 129, 130 (D.D.C. 2004) (citing *United States v. Hudspeth*, 143 F. Supp. 2d 32, 35-36 (D.D.C. 2001)).  "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception. " *United States v. Gloster*, 969 F. Supp. 92, 96–97 (D.D.C. 1997).  The federal bail statute grants this Court the authority to release the defendant upon the "least restrictive" combination of conditions necessary to assure his appearance and the safety of the community. 18 U.S.C. § 3141(c).

Thus, pursuant to the Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, "a person awaiting trial on a federal offense may either be released on personal recognizance or bond, conditionally released, or detained." *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) (citing 18 U.S.C. § 3142(a)). The Act further explains that a defendant may be detained pending trial; however, the Government carries the burden of establishing "that no condition or combination of conditions will reasonably assure the appearance of the person as required." *United States v. Fernandez Velez*, 608 F. Supp. 2d 93, 94 (D.D.C. 2009). When the reason for detention is risk of flight, the government bears the burden and must first establish, beyond a preponderance of the evidence, that the defendant poses a risk of flight. *United States v. Xulum*, 84 F.3d 441, 443 (D.C. Cir. 1996).

In making its determination for release, the court should consider the factors set forth under section 3142(g): (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or community that would be posed by the defendant's release. 18 U.S.C. § 3142(g)(1)-(4).

## ARGUMENT

Officer Sutton does not concede that he should be denied the presumption of release on his personal recognizance. He asserts his innocence, and contends that the indictment in this case is unlikely to survive a motion to dismiss for failure to state an offense. However, for purposes of this motion, we concede that certain conditions for release are appropriate. Therefore, the Court should review the criteria for conditions of release.

**(1)     Nature and Circumstances of the Offense Charged**

At Officer Sutton's initial appearance before Judge Faruqui on September 24, 2021, Assistant United States Attorney Ahmed Baset dwelt on the indictment, alleging that Officer Sutton violated his oath of service.  (Transcript of Proceedings to be Filed).  However, no additional evidence was proffered other than the four-cornered indictment itself.  In the DOJ Press Release accompanying the unsealing of the indictment, Acting United States Attorney Channing D. Phillips stated, "when a select few violate their oath by engaging in criminal conduct, they cannot do so with impunity and must be held accountable.  This indictment seeks to do just that."  (DOJ Press Release, attached as Exhibit A).  The polemic of both Mr. Baset and Mr. Phillips cannot overcome the unprecedented and unsupportable criminal theory espoused in the indictment.

The indictment says that officers "tried to stop [Karon] Hylton-Brown, who was driving a moped, without a helmet, on the sidewalk."  (Indictment at ¶ 10, attached as Exhibit B).  The officers then "pursued" Hylton-Brown when he refused to stop.  The indictment implies that this "pursuit" was a violation of a 2003 MPD General Order.  The indictment then goes on to allege that this pursuit somehow was the "cause" of Hylton-Brown's death in the following manner:

> The pursuit ended when SUTTON followed Hylton-Brown into an alleyway, deactivated his police vehicle's emergency lights and sirens; and accelerated behind Hylton-Brown as Hylton-Brown approached the alleyway's exit onto the 700 block of Kennedy Street.  Immediately upon entering the street, Hylton-Brown was struck by an oncoming civilian vehicle.  The impact ejected Hylton-Brown off the moped and across the full width of the alley, in plain view of SUTTON.  ZABAVSKY – who seconds before the collision had initiated a U-turn less than half a block away that positioned him to face the mouth of the alleyway – arrived at the scene approximately 16 seconds after the impact.

(Indictment at ¶ 13, attached as Exhibit B).

The indictment then goes on to describe further the actions of police which underlie the charges of conspiracy to obstruct justice. The indictment states that after returning to the Fourth District, Officer Sutton denied engaging in a "pursuit" as defined in MPD General Order OPS – 301.3 (implemented on February 25, 2003, by then Chief Charles H. Ramsey). (MPD General Order OPS-301.3, attached as Exhibit C). Yet, there is nothing in the indictment or in the MPD General Order which demonstrates that the facts as alleged amount to a "pursuit" under the General Order.

The indictment then states that Officer Sutton and Lt. Zabavsky "omitted any mention of Hylton-Brown's serious injuries" once they returned to the Fourth District. The indictment then states: "Because of their misleading account, no investigation by other MPD components, including MCS and IAD, was initiated at that time." (Indictment at ¶ 16, attached as Exhibit B). Yet, in contradiction of this allegation of a "cover up" related to Hylton-Brown's injuries, the indictment goes on to state:

> For the next 30 or more minutes, SUTTON and ZABAVSKY obtained multiple updates on Hylton-Brown's worsening medical condition, including that Hylton-Brown required a breathing tube, had a skull fracture, and was in critical condition. Only after receiving these details did ZABAVSKY reveal to the Watch Commander information about Hylton-Brown's serious injuries. In response to a question from the Watch Commander, ZABAYSKY still maintained that he did not know whether SUTTON had engaged in a police vehicular pursuit.

(Indictment at ¶ 17, attached as Exhibit B).

In the indictment's peroration, prosecutors wrote the following summary:

> When SUTTON entered the alleyway, he deactivated his emergency lights and momentarily used his siren before turning it off. As Hylton-Brown approached Kennedy Street, SUTTON accelerated to 26 mph, closing in on Hylton-Brown's moped.
>
> Hylton-Brown drove onto Kennedy Street and was immediately struck by an oncoming automobile traveling westbound. The impact hurled Hylton-Brown off the moped, across the width of the mouth of the alleyway. He landed in the

5

street, where he lay unconscious and motionless, with a gash on his face, and
blood pooling around his head. He never regained consciousness.

(Indictment at ¶¶ 16-17, attached as Exhibit B).

To be clear, the "facts" alleged in the indictment state that Hylton-Brown refused to stop

when followed by police, rode his moped in a circuitous route on the streets and alleyways in the

Kennedy Street area, intentionally road the moped through a northbound alley only 2 blocks

from his initial location, and then into the path of an on-coming vehicle without looking or

stopping, resulting in his subsequent death.  The on-coming vehicle was not driven by police,

and no police vehicle ever contacted Hylton-Brown or the moped.

The "nature" of the offense charged requires the Court to observe that the prosecution

team is from the United States Attorney's Public Corruption and Civil Rights Section.  The U.S.

Attorney's Office has not always had a "Civil Rights" division.  One of the prosecutors on the

team is a recent transfer from the Criminal Civil Rights Division of the Department of Justice.

Prosecution of law enforcement officers is highly regulated and coordinated by the Civil Rights

division at the Department of Justice.  Any such prosecution requires coordination from the

moment a U.S. Attorney's Office seeks to open an investigation which touches upon possible

violations of 18 U.S.C. § 242 (intentional deprivation of civil rights).  (See Justice Manual 8-

3.000, attached as Exhibit D).  We do not know whether the U.S. Attorney's Office engaged in

the coordination which DOJ requires, which includes obtaining express authority to seek an

indictment from a grand jury.

However, this rubric demonstrates to this Court that federal prosecution of law

enforcement officers, as governed by Justice Manual 8-3.000, focuses on Title 18 U.S.C. § 242,

which provides the following:

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

To prove a violation of § 242, the government must prove: (1) that the defendant deprived a victim of a right protected by the Constitution or laws of the United States, (2) that the defendant acted willfully, and (3) that the defendant was acting under color of law. Establishing the intent behind a Constitutional violation requires proof beyond a reasonable doubt that the law enforcement officer knew what he/she was doing was wrong and against established Constitutional standards and decided to do it anyway.  This statute provides the primary federal vehicle for prosecution of law enforcement officers.

The Grand Jury in this case did not return an indictment charging a violation of 18 U.S.C. § 242, meaning either it did not vote a True Bill on this charge or the United States Attorney did not seek an indictment under 18 U.S.C.  § 242.  Nor does the indictment allege any violation by officers of Hylton-Brown's Constitutional rights.  Instead, the indictment alleges murder in the second degree under D.C. Code § 22-2103.

The United States Attorney for the District of Columbia is the only federal prosecutor authorized to file non-federal criminal offenses in federal court.  The District of Columbia provided this authority by statute, after court-reorganization, under D.C. Code § 11-502(3).  That

statute provides jurisdiction in this federal District Court over "Any offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal offense."  The U.S. Attorney in this case has coupled the local murder charge with federal conspiracy and obstruction of justice charges to obtain jurisdiction of the local murder count in this Court.

The import of this phenomenon is that only in the District of Columbia can a law enforcement officer be indicted in a federal court for a local offense of murder in the second degree.  Therefore, in considering the "nature" of the charges in a bail review setting, we assert that the Court should consider whether the United States Attorney has ever charged a law enforcement officer in federal court with murder, where there is no violation of the Constitutional rights of the decedent, as is true in this case.  We believe this case is unprecedented in that regard.

(2)     **The Weight of the Evidence**

What is unsaid in the indictment, and which will be proven at a trial, is that the indictment follows a robust series of events and violence orchestrated in part through social media by the Kennedy Street Crew drug ring and the family of Karon Hylton-Brown, the decedent and a leader of the Kennedy Street drug crew.  This violence included a riot outside the Fourth District Headquarters with personal injuries and property damage.  More recently, two other members of Hylton-Brown's extended family were murdered blocks from the open-air drug market on Kennedy Street.  One of those decedents was lauded by the press for efforts to change his life after being released from prison.  Not reported by the press was that he was found by police wearing an armored vest with a .45 caliber handgun in his waistband.

After the October death of Hylton-Brown, Fourth District officers withdrew from the Kennedy Street area, resulting in multiple drug and gang-related shootings.  On November 16, 2020, the MPD Intelligence Division issued an Officer Safety Bulletin reporting an anonymous call to the Fourth District.  The Bulletin reports that the caller said "members of the Fourth District were not doing anything to prevent members of the Kennedy Street Crew (KDY) from being killed.  The caller then threatened to respond to the Fourth District to kill MPD officers and destroy MPD property."

The indictment also does not report that Hylton-Brown was observed by uniformed officers earlier on the day of his death in an altercation with a fellow KDY member on Kennedy Street.  At the time, despite being only 20-years of age, Hylton-Brown had six pending criminal cases in the District of Columbia and others in Maryland.  Hylton-Brown left the area after the altercation and returned on the moped, driving erratically and exhibiting an angry demeanor.  Officers feared he had returned armed to exact revenge.  The Crime Suppression Team, of which Officer Sutton and Lt. Zabavsky were members, was briefed by uniformed officers on these events of the day.  The CST knew of Hylton-Brown's criminal record, which included two arrests and a juvenile conviction for Carrying a Pistol Without a License.

The Lieutenant then directed the CST team to stop Hylton-Brown and conduct a *Terry* stop to determine whether he was armed.  This action, unstated in the indictment, is mandated by MPD General Order OPS 304.10, Field Contacts, Stops, and Protective Pat Downs, (July 9, 2019), attached as Exhibit E.  The officers would have been in dereliction of their duty not to attempt a stop of Hylton-Brown to determine if he was armed.  Officers knew from experience that when Hylton-Brown was "dirty" – that is being armed or in possession of drugs – he would run.  Otherwise, he would engage the officers by name in frivolous banter.

Also notably absent in the indictment is that Hylton-Brown was the cause of his own death.  He stayed in the Kennedy Street drug area, taunting officers on the moped.  The indictment suggests that Hylton-Brown lived innocently in the area, which is untrue.  He worked in the area selling drugs.  His death occurred when he continued to drive away, down an alley and into the path of an oncoming vehicle without braking or looking.  Almost immediately, the CST officers were surrounded by known members of the Kennedy Street Crew who threatened the officers with retaliation.

The United States Attorney's Office is fully aware of this evidence, which prosecutors have not provided to the defendants.  At least one officer who witnessed Hylton-Brown's activities that day was interviewed by prosecutors and testified in the Grand Jury.  Prosecutors also interviewed and presented to the Grand Jury an MPD supervisor who was on the scene of the accident.  This supervisor disputed the prosecutors' theory that any violation of MPD General Orders caused the death of Karon-Hylton.

This evidence, fully known to prosecutors, indicates that the applicable MPD General Order – assuming arguendo that violation of a general order is evidence of reckless disregard for the safety of Hylton-Brown – is not the nearly 20-year-old order related to police pursuits, but rather the 2-year-old order regarding Field Contacts, Stops, and Protective Pat Downs.  The General Order provides in part:

> If a member has **reasonable suspicion** that an individual has committed, is committing, or is about to commit any crime, the member has the authority to stop the individual for the purpose of determining whether or not probable cause exists to arrest. The member may exercise that authority in any place in which he or she has a legal right to be.

(MPD General Order OPS 304.10, Field Contacts, Stops, and Protective Pat Downs at 3, (July 9, 2019), attached as Exhibit E).

The General Order advises officers in conducting this assessment they must consider the characteristics of the individual, his actions, his demeanor, their own experience in the area, and information obtained from other officers.  The General Order also authorizes the Use of Force in conducting the stop if required.  (*Id*. at 6).  In this case, the evidence known to the United States clearly justifies the actions of the officers described in the indictment.  Officers were alerted to a known Kennedy Street Crew leader operating in the open-air drug market, engaging in bizarre and unlawful behavior, known to them to run when he is "dirty", remaining in that area, clearly for some unlawful purpose.  Failure to conduct a stop of Hylton-Brown would have been a violation of the MPD General Order quoted by prosecutors in the preamble of the indictment:

> MPD General Orders provide that "[i]t is the policy of the MPD to ensure its members preserve the peace, protect life and property, prevent crime, apprehend offenders, recover property and enforce all laws and ordinances of the District of Columbia and the United States of America." MPD General Order No. 201 .26, Pt. II.

(Indictment at ¶ 5, attached as Exhibit B).

### (3)    The History and Characteristics of the Person

Officer Terence D. Sutton, Jr., is a 37-year-old member of the Metropolitan Police Department.  Officer Sutton grew up in Prince Georges County, and his father was a P.G. County Police Officer and Detective for his career.  His father died in 2015.  Officer Sutton's mother now lives in Delaware, and is a constant and important part of his life.  Officer Sutton's aunt also lives in the Washington, D.C., metropolitan area.

Officer Sutton attended public school in Prince Georges County, and knew for years that he wanted to follow in the footsteps of his father into law enforcement.  To that end, after high school, Officer Sutton obtained his Associate of Arts degree in Criminal Justice.  He joined MPD at the age of 24.  Officer Sutton has served his entire 12+ years in the Fourth District, serving as

11

a patrol officer and community beat officer in the Kennedy Street corridor for 4 years.
Thereafter, he went to the vice unit, then back to patrol as a Training Officer in the Kennedy
Street area.  He was then selected to join the Crime Suppression Unit.  Officer Sutton has walked
a beat, ridden a police bicycle, and ridden a police motorcycle all in the same Kennedy Street
area.  In his 12 years, he came to know Karon Hylton-Brown when Hylton-Brown was a young
teenager.  Sadly, Officer Sutton watched Hylton-Brown succumb to the drug life of the Kennedy
Street Crew.

At the time of the October 2020 death of Hylton-Brown, Officer Sutton was known by
Hylton-Brown as "Tattoo".  When Hylton-Brown was not carrying drugs or a weapon, he and
Officer Sutton would engage in conversation frequently in the Kennedy Street area.  Officer
Sutton at the time of Hylton-Brown's death had arrested Hylton-Brown, and knew him as a drug
dealer with the Kennedy Street Crew.  He was aware that Hylton-Brown was arrested by CST for
an armed robbery at a Metro Station.  During the course of this arrest, Hylton-Brown ran from
police and discarded a hand gun as he attempted to flee.  Officer Sutton was also aware that CST
had executed two search warrants at Hylton-Brown's grandmother's home near Kennedy Street,
and was aware that Hylton-Brown had several criminal cases in Prince Georges County and
Montgomery County.

Officer Sutton has received numerous commendations from his superiors: three
achievement medals awarded by the MPD Chief of Police, and Officer of the Year for the Fourth
District in 2012.  He received an award for Law Enforcement Officer of the Year from ASIS
International in 2019 as the top officer in the District of Columbia and five states.  His unit was
awarded CST Unit of the Year in 2019.  Officer Sutton has also been the subject of death threats
confirmed by MPD Intelligence, including a death threat within the last week.  He owns his own

home, and requests permission as a condition of release to reside with attorney Carmen D. Hernendez, a close friend of Officer Sutton.  Ms. Hernendez will contact Pretrial Services to be interviewed on Monday morning and appear at the status hearing later that day.

