UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 21-cr-598-PLF |
| | : | |
| v. | : | Filed under seal |
| | : | |
| TERENCE SUTTON and | : | |
| ANDREW ZABAVSKY | : | |
| | : | |
| Defendants. | : | |

## GOVERNMENT'S MOTION TO DISQUALIFY COUNSEL

The United States of America, by and through its undersigned attorneys, respectfully moves this Court for an order disqualifying attorneys J. Michael Hannon, Harrison Richards, and their law firm, the Hannon Law Group, (collectively, "the attorneys") from representing any defendant or witness in this case. Presently, the attorneys represent both defendant Sutton and an anticipated government witness whose testimony proves defendant Sutton's guilt. Because this dual representation necessarily requires the attorneys to advance adverse positions—pitting one client's interests to the detriment of the other client's interests in the same litigation—an unwaivable conflict of interest is presented under D.C. Rule of Professional Conduct 1.7(a) that requires their disqualification from this case.

### I. FACTUAL BACKGROUND

a. Charges in the Indictment

On September 23, 2021, a federal Grand Jury of the District of Columbia returned an Indictment that charges Metropolitan Police Department (MPD) officer Terence Sutton with Second Degree Murder (D.C. Code § 22-2103), and that charges Sutton and his co-defendant Andrew Zabavsky, who was Sutton's supervising MPD lieutenant, with Conspiracy (18 U.S.C. § 371), and Obstruction of Justice (18 U.S.C. § 1512(b)(3)). These charges arise from Sutton and

1

Zabavsky's participation in and cover up of an October 23, 2020 unauthorized and fatal vehicular pursuit of District resident Karon Hylton-Brown.  While driving an unmarked MPD vehicle with three other MPD officers as his passengers, ███████████████████████ ███████ Sutton chased Hylton-Brown after seeing him not wearing a helmet while driving a moped on the sidewalk.  As Sutton closely pursued Hylton-Brown through an alleyway into the 700 block of Kennedy Street, N.W., Hylton-Brown was struck by an oncoming motorist.  The collision fatally injured Hylton-Brown.  Within minutes, Sutton and Zabavsky attempted to forestall any outside investigation into the matter by hiding the circumstances of the crash from their chain of command.  Starting on-scene, Sutton and Zabavsky agreed that Sutton would write the police report for the crash instead of an uninvolved officer.  Later, at the Fourth District police station, in what is an enumerated overt act of the conspiracy, Sutton drafted the report to minimize the extent of Hylton-Brown's observable injuries.

The final two minutes of the vehicular pursuit were captured on the body-worn cameras (BWC) of Sutton and his three passenger officers.  However, because the officers activated their BWC immediately after the collision, these recordings only contain video of the chase, with no sound.[1]  The subsequent events at the police station were also unrecorded by BWC.  ████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██ , ██

---

[1] By design, BWCs automatically capture two minutes of footage prior to the moment of their activation, at which point video and audio are both captured, but the two minute "buffer" period only captures video, without audio.

████████ As detailed below, this dual representation of ██ and Sutton presents an unwaivable conflict of interest that now, post-indictment, requires disqualification of these attorneys from the case in its entirety.

b. <u>Investigators' Efforts to Obtain Information from</u> ██

Investigators first approached ██ for an interview on May 18, 2021. ██ referred the request to his attorneys, who he identified as Mr. Hannon and Mr. Richards. For several weeks, these attorneys corresponded by phone and email with government counsel about the terms under which ██ might appear for an interview. Among the options discussed included proposals for ██ to participate in a voluntary interview, or in a "queen for a day" proffer session, or in a reverse proffer presented by the government to ██, Mr. Hannon, and Mr. Richards. On June 18, 2021, Mr. Richards and Mr. Hannon informed the government by phone that ██ would not meet with investigators. During that conversation, Mr. Richards stated that he and Mr. Hannon also represented defendant Sutton. Neither Mr. Richards nor Mr. Hannon had mentioned the fact of this dual representation to government counsel prior to this conversation.

This information fueled concern over whether ██ decision to decline a voluntary interview with investigators was influenced by the apparent conflict. Because of this concern, government counsel advised Mr. Hannon and Mr. Richards that their dual representation created a fundamental conflict for them: ████████████████████████████████████████ ██.

