UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
FILED UNDER SEAL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **FILED UNDER SEAL** |
| | : | |
| v. | : | Case No. 21-cr-598-PLF-01 |
| | : | |
| TERENCE SUTTON and | : | Hon. Paul L. Friedman |
| ANDREW ZABAVSKY, | : | |
| | : | |
| Defendants. | : | |

**TERENCE D. SUTTON, JR.'S MOTION TO
COMPEL DISCLOSURE OF REQUESTED DISCOVERY**

Comes now Defendant Terence D. Sutton, Jr., through counsel HANNON LAW GROUP, LLP, and respectfully requests that the Court order the Government to produce all evidence of the following:

1. Audio recordings of the grand jury testimony for all witnesses who testified in the grand jury in relation to this case.

2. All recordings of the government's presentation of charges to the grand jury.

3. All information relating to the investigation into the Kennedy Street crew over the last five years, with specific mention of related incidents, related arrests, related charges, and suspected and confirmed members of the Kennedy Street crew. All MPD intel and/or bulletins regarding the Kennedy Street Crew.

4. All MPD intel regarding threats to Officer Sutton and other Fourth District officers related after Mr. Hylton-Brown's death and up to the present.

5. Location of any and all cameras maintained by the MPD and other Law Enforcement Agencies, including FBI, to monitor the Kennedy Street area. All recordings from these cameras in the government's possession.

6. Police video from the riots that occurred outside of the MPD's Fourth District Headquarters on October 27-28, 2020.

7. All Personnel Performance Management System ("PPMS") reports for all officer witnesses in this case.

1

8. Annual compendium/report of Pursuit Investigations for the past 10 years maintained by MPD Internal Affairs Division ("IAD"), and all IAD Pursuit Investigations for the recent years for which a compendium/report is not available.

9. All MPD Form 163s reported by Officer Terence D. Sutton, Jr., for all time.

10. All MPD Form 751s[1] for Officer Terence D. Sutton, Jr., for all time.

11. MPD Officer Safety Bulletins for the Fourth District.

12. All documents saved in the G-Drive for every CST officer or supervisor on any computer in the CST office prepared between 10:00 p.m. on October 23 to 10:00 p.m. October 24.

This information was requested from the government in a letter dated October 15, 2021. The government responded in a letter accompanying the second discovery disclosure on November 9, 2021. There were additional discovery requests which the government did not oppose. In response to the grand jury audio requested in No. 1, the government indicated that it would not provide the requested recordings because they are not discoverable. However, the government further indicated that, to the extent that its disclosure is required under the *Jencks* Act, the government would provide such recordings prior to any witness testimony at trial. Similarly, in response to the PPMS information requested in No. 7, the government indicated that it would provide such information in advance of any witness's testimony at trial. PPMS information consists of a report listing pending and sustained violations for officers.

---

[1] A PD Form 751 is a report of an award or honor. In the initial request, they were inadvertently identified by the wrong number, PD Form 750.

Regarding the information requested in No. 12, the government asserted that none of the requested materials is relevant, but suggested it might provide a narrower set of materials. The government declined to provide any of the information requested in Nos. 2-6[2] and 8-11, claiming the information sought is not discoverable.

## LEGAL STANDARD

The government's pretrial discovery obligations are grounded in *Brady* and its progeny, Rule 16, and *The Jenks Act*.

Under *Brady*, the government must disclose evidence to the defense, regardless of whether the defense requests the evidence, that is favorable, either because it is exculpatory or impeaching, and failure to do so violates due process whether the evidence was suppressed willfully or inadvertently, and prejudice ensues. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Agurs*, 427 U.S. 97 (1976); *United States v. Bagley*, 473 U.S. 667, 676 (1985); and *Kyles v. Whitley*, 514 U.S 419, 433-434 (1995)). The Federal Rules of Criminal Procedure were recently modified to ensure the prosecutor is reminded of compliance with its obligatory disclosures in every case. *See* Fed. Crim. Pro. R. 5(f)(1) ("In all criminal proceedings on the first scheduled court date when both prosecutor and defense counsel are present, the judge shall issue an oral and written order to prosecution and defense counsel that confirms the disclosure obligation of the prosecutor under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and the possible consequences of violating such order under applicable law.").

---

[2]  In response to the request in No. 3, the government agreed to provide the requested information as it pertains to Mr. Karon Hylton-Brown. However, the government declines to provide broader information relating to the long-term investigation into the KDY crew.

