UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 21-0598-01 (PLF) |
| ) | |
| TERENCE SUTTON, ) | |
| ) | |
| Defendant. ) | |

OPINION AND ORDER

Defendant Terence Sutton has filed a motion for Brady sanctions, arguing that he

has been prejudiced by the government's failure to timely disclose exculpatory evidence

stemming from an apparent eyewitness's statements.  See Mr. Sutton's Motion for Brady

Sanctions ("Mot.") [Dkt. No. 67].  He asks that the Court order the government to produce every

document pertaining to investigators' and prosecutors' interactions with the witness and that the

Court conduct an evidentiary hearing at which the relevant investigators and prosecutors would

"testify under oath regarding their conduct in connection with [the witness]."  Reply to

Government Opposition to Mr. Sutton's Motion for Brady Sanctions ("Reply") [Dkt. No. 115]

at 15 (listing several possible "topics for examination" at such a hearing); see also Mot. at 8.[1]

The Court heard oral argument on the motion on January 25, 2022.

After carefully considering the parties' written and oral arguments and the entire

record in this case, the Court concludes that an evidentiary hearing is necessary to determine

---

[1]     Page number citations to documents that the parties have filed refer to those that
the Court's electronic case filing system automatically assigns, except for citations to trial
transcripts, in which case page number citations refer to the original page and line numbers.

whether the government violated its Brady obligations or its broad pre-trial duty of disclosure under this Court's Local Rules, Magistrate Judge Faruqui's September 24, 2021 order, and government counsel's ethical obligations.[2]

## I. BACKGROUND

### A. The Underlying Second Degree Murder Charge

On September 23, 2021, the Court unsealed an indictment returned by a federal grand jury charging Terence Sutton, an officer of the Metropolitan Police Department of the District of Columbia ("MPD"), with one count of murder in the second degree, in violation of D.C. Code § 22-2103; one count of conspiracy to obstruct justice, in violation of 18 U.S.C. § 371; and one count of obstruction of justice, in violation of 18 U.S.C. §§ 1512(b)(3), 2. See Indictment [Dkt. No. 1] ¶¶ 29, 31, 50.

As pertinent here, the grand jury alleges that on October 23, 2020, Mr. Sutton caused the death of Karon Hylton-Brown by recklessly pursuing Mr. Brown in a police vehicle for several blocks and at high speeds. See Indictment ¶¶ 1-2, 10-12, 20-27. Mr. Hylton-Brown, who was riding a rental moped, was mortally wounded when he was hit by oncoming traffic as he exited an alleyway, suffering severe head trauma. See id. ¶¶ 13, 18, 28. The grand jury asserts that Mr. Sutton pursued Mr. Hylton-Brown for a mere traffic violation – "driving a moped, without a helmet, on the sidewalk," id. ¶ 10 – in violation of the MPD vehicular pursuit

---

[2]     The documents and the attachments thereto that the Court has considered in connection with the pending motion include:  Mr. Sutton's Motion for Brady Sanctions ("Mot.") [Dkt. No. 67]; Government's Opposition to Mr. Sutton's Motion for Brady Sanctions ("Opp.") [Dkt. No. 92]; Reply to Government Opposition to Mr. Sutton's Motion for Brady Sanctions ("Reply") [Dkt. No. 115]; Mr. Sutton's Notice of Supplemental Authority [Dkt. No. 116]; Supplemental Memorandum in Support of Motion for Brady Sanctions ("Def. Suppl.") [Dkt. No. 126]; and Government's Reply to Mr. Sutton's Supplemental Memorandum for Brady Sanctions ("Gov't Suppl.") [Dkt. No. 128].

policy, which "prohibit[s] officers from pursuing a vehicle for the purpose of [e]ffecting a stop for a traffic violation," id. ¶ 8 (internal quotation omitted).

### B. The Events Precipitating Mr. Sutton's Motion for Brady Sanctions

Mr. Sutton's motion for Brady sanctions is predicated on events that occurred after the indictment was unsealed on September 23, 2021. The following day, Mr. Sutton appeared before Magistrate Judge Zia Faruqui for his initial hearing and arraignment. See September 24, 2021 Minute Entry. Also present were Assistant United States Attorneys ("AUSA") Risa Berkower and Ahmed Baset, who continue to serve as government counsel in this case. See id. During the hearing, Magistrate Judge Faruqui reminded government counsel of their obligations under Brady and its progeny and Rule 5(f) of the Federal Rules of Criminal Procedure to timely produce any exculpatory or impeachment evidence to Mr. Sutton:

> Next I want to warn the government pursuant to Rule 5(f) of the Rules of Criminal Procedure that they must turn over all exculpatory evidence as that term is defined in Brady v. Maryland and its related cases. Failing to do so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges, and contempt proceedings.
>
> It's important that you understand what that means, Mr. Sutton .... That means that if the government has evidence that's helpful to your case, they must turn it over quickly. They cannot sit on it.

