# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 21-cr-598-PLF-01 |
| | : | |
| TERENCE SUTTON and | : | Hon. Paul L. Friedman |
| ANDREW ZABAVSKY, | : | |
| | : | |
| Defendants. | : | |

## TERENCE D. SUTTON, JR.'S MOTION TO EXCLUDE EXPERT TESTIMONY

Comes now Defendant Terence D. Sutton, Jr., through counsel, HANNON LAW

GROUP, LLP, and hereby requests the Court to exclude the government's proposed expert

witnesses from offering expert and certain proposed fact testimony during trial in this matter

under Federal Rule of Evidence 702.  As grounds for this motion, Ofc. Sutton asserts the

following:

## INTRODUCTION

On July 14, 2022, the government provided expert notices for MPD Civilian Employee

Mark Hammond, MPD Officer Carolyn R. Totaro, retained expert Robert Drago, and Brian

Chase.  The government also provided a number of Memoranda of Investigation with Officer

Totaro and MPD Civilian Employee Hammond.  Attached to the notice was a written opinion

from Robert Drago, his credentials and a resume for Mark Hammond.  Neither MPD Officer

Totaro nor Mark Hammond prepared or signed a report of their opinions.  Instead, their opinions

are set forth in a letter from the government.  MPD Officer Totaro and Mark Hammond appear to

be reluctant expert witnesses, if experts at all.  The following are our observations relevant to the

proposed testimony of these three witnesses.

**Ofc. Carolyn R. Totaro**

MPD Officer Carolyn R. Totaro currently serves as an instructor at the MPD's Training Academy.  Ofc. Totaro joined the MPD in 2005, and served in patrol until 2014 when she was reassigned to the MPD's Training Academy.  Ofc. Totaro has served as an instructor at the MPD Training Academy since that time, apparently teaching driving skills.

The government met with Ofc. Totaro on three separate occasions close in time to the deadline for provision of expert notices in this case.  The first meeting took place on July 5, 2022, when USAO Special Agent (SA) Sean Ricardi and USAO Special Agent in Charge (SAIC) Tina Lukens interviewed Ofc. Totaro at the MPD Training Academy.[1]  Also present at the interview was Dr. Paula E. Gormley, Director of Continuing Studies at the Academy.  During the interview, Ofc. Totaro advised that she had never been involved in a "real-world" vehicle pursuit.  Nevertheless, the Special Agents questioned Ofc. Totaro about the particulars of vehicle pursuits and the training students receive on emergency driving and use of emergency equipment.  Ofc. Totaro advised that students at the training academy are warned about something she called "high speed pursuit syndrome" and possible civil or criminal liability stemming from failure to act with due regard for public safety.  Memorandum of Investigation, 07.05.2022, attached as Exhibit A.

Less than week thereafter, on July 11, 2022, Ofc. Totaro was summoned to the U.S. Attorney's Offices of SA Ricardi and AUSA Risa Berkower where they interviewed Ofc. Totaro

---

[1]     The United States Attorney's Office for the District of Columbia, over two decades ago, began to hire its own criminal investigators.  Apparently, the unit now has a Special Agent in Charge, mimicking the structure of the FBI and the USSS.  Under the DOJ Justice Manual, cases involving use of force by law enforcement officers is within the purview of the FBI Civil Rights Division as well as DOJ's Civil Rights Division.  We are unaware of the scope of involvement by the FBI in this case.

again.  Seemingly concerned, Ofc. Totaro brought with her MPD Union Steward Curtis

Coleman.  The Memorandum of Investigation for this meeting reports:

> Officer Totaro expressed concerns related to meeting with SA Ricardi and AUSA
> Berkower without having sufficient time to review all materials which would be
> relevant to any possible testimony.  Officer Totaro also expressed concerns with
> proceeding with the meeting without going through her proper chain of command
> within MPD.

Memorandum of Investigation, 07.11.2022, at 1, attached as Exhibit B.  The meeting was

terminated, and SA Ricardi then served Ofc. Totaro with a subpoena commanding her to appear

for trial in this case on October 19, 2022.  The government was unaware whether Ofc. Totaro,

obviously, held any opinions helpful to its case against Ofc. Sutton.

Three days later, on July 14, 2022 – the day before expert notices were due in this case –

SA Ricardi and AUSA Berkower met with Ofc. Totaro a third time at the U.S. Attorney's Office

to have a more in-depth discussion about MPD's instructions and policies regarding emergency

driving and pursuits.[2]  Once again, Ofc. Totaro was accompanied by an MPD Union Steward.

Ofc. Totaro reviewed training materials provided to students at the MPD training academy,

which included information related to the MPD's General Orders, and offered the following:

> Students are taught that failure to act with due regard for public safety can expose
> officers engaged in a vehicular pursuit to criminal and civil liability, even if the
> pursuit is legal and within policy.  Students are taught that any breach of duty
> owed to the public can result in criminal or civil liability.

> Reasonable suspicion that someone committed, or was in the process of
> committing a felony, is not a good enough reason to initiate a vehicle pursuit.
> Probable cause is required to initiate a vehicle pursuit.

> No MPD policy mandates initiating a Terry stop if officers thought a suspect was
> armed, even if it meant initiating a vehicle pursuit.

---

[2]      The United States Attorney's Office has the ability to summon any MPD officer to its of-
fices for "case preparation."  We do not know yet whether that was how Ofc. Totaro was sum-
moned.

Memorandum of Investigation, 07.14.2022, attached as Exhibit C.  Ofc. Totaro was then asked to review video footage that captured portions of the incident in this matter.  Ofc. Totaro reviewed footage captured on the BWC of Officers Sutton and Tejera, MPD surveillance camera, and home surveillance cameras.  After reviewing the footage, Ofc. Totaro provided her thoughts regarding the actions taken by the defendants.  Ofc. Totaro stated the following:

> The CST units should have discontinued following Hylton-Brown after initially attempting to stop him at 5th and Kennedy Streets in order to be within policy.

> There were several MPD policy violations in the videos she watched related to portions of the pursuit, which included: failure to fully activate lights and sirens, failure to put pursuit information over the main radio, and pursuing for a traffic violation.

> Ofc. Sutton was following or mimicking the movements of Hylton-Brown during the encounter, which were signs of target fixation and tunnel vision.

> The speedometer in Ofc. Sutton's vehicle moved from approximately 19 mph to approximately 26 mph as Ofc. Sutton drove through the alley south of the crash scene.

Memorandum of Interview, 07.14.2022 at 2-3, attached as Exhibit C.[3]

In their expert notice the government stated that it "anticipates calling Officer Totaro both as a fact witness and as an expert witness."  *Id*. at 2.  The notice, however, is replete with observations that Ofc. Totaro *may testify* about a variety of subjects, and that all of her relevant thoughts *may* mean something or *may* mean something else.  Government Discovery Letter #8 and Expert Disclosure at 2-4, attached as Exhibit E.  The relevant portions are the following:

> Ofc. Totaro will describe the driver training for new MPD recruits, although she did not train Ofc. Sutton.  This includes emergency response operations, vehicle pursuits, and the legal and MPD policy requirements for officers while driving MPD vehicles.

---

[3]      The government continues to see through a somewhat myopic prism.  All of the elements presented to Ofc. Totaro are completely consistent with an MPD officer engaging in a *Terry* stop under both MPD General Orders and the Constitution.

She is proposed to testify that in her training of new recruits, they are taught how to utilize their emergency equipment during a pursuit, and they are taught on using radio communications.  She will explain that recruits are also taught about "high speed pursuit syndrome" in which an officer *allegedly may develop tunnel vision.*

In the words of the government's notice, "[o]fficers are taught that public safety must be their primary focus; that if they do not make driving decisions that are within MPD policy they may be subject to departmental discipline, and *that even if they do act within MPD policy but do not exercise 'due regard' for public safety, they may be subject to civil or criminal liability."  Id.* at 3 (emphasis supplied).  There is no further explanation of what this means.

Ofc. Totaro reviewed the training materials for Ofc. Sutton from over a decade ago, and will testify they are the same materials she teaches today.

Ofc. Totaro will then provide an opinion "about the events in this case."  She will offer the opinion that Ofc. Sutton engaged in a pursuit under MPD General Orders in place at the time.

After detailing the ways in which Ofc. Sutton violated the MPD General Order on vehicular pursuits, "Officer Totaro will opine that these choices by the defendant made this pursuit more dangerous to everyone involved and to the public."  *Id*. at 4.

The basis for her opinions are her training and experience as an MPD driving instructor.

### Robert Drago

Robert Drago is a retired law enforcement officer from Florida who provides police

practices consultation and expert witness testimony through Eye to Eye Consultants, Inc.  Mr.

Drago's thirty-eight-year career in law enforcement began with the City of Pompano Beach,

Florida, before it merged with the Broward County Sheriff's Office in 1999.  Mr. Drago spent

the remainder of his career with the Broward County Sheriff's Office before retiring in February

of 2017.  There is no indication in the government's disclosures or Mr. Drago's *curriculum vitae*

that Mr. Drago has participated in any law enforcement related educational programs or

professional seminars since his retirement in 2017.

The government retained Mr. Drago as a consultant and expert in this matter.  Mr. Drago was asked to review documents and video footage related to this matter, then render his expert opinions about the police actions taken by the Ofc. Sutton and Lt. Zabavsky.[4]  Mr. Drago opines the following:

> Officer Sutton and Lieutenant Zabavsky used objectively unreasonable force[5] against Mr. Hylton-Brown, which led to his death in a fatal traffic accident.
>
> The two officers *knowingly and intentionally* participated in a vehicular pursuit with *gross negligence*[6] and in violation of Washington D.C. police policy and training, as well as nationally accepted police practices pertaining to vehicle pursuits.
>
> They *carried out a police pursuit* in a residential neighborhood for a traffic violation, which is clearly prohibited by Washington D.C. police department policy.
>
> The two officers *had no probable cause* to believe Mr. Hylton-Brown had committed any serious crimes at this time and his personal identity was known to them.
>
> Standard police practice and procedure, both nationally and as stated in the Washington D.C. police department policy, requires a pursuit to be terminated once the subject is identified.
>
> The officers had *no reasonable suspicion* to believe that Mr. Hylton-Brown would be a danger to the public, if not taken into custody.
>
> Nationally accepted police practice is that once the danger of the vehicle pursuit becomes greater to the public safety than the apprehension of the subject, if left at large, the pursuit must be terminated.

---

[4]     We have reviewed Lt. Zabavsky's motion to exclude Mr. Drago's opinions and join in the arguments he has made.

[5]     Mr. Drago cannot be permitted to opine that the officers used "force" in this case.  Use of force is a conclusion of constitutional dimension.  The Supreme Court has held that a pursuit does not constitute any use of force by officers.  *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989).

[6]     Nor can Mr. Drago opine on such a legal conclusion, particularly where gross negligence does not even approach the level of *mens rea* require for Murder in the Second Degree.

Under the totality of the circumstances, considered from a reasonable officer's perspective at that time, the vehicle pursuit and force used was *unreasonable and grossly negligent* [7] in accordance with nationally accepted police practices.

The vehicle crash report completed by Officer Sutton and supported by Lieutenant Zabavsky described a fictional account of events noted for omissions and mis-stated facts.  No vehicle pursuit form was completed for follow up by the Command Staff.

The officers failure to notify IAD and MCU resulted in the delaying of the investigation, which will always result in an investigation being compromised to some degree.

Officer Sutton and Lieutenant Zabavsky violated their own department's police policy and that of nationally recognized and accepted police practices.  Their misstatements and camouflage of facts, stated in their written police reports, supports their own *consciousness of guilt of their actions taken, which contributed to the death of Mr. Hylton-Brown*.

Opinion of Robert Drago at 2-3, attached as Exhibit F (emphasis supplied).

