**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**FILED UNDER SEAL**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | **FILED UNDER SEAL** |
| | : | |
| | : | Case No: 1:21-cr-598-PLF |
| v. | : | |
| | : | Judge Paul L. Friedman |
| TERENCE SUTTON, et al. | : | |
| | : | |
| Defendants. | : | |

**MOTION FOR PRETRIAL *BRADY* SANCTIONS**

Comes now Officer Terence D. Sutton, Jr., through counsel HANNON LAW GROUP, LLP, and respectfully requests that the Court issue appropriate sanctions against the government for its violation of *Brady* and the Court's Rule 5(f) Order. In support of these requested sanctions, Ofc. Sutton states the following:

**BACKGROUND**

On December 2, 2021, Ofc. Sutton filed his Motion for *Brady* Sanctions under seal relating to the delayed disclosure of and suppression of *Brady* information from an eyewitness. [ECF No. 67] On December 16, 2021, the government filed its Opposition to Motion for *Brady* Sanctions under seal. On January 6, 2022, Ofc. Sutton filed a Reply in Support of Motion for *Brady* Sanctions under seal. [ECF No. 115] On January 31, 2022, Ofc. Sutton filed a Supplement in Support of Motion for *Brady* Sanctions. [ECF No. 126] On Feb. 4, 2022, the government filed a Supplement responding to Ofc. Sutton's Supplement. On July 1, 2022, the Court issued an Opinion and Order ("*Brady* Op.") granting Ofc. Sutton's Motion for *Brady* sanctions in part. [ECF 191] That is, the Court ordered disclosure of certain requested documents and scheduled an evidentiary hearing for hearing the testimony of two Special Agents involved. *See Brady* Op. at 22.

The government made disclosures to Ofc. Sutton in keeping with the Court's July 1st Order on July 22, 2022. This disclosure also included a privilege log. The Court conducted an *in camera* review of the privilege log and items referenced in it, and scheduled an *ex parte* videoconference for the government to explain its claim of privilege and work product protection over Document 13. *See* Minute Order (Aug. 7, 2022). Subsequently, the Court ordered the government to disclose twelve of the thirteen documents in the privilege log, either in part or in their entirety. *See* Op. (Aug. 12, 2022), [ECF 223 at 17].

The Court held an evidentiary hearing on August 16-17, 2022, at which Special Agents Sean Ricardi and Geoffrey Guska testified. *See* Minute Entry (Aug. 17, 2022). Ofc. Sutton also called MPD Ofc. Michael R. Price and defense Investigator Trevor Hewick. Argument on the *Brady* motion is scheduled for August 30, 2022. On August 17, 2022, the Court also ordered that Ofc. Sutton's proposed sanctions be filed by August 25, 2021. *See* Minute Entry (Aug. 17, 2022). The Court ordered the government to file any responses by August 29, 2022 at 12 P.M.

**STATEMENT OF FACTS**

Ofc. Sutton has described the facts of this case in great detail in earlier pleadings, *see* Mot. To Dismiss [ECF 67]; Reply in Support of Mot. To Dismiss [ECF 115], and will not repeat all of the details here. The Court additionally heard lengthy testimony relating to the particular steps taken – and not taken – by the government and its personal corps of Special Agents in the investigation of this case. Having now heard the testimony during the two-day *Brady* evidentiary hearing, the following remains true:

> [REDACTED] is the *Brady* witness the Government fears. He spontaneously approached law enforcement – despite his criminal background – and reported to be an eye-witness to the incident underlying the charges in the indictment. [REDACTED] also claimed to have pertinent, exculpatory information. That is, he claimed that Mr. Hylton-Brown threw an object while law enforcement were following him. The Government well knew that Officer Sutton and the other

> officers believed Mr. Hylton-Brown had a weapon or "was dirty" from their experience. What [REDACTED] reported is exactly what the officers expected.

Mot. For Brady Sanctions at 7, ECF No. 67. The government knew – SA Ricardi testified that he knew immediately – that this witness would be important to Ofc. Sutton's defense. What followed the discovery of [REDACTED] as a witness was a severe deviation from proper conduct by the government.

