UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )    Criminal No. 21-0598 (PLF) |
| | ) |
| TERENCE SUTTON | ) |
|   and | ) |
| ANDREW ZABAVSKY, | ) |
| | ) |
|       Defendants. | ) |
| | ) |

OPINION

      Pending before the Court are five pretrial motions in limine seeking the exclusion

and admission of testimony and evidence at trial.[1]  The motions relate to the admissibility of

Metropolitan Police Department ("MPD") General Orders and MPD reports, body worn camera

videos, character evidence, hearsay objections, and testimony and argument related to other

disputed legal and policy issues.  The Court heard oral argument on certain issues raised in the

motions in limine on September 29, 2022.[2]

---

    [1]     A sixth motion in limine, Mr. Sutton's Motion in Limine to Permit Evidence
Regarding Decedent's Criminal Background, the Kennedy Street Crew, and Kennedy Street
Drug Corridor [Dkt. No. 257], is also pending.  For reasons discussed below, this motion and
portions of the government's omnibus motion in limine will be decided separately.

    [2]     The Court has reviewed the following documents and their attachments:
Defendant Andrew Zabavsky's Motion to Suppress Tangible Evidence, Statements, and
Identification Evidence ("Zabavksy Mot.") [Dkt. No. 255]; Government's Omnibus Motion in
Limine ("Gov't Mot.") [Dkt. No. 256]; Terence D. Sutton, Jr.'s, Motion in Limine to Preclude
Admission of Body Word Camera Videos and Sound ("Sutton BWC Mot.") [Dkt. No. 258];
Terence D. Sutton, Jr.'s, Motion in Limine to Preclude Admission of 404(b) Evidence Noticed by
Government ("Sutton 404(b) Mot.") [Dkt. No. 259]; Terence D. Sutton, Jr.'s, Motion in
Limine to Exclude Evidence Regarding the Metropolitan Police Department's General Order on
Vehicular Pursuits ("Sutton MPD Mot.") [Dkt. No. 260]; Defendant Andrew Zabavsky's
Opposition to Government's Omnibus Motion in Limine ("Zabavsky Opp.") [Dkt. No. 268];

I.   BACKGROUND

As previously described, see United States v. Sutton, Crim. No. 21-0598, 2022 WL 4653216, at *1-2 (D.D.C. Sept. 30, 2022), a grand jury returned an indictment charging defendants Terence Sutton and Andrew Zabavsky, both officers of the Metropolitan Police Department of the District of Columbia, with conspiracy to obstruct justice, in violation of 18 U.S.C. § 371, and obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3), 2.  See Indictment [Dkt. No. 1].  Mr. Sutton is also charged with second degree murder in violation of D.C. Code § 22-2013.  Id.

The indictment alleges that on October 23, 2020, Mr. Sutton caused the death of Karon Hylton-Brown by recklessly pursuing Mr. Hylton-Brown in a police vehicle for several blocks and at high speeds.  See Indictment ¶¶ 1-2, 10-12, 20-27.  Mr. Hylton-Brown, who was riding a rental moped, was mortally wounded when he was hit by oncoming traffic as he exited an alleyway, suffering severe head trauma.  See id. ¶¶ 13, 18, 28.  The indictment asserts that

Government's Opposition to Sutton's Motion in Limine to Exclude Evidence Regarding the Metropolitan Police Department's General Order on Vehicular Pursuits ("Gov't MPD Opp.") [Dkt. No. 269]; Government's Opposition to Defendant Motion in Limine to Exclude Body-Worn Cameras and Sound ("Gov't BWC Opp.") [Dkt. No. 270]; Government's Opposition to Defendant Zabavsky's Motion to Suppress Tangible Evidence, Statements, and Identification Evidence ("Gov't Zabavsky Opp.") [Dkt. No. 271]; Terence D. Sutton, Jr.'s, Opposition to the Government's Omnibus Motion in Limine ("Sutton Opp.") [Dkt. No. 272]; Government's Opposition to Defendant Motion in Limine to Exclude Evidence Under Federal Rule of Evidence 404(b) ("Gov't 404(b) Opp.") [Dkt. No. 273]; Defendant Andrew Zabavsky's Reply in Support of his Motion to Suppress Tangible Evidence, Statements, and Identification Evidence ("Zabavsky Reply") [Dkt. No. 280]; Terence D. Sutton, Jr.'s Reply to Government's Opposition to his Motion in Limine to Exclude Evidence Regarding the Metropolitan Police Department's General Order on Vehicular Pursuits ("Sutton MPD Reply") [Dkt. No. 281]; Terence D. Sutton, Jr.'s Reply in Support of his Motion in Limine to Exclude Evidence Under Federal Rule of Evidence 404(b) ("Sutton 404(b) Reply") [Dkt. No. 282]; Terence D. Sutton, Jr.'s Reply in Support of his Motion in Limine to Preclude Admission of Body Worn Camera Videos and Audio ("Sutton BWC Reply") [Dkt. No. 283]; and Government's Reply to Defendants' Oppositions to Government's Omnibus Motion in Limine ("Gov't Reply") [Dkt. No. 285].

Mr. Sutton pursued Mr. Hylton-Brown for a traffic violation – "driving a moped, without a helmet, on the sidewalk," id. ¶ 10 – in violation of the MPD vehicular pursuit policy, which "prohibit[s] officers from pursuing a vehicle for the purpose of [e]ffecting a stop for a traffic violation," id. ¶ 8 (internal quotation omitted).  It further alleges that between October 23 and October 24, 2020, in order to prevent an internal investigation and referral to federal authorities for a criminal civil rights investigation, Mr. Sutton and Mr. Zabavsky conspired to conceal from MPD officials the circumstances of the pursuit and collision.  Id. at ¶¶ 3, 31, 33-48.

On September 7, 2022, the parties filed motions in limine addressing the exclusion or admission of evidence and testimony at trial.  On September 29, 2022, the parties appeared for oral argument regarding three categories of evidence raised in the motions, including (1) the admissibility of MPD General Orders and changes to MPD General Orders; (2) Mr. Hylton-Brown's character, criminal history, and alleged associations with the Kennedy Street Crew and the Kennedy Drug Corridor, as well as community responses to Mr. Hylton-Brown's death; and (3) body worn cameras and evidence implying impropriety from the deactivation of body worn cameras.  See Order [Dkt. No. 286] at 2-3; see also Transcript of In-Person Motions Hearing, September 29, 2022 ("Oral Arg. Tr.").

At oral argument, on the second of the three issues discussed above, the Court recognized that the parties were proffering vastly different characterizations of the evidence at issue.  The Court therefore decided to hold an evidentiary hearing on limited issues relating to the motions before the start of trial.  See Oral Arg. Tr. at 58:22-24 ("Anybody you intend to call with respect to this testimony will testify in my presence under oath before opening statements."); id. at 61:5-6 ("[T]his prejudicial evidence is not coming in unless there is an adequate foundation for it.").  On October 13, 2022, the Court issued a memorandum opinion

and order summarizing the underlying issues and disputes between the parties and setting forth the parameters for the evidentiary hearing.  See Memorandum Opinion and Order [Dkt. No. 304].  The evidentiary hearing was held on October 14 and 17, 2022.  At the close of the evidence, the Court heard additional argument on the portions of the parties' motions that relate to the evidentiary hearing – namely, the admissibility of evidence regarding Mr. Hylton-Brown's character, criminal history, and alleged associations with the Kennedy Street Crew and the Kennedy Drug Corridor.

The Court has carefully considered the parties' filings, the oral arguments presented by counsel, and the applicable authorities, and addresses the remaining issues raised in the motions in limine in this opinion.

## II.  LEGAL FRAMEWORK

Courts evaluate the admissibility of evidence on a pretrial motion in limine according to the framework established by Rules 401 and 402 of the Federal Rules of Evidence. See Daniels v. District of Columbia, 15 F. Supp. 3d 62, 66-67 (D.D.C. 2014); see also Democracy Partners, LLC v. Project Veritas Action Fund, Civ. No. 17-1047, 2022 WL 3334689, at *3 (D.D.C. Aug. 12, 2022).  First, "the Court must assess whether the evidence is relevant." Id. at 66.  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  FED. R. EVID. 401.  "Relevant evidence is admissible" unless an applicable authority provides otherwise, whereas "[i]rrelevant evidence is not admissible."  FED. R. EVID. 402.  The proponent of admitting an item of evidence has the initial burden of establishing relevance.  See Dowling v. United States, 493 U.S. 342, 351 n.3 (1990); United States v. Oseguera Gonzalez, 507 F. Supp. 3d 137, 147 (D.D.C. 2020).

Even if the proponent of an item of evidence can demonstrate its relevance, however, a court may still conclude that it is inadmissible if "the United States Constitution; a federal statute; [the Federal Rules of Evidence]; or other rules prescribed by the Supreme Court" provide for its exclusion.  FED. R. EVID. 402.  Further, Rule 403 of the Federal Rules of Evidence provides that a court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  FED. R. EVID. 403.