      **(4)     The Nature and Seriousness of the Danger to Any Person or Community that Would be Posed by Officer Sutton.**

The major predicter of future dangerousness of a person is his record of prior dangerous conduct.  There is no reason to believe Officer Sutton is a danger to anyone.  The Government relies on its allegations of obstruction of justice for a condition of release that Officer Sutton stay away from 24 MPD Officers identified by the U.S. Attorney's Office as witnesses in the case. The majority of these officers are friends of Officer Sutton.  It is an insult to these officers as well as Officer Sutton that by some scheme or subterfuge he would corruptly influence their testimony.  Nor is it likely that if Officer Sutton conducted himself improperly, that these officers would not be the first to report such conduct.  The truth is that prosecutors have suppressed evidence provided to them by several of these MPD officers regarding Hylton-Brown's conduct on the night of his death.

The predominant measure of Officer Sutton's life is the Metropolitan Police Department and the officers at the Fourth District whom he has trained and with whom he has worked.  To deprive him of the association of these officers is unnecessary and ostracizes Officer Sutton from his support group.

WHEREFORE, Officer Sutton requests that his conditions of release be modified as requested.

Dated: October 2, 2021

Respectfully submitted,

HANNON LAW GROUP, LLP

_s/J. Michael Hannon_

J. Michael Hannon, #352526
Rachel E. Amster, #1618887
333 8th Street, NE
Washington, DC 20002
Tel: (202) 232-1907
Fax: (202) 232-3704
jhannon@hannonlawgroup.com
ramster@hannonlawgroup.com

*Attorneys for Defendant Terence D. Sutton, Jr.*

# EXHIBIT A

Case 1:21-cr-00598-RLF Document 17 Filed 10/02/21 Page 16 of 84



United States Department of Justice

Offices of the United States Attorneys

THE UNITED STATES ATTORNEY'S OFFICE

# DISTRICT *of* COLUMBIA

Search

SEARCH

**HOME**     **ABOUT**     **NEWS**     **MEET THE U.S. ATTORNEY**     **DIVISIONS**     **PROGRAMS**     **CONTACT**

U.S. Attorneys » District of Columbia » News

**Department of Justice**

U.S. Attorney's Office

District of Columbia

FOR IMMEDIATE RELEASE                                                                    Friday, September 24, 2021

# Two Officers Indicted on Charges in Death of 20-Year-Old Karon Hylton-Brown

### Defendants Made First Court Appearances Today

WASHINGTON – An indictment was unsealed today charging two members of the Metropolitan Police Department (MPD) with offenses stemming from the Oct. 23, 2020, police vehicular pursuit in Northwest Washington that caused the death of Karon Hylton-Brown.

Terence Sutton, 37, an officer, was indicted on a District of Columbia charge of second-degree murder and federal charges of conspiracy and obstruction of justice. Andrew Zabavsky, 53, a lieutenant, was indicted on federal charges of conspiracy and obstruction of justice.

"Police officers are sworn to uphold the law and ensure the safety of the community. The vast majority of officers execute their duties in an exemplary manner, and we are grateful for their dedicated service," said Acting U.S. Attorney Channing D. Phillips. "But when a select few violate their oath by engaging in criminal conduct, they cannot do so with impunity and must be held accountable.  This indictment seeks to do just that."

"As alleged in the indictment, these sworn law enforcement officers showed a careless disregard for Mr. Hylton-Brown's life and then conspired to obstruct the investigation of their actions," said Wayne A. Jacobs, Special Agent in Charge of the FBI Washington Field Office Criminal Division. "The FBI has an obligation to ensure that law enforcement officers do not abuse their positions of trust and authority to the detriment of the communities they serve."

The indictment was returned by a grand jury yesterday and unsealed today. Sutton and Zabavsky made their first appearances this afternoon before the Honorable Magistrate Judge Zia M. Faruqui in the U.S. District Court for the District of Columbia. They were released under certain conditions set by the Court, with the next hearing set for Oct. 4, 2021.

According to the indictment, at the time of the police pursuit, Sutton was assigned to the Crime Suppression Team in MPD's Fourth Police District. Zabavsky supervised the Fourth Police District's Crime Suppression Team officers, including Sutton. The pursuit began at approximately 10 p.m. on Friday, Oct. 23, 2020, after officers observed Mr. Hylton-Brown, 20, driving a moped on a sidewalk in the Brightwood Park area of Northwest Washington. The pursuit continued on neighborhood streets for more than 10 blocks and into an alley off the 700 block of Kennedy Street NW. Immediately upon exiting the alley and entering Kennedy Street, Mr. Hylton-Brown was struck by an oncoming civilian vehicle. He suffered severe head trauma and died on Oct. 25, 2020.

The indictment alleges that Sutton caused Mr. Hylton-Brown's death by driving a police vehicle in conscious disregard for an extreme risk of death or serious bodily injury to Mr. Hylton-Brown. It also alleges that Sutton and Zabavsky conspired and combined to hide from MPD officials the circumstances of the traffic crash leading to Mr. Hylton-Brown's death.

The charge of second-degree murder carries a statutory maximum of 40 years in prison. The conspiracy charge carries a statutory maximum of five years and the obstruction of justice charge carries a maximum of 20 years. A federal district court judge will determine any sentence after considering the U.S. Sentencing Guidelines and other statutory factors.

An indictment is merely an allegation and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.

This case was investigated by the Criminal Investigation and Intelligence Unit of the U.S. Attorney's Office for the District of Columbia and the FBI's Washington Field Office. The case is being prosecuted by the Public Corruption and Civil Rights Section of the U.S. Attorney's Office for the District of Columbia.

---

**Attachment(s):**
Download Sutton, Terence and Zabavsky, Andrew - Stamped Indictment

**Topic(s):**
Civil Rights
Public Corruption

**Component(s):**
Federal Bureau of Investigation (FBI)
USAO - District of Columbia

Updated September 24, 2021

# EXHIBIT B



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

RECEIVED

SEP 2 3 2021

Clerk, U.S. District and
Bankruptcy Courts

Grand Jury Sworn in on January 28, 2021

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 21-cr-_____ |
| | : | |
| v. | : | GRAND JURY ORIGINAL |
| | : | |
| TERENCE SUTTON and | : | VIOLATIONS: |
| (Counts 1, 2, 3) | : | |
| | : | D.C. Code § 22-2103 |
| ANDREW ZABAVSKY, | : | (Murder in the Second Degree) |
| (Counts 2, 3) | : | |
| | : | 18 U.S.C. § 371 |
| Defendants. | : | (Conspiracy) |
| | : | |
| | : | 18 U.S.C. §§ 1512(b)(3), 2 |
| | : | (Obstruction of Justice) |
| | : | |

**INDICTMENT**

The Grand Jury charges that, at all times material to this Indictment, on or about the dates

and at the approximate times stated below:

**BACKGROUND**

**Introduction**

1.      On October 23, 2020, Karon Hylton-Brown—a 20 year-old born and raised in the

Brightwood Park neighborhood of the District of Columbia—suffered severe head trauma from a

traffic collision caused by a police vehicular pursuit.  Fewer than two days later, on October 25,

he died from his injuries.

2.      This Indictment alleges that TERENCE SUTTON, a sworn Metropolitan Police

Department (MPD) officer, committed Murder in the Second Degree, in violation of D.C. Code

§ 22-2103—that is, SUTTON caused Hylton-Brown's death by driving a police vehicle in conscious disregard for an extreme risk of death or serious bodily injury to Hylton-Brown.

3.      This Indictment further alleges that SUTTON and ANDREW ZABAVSKY, SUTTON's supervising MPD lieutenant, conspired to obstruct justice, in violation of 18 U.S.C. § 371, and that they obstructed justice, and aided and abetted each other in doing so, in violation of 18 U.S.C. §§ 1512(b)(3), 2—that is, SUTTON and ZABAVSKY combined to hide from MPD officials the circumstances of the traffic collision leading to Hylton-Brown's death, to prevent an internal investigation of the incident and referral of the matter to federal authorities for a criminal civil rights investigation.

4.      Under D.C. Code § 11-502(3) this Court has pendent jurisdiction over the charge of Murder in the Second Degree.

**The Defendant Police Officials**

5.      MPD is the primary law enforcement agency for the District of Columbia. MPD General Orders provide that "[i]t is the policy of the MPD to ensure its members preserve the peace, protect life and property, prevent crime, apprehend offenders, recover property and enforce all laws and ordinances of the District of Columbia and the United States of America." MPD General Order No. 201.26, Pt. II.

6.      SUTTON was a police officer assigned to the Crime Suppression Team (CST) in MPD's Fourth Police District. He had more than ten years of experience on the police force.

7.      ZABAVSKY was a lieutenant that supervised the Fourth Police District's CST officers, including SUTTON. ZABAVSKY was responsible for ensuring that officers under his supervision complied with MPD policies and procedures. In addition, ZABAVSKY's duties

included reporting sensitive incidents to the MPD management chain above him.  He had 18 years of experience on the police force.

8.     SUTTON and ZABAVSKY knew the MPD policy regarding vehicular pursuits. MPD General Orders define a police vehicular pursuit as "an attempt by a member of this Department to apprehend a fleeing felon while in an authorized emergency vehicle with all emergency warning devices activated" and prohibit officers from "pursuing a vehicle for the purpose of affecting a stop for a traffic violation."  General Order No. 301.03, Pts. III.2 and IV.F. MPD General Orders state that "members and officials shall continually evaluate and assess the actual conditions of the pursuit in deciding whether to continue or discontinue the vehicular pursuit."  General Order No. 301.03, Pt. II.

9.     The District of Columbia Municipal Regulations afford authorized emergency vehicles, including police vehicles, certain privileges not afforded to ordinary citizens.  Those privileges, however, do not relieve police officers "from the duty to drive with due regard for the safety of all persons, nor shall these provisions protect the driver from the consequences of his reckless disregard for the safety of others."  DCMR § 18-2002.4.

**The Vehicular Pursuit That Caused Karon Hylton-Brown's Death**

10.     Just after 10:00 p.m. on Friday, October 23, 2020, SUTTON—driving his unmarked police vehicle with three other officers—and ZABAVSKY—alone in his marked police vehicle—tried to stop Hylton-Brown, who was driving a moped, without a helmet, on the sidewalk. Driving a moped on the sidewalk and riding a moped without a helmet are municipal traffic violations.  When Hylton-Brown did not stop, SUTTON and ZABAVSKY both activated the emergency lights on their vehicles and pursued him.

11.    For more than three minutes, SUTTON pursued Hylton-Brown through neighborhood streets with pedestrians and other vehicles present. At times, SUTTON accelerated to more than double the residential speed limit, at one point reaching 45 miles per hour (mph). SUTTON pursued Hylton-Brown for more than ten blocks, driving the wrong way on a one-way street and passing through multiple "STOP" signs.

12.    At the outset, ZABAVSKY assisted in initiating the pursuit with his emergency lights activated and overtook SUTTON as the primary pursuit vehicle behind Hylton-Brown for about one block. After several blocks, ZABAVSKY separated from the direct pursuit, but drove in a parallel path of travel that positioned him on the 700 block of Kennedy Street, N.W., where he could intercept Hylton-Brown from a different direction. SUTTON and ZABAVSKY regularly announced location updates that were communicated over a closed police radio channel. This channel was not broadcast to the communications dispatcher responsible for coordinating vehicle pursuits or the District Watch Commander, the MPD official to whom ZABAVSKY reported.

13.    The pursuit ended when SUTTON followed Hylton-Brown into an alleyway, deactivated his police vehicle's emergency lights and sirens, and accelerated behind Hylton-Brown as Hylton-Brown approached the alleyway's exit onto the 700 block of Kennedy Street. Immediately upon entering the street, Hylton-Brown was struck by an oncoming civilian vehicle. The impact ejected Hylton-Brown off the moped and across the full width of the alley, in plain view of SUTTON. ZABAVSKY—who seconds before the collision had initiated a U-turn less than half a block away that positioned him to face the mouth of the alleyway—arrived at the scene approximately 16 seconds after the impact.

14.    Hylton-Brown lay in the street motionless, unconscious, and with a pool of blood collecting underneath his head. Neither ZABAVSKY, the highest-ranking police official at the

scene, nor SUTTON, the officer who pursued Hylton-Brown onto Kennedy Street, made notifications about Hylton-Brown's condition to MPD's Major Crash Section (MCS)—the MPD component responsible for investigating traffic crashes involving serious bodily injury or death. Nor did SUTTON or ZABAVSKY apprise any official in the MPD chain-of-command of Hylton-Brown's serious injuries, the fact that a vehicle pursuit preceded the traffic collision that resulted in the injuries, or their involvement in the pursuit.   These actions delayed, and could have prevented, notifications to MCS and the Internal Affairs Division (IAD), which is responsible for making referrals to federal authorities for investigations of potential criminal civil rights violations.

15.   SUTTON and ZABAVSKY took control of the scene and deliberately neglected to execute their duties properly.  SUTTON and ZABAVSKY agreed that SUTTON would prepare the traffic crash report.  Neither SUTTON nor ZABAVSKY took routine steps to collect evidence relevant to a traffic crash investigation, including preserving the scene, collecting witness information, or interviewing witnesses.  Fewer than 21 minutes after the collision, before leaving the scene, SUTTON and ZABAVSKY deactivated their MPD-issued body-worn cameras (BWCs) and conferred privately.

16.   After leaving the scene, SUTTON and ZABAVSKY returned to the Fourth District police station.  Once there, they provided a misleading account of the incident to the Watch Commander.  SUTTON denied engaging in a vehicular pursuit of Hylton-Brown, ZABAVSKY withheld all information about his involvement in the incident, and both officers omitted any mention of Hylton-Brown's serious injuries.  Because of their misleading account, no investigation by other MPD components, including MCS and IAD, was initiated at that time.

17.   For the next 30 or more minutes, SUTTON and ZABAVSKY obtained multiple updates on Hylton-Brown's worsening medical condition, including that Hylton-Brown required

a breathing tube, had a skull fracture, and was in critical condition. Only after receiving these details did ZABAVSKY reveal to the Watch Commander information about Hylton-Brown's serious injuries. In response to a question from the Watch Commander, ZABAVSKY still maintained that he did not know whether SUTTON had engaged in a police vehicular pursuit. The Watch Commander reviewed the BWC himself and immediately directed ZABAVSKY to contact MCS. The Watch Commander then called IAD himself.

18.     On October 25, 2020, Hylton-Brown died from his injuries.

## COUNT ONE
### (Murder in the Second Degree—D.C. Code § 22-2103)

19.     The allegations in paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

20.     On the night of October 23, 2020, Hylton-Brown drove a borrowed Revel rental moped through Brightwood Park. He was not wearing a helmet. The maximum speed of a Revel moped is 30 mph.

21.     SUTTON and ZABAVKSY drove their MPD vehicles eastbound on Kennedy Street into the 400 block and passed Hylton-Brown. Both SUTTON and ZABAVSKY made a U-turn to drive back toward Hylton-Brown.

22.     As SUTTON and ZABAVKSY started driving westbound on Kennedy Street toward Hylton-Brown, Hylton-Brown began driving the moped on the sidewalk westbound on Kennedy Street, away from SUTTON and ZABAVSKY.

23.     At the intersection of Kennedy and Fifth Streets, SUTTON and ZABAVSKY activated the emergency lights on their MPD vehicles and attempted to stop Hylton-Brown.

24. Hylton-Brown turned southbound on Fifth Street. SUTTON and ZABAVKSY pursued Hylton-Brown in their MPD vehicles with their emergency lights still activated.

25. Hylton-Brown briefly slowed down at a parking lot entrance on Fifth Street, and SUTTON and ZABAVKSY also slowed down. Hylton-Brown then drove away on the moped, continuing southbound on Fifth Street.