On July 7, 2021, Mr. Hannon sent an email to government counsel stating that ██ was obtaining a new attorney who would be in contact with the government. To coordinate,

3

government counsel requested from Mr. Hannon the new attorney's name and contact information. Mr. Hannon declined to provide the information. Instead, Mr. Hannon responded that, "I just spoke again with ▉ attorney. He advises me that ▉ does not wish to speak with you or your team." Government counsel responded with a second request for the name of ▉ new attorney. Mr. Hannon again did not provide a name, instead stating that he would "pass on" the request for this contact information.

After this email exchange, attorney Stuart Johnson contacted government counsel concerning ▉ Mr. Johnson explained that he had been asked by Mr. Hannon to represent ▉ as "a favor." Mr. Johnson said that he had consulted with ▉, but because he did not have a fee agreement with ▉, he viewed himself as "bridge, or interim" counsel for ▉. Government counsel asked Mr. Johnson whether ▉ would participate in a voluntary interview with investigators, ▉. Mr. Johnson asserted that ▉ had done nothing illegal, ▉

On July 8, 2021, Mr. Johnson emailed government counsel confirming that ▉

4

On July 15, 2021, Mr. Johnson responded in writing to the government's question ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mr. Johnson copied Mr. Hannon and Mr. Richards on the email.

Shortly after receiving this email, government counsel spoke with Mr. Johnson by phone. Mr. Johnson was asked whether he still served as counsel for ▮▮▮ Mr. Johnson said that he understood the government's concern regarding Mr. Hannon and Mr. Richards's dual representation of both ▮▮. and Officer Sutton, but that those attorneys had decided to resume their representation of ▮▮, thus obviating his representation of ▮▮. as "bridge" counsel. Mr. Johnson stated that, in his view, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Throughout the day of July 20, 2021, Mr. Johnson and Mr. Hannon emailed government counsel concerning ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] Mr. Johnson was not copied on communications from Mr. Hannon concerning ▮▮ after July 20, 2021.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████ government counsel declined such a meeting, on the ground that Mr. Hannon still had a conflict of interest due to his simultaneous representation of ████ and Officer Sutton.

On July 23, 2021, ████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████

         ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

On September 23, 2021, the grand jury returned an indictment charging Sutton with Second Degree Murder, in violation of D.C. Code 22-2103, for engaging in an unauthorized police pursuit with conscious disregard for an extreme risk of death or injury to Hylton-Brown. The indictment further charged Sutton with conspiracy to obstruct a federal investigation into this incident, in violation of 18 U.S.C. § 371. One of the overt acts charged in the indictment to further this conspiracy alleges that Sutton "drafted a traffic crash report that minimized the extent of the observable injuries to Hylton-Brown." Indictment, ¶ 47.

    c. <u>Hannon Law Group's Simultaneous Representation of Defendant Sutton</u>

Throughout the time that Mr. Hannon, Mr. Richards, and the Hannon Law Group have represented ███, they also have represented—and continue to represent—defendant Sutton. As noted above, this dual representation was first made known to the government during a June 18, 2021 phone call between Mr. Richards, Mr. Hannon, and government counsel to discuss a meeting between ███ and investigators. In the ensuing months, Mr. Hannon and Mr. Richards continued to contact government counsel on defendant Sutton's behalf.

On August 16, 2021, Mr. Hannon and Mr. Richards met with government counsel for several hours to discuss Officer Sutton's criminal liability and to advocate that the prosecution team decline to seek a criminal indictment of their client. ████████████████████ ████████████████████████████████████████████████████ On September 13, 2021, Mr. Hannon provided a written submission to the government outlining reasons to not bring any criminal charges against defendant Sutton; ████████████████████████ ██████████████████████████.