Evidence is material when there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. *See Cone v. Bell*, 556 U.S. 449, 469-70 (2009); *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001) ("*Bagley* makes the *extent* of the disclosure required by *Brady* dependent on the anticipated *remedy* for violation of the obligation to disclose: the prosecutor must disclose evidence if, without such disclosure, a reasonable probability will exist that the outcome of a trial in which the evidence had been disclosed would have been different."). A reasonable probability is a probability sufficient to undermine the outcome. *See United States v. Bagley*, 473 U.S. 667, 682 (1985). An assessment of prejudice asks "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S 419, 434 (1995).

Notwithstanding the fact that a true *Brady* violation involves a retrospective assessment, *see Strickler*, 527 at 281 ("strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict"), the government bears a disclosure burden which requires the government to assess information at the pretrial phase. *See United States v. Celis*, 608 F.3d 818, 835 (D.C. Cir. 2010) ("[the D.C. Circuit] instructed that "[d]isclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure.") (citation omitted); *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009) ("It would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute,

4

during trial."); *Coppa*, 267 F.3d at 142 ("…the timing of a disclosure required by *Brady* is also dependent upon the anticipated remedy for a violation of the obligation to disclose: the prosecutor must disclose 'material' … exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made."); *United States v. Safavian*, 233 F.R.D. 12 (D.D.C. 2005) ("The only question *before (and even during) trial* is whether the evidence at issue may be 'favorable to the accused'; if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial.") (emphasis added).

*Brady* and its progeny illustrate that the prosecutor has a "special role" in the "search for truth" because the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Strickler*, 527 U.S. at 281 (quoting *Berger v. United States*, 295 U.S. 78 (1935)). The Supreme Court has continuously reaffirmed prosecutors' "affirmative duty to disclose evidence favorable to a defendant" and that the "prudent prosecutor will resolve doubtful questions in favor of disclosure." *See United States v. Celis*, 608 F.3d 818, 835 (D.C. Cir. 2010) (quoting *Kyles*, 514 U.S. at 432; *Agurs*, 427 U.S. at 108); *see also United States v. Daum*, 847 F. Supp. 2d 18, 20 (D.D.C. 2012) ("Federal Rule of Criminal Procedure 16 was 'designed to provide a criminal defendant, in the interests of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case.'") (quoting *United States v. Poindexter*, 727 F. Sup. 1470, 1473 (D.D.C. 1989)).

In addition to exculpatory evidence, the government is required to provide documentary evidence which is necessary for the defendant to prepare a defense. Under Rule 16(a)(1)(E):

> the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; . . . .

Rule 16 is meant to ensure broad discovery that supports the defendant's theory of the case. *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989) ("The language and the spirit of the Rule are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case."). Under a plain reading of the rule, "production of documents … is required only if (1) the documents are 'within the government's possession, custody, or control,' and (2) the documents are material to the preparation of the defense." *United States v. Libby*, 429 F. Supp. 2d 1, 5 (D.D.C. 2006) (finding that possession, custody, or control compels disclosure of documents held by other government agencies like in the *Brady* context).

The "central requirement" of Rule 16(a)(1)(E)[3] is a showing of materiality to the preparation of the defense. *United States v. George* ("*George I*"), 786 F. Supp. 11, 13 (D.D.C. 1991). The materiality "hurdle is not a high one." *See id.* "Evidence must not simply 'bear some abstract logical relationship to the issues in the case… There must be some indication that pretrial disclosure of the disputed evidence would enable the defendant significantly to alter the

---

[3]   Rule 16(a)(1)(E) was formerly located at Rule 16(a)(1)(C). *See United States v. O'Keefe*, 2007 WL 1239204 *1, at *2 (D.D.C Apr. 27, 2007).

quantum of proof in his favor.'") (quoting *United States v. Secord*, 726 F. Supp. 845, 846 (D.D.C. 1989); *United States v. Ross*, 511 F.2d 757, 762-3 (5th Cir. 1975)).