Transcript of Initial Appearance/Arraignment ("Arraignment Transcript") [Dkt. No. 33] at 10:13-23 (emphasis added).[3] That same day, the government issued a press release announcing the charges against Mr. Sutton and his co-defendant, Andrew Zabavsky. See DEP'T

---

[3]     Pursuant to the Due Process Protections Act ("DPPA"), Pub. L. No. 116-182, 134 Stat. 894 (2020), "[i]n all criminal proceedings, on the first scheduled court date when both prosecutor and defense counsel are present, the judge shall issue an oral and written order to prosecution and defense counsel that confirms the disclosure obligation of the prosecutor under Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, and the possible consequences of violating such order under applicable law." FED. R. CRIM. P. 5(f)(1).

OF JUSTICE, *Two Officers Indicted on Charges in Death of 20-Year-Old Karon Hylton-Brown* (Sept. 24, 2021), https://www.justice.gov/usao-dc/pr/two-officers-indicted-charges-death-20-year-old-karon-hylton-brown.

The following day, on September 25, 2021, an individual ("the witness") flagged down Officer Michael Price while he was on patrol. See Mot. at 2; Opp. at 2; see also Defense Exhibit D – September 25, 2021 Email from Joe Della-Camera ("Def. Ex. D") [Dkt. No. 125-1] at 2.[4]  The witness claimed to be an eyewitness to the interaction between law enforcement and Mr. Hylton-Brown.  The witness told Officer Price that he was motivated to come forward by the news of the indictment against Mr. Sutton and Mr. Zabavsky. See Mot. at 2-3.  The witness claimed that, before the fatal crash, he observed Mr. Hylton-Brown throw something onto the ground while evading police officers in pursuit. See id. at 2; see also Def. Ex. D at 3.  Rounding out the conversation, the witness provided his full name, home address, and phone number to Officer Price and represented that he "was willing to contact or be contacted by other individuals involved in the case." Mot. at 2-3.  Less than one hour later, Officer Price provided a summary of this interaction to his superiors and uploaded a copy of the body-worn camera footage to an MPD internal database, both of which were forwarded to government counsel and their investigators within the next few days. See Mot. at 2-3; Def. Ex. D at 2 (forwarding summary on September 25, 2021); Def. Ex. E at 2-3 (granting access to body-worn camera footage on

---

[4]     This initial conversation was captured on Officer Price's body-worn camera, the transcript of which has not been filed on the public docket but was eventually produced to the defendant. See Mot. at 2 n.1; Defense Exhibit E – Evidence Audit Trail [Dkt. No. 126-1]; see also Transcript of January 25, 2022 Oral Argument ("Oral Argument Transcript") [Dkt. No. 128-1] at 62:4-9 (noting that the body-worn camera footage was produced to Mr. Sutton on November 9, 2021).  The Court's description of this interaction is based upon the parties' briefing as well as several police reports and emails that describe the interaction second hand. See, e.g., Mot. at 2-5; Opp. at 2-5; Defense Exhibit A – September 28, 2021 Memorandum of Investigation by Special Agent Ricardi ("Def. Ex. A") [Dkt. No. 67-2]; Def. Ex. D at 2-3.

September 27, 2021).  Neither Mr. Sutton nor his counsel were informed of this interaction or

provided with any evidence of it until weeks later, on November 9, 2021.  See Mot. at 5.

   According to the government, the witness's account triggered an "obligation to

collect information from him."  Opp. at 3.  On September 28, 2021, Special Agent Sean Ricardi

of the Criminal Investigations and Intelligence Unit of the U.S. Attorney's Office for the District

of Columbia ("USAO") called the witness to discuss his recounting of Mr. Hylton-Brown's

death in greater detail and interviewed him over the phone.  See Mot. at 3; see Defense Exhibit A

– September 28, 2021 Memorandum of Investigation by Special Agent Ricardi ("Def. Ex. A")

[Dkt. No. 67-2] (memorializing the telephone interview).  Both AUSA Berkower and AUSA

Baset were "present telephonically for the interview."  Defense Exhibit B – Supplemental

September 28, 2021 Memorandum of Investigation by Special Agent Ricardi [Dkt. No. 67-3]

at 2.

   During the interview, the witness stated that he initially came forward because he

himself previously "had been wrongfully accused of criminal activity" and did not want the same

to happen to Mr. Sutton.  Def. Ex. A at 2.  The witness explained that he saw Mr. Hylton-Brown

"stop and throw something" as he was "running in an alley" away from police.  Id.  But when

Special Agent Ricardi suggested that this telling was inconsistent with investigators'

understanding of the incident – i.e., that Mr. Hylton-Brown was riding a scooter and was not on

foot – the witness "changed his story" and agreed that Mr. Hylton-Brown was riding a scooter.