**Mark Hammond**

On June 22, 2022, SA Sean Ricardi and FBI SA Luke Brunot interviewed Mark

Hammond at the Training Academy when he was still employed as a police officer with MPD.

At the beginning of the interview, Officer Hammond expressed his reluctance to be involved

with the case.  The MOI described his concern as follows:

Officer Hammond stated that he is reluctant to be involved with this investigation due to fear of reprisals from within MPD.  Hammond feels any involvement could harm his career and cause him personal stress.  Hammond also stated that he had "old wounds that have not healed" due to a falling out he had with the Driver Training Unit while he was assigned there.

\*          \*          \*          \*

Hammond described the circumstances of his falling out with the MPD Driver Training Unit.  Hammond stated that he felt he was treated poorly as an instructor, which he believed was due his frequent vocalization of frustration over deficiencies with the program.  Hammond stated that he, along with other instructors, were extremely dissatisfied with cutbacks in the program.  Hammond

---

[7]     See footnote 4.

cited the removal of in-service driving training as a major cause for concern about the direction of the program.  Hammond also discussed the fact that the physical training location was moved from the facilities located at the Federal Law Enforcement Training Center (FLETC) in Cheltenham, MD, to an inadequate site which was the parking lot of the old Fed Ex field in Washington DC.

        \*        \*        \*        \*

Hammond stated that despite his strong reservations about being involved with this investigation he was willing to talk with the agents regarding his knowledge of MPD pursuit policy, and his knowledge of pursuit tactics and techniques.

Memorandum of Investigation, 06.23.2022 at 1-2, attached as Exhibit D.

On June 30, 2022, SA Sean Ricardi, SAIC Tina Lukens, and AUSA Risa Berkower met with Ofc. Hammond again at the Training Academy.  The one-page Memorandum of Investigation reports the following:

Hammond stated he is reluctant to become involved with the investigation as a witness, due to the falling out he had with the MPD driver training program he referenced during the June 23, 2022, interview.  Hammond stated that since the June 23, 2022, interview he has given the matter further thought, and is experiencing extreme stress and anxiety.

It was explained to Hammond that he has firsthand knowledge of information critical to the case and would likely need to be involved with the trial, despite his hesitancy.

SA Ricardi served Hammond with a District Court trial subpoena requiring his appearance for trial on October 19, 2022.

Memorandum of Investigation, 06.30.2022 at 1, attached as Exhibit E.

Presumably relying on the subpoena served on Mr. Hammond's, in its notice of expert opinion, the government states the following, in pertinent part, regarding the anticipated testimony of Mr. Hammond:

SPO Hammond taught the vehicle skills class at the MPD Training Academy that defendant Sutton attended as an MPD recruit.  The government anticipates calling SPO Hammond primarily as a fact witness to testify to the training defendant Sutton received and the concepts and lessons taught in the course.

\*　　　\*　　　\*　　　\*

SPO Hammond *may also opine* on the BWC footage of the incident in this case from defendant Sutton's front seat passenger (Tejera), and that the defendant's manner of driving in the final alleyway before the crash *suggested target fixation* because the defendant's car was moving quickly toward the moped, without concern for fixed objects in the alley such as telephone poles.  SPO Hammond may opine that driving through the alley in this fashion presented a serious risk to all of the officers in the defendant's vehicle, including the defendant.  SPO Hammond *may also opine* that, with regard to the length of a vehicular pursuit, even one minute is a very long time during a pursuit.

Government Discovery Letter #8 and Expert Disclosure at 6, attached as Exhibit E (emphasis supplied).

## ARGUMENT

## I.    LEGAL STANDARD

"A district court has broad discretion in determining whether to admit or exclude expert testimony."  *Heller v. The District of Columbia*, 952 F. Supp. 2d 133, 138 (D.D.C. 2013)(quoting *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 895, (D.C. Cir. 2010)).  The admissibility of expert testimony is governed by Fed. R. Evid, 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.  Fed. R. Evid. 702 provides the following:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court "held that Rule 702 requires district courts to ensure that an expert's scientific testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 270 (D.D.C. 2018) (quoting *Daubert* 509 U.S. at 597). The Supreme Court also identified several relevant factors to be considered by a district court when determining the admissibility of expert witness testimony. Those factors include: "(1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community." *Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 10 (D.D.C. 2011), *aff'd*, 703 F.3d 547 (D.C. Cir. 2012) (citing *Daubert*, 509 U.S. at 592).

In *Kumho Tire Co. v. Carmichael*, the Supreme Court acknowledged that the *Daubert* factors "do not constitute a definitive checklist or test" and may not be applicable in all cases. 526 U.S. 137, 138 (1999). "In cases in which the *Daubert* factors do not apply 'reliability concerns may focus on personal knowledge or experience.'" *Khairkhwa v. Obama*, 793 F. Supp. at 11 (quoting *Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 6 (D.D.C. 2002) (internal citations omitted). Thus, "[t]he trial court's gatekeeping obligation applies not only to scientific testimony but to all expert testimony." *Khairkhwa*, 793 F. Supp. 2d at 10 (citing *Kumho Tire Co.*, 526 U.S. at 148).

"Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009); Fed. R.

Evid. 702.  "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject."  *Id*.  Nevertheless, the party offering the expert "bears the burden, by a 'preponderance of proof,' of establishing the qualifications of the proposed expert.  *Khairkhwa*, 793 F. Supp. 2d at 10 (citing *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 n. 9 (D.C. Cir. 2001).

## II.   EXPERT TESTIMONY REGARDING VIOLATIONS OF DEPARTMENT POLICY AND NATIONAL POLICE STANDARDS MUST BE EXCLUDED.

In this case, the government appears to propose that MPD Ofc. Totaro, MPD Employee Mark Hammond, and Robert Drago will testify that Ofc. Sutton did not follow MPD policies, orders, and training or other nationally accepted police policies.  The law does not permit the government to prove the underlying charges against Ofc. Sutton through expert testimony that he violated MPD policies, orders or training, or other nationally accepted police policies.  The Court should also exclude any and all expert testimony and fact testimony regarding teaching of or violations of MPD policies, procedures, standards and training, and nationally accepted police policies under Fed. R. Evid. 402 because such testimony is not relevant to establishing the crimes charged in this case.  Alternatively, the Court should exclude any expert testimony regarding violations of MPD policies, procedures, standards and training, and nationally accepted police policies pursuant to Fed. R. Evid. 403 because it creates a risk of juror confusion that substantially outweighs its probative value.

### A.   The Proffered Testimony is Not Relevant.

The trial court is cloaked with the discretion to determine whether expert testimony is reliable and relevant.  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining

the action" Fed. R. Evid. 401.  For an expert witness' proffered testimony to be relevant it must

"assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid.

702.  To assist the trier of fact in understanding the evidence, the testimony of an expert witness

must be legally relevant before the court even considers whether it would clarify something that

the jury would not be able to understand.  When an expert's testimony is an interpretation of

evidence that the jury could make without assistance of an expert, that testimony is inadmissible.

Any evidence or testimony related to the teaching of or the alleged violations of internal

policies or practices is not relevant or probative in a criminal case against a law enforcement

officer.  The Supreme Court addressed this issue in *Whren v. United States*, 517 U.S. 806 (1996).

In *Whren*, the Court evaluated whether police policies and practices could be used to determine

"what a 'reasonable officer' would do under the Fourth Amendment context of a traffic stop."

*Thompson v. City of Chicago*, 472 F.3d 444, 455 (7th Cir. 2006) (citing *Whren,* 517 U.S. 806,

815-16).  "The Court concluded that because police rules, practices and regulations vary from

place to place and from time to time, they are an unreliable gauge by which to measure the

objectivity and/or reasonableness of police conduct."  *Id*.

The Seventh Circuit confronted the same issue in *Thompson*, albeit in a civil case, when

it was tasked with determining whether a police department's general orders related to use of

force were relevant or material in a suit alleging an officer had used excessive force.  *Id*. at 446.

The Seventh Circuit embraced the rationale set forth by the Court in *Whren* in concluding that

use of "police manuals, guidelines or general orders" are not reliable or material for the purpose

of determining the reasonableness of an officer's use of force.  *Id*.  The Seventh Circuit reasoned

that the officer's conformity with the use of force general order "was irrelevant to the jury's

determination of whether his actions...were 'objectively reasonable' under the Fourth

Amendment." *Id*. at 455.  Accordingly, the Seventh Circuit affirmed the district court's decision to exclude the general orders as evidence.  *Id*. at 457.

The Seventh Circuit reasoned that an expert's insight on whether the officer used excessive force would not have had much value, aside from causing confusion while carrying a "substantial risk of prejudice."  *Id*.  The Seventh Circuit explained that the jury "was in as good a position as the experts to judge whether the force used by the officers to subdue [] [the suspect] was objectively reasonable given the circumstances", and that "[i]ntroducing two experts to testify that [] the officer used excessive force would have induced the jurors to substitute their own independent conclusions for that of the experts."  *Id*.

Eleven years after the *Thompson* case, the Seventh Circuit addressed the issue again; this time in a criminal matter.  In *United States v. Brown*, a local law enforcement officer was charged with falsifying a police record under 18 § U.S.C. 1519, and depriving a person of federal right under the color of law under 18 U.S.C. § 242.  871 F.3d 532, 535 (7th Cir. 2017).  The 18 U.S.C. § 242 count alleged that the officer had employed excessive force against the arrestee, thereby depriving the arrestee of his Fourth Amendment rights.  *Id*.  The defendant was convicted under the § 242 count, and appealed that decision to the Seventh Circuit based on the district court's "exclusion of his expert witness."  *Id*. at 536.  On appeal, the Seventh Circuit addressed two issues: (1) "whether the probative value of expert testimony regarding police department's use-of-force standard was substantially outweighed by danger of unfair prejudice" pursuant to Fed. R. Evid. 403; and (2) "whether expert's testimony that defendant acted reasonably under circumstances was inadmissible expert opinion about criminal defendant's state of mind."

The Seventh Circuit ultimately affirmed the district court's ruling on both issues.  When addressing the first issue, the Seventh Circuit employed the rationale the Supreme Court set forth in *Whren*.  The Seventh Circuit concluded that an officer's compliance with department standards or orders was not relevant to the issue presented to the jury, and stated the following:

> An officer's compliance with or deviation from departmental policy doesn't determine whether he used excessive force.  Put another way, a police officer's compliance with the rules of his department is neither sufficient nor necessary to satisfy the Fourth Amendment's reasonableness requirement.  Police policies are not nationally uniform; nor are they static.  If compliance with departmental policy were decisive, the Fourth Amendment's reasonableness standard would "vary from place to place and from time to time."  *Whren v. United States*, 517 U.S. 806, 815, (1996).  Worse, if compliance with departmental policy were the applicable legal standard, the police department itself would become the arbiter of Fourth Amendment reasonableness—a prospect that would have horrified those responsible for the Amendment's ratification.  See *Illinois v. Rodriguez*, 497 U.S. 177, 191 (1990) (internal citations omitted.)

*Id*. at 537.  The Seventh Circuit further elaborated on its reasoning and stated that "[e]vidence of purely localized police procedure is less likely to be helpful than nationally or widely used policy.  The jury's task is to determine how a reasonable officer would act in the circumstances, not how an officer in a particular local police department would act."  *Id*. at 538.  The Seventh Circuit declared that "[a]n expert's explanation of the Chicago Police Department's Use of Force Model would have added nothing that the jurors could not ascertain on their own by viewing the surveillance videotape and applying their everyday experience and common sense."  *Id*. at 539.