## LEGAL STANDARD

We borrow what is an eloquent description of the government's duty under *Brady* and other obligations from the D.C. Court of Appeals:

> Our adversarial system is premised on the belief that "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. Prosecutors have a critical role in ensuring the fairness of criminal trials. They are the representative of the sovereign, whose "interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *see also Miller v. United States,* 14 A.3d 1094, 1107 (D.C. 2011) (explaining that prosecutors must "seek justice before victory"). Prosecutors are thus obligated to play a dual role at trial; they must advocate for the government "with earnestness and vigor," *Berger,* 295 U.S. at 88, 55 S.Ct. 629, but they also have an obligation under *Brady* "to assist the defense in making its case." *United States v. Bagley,* 473 U.S. 667, 675 n. 6, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In this "limited departure from a pure adversary model," *id.,* prosecutors have a constitutionally imposed duty to disclose to the defense pretrial information that is "favorable to an accused ... [and] material either to guilt or to punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194.

*Vaughn v. United States*, 93 A.3d 1237, 1253–54 (D.C. 2014) (reversing conviction in part for government's *Brady* violation). One aspect of the government's obligation, so articulated, bears repeating – "they also have an obligation under *Brady* to assist the defense in making its case." *Vaughn, supra* (citations and internal quotations omitted). The government's failure to disclose *Brady* material violates due process whether the evidence is suppressed willfully or inadvertently, and prejudice ensues. *See Strickler v. Greene,* 527 U.S. 263, 280 (1999) (citing

*Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Agurs*, 427 U.S. 97 (1976); *United States v. Bagley*, 473 U.S. 667, 676 (1985); and *Kyles v. Whitley*, 514 U.S 419, 433-434 (1995)).

"It is not for the prosecutor to decide not to disclose information that is on its face exculpatory based on an assessment of how that evidence might be explained away or discredited at trial, or ultimately rejected by the fact finder." *Miller v. United States*, 14 A.3d 1094, 1110 (D.C. 2011) (quoting *Zanders v. United States*, 999 A.2d 149, 163–64 (D.C.2010)); *see also Smith v. Cain*, 565 U.S. 73, 76 (2012) (holding that a witness's inconsistent statements were subject to disclosure notwithstanding government's "argument … that the jury could have disbelieved the undisclosed statements."); *Vaughn v. United States*, 92 A.3d 1237, 1255-56 (D.C. 2014) ("[G]overnment could not withhold this information because it did not trust the conclusions of the OIA Final Report, or because it did believe its witness … who professed innocence of false reporting and asserted ignorance of the reason for his discipline. As we said in *Zanders* and *Miller*, 'it is not for the prosecutor to decide not to disclose information that is on its face exculpatory based on an assessment of how that evidence might be explained away or discredited at trial, or ultimately rejected by the fact finder."). While some of the cases cited above are from the D.C. Court of Appeals, the same United States Attorney's Office prosecuted those cases.

The government suppresses evidence when it delays disclosure. *See United States v. Pasha*, 797 F.3d 1122, 1139-40 (D.C. Cir. 2015) ("[F]ailing to recognize the costs of delayed disclosure would 'create dangerous incentives for prosecutors to withhold impeachment or exculpatory information until after the defense has committed itself to a particular strategy during opening statements or until it is too late for the defense to effectively use the disclosed information.'") (quoting *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009)); *Vaughn*

*v. United States*, 92 A.3d 1237, 1257 (D.C. 2014) ("[W]here disclosure of Brady is concerned, there is no time for strategic delay and 'as soon as practicable' should be the approach.'") (quoting *Miller*, 14 A.3d at 1108). The timing of *Brady* disclosures is critical to the government's duty to satisfy constitutional requirements. *See Pasha*, 797 F.3d at 1133 ("Government should have understood that *as soon as they were finished talking with that gentleman*, they had an obligation to give that information to the defense.") (emphasis added). Similarly, the government must be forthright in the manner it disclosed *Brady* information. *See Vaughn*, 92 A.3d at 1257 ("As we said in *Miller*, *Brady* does not authorize the government to engage in a game of hide and seek, or require the defense to 'scavenge for hints of undisclosed Brady material.'") (citing *Miller*, 14 A.3d at 1113 (quoting *Banks v. Dretke*, 540 U.S. 668, 695 (2004))). In *Vaughn*, the D.C. Court of Appeals quoted approvingly defense counsel's complaint regarding the manner of the government's disclosure:

> It wasn't as if [the prosecutors] called me and told me, I have a report you need to see. I just got this in the motion, and the motion, ironically, was to actually suppress or limit the use of this information while it's being given to me, even though it wasn't really being given to me…

92 A.3d at 1256-57.

Destruction of evidence constitutes prejudice, under *Brady*. *See United States v. Bohl*, 25 F.3d 904, 909, 914 (10th Cir. 1994) (holding dismissal was the only possible remedy where the government destroyed *Brady* evidence denying defendants the ability to conduct their own testing); *Virginia v. Gonzalez*, No. FE-2020-326, 2020 WL 6557460, at *3 (Va. Cir. Nov. 5, 2020) ("If the accused learns of the evidence at a point in the proceedings when he cannot effectively use it, his due process rights as enunciated in *Brady* are violated.") (citation omitted). Delayed disclosure, even where disclosure is made pre-trial, which causes witness unavailability constitutes destruction of evidence in violation of Brady. *See Pasha*, 797 F.3d at 1139-40;

*Gonzalez*, 2020 WL 6557460, at *2 (sanctioning the government's *Brady* violation because the witness could no longer be located). The witness may still be available in the literal sense, but rendered unavailable due to the government's conduct. *See Pasha*, 797 F.3d at 1140 (characterizing a *Brady* witness's loss of memory as destruction of evidence). In *Pasha*, the witness's lack of memory and willingness to cooperate with defense counsel underlay the Circuit Court's determination to reverse the conviction and remand for the trial court to issue appropriate sanctions:

> The more challenging circumstance is that there is no way to determine what [the witness] would have said in sworn testimony timely obtained by [the defendant's] counsel. As the District Court noted: "We will never know whether that statement would have been favorable or unfavorable… When credibility and memory are significant, not to say essential as they are in this trial, the eight-month passage of time can indeed detract from the ability to make sufficient use of the testimony." In other words, this case is less like one in which physical evidence has been turned over late and more like one in which physical evidence has been destroyed.

797 F.3d at 1140 (("[The witness] himself told defense counsel that, had they interviewed him at the time of his original statement, he 'would have been able to tell them more.' Moreover, defense counsel contended that government agents 'impeded and frustrated' Montgomery's willingness to cooperate with them.").

It has been said that a true *Brady* violation cannot occur absent a finding that favorable evidence was suppressed and prejudice ensued, which is usually not assessed until post-conviction. *See, e.g.*, *Pasha*, 797 F.3d at 1139; *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007) ("Once a court finds a *Brady* violation, a new trial follows as the prescribed remedy, not as a matter of discretion."). Yet, the fact that *Brady* violation remedies are not frequently considered until after conviction is no doubt a result of the many *Brady* violations that go undetected. Yet, a methodology should exist for dealing with *Brady* violations pre-trial.

Elizabeth Napier Dewar, *A Fair Trial Remedy for* Brady *Violations*, 115 Yale L.J. 1450, 1450 (2006) ("When evidence that should have been disclosed earlier emerges during or shortly before trial, the courts should consider instructing the jury on the duty to disclose and allowing the defendant to argue that the failure to disclose raises a reasonable doubt about the defendant's guilt."). Since Ms. Dewar's article publication in 2006, many courts have issued pre-trial sanctions to remedy the government's failure to fulfill its obligations under *Brady*. *See, e.g.*, *Ulcenat v. United States*, 260 A.3d 684 (D.C. 2021) (affirming the trial judge's mid-trial *Brady* sanction to draw all inferences against the government on a factual issue, resulting in defendant's acquittal on one count); *Virginia v. Gonzalez*, No. FE-2020-326, 2020 WL 6557460, at *3 (Va. Cir. Nov. 5, 2020) (granting adverse jury instruction as pre-trial *Brady* violation remedy).