## III. DISCUSSION

### A.  MPD General Orders

Mr. Sutton requests that the Court exclude at trial "the presentment of [MPD] General Order 301.03, which pertains to vehicular pursuits."  Sutton MPD Mot. at 1.  He argues that a "violation of the MPD General Order on vehicular pursuits is not relevant in this case because General Orders do not establish a standard or evidence of any sort for criminal or civil cases."  Id. at 2.  Instead, Mr. Sutton maintains that "the only standard upon which the jury can evaluate his conduct is that applicable to every law enforcement officer in the United States, Graham v. Connor."  Id. at 7.  The government responds that MPD General Order 301.03 "is highly relevant to the charges before the jury – in particular, the defendant's subjective state of mind when he chose to chase Karon Hylton-Brown on a moped for minor traffic infractions."  Gov't MPD Opp. at 1.  It further emphasizes that Mr. Sutton "may be prosecuted for his conduct that violates the District's criminal laws of general applicability, regardless of whether he is also alleged to have violated the Constitution."  Id. at 5.  While the government asks the Court to admit General Order 301.03, it seeks to exclude at trial "changes to the MPD General Orders[] [that were made] more than a year after the charged offenses," arguing that evidence about these

changes "would not only fail to elucidate the standard of care [Mr. Sutton] owed—and thus not assist the jury in any way with respect to the second degree murder count— but it would risk confusing the jury about the terms of the policy that was in place at the time of the charged conduct."  Gov't Mot. at 11-12.

The Court agrees with the government that MPD General Order 301.03 is admissible and concludes that this evidence is probative of Mr. Sutton's state of mind as it relates to the second degree murder charge.  For the reasons explained below, the Court rejects Mr. Sutton's contention that "the only standard upon which the jury can evaluate his conduct" is under the Supreme Court's jurisprudence under the Fourth Amendment.  See Sutton MPD Mot. at 7.  The Court will nevertheless allow Mr. Sutton to present evidence regarding changes to the MPD General Orders that were made after the dates of the charged offenses.

### 1.    Admissibility of MPD General Order 301.03

Mr. Sutton's first argument – that "the government has failed to carry a coherent message to the Court as to how an alleged violation of the MPD General Order is even relevant to the mens rea for Murder in the Second Degree" – is inaccurate.  Sutton MPD Mot. at 2.  The government's theory in this case is that Mr. Sutton's conduct constitutes a violation of the D.C. second degree murder statute because he subjectively knew that his conduct "created an extreme risk of death or serious bodily injury, but engaged in that conduct nonetheless."  Williams v. United States, 858 A.2d 984, 998 (D.C. 2004) (quoting Comber v. United States, 584 A.2d 26, 39 & n.12 (D.C. 1990) (en banc)) (emphasis added); see also Indictment ¶ 29 (alleging that Mr. Sutton "act[ed] with conscious disregard of an extreme risk of death or serious bodily injury to Karon Hylton-Brown").  As the Court has previously explained, see United States v. Sutton, Crim. No. 21-0598, 2022 WL 1202741, at *10 (D.D.C. Apr. 22, 2022), this conduct, if proven at

trial, would satisfy the <u>mens rea</u> required for second degree murder under D.C. law if the government demonstrates that Mr. Sutton acted with "malice aforethought."  <u>See</u> <u>Jennings v.</u> <u>United States</u>, 993 A.2d 1077, 1080 (D.C. 2010).  This is also called "depraved heart" murder. <u>See</u> <u>United States v. Sutton</u>, Crim. No. 21-0598, 2022 WL 2828995, at *2 (D.D.C. July 20, 2022) (citing <u>Comber v. United States</u>, 584 A.2d at 38-39).

   Whether a particular defendant acted with a "depraved heart" "may be shown by a 'gross deviation from a reasonable standard of care' or by other acts that may lead the finder of fact to determine that the 'defendant was aware of a serious risk of death or serious bodily harm.'"  <u>Jennings v. United States</u>, 993 A.2d at 1080 (quoting <u>Comber v. United States</u>, 584 A.2d 39).  The Court has determined that this standard involves both subjective and objective elements – namely, whether the defendant was <u>subjectively</u> aware of the risk created by his or her conduct; and whether there was an <u>objectively</u> "gross deviation from a reasonable standard of care."  <u>See</u> <u>United States v. Sutton</u>, 2022 WL 2828995, at *3; <u>accord</u> <u>Comber v. United States</u>, 584 A.2d at 39.  The government asserts that at trial it will present "evidence that shows the defendant subjectively knew that the driving decisions he made on the night of this chase were highly unsafe and created serious risks to Hylton-Brown."  Gov't MPD Opp. at 2.  To do this, the government states that it will elicit testimony regarding the training that Mr. Sutton received to operate an MPD vehicle, which "encompasse[d] instruction on . . . the MPD vehicular pursuit policy."  <u>Id</u>. at 3.

   Based on the seemingly uncontested assertion that Mr. Sutton received training on MPD General Order 301.03, the Court concludes that the order is relevant under Rule 401 of the Federal Rules of Evidence.  <u>See</u> FED. R. EVID. 401 (the evidence has a tendency to support the government's assertion that Mr. Sutton had the requisite mental state under D.C. Code

§ 22-2013, which "is of consequence in determining the action."). In addition, the Court agrees

with the government that "[b]ecause evidence concerning the vehicular pursuit policy will be

tied to the defendant's subjective knowledge of the risks he was aware of . . . when he chased

Hylton-Brown[,] . . . this evidence is highly probative of an essential element of Count 1." Gov't

MPD Opp. at 3; see also United States v. Sutton, 2022 WL 2828995, at *3 ("[T]he MPD General

Orders . . . may illuminate the contours of the reasonable standard of care that applied to Mr.

Sutton as he pursued Mr. Hylton-Brown on October 23, 2020."). The government does not, as

Mr. Sutton suggests, seek to introduce MPD General Order 301.03 to prove that a violation of

the order is per se evidence of malice under the second degree murder statute. See Sutton MPD

Reply at 4 (arguing that there is a "risk of having an 'expert' convert MPD policy into a criminal

violation through opinion testimony"). Rather, evidence of Mr. Sutton's training on the General

Order will be just one factor the jury may consider in determining Mr. Sutton's subjective state

of mind at the time of events at issue.[3] It is immaterial that "[t]here are no provisions in the

General Order which establish penalties for violations of the General Order." Sutton MPD

Reply at 4.

      The Court is also unpersuaded by Mr. Sutton's argument that the government

cannot rely on "civil cases from the District of Columbia Court of Appeals construing the 'gross

negligence' standard." Sutton MPD Reply at 1. First, determining the admissibility of evidence

"'is a matter [] for the district court's sound judgment under Rules 401 and 403.'" United States

v. Mosquera-Murillo, 153 F. Supp. 3d 130, 175 (D.D.C. 2015) (quoting Sprint/United Mgmt. Co.

---

[3]    The Court will ensure at trial that the government's experts do not "convert [the] conduct of Ofc. Sutton into a 'depraved heart' malice merely by opinion that he violated the MPD General Order on Vehicular Pursuits." Sutton MPD Reply at 3. If necessary, the Court may give a limiting instruction to the jury.

v. Mendelsohn, 552 U.S. 379, 384 (2008)).  As discussed, it is this Court's judgment that MPD

General Order 301.03 is relevant.  See id.  Second, although the cases that the government cites

arise in the civil context, the Court finds their reasoning and analysis persuasive.  In Tillery v.

District of Columbia, the D.C. Court of Appeals permitted a motorist in a civil personal injury

action to introduce evidence of an MPD General Order as "a factor the jury can consider in

determining whether the officer was grossly negligent in departing from the standard of care."

Tillery v. District of Columbia, 227 A.3d 147, 152 n.17 (D.C. 2020) (emphasis added) (internal

quotations omitted).  And in District of Columbia v. Walker, the D.C. Court of Appeals reached

a similar conclusion that "[w]hile evidence that the police violated the general order was one

factor that the jury could consider, liability would attach only if the MPD officers were grossly

negligent with reference to the [applicable] standard of care."  District of Columbia v. Walker,

689 A.2d 40, 47 n.13 (D.C. 1997) (citing District of Columbia v. Banks, 646 A.2d 972, 983

(D.C. 1994)).

   Having determined that MPD General Order 301.03 is relevant, the Court next

considers whether "its probative value is substantially outweighed by a danger of . . . unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly

presenting cumulative evidence."  FED. R. EVID. 403.  In Mr. Sutton's reply, he raises several

reasons why he believes the introduction of the General Order would be confusing or

"improper."  Sutton MPD Reply at 3.  He first states that because the "the standards contained in

the 2003 General Order do not require an officer to consider the safety of the suspect . . . it

would be improper to allow the government to rely on the 2003 General Order."  Id. at 2-3.  But

if anything, this is a relatively straightforward point that Mr. Sutton may use to bolster his own

defense and does not mitigate the probative value of the General Order.

Mr. Sutton next cites an Eleventh Circuit case in which the court of appeals "sustained the trial court's refusal to allow an expert to opine that Officers in a § 1983 case violated the Department's pursuit policy."  Sutton MPD Reply at 3 (citing Knight through Kerr ("Knight") v. Miami–Dade County, 856 F.3d 795 (11th Cir. 2017)).  The Court does not find this at all relevant or persuasive.  A civil action under 42 U.S.C. § 1983 requires the plaintiff to establish a constitutional violation that is premised on objective reasonableness alone.  See Knight v. Miami–Dade County, 856 F.3d at 809.  The officer's training in Knight on the Department's pursuit policy therefore was not relevant, and the court concluded that "[t]he risk of confusing the jury on this point was not insubstantial."  Id. at 813-14.  A criminal charge under D.C. Code § 22-2013, on the other hand, requires the jury to evaluate the defendant's subjective state of mind, which implicates what training the officer received on Department policies.  See United States v. Sutton, 2022 WL 2828995, at *3.  None of Mr. Sutton's other evidentiary arguments are persuasive.