26. SUTTON and ZABAVSKY continued to pursue Hylton-Brown in their MPD vehicles. The vehicular pursuit spanned ten city blocks and more than three minutes, ending in the traffic collision in which Hylton-Brown suffered fatal injuries. Throughout the pursuit, SUTTON and ZABAVSKY used a police radio channel broadcast only to CST officers, and not the communications dispatcher or the Watch Commander, to communicate about their locations. During the more than three-minute pursuit:

     a. ZABAVSKY took the lead car position for approximately one block at the start of the pursuit, during which time he was the only officer with activated emergency lights and sirens;

     b. ZABAVSKY announced Hylton-Brown's position to CST officers over the radio, stating: "Seventh and Ingraham. We're chasing Karon on a scooter right now.";

     c. ZABAVSKY took a separate but parallel path of travel that positioned him to intercept Hylton-Brown in the 700 block of Kennedy Street;

     d. SUTTON pursued Hylton-Brown the wrong way up a one-way street for two blocks;

     e. SUTTON drove through seven "STOP" signs;

     f. At multiple intersections where Hylton-Brown remained at a slow or stopped pace, SUTTON accelerated toward Hylton-Brown and then slammed on his brakes;

      g.      SUTTON pursued Hylton-Brown through two alleyways, driving more than 10 mph above the 15 mph speed limit in each, and reaching a top speed of 40 mph in the first alleyway;

      h.      SUTTON accelerated to speeds between 11 mph and 25 mph above the speed limit, at one point hitting a top speed of 45 mph when driving the wrong way on a one-way street; and,

      i.      SUTTON intermittently used his emergency lights and sirens throughout the pursuit.

27.      In the final ten seconds of the pursuit, SUTTON pursued Hylton-Brown into an alleyway that connects the 700 blocks of Jefferson and Kennedy Streets. The alleyway is 14 feet wide at its narrowest point when approaching Kennedy Street. When SUTTON entered the alleyway, he deactivated his emergency lights and momentarily used his siren before turning it off. As Hylton-Brown approached Kennedy Street, SUTTON accelerated to 26 mph, closing in on Hylton-Brown's moped.

28.      Hylton-Brown drove onto Kennedy Street and was immediately struck by an oncoming automobile traveling westbound. The impact hurled Hylton-Brown off the moped, across the width of the mouth of the alleyway. He landed in the street, where he lay unconscious and motionless, with a gash on his face, and blood pooling around his head. He never regained consciousness.

29.     On October 23, 2020, in the District of Columbia, the defendant,

**TERENCE SUTTON,**

acting with conscious disregard of an extreme risk of death and serious bodily injury to Karon

Hylton-Brown, caused Hylton-Brown's death—that is, as described above, SUTTON caused a

traffic collision from which Hylton-Brown sustained injuries and died.

(In violation of Title 22, D.C. Code, Section 22-2103)

## COUNT TWO
### (Conspiracy—18 U.S.C. § 371)

30.     The allegations in paragraphs 1 through 18 and 20 through 28 are realleged and

incorporated as if fully set forth herein.

### The Conspiracy

31.     Between October 23, 2020, and October 24, 2020, in the District of Columbia, the

defendants,

**TERENCE SUTTON and
ANDREW ZABAVSKY,**

did knowingly combine, conspire, confederate, and agree with each other to commit an offense

against the United States—that is, to engage in misleading conduct toward another person with

intent to hinder, delay, and prevent the communication to a law enforcement officer of the United

States information relating to the commission and possible commission of a Federal offense, in

violation of Title 18, United States Code, Section 1512(b)(3), as charged in Count Three of this

Indictment.

### Purpose of the Conspiracy

32.     The purpose of the conspiracy was for SUTTON and ZABAVSKY to hide from MPD officials the circumstances of the traffic collision leading to Hylton-Brown's death, to prevent an internal investigation of the incident and referral of the matter to federal authorities for a criminal civil rights investigation.

### Manner and Means of the Conspiracy

33.     SUTTON and ZABAVSKY carried out the conspiracy through the following manner and means, among others:

      a.     Delaying notification of the traffic collision to MPD officials and, in turn, federal authorities;

      b.     Controlling the law enforcement response to the traffic crash scene;

      c.     Willfully neglecting to collect and preserve relevant evidence; and,

      d.     Withholding information from the Watch Commander and misleading him about the circumstances of the traffic collision.

### Overt Acts

34.     ZABAVSKY, the most senior MPD official on the traffic crash scene, waited more than three minutes after the collision to communicate with the communications dispatcher, and did so only after the dispatcher requested the identity of the official in charge of the scene.

35.     Despite being the most senior official on scene, ZABAVSKY made no notifications to MCS, IAD, or any senior MPD officials.

36.     Nine minutes after the collision, SUTTON and ZABAVSKY agreed that SUTTON would write the police report for the incident.

10

37.     SUTTON told an MPD officer, who had not been involved in the pursuit of Hylton-Brown, and who had already started gathering information for a police report, that SUTTON would write the report.

38.     ZABAVSKY also told the uninvolved MPD officer that SUTTON would write the police report.

39.     ZABAVSKY obtained no witness statements, nor did he direct any other officer to take statements, despite being approached by at least one individual who asserted he was an eyewitness.

40.     SUTTON obtained no witness statements other than basic information from the driver of the striking vehicle that had already been gathered by another officer.  Nor did he direct any other officer to memorialize witness statements, despite being approached by at least one individual who asserted he was an eyewitness.

41.     Twenty minutes after the collision, SUTTON gave permission to the driver of the vehicle that struck Hylton-Brown to leave the scene with his vehicle, despite considerable damage to the vehicle.

42.     Fewer than 21 minutes after the collision, SUTTON and ZABAVSKY turned off their BWCs, stood apart from all other officers, engaged in a private conversation, and then immediately left the scene to return to the Fourth District police station.

43.     When ZABAVSKY left the scene, he did not leave any other police official in charge.

44.     When SUTTON left the scene, he drove his MPD vehicle from the location where it had come to a stop at the time of the collision.

11

45.     When SUTTON left the scene, he drove his MPD vehicle directly over physical evidence from Hylton-Brown's moped.

46.     At the Fourth District police station, SUTTON and ZABAVSKY met with the Watch Commander, the senior-most official in charge, and provided him with a misleading account of the incident:

      a.     SUTTON and ZABAVSKY portrayed the incident as a brief attempted traffic stop from which a moped driver took off and was then hit by a vehicle;

      b.     SUTTON minimized his conduct, saying that he did not engage in a vehicular pursuit;

      c.     ZABAVSKY said that he did not know if SUTTON had engaged in a vehicular pursuit;

      d.     ZABAVSKY withheld information concerning his own involvement in the pursuit;

      e.     ZABAVSKY said that Hylton-Brown had been drunk and had been slurring his words; and,

      f.     SUTTON and ZABAVSKY withheld all information about Hylton-Brown's serious injuries.

47.     SUTTON drafted a traffic crash report that minimized the extent of the observable injuries to Hylton-Brown.

48.     ZABAVSKY continued to withhold from the Watch Commander all information about Hylton-Brown's serious injuries and updates about his condition, despite knowing that it was critical and worsening.

(In violation of Title 18, United States Code, Section 371)

12

## COUNT THREE
### (18 U.S.C. §§ 1512(b)(3), 2—Obstruction of Justice)

49.     The allegations in paragraphs 1 through 18, 20 through 28, and 34 through 48 are realleged and incorporated as if fully set forth herein.

50.     Between October 23, 2020, and October 24, 2020, in the District of Columbia, the defendants,

**TERENCE SUTTON and
ANDREW ZABAVSKY,**

aiding and abetting each other, knowingly engaged in misleading conduct toward another person, and attempted to do so, with intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States information relating to the commission and possible commission of a Federal offense—that is, SUTTON and ZABAVSKY hid from MPD officials the circumstances of the traffic collision leading to Karon Hylton-Brown's death, to prevent an internal investigation of the incident and referral of the matter to federal authorities for a criminal civil rights investigation.

(In violation of Title 18, United States Code, Sections 1512(b)(3) and 2))


A TRUE BILL


FOREPERSON


CHANNING D. PHILLIPS
ACTING U.S. ATTORNEY FOR THE UNITED STATES
IN AND FOR THE DISTRICT OF COLUMBIA

# EXHIBIT C

LAW ENFORCEMENT USE ONLY

# GENERAL ORDER



**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Title** | |
| **Vehicular Pursuits** | |
| **Series / Number** | |
| **GO – OPS - 301.03** | |
| **Effective Date** | **Distribution** |
| **February 25, 2003** | **A** |
| **Replaces / Rescinds** | |
| General Order 301.3 (Operation of Emergency Vehicles, Fresh Pursuit and Vehicular Pursuit) General Order 308.3 (Use of Roadblocks) Teletype TT 07-072-02 (New Vehicular Pursuit Procedures) | |

|   |   |   |   |
|---|---|---|---|
| I. | Background.........Page | 1 |
| II. | Policy.................Page | 1 |
| III. | Definitions..........Page | 1 |
| IV. | Rules ................Page | 2 |

| V. | Regulations..........................Page | 3 |
| VI. | Procedural Guidelines.............Page | 5 |
| VII. | Cross Reference....................Page | 16 |

## I.      BACKGROUND

When a member of the Metropolitan Police Department is engaged in a vehicular pursuit, the overriding responsibilities are the protection of human life and property. This order is designed to establish guidelines for members to follow that best protect the lives and property of all persons while member(s) are engaged in a pursuit situation.

## II.      POLICY

The policy of the Metropolitan Police Department is that members who initiate a pursuit shall exercise caution and operate their vehicle in a safe manner while engaged in the vehicular pursuit.  As the vehicular pursuit progresses, members and officials shall continually evaluate and assess the actual conditions of the pursuit in deciding whether to continue or discontinue the vehicular pursuit.

## III.      DEFINITIONS

When used in this directive, the following terms shall have the meaning designated:

  1.      Emergency Vehicle - a Department vehicle equipped with the operable emergency warning devices listed below:

     a.      Marked vehicles that have identifiable Department logos and are equipped with a siren and a beacon light mounted on the roof;

     b.      Unmarked vehicles that do not have any identifiable markings, but are equipped with a siren and a portable emergency beacon light.

NOT TO BE DISSEMINATED TO THE PUBLIC

**LAW ENFORCEMENT USE ONLY**

2.  Vehicular Pursuit – an attempt by a member of this Department to apprehend a fleeing felon while in an authorized emergency vehicle with all emergency warning devices activated.

    a.  Hot pursuit is a pursuit that occurs within the District of Columbia.

    b.  Fresh pursuit is a hot pursuit that crosses the boundaries of the District of Columbia and enters into Maryland, Virginia or another jurisdiction.

3.  Primary Unit – the first police unit that initiates a pursuit or any unit that assumes control of the pursuit.

4.  Secondary Unit – the police unit that becomes involved as a backup to the primary unit.

5.  Probable Cause - A set of facts, circumstances, and reliable information that would lead a reasonable and prudent officer to believe a certain crime has been committed and that a certain person committed the crime.

6.  Reasonable Cause – A combination of specific facts and circumstances that would justify a reasonable officer to believe that a certain person had committed, is committing, or is about to commit a criminal act; more than a hunch or mere speculation but less than probable cause necessary to arrest; sometimes referred to as reasonable suspicion.

## IV.  RULES

Any member engaging in a vehicular pursuit must follow the conditions that are set forth under Part V, Section D-2, "Fleeing Felon," of GO-RAR-901.07 (Use of Force), as described below:  (CALEA 41.2.2. a & i)

A.  Members may use deadly force to apprehend a fleeing felon ONLY when every other reasonable means of affecting the arrest or preventing the escape have been exhausted AND,

    1.  The suspect fleeing poses an immediate threat of death or serious bodily harm to the member or others; OR (CALEA 1.3.2)

    2.  There is probable cause to believe the crime committed or attempted was a felony which involved an actual or threatened attack which resulted, or could have resulted, in death or serious bodily harm; and

**NOT TO BE DISSEMINATED TO THE PUBLIC**

LAW ENFORCEMENT USE ONLY

         a.      There is probable cause to believe the person fleeing committed, or attempted to commit, the crime; AND

         b.      Failure to immediately apprehend the person places a member, or the public in immediate danger of death or serious bodily injury; AND

         c.      The lives of innocent people will not be endangered if the fleeing felon is pursued.

      3.      Warning to Subject

         When feasible, members shall identify themselves as police officers and issue a warning before discharging a firearm.

B.      Members involved in a vehicular pursuit of a suspect shall not intentionally cause physical contact between their vehicle and the fleeing vehicle, nor shall the member attempt to force the vehicle into another object or off the roadway.  (CALEA 41.2.2.g)

C.      Members are prohibited from firing shots at, or from, a moving vehicle, unless deadly force is being used against them or another person, or intentionally placing themselves in a position to be in front of an on-coming vehicle where the use of deadly force would likely be the outcome.  See, GO–RAR– 901.07 (Use of Force).

D.      Members shall immediately notify the dispatcher and discontinue the pursuit when unsafe conditions exist or it becomes apparent that the vehicular pursuit could result in an accident, property damage or injury to citizens. (CALEA 41.2.2.h)

E.      Members shall immediately terminate a pursuit when ordered by a Department official.  (CALEA 41.2.2.h)

F.      Members are prohibited from pursuing a vehicle for the purpose of affecting a stop for a traffic violation.

## V.   REGULATIONS

A.      The initiation of a pursuit must be based on the conditions cited in Part IV, Rules, Section A, 1 & 2 of this order.  Members shall weigh whether the immediate danger the pursuit presents to the member(s) and the public is less than the immediate or potential danger the suspect presents to the public should the suspect remain at large. (CALEA 41.2.2.a)

NOT TO BE DISSEMINATED TO THE PUBLIC

LAW ENFORCEMENT USE ONLY

B.      A member who is pursuing a fleeing felon shall:  (CALEA 41.2.2.b)

1.      Immediately notify the dispatcher; and

2.      Maintain constant communications with the dispatcher as the pursuit progresses.

C.      Members, in both the primary and secondary unit, shall maintain a safe distance between their vehicle and the fleeing vehicle, to ensure that there is enough reaction time, should the fleeing vehicle suddenly turn or brake. (CALEA 41.2.2.b & c)

D.      Members shall comply with the following traffic regulations when engaged in a vehicular pursuit:

1.      When approaching an intersection controlled by electric signal devices:

a.      Stop before entering the intersection when facing a red signal;

b.      Slow to the maximum legal speed limit when a green signal or a flashing yellow signal is displayed; and

c.      Stop before entering an intersection where four-way pedestrian walk signals are displayed.

2.      When approaching an intersection controlled by a stop sign, the operator of the vehicle shall stop before entering the intersection.

3.      When approaching an uncontrolled intersection or an intersection controlled by yield signs:

a.      Slow to the maximum legal speed limit before entering the intersection, and

b.      Comply with all other requirements applicable to uncontrolled intersections or intersections controlled by yield signs.

E.      Only the PRIMARY and SECONDARY units are permitted to engage in a pursuit, unless the dispatcher or Watch Commander allows additional units to assist in the pursuit.

F.      Members are prohibited from engaging in pursuits when a civilian, e.g. a Ride-Along, is in the patrol vehicle or when transporting a prisoner. (GO-OPS-204.04 (Ride-Along Program) and GO–PCA-502.01 (Transportation of Prisoners).

NOT TO BE DISSEMINATED TO THE PUBLIC

LAW ENFORCEMENT USE ONLY

G.      The use of roadblocks is strictly prohibited.  (CALEA 61.3.4)

H.      If a suspect is apprehended outside of the District of Columbia, e.g. in Maryland or Virginia, the suspect must FIRST be taken before a court in that jurisdiction, prior to being extradited to the District of Columbia.

I.      When a fleeing subject has committed an offense for which a vehicular pursuit is not authorized, the member shall:

1.      Provide a description of the vehicle and attempt to obtain the tag number;

2.      Attempt to obtain a description of the operator;

3.      Contact the dispatcher and request that he/she broadcast a lookout to surrounding jurisdictions to which the fleeing offender may be proceeding; and

4.      Conduct an investigation of the incident and obtain a warrant so that the offender can be apprehended and prosecuted.

J.      When a fleeing subject has committed an offense for which a vehicular pursuit is not authorized, members are permitted to pursue suspects on foot or on a mountain bike.