────────────────────────────

███████████████████████████████████████████

Following the indictment in this case, on September 24, 2021, Mr. Hannon appeared as counsel for defendant Sutton at his initial appearance before Magistrate Judge Faruqi. Mr. Hannon also filed an appearance in this case on October 1, 2021, and subsequent communications with him about discovery (including written demands by Mr. Hannon for the immediate production of discovery) indicate that he continues to represent defendant Sutton through the present time.

    d.   <u>Current Procedural Posture</u>

██████████████████████████████████████████

██████████████ Count 1 charges Sutton with Second Degree Murder, for causing Hylton-Brown's death by engaging in an unauthorized police chase of Hylton-Brown with conscious disregard for the extreme risk of injury or death to him. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

Count 2 of the Indictment charges Sutton with conspiring with his supervising lieutenant, co-defendant Zabavsky, to cover up the circumstances of this incident, including the unauthorized police pursuit of Hylton-Brown and the extent of Hylton-Brown's serious injuries from the crash. In furtherance of this conspiracy, the Indictment alleges that Sutton and Zabavsky agreed that Sutton would draft the police report for the incident, and separately directed another uninvolved officer, who had already taken steps to prepare the report, to stand down. One of the overt acts charged in Count 2 further alleges that, after leaving the crash scene and returning to the police station, Sutton drafted a report that mischaracterized the extent of Hylton-Brown's injuries. ██

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ the government anticipates calling ███ as a witness against defendant Sutton.

## II. LEGAL STANDARD

The Sixth Amendment provides that a criminal defendant shall have the right to "the assistance of counsel for his defense." U.S. Const. amend. VI. To that end, "counsel owes the client a duty of loyalty, [and] a duty to avoid conflicts of interest," which is "perhaps the most basic of counsel's duties." *Strickland v. Washington*, 466 U.S. 668, 690, 692 (1984). However, the right to choose one's counsel is not absolute, as "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Moreover, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id*. at 160. "A court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel." *Id*.

Under D.C. Rule of Professional Conduct 1.7, two types of disqualifying conflicts may arise if an attorney represents two parties in the same matter. The first, under Rule 1.7(a), is unwaivable, and requires disqualification. Rule 1.7(a) provides that "[a] lawyer shall not advance two or more adverse positions in the same matter." D.C. Rules of Prof'l Conduct R.1.7(a). For these purposes, a "matter" is "any litigation, administrative proceeding, lobbying activity, application, claim, investigation, arrest, charge or accusation, the drafting of a contract, a

9

negotiation, estate or family relations practice issue, or any other representation, except as expressly limited in a particular rule." *United States v. Flynn*, 411 F. Supp. 3d 15, 55 (D.D.C. 2019) (citing D.C. Rule of Prof'l Conduct 1.0(h)). While the terms of this rule are narrowly drawn, this type of conflict is absolute, and cannot be remedied by client consent. *Icangelo v. Georgetown University*, 710 F. Supp. 2d 83, 89 (D.D.C. 2010) (citing D.C. Rules of Prof'l Conduct R.1.7(a), cmt. 6); *see Griva v. Davison*, 637 A.2d 830, 843 (D.C.C.A. 1994) ("Rule 1.7(a) mandates an absolute prohibition of dual or multiple representation when the lawyer would represent clients with 'adverse' 'position[s]' in the 'same matter.' Client consent cannot cure such a conflict."). The commentary to Rule 1.7 advises that if this type of conflict arises after a representation has already been undertaken, "then the lawyer should withdraw from the representation." D.C. Rule of Prof'l Conduct 1.7(a), cmt. 33. For these purposes, two lawyers within the same law firm are considered to have the same conflict. *See* D.C. Rule of Prof'l Conduct R. 1.10(a) (providing, with limited exceptions, that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9")*; see United States v. Davis*, 780 F.Supp. 21, 23 & n.4 (D.D.C. 1991) (discussing Rule 1.10).

The second type of conflict, under Rule 1.7(b), arises when an attorney seeks to represent one client with interests that are adverse to a second client, but the second client is represented by different counsel in that matter. Under these circumstances, the representation of *either* client is prohibited if it "will be or is likely to be adversely affected by" the representation of the other client. D.C. Rule of Prof'l Conduct 1.7(b)(1), (2). This type of conflict may be waived by informed consent by both clients "after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation." D.C. Rule of Prof'l

Conduct R. 1.7(c). However, even client consent has its limitations; only if the attorney can both continue the representation and comply with his other ethical obligations under the Rules will it overcome a conflict under Rule 17(b):

> The lawyer's authority to solicit and act upon the client's consent to a conflict is limited further by the requirement that the lawyer reasonably believe that he or she will be able to provide competent and diligent representation to each affected client. Generally, it is doubtful that a lawyer could hold such a belief where the representation of one client is likely to have a substantial and material adverse effect upon the interest of another client.