Unlike under *Brady*, "documents [requested under Rule 16] need not directly relate to the defendant's guilt or innocence." *See id.*; *United States v. Flynn*, 411 F. Supp. 3d 15, 28 (D.D.C. 2019) ("The government's *Brady* obligations are separate and distinct from its obligations under Rule 16 of the Federal Rules of Criminal Procedure, [Rule 16], which mandates the disclosure of any evidence that is material to the preparation of the defense.") (citations omitted). Under Rule 16(a)(1)(E), the requested information must "play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony or assisting impeachment or rebuttal." *United States v. Libby*, 429 F. Supp. 2d 1, 5 (D.D.C. 2006) (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993). The government "cannot take a narrow reading of the term 'material' in making its decisions on what to disclose under Rule 16. Nor may it put itself in the shoes of defense counsel in attempting to predict the nature of what the defense may be or what may be material to its preparation."). *See United States v. O'Keefe*, 2007 WL 1239204 *1, at *2 (D.D.D.C Apr. 27, 2007) (quoting *Safavian*, 233 F.R.D. at 15).

A court assessing materiality should "focus first on the indictment, which sets out the issues to which the defendant's theory of the case must respond." *United States v. George* ("*George II*"), 786 F. Supp. 56, 58 (D.D.C. 1992). Materiality has been described as "a sliding scale"; "when the requested documents are only tangentially relevant, the court may consider other factors, such as the burden on the government that production would entail…." *Id.* (citations omitted). However, "burdensomeness and logistical difficulty … cannot drive the decision whether items are material to preparation of the defense. *O'Keefe*, 2007 WL 1239204

7

at *2. Under this analysis, it is also relevant whether the defendant can obtain the information elsewhere. *See id.*

In *George II*, the defendant, the former deputy director for operations at the CIA, was charged in an indictment arising out of the Iran Contra affair. His request for certain classified documents was aimed at proving his "universe" as the deputy director for the CIA. *See id.* This request was made by reference to a related case brought in the Fourth Circuit, *United States v. Fernandez*. 913 F.2d 148 (1990). Fernandez sought to show that certain false statements with which he was charged were actually true and that he had not made others. *See id.* at 151. The district court granted Fernandez's request for two categories of classified information that were held material to Fernandez's defense. *See id.* After the Attorney General filed an affidavit prohibiting disclosure of some of this material information, the trial judge dismissed the indictment with prejudice. *See id.* at 153. The Fourth Circuit affirmed the dismissal based on the government's refusal to disclose certain material information, stating, "The nature of the charges against [Fernandez] demand that he be able to place his job before the jury in a concrete, palpable context, and that he be able to explain his understanding of the world in which he worked." *See id.* at 164.

While the Court rejected a request on a similar basis in *George II*, this was based on the scope and volume of the defendant's request. *See* 786 F. Supp. at 59 ("Comparison of Fernandez's request to those of this defendant demonstrate, however, that the *Fernandez* case is inapposite. The defendant in *Fernandez* requested a narrow array of documents which were directly related to the CIA's involvement with Contra resupply.").

## ARGUMENT

The Court should compel the government to turn over all of the requested information. The government's bases for refusing to turn over this information fall into three categories: (1) disclosure is premature; (2) request for disclosure is overbroad; and (3) disclosure is not required at any point. Each category and the relevant specific requests will be addressed in turn.

### 1. *Disclosure is Premature*

The government declines to provide the requested disclosures in Nos. 1 and 7 for grand jury audio and all officer-witnesses' PPMS reports as premature. The government also rejects that the grand jury audio is discoverable at all. Because the content of the audio is indistinguishable from the already provided grand jury transcripts, this argument is belied by the government's own disclosure. The argument that the audio could be discoverable under The *Jencks* Act but not until such time as witness testimony is imminent is also incorrect and not in keeping the government's responsibility to disclose information such that the defense can make effective use of it. *See United States v. Burke*, 571 F.3d at 1054 ("It would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial.").

The government has already disclosed the related grand jury transcripts to the audio recording. Additionally, the government provided some sections of the audio recording for ▇▇▇▇▇▇ grand jury testimony in advance of the first hearing on the Motion to Disqualify. ▇▇▇▇▇▇ grand jury audio was requested after reviewing the government's Reply in Support of the Motion to Disqualify. The government responded that it would provide ▇▇▇▇▇▇ grand jury testimony in audio form, but had discovered upon reviewing the audio that portions of government's whispered conversations at counsel's table were picked up

9

by the recording and therefor the recording would need to be redacted.  In the interest of time, the government proposed providing audio clips of the testimony that the government cited in its motion.  Undersigned counsel renewed the request for the entire audio with the referenced conversations redacted.   Subsequently, on November 10, 2021, the government changed its position and indicated in an email that the grand jury audio is not discoverable but that the previously referenced clips of ▉▉▉▉▉▉▉▉ testimony would be provided.