Id.  Throughout the interview, the witness "insisted that he did not want to make any formal

statements to investigators, or be involved with any legal proceedings," and he emphasized that

his statements to Officer Price were just "venting" or "voicing what he saw as a means to clear

his conscience."  Id.  At the end of the interview, Special Agent Ricardi asked the witness to

"take some time to reconsider meeting with agents in order to provide a more thorough and detailed account of what he observed." Id. The witness agreed to contact Special Agent Ricardi within the next two days for a follow-up interview. See id.

Three days later, on October 1, 2021, after not hearing back from the witness, Special Agents Ricardi and Geoffrey Guska showed up unannounced at the witness's last known address "in order to conduct a second interview." Defense Exhibit C – October 1, 2021 Memorandum of Investigation by Special Agent Ricardi ("Def. Ex. C") [Dkt. No. 67-4] at 2. The agents spoke with a woman, later identified as a relative of the witness, who was in the front yard. See id. She confirmed that the witness lived at the address, and the agents asked her to relate to the witness that he should call them when he was able. See id.

Approximately thirty minutes later, Special Agent Ricardi received four phone calls from the witness, the last of which the agent answered. Def. Ex. C at 2. The witness "appeared to be highly agitated" and "began to berate" Special Agent Ricardi for "coming to his residence, attempting to interview him when he stated he did not 'want to be involved,' and for scaring his [relative]." Id. Still agitated, the witness exclaimed that he "did not see nothing" and "did not say nothing." Id. Special Agent Ricardi advised that "he believed [the witness] may have lied to Officer Price" and told the witness that "telling the truth would be the right thing to do." Id. at 2-3. According to Special Agent Ricardi's memorandum of the interview, the witness then "admit[ted] that he initially lied to Officer Price." Id. When asked by Special Agent Ricardi whether he was being coerced or influenced into changing his story, the witness assertedly replied that he did not feel that "he was being intimidated" or "had any fear about talking with investigators." Id. at 2.

On October 5, 2021, the government produced an initial set of discovery to Mr.

Sutton. See Mot. at 5. Notably, at this time, the government did not produce any materials or

documents related to this witness, nor did it advise counsel for Mr. Sutton of the fact that the

witness had come forward at all. See id. According to the government, details of the witness's

testimony were not provided to Mr. Sutton in the first set of discovery because Special Agent

Ricardi was still awaiting approval from his supervisors on his draft memoranda of investigation

that memorialized his interviews with the witness. See Opp. at 4-5. It was not until over a

month later, on November 9, 2021, that the government produced the body-worn camera footage

and Special Agent Ricardi's memoranda of investigation to Mr. Sutton in a second set of

discovery. See Mot. at 5; Opp. at 4-5.[5]

Mr. Sutton filed his motion for Brady sanctions on December 2, 2021, arguing

that the government's delay in disclosing the witness's testimony was prejudicial and violated

the government's constitutional Brady obligations to timely disclose exculpatory material. See

Mot. at 7-8. He further asserted that the delay was intentional, intended to undermine the

credibility of the witness and to destroy the exculpatory value of the witness's statement to

Officer Price. See id. at 7. The parties fully briefed the motion and presented oral argument at

the January 25, 2022 motions hearing. At the Court's request, the parties filed supplemental

briefing regarding (1) whether the late disclosure of information, although made well before trial,

nevertheless may be prejudicial under Brady; and (2) whether there is any precedent for a court

to conduct a Brady evidentiary hearing where government investigators and prosecutors are

---

[5]     It was not until January 21, 2022, that the government produced a September 25,
2021 email summarizing Officer Price's initial conversation with the witness, which was
captured in its entirety on Officer Price's body-worn camera. See Def. Ex. D; Oral Argument
Transcript at 61:18-63:20.

required to testify about their conduct.  See Def. Suppl. at 5; Gov't Suppl. at 1.  The motion for

Brady sanctions is now ripe for decision.

## II.  LEGAL STANDARD

"Under Brady, 'the suppression by the prosecution of evidence favorable to an

accused upon request violates due process where the evidence is material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution.'" United States v.

Sitzmann, 74 F. Supp. 3d 128, 134 (D.D.C. 2014) (quoting Brady v. Maryland, 373 U.S. 83, 87

(1963)); see also United States v. Straker, 800 F.3d 570, 602 (D.C. Cir. 2015) (per curiam)

(noting that "[t]he Constitution's fair trial guarantee requires the prosecution to timely turn over

any information in the government's possession that is materially favorable to a criminal

defendant" (internal quotation omitted)).  The government is obligated to disclose such favorable

evidence "even in the absence of a defense request." United States v. Celis, 608 F.3d 818, 834

(D.C. Cir. 2010) (per curiam) (citing United States v. Agurs, 427 U.S. 97, 107 (1976)).

To prove that the government has violated its Brady obligations, a defendant

"must demonstrate three elements." United States v. Driscoll, 984 F.3d 103, 109 (D.C.