On the second issue, the Seventh Circuit concluded that the proffered testimony of defendant's expert witness "came too close to the line drawn in Rule 704(b), which prohibits expert opinion about a criminal defendant's state of mind."  *Id*. at 539.  The Seventh Circuit explained that the expert witnesses "opinion about objective reasonableness" was inadmissible because "an expert's role is to 'help the trier of fact to understand the evidence,' Fed. R. Evid. 702(a), not to draw conclusions for the fact finder when no help is needed."  *Id*.

14

The Tenth Circuit also dealt with this issue, and determined that evidence that a law enforcement officer violated standard operating procedures is irrelevant to the constitutional inquiry.  *See Tanberg v. Sholtis*, 401 F.3d 1151, 1167-68 (10th Cir. 2005).  In *Tanberg*, the Tenth Circuit cited to *Whren* and stated that the standard operating procedures were irrelevant to the issues presented because "[i]n the exclusionary rule context, the Supreme Court has rejected the use of local police regulations as a standard for evaluating constitutionality of police conduct, on the ground that such a 'basis of invalidation would not apply in jurisdictions that had a different practice.'"  *Tanberg*, 401 F.3d at 1163-64 (quoting *Whren*, 517 U.S. at 815).  The Tenth Circuit further stated:

> That an arrest violated police department procedures does not make it more or less likely that the arrest implicates the Fourth Amendment, and evidence of the violation is therefore irrelevant.  If [] [the defendant] violated the SOP governing the use of force in effecting arrest, that fact might well be pertinent to the Albuquerque Police Department's future decisions to promote, retain, or discipline him; it is not relevant to determining if Plaintiffs' arrest violated the reasonableness requirement of the Fourth Amendment.

*Tanberg*, 401 F.3d at 1163-64.  Accordingly, the Tenth Circuit upheld the district court's decision that the police department's standard operating procedures were not relevant and could lead to the jury confusing violations of the standard operating procedures with constitutional violations.  *Id*. at 1164.  The Tenth Circuit also concluded that an expert's opinion as to whether the officer's actions conformed with the police department's standard operating procedures "presented significant danger of jury confusion."  *Id*. at 1167.  For that reason, the Tenth Circuit upheld the district court's decision to exclude the proffered rebuttal testimony of the expert witness.  *Id*.

The proffered expert testimony of Ofc. Totaro, Mr. Hammond, and Mr. Drago must be excluded for the reasons similar testimony was excluded by the Supreme Court in *Whren*, the

Seventh Circuit in *Thompson* and *Brown*, and the Tenth Circuit in *Tanberg*.  Although those courts approached the issue in a different manner, they ultimately relied upon the same two principles as their bases for excluding expert testimony on police policies and practices.  Expert testimony on police policies, procedures, or practices cannot be admitted if it is not relevant to the underlying claims or charges, or if the probative value of the proffered testimony is outweighed by the risk of confusing the jury.

Here, any evidence or expert testimony that Ofc. Sutton did not comply with the MPD's policies, practices, or training is not probative or relevant as it has no bearing on the charges pending in this case.  Mr. Drago references the MPD's policies and training throughout his written opinion, and opines that Ofc. Sutton engaged in acts that were inconsistent with MPD policy and training.  Specifically, Mr. Drago opines that Ofc. Sutton "knowingly and intentionally participated in a vehicular pursuit with gross negligence and in violation of Washington D.C. police policy and training", and "carried out a police pursuit in a residential neighborhood for a traffic violation, which is clearly prohibited by Washington D.C. police department policy."  Exhibit G at 2-3.  Mr. Drago also opines that officers are required to terminate a pursuit "once the subject is identified" based on Washington D.C. police department policy, and concludes his written opinion by stating that "Officer Sutton and Lieutenant Zabavksy have violated their own department's police policy and that of nationally recognized and accepted police practices."  *Id*.

Similarly, Ofc. Totaro may opine that Ofc. Sutton committed several policy violations during what she classifies as the pursuit of Hylton-Brown.  Exhibit B at 2.  Ofc. Totaro also expresses her opinion on what is permissible and impermissible pursuant to MPD policy, and

whether Ofc. Sutton's actions comported with MPD policy and the training officers receive at the MPD Training Academy.  Exhibit B at 1-2.

Neither Ofc. Totaro nor Mr. Drago's anticipated expert testimony regarding MPD policies, practices, or training are relevant in the context of the crimes charged in this case.  Nor will their testimony aid the jury in determining whether Ofc. Sutton committed any of the crimes charged.  Violations of department policies and standards do not equate to violations of law, and expert testimony on department policies and standards does not assist in establishing any element of the crimes charged.  The jury's task is not to decide whether Ofc. Sutton violated the MPD's policies, standards, or training; it is to decide whether Ofc. Sutton violated D.C. Code § 22-2103, 18 U.S.C. § 371 , and 18 U.S.C. § 1512(b)(3).   Whether Ofc. Sutton failed to comply with the MPD's policies, practices, or training is simply not relevant in a criminal case where the focus is on the defendant's actions and state of mind.

Mr. Drago's proffered expert testimony regarding whether Ofc. Sutton conformed with nationally accepted police practices is also irrelevant.  The Tenth Circuit has explained that expert testimony on whether a law enforcement officer's conduct conformed with nationally accepted police practices or standards is irrelevant when deciding whether the officer acted unreasonably or used excessive force.  *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005).  In *Marquez*, the plaintiff sought to have its expert testify that the officer's actions "violated well established law enforcement standards".  *Id*.  The Tenth Circuit agreed with the district court, which held that "testimony regarding law enforcement standards was both irrelevant and confusing on the ground that such standards is not *ipso facto* a Fourth Amendment violation."  *Id*.  In his written opinion, Mr. Drago opines that Ofc. Sutton's actions violated "standard police practice and procedure" and "nationally accepted police practices".  Exhibit G

at 2-3.  Mr. Drago's testimony should be excluded for the same reasons the expert testimony on nationally accepted police practices was excluded in *Marquez*.[8]  It is irrelevant and carries a risk of confusing the jury.

The Fourth Circuit took a less restrictive approach in determining the admissibility of testimony regarding police department policies and procedures in *United States v. Perkins*, 470 F.3d 150, 159–60 (4th Cir. 2006).  In *Perkins*, the Fourth Circuit concluded that answers the experts provided to specific questions posed by the government were admissible.  *Id.* Specifically, the government asked the officers whether they believed there was any reason for the subject officer to use certain force against the suspect, and the officers answered that they saw no reason for the subject officer's use of force.  *Id.* at 159.  The Fourth Circuit concluded that the government's specific questions and the testimony in response to those questions were admissible, because they "were not couched in terms of objective reasonableness; instead, they honed in on [] [the officers'] personal assessments of [] [the subject officer's] use of force." *Id.* at 160.

The Fourth Circuit then made clear that "Rule 704 justifies differentiating between the officers' testimony that they saw no 'law enforcement' or 'legitimate' reason for [] [the subject

---

[8]     Although the Tenth Circuit cases referenced above are civil matters, the United States District Court for the District of New Mexico expressed "that a broad reading of the Tenth Circuit's decisions concerning the use of policies and standards is advisable." *United States v. Gould*, CR 03-2274 JB, 2007 WL 1302596, at \*4 (D.N.M. Mar. 17, 2007).  Accordingly, it adopted the view that there is no good reason not to allow use of policies against law enforcement officers in civil cases, but then allow policies to be used against law enforcement officers in criminal trials.  *Id.* ("While no Tenth Circuit case specifically addresses this issue in the criminal context, the Court does not believe that there is a reasonable distinction that would allow law enforcement policies and standards to be admitted in criminal but not civil matters.").  This is consistent with precedent that says that Supreme Court jurisprudence on Title 42 U.S.C. § 1983 has the same dignity as jurisprudence related to Title 18 U.S.C. § 242.  *See* Sutton Motion to Dismiss at 18-19, [Dkt. No. 188].

officer's] kicks and testimony that [] [the subject officer's] actions were 'objectively unreasonable.'" *Id*. In asking questions to the officers who were qualified as expert witnesses, the government did not introduce or reference specific departmental policies, orders, or practices. *Id*. at 153-154. Nor did the government seek to elicit testimony about whether the subject officer's use of force violated the department's policies and practices. *Id*.

Though the Fourth Circuit permitted testimony that the other circuits may have excluded, they balked at allowing experts to testify about an officer's conformity with specific policies, orders, and training. *Id*. at 159-160. The Fourth Circuit made a distinction between expert testimony that offers an opinion as to whether certain actions were generally necessary or taken for a legitimate purpose, and expert testimony that offers an opinion as to whether an officer complied with specific department policies, training, or practices. *Id*. at 159-160. The Fourth Circuit ruled that the former was admissible, while the latter was inadmissible. *Id*. Unlike the expert testimony that was admissible in *Perkins*, Ofc. Totaro, Mr. Hammond, and Mr. Drago reference specific MPD policies, orders and training, and their testimony expresses their opinions that Ofc. Sutton violated these specific policies, orders, and training. This type of expert testimony is not admissible under the Fourth Circuit's holding in *Perkins*, and it is certainly not admissible under the more restrictive approaches adopted by the Seventh Circuit in *Thompson* and *Brown* and the Tenth Circuit in *Tanberg*. Therefore, Ofc. Totaro and Mr. Drago's testimony regarding violations of MPD policies, practices, or training, and nationally accepted police practices should be excluded because it is not relevant.

> **B.    Any Probative Value of the Proffered Testimony is Substantially Outweighed by the Risk of Juror Confusion.**

Even if the Court determines that Ofc. Totaro, Mr. Hammond's and Mr. Drago's expert and fact testimony on the MPD's policies and nationally accepted police policies is relevant, the

Court should still exclude the testimony because the risk of juror confusion substantially

outweighs the probative value of their testimony.  Fed. R. Evid. 403.  Under Fed. R. of Evid.

403, the district court may exclude evidence when "its probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

      The proffered testimony of Ofc. Totaro, Mr. Hammond and Mr. Drago presents the

danger of confusing the issues and misleading the jury.  Reference to the MPD's policies and

nationally accepted police policies may confuse and mislead the jury as to the legal standards

with which Ofc. Sutton must comply.  The jury could confuse the difference between a violation

of the laws Ofc. Sutton has been charged with violating, and a violation of department policies

and nationally accepted police practices.  This creates the risk of the jury erroneously concluding

that a violation of department policies and nationally accepted police standards equates to a

violation of the law and the *mens rea* for Murder in the Second Degree.  The significant danger

and possibility for juror confusion was at least part of the reason the Seventh and Tenth Circuits

decided to preclude expert witnesses from testifying about whether an officer violated specific

department policies or nationally accepted police practices.  See *Tanberg*, 401 F.3d at 1163-64;

*Thompson*, 472 F.3d at 457; *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222.  For these

reasons, the Court should exclude the testimony of Ofc. Totaro and Mr. Drago regarding

violation of the MPD's policies and nationally accepted police policies.

      **C.**    **Mr. Drago Is Not Permitted to Render an Opinion as to Ofc. Sutton's State of Mind or the Reasonableness of Ofc. Sutton's Conduct.**

      In his written opinion Mr. Drago opines that Ofc. Sutton and Lt. Zabavsky "used

objectively unreasonable force against Mr. Hylton-Brown, which led to his death in a fatal traffic

accident."  Whether an officer used objectively reasonable force is a legal standard analyzed

under the Fourth Amendment, and expert testimony on the reasonableness of police action is

inadmissible because it is a statement of a legal conclusion.  "Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect, and thus it is not 'otherwise admissible.'"  *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997).