Our D.C. Circuit sets forth post-conviction remedies for a *Brady* violation:

> (1) a *Brady* violation requires a remedy of a new trial; (2) such new trial may require striking evidence, a special jury instruction, or other additional curative measures tailored to address persistent prejudice; and (3) if the lingering prejudice of a *Brady* violation has removed all possibility that the defendant could receive a newt rial that is fair, the indictment must be dismissed. To be sure dismissal is appropriate only as a last resort, where no other remedy would cure prejudice against a defendant.

*Pasha*, 797 F.3d at 1139 (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988); *Morrison*, 449 U.S. at 365; *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 254 (3d Cir. 2005)). It seems that in the pre-trial *Brady* analysis, steps two and three might guide a trial court. *See id.* at 1139 ("[C]ourts must sometimes fashion remedies to address persistent prejudice arising from the prosecution's failure to timely disclose exculpatory evidence to the defense.").

As stated by the D.C. Circuit, "That brings us to the question of what to do…". *Pasha*, 797 F.3d at 1138. "[T]he Supreme Court [has] observed that 'fashioning remedies for the illegal

destruction of evidence can pose troubling choices." *Pasha*, 797 F.3d at 1138 (quoting *California v. Trombetta*, 467 U.S. 479, 486 (1984). "In nondisclosure cases, a court can grant the defendant a new trial at which the previously suppressed evidence may be introduced. But when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing … the States' most probative evidence." *Trombetta*, 467 U.S. at 486-87. Trial courts have wide latitude in designing appropriate remedies. *See Pasha*, 797 F.3d at 1139 ("It appears that the District Court may have thought it lacked authority to impose such remedies [suggested by the defendant] … To the contrary, however, if a remedy is available that gives the defendant a fair trial –such as precluding cross-examination completely or precluding impeachment with a prior statement—that remedy is preferable to dismissal of the indictment").

"Dismissal is an appropriate remedy of last resort 'where no other remedy would cure prejudice against the defendant.'" *United States v. Dirscoll*, 984 F.3d 103, 109 (D.C. Cir. 2021) (quoting *United States v. Pasha*, 797 F.3d 1122, 1139 (D.C. Cir. 2015)). *Compare United States v. Bagley*, 473 U.S. 667, 682 (1985) (conviction must be overturned "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."), *with Hairston v. United States*, 264 A.3d 642, 651 (D.C. 2021) ("[T]rial court reasonably determined that dismissal of the indictment (a sanction that appellant acknowledges is 'severe') was not warranted … particularly given the court's well-founded finding that the defense team did not make a persuasive case for how appellant's defense was prejudiced by the delay."). Notwithstanding the seriousness of dismissal as a *Brady* remedy, it remains appropriate in a myriad of circumstances. *See United States v. Chapman*, 524 F.3d 1073

(9th Cir. 2008) (dismissing indictment after mid-trial discovery of 650 pages of undisclosed *Brady* material).

When considering appropriate remedies, the government's refusal to acknowledge a failure to satisfy its *Brady* obligation has troubled courts and ought to contribute to the severity of the sanction imposed. *See Chapman*, 524 F.3d at 1088 ("the district court was clearly troubled by the government's conduct and its failure to own up to its actions); *Government of Virgin Islands v. Fahie*, 419 F.3d 249 (3d Cir. 2005) ("*Morrison* also teaches that the intentional character of the government's misconduct affects the appropriate remedy. The [Supreme] Court noted, for example, that a 'pattern of recurring violations by investigative officers … might warrant the imposition of a more extreme remedy in order to deter further lawlessness.") (quoting *United States v. Morrison*, 449 U.S. 361, 365 n.2 (1981)); *United States v. Bohl*, 25 F.3d 904, 914 (10th Cir. 1994) (dismissing case as *Brady* sanction in part because government produced no explanation for spoliation of the relevant evidence); *Gonzalez*, 2020 WL 6557460, at *5 (finding troubling that "the Commonwealth unapologetically maintains that they have done their duty" where the government "buried its head in the sand.").