### 2.   Constitutional Standards

Mr. Sutton's second argument is that MPD General Order 301.03 is inadmissible because "the only standard upon which the jury can evaluate his conduct is that applicable to every law enforcement officer in the United States, Graham v. Connor."  Sutton MPD Mot. at 7. This argument has no merit.  The Court has already made clear that a violation of the D.C. second degree murder statute – a criminal statute of general applicability – does not require that the government meet the test for reasonableness under the Fourth Amendment of the United States Constitution.  See Transcript of Oral Ruling on Motion Hearing, August 3, 2022 ("Oral Ruling Tr.") [Dkt. No. 217] at 11:21-19:9.

10

Under 42 U.S.C. § 1983 and 18 U.S.C. § 242, government officials have qualified immunity from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see also United States v. Lanier, 520 U.S. 259, 265 (1997) (explaining that the "'clearly established' immunity standard [under 42 U.S.C. § 1983] is not different from that of 'fair warning' . . . for the purpose of validly applying § 242"). Law enforcement officers therefore can avoid liability under these specific statutes if they can prove that their conduct was reasonable under established Supreme Court precedent, including its interpretation of excessive force under Graham v. Connor, 490 U.S. 386 (1989). But neither Mr. Sutton nor Mr. Zabavsky has been sued civilly for deprivation of civil rights under 42 U.S.C. § 1983, nor have they been charged with criminal deprivation of civil rights under 18 U.S.C. § 242. See Indictment; see also Oral Arg. Tr. at 14:4-6. And with the exception of 18 U.S.C. § 242, qualified immunity does not apply to criminal cases. See Oral Ruling Tr. at 14:15-17 ("[T]he deprivation of rights at issue in Section 242 is uniquely constitutional; [] the same analysis does not apply to allegations of non-constitutional violations." (citing Hope v. Pelzer, 536 U.S. 730, 731 (2002))).

Furthermore, the government need not prove a constitutional violation to demonstrate that Mr. Sutton's conduct violated the D.C. second degree murder statute. "[P]olice officers like everyone else are subject to generally applicable laws unless there's an express [exemption] made and the Constitution does not give them an exemption." Oral Ruling Tr. at 18:25-19:3.

11

3.   Changes to MPD General Orders

With regard to changes made to MPD General Orders, the Court believes that Mr. Sutton has "a good faith basis" for initiating a line of questioning on cross-examination regarding new versions of the General Orders and the specific amendments made to the General Orders after Mr. Hylton-Brown's death.  United States v. Lin, 101 F.3d 760, 767 (D.C. Cir. 1996).  The amended General Orders include the 2021 General Order on Vehicle Pursuits (GO-OPS-301.03), see Sutton Opp. at 16, and the 2022 General Order on Use of Force (GO-RAR-901.07), see id. at 20.

In a prior opinion resolving certain discovery requests, the Court denied Mr. Sutton's motion to compel "internal police documents and training materials that relate to the amendment of MPD General Orders after Mr. Hylton-Brown's death."  United States v. Sutton, Crim. No. 21-0598, 2022 WL 3134449, at *8 (D.D.C. Aug. 5, 2022) (emphasis added).  In so holding, the Court stated that Mr. Sutton failed to explain how these materials would "shed light on the reasonable standard of care applicable to Mr. Sutton on the evening of Mr. Hylton-Brown's death."  Id.  He now has done so.  Mr. Sutton has demonstrated that "[w]hat the new General Orders include serves to highlight what was not part of the policy under the General Orders in effect in November 2020," for example, "[t]he 2021 Pursuit General Order is [] more explicit regarding the conditions under which officers may initiate a vehicle pursuit."  Sutton Opp. at 16, 18.

The Court therefore concludes that "new versions of the General Orders are relevant" because this evidence will allow the jury to determine how much weight to give testimony about MPD General Order 301.03 and other General Orders in effect at the time of Mr. Hylton-Brown's death.  Sutton Opp. at 16; see also United States v. Abel, 469 U.S. 45, 52

(1984) ("[T]he jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.").  The amendments relate specifically to the kind of conduct at issue in this case.  See Sutton Opp. at 16-20; compare MPD General Order 301.03 § 3 (2003) (defining "Vehicular Pursuit" as "[a]n attempt by a member of this Department to apprehend a fleeing felon while in an authorized emergency vehicle with all emergency warning devices activated") with MPD General Order 301.03 § 3 (2021) (defining "Vehicle Pursuit" as an "[a]ttempt by law enforcement officers in an emergency vehicle to apprehend a suspect who is actively attempting to elude apprehension while operating a motor vehicle).

       To ensure that this evidence is not unduly prejudicial or confusing under Rule 403, the Court will preclude testimony about "why the key MPD General Orders applicable to this case have been changed."  United States v. Sutton, Crim. No. 21-0598, 2022 WL 3134449, at *7; see also United States v. Sampol, 636 F.2d 621, 658 (D.C. Cir. 1980) ("[C]ounsel must have a reasonable basis for asking questions on cross-examination which tend to incriminate or degrade the witness and thereby create an unfounded bias which subsequent testimony cannot fully dispel.").  Mr. Sutton may only offer evidence and elicit testimony about how the MPD General Orders differ and what specific changes were made to new versions.  The parties may also present evidence about how the new General Orders would have applied to defendants' conduct and may ask the jury to draw reasonable inferences from this evidence.

### B.  MPD Reports

       The government requests that the Court exclude at trial "prior reports defendant Sutton wrote" – consisting of MPD Form 163 arrest reports ("arrest reports") and MPD Form 10 traffic crash reports ("crash reports") – as well as "MPD internal affairs ('IAD') vehicular pursuit

investigations" written by other officers.  Gov't Mot. at 8-9.  The government argues that arrest reports are "too dissimilar to the traffic crash reports" at issue "to provide a probative comparison for the jury, and should therefore be excluded as irrelevant under Rule 401, and an undue waste of time under Rule 403."  Gov't Mot. at 9.  The government further argues that crash reports are not relevant because "[w]hether defendant Sutton wrote fulsome crash reports on other occasions, regarding other incidents, is immaterial . . . and is not probative."  Id.  Mr. Sutton responds that these prior reports are "relevant to highlight" that "the manner in which [he] drafted the crash report" at issue in this case was "consistent with how he drafted the type of report with which he was more familiar, PD-163 [arrest reports]."  Sutton Opp. at 14.  For the following reasons, the Court concludes that all three categories of evidence – arrest reports, crash reports, and IAD vehicular pursuit investigations – will be admissible at trial.

### 1.    Arrest and Crash Reports

The Court first concludes that under Rule 401, both the prior arrest reports and the prior crash reports that Mr. Sutton prepared are relevant to the obstruction of justice and conspiracy charges, and specifically the allegation that Mr. Sutton "drafted a traffic crash report that minimized the extent of the observable injuries to Hylton-Brown."  Indictment ¶ 47.  As the Court previously described, both types of reports have probative value in terms of their comparison with the crash report at issue in this case, and in particular, with respect to the question of whether the crash report at issue "was consistent in terms of quality with [Mr. Sutton's] prior work product or whether it uncharacteristically 'minimized' important details."  See United States v. Sutton, 2022 WL 1202741, at *12.  The crash reports are relevant as "direct examples of [Mr. Sutton's] standard for drafting the exact type of report that is at issue in this case."  See United States v. Sutton, 2022 WL 3444963, at *2 (D.D.C. Aug. 17, 2022).  And the

arrest reports are relevant because they "illustrate [Mr. Sutton's] standard for report drafting." United States v. Sutton, 2022 WL 1202741, at *12.  Furthermore, as Mr. Sutton suggests, the reports may illustrate whether he drafted the crash report in this case consistent with how he drafted "the type of report with which he was more familiar," namely, arrest reports.  See Sutton Opp. at 14.

Under Rule 403, a court may still exclude relevant evidence if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  FED. R. EVID. 403.  The government argues that introducing Mr. Sutton's prior arrest reports at trial would be an "undue waste of time."  Gov't Mot. at 9.  The government makes a similar argument with respect to Mr. Sutton's prior crash reports, arguing that their admission would require "delv[ing] into the details of those incidents" and could risk "descending into trials-within-the-trial that would confuse the jury and needlessly consume its time."  Id.  The Court can deal with these concerns at trial.  Any risk of jury confusion or wasting time would not substantially outweigh the probative value of the arrest and crash reports with regard to Mr. Sutton's standard for report drafting.  The Court will assess whether the evidence presented is needlessly cumulative and may limit the number of reports admitted and the examination of witnesses about these reports at trial.

### 2.   IAD Reports

With respect to the IAD vehicular pursuit reports ("IAD reports"), Mr. Sutton argues that the reports are relevant to the second degree murder charge, and specifically whether he "deviated from a reasonable standard of care."  Sutton Opp. at 15.  Mr. Sutton asserts that the reports "provide some insight into how pursuits are conducted and treated by the [MPD]."  Id.