VI.    **PROCEDURAL GUIDELINES**

A.      Responsibilities of Members of the Department in Vehicular Pursuit (CALEA 41.2.2)

1.      Once a vehicular pursuit has been initiated in compliance with the provisions of this order, members who are engaged in the pursuit shall observe the following procedures: (CALEA 41.2.2-B)

a.      As the PRIMARY UNIT:

(1)    Immediately notify the dispatcher;

(2)    Activate all emergency equipment; and

(3)    TURN ON THE HEADLIGHTS regardless of the time of day.

b.      Members operating a 10-4 unit shall open BOTH FRONT WINDOWS and in a 10-99 unit the DRIVER'S FRONT

NOT TO BE DISSEMINATED TO THE PUBLIC

**LAW ENFORCEMENT USE ONLY**

WINDOW shall be opened so that the driver can hear other units responding to the area and to avoid a collision.

c.   The PRIMARY UNIT shall provide the dispatcher with:

   (1)   Their unit number;

   (2)   The suspected criminal violation(s) and location;

   (3)   The suspect's direction of travel and vehicle information;

   (4)   The number of occupants and their description, if possible; and

   (5)   Notification when the pursuit is entering another jurisdiction.

d.   The SECONDARY UNIT shall back-up the PRIMARY PURSUIT VEHICLE and refrain from using airtime, except for emergencies. In cases involving accidents, the SECONDARY UNIT will disengage from the pursuit to provide medical assistance and/or to take reports of any injuries and/or property damage.  (CALEA 41.2.2.c)

2.   When involved in a pursuit, the PRIMARY PURSUIT UNIT shall use the WAIL POSITION on the electronic siren selector and the SECONDARY PURSUIT UNIT shall use the YELP POSITION.

3.   Department vehicles shall be operated as emergency vehicles, when engaged in hot and fresh pursuits. Members shall not operate Department vehicles at speeds where they cannot control the vehicle, thereby endangering lives.

4.   The dispatcher shall control all communications on the channel where the pursuit is being conducted and radio transmissions shall be confined to those units involved in the pursuit.

5.   If airborne assistance becomes available, the helicopter shall only assist the primary and secondary units with the fleeing vehicle's direction of travel; both units shall continue the pursuit until it is terminated.

6.   Members operating any of the below listed Department vehicles may initiate and continue a vehicular pursuit, until a marked unit joins the pursuit, at which time, the operators of the below listed vehicles shall immediately discontinue their participation:   (CALEA 41.2.2. d)

**NOT TO BE DISSEMINATED TO THE PUBLIC**

a.  A motorcycle equipped as an authorized emergency vehicle;

b.  A patrol wagon that is not transporting prisoners;

c.  An unmarked sedan equipped with emergency devices; and

d.  Sport Utility Vehicle (SUV).

7.  The above vehicles shall continue to monitor the pursuit and proceed to the termination point, with appropriate authorization, to process any necessary reports and arrests.

8.  Members who are not in uniform and/or are in unmarked vehicles, without grill or portable lights, and/or sirens, may take enforcement action only in the case of a violation that is set forth under Part IV, A of this directive and after requesting the assistance of a marked cruiser. Once the marked cruiser has arrived on the scene the member shall discontinue the pursuit.

9.  A vehicular pursuit shall be continually assessed to determine whether it should be continued, taking into account the associated risk it presents to the member and the public. A decision to continue or terminate a pursuit may be made by the primary pursuit unit, the monitoring field supervisor or the Watch Commander.  This does not replace the obligation to adhere to a lawful order given by an official. (41.2.2.a & h)

10. Conditions under which a vehicular pursuit shall be terminated include, but are not limited to, the following:  (CALEA 41.2.2.a & h)

a.  When it becomes apparent that the vehicular pursuit could lead to unnecessary property damage, injury to citizen(s) or member(s) of the Department; or

b.  The pursuit is in close proximity to school(s) and hospital(s) and other locations with high pedestrian or vehicular activity; or

c.  When the distance between the pursuing member and the violator's vehicle is so great that the pursuing member loses sight of the violator and it becomes futile to continue the pursuit; or

d.  The violator is identified so that a warrant can be obtained for his/her arrest, and failure to apprehend does not pose an immediate threat of death or serious injury to another person; or

Revised
05/04/07

NOT TO BE DISSEMINATED TO THE PUBLIC

**LAW ENFORCEMENT USE ONLY**

      f.      When the time of day and locations are heavy with vehicular and pedestrian traffic.

11.     When it is apparent that a vehicular pursuit should be terminated, the member shall notify the dispatcher and broadcast the suspect's direction and method of travel.  If known, a description of the suspect, a lookout for the vehicle, including the tag number and its description shall be included in the broadcast. The member shall prepare any necessary reports.

B.     Fresh Pursuit Laws

1.     Pursuit of an offender who has committed a felony, to a surrounding jurisdiction is legal pursuant to the policy of this order. Because the consequences of fresh pursuit could be grave, and in some cases irreversible, it is imperative that all members have a clear and thorough understanding of their legal position while engaged in fresh pursuit.

      a.      The D.C. Official Code, § 23, Sections 901 through 903, provides that a police officer from another jurisdiction may enter the District of Columbia in fresh pursuit, in order to arrest a person "on the grounds that he/she is believed to have committed a felony" in the pursuing officer's State.  The pursuing officer has the same authority to arrest the person and hold him/her in custody as an MPD member.  The arrested person must be taken before a judge of the D.C. Superior Court, without unnecessary delay, for a hearing to determine the lawfulness of the arrest.

      b.      The Code of Maryland § 2–305 (Authority of officers of other states to arrest in this State), provides that a police officer may enter Maryland in fresh pursuit in order to arrest a person "on the grounds that he/she is believed to have committed a felony" in the pursuing officer's State (or the District of Columbia), and the pursuing member has the same power to arrest the person and hold him/her in custody as a Maryland officer.  The arrested person must be taken before a county circuit judge without unnecessary delay for a hearing to determine the lawfulness of the arrest.

      c.      The Code of Virginia  § 19.2-79 (Arrest by officers of other states of the United States), provides that a police officer may enter Virginia in close/fresh pursuit in order to arrest a person "on the ground that he/she has committed a felony" in the pursuing officer's state or the District of Columbia.  The pursuing

**NOT TO BE DISSEMINATED TO THE PUBLIC**

LAW ENFORCEMENT USE ONLY

officer has the same power to arrest that person and hold him/-her in custody as a Virginia officer.  The arrested person must be taken before a judge of a general district court, or the circuit court of the county or city where the arrest was made, without unnecessary delay, for a hearing to determine the lawfulness of the arrest.

NOTE:   The Office of the Attorney General, Commonwealth of Virginia, interprets the code provision "has committed" to mean that an officer need only have reasonable grounds or probable cause to suspect, rather than actual knowledge that a felony has been committed.

2.      When a pursuit enters another jurisdiction (e.g. Maryland or Virginia), the pursuing member shall notify the dispatcher and request authorization from the Watch Commander to proceed into the adjoining jurisdiction.  If authorization is granted, the member shall: (CALEA 41.2.2.i)

   a.      As soon as possible, allow the pursuing unit from the outside jurisdiction to assume responsibility for the chase and discontinue the pursuit. De-activate all emergency warning devices and continue to monitor the pursuit, via the radio dispatcher, and proceed to the termination point to identify the suspect and the vehicle;

   b.      If the situation culminates in the apprehension of a fleeing felon, the initiating MPD member shall place the suspect in the custody of the officer from the outside jurisdiction as a Fugitive from Justice and inform that officer of the crime the suspect will be charged with in the District of Columbia and the intent of the District of Columbia to request extradition of the suspect.

3.      If a felon wants to voluntarily return to the District of Columbia, he/she shall be taken before a judge of the local court or a justice of the peace by the arresting officer from the outside jurisdiction for the purpose of executing a waiver.

4.      When the felon does not want to return voluntarily, members shall place the felon in the custody of the officer from the outside jurisdiction and apply for a warrant in the District of Columbia.

5.      UNDER NO CIRCUMSTANCES shall a felon who was apprehended in Virginia, Maryland or any other state be returned to the District of Columbia without being processed through the criminal justice system

NOT TO BE DISSEMINATED TO THE PUBLIC

**LAW ENFORCEMENT USE ONLY**

of the state where he/she was apprehended, in accordance with the legal procedures applicable to that jurisdiction.

6.   Upon apprehension of the suspect, the MPD member shall contact the United States Attorney's Office in the District of Columbia to begin the extradition process.  Once authorization has been granted, members shall notify the holding agency of the outside jurisdiction with the following information:

a.   Prepare a Teletype message to be forwarded to the arresting jurisdiction, including the name and description of the defendant, date, charge, and authorization (issued by the Assistant United States Attorney) to hold the defendant; and

b.   Provide the United States Attorney's Office in the District of Columbia with the arrest affidavit. Upon approval of the warrant, the United States Attorney's Office will handle all further matters concerning the return of the wanted person(s).

C.   Fresh Pursuit into the District of Columbia from Outside Jurisdictions (CALEA 41.2.2.i)

1.   A duly sworn officer from another jurisdiction (e.g., Maryland or Virginia) is permitted to enter the District of Columbia in fresh pursuit and to continue the pursuit of an offender in order to arrest him/her on the grounds that he/she is believed to have committed a felony in the jurisdiction where the pursuit began. However, there is no authorization under the District of Columbia Code for an officer from another jurisdiction to affect an arrest within the District of Columbia for a misdemeanor offense.

a.   In cases where a suspect being pursued by an officer from an outside jurisdiction is apprehended, the vehicle operator and/or suspect may be charged with any violations committed in the District of Columbia, regardless of other actions taken in the case.

b.   Members of this Department who respond to a scene to assist an officer from an outside jurisdiction, at the end of a pursuit and discover that the crime for which the suspect was pursued was not a felony shall:

(1)   Assist the officer from the outside jurisdiction. This may include, but is not limited to, initiating a contact or conducting a stop and frisk, whichever is appropriate for the situation.

**NOT TO BE DISSEMINATED TO THE PUBLIC**

**LAW ENFORCEMENT USE ONLY**

    (2)    If, after conducting a contact or stop and frisk, the member still does not have grounds to arrest the suspect for a felony or a probable cause misdemeanor, the suspect shall be permitted to leave.

    (3)    Under no circumstances shall a person arrested in the District of Columbia, whether by a member of this Department or an officer of another jurisdiction, be permitted to be removed from this jurisdiction without being extradited through the Court of the District of Columbia in accordance with the D.C. Official Code.

  2.    An operator of a Department vehicle shall not participate in a vehicular pursuit initiated by other law enforcement agencies operating within the District of Columbia or a vehicular pursuit initiated by officers of outside jurisdictions, which enter or terminate in the District.

D.    Responsibilities of the Public Safety Communications Center
(CALEA 41.2.2 - e)

  1.    The Director, Public Safety Communications Center, shall:

    a.    Ensure that the policy and procedures outlined in this directive are followed by members assigned to the center;

    b.    Forward training recommendations, through channels, to the Director, Institute of Police Science ; and

    c.    Forward policy recommendations, through channels, to the Senior Executive Director, Office of Organizational Development.

  2.    The Communications Supervisor shall:

    a.    Ensure that the provisions of this order and the Division's policies were followed in situations involving a vehicular pursuit;

    (1)    Identify any training needs;

    (2)    Determine whether any modifications need to be made to this order and/or the Communications Center policy; and

    (3)    Submit any training or policy recommendations to the communications center director.

**NOT TO BE DISSEMINATED TO THE PUBLIC**

LAW ENFORCEMENT USE ONLY

    b.     Monitor fresh pursuit situations;

    c.     Obtain complaint system (CS) numbers for all vehicular pursuits involving Department vehicles from the Office of Internal Affairs; and

    d.     Ensure that a copy of the tape-recorded radio transmission involving a vehicular pursuit is forwarded to the Office of Professional Responsibility within twenty-four hours of the incident.

3.     The Communications Dispatcher shall:

    a.     Have authority to control and coordinate a vehicular pursuit, by assigning the radio channel to be used by the primary and secondary units.  All radio transmissions on the designated channel shall be confined to the units assigned by the dispatcher to participate in the vehicular pursuit.

    b.     Upon notification from a mobile unit that a vehicular pursuit has been initiated;

        (1)    Identify and give priority to the primary pursuit and secondary pursuit units,

        (2)    Immediately notify a Communications Division supervisor,

        (3)    As soon as possible, identify a field supervisor of the organizational element to which the pursuit vehicles are assigned to monitor the pursuit,

        (4)    Record all incoming information relating to the pursuit and perform relevant records and vehicle checks in an attempt to identify the owner and/or the violator,

        (5)    Assign no more than three Department vehicles to handle a pursuit: the primary and secondary units, and a field supervisor,

        (6)    Ascertain whether a helicopter is available to respond, and

        (7)    Notify other mobile units, as necessary, of the pursuit in progress.

NOT TO BE DISSEMINATED TO THE PUBLIC

LAW ENFORCEMENT USE ONLY

    c.      Voice a command to the affect that no other vehicles shall participate in the pursuit, unless specifically authorized to do so by the Watch Commander, when the primary and secondary units have been assigned to a pursuit.

    d.      In fresh pursuit situations, a Communications supervisor shall monitor the pursuit and the radio dispatcher shall be responsible for notifying the dispatcher of the adjacent jurisdiction that the pursuit has crossed their boundary, and for maintaining liaison, via the Police Mutual Aid Radio System (PMARS), with any jurisdiction that is involved or may become involved.

    e.      Take the following steps when a member of a law enforcement agency, other than this Department, initiates a vehicular pursuit;

        (1)      Advise mobile units, as appropriate, of the general direction and progress of the pursuit, as well as any other pertinent information; and

        (2)      When the pursuit terminates in the District of Columbia, designate two mobile units and one supervisory vehicle to respond to the termination point for the purpose of assisting the pursuing member; and

        (3)      Broadcast the necessary lookout information to assist other mobile units in locating the vehicle and/or possible suspects when a pursued vehicle is lost.

E.     The Field Supervisor shall:  (CALEA 41.2.2. f)

    1.     Immediately begin monitoring a vehicular pursuit involving a member of their assigned organizational element;

    2.     Determine whether the pursuit was initiated in accordance with the provisions of this order;

    3.     Approve or disapprove pursuits that enter into another jurisdiction and ensure that units are in compliance with inter-jurisdictional pursuit agreements and the law;

    4.     Continuously monitor radio transmissions to determine whether the pursuit should be continued or terminated;

    5.     Approve the assignment of additional backup units to assist the primary and secondary units and secure the location where the pursuit

NOT TO BE DISSEMINATED TO THE PUBLIC

**VEHICULAR PURSUITS (GO - OPS – 301.03)**                    14 of 16

terminates, in order to assist with the preliminary investigation, in the event the incident turns into a foot pursuit;

6.    Respond to all scenes where injury and property damage occur as a result of the vehicular pursuit;

7.    Conduct an administrative review with the members involved in the pursuit as soon as practical at the end of each pursuit to:  (CALEA 41.2.2. j)

   a.    Determine whether the pursuit was conducted in compliance with this order;

   b.    Identify any pursuit patterns or trends that indicate training needs; and

   c.    Determine whether any modifications need to be made to the policy herein.

8.    Notify the Watch Commander of the circumstances involved in the vehicular pursuit as soon as practical.

9.    Ensure that PD Form 845 (Vehicular Pursuit Report) is completed by all involved members prior to the end of their tour and submit the completed report to the Watch Commander.

F.    The Watch Commander shall:

1.    Review the Vehicular Pursuit Report, to confirm that the provisions of this order were followed. Attach the report to the PD Form 150 (Watch Commander's Report.)  When vehicular pursuits result in accidents with injuries or property damage, copies of all reports shall be forwarded through channels to the Office of General Counsel.

2.    Review any recommendations submitted by the field supervisor regarding the vehicular pursuit; and

   a.    Forward any recommendations concerning training, through channels, to the Director, Institute of Police Science, or

   b.    Forward any recommended policy modifications, through channels, to the Senior Executive Director, Office of Organizational Development.

**LAW ENFORCEMENT USE ONLY**

**VEHICULAR PURSUITS (GO - OPS – 301.03)**                    15 of 16

G.    The Director, Institute of Police Science shall:

1.    Receive and review training recommendations resulting from vehicular pursuit incidents and investigations.

2.    Incorporate appropriate training recommendations into Department training curricula.

3.    Conduct a documented annual analysis, in consultation with the Senior Executive Director, Office of Organizational Development, to assess Department training and/or policy needs relative to vehicular pursuit situations.  (CALEA 41.2.2)

H.    The Commanding Officer shall:

1.    Ensure that members comply with the policy and procedures outlined in this order.

2.    Assign a non-involved element official, the rank of Captain or above, to conduct an investigation into the facts and circumstances surrounding ALL vehicular pursuits involving MPD vehicles.

I.    Office of Internal Affairs shall:

1.    Assign complaint system (CS) numbers to vehicular pursuit incidents and provide those numbers to the Communications supervisor or requesting official.