D.C. Rule of Prof'l Conduct R. 1.7, cmt 30.

Significantly, a different rule applies where an attorney seeks to represent a client in a matter in which a second *former* client has materially adverse interests. In such cases, Rule 1.9 applies: "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent." D.C. Rule of Prof'l. Conduct 1.9. For these purposes, "'material adversity' does not require showing that evidence be directly incriminating. . . . Rather, the limitations placed upon counsel are broader and encompass situations that (1) pit the duty of loyalty to each client against the loyalty to the other; and (2) risk breaching the duty of confidentiality to the client-witnesses." *United States v. Bikundi*, 80 F.Supp.3d 9, 17-18 (D.D.C. 2015) (citations and quotation marks omitted). This includes "situations where counsel must impeach the testimony of a former client or present inconsistent case theories (even where not directly inculpatory) as between the former client and the current client." *Id*.

Even where a conflict could be waived under Rules 1.7(b) or 1.9, the district court is not bound to accept the waiver. Rejecting a waiver is appropriate "if the conflict of interest jeopardizes the integrity of the proceedings." *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 200 (D.C.

11

Cir. 2013); *see Wheat*, 486 U.S. at 162 ("[W]here a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver [of the conflict], and insist that defendants be separately represented."). Indeed, "[a] district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat*, 486 U.S. at 163. "In making this determination, a court balances the defendant's right to choose his representative against both the defendant's countervailing right to conflict-free representation *and* the court's independent interest in the integrity of criminal proceedings." *Lopesierra-Gutierrez*, 708 F.3d at 200 (emphasis in original).

The "nature and extent of the conflict" govern whether a court should reject such a waiver. *Bikundi*, 80 F.Supp.3d at 16 (quoting *Lopesierra-Gutierrez*, 708 F.3d at 200). Where the same attorney represents a client and a potential witness against that client, an actual conflict exists. *United States v. Lorenzana-Cordon*, 125 F. Supp.3d 129, (D.D.C. 2015) (citing *United States v. Weaver*, 265 F.3d 1074, 1075-77 (D.C. Cir. 2001) (holding, in § 2255 litigation, that counsel's representation of a client and a potential witness against the client created a conflict of interest). An attorney's own acknowledgement of a conflict, while not determinative, should be given weight in a court's assessment of that conflict. *McCrimmon v. United States*, 853 A.2d 154, 164 (D.C. 2004) ("We have noted that the subjective belief of an attorney that a conflict is present, while not conclusive, is strong evidence of an actual conflict."). Moreover, a conflict violates a defendant's Sixth Amendment rights if it adversely impacts counsel's performance. *See id*. (citing *Mickens v. Taylor*, 535 U.S. 162, 166-74 (2002)). "If in the context of a particular case the district court believes a conflict is intolerable, it may decline to accept a defendant's waiver." *Lopesierra-*

*Gutierrez*, 708 F.3d at 202.

## III. ARGUMENT

Counsel's dual representation of witness ▇ and defendant Sutton creates an unwaivable conflict of interest under Rule 1.7(a) that both overcomes defendant Sutton's right to counsel of his choice and requires the attorneys' disqualification from this case. Both circumstances triggering Rule 1.7(a) are present here. First, Mr. Hannon and Mr. Richards represent both ▇ and defendant Sutton in the same matter: the criminal prosecution of defendant Sutton. Their dual representation ▇▇▇▇▇▇▇▇▇▇, ▇▇▇▇▇▇▇▇▇▇, where one client is now a named defendant (Sutton), and the other (▇) is a potential inculpatory witness against him. This qualifies as a dual representation in the same "matter" for purposes of this rule. See D.C. R. Prof'l Conduct 1.0(h) (defining "matter" to include "any litigation, . . . investigation, arrest, charge or accusation").[4]

Second, this dual representation will necessarily require the attorneys to improperly choose between their clients' adverse interests at trial. Such a scenario is not difficult to envision. For example, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[4] Mr. Hannon and Mr. Richards appear to have acknowledged the conflict, at least for a brief period, by momentarily referring ▇'s representation to Mr. Johnson. While not determinative, the Court may consider this as evidence of an actual conflict. *See McCrimmon*, 853 A.2d at 164 (permitting this inference).