      The only reason for withholding the remaining grand jury audio in this case, having already disclosed unredacted transcripts, is strategic.  The content of the audio and the transcripts will be the same, except that the government has the advantage of knowing the tone of answers provided in the grand jury and how credible the testifying witnesses sounded in their responses. There is also the possibility that the manner in which officers answered questions does alter its meaning.  The government presented fourteen MPD Officers as witnesses in the grand jury.

      Only the government possesses this information right now.  Although it is not common practice in all cases to disclose the audio along with the transcripts, the government has granted the request in other cases.  Here, the government appeared amenable to disclose the audio until it was discovered to require additional time and effort to prepare.  This is not a basis for declining to provide the audio until a later time.  A significant portion of the evidence in this case arose solely in the grand jury.  The defense should have equivalent access to this information, which has itself already been provided in another form.

      Based on a preliminary review of the grand jury transcripts, the government interrupted witnesses while providing answers to questions, the government utilized leading questions, and the government repeated questions to get different answers. Grand jury witnesses in this case who have spoken with defense counsel confirmed the government behaved in this manner during

their testimony. The audio will be necessary to prevent the kind of impeachment or rehabilitation which may be unfair to the witness. And, the Court need not decide now whether use of the audio at trial will be necessary. If counsel wish to do so, the proposal can be fleshed out ahead of time.

Officer-witnesses' PPMS in this case should also be provided at this time and additionally be updated in advance of trial. Although such information is usually disclosed close to trial or before a particular witness testifies in a hearing as potentially impeaching information, this case is different in kind from any other prosecution against a civilian or officer. The government advances a novel theory of criminal liability for officers performing their duties on the job. To procure the indictment, the government asked many of the witnesses to opine on whether a chase occurred in this case. Whether such testimony would be admissible is a question to be addressed later. At this point, the government has used various officers' opinions on this matter to support its theory of prosecution to the grand jurors. Since the government has relied on this information to procure an indictment, any impeaching information against these officers is relevant and exculpatory under the facts and circumstances of this case. The disclosure of PPMS is appropriate at this time and will be relevant to the defense's impending Motion to Dismiss to the extent the government intends to rely on officers' testimony regarding the standards for compliance with MPD General Orders.

2. *Requested Disclosure is Overbroad*

In response to request No. 12 for "All documents saved in the G-Drive for every CST officer or supervisor and any computer in the CST office prepared between 10:00 p.m. on October 23 to 10:00 p.m. October 24." This request requires the government to access the electronic memory of 13 computers in the CST office at the Fourth District, hardly a burdensome

task. The government suggested that a narrower set of information is appropriately discoverable, but the request as phrased is too broad. The burden of collecting this information for disclosure is not a basis for rejecting the request in its entirety, and the government has provided no information suggesting this is a burdensome request.

task. The government suggested that a narrower set of information is appropriately discoverable, but the request as phrased is too broad. The burden of collecting this information for disclosure is not a basis for rejecting the request in its entirety, and the government has provided no information suggesting this is a burdensome request.

This information is important to the defense because the government has accused Officer Sutton of obstruction of justice in his preparation of an incomplete and draft traffic accident report. The draft report can be accessed from any computer in the CST office, and any officer can make contributions to the report. There is currently no evidence of who made the entries on the draft report, except that it was printed by Lt. Zabavsky on October 24, 2020 at 2:16 AM, after the CST officers had been suspended and sent home.

In addition, it is not uncommon for other officers to use the computers to prepare their own sections of a report, or even to prepare a word document the officer keeps privately. The information will also provide evidence on who was present in the office using a computer during a time period critical to the defense. Such information would inform the defense what additional witnesses need to be contacted and interviewed in preparation for trial.

### 3. *Disclosure Not Required*

In response to the remaining requests, Nos. 2-6 and 8-11, the government has declined to provide the requested information at any point in time on the basis that it is not discoverable. That is, the government does not seem to consider this information material. As noted above, the government agreed to provide a partial response to request No. 3 but rejected the remaining information requested. The relevance of each of these requests will be addressed in turn.

Request No. 2 for recordings of the government's presentation of charges to the grand jury are properly discoverable as the particular and relevant circumstances of this case

necessitate disclosure.  See *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 223 (1979).  Under Federal Rule of Criminal Procedure 6(e)(3)(E)(i), disclosure of grand jury materials may be authorized by the Court in connection with a judicial proceeding when the defendant shows that there is a particularized need or compelling necessity for disclosure of the material requested.  *United States v. Wilkerson*, 656 F. Supp. 2d 22, 34 (D.D.C. 2009), aff'd, 966 F.3d 828 (D.C. Cir. 2020) (citing *Smith v. United States*, 423 U.S. 1303, 1304 (1975)).