Cir. 2021) (quoting United States v. Borda, 848 F.3d 1044, 1066 (D.C. Cir. 2017)).  First, "[t]he

evidence at issue must be favorable to the accused, either because it is exculpatory, or because it

is impeaching." United States v. Sitzmann, 893 F.3d 811, 826 (D.C. Cir. 2018) (quoting

Strickler v. Greene, 527 U.S. 263, 281-82 (1999)); accord United States v. Bagley, 473 U.S. 667,

676 (1985) (citing Giglio v. United States, 405 U.S. 150, 154 (1972)).  Second, that favorable

evidence must have been suppressed by the government, either willfully or inadvertently.  See

United States v. Borda, 848 F.3d at 1066; see also Strickler v. Greene, 527 U.S. at 288 ("[U]nder

Brady an inadvertent nondisclosure has the same impact on the fairness of the proceedings as

8

deliberate concealment."). Third, "prejudice must have ensued." United States v. Sitzmann, 893 F.3d at 826 (quoting Strickler v. Greene, 527 U.S. at 288).

The courts of appeals have held that for prejudice to have ensued, "the defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" United States v. Sitzmann, 893 F.3d at 826 (quoting United States v. Bagley, 473 U.S. at 682). "[T]he question is not whether the defendant would more likely than not have received a different verdict, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." United States v. Clarke, 767 F. Supp. 2d 12, 40 (D.D.C. 2011) (quoting United States v. Oruche, 484 F.3d 590, 597 (D.C. Cir. 2007)); accord Kyles v. Whitley, 514 U.S. 419, 434 (1995).

Generally, this post hoc framework is appropriate for post-trial Brady claims, not pre-trial motions to compel Brady material. See United States v. Olsen, 704 F.3d 1172, 1183 n.3 (9th Cir. 2013). Compare United States v. Driscoll, 984 F.3d 103, 109-10 (D.C. Cir. 2021) (applying the framework on direct appeal), United States v. Clarke, 767 F. Supp. 2d at 40 (applying the framework to post-trial motions for dismissal or a new trial), and United States v. Spinner, 109 F. Supp. 2d 18, 20-21 (D.D.C. 2000) (applying the framework to a Section 2255 motion to vacate, set aside, and correct sentence), with United States v. Safavian, 233 F.R.D. 12, 16 (D.D.C. 2005) (noting that in the pre-trial setting the question "is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed"), and United States v. Sudikoff, 36 F. Supp. 2d 1196, 1198-99 (C.D. Cal. 1999) ("This [prejudice] standard is only appropriate, and thus applicable, in the context of appellate

review.  Whether disclosure would have influenced the outcome of a trial can only be determined
after the trial is completed . . . .").

In this case, Mr. Sutton has received the favorable evidence that the government
suppressed, albeit belatedly.  His argument therefore is that the government's <u>delay</u> in producing
<u>Brady</u> material has substantially prejudiced the preparation of his defense and his ability to make
use of the exculpatory evidence at trial, in violation of his constitutional right to due process.
Mr. Sutton asks for sanctions to mitigate that harm.

### III.  DISCUSSION

Mr. Sutton's claim – and the Court's analysis – focuses primarily on the
government's intentional delay in disclosing the witness's statement to MPD Officer Price until
after government agents had interviewed the witness twice.  <u>See</u> Mot. at 7-8; Reply at 11.
Although the government ultimately disclosed this information and other statements and
memoranda of interviews to Mr. Sutton, it did so only after USAO Special Agents Ricardi and
Guska had interviewed the witness and, importantly, after the witness recanted his initial
statement.  Although the witness first approached Officer Price on September 25, 2021, and the
USAO Special Agents interviewed him on September 28 and October 1, 2021, the government
did not make its disclosures until November 9, 2021.  <u>See</u> <u>supra</u> Section I.B.  In Mr. Sutton's
view, the government's delay resulted in blunting the exculpatory force of the witness's assertion
that he observed Mr. Hylton-Brown throw something onto the ground as he evaded police, as
well as undermining the witness's credibility should he be called to testify at trial.  Reply at 14
("What resulted was a destruction of the very evidence itself and a delay of greater than one
month in the defense's knowledge of the witness's existence."); <u>see</u> <u>United States v. Pasha</u>, 797
F.3d 1122, 1140 (D.C. Cir. 2015) (likening the improper withholding of testimonial evidence to

the destruction of physical evidence because a witness's memory may "not hold through the delay").