Mr. Drago's proffered testimony directly addresses the reasonableness of Ofc. Sutton's conduct, and tells the jury the result it should reach.  The reasonableness of Ofc. Sutton's conduct is a decision to be made by the jury, not Mr. Drago.  *McKnight v. District of Columbia*, 00-CV-2607 AK, 2006 WL 6904002, at *2 (D.D.C. Jan. 17, 2006) (an expert "may not testify that he believes that [] a use of force was 'unreasonable' or 'unjustified,' as this is the question the jury will ultimately have to decide.").  Consequently, Mr. Drago's opinion that Ofc. Sutton used "objectively unreasonable force" exceeds the scope of permissible testimony of an expert witness as it expresses a legal conclusion.  *See Perkins*, 470 F.3d at 159–60.

Mr. Drago's proffered testimony also crosses "the line drawn in Rule 704(b), which prohibits expert opinion about a criminal defendant's state of mind."  *Brown*, 871 F.3d at 539.  In *Brown*, the Seventh Circuit held that an expert could not offer his opinion on whether the law enforcement officer's use of force was reasonable because it related to the officer's state of mind. *Id*.  Here, Mr. Drago opines that Ofc. Sutton "knowingly and intentionally participated in a vehicular pursuit against Mr. Hylton-Brown", and that "the vehicle pursuit and force used was unreasonable and grossly negligent in accordance with nationally accepted police practices" is impermissible.

Determining a defendant's intent, motive, or state of mind is a task reserved for the jury. Mr. Drago's opinion that Ofc. Sutton "knowingly and intentionally" engaged in a pursuit of Hylton-Brown directly relates to Ofc. Sutton's guilt or innocence, as intent and knowledge are

key elements of two of the crimes charged in the Indictment.  Mr. Drago's opinion that the

"vehicle pursuit and force used was unreasonable and grossly negligent" also relates to Ofc.

Sutton's guilt or innocence, as it relates to the malice element of the Murder in the Second

Degree.  Accordingly, Mr. Drago's proffered testimony is also impermissible pursuant to Fed. R.

Evid. 704(b).

### D.       Mr. Drago May Not Testify to the Alleged "Fictional Account."

Mr. Drago is also reported to opine that the vehicle crash report completed by Officer

Sutton "described a fictional account of events."  The alleged "failure to notify IAD and MCU

resulted in delaying the investigation."  Finally, Mr. Drago states that Officer Sutton and

Lieutenant Zabavsky violated their own department's police policy, without stating what those

policies are.  This is the same defect we saw in the Indictment.  The Indictment says that the

officers did things, implying they were improper without citing any MPD policy, law or rule

which either required or did not require their conduct.

These opinions cannot be permitted.  Mr. Drago simply recites elements of obstruction of

justice listed in the Indictment and opines they are true.  There are no standards upon which he

relies, and there is no field of expertise which he even purports to rely upon for these opinions.

### E.       The Proffered Opinions Lack Documentary Support and the Government Has Rendered its Experts Fatally Ignorant.

The government must provide the defendant with the underlying documents upon which

the experts rely.  *United States v. Naegele*, 468 F.Supp.2d 175, 176 (D.D.C. 2007).  Notably

absent in the government's production is anything that justifies or explains the science behind

"high-speed pursuit syndrome" or "target fixation" which appear to underly the thoughts of Ofc.

Totaro, who has never herself engaged in a vehicular pursuit, and those of Mr. Hammond, who is

now an armorer for MPD.  Nor is there any explanation as to how this phenomenon is studied in

the field, or how one determines whether a particular officer has experienced this phenomenon. One wonders how long-haul truckers can safely deliver so much of America's products without road carnage.

More particularly, the government has rendered these two MPD employees purposefully ignorant of the underlying facts of the case, and more particularly elements of the theory of the defense. Ofc. Totaro seems oblivious to the MPD General Order on *Terry* stops, although she appears to have heard of a *Terry* stop. Ofc. Totaro is wise to be suspicious of the government's intimidating rush at her with a team made up of an Assistant United States Attorney, Special Agent of the Criminal Investigations Unit, the Special Agent in Charge of the Criminal Investigations Unit, and Ofc. Totaro's supervisor. In their quest for the truth, the team somehow caused Ofc. Totaro to opine clairvoyantly about a Terry stop in general terms: "Officer Totaro was asked if she was aware of any MPD general order which required officers to initiate a terry stop, even if it meant initiating a vehicle pursuit, if they thought a suspect was armed. Officer Totaro responded she was not aware of any policy which would mandate this." Memorandum of Investigation, 07.14.2022, at 2, Exhibit C.

On August 16, 2022, at the *Brady* hearing initiated by the Court, perhaps we will learn more about the relationship between the USAO in-house Criminal Investigation Unit and the prosecutors within the same office. It should be remembered that the downfall of the Ted Stevens prosecution was initiated by an FBI Agent whistleblower who revealed the misconduct among the prosecution team. This interview with Ofc. Totaro on the day before the government's expert notice was due is utterly transparent. This manipulation of Ofc. Totaro is another miscarriage, certainly to Ofc. Sutton, as the question twisted and twirled a rather naïve Officer who could not know the import of her answer.

There is nothing in the record that the USAO team advised any of these three witnesses that Ofc. Sutton is an experienced and decorated member of the Crime Suppression Team protecting the residents of the Kennedy Street corridor from the decades of drug trafficking by the KDY crew of which Hylton-Brown was a young Prince.  We request the Court to allow counsel for Ofc. Sutton to subpoena Ofc. Totaro and MPD armorer Hammond to the Daubert hearing now scheduled so they can be questioned on a number of topics: (1) do they know the government has identified them as expert witnesses in this case? (2) does the Metropolitan Police Department know that these employees have been subpoenaed to provide expert testimony?[9]; and, (3) what would these MPD members opine if they knew the full story?

### III.      DUAL-ROLE WITNESSES SHOULD NOT BE PERMITTED.

Courts are cognizant of the dangers associated with witnesses who offer both lay and expert testimony.  These witnesses are dubbed hybrid or dual-role witnesses, and the courts typically take procedural safeguards to prevent or mitigate the risks that accompany dual-role witnesses.  *Restoration Group, Inc. v. Liberty Mut. Group Inc.*, CV 18-2121 (BAH), 2020 WL 622152, at *4 (D.D.C. Feb. 10, 2020).  These risks include requiring the jury to determine which capacity the witness is testifying in, and leading the jury to assume that all of the witnesses testimony was based on their expertise and not their own perception of events being presented to the jury.  *Id*.  "These concerns about juror confusion may require, under Rule 403, the exclusion altogether of, or imposition of strict scope limits on, the expert portion of a hybrid witness's testimony or the use of other procedural safeguards against jury confusion."  *Id*.  "Such

---

[9]      As the Court knows, a federal agency generally will not permit an employee to be subpoenaed to any court to present expert testimony.  I doubt the Chief of Police would be pleased at the conduct of the government with his command.

safeguards might include requiring the witness to testify at different times, in each capacity; giving a cautionary instruction to the jury regarding the basis of the tes-timony; allowing for cross-examination by defense counsel; establishing a proper foundation for the expertise; or having counsel ground the question in either fact or expertise while asking the question." *United States v. Garcia*, 752 F.3d 382, 392 (4th Cir. 2014) (citing *United States v. Baptiste*, 596 F.3d 214, 224 (4th Cir. 2010)).

In their disclosures, the government states that it anticipates calling Ofc. Totaro and Mark Hammond both as a fact and expert witness. However, given the problems that accompany dual-role witnesses and the circumstances of this case, the Court should forbid these witnesses from testifying as an expert witness during the trial in this case. As explained above, the proffered testimony of Ofc. Totaro and Mark Hammond regarding the MPD's policies and training is not based on reliable principles and methods and is not helpful to the jury. The government has not provided any information demonstrating that Ofc. Totaro's expert opinion on MPD policy and training would be reliable or helpful, especially in light of the fact that Ofc. Totaro's proffered testimony is irrelevant to the charges at issue in this case.

Moreover, the summary of Ofc. Totaro's anticipated testimony reflects the problems that are likely to arise during trial should she be permitted to testify as a dual-role witness. In the summary of Ofc. Totaro's anticipated testimony, the government does not point out which portions of Ofc. Totaro's anticipated testimony will be made in her capacity of an expert witness, and which portions will be made in her capacity as a fact witness. Presumably, the government's failure to point out whether Ofc. Totaro is testifying based on fact or her expertise could carry over during trial. The nature of Ofc. Totaro's proffered testimony coupled with the inherent

risks in permitting hybrid witnesses make it too risky to allow Ofc. Totaro to proceed as a dual-role witness, even if the Court implemented safeguards to avoid jury confusion and prejudice.

**WHEREFORE**, Ofc. Sutton respectfully requests that this Court grant his motion and exclude the expert testimony of Ofc. Totaro, Mr. Drago, and Ofc. Hammond.

Dated: August 8, 2022                   Respectfully submitted,

HANNON LAW GROUP, LLP

___*s/J. Michael Hannon*___
J. Michael Hannon, #352526
Rachel E. Amster, #1618887
Harrison E. Richards, #1723607
1800 M Street, N.W., Suite 850 S
Washington, DC 20036
Tel: (202) 232-1907
Fax: (202) 232-3704
jhannon@hannonlawgroup.com
ramster@hannonlawgroup.com
hrichards@hannonlawgroup.com

*Attorneys for Defendant Terence D. Sutton, Jr.*

# EXHIBIT A



# United States Department of Justice
## United States Attorney's Office
## for the District of Columbia
## Criminal Investigations Unit

# Memorandum of Investigation

| | | | |
|---|---|---|---|
| **Case Number:** | 20R2429 | **Location:** | 4665 Blue Plains Drive<br>Washington DC |

| | |
|---|---|
| **Activity Type:** | Interview |
| **Date:** | July 5, 2022 |
| **Time:** | 1000 Hours |
| **Participant (s):** | SA Sean Ricardi (USAO-DC)<br>SAIC Tina Lukens (USAO-DC)<br>Officer Carolyn Totaro (MPD)<br>Paula Gormley (MPD) |

On July 5, 2022, U.S. Attorney's Office (USAO) District of Columbia (DC) Special Agent (SA) Sean Ricardi and USAO Special Agent in Charge (SAIC) Tina Lukens interviewed District of Columbia Metropolitan Police Department (MPD) Officer Carolyn Totaro. The interview took place at the MPD training academy located at 4665 Blue Plains Drive, Washington DC. Officer Totaro's Director, Doctor Paula Gormley, was also present.

Officer Totaro stated she has worked for MPD since 2005. Officer Totaro stated she was transferred to the MPD training academy in 2014 as an instructor, and in 2015, she became a full-time vehicle skills instructor. Officer Totaro stated updates to the MPD Driver Training Course curriculum were made since 2010, and noted the changes were minor.

*(Agent's Note: Totaro explained the overall course was still largely the same as it was in 2010).*

Officer Totaro mentioned a recent change to the driver training program included instruction requiring students to immediately activate their Body Worn Camera (BWC) when engaging emergency lights and sirens, or initiating a vehicle pursuit. Officer Totaro stated the recentfocus on activation of BWC's during emergency driving was partially in response to events related to this investigation

Officer Totaro informed SA Ricardi, she has never been involved in a "real-world" vehicle pursuit. Officer Totaro explained she had opportunities during her career to pursue, however, cited her aversion to the risks associated with vehicle pursuits as the reason behind not being involved.

Officer Totaro was questioned about the appropriate use of emergency equipment and radio communications during a vehicle pursuit. Officer Totaro stated MPD trainees are taught to immediately notify their radio dispatch when they engage in a vehicle pursuit. According to Officer Totaro, this is to notify nearby units, especially supervisors, that a pursuit has been initiated.  Officer Totaro stated trainees are taught it is critical for pursuing officers to provide constant updates on their pursuit status. Officer Totaro explained constant radio communications allows supervisors to monitor and, if necessary, call for the termination of a vehicle pursuit.