Government refusal to acknowledge their shortcomings is a factor that weighs in favor of dismissal. *See Chapman*, 524 F.3d at 1088 ("The [trial] court also emphasized the AUSA's unwillingness to take responsibility for his conduct: [F]or over two weeks of trial, the prosecutor consistently claimed that he had disclosed the required material to the defendants…And I accepted that, I accepted [the AUSA's] statements as an officer of the Court and overruled the objection on several occasions… Only after I excoriated the Assistant U.S. Attorney in the strongest terms did he then offer an apology to the Court, not a heartfelt apology, but simply a

response to me. And finally I said, be quiet and listen to me because he was just saying, yeah, I'm sorry, I'm sorry, I'm sorry, and not really meaning it.").

Courts have also crafted creative sanctions short of dismissal where appropriate. Courts have deemed certain jury instructions appropriate which highlight the government's misconduct and the sort of inferences that may be drawn from it. *See* Gonzalez, 2020 WL 6557460, at *9-10 (granting the use of a jury instruction which in part stated "The jury should infer that this testimony, had it been disclosed to the Accused in a timely fashion, would have been favorable to his claim of self-defense which could lead to the acquittal of the Defendant and the dismissal of this indictment."). A D.C. Superior Court judge decided to prohibit the government's redirect of a witness and to draw all inferences against the government regarding the witness's testimony. *See Ulcenat v. United States*, 260 A.3d 684, 688 (D.C. 2021). Granting of additional discovery not otherwise required may be appropriate. *Hairston*, 264 A.3d at 650. ("The court did … direct the government to make available to the defense government counsel's 'notes regarding [the witness's] conversations with the [g]overnment,' including the homicide prosecutors' notes of their debriefing of [the witness], even though the notes were not subject to Super. Ct. Crim. R. 16 discovery.").

**PROPOSED SANCTIONS**

The government has fallen woefully short of its obligation to see that "justice … be done." *Berger*, 295 U.S. at 88. This is particularly egregious in a case where the defendant is innocent. The government has charged a novel theory of second-degree murder, which they refuse to acknowledge is novel. The theory of intent in this case is a deviation from a standard of prosecutorial decisions and concomitant societal expectations, and the conduct of Ofc. Sutton in this case has *never* resulted in criminal prosecution of another officer. This case reflects a

zealousness borne of social discord; whereas, the rule of law requires a steadfast hand. The same United States Attorney's Office which has spawned the *Brady* litigation described above now once again sits on the horns of dilemma.

Over thirteen-years ago, the following occurred in the courtroom of another Judge on this very Court:

> [T]he Court questioned Ms. Morris as to whether the complaint [of FBI Special Agent Chad Joy], which makes serious allegations of law enforcement and prosecutorial misconduct in the investigation and trial of the defendant, was not in fact exculpatory information the government was obligated to produce to the defendant. Ms. Morris denied that the information was even relevant to the defense, based on a theory that any misconduct had previously been addressed by the Court before or during the trial.
>
> THE COURT: If you were a defense attorney you'd want this information, wouldn't you?
>
> MS. MORRIS: Judge, you know, this is very difficult for me to say because I am a witness in this matter and I'm very sensitive –
>
> THE COURT: You're bringing up other issues now that we haven't gotten to and I really don't want to go down that road, you know, about who represents the government. I just want to deal with the hypothetical. If you were a defense attorney you'd be raising a storm about that information and you know it, don't you? You can look me in my eye and tell me.
>
> MS. MORRIS: It's not about looking in your eye and telling you or not, Judge.
>
> THE COURT: But, you know, it doesn't –
>
> MS. MORRIS: I'm biased in the situation, Judge.
>
> ***
>
> THE COURT: So I can't get an answer from you as to whether you'd want that information if you were a defense attorney?
>
> MS. MORRIS: Again, Judge, it's very difficult for me to say because I was there. I saw what happened, and is there a [grain of] truth in some things? Yes, there is a [grain of] truth, but it's not telling you the whole thing of what was happening and I don't want to put the cart before the horse.
>
> ***

> THE COURT: You're the chief deputy of that office, and you know that's favorable information. You know it. You know, you don't want to give me an answer, that's fine. But, you know, if you were a defense attorney and you learned about that, you would be making your case: Judge, I'm entitled to that because that's favorable to the accused. And if the government argued that it's not true, let some fact-finder determine it, Judge, we're entitled to use it. If you didn't want to give me an answer, that's fine.
>
> MS. MORRIS: You know, I'm trying my best to be unbiased, but I am. I know what the situation was, so it's very difficult and I don't am. I know what the situation was, so it's very difficult and I don't want to say too much because I want the system to work.