The government, in contrast, argues that these reports are not relevant to the second degree murder charge because the investigations "arise from any numbers of factual circumstances," not all of which necessarily "[bear] any similarity to the facts of this case."  Gov't Mot. at 10.  The government maintains that the IAD reports therefore should be excluded because they are "based on the unique (and dissimilar) circumstances of each vehicular pursuit, with no standard of care created for individual officers or the department."  Id. at 8.  It argues that their admission in evidence could create a "high risk that it will confuse the jury and waste time on collateral matters," Id. at 10.

The Court concludes that the IAD reports are relevant because they may demonstrate whether there was a "gross deviation from a reasonable standard of care" under the second degree murder charge, which is one of the ways the government can prove whether Mr. Sutton acted with a "depraved heart."  United States v. Sutton, 2022 WL 2828995, at *3; accord Comber v. United States, 584 A.2d at 39.  And this Court has previously explained that "[b]ecause IAD pursuit investigations construe and apply the MPD General Orders to a range of pursuits – including circumstances in which IAD investigators ultimately find that an officer engaged in misconduct that warrants discipline – the IAD pursuit investigations may illuminate the contours of the reasonable standard of care that applied to Mr. Sutton as he pursued Mr. Hylton-Brown on October 23, 2020."  United States v. Sutton, 2022 WL 2828995, at *3.  The IAD reports therefore are relevant under Rule 401 because of the mens rea required for second degree murder under D.C. law.

The Court further declines to exclude the IAD reports under Rule 403.  It disagrees with the government that "the introduction of these reports risks confusing the jury with dissimilar and improper comparisons."  Gov't Mot. at 10.  As stated, the IAD reports may

demonstrate the reasonable standard of care that applied to Mr. Sutton, which is probative of his state of mind under the second degree murder statute. Any risk of jury confusion or wasting of time would not substantially outweigh the probative value of this evidence. Accordingly, the IAD reports are admissible. At trial, the Court will assess whether the evidence presented is needlessly cumulative and may limit the number of reports and related testimony.

### C. Body Worn Cameras

#### 1. Admissibility

Mr. Sutton requests that the Court preclude two types of evidence related to body worn cameras ("BWC"): "(1) police BWC audio which captures statements as hearsay; and, (2) police BWC video evidence, other than that of Officer Sutton, of Karon Hylton-Brown's injuries." Sutton BWC Mot. at 1.

With respect to the first issue, Mr. Sutton argues that (a) only the video portion of the BWCs should be admitted because the audio is hearsay; and (b) as the proponent of the BWC evidence, the government bears the burden of showing both the relevance of a particular video and which specific statements in the video qualify as not hearsay. See Oral Arg. Tr. at 91:23-24; id. at 92:16-93:2; see also Sutton BWC Reply at 4 ("The government further demands that Ofc. Sutton parse all of the video from the body-worn cameras of twenty-two officers for statements that are objectionable from an evidentiary standpoint. This misstates the evidentiary burden.").

With respect to the second issue – BWC video evidence of Mr. Hylton-Brown's injuries – Mr. Sutton argues that it is not relevant, it is highly prejudicial, and it is being offered for its shock value at trial. See Oral Arg. Tr. at 99:7-18. He also argues that "only Officer Sutton's video shows what Officer Sutton observed, and others are more prejudicial than probative." Sutton BWC Mot. at 4. In response, the government states that it only seeks to

admit the videos at the crash scene for non-hearsay purposes, not for the truth of the matters asserted – namely, to "show the defendants' conduct during the chase and at the crash scene, the conditions of the crash about which they were on notice, the manner in which the defendants behaved in response to those conditions, and the manner in which they handled the crash scene." Gov't BWC Opp. at 3.  For this reason, the government asserts that "the truth of the statements made on the recordings is largely immaterial to [their] purpose."  Id. (citing FED. R. EVID. 801(c) (defining hearsay only as a statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement")).  The government also argues that the videos are not unduly prejudicial under Rule 403.  See id. at 4-5.

First, the Court agrees with Mr. Sutton that it is the government's burden to demonstrate the relevance of any particular BWC and the admissibility of statements not made by individuals who will be witnesses at trial.  See FED. R. EVID. 801(c).  The government's blanket assertion that the BWC audio is admissible because it is not offered "to prove the truth of the matter asserted" is insufficient.  See id.  The government must identify the statements it wants to admit and provide specific reasons why the statements do not fall under the definition of hearsay set forth in Rule 801 or are admissible as an exception to the rule against hearsay under Rule 803.  See FED. R. EVID. 801, 803.  Should that prove too difficult, with respect to some or all of the BWC videos, the Court will consider admitting the video portions only.

And second, with respect to body worn camera videos of Mr. Hylton-Brown's injuries, the Court agrees with Mr. Sutton that there is a substantial likelihood of prejudice if the jury is exposed to too much body worn camera footage showing Mr. Hylton-Brown's injuries. The Court therefore will limit the videos that the government may present at trial, but it will not

exclude all body worn camera videos from the officers listed in Mr. Sutton's motion.  See Sutton BWC Mot. at 5.[4]

        As an initial matter, both Mr. Sutton's and Mr. Zabavsky's body worn camera videos are clearly probative and admissible.  They show what both defendants perceived and personally observed before and during the conduct at issue with respect to the charges of obstruction of justice and conspiracy.  With regard to Mr. Sutton, the government does not dispute that he "observed Hylton-Brown for a matter of seconds . . . [then] walked east on Kennedy Street to question the driver of the Scion.  Ofc. Sutton did not observe Hylton-Brown again before Hylton-Brown was transported to the hospital."  Sutton BWC Mot. at 5.  But with regard to Mr. Zabavsky, the jury must be able to evaluate what Mr. Zabavsky actually observed in the aftermath of the crash to determine whether he "knew the seriousness of what had happened to Hylton-Brown, yet misled his commanding officer about those injuries and did not make appropriate notifications up his chain of command."  Gov't BWC Opp. at 5.  The probative value of Mr. Zabavsky's body worn camera is extremely high.  See FED. R. EVID. 403.

        The Court will also admit the BWC of Officer Novick.  The government proffers that "[b]ack at the police station, when defendant Sutton wrote his report of the incident, Officer Novick reviewed the narrative section and told him that his description of the observable injuries to Hylton-Brown was inaccurate, because it should reflect the fact that Hylton-Brown had sustained severe trauma to his head, not the minimal injuries defendant Sutton had described."  Gov't BWC Opp. at 5 (emphasis added).  After reviewing the videos, the Court believes that Mr. Zabavsky's body worn camera alone may not be sufficient to show Mr. Hylton-Brown's severe

---

[4]     The Court has reviewed the videos in dispute and bases its decision of admissibility after conducting its own a balancing test pursuant to Rule 403.

head trauma, an essential element of Officer Novick's representations.  Specifically, Mr. Zabavsky's video does not get close enough to Mr. Hylton-Brown to show the extent of his head injury.  The Court therefore agrees with the government that Officer Novick's video is highly probative to "corroborate[] Officer Novick's account of the serious injuries he observed, which he relayed to defendant Sutton so that the defendant could correct his police report."  Id.  Officer Novick's body worn camera therefore is admissible under Rule 403.  See FED. R. EVID. 403.

Having determined that Mr. Sutton's, Mr. Zabavsky's, and Mr. Novick's body worn camera videos are admissible, the Court will decide at trial whether to admit portions of the BWCs from some or all of the six other officers listed in Mr. Sutton's motion – specifically, Officers Al-Shrawi, Tajera, Arroyo, Perren, Toth, and Wilson.  See Sutton BWC Mot. at 5.  It may be that some or all of these videos have a low probative value because they are largely duplicative of what is captured by Mr. Zabavsky's and Mr. Novick's body worn cameras.  They also are not probative of what Mr. Sutton observed or his conduct in the aftermath of the crash, as the government does not allege that any of these officers communicated with Mr. Sutton regarding the extent of Mr. Hylton-Brown's injuries.  The risk of prejudice stemming from the disturbing nature of the graphic depictions of Mr. Hylton-Brown bleeding and vomiting while his condition was deteriorating, likely substantially outweighs the videos' probative value.  See FED. R. EVID. 403.

### 2.  Inferences

Mr. Zabavsky separately moves the Court to preclude "[e]vidence inferring impropriety from the deactivation of body worn cameras."  Zabavsky Mot. at 2.  He maintains that "any assertion as to [his] adherence to MPD general orders would be opinion evidence that must be provided by an expert witness."  Id.  He further argues that the Court should preclude at

trial any "discussion about drawing an inference from him turning off his . . . camera" regardless of whether the General Orders are invoked.  See Oral Arg. Tr. at 102:11-13.

       The government opposes Mr. Zabavsky's request and asserts that the timing of the deactivation of both Mr. Sutton's and Mr. Zabavsky's body worn cameras is relevant "regardless of whether this [conduct] violated the MPD General Order on operating BWC." Gov't Zabavsky Opp. at 1.  The government maintains that "the defendants' simultaneous decision to turn off their BWCs and confer privately before quickly returning to the police station . . . demonstrates their corrupt intent."  Id. at 6.  The government further asserts that this conduct "provides relevant, circumstantial evidence of their agreement to continue to engage in misleading conduct at the police station to cover up the true circumstances of this incident, which is an element the government must establish to prove the offense of conspiracy, in violation of Section 371."  Id.