2.    Monitor and/or investigate a vehicular pursuit involving a fatality, in conjunction with the Major Crash Unit.

3.    Prepare an annual report relating the findings of Department vehicular pursuit investigations.

J.    Major Crash Unit

The Major Crash Unit shall investigate vehicular pursuits involving fatalities, in conjunction with the Office of Internal Affairs.

**NOT TO BE DISSEMINATED TO THE PUBLIC**

**VII.      CROSS REFERENCES**

> 1.    District of Columbia Municipal Regulations, Title 6A, Police Personnel, Chapter 2, Section 207
> 2.    General Order 901.7, Use of Force
> 3.    General Order 302.5, Radio Communications
> 4.    General Order 302.1, Calls for Police Services


// SIGNED //
Charles H. Ramsey
Chief of Police


Attachments


CHR:NAJ:MAR:pas

LAW ENFORCEMENT USE ONLY

PD Form 845 10/02

# METROPOLITAN POLICE DEPARTMENT
# VEHICULAR PURSUIT REPORT

_____
(Organizational Element)

## GENERAL INFORMATION

Date_____

Time_____

Vehicular pursuit was initiated at _____
(Location)

Nature of pursuit_____

Vehicular pursuit terminated at _____
(Location)

## AUTHORIZATION

Dispatcher Notified  __YES          Authorization __YES          __Primary Unit
___NO                              ___NO          __Secondary Unit
                                                  _Other

By Whom_____

## VEHICLE OPERATION

_____          Vehicle Headlights On     __YES
(MPD Vehicle Operated/Unit Call Sign)                             __ NO

Emergency Equipment Activated __YES     Vehicle Windows Down   __YES
___NO                                                          ___NO

## SAFETY

Accident involved __ YES __NO          Injuries __Yes __NO     MPD Member __YES __NO
CCN #_____(Attach copy of report)  (List Injured Person Names Below)
Witnesses __YES ___NO                  _____
(List witness names below)             _____
_____        _____
_____        _____
_____        _____
Use of Force __YES __ NO
(if yes, list type of Force Used)

_____
Reporting Officer Name/Badge Number
(Print Name)

NOT TO BE DISSEMINATED TO THE PUBLIC

# EXHIBIT D

🇺🇸 An official website of the United States government  Here's how you know ⌄

| | |
|---|---|
| 8-3.010 | Introduction |
| 8-3.100 | Coordination of Activities |
| 8-3.120 | Staffing Cases |
| 8-3.130 | Cases of National Interest |
| 8-3.140 | Advance Notice/Prior Approvals of Indictments |
| 8-3.141 | Certification Provisions |
| 8-3.142 | Coordination of Immunity Requests and Requests for Juvenile Certification |
| 8-3.150 | Declinations |
| 8-3.160 | Appeals |
| 8-3.170 | Cooperation with State Prosecutions |
| 8-3.180 | Subpoenas Issued to FBI Agents or Other Federal Agents |
| 8-3.190 | Notification to Parties of Closing File |
| 8-3.195 | Production or Disclosure in Federal And State Proceedings of Material or Information in Civil Rights Division Files |
| 8-3.200 | Prior Approvals |
| 8-3.300 | Neutral and Objective Criteria for Guiding Prosecutorial Discretion |
| 8-3.400 | Prosecution of Customers Involved in Federal Sex Trafficking Offenses |
| 8-3.500 | Collection of Special Assessments and Restitution for Offenses under Chapters 77, 109A, 110, and 117, and 8 U.S.C. § 1324 |

## 8-3.010 - Introduction

The United States Attorneys and the Civil Rights Division share responsibility for enforcement of criminal civil rights statutes. The Assistant Attorney General for the Civil Rights Division and the Civil Rights Division's Criminal Section oversee that enforcement. The principal criminal statutes whose enforcement is overseen

by the Civil Rights Division are 18 U.S.C. § 241 (Conspiracy to Injure Citizens in the Exercise of Federal Rights); 18 U.S.C. § 242 (Willful Deprivations of Federal Rights Under Color of Law); 18 U.S.C. § 245 (Interference with Federally Protected Activities); 18 U.S.C. § 247 (Damage to Religious Property); 18 U.S.C. § 248 (Freedom of Access to Clinic Entrances); 18 U.S.C. § 249 (Hate Crime Prevention Act); 42 U.S.C. § 3631 (Interference with Fair Housing Activities); 18 U.S.C. § 1581 (Peonage); 18 U.S.C. § 1584 (Involuntary Servitude); 18 U.S.C. § 1589 (Forced Labor); 18 U.S.C. § 1590 (Trafficking with Respect to Servitude); 18 U.S.C. § 1591 (Sex Trafficking); 18 U.S.C. § 1592 (Document Servitude), and 18 U.S.C. § 1594(a), (b), and (c) (Attempting and Conspiring to Violate Trafficking Statutes). United States Attorneys' Offices, working in coordination with the Civil Rights Division, are jointly responsible for enforcement of criminal civil rights statutes in their individual districts.

[updated March 2018]

---

## 8-3.100 - Coordination of Activities

The Civil Rights Division and the United States Attorneys' Offices will work as partners to ensure a vigorous national civil rights enforcement program. The purpose of this chapter is to provide guidance to the United States Attorneys and the Criminal Section of the Civil Rights Division in carrying out their responsibilities in the investigation and prosecution of violations of criminal civil rights statutes in a manner that (1) encourages initiative on the part of individual United States Attorneys' Offices and draws upon their litigation expertise and knowledge of the local community; and (2) utilizes the trial expertise and institutional knowledge of the Criminal Section of the Civil Rights Division. Cooperative prosecutions and investigations utilizing attorneys from both the Criminal Section and the United States Attorneys' Offices can be particularly successful and can provide valuable benefits in the enforcement of these statutes. When it is appropriate for either the Civil Rights Division or a United States Attorney's Office to act independently on a matter in a particular district, the office initiating the activity should ensure that the other office is notified in advance. Specifically, prior to initiating any significant activity in a district, the Civil Rights Division shall provide notice to the designated contact attorney for the United States Attorney's Office. Similarly, United States Attorneys' Offices shall advise the Civil Rights Division of matters not already being monitored by the Civil Rights Division that appear likely to result in inquiries to the Civil Rights Division.

United States Attorneys' Offices and attorneys from the National Security Division should consult with the Civil Rights Division in any case involving an act of domestic terrorism in which the underlying incident was motivated in whole or in part (or is suspected of being motivated in whole or in part) by one of the bias motivations listed in any federal hate crime statute, 18 U.S.C. §§ 245, 247, 249 or 42 U.S.C. § 3631. The Civil Rights Division should also be consulted on any domestic terrorism case in which the underlying act was motivated in whole or in part by the perpetrator's views or beliefs about reproductive health services, as such motivation falls under Freedom of Access to Clinic Entrances, 18 U.S.C. § 248, enforced by the Civil Rights Division.

[updated March 2018]

---

## 8-3.120 - Staffing Cases

Subject to the general principles contained herein, either the Civil Rights Division or a United States Attorney's Office may investigate and prosecute on its own any type of criminal civil rights violation.

At the outset of a criminal investigation initiated by a United States Attorney's Office that may implicate federal criminal civil rights statutes, including human trafficking and involuntary servitude statutes, 18 U.S.C. §§ 1581 to 1594, and in no event later than ten days before the commencement of the examination of witnesses before a grand jury, the United States Attorney's Office shall advise the Civil Rights Division in writing of the new investigation. The notification should be in writing and contain the following information: (1) identity of the targets of the investigation; (2) the factual allegations under investigation; (3) the statutes that may have been violated; (4) the United States Attorney's Office's assessment of the significance of the case and whether the case is one of "national interest," as

9/29/21, 3:59 PM
Case 1:21-cr-00598-PLF Document 17 Filed 10/03/21 Page 53 of 84
3-3000 - Enforcement of the Civil Rights Criminal Statutes | JM | Department of Justice

defined below; and (5) the United States Attorney's Office's proposed staffing of the matter, including whether a Civil Rights Division attorney should be assigned to work directly on the matter. The United States Attorney's Office will advise the Civil Rights Division as the case develops of new information relating to the United States Attorney's Office's assessment of the case and whether it is one of "national interest."

When an attorney from the Criminal Section of the Civil Rights Division is jointly working on a case, notification to that attorney is sufficient. If there is no attorney from the Criminal Section assigned to the case, notification should be made to the Deputy Chief who has supervisory authority over cases in the district conducting the investigation or to the Principal Deputy Chief. In cases involving human trafficking or involuntary servitude, notification under this provision shall be made to the Criminal Section's Human Trafficking Prosecution Unit at HTPU@usdoj.gov.

Similarly, at the outset of a criminal investigation initiated by the Civil Rights Division, the Division should notify the United States Attorney(s) for the district(s) in which the conduct occurred in writing of the new investigation, containing the above information.

In cases involving sex trafficking of minors in violation of 18 U.S.C. § 1591, the Child Exploitation and Obscenity Section of the Criminal Division should also be notified.

The staffing proposal of the United States Attorney will be given deference by the Civil Rights Division. If the Civil Rights Division does not express disagreement with a staffing proposal by the United States Attorney within three business days, the proposal is deemed acceptable. The Assistant Attorney General of the Civil Rights Division retains the final and on-going authority to determine the staffing of any criminal civil rights matter that is being handled jointly.

[updated March 2018] [cited in JM 8-3.200; JM 9-2.400; JM 9-75.030]

## 8-3.130 - Cases of National Interest

A case of "national interest" is one that presents important public policy considerations; a case that presents a novel issue of law; a case that because of peculiar facts and circumstances may set important precedent; a case with simultaneous investigations in multiple districts (unless the United States Attorney's Office in each district and the Civil Rights Division conclude that national interests are not involved); a case with international or foreign policy implications; a case that is urgent or sensitive; or a case that substantially affects the uniform application of the law. A case involving a violation of the federal criminal civil rights laws resulting in death is presumed to be a case of national interest.

The Assistant Attorney General for the Civil Rights Division, after consultation with the United States Attorney, shall determine whether a case is of "national interest," considering the factors listed above. In a case of national interest, the Assistant Attorney General, after consultation with the United States Attorney, may require the United States Attorney's Office and the Civil Rights Division to participate jointly as co-counsel from the initiation of the investigation through prosecution. The Assistant Attorney General for the Civil Rights Division, after consultation with the United States Attorney, shall take into consideration all of the circumstances, including the experience of the particular United States Attorney's Office and the efficient use of government resources in making staffing decisions. The Assistant Attorney General for the Civil Rights Division, after consultation with the United States Attorney's Office, may also determine that a case is best staffed by attorneys only from the United States Attorney's Office or only from the Civil Rights Division.

In a case of national interest or that is presumptively of national interest, the United States Attorney's Office in the relevant district, the FBI, and the Civil Rights Division should consult and coordinate with each other before any press conference is held or before any statement is made to the media.

[updated March 2018]

## 8-3.140 - Advance Notice/Prior Approvals of Indictments

United States Attorneys need not obtain prior authorization by the Civil Rights Division to indict criminal civil rights cases, including human trafficking or involuntary servitude cases, unless the case has been deemed by the Assistant Attorney General for the Civil Rights Division as a case of national interest or unless approval is necessary due to a statutory certification requirement. *See* Section 8-3.141. However, prior to presenting any civil rights case for indictment, the United States Attorney's Office shall provide written notification to the Civil Rights Division of the intention to seek an indictment or to file a felony information. This notification should occur at least 10 business days before the indictment will be presented to the grand jury, except in emergencies when time is of the essence. The notification should be accompanied by a copy of the proposed indictment and a prosecutive memorandum. United States Attorneys' Offices are encouraged to provide even earlier notice as a general practice in order to take full advantage of the expertise of the Civil Rights Division.

Even in those cases in which the United States Attorney's Office need not obtain prior authorization to indict, if there exists a significant issue affecting the Department of Justice's enforcement of federal civil rights laws, then the Assistant Attorney General for the Civil Rights Division may exercise the ultimate authority to disapprove the prosecution.

If prior approval to indict a civil rights matter is required because the case has been deemed by the Assistant Attorney General for the Civil Rights Division to be a case of national interest or because there is a statutory certification requirement, the United States Attorney's Office will provide to the Civil Rights Division a copy of the proposed indictment and any prosecutive memorandum at least 10 business days in advance of the time when the indictment will be presented to the grand jury. The Civil Rights Division will communicate its authorization decision within 10 business days of receipt of the proposed indictment, unless certification by ranking Department officials is required by law, 18 U.S.C. §§ 245, 247, and 249.

When an attorney from the Criminal Section of the Civil Rights Division is jointly working on a case, or has been formally assigned to assist with legal issues, the indictment may be sent to the attorney assigned to the case. If there is no attorney in the Criminal Section formally assigned to the case, notification should be made to the Deputy Chief with supervisory authority over cases from the district seeking indictment approval or to the Principal Deputy Chief. In cases involving human trafficking or involuntary servitude, notification under this provision shall be made to the Criminal Section's Human Trafficking Prosecution Unit at HTPU@usdoj.gov.

[updated March 2018] [cited in JM 8-3.200]

---

## 8-3.141 - Certification Provisions

Several federal hate crime statutes require certification from the Attorney General or from his or her designee before prosecution may be undertaken. *See* 18 U.S.C. §§ 245, 247, and 249. The Assistant Attorney General for the Civil Rights Division has been delegated this certification authority. *See* 28 C.F.R. § 0.50 (delegating authority for §§ 245 and 249); Attorney General Order No. 2048-96, Delegation of Authority to Authorize the Initiation of Prosecutions under 18 U.S.C § 247 (delegating authority for § 247). No indictment, information, or criminal complaint under these statutes may issue without such certification.

When an attorney from the Criminal Section of the Civil Rights Division is jointly working on a case with attorneys from a United States Attorney's Office, or when an attorney from the Criminal Section of the Civil Rights Division has been formally assigned to assist the United States Attorney's Office with legal issues, the request for certification may be sent to the attorney assigned to the case who will then provide advice and assistance in the certification process. If there is no attorney in the Criminal Section formally assigned to the case, the request for certification should be sent to the Deputy Chief with supervisory authority over cases from the district seeking certification or the request may be sent to the Principal Deputy Chief. In cases charging conspiracies to violate these statutes or solicitations to violate these statutes, notice should be given to the Criminal Section and may be provided in the same manner.

Case 1:21-cr-00598-PLF  Document 47  Filed 10/03/21  Page 55 of 84

[added March 2018]

**8-3.142 - Coordination of Immunity Requests and Requests for Juvenile Certification**

Any time a United States Attorney's Office submits a request, in accordance with §§ 9-23.100 *et seq.* of the United States Attorney's Manual (JM), to immunize a witness in a civil rights case, including in a human trafficking case, the request should be coordinated through the Criminal Section of the Civil Rights Division. In cases in which an attorney from the Criminal Section is jointly working a case with attorneys from a United States Attorney's Office, or when an attorney from the Criminal Section of the Civil Rights Division has been formally assigned to assist the United States Attorney's Office with legal issues, coordination with the assigned attorney is sufficient. If there is no attorney from the Criminal Section formally assigned to the case, the request should be sent in advance to the Deputy Chief with supervisory authority over cases from the district seeking immunity or the request may be sent to the Principal Deputy Chief.

Similarly, any time a United States Attorney's Office requests authorization to proceed against a juvenile subject in a civil rights case, in accordance with §§ 9-8.000 of the JM, that request should be coordinated through the Criminal Section, either through an attorney assigned to the case, or through the appropriate Deputy Chief or through the Principal Deputy Chief.

Any time a United States Attorney's Office requests authorization to prosecute a case after a state prosecution, in accordance with the dual prosecution policy (Petite Policy) set forth in § 9-2.031 of the JM, in a case involving civil rights charges, including human trafficking charges, that request should be coordinated through the Criminal Section, either through an attorney assigned to the case, or through the appropriate Deputy Chief or through the Principal Deputy Chief.

[added April 2018]

## 8-3.150 - Declinations

The United States Attorneys' Offices may decline cases by orally advising the FBI or other lead federal investigative agency of the declination. The declination should then be reflected in the investigative report submitted by the FBI or other lead federal investigative agency.

In all cases resulting in death, the Civil Rights Division will obtain the concurrence of the United States Attorney's Office before closing any such case.

Ultimate declination authority in any case arising under the federal civil rights laws resides with the Assistant Attorney General for the Civil Rights Division. While cases should be declined after coordination between the Civil Rights Division and the United States Attorneys' Offices, a declination by a United States Attorney's Office does not bind the Civil Rights Division.