13

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

Given this posture, Mr. Hannon cannot both represent ███ interests and effectively cross-examine ███ at defendant Sutton's trial, should ███ testify. The cross-examination of ███ ████████ █████████████████████████████████████████ ██████████████████████████████████████. ███ secrets obtained from representing ███ could be ripe for use when cross-examining him. This stands in direct conflict with ████ █████ ████████████████████████████████████████. Because ███'s interests stand in direct conflict to defendant Sutton's interests in cross-examining him, the attorneys' dual representation of both clients is exactly the type of unwaivable conflict that Rule 1.7(a) prohibits, and which requires disqualification. *See United States v. Davis,* 780 F.Supp. 21, 23–24 (D.D.C.1991) ("[E]ven if [challenged defense counsel] would have independent access to all possible impeaching information, the appearance of a conflict in using the information against a former client of his firm requires his disqualification.").

This conflict cannot be resolved simply by the attorneys terminating their representation of ██████ Because ███ and defendant Sutton are "materially adverse," Rule 1.9 forbids the continued representation of defendant Sutton absent informed consent from ███ However, the circumstances here strongly favor rejecting any such attempted waiver of the conflict by ███: as several courts have recognized, a defense attorney who must cross-examine a former client in a criminal case pits his ongoing duty of confidentiality to the former client against his obligations of zealous representation to his current client. *Bikundi*, 80 F.Supp.3d at 18 (disqualifying defense

counsel for this reason); *United States v. Alvarez*, No. 10-cr-20547, 2010 WL 4774649 (S.D. Fl. Nov. 16, 2010) (collecting cases); *see also Nix v. Whiteside*, 475 U.S. 157, 188 n.7 (1986) (Blackmun, J. concurring) (noting that "an attorney who has previously represented one of the state's witnesses has a continuing obligation to that former client not to reveal confidential information received during the course of the prior representation. That continuing duty could conflict with his obligation to his present client, the defendant, to cross-examine the state's witnesses zealously."). These conflicting responsibilities are not limited to the time of cross-examination at trial, but as illustrated in this matter, could impact the larger defense strategy:

> [I]n the context of successive representations, we find it difficult to envision circumstances more fraught with inherent conflicts than where an appointed attorney representing a reluctant defendant must present a defense theory inculpating the attorney's former client, particularly where the former representation was factually intertwined with the criminal defendant's case.

*Bikundi*, 80 F.Supp.3d at 18 (quoting *Church v. Sullivan*, 942 F.2d 1501, 1511 (10th Cir. 1991)). Here, a cross-examination of ▮ at trial would implicate exactly these concerns: to zealously represent defendant Sutton, Mr. Hannon must try to undermine ▮ testimony ▮ —or at least have the option of trying to do so. ▮



Given these competing ethical demands, Mr. Hannon and Mr. Richards cannot continue to represent defendant Sutton without risking the integrity of the proceedings, or at least creating the appearance of such risk. *See id*. (noting that such conflicts risk "taint [to] the integrity of the criminal proceeding and 'are insidious because it often is not clear that the conflict of interests, and not pure trial strategy, are the reasons for the tactics adopted—or forgone—at trial'" (quoting *United States v. Curcio*, 680 F.2d 881, 887 (2d. Cir. 1982))). Accordingly, even if Mr. Hannon

15

and Mr. Richards were to terminate ▓ representation, the Court should still decline to accept a waiver from ▓ and disqualify them.

## CONCLUSION

For the reasons given above, J. Michael Hannon, Harrison Richards, and the Hannon Law Group should be disqualified from representing any party or witness in this case.

>Respectfully submitted,
>
>CHANNING D. PHILLIPS
>Acting United States Attorney
>DC Bar No. 415793
>
>By: */s/ Risa Berkower*
>AHMED BASET
>IL Bar No. 6304552
>RISA BERKOWER
>NY Bar No. 4536538
>Assistant United States Attorneys
>U.S. Attorney's Office for the District of Columbia
>555 4th Street, N.W.
>Washington, D.C. 20530
>Phone: (202) 252-7097 (Baset)
>           (202) 252-6782 (Berkower)
>Email: Ahmed.Baset@usdoj.gov
>           risa.berkower@usdoj.gov