   The unusual nature of this case creates the particularized need for the requested recordings.  As discussed above, the government alleges a novel theory of criminal liability.  The contours of the government's legal theory will be the subject of pretrial motions and ought to be closely considered by the Court.  Additionally, the recordings will confirm whether the government ever conducted an investigation into a criminal civil rights violation or presented a charge for a criminal civil rights violation that was rejected by the grand jury.  In the indictment, as a basis for both the conspiracy and obstruction of justice charges, the government alleges that Officer Sutton intended to "prevent an internal investigation of the incident and referral of the matter to federal authorities for criminal civil rights investigation."  Indictment at ¶¶ 32, 50.  Proof that no criminal civil rights investigation was ever conducted could serve as grounds for dismissal of both the conspiracy and obstruction of justice charges.

   Request No. 8 for the "Annual compendium/report of Pursuit Investigations for the past 10 years maintained by MPD Internal Affairs Division (IAD), and all IAD Pursuit Investigations for the recent years for which a compendium/report is not available" is critical as it directly relates to the government's theory of criminal culpability in this case and Officer Sutton's defense.  The MPD website reports that the Internal Affairs Division maintains an annual compendium of all "Pursuit Investigations" that is publicly available.  This information is also

occasionally reported to the City Council. ▮

▮

Paragraph 26 of the indictment proposes several factors which the government presumably posits indicate Officer Sutton engaged in a police chase. *See* Indictment ¶¶ 26(a)-(i). The government further purports that there is a no-chase policy in Washington, D.C. which specifically precluded Officer Sutton's conduct in this case. *See id.* at ¶ 8. ▮

▮ However, the actual General Order upon which the government also relies bears none of these elements of a "chase", and does not even use the word "chase".

The General Order which the government cites as the basis of the indictment is GO 301.03. *See* Attachment A. The General Order states:

> When a member of the Metropolitan Police Department is engaged in a vehicular pursuit, the overriding responsibilities are the protection of human life and property. This order is designed to establish guidelines for members to follow that best protect the lives and property of all persons while member(s) are engaged in a pursuit situation.

General Order 301.03 (Background). This language clarifies what the General Order is and what it is not. Namely, it is policy guidance for officers to use in informing and guiding their discretion. What the government describes as a "no chase policy" is not mentioned anywhere in the order. ▮ It is hardly a bright line rule.

Several D.C. Council members have proposed legislation under Bill 24-213 that would significantly circumscribe officers' conduct in vehicular pursuits.  *See* https://lims.dccouncil.us/Legislation/B24-0213.  This is an important issue in this case which has been duplicated on a national basis, particularly in the last two years.  If the practices of MPD officers are to be subjected to criminal scrutiny, it is for the legislature to make that judgment.  In this case, the government purports that the General Order on vehicular pursuits carries the same weight and effect as such legislation.  It does not.

What is clear from video in this case is that Officer Sutton proceeded in a manner that he believed was in compliance with the Vehicular Pursuits General Order.  The government in the Indictment dramatizes the event, claiming that the CST vehicle reached a speed of 45 m.p.h., no doubt relying on a momentary view of the speedometer on Officer Sutton's body-worn camera.  It is not improper for an MPD Officer to exceed the speed limit, and the Indictment fails to report that most of the time the CST vehicle was traveling below the speed limit.  There is nothing in the Indictment nor in the evidence which demonstrates a clear-cut violation of any General Order, let alone the pursuit policy.  How the various elements of fact in this case are historically viewed by the Internal Affairs Division is the heart of Officer Sutton's defense.  Even if the government is able to prove that Officer Sutton was engaged in a vehicular pursuit and that it was in violation of this order, they have not proposed any evidence that this fact would give an officer notice of criminal culpability.  Put differently, one cannot violate a criminal statute by accident.

Whether Officer Sutton engaged in a chase and whether the government is correct that a policy prohibited Officer Sutton's conduct are clearly relevant questions for the defense to address in pretrial motions and trial preparation.  The compendium/report of pursuit

investigations is necessary for this inquiry. This information will be necessary for our standard of care expert. It will also be necessary to demonstrate the training – or lack thereof – that contradicts the kind of advance warning the government claims Officer Sutton has. Specifically, officers are trained that violation of constitutional rights can expose them to criminal liability. There is no similar training regarding General Order 301.03. This general order does not receive the kind of emphasis the government contends. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Officer Sutton should be permitted to explore in a motion to dismiss or at trial why this history has now been altered by the U.S. Attorney's Office.