## A. *Brady*

Mr. Sutton claims that the government's "delay in disclosing [the witness's] statements is a <u>Brady</u> violation." Mot. at 8; <u>see</u> <u>supra</u> Part II. It is clear that the witness's initial statement to Officer Price is "favorable" evidence because it is exculpatory. <u>See</u> <u>United States v. Sitzmann</u>, 893 F.3d at 826; <u>United States v. Safavian</u>, 233 F.R.D. at 16 (defining favorable evidence as "any information in the possession of the government . . . that relates to guilt or punishment and that tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses"). The indictment alleges that Mr. Sutton "knew the MPD policy regarding vehicular pursuits," which "prohibit[ed] officers from 'pursuing a vehicle for the purpose of [e]ffecting a stop for a traffic violation,'" and that Mr. Sutton nevertheless pursued Mr. Hylton-Brown for driving a moped on the sidewalk without a helmet, a municipal traffic violation. Indictment [Dkt. No. 1] ¶¶ 8, 10. If believed, the witness's initial statement tends to rebut this allegation to the extent that it might corroborate Mr. Sutton's defense that he pursued Mr. Hylton-Brown not for a mere traffic violation but to effectuate a lawful <u>Terry</u> stop. <u>See</u> Reply at 11.[6]

---

[6]     The government suggests that it was not required to immediately disclose the witness's statement because "the witness's initial account to [Officer Price] is [demonstrably] false and admittedly fictitious, and is thus neither exculpatory [n]or impeaching." Oral Argument Transcript at 64:9-12; <u>see also</u> <u>id.</u> at 65:11-14, 67:4-6. In other words, the government seems to argue that the witness's statement is not in fact <u>Brady</u> material. This, simply put, is wrong. "The government is obligated to disclose all evidence relating to guilt or punishment which might be <u>reasonably considered</u> favorable to the defendant's case." <u>United States v. Safavian</u>, 233 F.R.D. at 17 (emphasis added) (quoting <u>United States v. Sudikoff</u>, 36 F. Supp. 2d at 1199-1200). "Where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure." <u>Id.</u> Where, as here, the government doubts the ultimate truth of an exculpatory account or piece of evidence, it may

The next question is whether the government improperly "suppressed" this clearly favorable evidence by delaying the disclosure of the witness's statements to Mr. Sutton. See United States v. Sitzmann, 893 F.3d at 826. When, as here, the government "tardily discloses" Brady material, "the timing of [such] disclosures . . . is important." United States v. Celis, 608 F.3d at 835. Generally, "[d]isclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case." Id. (alteration in original) (quoting United States v. Pollack, 534 F.2d 964, 973 (D.C. Cir. 1976)); see, e.g., United States v. Pasha, 797 F.3d at 1133 (noting that "counsel for the Government should have understood that as soon as they were finished talking with [a witness who gave an exculpatory account of events], they had an obligation to give that information to the defense").

Here, the government delayed for over a month before disclosing the witness's statements. But because no trial date had yet been set in this case, the government maintains that Mr. Sutton had – and still has – ample time to prepare his defense using the favorable evidence. See, e.g., United States v. Straker, 800 F.3d at 607 (finding no Brady violation where the late disclosure of Giglio material occurred "a mere two hours" before the witness took the stand); United States v. Moore, 867 F. Supp. 2d 150, 152 (D.D.C. 2012) (finding no Brady violation where defendant "ha[d] at least four days" to use tardily disclosed evidence); United States v. Morrow, 412 F. Supp. 2d 146, 161 (D.D.C. 2006) (finding no Brady violation where defendant

---

explore those suspicions before trial through further investigation and at trial using countervailing or impeaching evidence. What it may not do, however, is delay disclosure of such exculpatory evidence in the hopes that follow-up investigation will reveal that the evidence is less exculpatory than initially believed so that it need never be disclosed.

had substantial time, "weeks, in fact," to review and prepare to use Brady evidence for trial).[7]
The government argues that the circumstances here are distinguishable from instances of delayed
disclosure where courts have found that the government clearly suppressed Brady material. See,
e.g., United States v. Pasha, 797 F.3d at 1133 (finding inexcusable the delay in disclosure of
Brady material for "over eight months until the eve of trial"); United States v. Mason, 951 F.3d
567, 573 (D.C. Cir. 2020) (finding that the government's purposeful delay in disclosing Giglio
material "until trial was imminent" was "inexcusable").

       Mr. Sutton responds that, in this unique situation, the fact that there are several
months between now and the start of trial in which he can interview the witness and otherwise
investigate still cannot cure the prejudice caused by the government's conduct. In his view, the
government and its investigators have so poisoned the well – by re-interviewing the witness
twice, suggesting to him that he had lied in his first interaction with law enforcement, and telling
him that his statements were inconsistent with physical evidence – that the witness decided he
wanted nothing more to do with this matter and recanted his testimony. See Reply at 12-13; Oral
Argument Transcript at 85:4-9 (arguing that Special Agents Ricardi and Guska "accus[ed] the
witness of lying [a]s an interrogation technique"). Thus, Mr. Sutton argues, nothing the defense
does between now and the start of trial – including re-interviewing the witness – will be
sufficient to restore the witness's credibility or to rescue the exculpatory value of any trial
testimony he might give about his spontaneous reporting to Officer Price. See id. at 13-14. The
damage is done.

---

      [7]     On May 9, 2022, the Court entered an order scheduling trial to commence on
October 17, 2022. See Scheduling Order [Dkt. No. 166] at 1-2.

There is force to this argument – which is why, as discussed in Section III.C, the Court will conduct an evidentiary hearing to find the facts as to what was said to the witness and to determine whether any potential prejudice caused to Mr. Sutton by the government's delay must be mitigated by imposing appropriate sanctions.