**USAO_016323**

Officer Totaro related peer-to-peer tactical radio channels should not be used for communication during vehicle pursuits because they do not allow everyone in the area, or dispatch, to have necessary knowledge of what is happening. Further, Officer Totaro added she personally thought use of peer-to-peer channels for pursuits was dangerous.

Officer Totaro stated MPD trainees are taught that when engaged in emergency driving, including vehicle pursuits, they must utilize their emergency equipment (both emergency lights and sirens). Officer Totaro related this is important because (1) it continuously informs the suspect that the officer wants them to stop; (2) it alerts nearby MPD units; and (3) it warns the public there is an emergency, and they should be prepared to yield for safety. Additionally, Officer Totaro stated it is important for officers to relay the reason they are perusing a suspect, so supervisors and other units know the reason for the pursuit. Officer Totaro stated vehicle pursuits are only authorized for crimes against persons that are serious felonies.

Officer Totaro explained the only reasons for deactivating emergency lights or sirens during a vehicle pursuit are (1) if the suspect stops, or (2) if the vehicle pursuit is terminated. Officer Totaro stated trainees are taught, "you are either committed to it or you are not" with respect to vehicle pursuits. Officer Totaro stated MPD trainees are taught to turn off their emergency equipment after they have completely disengaged the pursuit and put out the suspects last known location and direction of travel.

Officer Totaro stated students are warned about "High Speed Pursuit Syndrome". Officer Totaro described "High Speed Pursuit Syndrome" as the tendency for officers and suspects to develop tunnel vision during a vehicle pursuit, and to push themselves faster and faster during the pursuit. Officer Totaro reported constant radio communications may assist in breaking an officer's tunnel vision. Officer Totaro stated officers engaged in vehicle pursuits also have a tendency to mirror a suspect's moves, causing the pursuit to become increasingly dangerous. Officer Totaro related students are taught to slow themselves down during pursuits, which will often cause the suspect to slow down as well. Additionally, Officer Totaro noted students are also taught not to follow a suspect too closely and to avoid fixation on a suspect's vehicle.

Officer Totaro related public safety is the most important factor to consider with all vehicle operations. She stated that the duty to act with due care is heavily focused on in MPD driver training.  Officer Totaro explained that while supervisors can call for a pursuit's termination, the ultimate responsibility falls upon the officers engaged in the vehicle pursuit. Officer Totaro reported recruits are taught that public safety must be their primary focus, are warned about possible civil or criminal liability for failure to act with due regard for public safety.

Officer Totaro verbally indicated she understood her testimony may be required at the trial related to this investigation. Further, Officer Totaro agreed to meet with Agents and AUSAs in the future to discuss her knowledge of MPD driving instructions and policies related to emergency driving and pursuits.

Digitally signed by SEAN RICARDI
Date: 2022.07.14 12:31:45 -04'00'

Digitally signed by Tina Lukens
Date: 2022.07.14 14:37:01 -04'00'

Sean Ricardi
Special Agent

Tina Lukens
Special Agent in Charge

# EXHIBIT B



# United States Department of Justice
### United States Attorney's Office
### for the District of Columbia
### Criminal Investigations Unit

# Memorandum of Investigation

---

| **Case Number:** | 20R2429 | **Location:** | 601 D Street NW |
| | | | Washington DC |

| **Activity Type:** | Interview |
| **Date:** | July 11, 2022 |
| **Time:** | 11:00 hours |
| **Participant (s):** | SA Sean Ricardi (USAO-DC) |
| | AUSA Risa Berkower (USAO-DC) |
| | Officer Carolyn Totaro (MPD) |
| | Curtis Coleman (MPD) |

Reference is made to the Memorandum of Interview documenting the interview of Carolyn Totaro, dated July 5th, 2022.

On July 11, 2022, U.S. Attorney's Office (USAO) District of Columbia (DC) Special Agent (SA) Sean Ricardi, and Assistant United States Attorney Risa Berkower met with District of Columbia Metropolitan Police Department (MPD) Officer Carolyn Totaro at the USAO. MPD union steward Curtis Coleman was also in attendance.

Officer Totaro expressed concerns related to meeting with SA Ricardi and AUSA Berkower without having sufficient time to review all materials which would be relevant to any possible testimony. Officer Totaro also expressed concerns with proceeding with the meeting without going through her proper chain of command within MPD.

Officer Totaro provided a summary of her education, training, and experience in the field of law enforcement driving instruction.

- Officer Totaro graduated from Buffalo State University Bachelor's in Psychology in 2004;
- Completed the MPD basic Instructor course in 2014 (40 hours);
- Completed the MPD Driver Training Instructor Course in 2014 (80 hours);
- Completed a Louisiana State University Instructor development workshop in 2021 (40 hours) ;

In addition to these qualifications, Officer Totaro estimated she has been involved with approximately 520 hours of training as a driving instructor.

After discussing her concerns with AUSA Berkower, Officer Totaro stated that she would like to take time to review all relevant materials related to any potential testimony and make appropriate notifications to her chain of command regarding her involvement with the investigation. Officer Totaro and Coleman agreed to return to

the USAO on July 14, 2022, to participate in a more in-depth meeting regarding her knowledge pertaining to MPD driving instruction.

At the conclusion of the meeting, SA Ricardi served Officer Totaro with a District Court trial subpoena requiring her appearance for trial on October 19, 2022.

Digitally signed by SEAN
RICARDI
Date: 2022.07.13
11:52:59 -04'00'

Digitally signed by Tina
Lukens
Date: 2022.07.13
12:52:29 -04'00'

Sean Ricardi
Special Agent

Tina Lukens
Special Agent in Charge

# EXHIBIT C



# United States Department of Justice
## United States Attorney's Office
## for the District of Columbia
## Criminal Investigations Unit

# Memorandum of Investigation

| | | | |
|---|---|---|---|
| **Case Number:** | 20R2429 | **Location:** | 4665 Blue Plains Drive<br>Washington DC |

**Activity Type:** Interview

**Date:** June 23, 2022

**Time:** N/A

**Participant (s):** SA Sean Ricardi (USAO-DC)
SA Luke Brunot (FBI-WFO)
Mark Hammond (MPD)

On June 22, 2022, U.S. Attorney's Office (USAO) District of Columbia (DC) Special Agent (SA) Sean Ricardi and Federal Bureau of Investigation (FBI) SA Luke Brunot interviewed District of Columbia Metropolitan Police Department (MPD) Senior Police Officer Mark Hammond at the MPD training academy located at 4665 Blue Plains Drive, Washington DC. Officer Hammond stated that he is reluctant to be involved with this investigation due to fear of reprisals from within MPD. Hammond feels any involvement could harm his career and cause him personal stress. Hammond also stated that he had "old wounds that have not healed" due to a falling out he had with the Driver Training Unit while he was assigned there.

Hammond stated that he been employed by MPD as an instructor since 2008. From 2008 to 2019, Hammond was assigned as a driving instructor. In 2019, Hammond was moved from the Driver Training Unit to the Firearms Training Unit, located at the MPD academy. From 1991 to 2008, prior to his employment with MPD, Hammond was a Takoma Park, MD, police officer. At the time of his retirement from the Takoma Park Police Department, Hammond held the rank of Patrol Sergeant, a position he had held for over four years.  Hammond stated that as a Takoma Park police officer, he engaged in approximately five (5) vehicle pursuits, and as a sergeant he supervised approximately five (5) pursuits.

Hammond described the circumstances of his falling out with the MPD Driver Training Unit. Hammond stated that he felt he was treated poorly as an instructor, which he believed was due his frequent vocalization of frustration over deficiencies with the program. Hammond stated that he, along with other instructors, were extremely dissatisfied with cutbacks in the program. Hammond cited the removal of in-service driving training as a major cause for concern about the direction of the program. Hammond also discussed the fact that the physical training location was moved from the facilities located at the Federal Law Enforcement Training Center (FLETC) in Cheltenham, MD, to an inadequate site which was the parking lot of the old Fed Ex field in Washington DC.

Hammond stated that he believed he was continuously denied promotions within the Driver Training Unit due to his vocalization of concerns over training deficiencies. Hammond stated that on his last day as a driving instructor he arrived at his office to see all of his belongings outside of his office, in a hallway.

Hammond stated that despite his strong reservations about being involved with this investigation he was willing to talk with the agents regarding his knowledge of MPD pursuit policy, and his knowledge of pursuit tactics and techniques. Hammond was provided with the training materials for the 2010 MPD Driver Training Class in which he was an instructor and Terrance Sutton was a student in order to refresh his memory regarding what was taught in that class.

Hammond was questioned about proper radio procedures for officers to utilize during a vehicle pursuit, particularly the procedures that were taught to Sutton's MPD academy class.  Hammond stated that students in Sutton's class would have been taught to immediately notify their radio dispatch other units, and especially a supervisor, when they engage in a vehicle pursuit. Hammond stated that it was taught that it is critical for pursuing officers to provide constant updates on pursuit status, to allow other officers to assist more effectively. Hammond stated that constant radio communications also allows supervisors to monitor and, if necessary, call for termination of a pursuit.

Hammond stated that, in his opinion, use of peer-to-peer tactical radio channels for pursuit communications is very dangerous. Hammond stated this is because it limits the ability of other patrol officers, dispatchers, and supervisors to monitor and assist with the situation. Hammond further stated that it is important for assisting officers to know the reason for the pursuit for officer safety and more effective response.  Hammond also stated that the reason for a vehicle pursuit would be a large factor in a supervisor's decision to continue to authorize the vehicle pursuit. Hammond stated that a vehicle pursuit should only be authorized for serious felonies committed in the officer's presence.

Hammond stated that students were taught that during a vehicle pursuit, they should engage their emergency equipment to include both emergency lights and sirens. Hammond stated this is important because it continuously informs the suspect that the officer wants them to stop, it alerts nearby units who can assist, and it warns the public that there is an emergency, and they should be prepared to yield for safety.

Hammond stated training classes were taught that the only acceptable reasons to deactivate emergency equipment would be upon discontinuation of a pursuit or emergency driving, or to approach a burglary alarm call with an added level of stealth. Hammond added that he could not think of any way to justify turning off emergency equipment during a vehicle pursuit, while continuing to pursue the suspect.

Hammond affirmed that students were taught that once emergency equipment is deactivated officers must immediately discontinue following the suspect. SA Ricardi asked Hammond if he was aware if some MPD officers continued to follow vehicles they had been pursuing after they had deactivated their emergency equipment. Hammond stated that he knew it happened, but said "If they do that it's not because they learned it here, they learned that out there away from us."

Hammond stated that public safety would have been the highlighted as the first priority for MPD driver training students. Hammond affirmed that this would have been heavily emphasized in the training class and confirmed that there was a question on the written test for this class which specifically tested student's knowledge. Hammond also stated that along with the need to prioritize public safety students would have been given training which discussed the civil liability due to failure to act with appropriate care for public safety.

Hammond stated the MPD Academy training class would have reviewed the general orders regarding police pursuits and emergency driving. Hammond stated MPD Academy trainees would have also been taught to consider alternatives to initiating a pursuit. As an example, Hammond stated officers should consider getting an arrest warrant for the individual if they know they person's identity and where to find them.

Hammond was asked to discuss vehicle pursuit and emergency related phenomenon such as "High Speed Pursuit Syndrome", pushing, and target fixation. Hammond described "High Speed Pursuit Syndrome" as a situation where the officers pursue a subject and the person being pursued continues to move at faster and faster speeds, thus escalating the situation and making the vehicle pursuit more dangerous. This is due to officers and suspects becoming more concerned with the outcome of the pursuit rather than safety.