Opinion and Order, *United States v. Stevens*, Case 1:08-cr-00231-EGS (D.D.C. Jan. 21, 2009) [ECF No. 274 at 5-6].

Local Criminal Rule 5.1 is the product, in part, of the colloquy quoted above. The Rule is assurance in this Court that the Constitutional rights of the accused are meaningful. The Government cannot make a "mistake" in judgment and by virtue of that mistake avoid sanctions under this Rule. That cannot be the way the system works. Every day, the Government is warned in the same words as Magistrate Judge Zia M. Faruqui warned the Government in this case:

> Next I want to warn the government pursuant to Rule 5(f) of the Rules of Criminal Procedure that they must turn over all exculpatory evidence as that term is defined in *Brady v. Maryland* and its related cases. Failing to do so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges, and contempt proceedings.

09.24.2020 Hearing Transcript at 10.

There are two components to sanctions discussed by the courts: (1) protection of the accused; and, (2) deterrence of Government further misconduct. At the hearing scheduled by the Court for August 30, 2022, counsel intends to present further argument regarding the misconduct of the government in this case in balance against the innocence of Ofc. Sutton. This is not a case where a guilty man will go free to protect the innocent from misconduct of the government in the

future. At the hearing, we will propose that the following sanctions are justified, and some in the alternative:

1. Dismissal of the Indictment;

2. Issuance of a Show Cause Order as to why AUSAs Baset, Berkower, Gaston and Cooney should not be held in contempt;

3. Disqualify AUSA Berkower and Baset from further participation in the case.

The Court suggested after the conclusion of testimony on August 17, 2022, that sanctions might be structured along the lines of Fed. R. Civ. P. 37. The legal precedents above already set forth the standards that the Court should apply. Those standards, including Local Criminal Rule 5.1, are clear, and justify the severest of sanctions.

There is justification and precedent for pretrial sanctions which would include, in part, an appropriate jury instruction. In our view, such an approach would be improper in this case for a number of reasons which will be addressed in more detail at the upcoming argument. However, an instructional remedy would require Ofc. Sutton to put on a defense. Such a solution would effectively shift the burden of proof to Ofc. Sutton if he wished to take full advantage of a jury instruction accompanied by a limitation on proof and cross-examination related to the witness in question. This burden shifting is particularly prejudicial where constitutional principles auger for a directed verdict of acquittal at the close of the government's case.

Nevertheless, the following is an adaptation from two sources of a possible instruction and pre-trial sanction:

> Ladies and Gentlemen, you are about to hear the testimony of Metropolitan Police Officer Michael Price and Sergeant Christian Tobe. During the testimony, you will also watch a video produced from Ofc. Michael Price's body-worn camera. The video shows Mr. [WITNESS] describing what he saw on the night of October 23, 2020, the night of the alleged offenses in this case. However, I need to instruct you that Mr. [WITNESS] will not appear to testify in this trial himself.

Let me explain. When this case was first charged, a Judge of this Court ordered the United States Attorney's Office – the Office prosecuting this case – in the following manner:

> Next I want to warn the government pursuant to Rule 5(f) of the Rules of Criminal Procedure that they must turn over all exculpatory evidence as that term is defined in *Brady v. Maryland* and its related cases. Failing to do so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges, and contempt proceedings.