       The Court agrees with the government that "[a]dmission of this evidence does not rest on violation of MPD policy" and is highly probative.  Gov't Zabavsky Opp. at 4.  The government may present evidence concerning the deactivation of body worn cameras and ask the jury to infer that it supports the charges of obstruction and conspiracy without relying on the MPD General Orders.  Furthermore, the Court rejects Mr. Zabavsky's assertion that "[a]ny testimony or evidence concerning any alleged impropriety in the deactivation of the body worn cameras would be expert testimony . . . [and therefore] must be introduced by an expert witness." Zabavsky Reply at 3.  To the contrary, the Court concludes that this evidence is not rationally tied to any scientific complexity of body worn camera technology that warrants limitation of lay testimony.  See FED. R. EVID. 701(c).  The technology itself is not in question; rather defendants' intent underlying their decision to deactivate the cameras is at issue.  The question of whether to

exclude this evidence or inference therefore does not turn on Rules 701 and 702 of the Federal Rules of Evidence.

The Court further concludes that the government has "a good faith basis" for presenting evidence from which the jury may infer impropriety from the deactivation of body worn cameras. United States v. Lin, 101 F.3d at 767. Evidence of defendants' intent regarding the deactivation of their body worn cameras is directly relevant to an essential element of the obstruction of justice charge – namely, whether defendants knowingly "engage[d] in misleading conduct" with the purpose "to prevent an internal investigation of the incident and referral of the matter to federal authorities for a criminal civil rights investigation." Indictment at ¶¶ 31-32; see also 18 U.S.C. § 1512(b)(3).

Furthermore, the cases on which Mr. Zabavsky relies fail to support his arguments. First, Taylor does not stand for the proposition that bad faith cannot be inferred from failure to activate – or deactivate – a body worn camera. See United States v. Taylor, 312 F. Supp. 3d 170, 178 (D.D.C. 2018). Rather, the court in Taylor concluded that failure to comply with the relevant police department policies regarding activation does not by itself imply bad faith. See id. (concluding that an officer's "failure to activate his body-worn camera does not constitute prima facie evidence of bad faith"). Nor did the court in Garcia, contrary to Mr. Zabavsky's representations, preclude a negative inference from failure to activate a BWC. See United States v. Garcia, 554 F. Supp. 3d 421, 432 (E.D.N.Y. 2021) ("The Court . . . embraces the rationale of [] district courts which have held that the failure to activate the body camera is an adverse credibility factor."). Likewise, Casamento does not suggest that only the jury can draw these kinds of inferences. See Oral Arg. Tr. at 102:7-9. In contrast, the court in Casamento

stated that "[t]he government has broad latitude in the inferences it may reasonably suggest to the jury during summation." United States v. Casamento, 887 F.2d 1141, 1189 (2d Cir. 1989).[5]

Mr. Zabavsky has not met his burden of establishing any foundation to exclude evidence from which the jury could infer impropriety from the timing of the deactivation of body worn cameras at trial. Given the high probative value of this evidence, the Court will allow the government to make inferences regarding the deactivation of BWCs at trial. See FED. R. EVID. 403.

### D. Rule 404(b) Evidence

Rule 404 of the Federal Rules of Evidence prohibits "[e]vidence of a crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1); see Sutton 404(b) Mot.; Zabavsky Mot. at 9. Under Rule 404(b)(2), however, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). This is not an exclusive list of permissible purposes, however, so long as the evidence is not offered solely to prove character or criminal propensity. See United States v. Miller, 895 F.2d 1431, 1436 (D.C. Cir. 1990); cf. United States v. Mahdi, 598 F.3d 883, 891 (D.C. Cir. 2010); United States v.

---

[5]     It is also unclear what exactly Mr. Zabavsky requests that the Court exclude at trial. In his original motion, Mr. Zabavsky suggests that an inference regarding the deactivation of body worn cameras is permissible if proffered through an expert witness. See Def. Mot. at 6. In his reply, Mr. Zabavsky asserts that he "does not object to reference that the body worn cameras were deactivated [at] the scene." Zabavsky Reply at 3. But at oral argument, counsel for Mr. Zabavsky stated that "a jury can certainly infer things. But our argument is they can't state there should be an inference made from it." Oral Arg. Tr. 120:3-5; see id. at 100:19-21 ("Obviously a jury can draw an inference from it, but we don't want any discussion about turning [the body worn cameras] off."). His arguments appear inconsistent.

Pettiford, 517 F.3d 584, 588–89 (D.C. Cir. 2008).  "So-called 'propensity' evidence is excluded

not because it is irrelevant, but because 'it is said to weigh too much with the jury and to so

overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity

to defend against a particular charge.'"  United States v. Oseguera Gonzalez, 507 F. Supp. 3d at

147 (quoting Michelson v. United States, 335 U.S. 469, 475-76 (1948)).

       In determining whether Rule 404(b)(2) evidence is admissible, the Court applies a

two-step analysis.  See United States ex rel. Westrick v. Second Chance Body Armor, Inc., 289

F. Supp. 3d 118, 119 (D.D.C. 2018).  First, the Court must determine whether "the evidence [is]

probative of some material issue [in the case] other than character."  United States v. Clarke, 24

F.3d 257, 264 (D.C. Cir. 1994); see also FED. R. EVID. 404(b)(2).  Second, if the Court

determines that the evidence is admissible for a relevant and proper purpose, the Court must

decide whether it nevertheless should be excluded under Rule 403 of the Federal Rules of

Evidence.  See FED. R. EVID. 403; see also United States v. Clarke, 24 F.3d at 264 ("The second

step requires that the evidence not be inadmissible under Rule 403.").

### 1.   Evidence Related to Mr. Sutton

       In an email to Mr. Sutton's counsel on September 2, 2022, the government gave

the following notice under Rule 404(b):

> I write to provide notice, pursuant to Fed. R. Evid. 404(b), that the
> government may seek to introduce in its case in chief evidence
> concerning an interaction between Karon Hylton-Brown and
> Terence Sutton on the night of April 18-19, 2020. This interaction
> was captured on MPD BWC that was disclosed to you on October
> 5, 2021 and November 9, 2021. The government will seek to
> introduce evidence of this prior encounter between defendant
> Sutton and the decedent with regard to Count 1 in the indictment,
> as proof of the defendant's motive, intent, knowledge, and absence
> of mistake or accident.

Sutton 404(b) Mot. at 1.  Mr. Sutton seeks to exclude from evidence this body worn camera

footage from the night of April 18-19, 2020.  See Sutton 404(b) Mot. at 1.[6]

          The footage in question shows an interaction between Mr. Sutton and Mr. Hylton-

Brown, during which Mr. Hylton-Brown was a passenger in a car that was pulled over by other

officers for a traffic stop near Kennedy Street.  See Sutton 404(b) Mot. at 2.  Mr. Sutton

responded to the scene after the stop.  Id.  The driver and three passengers in the car, including

Mr. Hylton-Brown, were handcuffed while officers searched the vehicle.  Id.  Marijuana and a

scale were removed from the vehicle, "but no arrests were made because of the quantity.

Ultimately, [another officer] issued a traffic citation, and the vehicle was permitted to leave."  Id.

          During this interaction, Mr. Hylton-Brown and Mr. Sutton spoke to each other

briefly.  See Gov't 404(b) Opp. at 2.  Mr. Sutton asked Mr. Hylton-Brown why he was shaking,

and Mr. Hylton-Brown responded that he was cold and being "harassed by the whole 4D."  Id.

The body worn camera footage also captures a conversation between Mr. Sutton and another

officer regarding a vehicle chase that occurred earlier in the day.  See id. at 2-3.  Mr. Sutton says

to the officer, "I caught one today.  Motorcycle."  Id. at 2.  One of the men who was in the car

then states, "707.  Sutton, that's going to be your last chase," to which the defendant responds,

"Yeah, bring it on."  Id. at 2-3.  Mr. Sutton seeks to have this entire interaction excluded from

evidence.  See Sutton 404(b) Mot.

          Mr. Sutton first argues that "the government's notice falls woefully short of the

re-drafted Rule 404(b) notice requirement," id. at 4, which requires "[t]he prosecution . . . [to]

---

[6]     On October 6, 2022, the government stated in an email to the Court and the
parties that "[t]o the extent the government seeks to use any videos from [April 18-19, 2020], it
only would seek to use those from Officers Sutton and Tejera [and Wilson]."  Email from R.
Berkower (Oct. 6, 2022).

articulate a non-propensity purpose for which the evidence is offered and the basis for concluding that the evidence is relevant in light of this purpose."  FED. R. EVID. 404(b) advisory committee's note to 2020 amendment.  He states that "[t]he prior incident involves Ofc. Sutton and Hylton-Brown, but otherwise does not share any traits with the present incident.  Absent an explanation from the government about the relevance and non-propensity purpose of this evidence, Ofc. Sutton is left guessing how to address the government's position."  Id.

Notwithstanding the adequacy of the government's notice, the Court has carefully reviewed the disputed videos and agrees with Mr. Sutton that the evidence is not "probative of some material issue [in the case]."  United States v. Clarke, 24 F.3d at 264.  To start, Mr. Sutton and Mr. Hylton-Brown interact only very briefly in the videos, certainly not to an extent that would be indicative of Mr. Sutton's motive or intent six months later on the night of the events in this case.  The Court further rejects the government's argument that the incident "provides insight into the relationship between the defendant and Hylton-Brown."  Gov't 404(b) Opp. at 3-4.  There is no "relationship" established between the individuals in the video; Mr. Hylton-Brown was not driving the vehicle when it was pulled over, and he barely spoke to anyone while handcuffed.