[updated March 2018]

## 8-3.160 - Appeals

Appeals in civil rights cases are supervised by the Appellate Section of the Civil Rights Division. Additional information regarding notification and coordination between United States Attorneys' Offices and the Civil Rights Division of appeals of civil rights cases in which the United States participates as a party and as amicus curiae are set forth in §§ 8-2.150 and 8-2.170 of the JM. For responsibilities of United States Attorneys' Offices in the handling of criminal appeals, *see* JM 2-3.210.

[updated March 2018]

## 8-3.170 - Cooperation with State Prosecutions

Frequently, conduct which deprives persons of federally protected rights in violation of federal law also violates state law. In such cases, where state and local authorities undertake prosecution in state courts, it is Department of Justice policy to cooperate with the local prosecutor unless there is a good faith basis that is supported by the law, the facts, or other established Department of Justice Policy, to disagree with the state's decision to prosecute or with its conduct of a prosecution.

Any release of reports of investigative materials should be undertaken in accordance with 28 C.F.R. Part 16 and §§ 1-6.000 *et seq.* of the JM.

[updated March 2018]

## 8-3.180 - Subpoenas Issued to FBI Agents or Other Federal Agents

Occasionally FBI agents, or other federal agents, are subpoenaed to appear to testify in local proceedings or even in federal proceedings to which the United States is not a party. Quite often the subpoena is issued on behalf of a state defendant in a criminal case seeking to obtain the results of an FBI investigation into alleged police mistreatment of the defendant. This can also arise with regard to other federal agents in prosecutions relating to human trafficking.

The Department of Justice's policy is generally to resist such a subpoena except where the agent can give eyewitness fact testimony like any other witness. *See* 28 C.F.R. Part 16 and §§ 1-6.100 *et seq.* of the JM. There may be unique and limited circumstances in which the FBI (or other federal agency), the Criminal Section of the Civil Rights Division, and the United States Attorney's Office all agree that testimony of an agent is in the interest of justice. In such a case, the agent may testify. In all cases involving requests for testimony in cases related to civil rights investigations or prosecutions, it is expected that the Civil Rights Division, the relevant United States Attorney's Office, and the FBI will consult. In no event should any component represent to a court or defense counsel that an agent will provide testimony without consultation with the other components.

When subpoenas are issued to Department of Justice attorneys or agents for either testimony or records in any civil rights matter, the Assistant Attorney General for the Civil Rights Division has ultimate authority to determine the Department of Justice's position regarding compliance with the subpoena. Any motions to quash or related proceedings should be handled by the United States Attorney's Office in consultation with the Civil Rights Division. In cases involving a request for records authored by the FBI, the FBI must be consulted before decisions are made about whether the records are turned over.

[updated March 2018]

## 8-3.190 - Notification to Parties of Closing File

Because criminal civil rights cases often spark intense public interest, it is often the practice to send case-closing notification letters in cases closed without indictment or prosecution. The practice of sending notification letters of case closings is particularly encouraged in cases of police misconduct and other cases involving law enforcement officer subjects.

It is important that United States Attorneys' Offices advise the Criminal Section as soon as possible of any matters involving police misconduct (or other criminal civil rights cases in which a subject acted under color of law) that they believe may have prosecutive merit. This notification should occur not more than 30 days after receipt of the final FBI report in the matter. The Criminal Section of the Civil Rights Division will not send notification letters if a United States Attorney's

Case 1:21-cr-00598-PLF Document 47 Filed 10/03/21 Page 57 of 84

Office has expressed an interest in investigating or prosecuting non-civil rights charges against the subject or subjects, unless the letter has been expressly authorized by the United States Attorney's Office.

In some rare, high profile, or complex matters, attorneys from the Civil Rights Division and the United States Attorney's Office may elect to meet with families of a victim to explain the basis for a closing decision. United States Attorneys' Offices who wish to employ such a procedure in a particular case should consult with the Criminal Section well in advance.

[updated April 2018]

---

### 8-3.195 - Production or Disclosure in Federal And State Proceedings of Material or Information in Civil Rights Division Files

General procedures to be followed by Department of Justice employees in responding to demands for Department of Justice information in federal and state proceedings are contained in 28 C.F.R. Part 16 and in §§ 1-600 *et seq.* of the JM.

[updated March 2018] [cited in JM 8-2.190]

---

### 8-3.200 - Prior Approvals

| 8-3.120 | At the outset of a criminal investigation initiated by a United States Attorney's Office that may implicate federal criminal civil rights statutes, including human trafficking and involuntary servitude statutes, and in no event later than ten days before the commencement of the examination of witnesses before a grand jury. | Civil Rights Division must be advised in writing. |
|---------|----|----|
| 8-3.120 | In cases involving sex trafficking of minors in violation of 18 U.S.C. § 1591. | Notify the Child Exploitation and Obscenity Section of the Criminal Division. |
| 8-3.140 | Indictments of civil rights cases deemed by the Assistant Attorney General, Civil Rights Division, to be of national interest, or as required by statute. | The Civil Rights Division must provide authorization prior to indictment, information, or complaint. |

[updated April 2018]

---

### 8-3.300 - Neutral and Objective Criteria for Guiding Prosecutorial Discretion

Government Attorneys shall enforce 18 U.S.C. § 249 in a neutral and objective manner. All prosecutions shall comport with the Principles of Federal Prosecution set forth in JM Chapter 9-27.000. Attorneys for the government are particularly instructed to follow the dictates of JM 9-27.260, which prohibits attorneys for the government from being influenced in making prosecution decisions by any subject's race, religion, sex, national origin, or political association, activities or beliefs. In addition, government attorneys should not be influenced by a subject, victim, or witness's sexual orientation, gender identity, or disability, except to the extent such characteristic is relevant to a determination whether the statute has been violated.

Section 249 requires that attorneys for the government consider whether evidence is sufficient to prove that a criminal act identified by the statute occurred because of the actual or perceived race, religion, gender, national origin, sexual orientation, gender identity, or disability of any person. In no case, however, shall the government attorney be influenced by his or her own personal feelings concerning the subject or the subject's associates; the victim or the victim's associates; or a witness or a witness's associates. Nor shall the attorney for the government be influenced by the effect the decision to prosecute (or not to prosecute) may have on the attorney's own professional or personal circumstances. *See* JM 9-27.260. No attorney for the government may make prosecution or declination decisions based solely upon the speech or expressive conduct of a subject, victim, or witness. Nor shall any attorney for the government make such prosecution or declination decisions based solely upon such a person's affiliation with any group advocating for or against rights of persons with the characteristic identified by statute. Such factors may be considered only to the extent that they inform a reasoned, neutral decision about whether § 249—or any other criminal statute—has been violated.

In choosing to pursue a prosecution under this statute, the primary responsibility of Government attorneys shall be to seek justice. A government attorney shall file only those charges which he or she reasonably believes can be substantiated at trial through admissible evidence. Charging and declination decisions should be made based upon the facts and totality of the circumstances in each individual case.

[updated March 2018]

---

### 8-3.400 - Prosecution of Customers Involved in Federal Sex Trafficking Offenses

It is the policy of the Department of Justice to reduce demand for sex trafficking by prosecuting those who engage in commercial sex with victims of sex trafficking, in addition to those who otherwise perpetrate or facilitate human trafficking offenses, in accordance with the Principles of Federal Prosecution (Justice Manual 9-27.000). Such prosecutions can be brought under a variety of federal statutes, including 18 U.S.C. § 1591(a) (which provides a penalty for those who, among other things, recruit, entice, obtain, patronize, or solicit an individual for commercial sex, knowing or in reckless disregard that the individual is a victim of sex trafficking); 18 U.S.C. § 2251 (criminalizing the production of child sexual abuse material); and 18 U.S.C. §§ 2421-2423 (criminalizing travel, transportation, and enticement or coercion of victims to engage in prostitution).

[added December 2020]

---

### 8-3.500 - Collection of Special Assessments and Restitution for Offenses under Chapters 77, 109A, 110, and 117, and 8 U.S.C. § 1324

The Domestic Trafficking Victims' Fund ("Fund") was established by the Justice for Victims of Trafficking Act. *See* 18 U.S.C. § 3014(c). Money collected from a $5,000 special assessment on offenders convicted of human trafficking, sexual assault, child sexual exploitation, and alien smuggling is placed into the Fund for grants to programs that assist victims of those crimes. *Id.* §§ 3014(a), (e), (h). The Fund is scheduled to expire on September 30, 2021, but may be extended by Congress. *Id.* § 3014(a). Prosecutors handling sentencings after that date should confirm whether the Fund has been extended. In an effort to continue to support the Fund, all Department attorneys handling cases in which a special assessment is required should use their best efforts to collect the assessment imposed under section 3014(a). Because payment of the special assessment is mandatory unless the defendant is indigent, Department attorneys should make every effort to identify and provide sufficient facts to allow courts to determine the defendant's ability to pay forthwith the $5,000 special assessment established in section 3014(a), or alternatively, identify and provide facts and information about the defendant's ability to pay the assessment in the future. Department attorneys should present information relevant to the defendant's current and future ability to pay a special assessment to the district court through the United States Probation Department, so it may be included in the pre-sentence report. In addition, Department attorneys should include this same information in any

sentencing memorandum or pleadings filed with the district court. If the defendant is non-indigent, Department attorneys should consult with their component's financial litigation coordinator to provide the district court with a suggested payment plan for the defendant to pay the assessment.

Furthermore, Department attorneys shall pursue restitution and forfeiture orders for victims. Both restitution and forfeiture are mandatory – regardless of the defendant's ability to pay – for these crimes. *See, e.g.*, 18 U.S.C. § 1593 (restitution for human trafficking victims); 18 U.S.C. § 2248 (restitution for sexual assault victims); 18 U.S.C. § 2259 (restitution for victims of child sexual abuse material); 18 U.S.C. § 2429 (restitution for victims of transportation, travel, and enticement and coercion offenses); and 18 U.S.C. § 3663A (restitution for crimes of violence and Title 18 offenses against property – including by fraud or deceit). *See also* 18 U.S.C. § 1594 (forfeiture for human trafficking victims)[1]; 18 U.S.C. § 2253 (forfeiture for victims of child sexual abuse material). In fact, restitution and forfeiture are not mutually exclusive but are complementary of each other. By statute, judges are required to order both, where applicable and appropriate. *See* Fed. R. Crim. P. 32.2(b)(1)(A) (forfeiture); 18 U.S.C. §3556 (2013) (restitution). In human trafficking cases, restitution is mandatory even if the victim engaged in illegal conduct as a result of being trafficked. Even when restitution is not mandatory, the sentencing court may require restitution in accordance with a plea agreement (18 U.S.C. § 3663A(a)(3)), or pursuant to the court's discretion (18 U.S.C. § 3663). The court may also require restitution as a condition of probation or supervised release (18 U.S.C. §§ 3563(b)(2); 3583(d)). Department employees' obligations with regard to forfeiture, ensuring victims obtain restitution, and best practices for doing so are addressed in the Attorney General Guidelines for Victim-Witness Assistance, in particular, Article V.H, *available at* https://www.justice.gov/sites/default/files/olp/docs/ag_guidelines2012.pdf, and in Justice Manual 9-16.320 (Plea Agreements and Restitution). Additionally, Department attorneys should consult with their component's financial litigation or asset forfeiture coordinators to ensure that any and all authorized collection methods and remedies are used to satisfy the special assessment and provide victims with full and timely restitution. *See* 18 U.S.C. § 3771(a)(6).

---

[1] On May 29, 2015, the Justice for Victims of Trafficking Act (Pub. L. 114-22, May 29, 2015, 129 Stat. 227), was enacted. As a result, 18 U.S.C. § 1594 directs the Attorney General to pay victim restitution orders in cases where a forfeiture occurs pursuant to § 1594. *See* 18 U.S.C. § 1594(f)(1).

[added December 2020]

‹ 8-2.000 - Enforcement Of Civil Rights Civil Statutes       up       Title 9: Criminal ›

# EXHIBIT E

# GENERAL ORDER



METROPOLITAN
POLICE

**DISTRICT OF COLUMBIA**

| Title | | |
|---|---|---|
| **Field Contacts, Stops, and Protective Pat Downs** | | |
| Topic | Series | Number |
| **OPS** | **304** | **10** |
| Effective Date | | |
| **July 9, 2019** | | |
| **Replaces**: GO-OPS-304.10 (Field Contacts, Stops, and Protective Pat Downs), Effective Date November 9, 2018 **Rescinds**: EO-19-001 (Categorizing Body-Worn Camera Recordings Involving Stops), Effective Date May 8, 2019 | | |

| I. | Purpose | Page | 1 |
|---|---|---|---|
| II. | Procedures | Page | 1 |
| II.A | Field Contacts | Page | 1 |
| II.B | Stops | Page | 3 |
| II.C | Protective Pat Downs | Page | 7 |
| II.D | Searches Conducted During a Stop | Page | 10 |
| II.E | Record Keeping | Page | 12 |
| III. | Definitions | Page | 12 |
| IV. | Attachments | Page | 13 |

**I.    PURPOSE**

The purpose of this order is to establish policies and procedures governing field contacts, stops, protective pat downs, and searches that may occur during a stop. Policies and procedures concerning arrests and searches connected with arrests are covered in other directives. This order is intended to promote public safety and to safeguard members of the Department from injury, while ensuring that invasions of individual privacy are held to a minimum.

**II.    PROCEDURES**

A.    Field Contacts

1.    Field contacts may be initiated at any time by members. No evidence of any crime is needed to initiate a field contact, and the encounter may be terminated at any time by either party.

2.    Since a field contact involves solely the voluntary cooperativeness of an individual who is free not to respond and to leave, the standard for a field contact does not require probable cause, reasonable suspicion, or any other specific indication of criminal activity.

3.    Members may initiate a field contact for any legitimate, police-related purpose including to question potential witnesses observed near the scene of a crime who may have knowledge relevant to the investigation. Field contacts **shall not** be conducted in a hostile or aggressive manner, or as a

means of harassing an individual or attempting to coerce an individual to leave an area merely because he or she is "hanging around" or loitering.

4.   Initiating a Field Contact

Members may initiate a field contact with an individual in any place the member has a right to be. This applies to all public space. It is difficult to define precisely other places where members have a right to be. Generally, they may include:

a.   Areas of government-owned or possessed property normally open to officers and the public;

b.   Places intended for public use, or normally exposed to public view;

c.   Places to which the member has been admitted with the consent of an individual empowered to give such consent;

d.   Places to which the member may be admitted pursuant to a court order (e.g., an arrest or search warrant);

e.   Places where the circumstances require an immediate law enforcement presence to protect life, well-being, or property; and

f.   Places in which the member may make a lawful warrantless arrest.

5.   Conducting Field Contacts

a.   When engaging in a field contact, members shall not detain an individual in any manner against their will, nor conduct a protective pat down. Members may not require the individual to answer questions or respond in any way to the member if they choose not to do so. Members may not use force or coercion to require individuals to stop or to respond.

b.   Members must constantly keep in mind that the distinction between a field contact and a stop depends on whether, under the particular circumstances, an individual could reasonably perceive that he or she is not free to leave the member's presence. Therefore, members shall take special care to act in as restrained and courteous a manner as possible.

c.   Members should avoid short responses that could be misunderstood or requests that sound like commands. Members should phrase verbal requests, whenever possible, with **optional** words and phrases such as "may" or "would you mind".

d.   The duration of a field contact should be as brief as possible. Frequently, the success, or failure, of conducting a meaningful field contact will depend upon the member's ability to put individuals at

ease and establish rapport.

e.  If, during a field contact, individuals ask whether they must respond, or give the impression of feeling compelled to respond, members shall immediately inform them of their right to refuse or leave.

f.  Where individuals refuse or cease to cooperate during a field contact, they **must** be permitted to go on their way unless, based on the totality of the circumstances as described in Part II.B, the field contact is escalated to a stop. The refusal to cooperate (or silence) cannot, absent other factors, be used as the basis to escalate the encounter into a stop.

g.  Members shall bear in mind that individuals are not required to possess, or have on their person, any means of identification, nor, absent unusual circumstances, can individuals be required to account for their presence in a public place.

B.  Stops

1.  Basis for a Stop

If a member has **reasonable suspicion** that an individual has committed, is committing, or is about to commit any crime, the member has the authority to stop the individual for the purpose of determining whether or not probable cause exists to arrest. The member may exercise that authority in any place in which he or she has a legal right to be.