Request Nos. 3 and 11, for "All information relating to the investigation into the Kennedy Street crew over the last five years, with specific mention of related incidents, related arrests, related charges, and suspected and confirmed members of the Kennedy Street crew. All MPD intel and/or bulletins regarding the Kennedy Street Crew" and "MPD Officer Safety Bulletins for the Fourth District" are properly discoverable in this case. The government has described Officer Sutton's conduct in this case as unusual and unlawful, stating, "Police officers are sworn to uphold the law and ensure the safety of the community. The vast majority of officers execute their duties in an exemplary manner, and we are grateful for their dedicated service … But when a select few violate their oath by engaging in criminal conduct, they cannot do so with impunity and must be held accountable. This indictment seeks to do just that." USAO-DC Press Release, "Two Officers Indicted on Charges in Death of 20-Year-Old Karon Hylton-Brown" (Sept. 24, 2021), https://www.justice.gov/usao-dc/pr/two-officers-indicted-charges-death-20-year-old-karon-hylton-brown.

16

The indictment similarly suggests the interaction between the officers and Mr. Hylton-Brown is suspect. *See* Indictment ¶ 10 ("Just after 10:00 p.m. on Friday, October 23, 2020, SUTTON – driving his unmarked police vehicle with three other officers—and Zabavsky—alone in his marked police vehicle—tried to stop Hylton-Brown, who was driving a moped, without a helmet, on the sidewalk."). ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. To the contrary, MPD's placement of the officers in that neighborhood and their interactions with civilians are appropriately contextualized by the larger investigative priorities of MPD. That is, the officers' judgments and decisions require reference to the long-term investigation into the KDY crew, including participation by the Federal Bureau of Investigations. Additionally, the MPD Safety Bulletins are similarly relevant as information known to officers which informs their practices and judgments.

Request Nos. 4 and 6 for "All MPD intel regarding threats to Officer Sutton and other Fourth District officers related after Mr. Hylton-Brown's death and up to the present" and "Police video from the riots that occurred outside of the MPD's Fourth District Headquarters on October 27-28, 2020" are properly discoverable. The community response to MPD and Officer Sutton following this incident involved potential witnesses to the incident on October 23, 2020 as well as potential witnesses to other previous interactions between Officer Sutton and Mr. Hylton-Brown. These threats are part of a concerted effort by the Kennedy Street Crew to intimidate the police.

Request No. 5 for "Location of any and all cameras maintained by the MPD and other Law Enforcement Agencies, including FBI, to monitor the Kennedy Street area. All recordings

from these cameras in the government's possession" is properly discoverable.  At this time, the government has turned over body worn camera and private security footage related to the October 23, 2020 incident as well as other previous incidents involving Officer Sutton, Mr. Hylton-Brown, or both.  Any other relevant video in the Kennedy Street area is appropriate for disclosure.  The location of cameras in the area will allow the defense to ensure that all relevant video has been collected and provided.  Failure to retrieve and preserve video from a camera in a relevant location would also form the basis of a sanctions motion.

Request Nos. 9 and 10 for "All MPD 163s reported by Officer Terence D. Sutton, Jr., for all time" and "All MPD 750s for Officer Terence D. Sutton, Jr., for all time" are properly discoverable.  To the extent that the government would call into question Officer Sutton's investigative integrity as an officer, Officer Sutton's prior work, evidenced by MPD 163s, and his record of accolades, as evidenced in MPD 750s, are appropriate for disclosure.  This information will also be relevant for experts the defense intends to call at trial.

WHEREFORE, Officer Sutton requests that the Court order the Government to produce all the information in the discovery requests made on October 15, 2021.

Dated: January 25, 2022                    Respectfully submitted,

                                                  HANNON LAW GROUP, LLP

                                                  __*s/J. Michael Hannon*__
                                                  J. Michael Hannon, #352526
                                                  Rachel E. Amster, #1618887
                                                  333 8th Street, NE
                                                  Washington, DC 20002
                                                  Tel: (202) 232-1907
                                                  Fax: (202) 232-3704
                                                  jhannon@hannonlawgroup.com
                                                  ramster@hannonlawgroup.com

                                                  *Attorneys for Defendant Terence D. Sutton, Jr.*