The government attempts to justify its delayed disclosure of the witness's statements and its decision to conduct follow-up interviews of the witness by the USAO investigators – despite Magistrate Judge Faruqui's order – on the ground that the government has a supposed "obligation" to test the veracity and trustworthiness of the witness and to "collect information from him." Opp. at 3; see also Oral Argument Transcript at 66:17-67:1, 67:18-22. The government argues that it appropriately undertook an investigation of the witness's account before disclosing this exculpatory evidence because it needed to "understand . . . from this witness's point of view what it was that he saw" and "[s]imply test[] the veracity of the witness by indicating to him that the agent believed he was not telling the truth." Oral Argument Transcript at 66:22-23, 67:19-20; see also id. at 66:23-24 ("[W]e were really behind obtaining the truth from him.").

In response, counsel for Mr. Sutton points out that the government has cited to no authority recognizing such an obligation. See Reply at 12; Oral Argument Transcript at 57:4-16. Indeed, the Court has found no statute, Rule, or case that supports the government's position. Whatever obligation the government may think it had to collect additional evidence from or information about a witness, such a supposed duty to interview further does not supersede the government's obligation to promptly disclose exculpatory material in the first place. As the Court said at oral argument:

> So you say [the witness statement is] demonstrably false. You say
> it's not true. It may or may not be. You say there is evidence that
> shows it's false. Maybe [there is]. But the defense has a right to
> and had a right from the beginning to something, even if you
> thought it was false, anything the witness said which is
> exculpatory.

Oral Argument Transcript at 65:19-24; see also id. at 66:6-11 (noting that "it's not [a] defense to

a Brady motion that . . . the government doesn't believe what the witness said").

      "It is not for the prosecutor to decide not to disclose information that is on its face

exculpatory based on an assessment of how that evidence might be explained away or discredited

at trial, or ultimately rejected by the fact finder." Zanders v. United States, 999 A.2d 149, 164

(D.C. 2010): Rather, "disclosure must be timely if the defense is to have a fair opportunity to

pursue leads before they turn cold or potential witnesses become disinclined to cooperate with

the defense." Id.; see also United States v. Mason, 951 F.3d at 571-74 (suggesting that the

prosecutor's disclosure obligation first accrued when government counsel "learned of a rumor"

that a government witness intended to lie at trial, not months later when government counsel

obtained a letter written by the witness memorializing such a plan); United States v. Safavian,

233 F.R.D. at 17 ("[T]he government must always produce any potentially exculpatory or

otherwise favorable evidence without regard to how the withholding of such evidence might be

viewed – with the benefit of hindsight – as affecting the outcome of the trial. The question

before trial is not whether the government thinks that disclosure of the information or evidence it

is considering withholding might change the outcome of the trial going forward, but whether the

evidence is favorable and therefore must be disclosed."); LCrR 5.1(a) (describing the

government's obligation "to disclose [exculpatory] information . . . as soon as reasonably

possible after its existence is known").

It is demonstrably not the responsibility of a prosecutor to test the credibility or

trustworthiness of an exculpatory statement given by a witness or to weigh that statement against

their assessment of the inculpatory evidence in the case.  It is their responsibility to disclose

exculpatory evidence promptly no matter what they may think of its reliability or

trustworthiness.  See United States v. Hsia, 24 F. Supp. 2d 14, 30 (D.D.C. 1998) ("The

government must bear in mind . . . that it has the 'affirmative duty to resolve doubtful questions

in favor of disclosure,' and that 'if the sword of Damocles is hanging over the head of one of the

two parties, it is hanging over the head of the [government].'" (alteration in original) (quoting

United States v. Blackley, 986 F. Supp. 600, 607 (D.D.C. 1997))).

### B.  Broad Pre-Trial Duty of Disclosure

A separate question is whether the government has violated its broad pre-trial

duty of disclosure under (1) this Court's Local Rules; (2) Magistrate Judge Faruqui's September

24, 2021 order pursuant to the DPPA and Rule 5(f) of the Federal Rules of Criminal Procedure;

and (3) government counsel's ethical obligations.  See Cone v. Bell, 556 U.S. 449, 470 n.15

(2009) ("Although the Due Process Clause of the Fourteenth Amendment, as interpreted by

Brady, only mandates the disclosure of material evidence, the obligation to disclose evidence

favorable to the defense may arise more broadly under a prosecutor's ethical or statutory

obligations." (citing Kyles v. Whitley, 514 U.S. at 437)).  Although such a violation may not be

constitutional in magnitude, see Strickler v. Greene, 527 U.S. at 281, the imposition of sanctions

may nevertheless be appropriate to prevent the violation from tainting these proceedings.