Hammond stated that "pushing" is related to "High Speed Pursuit Syndrome", and describes instances whereas a pursuing officer increases their speed the fleeing suspect also increases theirs, causing the pursuit to rapidly escalate in speed and danger. Hammond stated that as this happens, both the officers and the suspects begin to operate their vehicle outside of their alibies as drivers. Hammond stated that the opposite of this can also be true; as a pursuing officer decreases speed, a suspect will also begin to decrease their speed. Hammond stated that more experienced officers will slow down to deescalate vehicle pursuits. Hammond stated that by doing this, officers put themselves in a better position to take control of the situation and themselves.

Hammond stated that target fixation describes a pursuing officer's tendency to become tunnel visioned around the person they are pursuing, losing focus as they move. Upon being shown the Body Worn Camera (BWC) of the vehicle pursuit, Hammond indicated that the manner in which Sutton drove the CST vehicle down the final alley before the scooter crash suggested target fixation. Hammond highlighted that the CST vehicle was moving quickly towards the moped, without concern for the fixed objects such as telephone poles in the alley. Hammond stated that driving through the alley at such speeds represented a serious risk to the driver and passengers of the CST vehicle.

Hammond was shown BWC of the vehicle pursuit and a map showing the path of the CST vehicle after it made initial contact with the victim, Hylton. Hammond stated he was surprised at how long the CST vehicle attempted to stop Hylton. Hammond added that even a minute is a very long time during a vehicle pursuit.

Digitally signed by SEAN
RICARDI
Date: 2022.06.30
08:11:25 -04'00'

Sean Ricardi                                                    Tina Lukens
Special Agent                                                  Special Agent in Charge

# EXHIBIT D



# United States Department of Justice
## United States Attorney's Office
## for the District of Columbia
## Criminal Investigations Unit

# Memorandum of Investigation

---

| | | | |
|---|---|---|---|
| **Case Number:** | 20R2429 | **Location:** | 4665 Blue Plains Drive<br>Washington DC |

**Activity Type:**   Interview

**Date:**   June 23, 2022

**Time:**   N/A

**Participant (s):**   SA Sean Ricardi (USAO-DC)
SA Luke Brunot (FBI-WFO)
Mark Hammond (MPD)

On June 22, 2022, U.S. Attorney's Office (USAO) District of Columbia (DC) Special Agent (SA) Sean Ricardi and Federal Bureau of Investigation (FBI) SA Luke Brunot interviewed District of Columbia Metropolitan Police Department (MPD) Senior Police Officer Mark Hammond at the MPD training academy located at 4665 Blue Plains Drive, Washington DC. Officer Hammond stated that he is reluctant to be involved with this investigation due to fear of reprisals from within MPD. Hammond feels any involvement could harm his career and cause him personal stress. Hammond also stated that he had "old wounds that have not healed" due to a falling out he had with the Driver Training Unit while he was assigned there.

Hammond stated that he been employed by MPD as an instructor since 2008. From 2008 to 2019, Hammond was assigned as a driving instructor. In 2019, Hammond was moved from the Driver Training Unit to the Firearms Training Unit, located at the MPD academy. From 1991 to 2008, prior to his employment with MPD, Hammond was a Takoma Park, MD, police officer. At the time of his retirement from the Takoma Park Police Department, Hammond held the rank of Patrol Sergeant, a position he had held for over four years.  Hammond stated that as a Takoma Park police officer, he engaged in approximately five (5) vehicle pursuits, and as a sergeant he supervised approximately five (5) pursuits.

Hammond described the circumstances of his falling out with the MPD Driver Training Unit. Hammond stated that he felt he was treated poorly as an instructor, which he believed was due his frequent vocalization of frustration over deficiencies with the program. Hammond stated that he, along with other instructors, were extremely dissatisfied with cutbacks in the program. Hammond cited the removal of in-service driving training as a major cause for concern about the direction of the program. Hammond also discussed the fact that the physical training location was moved from the facilities located at the Federal Law Enforcement Training Center (FLETC) in Cheltenham, MD, to an inadequate site which was the parking lot of the old Fed Ex field in Washington DC.

Hammond stated that he believed he was continuously denied promotions within the Driver Training Unit due to his vocalization of concerns over training deficiencies. Hammond stated that on his last day as a driving instructor he arrived at his office to see all of his belongings outside of his office, in a hallway.

Hammond stated that despite his strong reservations about being involved with this investigation he was willing to talk with the agents regarding his knowledge of MPD pursuit policy, and his knowledge of pursuit tactics and techniques. Hammond was provided with the training materials for the 2010 MPD Driver Training Class in which he was an instructor and Terrance Sutton was a student in order to refresh his memory regarding what was taught in that class.

Hammond was questioned about proper radio procedures for officers to utilize during a vehicle pursuit, particularly the procedures that were taught to Sutton's MPD academy class.  Hammond stated that students in Sutton's class would have been taught to immediately notify their radio dispatch other units, and especially a supervisor, when they engage in a vehicle pursuit. Hammond stated that it was taught that it is critical for pursuing officers to provide constant updates on pursuit status, to allow other officers to assist more effectively. Hammond stated that constant radio communications also allows supervisors to monitor and, if necessary, call for termination of a pursuit.

Hammond stated that, in his opinion, use of peer-to-peer tactical radio channels for pursuit communications is very dangerous. Hammond stated this is because it limits the ability of other patrol officers, dispatchers, and supervisors to monitor and assist with the situation. Hammond further stated that it is important for assisting officers to know the reason for the pursuit for officer safety and more effective response.  Hammond also stated that the reason for a vehicle pursuit would be a large factor in a supervisor's decision to continue to authorize the vehicle pursuit. Hammond stated that a vehicle pursuit should only be authorized for serious felonies committed in the officer's presence.

Hammond stated that students were taught that during a vehicle pursuit, they should engage their emergency equipment to include both emergency lights and sirens. Hammond stated this is important because it continuously informs the suspect that the officer wants them to stop, it alerts nearby units who can assist, and it warns the public that there is an emergency, and they should be prepared to yield for safety.

Hammond stated training classes were taught that the only acceptable reasons to deactivate emergency equipment would be upon discontinuation of a pursuit or emergency driving, or to approach a burglary alarm call with an added level of stealth. Hammond added that he could not think of any way to justify turning off emergency equipment during a vehicle pursuit, while continuing to pursue the suspect.

Hammond affirmed that students were taught that once emergency equipment is deactivated officers must immediately discontinue following the suspect. SA Ricardi asked Hammond if he was aware if some MPD officers continued to follow vehicles they had been pursuing after they had deactivated their emergency equipment. Hammond stated that he knew it happened, but said "If they do that it's not because they learned it here, they learned that out there away from us."

Hammond stated that public safety would have been the highlighted as the first priority for MPD driver training students. Hammond affirmed that this would have been heavily emphasized in the training class and confirmed that there was a question on the written test for this class which specifically tested student's knowledge. Hammond also stated that along with the need to prioritize public safety students would have been given training which discussed the civil liability due to failure to act with appropriate care for public safety.

Hammond stated the MPD Academy training class would have reviewed the general orders regarding police pursuits and emergency driving. Hammond stated MPD Academy trainees would have also been taught to consider alternatives to initiating a pursuit. As an example, Hammond stated officers should consider getting an arrest warrant for the individual if they know they person's identity and where to find them.

Hammond was asked to discuss vehicle pursuit and emergency related phenomenon such as "High Speed Pursuit Syndrome", pushing, and target fixation. Hammond described "High Speed Pursuit Syndrome" as a situation where the officers pursue a subject and the person being pursued continues to move at faster and faster speeds, thus escalating the situation and making the vehicle pursuit more dangerous. This is due to officers and suspects becoming more concerned with the outcome of the pursuit rather than safety.

Hammond stated that "pushing" is related to "High Speed Pursuit Syndrome", and describes instances whereas a pursuing officer increases their speed the fleeing suspect also increases theirs, causing the pursuit to rapidly escalate in speed and danger. Hammond stated that as this happens, both the officers and the suspects begin to operate their vehicle outside of their alibies as drivers. Hammond stated that the opposite of this can also be true; as a pursuing officer decreases speed, a suspect will also begin to decrease their speed. Hammond stated that more experienced officers will slow down to deescalate vehicle pursuits. Hammond stated that by doing this, officers put themselves in a better position to take control of the situation and themselves.

Hammond stated that target fixation describes a pursuing officer's tendency to become tunnel visioned around the person they are pursuing, losing focus as they move. Upon being shown the Body Worn Camera (BWC) of the vehicle pursuit, Hammond indicated that the manner in which Sutton drove the CST vehicle down the final alley before the scooter crash suggested target fixation. Hammond highlighted that the CST vehicle was moving quickly towards the moped, without concern for the fixed objects such as telephone poles in the alley. Hammond stated that driving through the alley at such speeds represented a serious risk to the driver and passengers of the CST vehicle.

Hammond was shown BWC of the vehicle pursuit and a map showing the path of the CST vehicle after it made initial contact with the victim, Hylton. Hammond stated he was surprised at how long the CST vehicle attempted to stop Hylton. Hammond added that even a minute is a very long time during a vehicle pursuit.

Digitally signed by SEAN
RICARDI
Date: 2022.06.30
08:11:25 -04'00'

Sean Ricardi                                          Tina Lukens
Special Agent                                         Special Agent in Charge

# EXHIBIT E



U.S. Department of Justice

Matthew M. Graves
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

July 15, 2022

J. Michael Hannon
Rachel E. Amster
Harrison Richards
Hannon Law Group, LLP
333 8th Street, N.E.
Washington, D.C. 20002
(202) 232-1907
Attorneys for Terence Sutton

Christopher Zampogna
Abraham Bluestone
Zampogna, PC
1776 K St. NW Ste. 700
Washington, DC 20006
(202) 223-6635 ext 101
Attorney for Andrew Zabavsky

      Re:    <u>Government Discovery Letter #8 and Expert Disclosures</u>
             *United States v. Terence Sutton*
             *United States v. Andrew Zabavksy*
             Case No. 21-cr-598 (PLF)

Dear Counsel:

      In accordance with the Court's June 14, 2022 pre-trial schedule in this case (ECF 179), we write to provide you with expert notices and related discovery for this case pursuant to Fed. R. Crim. P. 16(a)(1)(G). In addition to the disclosures enclosed as exhibits to this letter, you are also being provided today with related materials that are Bates stamped to encompass pages USAO_016297 to USAO_016785. An updated index of the discovery is enclosed.

      These materials are being provided subject to the protective order entered by the Court on October 4, 2021. Where appropriate, we have tried to designate materials with personal identifying

information (PII) as "sensitive" but also request that any PII not so designated be treated with the same safeguards.

These materials are being provided to you via USAFx.  Please be mindful of the USAFx retention policies; the service is for document sharing, not document storage, and materials are automatically deleted from the system after a given period of time. If you need help with USAFx, we are available to address any questions and provide you with assistance from our technical litigation support unit, if necessary.  We are also available to confer regarding pretrial discovery as provided in Fed. R. Crim. P. 16.1.

In addition, pursuant to Fed. R. Crim. P. 16(a)(1)(G), we write to provide you with notice of the following witnesses who may provide testimony pursuant to Fed. R. Evid. 702, 703, or 705 in the government's case in chief at trial:

**Officer Carolyn Totaro, Vehicle Skills Instructor**
**Metropolitan Police Department (MPD) Training Academy**

Qualifications: Officer Totaro graduated from Buffalo State College with a bachelor's degree in psychology in 2004.  She joined MPD as an officer and graduated from the department's training academy in 2005.  She served in patrol until 2014, when she completed the MPD Training Academy's basic 40-hour instructor course.  After that, also in 2014, she completed the MPD Driver Training Instructor course, which is an 80-hour program.  In 2021, she completed a 40-hour instructor development workshop through Louisiana State University.  Upon reviewing her records during her time at the MPD Training Academy, Officer Totaro estimated that she has provided approximately 520 hours of training as a vehicle skills instructor at MPD, both to new recruits and to experienced officers who are referred to the Training Academy for re-training following officer discipline.