This statement to the government by the Judge is a warning and a reminder that the Assistant United States Attorneys prosecuting this case have a personal and professional obligation to promptly turn over to Ofc. Sutton's and Lt. Zabavsky's attorneys any evidence they discover which might be favorable to their defense. This is a warning and reminder given in every criminal case. This obligation to promptly provide exculpatory evidence to the accused is a requirement imposed on those attorneys by the Constitution of the United States. This duty exists in every criminal case that these attorneys prosecute in this Court. They are the representatives of your United States, whose "interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done."

The Assistant United States Attorneys learned of Mr. [WITNESS'S] report to Ofc. Price that same day, the morning of Saturday, September 25, 2021. On the afternoon of Monday, September 27, 2021, the Assistant United States Attorneys Berkower and Baset obtained and watched the video of Mr. [WITNESS] produced by Ofc. Price's body-worn camera, the same video you will see today. Later that Monday, the attorneys met with their two supervisors to discuss what to do about this evidence.

On September 28, 2021, Assistant United States Attorneys Berkower and Baset directed United States Attorney's Office Criminal Investigator Sean Ricardi to call Mr. [WITNESS] on the phone, while they secretly listened. Three days later, on October 1, 2021, Ms. Berkower directed Ricardi to interview the witness again. Ricardi went to the home of Mr. [WITNESS] and spoke with his sister. She said Mr. [WITNESS] was not home.

Very soon after Ricardi left, Mr. [WITNESS] called Ricardi on his cell phone.

Assistant United States Attorneys Berkower and Baset did not tell attorneys for Ofc. Sutton and Lt. Zabavsky about this witness until November 9, 2021, almost six weeks later. On that date, the government attorneys delivered to the attorneys for Ofc. Sutton and Lt. Zabavsky a large electronic transmission of evidence. Attorneys for Ofc. Sutton and Lt. Zabavsky then discovered in this evidence the video related to Mr. [WITNESS] including information provided to the Assistant United States Attorney's by Ofc. Price and Sgt. Tobe.

> The attorneys for Ofc. Sutton brought this conduct by the Assistant United States Attorneys to my attention. I held a hearing, and I now will further instruct you as to what I concluded in that hearing.
>
> First, I concluded that the Assistant United States Attorney's violated the constitutional rights of Ofc. Sutton and Lt. Zabavsky by withholding this evidence for over almost six weeks and using their agent to interview Mr. [WITNESS] on two occasions.
>
> Second, I concluded that because of this constitutional violation, the defense was unable to interview Mr. [WITNESS] and, in particular, take him to the Kennedy Street area to explain to Ofc. Sutton's and Lt. Zabavsky's attorneys what he saw. Because of this misconduct by the Assistant United States Attorneys, you must infer that had the defense been able to interview Mr. [WITNESS] after he came forward, Mr. [WITNESS'S] testimony would have been favorable to Ofc. Sutton and Lt. Zabavsky. By that I mean, it would tend to prove their innocence.
>
> I also instruct you that you may consider this misconduct by the Assistant United States Attorneys' sufficient by itself to raise a reasonable doubt in your minds as to the guilt of Ofc. Sutton and Lt. Zabavsky as to all the charges against them.

*Virginia v. Gonzalez*, No. FE-2020-326, 2020 WL 6557460, at *10–11 (Va.Cir.Ct. Nov. 05, 2020); Elizabeth Napier Dewar, *A Fair Trial Remedy for* Brady *Violations*, 115 Yale L.J. 1450, 1450 (2016).

Such an instruction would also requires foreclosing any cross-examination of these witnesses or argument to the jury to disbelieve Mr. [WITNESS] which would, of course, conflict with the requested instruction. It would also require affording carte blanche to the defense to use any evidence related to the witness, and excluding any use by the government.

WHEREFORE, Ofc. Sutton respectfully submits the foregoing for the consideration of the Court.

Dated: August 25, 2022

Respectfully submitted,

HANNON LAW GROUP, LLP

___s/J. Michael Hannon__________

J. Michael Hannon, #352526
Rachel E. Amster, #1618887
333 8th Street, NE
Washington, DC 20002
Tel: (202) 232-1907
Fax: (202) 232-3704
jhannon@hannonlawgroup.com
ramster@hannonlawgroup.com

*Attorneys for Defendant Terence D. Sutton, Jr.*