Furthermore, although Mr. Sutton talks briefly about motorcycles towards the end of the video, his statements do not relate to a material issue in this case nor are they probative of "motive, intent, knowledge, and absence of mistake or accident in his choice to pursue Hylton-Brown on a moped on the night of the fatal crash."  Gov't 404(b) Opp. at 4.  Contrary to the government's description of events, Mr. Sutton never says he "likes to chase motorcycles," id. at 2, and the videos capture multiple officers conversing with civilians without clear delineations of who is speaking or to whom individuals are addressing their comments.  As this Court

reasoned in <u>Democracy Partners</u>, the "disembodied voices" in the videos "would make it difficult for the jury to distinguish [Mr. Sutton's] statements."  <u>Democracy Partners, LLC v. Project Veritas Action Fund</u>, 2022 WL 3334689, at *10.  Hearsay issues aside, the probative value of the videos is substantially outweighed by prejudice and the possibility of confusing the jury and wasting time.  FED. R. EVID. 403.

By email of October 7, 2022, the government advised Mr. Sutton's counsel of another piece of evidence the government may seek to offer under Rule 404(b) – a March 2019 pursuit investigation of Mr. Sutton concerning a prior vehicular pursuit.  <u>See</u> Email from R. Berkower to J. Michael Hannon (Oct. 7, 2022).  The government argues that this evidence shows Mr. Sutton's knowledge of the MPD policy requirements concerning vehicular pursuits and that Mr. Sutton was aware of these requirements "based upon the official reprimand he received, and the fact that he knows vehicular pursuits are investigated internally at MPD."  <u>Id</u>.

Based on the foregoing analysis, the Court agrees that the pursuit investigation is probative of Mr. Sutton's knowledge regarding MPD vehicular pursuit policies under Rule 404(b).  The Court will seek a proffer from the government as to how it seeks to prove Mr. Sutton's knowledge and review the report itself before deciding whether the probative value of this evidence – or some portion of it – is substantially outweighed by a danger of unfair prejudice.  <u>See</u> FED. R. EVID. 403.

2.    Evidence Related to Mr. Zabavsky

Mr. Zabavsky seeks to exclude all evidence related to his involvement in prior Driving While Intoxicated ("DWI") enforcement matters.  <u>See</u> Zabavsky Mot. at 9.  Specifically, he wants to exclude information regarding a 2015 civil suit in which he, along with other MPD officers, was accused of improper crime lab procedures.  <u>Id</u>. at 8; <u>see also</u> <u>Rodriguez v. District</u>

of Columbia, 124 A.3d 134 (D.C. 2015).  The government only seeks to admit evidence

regarding Mr. Zabavsky's previous DWI training, and states that "[t]he United States agrees not

to admit or make any argument relating to the allegations against defendant Zabavsky in the

[Rodriguez] case."  Gov't Zabavsky Opp. at 1.  The issue regarding the 2015 case raised by Mr.

Zabavsky therefore is moot.

      The Court concludes, however, that evidence regarding Mr. Zabavsky's training

and experience with DWI enforcement is relevant under Rule 401 because it is probative of Mr.

Zabavsky's state of mind when he made multiple statements about Mr. Hylton-Brown being

intoxicated on the night of the crash.  Gov't Zabavsky Opp. at 2, 3.  This evidence is a "fact of

consequence in determining the action" because contrary to Mr. Zabavsky's statements, a

toxicology report revealed there was no alcohol in Mr. Hylton-Brown's blood at the time of his

death.  FED. R. EVID. 401; see also Gov't Zabavsky Opp. at 3.[7]  The probative value of this

evidence is also not substantially outweighed by unfair prejudice or a risk of juror confusion.

See FED. R. EVID. 403.  The evidence merely provides context for Mr. Zabavsky's training and

experience as a police office.

      Mr. Zabavsky's argument that "[a]ny evidence related to the impact of [his] DWI

experience . . . must be produced through an expert witness" is without merit.  Zabavsky Reply

at 2.  Rule 701 states that "[i]f a witness is not testifying as an expert, testimony . . . is limited to

one that is rationally based on the witness' perception . . . and not based on scientific, technical,

or other specialized knowledge within the scope of Rule 702."  FED. R. EVID. 701.  If a lay

witness is called to testify about Mr. Zabavsky's DWI training at trial, his or her opinion will be

---

[7]    Notwithstanding the government's proffer that a toxicology report revealed that there was no alcohol in Mr. Hylton-Brown's blood at the time of his death, see Gov't Zabavsky Opp. at 2, the Court is inclined to exclude the underlying toxicology report at trial.

limited to what is rationally based on the witness's perception – not their "scientific, technical, or other specialized knowledge" about driving while intoxicated.  Id.

### E.  MPD Detective Victor DePeralta

The government seeks to exclude the grand jury testimony of MPD Detective Victor DePeralta as inadmissible hearsay evidence, arguing that his statements do not qualify as an opposing party's statement under Rule 801(d)(2) of the Federal Rules of Evidence.  See Gov't Mot. at 12-13; see also FED. R. EVID. 801(d)(2) (A court may admit an opposing party's out-of-court statement for the truth of the matter asserted if "[t]he statement is offered against an opposing party" and meets one of five enumerated conditions under the Rule.).  The government asserts that "Det. DePeralta is a witness, not a member of the prosecution team," and that his prior testimony therefore may only be admitted if the government has "adopted Det. DePeralta's statements or expressed a belief in their truth," which the government maintains it has not.  Gov't Mot. at 12-13.  The government further argues that the precedent on which Mr. Sutton relies, United States v. Morgan, 581 F.2d 933, 938 (D.C. Cir. 1978), is distinguishable from this case because the prosecutor in Morgan had previously submitted a sworn affidavit characterizing the informant's statements as "reliable."  Id.

Mr. Sutton opposes the government's motion and asserts that Detective DePeralta's grand jury testimony is admissible as substantive evidence under Rule 801(d)(2).  See Sutton Opp. at 21.  He maintains that Detective DePeralta need not be a "member of the prosecution team" in order for his grand jury testimony to qualify as a "statement[] of a party opponent."  Id.  Mr. Sutton further argues that "[e]ven if Det. DePeralta's prior sworn statements are not admissible[,] . . . his Major Crash Report is admissible as a public record."  Sutton Opp. at 21.  He maintains that "[a] police report, like the one prepared by Det. DePeralta, is a 'public

record and report' as defined under Fed. R. Evid. 803(8), and is therefore admissible in a criminal proceeding 'when offered by a criminal defendant to support his defense.'" Id. at 22 (quoting United States v. Smith, 521 F.2d 957, 965 (D.C. Cir. 1975). Mr. Sutton states that because "the term 'factual findings' is to be interpreted broadly, and encompasses the conclusions and opinions contained within a report[,] . . . Det. DePeralta's conclusion [in the Major Crash Report] that the accident was caused by Karon Hylton-Brown's failure to yield is a 'factual finding'" that is admissible under the public record hearsay exception. Id.

### 1.    Detective DePeralta's Grand Jury Testimony

The Court first concludes that Detective DePeralta's grand jury testimony is inadmissible hearsay and does not qualify as an opposing party statement. Under Rule 801(d)(2), a statement offered against an opposing party is admissible if the statement "(A) was made by the party in an individual or representative capacity; (B) is one the party manifested that it adopted or believed to be true; (C) was made by a person whom the party authorized to make a statement on the subject; (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or (E) was made by the party's coconspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(A)-(E). "Det. DePeralta specifically, and MPD generally, are not on the prosecution team, and Det. DePeralta is not the government's agent." Gov't Mot. at 14. His testimony therefore is admissible only if the government "manifested that it adopted or believed [it] to be true." FED. R. EVID. 801(d)(2)(B). Mr. Sutton shoulders the burden of proving the predicate facts under this exception. Bourjaily v. United States, 483 U.S. 171, 176 (1987).

Here, the government has not "manifested that it adopted or believed [Detective DePeralta's testimony] to be true." FED. R. EVID. 801(d)(2)(B). Citing United States v. Morgan,

Mr. Sutton argues that "in certain circumstances statements made by government agents are admissible against the government as substantive evidence."  Terence D. Sutton, Jr.'s Motions to Dismiss the Indictment for Prosecutorial Misconduct in the Grand Jury and to Disclose the Full Record of Matters Occurring Before the Grand Jury [Dkt. No. 185] at 28 n.2 (quoting United States v. Morgan, 581 F.2d at 937 n.10).  In Morgan, however, the D.C. Circuit made clear that its ruling was limited to a factual scenario where "the government [] indicated in a sworn affidavit to a judicial officer that it believes [the statements in question] are trustworthy."  United States v. Morgan, 581 F.2d at 939, see id. at 937.  The court of appeals clarified that it would "not decide that just [a]ny statement the informant might have made is admissible against the government."  Id. at 938; see also United States v. Warren, 42 F.3d 647, 655 (D.C. Cir. 1994) (statements made by police officers on arrests reports were not sworn before a judicial officer, and "[t]hus, the Government cannot be said to have manifested a belief in their truth so as to bring the statements within the non-hearsay classification of Rule 801(d)(2)(B).").