2.  Reasonable Suspicion

The term reasonable suspicion necessitates a minimal level of objective justification for making the stop. Although reasonable suspicion is not capable of precise definition, it is more than a hunch or mere speculation but less than the probable cause necessary to arrest. Members shall consider the totality of the circumstances and base reasonable suspicion on their training and experience. The following list contains some of the factors that may be considered in determining whether reasonable suspicion exists:

a.  Stopped Individual's Characteristics:

An individual may generally fit the description of an individual wanted for a known offense. The individual may seem to be suffering from a recent injury related to a known offense, fatigued from running, overly nervous, under the influence of alcohol or drugs, or other factors may exist that tie the individual to an offense.

b.  Stopped Individual's Actions:

An individual may be fleeing from an actual or possible crime scene, hiding, discarding possible items of evidence, be in the area

of a known offense soon after its commission or in an area known for the type of criminal activity on which the suspicion is based, or be in an area during a time of day during which criminal activity of the kind suspected might usually occur (e.g., a late hour when it would be unusual for individuals to be in a certain area).

c.    Demeanor during a Field Contact:

During a field contact an individual may respond to inquiries with evasive, suspicious, or incriminating replies or may be excessively tentative or nervous.

d.    Police Training and Experience:

A member may have experience in investigating a particular kind of criminal activity and recognize an individual's conduct as consistent with a pattern or modus operandi generally followed in particular criminal offenses.

e.    Information Obtained from Witnesses or Informants:

An investigating member may base his or her suspicion upon information supplied by civilian witnesses or police informants deemed reliable, either by virtue of their character or by information provided that has been corroborated by the member. Anonymous tips shall be considered in combination with the totality of the circumstances to justify a stop. Based upon an anonymous tip, members may respond to a location and observe the suspect to see if the tip is credible or reliable. Members must then use their own observations of the suspect to determine whether they have the reasonable suspicion necessary to conduct a stop.

f.    Information Obtained from Law Enforcement Sources:

(1)    The member may recognize an individual as having an arrest or conviction record or know of an individual by reputation.

(2)    The member may rely on reasonable suspicion developed by another officer, including one from another police agency, and on sources of police information such as lookouts, flyers, and teletype messages.

(3)    The member may have other information that may tend to tie an individual to a crime that would justify a stop. For example, an individual may occupy a wanted vehicle or be in a premise that is the target of a search warrant. In instances of this type, the member shall conduct a stop to determine if sufficient probable cause exists to make an arrest.

3.  Citing Justification for a Stop

Every member conducting a stop must be prepared to cite the particular factors that supported the determination that reasonable suspicion existed. The record of the stop shall contain all factors relied on, whether or not they are specifically described in Part II.B.2.

Example: In the early morning hours, a member on patrol receives a broadcast that a homicide has just occurred at a particular location. A general physical description of the suspect is given, and he is said to be wearing a dark jacket. Soon afterwards, in the vicinity of the homicide, the member observes a man generally fitting the physical description but not wearing a dark jacket. Under these circumstances a stop is proper and the member's reasonable suspicion is justified based on the individual's characteristics, the area of the stop, and the type of crime under investigation.

4.  Police Conduct during a Stop

In determining whether a stop is reasonable and lawful, every phase must be conducted in a reasonable manner.

a.  Duration of a Stop

(1)  An individual may be stopped at or near the origination of the stop for a reasonable time.

(2)  Members shall stop an individual for only the length of time required to obtain the information necessary for the investigation.

(3)  The length of the stop must be reasonable and will be evaluated on the particular facts, but caution dictates moving quickly so as to avoid the stop becoming more like an arrest.

(4)  When a stop occurs over an extended period of time, officers shall articulate the justification for the length of the stop in the records management system (RMS) report.

b.  Explanation to Stopped Individual

(1)  Members shall act with restraint and courtesy.

(2)  Members shall identify themselves as a law enforcement officer as soon as practicable after making a stop.

(3)  Prior to release, members shall give the individual a general explanation of the purpose of the stop. If an arrest is made, members shall also provide the reason for their arrest.

(4)     The record of the stop shall briefly note that the member gave the individual an explanation for the stop, and the nature of that explanation.

c.     Rights of Stopped Individuals

(1)     The member may direct questions to the stopped individual for the purpose of obtaining their name, address, and an explanation concerning their presence and conduct.

(2)     The stopped individual shall not be compelled to answer questions or produce identification for examination by the member.

d.     Refusal to Cooperate

Neither refusal to answer questions nor to produce identification by itself establishes probable cause to arrest. However, such refusal may be considered, along with other factors, as an element contributing to probable cause if, under the circumstances, an innocent individual could reasonably be expected not to refuse.

5.     Initiating a Stop

Members shall use the least coercive means necessary to conduct a stop. The least coercive means, depending on the circumstances, may be a verbal request, an order, or the use of physical force.

6.     Use of Physical Force

a.     Members may use only such force as is reasonably necessary to carry out the authority granted by this order and GO-RAR-901.07 (Use of Force).

b.     If the member is attacked or circumstances exist that create probable cause to arrest, the member may use the amount of force necessary, in accordance with GO-RAR-901.07 (Use of Force), to defend him or herself or make an arrest.

7.     Stopping Potential Witnesses under Exigent Circumstances

a.     A stop of a potential witness is authorized only in exigent circumstances (i.e., a person suspected to be an eyewitness to a recently committed "crime of violence" as defined in D.C. Official Code § 23-1331(4)). (See Part III.1, "Definitions").

b.     In such exigent circumstances, a member responding to the scene of a crime may briefly stop a potential witness to "freeze" the situation for only the length of time necessary to obtain identification and an account of the circumstances from the person.

<u>NOTE</u>: Interviews with willing witnesses are authorized under the field contact section in Part II.A.3.

C.    Protective Pat Downs

    1.    Basis for a Protective Pat Down

       A member may pat down a stopped individual if the member has **<u>reasonable suspicion</u>** that the individual is carrying a concealed weapon or dangerous instrument and that a pat down is necessary to self-protect or protect others. The protective pat down may be conducted at any time during the stop, so long as reasonable suspicion to conduct the pat down exists.

    2.    Reasonable Suspicion to Support a Protective Pat Down

       a.    Reasonable suspicion to support a pat down is more than a vague hunch and less than probable cause. If, under the circumstances, a reasonably prudent law enforcement officer would be warranted in believing his or her safety or that of other individuals is in danger because the individual may be carrying a weapon or dangerous instrument, a pat down is justified.

       b.    Members shall consider the totality of the circumstances and base reasonable suspicion to support a pat down on their training and experience. The following list contains some of the factors that may be considered in determining whether reasonable suspicion to support a pat down exists:

          (1)    Individual's Characteristics:

            A stopped individual's clothes may bulge in a manner suggesting the presence of an object capable of inflicting injury. His or her behavioral characteristics, like demeanor, may suggest the possibility that the individual may be carrying a weapon.

          (2)    Individual's Actions:

            A stopped individual may have made a movement as if to hide a weapon when approached, appear nervous during the course of the stop, use threatening words or actions, be in an area known for criminal activity or be so isolated that witnesses to an attack would be unlikely, or occur at a time of day when an attack is more difficult to defend or more likely to occur (e.g., during a period of darkness or during a time of day that is consistent with a serious or violent crime pattern).

(3)  Prior Knowledge:

The member may know that a stopped individual has an arrest or conviction record for weapons or other potentially violent offenses, or a reputation in the community for carrying weapons or for aggressive behavior.

c.  An anonymous tip that an individual has engaged in or is about to engage in criminal conduct is **not sufficient** to justify a protective pat down without independent evidence of criminal activity apart from the anonymous tip. Based upon an anonymous tip, members may respond to a location and observe the suspect to see if the tip is credible or reliable. Members must then use their own observations of the suspect to determine whether they have the reasonable suspicion necessary to conduct a stop and protective pat down.

3.  Citing Justification for Protective Pat Down

a.  Every member conducting a protective pat down must be prepared to cite the specific factors that supported his or her determination that reasonable suspicion existed to support the pat down.

b.  The RMS record of the protective pat down shall contain all factors relied upon to establish reasonable suspicion.

4.  Protective Pat Down Procedure

a.  A protective pat down authorized under this order shall be limited to seeking possible weapons or dangerous instruments.

b.  The authority to pat an individual down shall not be used to conduct full searches designed to produce evidence or other incriminating material. Full searches of individuals conducted without adequate probable cause to arrest are illegal and are specifically prohibited by this order.

c.  Protective pat down procedures are as follows:

(1)  If the individual is carrying an item immediately separable from his or her person, such as a purse, shopping bag, or briefcase, it shall be taken from him or her.

(a)  The member shall not search inside the object but shall place it at a safe distance out of the individual's reach for the duration of the stop.

(b)  If something occurs during the stop that makes the member reasonably suspect the possibility of harm should he or she return an unsearched item without first inspecting it, he or she may briefly inspect the

contents in order to determine if the item contains a weapon or other dangerous objects.

    (c)    The member must be able to articulate the factors justifying an inspection of the contents of the item, and shall note such factors in the RMS report.

(2)    The member shall first pat down the area of the individual's body or clothing most likely to contain a concealed weapon or dangerous instrument. Outer clothing may be opened to allow a pat down of shirts and trousers to determine adequately if a weapon is concealed under the outer clothing.

(3)    The member shall not reach inside the individual's clothing or pockets during a pat down, unless the member feels something that may reasonably constitute a weapon or dangerous instrument.

    (a)    In such event, the officer may reach inside that portion of the individual's clothing to uncover the article that was felt.

    (b)    Although objects such as change, envelopes, and other papers may be detected as a result of the protective pat down, members have no authority to require their removal prior to an arrest because they are not likely to constitute, or be used as, weapons or dangerous instruments.

(4)    A member may also take steps to secure those areas that the stopped individual would reasonably reach during the detention if the member reasonably suspects that the individual might obtain an object from such an area and attempt to harm the member.

(5)    If, during the course of a protective pat down, the member feels an object and believes that it could be used to harm him or her or others, the member may take whatever action is necessary to examine the object and to secure it for the duration of the detention.

Example: While approaching a suspect, a member observes him thrust his hand into his left front pants pocket, and withdraw it. The suspect is asked for identification, and says he has none. The member runs his or her hand over the pants pocket and feels a soft lump.  The member's actions to this point are proper. However, if the member then reaches into the pocket to recover the object, this action is improper, since the member could not, from these facts, reasonably believe the soft lump was a dangerous weapon or instrument.

5.      Discovery of Weapon Lawfully Possessed

If a protective pat down discloses a weapon, the possession of which is licensed or otherwise lawful, the member shall secure it out of the individual's reach for the duration of the stop. Ammunition may be removed from any firearm, and the weapon and ammunition returned in a manner that ensures the member's safety.

6.      Discovery of Incriminating Evidence

a.      If, while conducting a protective pat down, a member feels an object that he or she reasonably believes to be a weapon or dangerous instrument, he or she may reach in and remove it.

(1)     If, while in the process of removing what is believed to be a weapon, the member discovers other items that are contraband, instrumentalities, or evidence of a crime, he or she may lawfully seize the items.

(2)     These items may be considered in determining whether probable cause exists to arrest the individual. If, as a result, an arrest is made, a search incident to arrest is proper.

b.      Nothing in the preceding paragraph authorizes searches for incriminating evidence without probable cause. Members shall at all times understand that the authority to conduct a protective pat down is limited.

7.      Situations may occur where the member possesses sufficient information from an individual, informant, or otherwise that simultaneously provides reasonable suspicion for a stop and a reasonable belief that the individual to be stopped is armed.

a.      In such a situation, a protective pat down is justified immediately upon confronting the individual. If the member reasonably believes he or she knows the location of the weapon, he or she may immediately reach inside the individual's clothes or pockets to remove the weapon without conducting a protective pat down.

Example: A member is informed that an individual is sitting in the front passenger seat of a specific automobile with a pistol in his waistband. The member approaches the car and observes an individual generally fitting the description sitting in the front seat passenger side. The member immediately reaches into the waistband of the man's trousers and recovers a pistol.

D.      Searches Conducted during a Stop

1.      A member may conduct a search during a stop when proper legal justification for the search exists. The search may be conducted at any time during the stop, so long as legal justification to conduct the search exists.

2.   Searches conducted during a stop shall be conducted pursuant to GO-SPT-602.01 (Vehicle Searches and Inventories) and GO-PCA-702.03 (Search Warrants) and documented pursuant to Attachment B. Post-arrest searches are not subject to NEAR Act documentation requirements but shall be conducted and documented in accordance with Department policies and procedures.

3.   Consent Searches

A member may conduct a search based upon valid consent of the individual whose person or property is being searched. The Fourth Amendment requires that consent to a search not be coerced, by explicit or implicit means, by implied threat, or covert force.

4.   Probable Cause Vehicle Searches

A member may conduct a warrantless vehicle search based upon probable cause to believe that contraband is in a moveable (i.e., operable) vehicle in a public area (e.g., public space, place commonly used for vehicular movement, shopping center, parking lot).

a.   This includes any closed container, locked or unlocked, that could conceal the item to be seized. Pursuant to *Carroll v. U.S.* 267 U.S. 132 (1925) there is no requirement of exigent circumstances to justify a warrantless search.

b.   Once established, authority to search the vehicle remains even if a suspect is removed from the vehicle and kept nearby.

5.   Protective Vehicle Searches

A member may conduct a limited protective search of the passenger compartment of a lawfully stopped vehicle for concealed weapons or dangerous instruments.

a.   Pursuant to *Michigan v. Long*, 463 U.S. 1032 (1983), a cursory vehicle search, also known as a vehicle frisk, is limited to places in the interior passenger compartment in which a quickly accessible weapon could be placed or hidden.

b.   A closed container found in the passenger compartment may be opened and checked for weapons as long as the contents of the container are immediately accessible to vehicle occupants (i.e., the container opened quickly without breakage).

6.   Searches Conducted with a Warrant

A member may conduct a search pursuant to a valid search warrant granted by a judge or magistrate based upon probable cause. Search warrant procedures can be found in GO-PCA-702.03 (Search Warrants).

E.      Record Keeping

1.      Members **may** maintain records of field contacts, consistent with the rules set forth in Attachment A (Documenting Field Contacts). Documenting contacts is optional unless required by an official.

2.      Members **shall** maintain records of **all** stops consistent with the rules set forth in Attachment B (Documenting Stops).

3.      Members shall enter all RMS reports prior to the end of their shift.

4.      Reviewing officials shall review all RMS reports for conformity with this order, including ensuring that officers are documenting the factors that supported the determination that reasonable suspicion was present.