Pursuant to Local Criminal Rule 5.1, "the government shall disclose to the

defense all information 'favorable to an accused' that is 'material either to guilt or to

punishment' under <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), and that is known to the government." LCrR 5.1(a).  The Rule further states:

> Beginning at the defendant's arraignment and continuing throughout the criminal proceeding, the government shall make good-faith efforts to disclose such information to the defense as soon as reasonably possible after its existence is known, so as to enable the defense to make effective use of the disclosed information in the preparation of its case.

<u>Id</u>.  If the government fails to do so, "in addition to ordering production of the information," the Court may, "(1) specify the terms and conditions of such production; (2) grant a continuance; (3) impose evidentiary sanctions; or (4) enter any other order that is just under the circumstances."  LCrR 5.1(g).

The government's obligation under Local Criminal Rule 5.1 to produce exculpatory evidence "as soon as reasonably possible" overlaps with its disclosure obligation under the DPPA.  <u>See</u> FED. R. CRIM. P. 5(f)(1).  As Magistrate Judge Faruqui expressly warned at the initial hearing, the government "must turn over all exculpatory evidence as that term is defined in <u>Brady v. Maryland</u> and its related cases," as "[f]ailing to do so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges, and contempt proceedings."  Arraignment Transcript at 10:13-19.

Finally, government counsel's ethical obligations impose disclosure requirements broader than what is constitutionally mandated. [8]  Under the applicable rules of professional conduct, "[t]he prosecutor in a criminal case shall not . . . [i]ntentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence

---

[8]      "An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."  28 U.S.C. § 530B.

or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense." D.C. RULES OF PRO. CONDUCT r. 3.8(e) (2007); see In re Kline, 113 A.3d 202, 213 (D.C. 2015) (holding that "Rule 3.8(e) requires a prosecutor to disclose all potentially exculpatory information in his or her possession regardless of whether that information would meet the materiality requirements of Bagley, Kyles, and their progeny"); see also MODEL RULES OF PRO. CONDUCT r. 3.8(d) (AM. BAR ASS'N 2020) (requiring "[t]he prosecutor in a criminal case [to] . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense"); ABA Comm. on Ethics & Pro. Resp., Formal Op. 09-454, 5 (2009) (observing, in relation to ABA Model Rule 3.8(d), that "[n]othing in the rule suggests a de minimis exception to the prosecutor's disclosure duty where, for example, the prosecutor believes . . . that the favorable evidence is highly unreliable").[9]

These myriad sources together impose on the government a broad obligation to disclose favorable evidence – without regard to its "materiality" – "as soon as reasonably possible after its existence is known." LCrR 5.1(a). Yet, despite this obligation and the express order of Magistrate Judge Faruqui, the government sat on the witness's exculpatory account for approximately six weeks. The government intentionally delayed its disclosure of the witness's statements so that USAO Special Agents Ricardi and Guska could interview the witness to assess

---

[9]     In addition, although it does not "create any rights, substantive or procedural, enforceable at law," Justice Manual § 1-1.200, the Justice Manual "requires disclosure by prosecutors of information beyond that which is 'material' to guilt," so long as such information is relevant and "significantly probative of the issues before the court." Id. § 9-5.001(C); see also id. § 9-5.001(C)(1) ("A prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime.").

– or, in Mr. Sutton's view, to undermine – the credibility of his account. Even if the government

doubted the veracity of the witness's recounting of events, it should have explored the matter

after disclosing the existence of the statement itself rather than delaying its disclosure. See Cone

v. Bell, 556 U.S. at 470 n.15 ("[T]he prudent prosecutor will err on the side of transparency,

resolving doubtful questions in favor of disclosure."); see also, e.g., United States v. Pasha, 797

F.3d at 1133 (endorsing the district court's statement that the prosecution should have

understood, upon hearing an eyewitness give an exculpatory account, that it "had an obligation to

give that information to the defense" "as soon as [it was] finished talking with [the

eyewitness]"); United States v. Mason, 951 F.3d at 573-74 (noting that the government's delayed

disclosure of impeachment evidence "for months" was "inexcusable").[10]

### C.  The Necessity of Additional Discovery and an Evidentiary Hearing

The potential harm stemming from the government's delayed disclosure of the

witness's statements cannot be fully ascertained at this time. In Mr. Sutton's view, the

government effectively "destroyed [the witness's] candid and selfless report to Officer Price" by

delaying disclosure of the statement until the witness, after twice speaking with USAO

investigators, recanted his initial account. Reply at 13-14. But according to the government, the

witness freely admitted that he had initially lied to Officer Price and said that he had not in fact

---

[10]     As this Court has previously observed, in the pre-trial context "[t]he only question
before (and even during) trial is whether the evidence at issue may be 'favorable to the accused';
if so, it must be disclosed without regard to whether the failure to disclose it likely would affect
the outcome of the upcoming trial." United States v. Safavian, 233 F.R.D. at 16; accord United
States v. Naegele, 468 F. Supp. 2d 150, 152-53 (D.D.C. 2007); cf. In re Kline, 113 A.2d
at 208-09 (noting that "it makes little common sense to premise a violation of [the prosecutor's
ethical obligations to disclose exculpatory evidence to the defendant] on the effect compliance
with that rule may have on the outcome of the underlying trial, because there can be 'no
objective, ad hoc way' for a prosecutor 'to evaluate before trial whether [evidence or
information] will be material to the outcome.'" (second alteration in original) (quoting Lewis v.
United States, 408 A.2d 303, 307 (D.C. 1979))).