Summary of anticipated testimony:  The government anticipates calling Officer Totaro both as a fact witness and as an expert witness.  Officer Totaro will explain the training requirements of the driver training course at MPD for new recruits and the topics covered in the course, including vehicle dynamics, emergency response operations, vehicle pursuits, and the legal and MPD policy requirements for officers while driving MPD vehicles, among other topics.  Course materials from the class Officer Totaro teaches have been disclosed today as USAO_016330- 016738.  She will explain that the course has both a classroom and a practical, hands-on component, and that passing the course, which includes both written and practical tests, is a requirement to graduate the MPD academy and become a sworn officer.

Officer Totaro will explain that the instruction on vehicular pursuits has both a written and practical component.  This includes teaching students about the MPD policy concerning vehicular pursuits, and the policy requirements that officers must follow when engaged in a pursuit, and then reinforcing those lessons in a simulated vehicular pursuit in a police car on a closed training course. Officers are taught that they must utilize their emergency equipment (lights and sirens) throughout the duration of a pursuit, and that they may cut off their emergency equipment only if the pursuit

ends because the suspect stops or the pursuit is otherwise terminated by the officer and/or a supervisor. Officers are also taught that they must engage in radio communications with dispatch over the main radio channel. Both the use of emergency equipment and radio communications are required by MPD policy. Officers are also taught about "high speed pursuit syndrome" in which an officer may develop tunnel vision, and may mirror a suspect's moves, causing the pursuit to become increasingly dangerous. Officers are trained on techniques to avoid these issues, including use of radio communications, slowing down (which may lead the suspect to slow down as well), and to avoid fixation on the suspect vehicle.

Officer Totaro will explain that an officer's consideration of public safety and the need to drive with due regard is emphasized repeatedly throughout the course, and is the underlying principle behind all driving rules and procedures at MPD. Officers are taught that public safety must be their primary focus; that if they do not make driving decisions that are within MPD policy they may be subject to departmental discipline, and that even if they do act within MPD policy but do not exercise "due regard" for public safety, they may be subject to civil or criminal liability. Officers are taught that these safety considerations include the public, other officers, and in the case of a vehicular pursuit, the suspect being pursued. Officers are taught that considerations of public safety may mean that they do not end up stopping a suspect on a given day, and they should not allow their desire to stop someone overtake the need to drive with due regard for safety.

Based on a review of the course materials used at the time that defendant Sutton received his driving training, Officer Totaro will explain that the lesson concepts that are currently taught to officers concerning safety, the requirement to exercise due regard at all times while operating an MPD vehicle, the requirements of MPD's vehicular pursuit policy,[1] and the potential for criminal liability, civil liability, or departmental discipline if the officer does not comply with MPD policy and applicable law, are the same lesson concepts that were taught to the defendant.

Officer Totaro will also provide an opinion concerning the events in this case. She will opine that defendant Sutton engaged in a pursuit of Hylton-Brown that did not comply with MPD policy or comport with MPD training in several ways. Officer Totaro will opine that MPD policy, and the training given to officers on the policy, allows an officer to initiate a vehicular pursuit only if there is probable cause to believe a violent felony has recently occurred, or that the suspect presents an immediate danger. Officer Totaro will explain that unless defendant Sutton had such probable cause, there was no basis to initiate a pursuit under MPD policy or the training given to officers. Officer Totaro will explain that probable cause for a traffic violation, or mere reasonable suspicion of a crime, is insufficient under MPD policy or training given to officers to initiate a vehicular pursuit.

---

[1] If necessary, Officer Totaro will explain the changes to the vehicular pursuit policy that post-date the fatal collision in this incident, but she will also state that the underlying principles for both policies—the safety of everyone involved—and the attendant training lessons, have not changed.

Officer Totaro will opine that the manner in which defendant Sutton used his squad car during this incident establishes that he engaged in a vehicular pursuit of Hylton-Brown that did not comport with MPD policy or the training given to officers. She will explain that based on MPD policy and training, an unauthorized pursuit began when defendant Sutton chose to continue behind Hylton-Brown with his emergency lights activated after Hylton-Brown initially refused to pull over for the officers, because there was not probable cause at that time to initiate a pursuit under the policy. She will explain that additional policy violations that do not comport with officers' training occurred after that point as well. Specifically, she will explain that defendant Sutton did not utilize radio communications as required by MPD policy, and as officers are trained to do, during a pursuit. He also did not continuously employ his emergency lights and sirens, as required by MPD policy, D.C. Municipal regulations, and the training given to officers on those topics. Officer Totaro will opine that the defendant's choices not to use the radio, not to continuously employ his emergency equipment, his mimicking of Hylton-Brown's movements with his squad car, and his choice to deactivate his emergency equipment while in the final alleyway before the crash, were inconsistent with MPD policy and the manner in which officers are trained to handle similar situations. Officer Totaro will opine that these choices by the defendant made this pursuit more dangerous to everyone involved and to the public.

Additional facts to which Officer Totaro may testify concerning the training officers receive, as well as her opinions concerning her review of case materials from this incident, are included either in the summary of her interviews in connection with this case, which have been disclosed to you as USAO_016323 to USAO_016329, and/or in her course materials.

Summary of basis for opinion: Officer Totaro's testimony will be based upon her training and experience as an MPD driving instructor, including her knowledge of the topics taught in MPD's driver training including vehicle skills, vehicle dynamics, the relevant provisions of the D.C. Municipal Regulations concerning emergency vehicle operation, and the MPD general orders concerning driving and vehicular pursuits. Her opinions on the events in this case will be based upon her training and experience as an MPD driving instructor, as well as a review of the course materials she teaches at the MPD Training Academy and case materials including but not limited to BWC videos, traffic camera videos, surveillance videos, area maps, and MPD Training Academy materials used at the time that defendant Sutton attended the driver training course.

### Robert Drago, Professional Training Consultant and Police Practices Expert
### Eye to Eye Consultants, Inc.

Qualifications: Mr. Drago is a retired Lieutenant Colonel in the Broward County (Florida) Sheriff's Office. The Broward County Sheriff's Office is a large urban law enforcement agency with approximately 5,000 employees and responsibilities that cover an area with approximately 1.9 million residents. Mr. Drago's law enforcement career spanned 38 years with the City of Pompano Beach, Florida and in the Broward County Sheriff's Office, before his retirement in 2017. During his many years in law enforcement, he held command positions, worked in patrol, investigations, and law enforcement training and policy formation. He has also chaired or participated in committees that formulate law enforcement policy including use of

force and vehicular pursuit policies.  In connection with his policy work, Mr. Drago has extensive knowledge of national model policing standards, including those standards concerning use of force and vehicular pursuits as employed by the International Association of Chiefs of Police.  He also has familiarity with the policies on those topics that are used by various law enforcement agencies around the country.

As a member of the executive command staff at his former agency, Mr. Drago chaired or participated in numerous review and policy formation boards, including discipline review boards, use of force, police pursuits, patrol functions, policy formation, training review, and implementation.  In particular, Mr. Drago served as a chairperson and member of the discipline review board for his agency.  In that position, he reviewed a wide range of police misconduct allegations and issued discipline recommendations in accordance with standing agency policies. He served as the lead investigator in numerous officer misconduct allegations in all areas of law enforcement, including use of force and police pursuits.  While at the Broward County Sheriff's Office, he developed a real-time evaluation system to document police behavior that was implemented in thirteen city police districts.  He is a Florida Certified Police Instructor and has trained hundreds of officers in use of force tactics and techniques and patrol procedures.

A copy of Mr. Drago's curriculum vitae is attached as Exhibit 1 and his fee schedule is attached as Exhibit 2.[2]

Summary of anticipated testimony and basis for opinion: Mr. Drago will be called to testify about nationally accepted police practices and standards concerning vehicular pursuits (and, as needed, use of force), as well as how they compare to the MPD general order on vehicular pursuits (and, as needed, use of force) that was in effect at the time of this incident.  He will explain that these standards and policies are known as restrictive policies because they reflect a primary underlying concern of safety.  He will explain the manner in which this policy concern of safety is reflected in the MPD general orders that were in effect at the time of this incident.  The basis for this testimony will be Mr. Drago's training and experience over the course of his law enforcement career, as well as his familiarity and experience with national policing standards, a review of MPD's general orders, and his experience in developing and implementing policies in these areas as a command staff member at the Broward County Sheriff's Office.

Mr. Drago also may testify about the driving-related and pursuit-related training that MPD has provided to its officers and to the defendants, and how that training compares to national policing standards and the MPD general orders on the same topics.  He will testify that the underlying goal of such training is ensuring safety, and he will explain how that goal is reflected in MPD's training. The basis for this testimony will be Mr. Drago's training and experience over the course of his law enforcement career, including his experience in commanding and directly supervising officers who are engaged in pursuits, training officers in

---

[2] The retainer fee referenced in the fee schedule was not imposed in this case; instead, Mr. Drago is contracted to work at his hourly rate.

these areas, as well as his familiarity and experience with national policing standards and a review of MPD's training materials and general orders.

Mr. Drago also will provide his opinion concerning the events in this case. Mr. Drago's written summary of these opinions and the basis for them is attached as Exhibit 3.

### Senior Police Officer Mark Hammond, Former Vehicle Skills Instructor
### MPD Training Academy

Qualifications: Senior Police Officer (SPO) Hammond received a bachelors of science in communications from Bowie State University in 1989 and a masters of science in Homeland Security Management from the University of Maryland University College in 2020. SPO Hammond worked as a Takoma Park Police Department (TPPD) officer from 1991 to 2008, retiring as a sergeant. While with TPPD he completed the Maryland Police Training Commission Instructor Training Program in 2003 and the Maryland Police Training Commission Emergency Vehicle Operation Instructor Training Program in 2004. In 2008, he completed the Federal Law Enforcement Training Center (FLETC) Driver Training Instructor Program Certification. That same year, he joined MPD as a Vehicle Skills and Firearms Instructor at the MPD Training Academy. He stayed in that position until 2019; since that time, he has worked as a weapons armorer at MPD, for which he holds a separate certification. A copy of his resume is attached as Exhibit 4.

Summary of anticipated testimony: SPO Hammond taught the vehicle skills class at the MPD Training Academy that defendant Sutton attended as an MPD recruit. The government anticipates calling SPO Hammond primarily as a fact witness to testify to the training defendant Sutton received and the concepts and lessons taught in the course. The course materials for the class defendant Sutton attended have been previously disclosed, with the addition of materials provided today as USAO_016739 to USAO_16785. SPO Hammond's testimony may also provide an explanation of the lesson concepts concerning vehicular pursuits and the relevant MPD general orders that were taught to defendant Sutton's recruit class. A summary of that information, which SPO Hammond provided to case investigators, is contained in USAO_016303 to USAO_016305.

SPO Hammond may also opine on the BWC footage of the incident in this case from defendant Sutton's front seat passenger (Tejera), and that the defendant's manner of driving in the final alleyway before the crash suggested target fixation because the defendant's car was moving quickly toward the moped, without concern for fixed objects in the alley such as telephone poles. SPO Hammond may opine that driving through the alley in this fashion presented a serious risk to all of the officers in the defendant's vehicle, including the defendant. SPO Hammond may also opine that, with regard to the length of a vehicular pursuit, even one minute is a very long time during a pursuit.

Summary of basis for opinion: To the extent that SPO Hammond provides expert testimony, it will be based upon his training and experience in law enforcement, his training and experience as an instructor at the MPD Training Academy for the Vehicle Skills class, a review of

the course materials used in the Vehicle Skills training class attended by defendant Sutton, and a review of case-related materials for this incident including BWC and area maps.