Although Mr. Sutton is correct that a statement need not come directly from the prosecutors to qualify as an opposing party's statement, Mr. Sutton has failed to demonstrate that the government ever adopted Detective DePeralta's statement as its own.  There is no basis to admit Detective DePeralta's grand jury testimony as an opposing party's statement at trial – although portions of it presumably could be used for impeachment if Detective DePeralta testifies.  Furthermore, Mr. Sutton may not characterize the testimony as a government admission during any witness examination or argument.

### 2.   Detective DePeralta's Major Crash Report

Notwithstanding the exclusion of Detective DePeralta's grand jury testimony, the Court may admit his Major Crash Report if it qualifies as "a record or statement of a public

office" under the public records exception to the hearsay rule.  See FED. R. EVID. 803(8).

Rule 803(8) provides that "[a] record or statement of a public office" is not excluded by the rule

against hearsay if:

> (A) it sets out:
>
>> (i) the office's activities;
>>
>> (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>>
>> (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
>
> (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

FED. R. EVID. 803(8); see also English v. District of Columbia, 651 F.3d 1, 8 (D.C. Cir. 2011)

(stating that "portions of the reports containing opinions rather than facts" are also admissible).

Mr. Sutton is correct that Detective DePeralta's conclusions in the Major Crash

Report constitute the kind of "factual findings" contemplated by Rule 803(8)(A)(iii).  See Beech

Aircraft Corp. v. Rainey, 488 U.S. 153, 170 (1988) ("As long as the conclusion is based on a

factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible

along with other portions of the report.").  Any personal observations within the report, however,

are not admissible because the public records exception clearly prohibits "a matter observed by

law-enforcement personnel."  FED. R. EVID. 803(8)(A)(ii).  And Mr. Sutton concedes that the

report "was based primarily on observations [Detective DePeralta] made and data he compiled."

See Sutton Opp. at 22 (emphasis added).

Given the fact that the report is 198 pages long and the Court has not yet received

a redacted version of the report or the excerpts that Mr. Sutton wishes to offer at trial, it remains

unclear whether Detective DePeralta's findings and conclusions are admissible under the Rule 403 balancing test. At this time, due to the substantial risk of juror confusion from the fact that the jury may be unable to distinguish between the kind of "causation" examined by the report and the "causation" required for criminal liability, the Court will preclude introduction of the report and argument about its conclusions during opening statements. The Court will decide at a later date – after balancing the probative value of specific portions of the report with the risk of juror confusion – whether Mr. Sutton may offer its factual findings and conclusions at trial.

### F.  Mr. Sutton's Public Authority Defense

The government seeks to exclude all evidence regarding Mr. Sutton's assertion that he was authorized by Mr. Zabavsky to pursue Mr. Hylton-Brown, arguing that this evidence constitutes an impermissible public authority defense. See Gov't Mot. at 22. The government contends that Mr. Sutton cannot raise this defense for two reasons. First, it states that Mr. Sutton failed to provide adequate notice of the defense. Id. at 23. And second, it argues that Mr. Sutton has not demonstrated that Mr. Zabavsky directed him to pursue Mr. Hylton-Brown, that Mr. Sutton reasonably relied on that instruction, and that Mr. Zabavsky had the authority to direct him to violate D.C. law. Id.

Mr. Sutton responds that he is not raising a public authority defense and therefore had no obligation to give prior notice. Sutton Opp. at 25. He maintains that his "position is that all the officers were aware of the significance of the information relayed to them, and Lt. Zabavsky concurred and directed their actions." Id. at 28. According to Mr. Sutton, "[t]hat is not a 'public authority defense.' It is an example of Ofc. Sutton complying with the directives of his supervisor, an issue which implicates whether Ofc. Sutton violated the MPD General Order on Vehicular Pursuits." Id.

Mr. Sutton is correct that Mr. Zabavsky's directive does not itself constitute a public authority defense and instead amounts to a fact that is independently relevant to the charges against Mr. Sutton.  See Sutton Opp. at 28.  The government is also correct that introduction of evidence concerning this fact may raise a substantial risk of prejudice and may mislead the jury if improperly presented as a legal argument to excuse Mr. Sutton's conduct.  See FED. R. EVID. 403; see also Gov't Mot. at 22-24; Gov't Reply at 18-20.  At this point, the Court concludes that these dangers do not outweigh the probative value of the factual evidence that Mr. Sutton has proffered.  The Court therefore will allow Mr. Sutton to offer evidence of Mr. Zabavsky's directive through testimony from Mr. Sutton or any other officers.  The jury may draw certain inferences from this testimony.  The Court will not, however, permit counsel for Mr. Sutton to make a legal argument that implies that authorization by Mr. Zabavsky to pursue Mr. Hylton-Brown is per se evidence of his innocence.  Moreover, given the potential dangers under Rule 403 articulated above, the Court will determine at trial whether a jury instruction is necessary to prevent the jury from misconstruing this factual evidence as a legal excuse.  Any sua sponte jury instruction that a party may request is subject to the procedures and requirements set forth by this Court.  See Amended Order Regarding Trial Schedule and Procedures [Dkt. No. 308] at ¶ 18.

### G. Defendants' Good Character Evidence

The government seeks to exclude evidence about Mr. Sutton's prior good acts as MPD officers, to prohibit defendants from eliciting character testimony through cross-examination, and to limit the number of character witnesses that each defendant may call.  See Gov't Mot. at 15-18.  Mr. Sutton asserts that he wishes to offer evidence of his reputation for truthfulness, nonviolence, and being a "reliable and superior" officer, and argues that the Court

should not prohibit character evidence on cross-examination because both sides likely will call overlapping witnesses.  Sutton Opp. at 23.  Both Mr. Sutton and Mr. Zabavsky also oppose any limitation on the number of witnesses they may call to testify about their good character.  See id. at 23-24; Zabavsky Opp. at 5-6.  Mr. Sutton states that "[o]ne or two witnesses describing Ofc. Sutton's relevant character traits would not be sufficient for establishing his broad reputation as an honest person, with a reputation for nonviolence."  Sutton Opp. at 23; see also Zabavsky Opp. at 5 ("While the Court has the authority to limit the number of character witnesses, the Court must permit the defendants to each call three to four character witnesses each.").

### 1.    General Character and Reputation Evidence

Rule 404(a) provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."  FED. R. EVID. 404(a)(1).  An exception to this rule states that "a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it."  FED. R. EVID. 404(a)(2)(A).

"Pertinent" traits are traits relevant to an element of the defense.  See 22B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 5238 (2d ed. 2022) ("In determining what traits of character are 'pertinent', judges and lawyers will follow the general principles of relevance as stated in Federal Rule of Evidence 401."); see also United States v. John, 309 F.3d 298, 303 (5th Cir. 2002) ("In the criminal context, a pertinent character trait is one that is relevant to the offense charged.").  A pertinent trait must be specific, it may not be offered as evidence of one's general character.  See WRIGHT & MILLER § 5238 (explaining that common law judges drew a distinction between "general good character ('he's a great guy') and a specific trait of character ('he's as honest as the day is long' . . .)").

Rule 405 provides that "[w]hen evidence of a person's character . . . is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion.  On cross-examination of a character witness, the court may allow an inquiry into relevant specific instances of the person's conduct."  FED. R. EVID. 405(a); see also United States v. Guerrero, 665 F.3d 1305, 1312 (D.C. Cir. 2011) ("Federal Rule of Evidence 405 permits cross examination of a character witness only as to 'relevant specific instances of conduct.'").  The Supreme Court has held that "[w]hen the defendant elects to initiate a character inquiry, . . . [t]he witness is [] allowed to summarize what he has heard in the community."  Michelson v. United States, 335 U.S. 469, 477 (1948); see also United States v. Zhong, 26 F.4th 536, 554 (2d Cir. 2022); United States v. Lewis, 482 F.2d 632, 641 (D.C. Cir. 1973) (explaining that testimony about defendant's "character trait for peace and good order . . . would have been limited to a showing of his community reputation therefor at that time.").

Mr. Sutton seeks to admit evidence regarding his reputation for truthfulness, nonviolence, and character as a "reliable and superior officer."  Sutton Opp. at 23.  The Court concludes that evidence regarding Mr. Sutton's reputation as a nonviolent and a reliable officer may be pertinent to the charge of murder of the second-degree under Rule 404(a)(2)(A).  See 1 McCormick on Evidence § 191 (8th ed. 2022) ("[S]omeone accused of murder might show that he is peaceful . . . [and] general traits, like being law-abiding, seem relevant to almost any accusation.").

Evidence of both defendants' reputations for truthfulness and reliability are also directly relevant to the obstruction of justice charge – namely, whether defendants knowingly "engage[d] in misleading conduct" with the purpose "to prevent an internal investigation of the incident and referral of the matter to federal authorities for a criminal civil rights investigation."

Indictment at ¶¶ 31-32; see also 18 U.S.C. § 1512(b)(3).  Evidence that defendants are truthful

and respected officers involve "pertinent" traits that are relevant to the jury's determination of

this charge.  See FED. R. EVID. 404(a)(2)(A).  For example, in Yarbrough, the Fifth Circuit

concluded that in a prosecution for obstructing an official proceeding under 18 U.S.C.

§ 1512(c)(2), "character evidence of [defendant's] integrity and status as a law-abiding, trusted

police officer . . . is not only relevant, but also vitally important."  United States v. Yarbrough,

527 F.3d 1092, 1100-01 (5th Cir. 2013).  The Fifth Circuit reasoned that "character evidence is

admissible in cases, such as this one, where the sole issue before the jury is whether a defendant

undertook his undisputed acts with a prohibited state of mind."  Id. at 1102.