## III.    DEFINITIONS

When used in this directive, the following terms shall have the meanings designated.

|   | Term | Definition |
|---|------|------------|
| 1. | Crime of violence | The term "crime of violence" means aggravated assault; act of terrorism; arson; assault on a police officer (felony); assault with a dangerous weapon; assault with intent to kill, commit first degree sexual abuse, commit second degree sexual abuse, or commit child sexual abuse; assault with significant bodily injury; assault with intent to commit any other offense; burglary; carjacking; armed carjacking; child sexual abuse; cruelty to children in the first degree; extortion or blackmail accompanied by threats of violence; gang recruitment, participation, or retention by the use or threatened use of force, coercion, or intimidation; kidnapping; malicious disfigurement; manslaughter; manufacture or possession of a weapon of mass destruction; mayhem; murder; robbery; sexual abuse in the first, second, or third degrees; use, dissemination, or detonation of a weapon of mass destruction; or an attempt, solicitation, or conspiracy to commit any of the foregoing offenses. [D.C. Official Code § 23-1331(4)] |
| 2. | Field contact | Conduct by a member which places the member in face-to-face communication with an individual under circumstances in which the individual is free not to respond and to leave. |
| 3. | Probable cause | Set of facts, circumstances, or reliable information that would lead a reasonable and prudent police officer to believe that a crime has been committed, or is about to be committed, and that a certain person committed it. |

| 4. | Protective pat down | Limited protective search for concealed weapons or dangerous instruments. A pat down, also known as a frisk, consists of patting an individual's outer clothing to determine the presence of weapons and other dangerous objects. Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), members have authority to conduct a limited search of a person for weapons during some stops. Reasonable suspicion for a stop does not automatically provide the basis for a pat down. For such a pat down to be reasonable and constitutional under the Fourth Amendment, the preceding stop of the individual's person must be lawful and the police must have an objectively reasonable basis to believe that the individual is armed and dangerous. |
|---|---|---|
| 5. | Reasonable | Fair, proper, or moderate under the circumstances. Determining whether a member has behaved reasonably is an objective standard whereby the court will consider the circumstances, not the intent of the actor. |
| 6. | Reasonable suspicion | Minimal level of objective justification for making a stop. Although reasonable suspicion is not capable of precise definition, it is more than a hunch or mere speculation but less than probable cause. |
| 7. | Search | Examination of a person's body, property or other area which would reasonably be considered private for the purpose of finding evidence of a crime. Under the Fourth Amendment of the United States Constitution, any search of a person or premises (including a vehicle), and any seizure of tangible property, must be reasonable. Generally, members must obtain a search warrant when conducting a search, though exceptions to the search warrant requirement exist. |
| 8. | Seizure | Act of taking possession of a person or property by the legal process. |
| 9. | Stop | Temporary investigative detention of a person for the purpose of determining whether probable cause exists to make an arrest. A stop is a seizure of an individual's person and occurs whenever an officer uses his or her authority to compel a person to halt, remain in a certain place, or to perform an act (such as walking to a nearby location where the member can use a radio or telephone). If a person is under a reasonable impression that he or she is not free to leave the member's presence, a stop has occurred. |

## IV.   ATTACHMENTS

Attachment A: Documenting Field Contacts

Attachment B: Documenting Stops

Peter Newsham
Chief of Police

PN:KDO:MOC:SMM

**Documenting Field Contacts**

I.   Members **may** maintain records of field contacts, consistent with the following rules:

    A.   Documenting contacts is optional unless required by an official.

    B.   Members shall be mindful that use of the "field contact" card [PD Form 76 (Contact Card)] during a contact may be interpreted as coercive by some individuals. Consequently, if a determination is made before or during a contact to record information, the individual should promptly be informed that the "field contact" card is strictly for internal use by this Department, not available to the public, and does not signify or imply an arrest circumstance or involvement in criminal activity.

    C.   Members shall enter "field contact" cards in RMS prior to the end of their shift.

    D.   Access to the "field contact" card shall be restricted to direct law enforcement uses only, and any accessing by sworn personnel not normally charged with, or responsible for, investigations shall be challenged.

    E.   "Field contact" cards shall be maintained for a minimum of four years from the date of their execution unless they are subject to a litigation hold.

**Documenting Stops**

I.     D.C. Act 21-356 "Neighborhood Engagement Achieves Results Amendment Act of 2016" (NEAR Act), D.C. Official Code § 5-113, requires information collection specific to police stops and protective pat downs. Members shall be mindful of these reporting requirements when conducting stops in such a way that they are able to document all required information during the completion of their RMS reports. The purpose of this attachment is to expand upon existing Department reporting requirements to ensure compliance with the provisions of the NEAR Act.

II.    In all cases, members shall use the instructions provided in this attachment in addition to all other Department RMS reporting requirements.

III.   Members **shall** maintain records of **all** stops consistent with the following rules:

    A.     For the purposes of NEAR Act data collection and this order:

        1.     **All** arrests are also considered stops.

        2.     NEAR Act data collection requirements apply to all stopped individuals. Members shall fully document each individual stopped.

        3.     Required documentation varies by the circumstances of the stop.

            a.     Stops that are resolved using a Notice of Infraction (NOI) shall be referred to in this order as "NOI stops". This also includes stops resulting in notices of violation (NOV).

            b.     All other stops shall be referred to as "stops".

    B.     The "field contact" card [PD Form 76 (Contact Card)] **shall not** be used to document stops of any kind.

    C.     All NOI stops shall be documented according to the following procedures.

        1.     **All** NOI stops shall be conducted by body-worn camera (BWC)-equipped members. In cases where the serious nature of an offense justifies a member not equipped with a BWC to conduct the stop, he or she shall request that a BWC-equipped member respond to the scene. In such cases, the member conducting the stop shall also record the details of the stop, including a justification of the circumstances, in RMS.

        2.     For the purposes of documenting stopped individuals' gender, race, ethnicity, and date of birth, members shall conduct a direct inquiry by stating, "Per the NEAR Act, as passed by the Council of the District of Columbia, we are required to ask for your gender, race, ethnicity, and date of birth." Members shall record the demographic information as reported by the stopped individual.



**RACE** values:
A: Asian
B: Black
H: Hispanic (ethnicity)
M: Multiple
N: American Indian or Alaska Native
P: Native Hawaiian or Other Pacific Islander
U: Unknown
W: White

**SEX** values:
M: Male
F: Female
U: Unknown
X : Non-binary
*Non-binary refers to individuals who identify as neither entirely male nor entirely female.

In cases where an official government identification card is presented by the stopped individual, members can use available information (e.g., sex) from the identification card. In cases where the stopped individual refuses to report their demographic information, members shall select "unknown."

*MPD uses adjusted categories and definitions provided by the United States Census Bureau for race and ethnicity. They define race as a person's self-identification with one or more social groups according to the following descriptions.*

**Asian (A)** – Person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.
**Black or African American (B)** – Person having origins in any of the Black racial groups of Africa.
**Hispanic (H)** – Person of Hispanic or Latino ethnicity.
**Multiple (M)** – Person who identifies with multiple races.
**American Indian or Alaska Native (N)** – Person having origins in any of the original peoples of North and South America (including Central America) and who maintains tribal affiliation or community attachment.
**Native Hawaiian or Other Pacific Islander (P)** – A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.
**Unknown (U)** – A person who identifies as a race or ethnicity that is not captured by RMS or refuses to provide their ethnicity.
**White (W)** – A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

3.  **All** NOI stops resolved with a warning, where no other law enforcement action was taken, shall be documented by issuing a warning NOI or NOV as appropriate.

    a.  Verbal warnings **shall not** be issued. Pursuant to GO-SPT-303.01 (Traffic Enforcement), verbal warnings shall only be given under extreme circumstances (e.g., receipt of a radio assignment requiring immediate response, motorist was en route to a hospital for emergency treatment of a sick or injured passenger). In the

occasion that a verbal warning is issued, members shall document the details of the stop, including a justification of the extreme circumstances, in RMS using an "incident" card.

b. When issuing the warning NOI, members shall indicate the reason for the stop by stating, "You were stopped because (specific violation indicated here)".

4. **All** NOI stops resulting only in issuance of an NOI, where no other law enforcement action was taken, shall be documented solely through issuance of the NOI.

a. Members shall indicate the reason for the stop by stating, "You were stopped because (specific violation indicated here)" and document the reason for the stop on the NOI in the "RFS Code" field. One RFS Code shall be selected and based upon the reason that the stop originated, regardless of any other outcomes of the stop.

b. Members shall indicate the approximate duration of the stop on the NOI in the "Approx. Duration of stop" field. Stop duration is approximate and measured in minutes; only covering the time in which the actual stop took place (e.g., not time spent on field contacts, arrests, or booking).

**"Approx. Duration of stop"** is approximate and measured in minutes.

I swear or affirm under penalty of perjury that I observed or investigated the commission of this violation and served this notice of infraction as provided for by law.

| ISSUER'S SIGNATURE | | DEPT. | ELEMENT | BADGE NO. |
|---|---|---|---|---|
| Approx. Duration of stop minutes | RFS Code | | | MPD CAD# |

**"RFS Code"** is the **reason for the stop**
0001. BOLO/Lookout
0002. Call for service
0003. Information obtained from LE sources
0004. Observed a weapon
0005. Response to crash
0006. Suspicion of non-traffic criminal activity (self-initiated)
0007. Traffic violation: Observed moving violation
0008. Traffic violation: Observed equipment violation

**Only one RFS category may be listed and it must reflect the initial reason for the traffic stop regardless of any other outcomes of the stop.**

5.  **All** stops resulting only in the issuance of an NOV, where no other law enforcement action was taken, shall be documented solely through issuance of the NOV using the "Notes" section as indicated below. Members shall submit a scanned copy of the NOV to the Strategic Change Division Adminbox.



The "**Notes**" section of the NOV shall include:
- **Reason for the stop**
- **Approximate duration of the stop**
- **Race** of the stopped subject
- **Sex** of the stopped subject

D.  All stops shall be documented according to the following procedures.

1.  **All** stops regardless of the outcome of the event require a Central Complaint Number (CCN). For each event, members shall select "Yes" in response to "Was a Stop Involved?" to indicate that a stop occurred. This selection prompts all data collection fields necessary to document stops. RMS fields capture stop data requirements as indicated in this attachment.



Stop data collection is triggered by selecting "**Yes**" to the "Was a Stop Involved? field.

A "**Yes**" response enables fields to enter the start time, stop time, and reason for the stop.

2.  Members shall be mindful of the time that subjects are no longer considered stopped. The stop ends when the subject is either free to leave or probable cause has been established for an arrest. Stop duration shall be captured for each individual who is stopped and is approximate and measured in minutes; only covering the time in which the actual stop took place (e.g., not time spent on field contacts, arrests, or booking).

3.      Reports involving stops shall be properly classified and list at least one
        selection from the "What was the reason for the stop?" field.



4.      NEAR Act data collection requirements apply to all stopped individuals.
        Members shall fully document each individual stopped using a person card.

   a.   For the purposes of documenting stopped individuals' gender, race,
        ethnicity, and date of birth, members shall conduct a direct inquiry
        by stating, "Per the NEAR Act, as passed by the Council of the
        District of Columbia, we are required to ask for your gender, race,
        ethnicity, and date of birth." Members shall record the demographic
        information as reported by the stopped individual.

   b.   Members may document individuals who were present during the
        stop but not considered stopped using the "witness" person card.

5.      Documenting Pat Downs and Searches

   a.   When documenting searches in RMS, members shall differentiate
        between searches that occur as a result of a stop and searches that
        result from an arrest. Searches occurring during the stop shall be
        documented by selecting "Yes" in response to one or both of these
        questions:

        (1)   "Was this PERSON patted down and/or searched as a result
              of the stop (prior to arrest)?"

        (2)   "Was this person's PROPERTY patted down and/or searched
              as a result of the stop (prior to arrest)?"

   b.   Multiple searches can be entered on each type of search by selecting
        "+ Search Type."

   c.   Post-arrest searches are not subject to NEAR Act requirements and
        shall be documented in the "arrest" card.





Was this PERSON patted down and/or searched as a result of the stop (prior to arrest)?

Yes

What was the type of search or pat down? (Select ALL that apply, duplicates are not permitted.)

Consent

**Multi-select options**:
- Consent
- Probable cause
- Protective pat down
- Warrant

What was the reason for this search or pat down? (Officers still must articulate in the narrative.) (Select all that apply)

Consent (consent search only)

**Multi-select options**:
- Characteristics of an armed individual
- Consent (consent search only)
- Exigent circumstances
- Individual's actions
- Individual's characteristics
- Information obtained from law enforcement sources
- Information obtained from witnesses or informants
- Nature of the alleged crime
- Prior knowledge
- Warrant (warrant search only)

Was any property seized as a result of this search or pat down? (Select all that apply)

Gun

+ SEARCH TYPE

Multiple searches can be entered by clicking **+ Search Type**

Was this person's PROPERTY patted down and/or searched as a result of the stop (prior to arrest)?

Yes

What was the type of search or pat down? (Select ALL that apply, duplicates are not permitted.)

Probable cause

**Multi-select options**:
- Consent
- Probable cause
- Protective pat down
- Warrant

What was the reason for this search or pat down? (Officers still must articulate in the narrative.) (Select all that apply)

Nature of the alleged crime

**Multi-select options**:
- Consent (consent search only)
- Exigent circumstances
- Individual's actions
- Individual's characteristics
- Information obtained from law enforcement sources
- Information obtained from witnesses or informants
- Nature of the alleged crime
- Prior knowledge
- Warrant (warrant search only)

What object was searched or patted down? (Select all that apply)

Vehicle

**Multi-select options**:
- Bag
- Residence/Other Building
- Vehicle
- Other

Was any property seized as a result of this search or pat down? (Select all that apply)

Gun

+ SEARCH TYPE

**Multi-select options**:
- Drug Paraphernalia
- Gun
- Narcotics
- None
- Other
- Other Weapon
- Stolen Property
- Vehicle

6.    Classifying Stops

a.    **All** stops **not** involving an offense or arrest shall be documented using an "incident" card, and "Yes" in response to "Was a Stop Involved?" shall be selected to indicate that a stop occurred.

(1)    If there is no other incident type, "Stop" shall be selected.

Example: An individual is stopped and questioned about suspicious activity witnessed by the member. The individual is released without further action. This stop shall be documented using an "incident" card and the stop shall be documented by selecting "Yes" in response to "Was a Stop Involved?" to indicate that a stop occurred.

(2)    If there is an appropriate incident type that can be selected other than "Stop" (e.g., "Family Disturbance"), that value shall be selected.

Example: An individual at the scene of a family disturbance call is stopped and patted down. The individual is released without further action. The "incident" card shall be classified "Family Disturbance" and the stop shall be documented by selecting "Yes" in response to "Was a Stop Involved?" to indicate that a stop occurred.

b.    **All** stops involving an offense or arrest shall be documented using an "offense" or "arrest" card(s), and "Yes" in response to "Was a Stop Involved?" shall be selected to indicate that a stop occurred.

(1)    The "offense" and "arrest" card(s) shall be classified according to the applicable offense(s).

Example: An individual at the scene of a robbery call is stopped and patted down. The individual is arrested. The arrest shall be documented using the "arrest" card classified according to the applicable offense(s), and the stop shall be documented by selecting "Yes" in response to "Was a Stop Involved?" to indicate that a stop occurred.

c.    In cases where an NOI or NOV was also issued, the "NOI or NOV Issued" check box under "Incident Statistics" shall be marked.

7.    Members conducting a stop must be prepared to cite the particular factors that supported the determination that reasonable suspicion was present. Members shall use the "Internal Narrative" section of the report to describe the circumstances of the stop and an articulation of the officer's reasonable suspicion. The record of the stop shall contain all factors relied upon for this justification. The "Internal Narrative" shall also briefly note that the

member gave the person an explanation for the stop and the nature of that explanation.

E.      BWC Categorization

Members shall use the BWC categorization instructions provided in the below chart in addition to all other Department BWC requirements in accordance with GO-SPT-302.13 (Body Worn Camera Program).

| BWC Category | Description |
|---|---|
| Traffic Stop | All vehicle stops resulting in notice of infraction (NOI) and notice of violation (NOV) stops pursuant to this order and vehicle stops that do not result in an arrest. |
| Contact/Stop | All contacts and non-vehicle stops not resulting in an arrest and non-vehicle stops resulting in issuance of an NOV. |

1.      Members shall select the BWC category that corresponds to the most serious offense.

2.      For stops resulting in an NOI or NOV, members shall enter the NOI or NOV number in the ID field in evidence.com. In cases of multiple NOIs or NOVs, only one NOI or NOV number shall be entered.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Case No. 21-cr-598-PLF-01 |
| | : | |
| TERENCE SUTTON and | : | |
| ANDREW ZABAVSKY, | : | |
| | : | |
| Defendants. | : | |

**ORDER**

Upon consideration of Terence D. Sutton, Jr.'s Motion to Modify Conditions of Release, it is this _____ day of October, 2021,

**HEREBY ORDERED** that Terence D. Sutton, Jr.'s Conditions of Release are modified as follows:

1.      Terence D. Sutton, Jr. will reside at the residence and be placed in the custody of Carmen D. Hernendez, who will assure his appearance at all court proceedings and notify the court immediately if he violates a condition of release or is no longer in her custody.

2.      Terence D. Sutton, Jr. will travel only in the State of Maryland and the District of Columbia, except for travel to his mother's residence in Delaware or other travel within the United States, with prior approval of Pretrial Services, and remain overnight while at his mother's residence.

3.      Terence D. Sutton, Jr. will stay away from the location of his previous assignment at the Fourth District Headquarters of MPD.

4.      Terence D. Sutton, Jr. will stay away from the 4 civilian witnesses identified in the U.S. Attorney's Witness List.

**SO ORDERED.**


_____
**The Honorable Paul L. Friedman
United States District Judge**


Copies to:

J. Michael Hannon
Rachel E. Amster
HANNON LAW GROUP, LLP
333 8th Street, NE
Washington, D.C. 20002

Ahmed Baset
Risa Berkower
Assistant United States Attorneys
U.S. Attorney's Office for the
District of Columbia
555 Fourth Street, NW
Washington, D.C. 20530

George Monk
Pretrial Services Agency