seen anything. See Def. Ex. C at 2-3 ("[The witness] was also asked if he felt he was being intimidated or had any fear about talking with investigators. [The witness] replied that he did not."). Although nothing now prevents Mr. Sutton's counsel from speaking with the witness to independently assess his credibility, the Court agrees that it is necessary to determine, through discovery and live testimony, whether the witness was improperly influenced into changing his story or discouraged from testifying and to what extent the government's delayed disclosure may have prejudiced Mr. Sutton's preparation of his defense.

First, the Court will order the government to produce to Mr. Sutton on or before July 12, 2022, all documents and materials, including any internal memoranda and handwritten notes of USAO prosecutors and investigators and any email exchanges between them or with supervisors in the USAO, related to the witness's interactions with law enforcement regarding this case. To the extent that the government asserts any claims of privilege or work product protection over any such documents and materials, the government shall submit those documents and materials to the Court for in camera review and shall produce to the Court and Mr. Sutton a privilege log identifying the withheld documents and materials and explaining the reasons for their withholding.

Second, the Court will convene an evidentiary hearing on July 21, 2022, at 10:00 a.m., in Courtroom 29 in the William B. Bryant Annex to the E. Barrett Prettyman Courthouse at 333 Constitution Avenue N.W., Washington, D.C. 20001, at which Special Agents Ricardi and Guska will give testimony about their follow-up interviews with the witness on September 28 and October 1, 2021, and their discussions and internal communications with prosecutors.[11] The

---

[11]     Having reviewed the relevant case law, the Court concludes that it may conduct an evidentiary hearing pursuant to its inherent authority to further explore the potential prejudice created by the government's alleged violation of its broad duty of disclosure. See, e.g., United

Court wishes to hear testimony from both special agents about their interactions with the witness, any instructions received from and any conversations or communications with USAO prosecutors, and the circumstances under which the witness assertedly recanted his prior statement to Officer Price.  Mr. Sutton requests that AUSA Berkower and AUSA Baset also be made available to testify, but the Court sees no need to require attorneys for a party to become witnesses in this case.  Testimony from Special Agents Ricardi and Guska regarding any conversations they had with USAO prosecutors should suffice.

If the Court determines that the government violated either its <u>Brady</u> obligations or its broad pre-trial duty of disclosure, the Court may impose appropriate sanctions within its "sound discretion" to ensure that any further proceedings in this case are not "infected by non-disclosure of discoverable evidence."  <u>United States v. Pasha</u>, 797 F.3d at 1140-41 (internal quotation omitted); <u>see also id.</u> at 1141 ("Where the district court concludes that the government was dilatory in its compliance with <u>Brady</u>, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial." (quoting <u>United States v. Burke</u>, 571 F.3d 1048, 1054 (10th Cir. 2009))).

## IV.  CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Mr. Sutton's Motion for <u>Brady</u> Sanctions [Dkt. No. 67] is GRANTED IN PART; it is

---

States v. Borda, 848 F.3d at 1068 (noting that the district court conducted a post-trial evidentiary hearing to hear testimony from a DEA agent regarding her draft report that was arguably improperly withheld <u>Brady</u> material); <u>United States v. Driscoll</u>, 984 F.3d at 106 (noting that the district court "interrupted the trial and held an evidentiary hearing" to hear testimony from an IRS criminal investigator, for whom certain <u>Giglio</u> material was withheld until trial).

FURTHER ORDERED that the government shall produce to Mr. Sutton on or before July 12, 2022, all documents and materials, including any internal memoranda and handwritten notes of USAO prosecutors and investigators, and any email exchanges between them or with supervisors in the USAO, related to the witness's interactions with law enforcement in relation to this case. To the extent the government asserts any claims of privilege or work product protection over any such documents and materials, the government shall submit those documents and materials to the Court for in camera review and shall produce to the Court and Mr. Sutton a privilege log identifying the withheld documents and materials and explaining the reasons for their withholding; and it is

FURTHER ORDERED that the parties shall appear for an evidentiary hearing on July 21, 2022, at 10:00 a.m., in Courtroom 29 in the William B. Bryant Annex to the E. Barrett Prettyman Courthouse at 333 Constitution Avenue N.W., Washington, D.C. 20001. The Court will hear testimony from USAO Special Agents Sean Ricardi and Geoffrey Guska regarding their follow-up interviews with the witness, any instructions received from and any conversations or communications with USAO prosecutors, and the circumstances under which the witness assertedly recanted his prior statement to Officer Price.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 7|1|22

22