***

Finally, while not required pursuant to Fed. R. Crim. P. 16(a)(1)(G), we also provide you with notice of the following witness who may provide testimony pursuant to Fed. R. Evid. 702, 703, or 705 in any rebuttal case that the government may present at trial:

### Brian F. Chase, Chief Vehicle Forensics Examiner/Collision Reconstruction Expert
### Comprehensive Motor Vehicle Services & Consulting

Qualifications: Mr. Chase is an expert in several motor vehicle related fields including collision investigation/reconstruction, vehicle forensics, occupant kinematics, vehicle dynamics, and automotive technology inclusive of computer control system design. He has over thirty-five years of education, training, and experience in the science of motor vehicle crash reconstruction, retiring as a Sergeant with the New Hampshire State Police after over 20 years of law enforcement service, now providing expert services inclusive of unique training seminars internationally. During his tenure with the New Hampshire State Police, Mr. Chase served in many capacities inclusive of Training Coordinator, Originator/Commander of the New Hampshire State Police Post Crash Vehicle Inspection Unit, Supervisor of the New Hampshire State Police Technical Accident Reconstruction Unit, Fatal Crash Analyst for State/Federal crash reporting, and instructor of related seminars inclusive of Technical Accident Reconstruction and Forensic Vehicle Analyses.

After retiring from the New Hampshire State Police, Mr. Chase founded Comprehensive Motor Vehicle Services and Consulting through which he provides expert consulting services. Mr. Chase serves as an instructor to law enforcement agencies in areas relating to Accident Investigation, Accident Reconstruction, Occupant Kinematics, Automotive Technology, Motor Vehicle Computer Control System Design/Function, Forensic Motor Vehicle Analyses, and Motor Vehicle Component Design/Operation.

Mr. Chase also has over thirty-five years of training, education, and experience in the science of automotive technology, providing unique realms of automotive technology training seminars to law enforcement as well as providing comprehensive automotive analyses of motor vehicles. Briefly stating, Mr. Chase is also an NIASE Certified Master Automotive Technician, Master NIASE Certified Heavy Truck Technician, NIASE Certified Undercar Specialist, and NIASE Certified Collision Damage Analyst.

Mr. Chase is a member of the National Association of Professional Accident Reconstruction Specialists, and a member of the Society of Automotive Engineers. A copy of Mr. Chase's Curriculum Vitae is attached as Exhibit 5 and his fee schedule is attached as Exhibit 6.

Subject matter of expected testimony: Mr. Chase is expected to provide expert testimony to include professional opinion as required for rebuttal to defense expert testimony for realms

including, but not limited to, collision reconstruction, vehicle dynamics, time/distance analysis, automotive technology, automotive system design, and automotive computer control systems.

<u>Summary of basis for opinion</u>: any opinion testimony provided by Mr. Chase will be based upon (1) his experience, training, and education in the science of Automotive Technology; (2) his experience, training, and education in the science of Collision Reconstruction; (3) his review and analysis of case-related discovery provided by the government including, but not limited to, police reports, scene photographs, police body-worn camera videos, surveillance/security camera videos, and witness statements; (4) technical research with respect to the motor vehicles involved in this incident; and (5) forensic analyses of the motor vehicles involved in this matter, including but not limited to visual inspection procedures, measurements, documentation of collision damage (scooter), documentation of installed components, and documentation related to computer control modules.

*** 

The disclosures provided today reflects that a substantial portion of the materials in this case that are in the government's possession at this time are now in your receipt.  Understanding that we will continue to supplement the discovery with additional materials on a rolling basis, feel free to let us know if there are any categories of information that you believe you should have but are not in receipt of.

We recognize the government's discovery obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), its progeny, and Rule 16.  We will provide timely disclosure if any such material comes to light.  Consistent with *Giglio*, *Ruiz*, and 18 U.S.C. § 3500, we will provide information about government witnesses prior to trial and in compliance with the court's trial management order.

We request reciprocal discovery to the fullest extent provided by Rule 16 of the Federal Rules of Criminal Procedure, including results or reports of any physical or mental examinations, or scientific tests or experiments, and any expert witness summaries.  We also request that you disclose prior statements of any witnesses you intend to call to testify at any hearing or trial.  *See* Fed. R. Crim. P. 26.2; *United States v. Nobles*, 422 U.S. 255 (1975).  We request that such material be provided on the same basis upon which the government will provide your client with materials relating to government witnesses. These requests were originally made on October 5, 2021, in Discovery Letter #1, and most recently on June 21, 2022, in Discovery Letter #6; to date, there has been no response to these requests.  Please provide any update on the existence and disclosure of any such materials at your earliest convenience.

Additionally, pursuant to Federal Rules of Criminal Procedure 12.1, 12.2, and 12.3, we request that you provide the government with the appropriate written notice if defendant(s) plans to use one of the defenses referenced in those rules.  Please provide any notice within the time period required by the Rules or allowed by the Court for the filing of any pretrial motions.

We will forward additional discovery as it becomes available. If you have any questions, please feel free to contact us.

Sincerely,

By:     */s/ Risa Berkower*
AHMED BASET
IL Bar No. 6304552
RISA BERKOWER
NY Bar No. 4536538
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.,
Washington, D.C. 20530
(202) 252-7097 (Baset)
(202) 252-6782 (Berkower)
Ahmed.Baset@usdoj.gov
Risa.Berkower@usdoj.gov

Enclosures
cc:

9

# EXHIBIT F



# United States Department of Justice
### United States Attorney's Office
### for the District of Columbia
### Criminal Investigations Unit

# Memorandum of Investigation

---

| | | | |
|---|---|---|---|
| **Case Number:** | 20R2429 | **Location:** | 4665 Blue Plains Drive<br>Washington DC |

| | |
|---|---|
| **Activity Type:** | Interview |
| **Date:** | June 30, 2022 |
| **Time:** | 1300 hours |
| **Participant (s):** | SA Sean Ricardi (USAO-DC)<br>SAIC Tina Lukens (USAO-DC)<br>AUSA Risa Berkower (USAO-DC)<br>Mark Hammond (MPD) |

Reference is made to the Memorandum of Interview documenting the interview of Mark Hammond, dated June 23, 2022.

On July 5, 2022, U.S. Attorney's Office (USAO) District of Columbia (DC) Special Agent (SA) Sean Ricardi and USAO Special Agent in Charge Tina Lukens, and Assistant United States Attorney (AUSA) Risa Berkower met with District of Columbia Metropolitan Police Department (MPD) Senior Police Officer Mark Hammond at the MPD training academy located at 4665 Blue Plains Drive, Washington DC.

Hammond stated he is reluctant to become involved with the investigation as a witness, due to the falling out he had with the MPD driver training program he referenced during the June 23, 2022, interview. Hammond stated that since the June 23, 2022, interview he has given the matter further thought, and is experiencing extreme stress and anxiety.

It was explained to Hammond that he has firsthand knowledge of information critical to the case and would likely need to be involved with the trial, despite his hesitancy.

SA Ricardi served Hammond with a District Court trial subpoena requiring his appearance for trial on October 19, 2022.

| | |
|---|---|
| *Sean Ricardi* signature<br>Digitally signed by SEAN RICARDI<br>Date: 2022.07.13 13:28:47 -04'00' | *Tina Lukens* signature<br>Digitally signed by Tina Lukens<br>Date: 2022.07.13 13:37:18 -04'00' |
| Sean Ricardi<br>Special Agent | Tina Lukens<br>Special Agent in Charge |

# EXHIBIT G

# Introduction

US Attorney's Office, District of Columbia
601 D Street. NW Washington, DC 20530
T: (202) 803-1576
E: risa.berkower@usdoj.gov

 Dear Attorney Risa Berkower:

I have been retained as a consultant and expert in the matter known to me as Grand Jury Indictment of Terence Sutton and Andrew Zabavsky, for violations of D.C. Code 22-2103 (murder in the second degree), 18 U.S.C 371 (conspiracy) and 18 U.S.C 1512 (b) (3), 2 (obstruction of justice).

I was asked to review documents and video relevant to this matter and render expert opinions about the police actions taken by the defendants, involved in this matter.

After evaluation of all the facts and circumstances that are known to the witnesses at the time of this incident, and review of videos taking at the time of the incident, I employed comparative methodology in determining my opinions and in evaluating the police officers' actions. This method of comparing the actions of the police officers with accepted practices and training in law enforcement is a common and consistently applied method when evaluating their actions. Therefore, I formed a number of opinions to a reasonable degree of professional certainty, as to the procedures used by the defendants, during a vehicle pursuit and attempts to cover such pursuit, as well as their actions, after the completion of the pursuit.

My opinions are based not only on the materials reviewed in this case, but my experience and training concerning proper policies and police practices in citizen contacts, use of force, detention, police pursuits and arrest procedures. I have studied the reports and other materials provided to me regarding this case. Please be advised that if there are any additional depositions, policies, or other materials produced in this case, a supplemental report may be necessary; thus, I reserve the right to supplement my opinions and/or this report.

# Opinions

In this expert's opinion, **Officer Sutton and Lieutenant Zabavsky used objectively unreasonable force against Mr. Hylton-Brown, which led to his death in a fatal traffic accident. The two officers knowingly and intentionally participated in a vehicle pursuit with gross negligence and in violation of the Washington D.C. police policy and training, as well as nationally accepted police practices pertaining to vehicle pursuits.** Both officers had received sufficient training provided by the department in these areas and were updated during in-service training.

The two officers initiated a vehicle pursuit in a residential neighborhood for Mr. Hylton-Brown, who was driving a moped at the time and not wearing a helmet. They carried out the vehicle pursuit in a residential neighborhood for a traffic violation, which is clearly prohibited by Washington D.C. police department policy. They violated traffic control devices (stop signs), exceeded speed limits, and proceeded down one-way streets in the wrong direction, while driving an unmarked vehicle and using emergency equipment intermittently. The vehicle traffic in the area was moderate according to the official traffic crash report.

Additionally, the two officers had no probable cause to believe that Mr. Hylton-Brown had committed any serious crimes at this time and his personal identity was known to them. Standard police practice and procedure, both nationally and as stated in the Washington D.C. police department policy, requires a pursuit to be **terminated once the subject is identified**.

The officers had no reasonable suspicion to believe that Mr. Hylton-Brown would be a danger to the public, if not taken into custody. The nationally accepted police practice is that once the danger of the vehicle pursuit becomes greater to the public safety than the apprehension of the subject, if left at large, the pursuit must be terminated. **Under the totality of the circumstances, considered from a reasonable officer's perspective at that time, the vehicle pursuit and force used was unreasonable and grossly negligent in accordance with nationally accepted police practices.**

In this expert's opinion **Officer Sutton and Lieutenant Zabavsky failed to follow nationally accepted police practices and Washington D.C. police department's training and policy, as they pertain to reporting police vehicle pursuits and vehicle homicide investigations.** Both officers had received sufficient training provided by the department in these areas.

The vehicle crash report completed by Officer Sutton and supported by Lieutenant Zabavsky described a fictional account of events noted for omissions and mis-stated facts. In fact, it was never reported that a police pursuit had even taken place. No vehicle pursuit form was completed for follow up by the Command Staff. At the time of this event the Internal Affairs Division and the

Major Crash Unit, which are required by police department policy to be notified and trained to investigate this type of event, were not notified. The failure to notify these units resulted in the delaying of the investigation, which will always result in an investigation being compromised to some degree.

**In this expert's opinion Officer Sutton and Lieutenant Zabavsky have violated their own department's police policy and that of nationally recognized and accepted police practices. Their misstatements and camouflage of facts, stated in their written police reports, supports their own consciousness to guilt of their actions taken, which contributed to the death of Mr. Hylton-Brown.**