Here, as in Yarbrough, defendants will be permitted to offer evidence regarding

their reputations for truthfulness and reliability, and the government may offer evidence to rebut

it.  See FED. R. EVID. 404(a)(2)(B).  The Court will decide at trial the extent to which it will limit

the number of character witnesses called by each defendant in their case in chief.

## 2.    Prior Good Acts

When character is an essential element of a charge, claim, or defense, "the

character or trait may also be proved by relevant specific instances of the person's conduct."

FED. R. EVID. 405(b).  But Rule 405(b) "only applies to cases in which the parties have made

character an ultimate issue," WRIGHT & MILLER § 5263, including "when character or a character

trait is an operative fact which under the substantive law determines the legal rights of the

parties."  Id. at § 5267 (internal quotation omitted).

The Court is persuaded that defendants' character traits of truthfulness and

reliability as police officers are relevant to the obstruction of justice charge in this case.  As

Judge Colleen Kollar-Kotelly explained in United States v. Brown, an obstruction of justice case,

"the conduct at the heart of the charges against Defendants . . . [is] part and parcel of Defendants' professional diligence and involves their duties as police officers." United States v. Brown, 503 F. Supp. 2d 239, 243 (D.D.C. 2007). Accordingly, although the Court is not yet unaware of the specifics of the commendations sought to be introduced by defendants, the Court believes that "a character trait akin to 'professional diligence' may be relevant to the case as a whole or to Defendants' defense." Id.; but see United States v. Irving, 2008 WL 163653, at *1 (D.D.C. Jan. 18, 2008) (concluding in a case involving tax fraud that a police detective's awards and commendations did not reflect "'essential' traits" under Rule 405(b)). The Court therefore concludes that, in addition to reputation evidence, "specific instances" of defendants' "professional diligence" may be offered at trial to defend against the obstruction of justice charge, regardless of whether the defendants testify. FED. R. EVID. 405(b); United States v. Brown, 503 F. Supp. 2d at 242, 243. And like Judge Kollar-Kotelly, the Court finds that given the charges in this case, evidence about commendations and awards constitutes admissible character evidence. Id.

### H.  Other Legal and Policy Issues

The government raises five additional topics of potential testimony and argument it seeks to preclude at trial:  (1) defendants' allegations of selective or unprecedented prosecution; (2) Brady violations by the government; (3) potential consequences of prosecution; (4) community responses to Mr. Hylton-Brown's death; and (5) constitutional policing standards. See Gov't Mot. at 19-22, 24-26. With the exception of the fourth category, the Court agrees with the government, except for the limited exception discussed below. The Court also agrees with the government that Mr. Sutton is prohibited from presenting a legal argument about whether he was entitled to conduct a Terry stop of Mr. Hylton-Brown. The Court will nevertheless allow

Mr. Sutton to present evidence concerning his knowledge and training related to the MPD General Order on Field Contacts, Stops, and Protective Pat Downs.

To start, this Court has already fully rejected all allegations of selective prosecution and alleged violations of Brady v. Maryland, 373 U.S. 83 (1963), and related ethical and local rules.  See Memorandum Opinion and Order [Dkt. No. 215] at 3 (denying selective prosecution claims); United States v. Sutton, Crim. No. 21-598, 2022 WL 4482699 (D.D.C. Sept. 27, 2022) (denying Brady motions).  These issues are irrelevant, inappropriate for consideration by the jury, invite jury nullification, and distract from the issues at trial.  The same is true with regard to defendants' assertions that this is an unprecedented criminal case, or as Mr. Sutton has described it, "a unicorn among the criminal cases brought by DOJ against law enforcement officers."  Gov't Mot. at 19 (quoting Terence D. Sutton, Jr.'s Motion to Modify Pleading Schedule [Dkt. No. 79] at 6).  And for many of the same reasons, the Court further concludes that testimony and argument about the potential consequences of prosecution have no place at trial.  See United States v. Bell, 506 F.2d 207, 226 (D.C. Cir. 1974) ("[E]vidence which has the effect of inspiring sympathy for the defendant or for the victim . . . is prejudicial and inadmissible when otherwise irrelevant.").

With respect to references to the community's reaction to Mr. Hylton-Brown's death, the Court largely agrees with the government that "[t]hese arguments lack any relation to a relevant matter the jury must address . . . and present a strong risk of inflaming the jurors on irrelevant issues."  Gov't Reply at 8-9; see also United States v. Sutton, 2022 WL 1202741, at *13 ("Individual and community responses to Mr. Hylton-brown's death – even those that are unquestionably criminal – are not relevant to whether Mr. Sutton committed second degree murder or obstructed justice.").  For the limited purpose of impeachment or to show bias,

however, defendants may ask targeted and discrete questions to specific witnesses called to testify by the government if they <u>participated in</u> public protests at MPD's Fourth District station following Mr. Hylton-Brown's death.

The Court is strictly limiting this testimony because the only relevant purpose of this testimony is to allow defendants to impeach or to show potential witness bias.  <u>See</u> <u>United States v. Abel</u>, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."); <u>see also</u> <u>Democracy Partners, LLC v. Project Veritas Action Fund</u>, 2022 WL 3334689, at *9 (stating that evidence is probative of witness bias because it may demonstrate "personal animus towards [the defendant] at a level that exceeds that of a typical party in civil litigation and surpasses ill feelings") (internal quotations omitted)).

Because of the high risk of prejudice under Rule 403, however, the Court will prohibit defendants from eliciting any testimony from witnesses who were merely aware of the protests but did not participate in them, and from law enforcement officers who were on duty at the Fourth District station at the time.  Moreover, defendants' questions may only relate to the <u>fact</u> of the witness's participation; defendants may not elicit any testimony related to violence at the Fourth District station or allegations that the protests were orchestrated by individuals connected to Mr. Hylton-Brown.  And defendants have absolutely no basis whatsoever in questions or argument to assert or infer that "the community reaction . . . explain[s] why an Indictment was sought."  Sutton Opp. at 15.  That is absolutely prohibited.

The final issue is whether defendants are "permitted to present evidence, or argue to the jury, that they were legally entitled to conduct a <u>Terry</u> stop of Mr. Hylton-Brown on

October 23, 2020, . . . or otherwise put the question to the jury of whether such a procedure was legally appropriate."  Gov't Mot. at 24.  These types of legal arguments will not be permitted at trial because "it would risk leading the jurors to believe, erroneously, that they are supposed to make a legal determination about the Terry stop, or that if the defendants were conducting a legitimate Terry stop, it somehow mitigates defendant Sutton's later conduct as he continued to chase Mr. Hylton-Brown over the course of several minutes."  Id. at 25.  The probative value of any legal determination of a Terry stop is substantially outweighed by the risk of confusion, misleading the jury, or permitting them to make decisions about the law.  See FED. R. EVID. 403. The Court will instruct the jury on the law, as relevant.

    Testimony and evidence about Mr. Sutton's knowledge and training regarding Terry stops nevertheless is relevant.  As discussed in relation to the MPD General Orders, the government's theory is that Mr. Sutton subjectively knew that his conduct "created an extreme risk of death or serious bodily injury, but engaged in that conduct nonetheless."  Williams v. United States, 858 A.2d at 998 (internal quotation omitted).  Mr. Sutton maintains that he was engaged in a legitimate Terry stop.  Evidence of Mr. Sutton's training on Terry stops therefore is a factor the jury may consider in determining Mr. Sutton's subjective state of mind at the time and why he engaged in the conduct at issue.  This evidence is relevant to the defense because the parties will present contrasting explanations of what MPD General Orders governed Mr. Sutton's conduct leading up to the crash and what motivated Mr. Sutton.  The government has consistently asserted that Mr. Sutton "knew the MPD policy regarding vehicular pursuits" and violated such policy.  Indictment at ¶ 8-10.  Mr. Sutton, in contrast, argues that he was aware of and complied with a different MPD General Order – namely, the General Order on Field

Contacts, Stops, and Protective Pat Downs.  See Sutton Opp. at 28.  Both theories may be properly presented to the jury.

     Mr. Sutton further asserts that "[a]t the hearing on the admissibility of expert testimony, the government conceded that since the government can rely on the MPD General Order on Vehicular Pursuits, the defense could rely on the MPD General Order on Field Contacts, Stops, and Protective Pat Downs."  Sutton Opp. at 28.  The government correctly points out, however, that it did not "concede" that "questions concerning whether the defendant was lawfully engaged in a Terry stop of Hylton-Brown should be put before the jury."  Gov't Reply at 22.  Instead, the government "[did] not dispute that, with a proper foundation, evidence concerning the content of the MPD policy on Terry stops, and officers' training concerning that policy, could be relevant."  Id.  The Court concludes that Mr. Sutton has now laid the proper foundation for this evidence.  Mr. Sutton therefore will be permitted to "use the term 'Terry stop'" in construing the MPD General Order on Field Contacts, Stops, and Protective Pat Downs. Gov't Mot. at 24.  The Court will instruct the jury on the law.

     An Order consistent with this Opinion shall issue in due course.

     SO ORDERED.

_____
/s/
PAUL L. FRIEDMAN
United States District Judge

DATE:  October 23, 2022