UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 21-0598 (PLF) |
| | ) | |
| TERENCE SUTTON | ) | |
| and | ) | |
| ANDREW ZABAVSKY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

OPINION

Pending before the Court are four pretrial <u>Daubert</u> motions seeking the exclusion

of proposed expert testimony at trial.  The government has proffered four expert witnesses and

defendants have proffered five.  Defendant Terence Sutton challenges three of the four

government experts – Robert Drago, Carolyn Totaro, and Mark Hammond.[1]  Defendant Andrew

Zabavsky separately challenges Robert Drago.  The government has filed motions seeking the

exclusion of all four experts proposed by Mr. Sutton – John J. Brennan, Bruce-Alan Barnard,

Michael A. Wear, and Thomas Langley – along with Mr. Zabavsky's expert, James K. Dahlquist.

The parties appeared for oral argument on three of the four pending motions on

---

[1]     There is no defense challenge to government expert Brian F. Chase, the Chief
Vehicle Forensic Examiner and collision reconstruction expert at Comprehensive Motor Vehicle
Services and Consulting.  <u>See</u> Government Discovery Letter #8 and Expert Disclosures [Dkt.
No. 220-1].

September 1, 2022.  See Transcript of Motions Hearing, September 1, 2022 [Dkt. No. 265].[2]

The Court has carefully considered the parties' written submissions, the oral arguments presented by counsel, and the applicable authorities.  It concludes that Robert Drago's testimony (as proffered and narrowed in scope on November 1, 2022) will be admitted in full; Carolyn Totaro's testimony will be admitted in part and excluded in part; and Mark Hammond's testimony will be admitted in full.  With regard to defendants' experts, John J. Brennan's testimony will be admitted in part and excluded in part; Bruce-Alan Barnard's testimony is excluded in full; Michael A. Wear's testimony will be admitted in part and excluded in part; Thomas Langley's testimony will be admitted in part and excluded in part; and James K. Dahlquist's testimony is excluded in full.

---

[2]     The Court has reviewed the following documents and their attachments: Government's Motion in Limine to Exclude Inadmissible Expert Testimony ("Gov't Mot.") [Dkt. No. 219]; Terence D. Sutton's Expert Notice and Disclosure ("Sutton Discl.") [Dkt. No. 219-1]; Defendant Andrew Zabavsky's Expert Disclosure ("Zabavsky Discl.") [Dkt. No. 219-3]; Defendant Andrew Zabavsky's Daubert Motion to Preclude Expert Testimony ("Zabavsky Mot.") [Dkt. No. 220]; Government Discovery Letter #8 and Expert Disclosures ("Gov't Discl.") [Dkt. No. 220-1]; Robert Drago Letter ("Drago Letter") [Dkt. No. 220-2]; Terence D. Sutton, Jr.'s Motion to Exclude Expert Testimony ("Sutton Mot.") [Dkt. No. 221]; Defendant Andrew Zabavsky's Opposition to Government's Motion in Limine to Exclude Inadmissible Expert Witness Testimony ("Zabavsky Opp.") [Dkt. No. 229]; Government's Omnibus Opposition to Defendants' Motions to Exclude Expert Testimony ("Gov't Opp.") [Dkt. No. 231]; Terence D. Sutton, Jr.'s Opposition to Government's Motion in Limine to Exclude Inadmissible Expert Testimony ("Sutton Opp.") [Dkt No. 232]; Terence D. Sutton, Jr.'s Reply in Support of His Motion to Exclude Expert Testimony ("Sutton Reply") [Dkt. No. 245]; Government's Reply in Support of Its Motion in Limine to Exclude Inadmissible Expert Testimony ("Gov't Reply") [Dkt. No. 246]; Defendant Andrew Zabavsky's Reply in Support of His Daubert Motion to Preclude Expert Testimony ("Zabavsky Reply") [Dkt. No. 247]; Government's Motion in Limine to Exclude Defendant Sutton's Crash Reconstruction Opinion Testimony ("Gov't Crash Mot.") [Dkt. No. 293]; Thomas Langley Letter ("Langley Letter") [Dkt. No. 293-1]; Terence D. Sutton, Jr.'s Opposition to the Government's Motion in Limine to Exclude Testimony of Expert Thomas Langley ("Sutton Crash Opp.") [Dkt. No. 317]; and Reply to Defendant Sutton's Opposition to Government's Motion to Exclude Expert Testimony of Thomas Langley ("Gov't Crash Reply") [Dkt. No. 320].

## I.  LEGAL FRAMEWORK

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) [t]he expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) [t]he testimony is based on sufficient facts or data; (c) [t]he testimony is the product of reliable principles and methods; and (d) [t]he expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  "In general, Rule 702 has been interpreted to favor admissibility." Khairkhwa v. Obama, 793 F. Supp. 2d 1, 10 (D.D.C. 2011); see also FED. R. EVID. 702 advisory committee's note (2000) ("A review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule.").  Trial judges are generally afforded broad discretion in rendering evidentiary rulings "[i]n deference to their familiarity with the details of the case." Youssef v. Lynch, 144 F. Supp. 3d 70, 80 (D.D.C. 2015); accord Graves v. District of Columbia, 850 F. Supp. 2d 6, 11 (D.D.C. 2011).

Rule 702 of the Federal Rules of Evidence effectively codifies the Supreme Court's decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).  In Daubert, the Court charged trial judges with the responsibility of acting as "gatekeepers" to shield unreliable or irrelevant expert testimony and evidence from the jury.  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 597.  In Kumho, the Court made clear that the gatekeeper function applies to all expert testimony, not just scientifically based testimony.  See Kumho Tire Co. v. Carmichael, 526 U.S. at 148-49.  Consistent with the Court's role as the "gatekeeper for expert testimony," Little v. Wash. Metro. Area Transit Auth., 249 F. Supp. 3d 394, 408 (D.D.C. 2017), the Court has "broad discretion in determining whether to admit or exclude expert testimony." Blake v. Securitas Sec.

Servs., Inc., 292 F.R.D. 15, 17 (D.D.C. 2013) (quoting U.S. ex rel. Miller v. Bill Harbert Int'l

Constr., Inc., 608 F.3d 871, 895 (D.C. Cir. 2010)).

      As the D.C. Circuit has explained, the twin requirements for the admissibility of

expert testimony are evidentiary reliability and relevance. See Ambrosini v. LaBarraque, 101

F.3d 129, 133 (D.C. Cir. 1996); see also United States v. Naegele, 471 F. Supp. 2d 152, 156-57

(D.D.C. 2007); McReynolds v. Sodexho, 349 F. Supp. 2d 30, 34-35 (D.D.C. 2004). With respect

to reliability, the court's focus must be on the methodology or reasoning employed by

application of the factors in Rule 702 and the non-exhaustive lists of factors set forth in Daubert

and Kumho. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 595 ("The focus, of

course, must be solely on principles and methodology, not on the conclusions that they

generate."); Ambrosini v. LaBarraque, 101 F.3d at 140 ("[T]he admissibility inquiry focuses not

on conclusions, but on approaches."). With respect to relevance, the court must determine

whether the proffered testimony is sufficiently tied to the facts of the case and whether it will aid

the jury in resolving a factual dispute. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.

at 592-93.

      For an expert to be "qualified" under Rule 702, "it is not necessary that the

witness be recognized as a leading authority in the field in question or even a member of a

recognized professional community." 29 CHARLES ALAN WRIGHT & ARTHUR R. MILLER,

FEDERAL PRACTICE & PROCEDURE § 6264.1 (2d ed. 2022). "[A]n expert may be qualified on the

basis of his or her practical experience." Khairkhwa v. Obama, 793 F. Supp. 2d at 11. As the

"gatekeeper" to shield the jury from unreliable or irrelevant expert testimony, the trial judge "is

to make certain that an expert, whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field," but "reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. at 152-53.

The D.C. Circuit has held that expert testimony consisting of legal conclusions is impermissible because such testimony may improperly influence the decisions of the trier of fact – the jury – and impinge upon the responsibilities of the trial court. <u>See</u> <u>United States ex rel. Mossey v. Pal-Tech, Inc.</u>, 231 F. Supp. 2d 94, 98 (D.D.C. 2002) (citing <u>Burkhart v. Wash. Metro. Area Transit Auth.</u>, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997)). Whether expert opinion testimony is admissible "depends, in part, on whether it will 'assist the trier of fact' in either 'understand[ing] the evidence or . . . determin[ing] a fact in issue.'" <u>Burkhart v. Wash. Metro. Area Transit Auth.</u>, 112 F.3d at 1212 (quoting FED. R. EVID. 702). Expert testimony consisting of legal conclusions is not admissible because it "cannot properly assist the trier of fact in either respect." <u>Id.</u> Thus "an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." <u>Id.</u> at 1212-13; <u>see also</u> <u>Halcomb v. Wash. Metro. Area Transit Auth.</u>, 526 F. Supp. 2d 24, 27 (D.D.C. 2007).

Under Rule 704(a) of the Federal Rules of Evidence, "[a]n opinion is not objectionable just because it embraces an ultimate issue." FED. R. EVID. 704(a). Other rules, however, including Rule 702, "may still be used to exclude 'opinions which would merely tell the jury what result to reach.'" <u>United States v. Boney</u>, 977 F.2d 624, 630 (D.C. Cir. 1992) (quoting FED. R. EVID. 704, Note of Advisory Committee on 1972 Proposed Rules); <u>see also</u> 3 STEPHEN A. SALTZBURG, MICHAEL M. MARTIN & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL § 704.02[1] (12th ed. 2022) ("Rule 704(a) permits ultimate issue testimony,

but only if it will be helpful in accordance with Rule 701 or 702."). Rule 704 is "not intended to allow experts to offer opinions embodying legal conclusions." SALTZBURG, MARTIN & CAPRA, supra, § 704.02[3] (quoting United States v. Scop, 846 F.2d 135, 139 (2d Cir. 1988)). In drawing a line between "testimony on ultimate factual conclusions and testimony on the law . . . [t]he question is always whether the expert testimony will assist the jury – and it is within the trial court's discretion to determine the helpfulness of such ultimate testimony in a specific case." Id.

Under Rule 704(b), "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." FED. R. EVID. 704(b). This rule was originally "enacted to limit psychiatric testimony when a criminal defendant relies upon the defense of insanity," but it "applies in fact to all instances in which expert testimony is offered as to a mental state or condition constituting an element of the crime charged or defense thereto." See United States v. Boyd, 55 F.3d 667, 671 (D.C. Cir. 1995) (citing S. Rep. No. 98-225, at 230 (1983)). The D.C. Circuit has adopted the view that "what is proscribed is questioning that produces responses suggesting some special knowledge of the defendant's mental processes." United States v. Watson, 171 F.3d 695, 703 (D.C. Cir. 1999).

## II. DISCUSSION

### A. Police Experts

The parties have proffered six experts to testify on topics relating to police procedures. The government has proffered Robert Drago, Carolyn Totaro, and Mark Hammond;

Mr. Sutton has proffered John J. Brennan and Michael A. Wear; and Mr. Zabavsky has proffered James K. Dahlquist.

### 1.   Relevance of National and Local Policing Standards

As an initial matter, Mr. Sutton challenges the government's police experts on the ground that their testimony regarding both local and national police standards is not probative or relevant to the charges in this case. The Court disagrees. First, with regard to local standards, Mr. Sutton argues that "any evidence or expert testimony that Ofc. Sutton did not comply with the [Metropolitan Police Department's] policies, practices, or training is not probative or relevant as it has no bearing on the charges pending in this case." Sutton Mot. at 16. The Court rejects this argument. Under the D.C. second degree murder statute, whether a particular defendant acted with a "depraved heart" "may be shown by a 'gross deviation from a reasonable standard of care' or by other acts that may lead the finder of fact to determine that the 'defendant was aware of a serious risk of death or serious bodily harm.'" Jennings v. United States, 993 A.2d 1077, 1080 (D.C. 2010) (quoting Comber v. United States, 584 A.2d 26, 39 (D.C. 1990) (en banc)). "The Court has determined that this standard involves both subjective and objective elements – namely, whether the defendant was subjectively aware of the risk created by his or her conduct; and whether there was an objectively 'gross deviation from a reasonable standard of care.'" United States v. Sutton, Crim. No. 21-0598, 2022 WL 13940371, at *4 (D.D.C. Oct. 23, 2022) (emphasis in original) (citing United States v. Sutton, Crim. No. 21-0598, 2022 WL 2828995, at *3 (D.D.C. July 20, 2022)). Furthermore, the Metropolitan Police Department ("MPD") General Orders "may illuminate the contours of the reasonable standard of care that applied to Mr. Sutton as he pursued Mr. Hylton-Brown on October 23, 2020." United States v. Sutton, 2022 WL 2828995, at *3. Based on this determination, the Court concludes that expert

testimony about "MPD's policies, practices, or training" is both probative and relevant to whether there was an objectively gross deviation from a reasonable standard of care. Sutton Mot. at 16. The police experts offered by both sides – to the extent that the Court finds them qualified – may testify about this issue.

Second, with regard to national standards, Mr. Sutton argues that testimony regarding "nationally accepted police practices should be excluded because it is not relevant." Sutton Mot. at 19. Mr. Sutton cites cases litigated under 42 U.S.C. § 1983 and 18 U.S.C. § 242 to support this proposition. See id. at 17-19. These cases, however, are not analogous or persuasive. To start, 42 U.S.C. § 1983 and 18 U.S.C. § 242 give government officials qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see also United States v. Lanier, 520 U.S. 259, 265 (1997). These statutes therefore require proof that a defendant's conduct violated "clearly established" controlling federal court precedent. Pearson v. Callahan, 555 U.S. at 231. A plaintiff in a Section 1983 suit therefore must show that a right is "clearly established" by a federal court and cannot prove their case merely by eliciting testimony about "well established law enforcement standards." Marquez v. City of Albuquerque, 399 F.3d 1216, 1222 (10th Cir. 2005). A determination of an officer's liability in a Section 1983 suit is confined to the analysis of the cases decided under the Fourth Amendment – in use of force cases – or other relevant constitutional principles. See United States v. Perkins, 470 F.3d 150, 159 (4th Cir. 2006) (explaining that "the word 'reasonable' in the § 242 context has a specific legal meaning"); see also Marquez v. City of Albuquerque, 399 F.3d at 1222 (affirming the district court's ruling that "testimony regarding law enforcement standards was both

irrelevant and confusing on the ground that the violation of such standards is not ipso facto a Fourth Amendment violation"). But the calculus is different under the District of Columbia second degree murder statute. As discussed above, one of the ways the government can prove that Mr. Sutton had the requisite mental state is if it shows a "gross deviation from a reasonable standard of care." Jennings v. United States, 993 A.2d at 1080. Nationally accepted police practices therefore may illuminate that standard of care.

Consistent with this distinction, courts in this Circuit have concluded that expert testimony regarding police procedures is admissible both within the Section 1983 context and outside of this context. For example, in Butera v. District of Columbia, the court of appeals affirmed a jury verdict that awarded damages for claims under the District of Columbia's Survival Act and Wrongful Death Act. See Butera v. District of Columbia, 235 F.3d 637 (D.C. Cir. 2001). The case involved a civil action brought by a mother who sued the District of Columbia and individual MPD police officers who engineered an undercover operation during which the plaintiff's son was beaten to death while serving as an undercover operative. See id. at 640-43. At trial, "[t]he district court ruled that expert testimony concerning proper police procedures for the undercover operation was warranted." Id. at 659. The D.C. Circuit affirmed, concluding that the expert, who had twenty-five years of experience at MPD, "presented sufficient evidence to establish a national standard of care" because "[r]ather than relying on [his] experience in the abstract to proffer a national standard of care, [the expert] set forth concrete bases for his expert testimony." Id. at 660. The court held that an expert, testifying as to whether a defendant met a national standard of care, "must refer to commonly used police procedures, identifying specific standards by which the jury could measure the defendant's actions." Id. at 659.

Following Butera, judges in this district have made similar rulings regarding police procedures experts. For example, this Court previously concluded that an expert "may offer opinions with respect to the issues in this case only to the extent that those opinions are tied to and based upon identifiable, objective standards of police practice such as those set forth in publications of the International Association of Chiefs of Police ('IACP') or similarly authoritative and relevant documents." Halcomb v. Wash. Metro. Area Transit Auth., 526 F. Supp. 2d at 30. In Sherrod v. McHugh, Judge Rudolph Contreras rejected a challenge to a police expert and concluded that his report "set forth concrete bases for his expert testimony[,] [including] his review of the MPD's General Orders, his consultation with personnel from hundreds of law enforcement agencies, and his assessment of 'the principles of police practices, policies, and procedures as thoroughly discussed by several national law enforcement organizations.'" Sherrod v. McHugh, 334 F. Supp. 3d 219, 259 (D.D.C. 2018) (emphasis added). And in McKnight v. District of Columbia, Magistrate Judge Alan Kay permitted an expert to opine on whether a police officer "acted outside the scope of accepted police practice in the United States and outside the D.C. Metropolitan Police Department policy governing use of force" and whether "the various policies regarding use of force [and] the training officers receive on when and under what circumstances to use deadly force." McKnight v. District of Columbia, Civ. Action No. 00-2607, 2006 WL 6904002, at *2 (D.D.C. Jan. 17, 2006). The expert, however, was prohibited from testifying "that he believes that [an officer's] use of force was 'unreasonable' or 'unjustified,' as this is the question the jury will ultimately have to decide." Id. The police experts noticed by both parties in this case – to the extent that the Court finds them qualified – will be permitted to offer similar testimony, with similar limitations, regarding local and national standards of care.

Mr. Sutton also seeks to exclude on relevancy grounds Mr. Drago's testimony on whether "[s]tandard police practice and procedure, both nationally and as stated in the Washington D.C. police department policy, requires a pursuit to be terminated once the subject is identified." Drago Letter at 2. For the reasons described above, the Court declines to exclude this opinion and agrees with the government that testimony on "nationally accepted police standards concerning vehicular pursuits," and how they compare to MPD policies, is relevant to the elements of second degree murder and obstruction of justice. Gov't Opp. at 7; see United States v. Sutton, Crim. No. 21-0598, 2022 WL 13940371, at *4 (D.D.C. Oct. 23, 2022) ("[E]vidence of Mr. Sutton's training on the General Order will be [] one factor the jury may consider."); see also Transcript of Jury Trial – Day 7 (Morning Session), November 3, 2022 at 42:23-43:1 (explaining that the MPD General Order on vehicular pursuits is "relevant to obstruction"); id. at 43:7-11 ("[T]he relevance of testimony about the MPD general orders, in combination later with fact witnesses who will testify about what happened, and inferences the government may want to draw, suggests that this proposed instruction should apply to both defendants."). Any risk of jury confusion does not substantially outweigh the probative value of Mr. Drago's proposed testimony. See FED. R. EVID. 403.

For the same reasons, the Court will not exclude Mr. Wear's opinion that "[u]nder the vehicular pursuit policy, activating the lights and sirens on an emergency vehicle does not immediately or automatically constitute a vehicular pursuit." Sutton Discl. at 7-8. The Court has already concluded that expert testimony about "MPD's policies, practices, or training" is both probative and relevant. Sutton Mot. at 16. The testimony of Ms. Totaro and Mr. Hammond about "MPD's policies and practices" and "the training defendant Sutton received in these areas"

11

is also probative and relevant.  Gov't Opp. at 7; see also United States v. Sutton, 2022
WL 13940371, at *4.  The Court declines to exclude their opinions on these topics.

   In addition, the police experts noticed by both parties in this case – to the extent
that the Court finds them qualified – will be permitted to offer testimony regarding whether the
defendants' conduct conformed to the professional police standards they will testify about.  This
testimony is consistent with the Federal Rules of Evidence.  See Halcomb v. Wash. Metro. Area
Transit Auth., 526 F. Supp. 2d at 27 ("There is no doubt that under Rules 702 and 704 an expert
may testify about applicable professional standards and the defendants' performance in light of
those standards." (quoting Richman v. Sheahan, 415 F. Supp. 2d 929, 945-46 & n.16 (N.D. Ill.
2006))); see also Restivo v. Hessemann, 846 F.3d 547, 580 (2d Cir. 2017) (holding that the
district court did not abuse its discretion in admitting expert testimony "about what minimally
accepted police practices required and about [the expert's] opinion that [the defendant's] conduct
departed from accepted police practices").  For example, in Sherrod v. McHugh, after concluding
that the plaintiffs' police practices expert could testify about the national standard of care, Judge
Contreras further held that the expert's "opinions regarding the [] steps [the defendant] should
have taken according to the standard of care" were admissible.  Sherrod v. McHugh, 334 F.
Supp. 3d at 273.  He stated that "because the [plaintiffs] have made the requisite threshold
showing of admissibility[,] further disputes go to weight, not admissibility."  Id. (internal
quotations and brackets omitted).  He further noted that "[d]efendants may exercise their
disagreement by presenting their own expert testimony contradicting [plaintiffs' expert's]
opinions, and by vigorously cross-examining [plaintiffs' expert] at trial."  Id.  The same logic
applies here.  The parties' police experts, however, are prohibited from opining on whether
Mr. Sutton or Mr. Zabavsky acted "reasonably" or "appropriately" – testimony which "[i]n

varying contexts, a number of courts have been unwilling to allow . . . on the theory that the opinion constitutes an impermissible legal conclusion." Richman v. Sheahan, 415 F. Supp. 2d at 946 & n.16 (collecting cases).

2.   Robert Drago, John J. Brennan, and Michael A. Wear

For the reasons that follow, the testimony of Robert Drago (as proffered and narrowed in scope on November 1, 2022) will be admitted in full, and the testimony of John J. Brennan and Michael A. Wear will be admitted in part and excluded in part.  The Court addresses in turn the various issues that the parties raise.

a.   Qualifications

Robert Drago is a retired Lieutenant Colonel of the Broward County, Florida Sheriff's Office.  On November 1, 2022, the government proffered in open court that Mr. Drago would not testify on the incident at issue in this case and how Mr. Sutton and Mr. Zabavsky's conduct conformed to national police standards.  See Transcript of Jury Trial – Day 5 (Afternoon Session), November 1, 2022 at 37:3-38:4.  The Court therefore need not address issues that the parties earlier raised regarding proposed testimony from Mr. Drago as to whether Mr. Sutton's and Mr. Zabavsky's conduct conformed to police standards.  Mr. Drago testified in this trial on November 3, 2022.

Mr. Drago worked in the field of law enforcement for thirty-eight years before retiring in 2017.  According to the government, Mr. Drago "chaired or participated in committees that formulate law enforcement policy including use of force and vehicular pursuit policies" and has "extensive knowledge of national model policing standards, including those standards concerning use of force and vehicular pursuits as employed by the International

13

Association of Chiefs of Police." Gov't Discl. at 4-5.  The government called Mr. Drago to

testify about "nationally accepted police practices and standards concerning vehicular

pursuits . . . as well as how they compare to the MPD general order on vehicular pursuits . . . that

was in effect at the time of this incident." Id. at 5.  Mr. Zabavsky argued that Mr. Drago is not

qualified because his CV "fails to establish expertise." Zabavsky Mot. at 4.  The Court disagrees

with Mr. Zabavsky.  Mr. Drago is a qualified police procedures expert whose expertise is based

on his practical experience.  See Robert Drago CV [Dkt. No. 220-3] at 1-9.

John J. Brennan was employed with the MPD for forty-four years, retiring

in 2015.  He then worked for three years as a civilian supervisor of "detectives conducting

investigations of drug and gun violence in Washington DC and surrounding areas."  Sutton

Discl. at 12.  The government seeks to exclude Mr. Brennan on the grounds that he "has no

training of any kind listed on his resume other than the MPD police academy, from which he

graduated in 1971." Gov't Mot. at 4.  Further, the government challenges Mr. Brennan's

"purported brea[d]th of . . . experience and expertise." Id. at 5.  Mr. Sutton argues that

Mr. Brennan's "training and over four decades of personal experience with the MPD have

supplied [Mr. Brennan] with the requisite specialized knowledge to qualify as an expert on

police procedures and practices because he was a leader in the very same policy strategy

employed by the City." Sutton Opp. at 3.  Mr. Sutton further argues that Mr. Brennan's

"personal experience with the Crime Suppression Team and its prior iterations provides him the

specialized experience and knowledge to opine" on the Crime Suppression Team ("CST"), to

which Mr. Sutton belonged.  Id.  The Court agrees with Mr. Sutton.  Based on his decades of

experience with MPD, Mr. Brennan is qualified as an expert on police procedures and MPD

policies.

Michael A. Wear was a member of MPD for twenty-nine non-consecutive years, most recently from November 2018 to October 2020 as a senior officer, sergeant, and reserve sergeant. Sutton Discl. at 25. Mr. Sutton noticed Mr. Wear as a police procedures expert – specifically, an expert in "training standards for operation of law enforcement vehicles, vehicular pursuits, identification of criminal behaviors and tactics to reduce crime, contacts and Terry stops, and training standards for criminal and civil liabilities of law enforcement officers." Id. at 6-7. In Mr. Wear's most recent role with the MPD, he was responsible for "oversight of departmental policy," "monitoring and evaluating patrol methods ensuring current and emerging law enforcement practices were being adhered [to]," and "[p]resent[ing] vehicle training as a subject matter expert." Id. at 25. The Court agrees with Mr. Sutton that Mr. Wear is qualified to testify on police procedures and MPD policies.

b.  Reliability and Scope of Expertise

Mr. Zabavsky challenges the reliability of Mr. Drago's methodology, and the government challenges the scope of Mr. Brennan's expertise and the reliability of Mr. Wear's opinions. With respect to Mr. Drago, Mr. Zabavsky argues that Mr. Drago's testimony is not reliable because "neither the Government's expert disclosure nor the expert report state what materials Mr. Drago was provided or how those materials influenced his findings" and "[w]ithout knowing what materials Mr. Drago reviewed, the Court cannot determine whether the methodologies used to reach the conclusion are reliable." Zabavsky Mot. at 5. In addition, Mr. Zabavsky argues that Mr. Drago's testimony is unreliable because "[t]he factual inaccuracies in the expert report indicate that Mr. Drago lacked a proper investigation." Id. at 7. The Court is not persuaded by these arguments.

Mr. Drago's methodology is reliable. As Mr. Drago states in his letter, his "opinions are based not only on the materials reviewed in this case, but [his] experience and training concerning proper policies and police practices in citizen contacts, use of force, detention, police pursuits and arrest procedures." Drago Letter at 1; see Sherrod v. McHugh, 334 F. Supp. 3d at 258-59 (permitting similar methodology for a police expert). Furthermore, the Court agrees with the government's contention that "[e]ven if the defendants dispute certain facts upon which Mr. Drago relied . . . those assertions speak to the accuracy of his testimony and the weight the jury should give it, not to the gatekeeping role of the Court addressing a Daubert challenge." Gov't Opp. at 21; see also United States v. Smith, Crim. No. 19-324, 2020 WL 5995100, at *24 (D.D.C. Oct. 9, 2020) ("[T]he party offering the expert need not prove that the expert's opinions are correct but rather that the expert is a qualified person who has reached her opinions in a methodologically reasonable manner." (citing Ambrosini v. Labarraque, 101 F.3d at 133)).

With respect to Mr. Brennan, the government first seeks to exclude several of his proffered opinions on the grounds that these "opinions are beyond the scope of any expertise Sgt. Brennan may have" and "will mislead the jury concerning the legal standard[s]." Gov't Mot. at 7-8; see FED. R. EVID. 702; FED. R. EVID. 403. The government argues that "it is unclear how Sgt. Brennan has specialized training or knowledge that would allow him to opine on any of these issues" because "he has no experience in police administration other than being a line supervisor of a CST-type unit, no experience training officers about their job responsibilities and/or MPD policies, and no experience working in the Internal Affairs Division." Gov't Mot at 7. The government also challenges Mr. Brennan's expertise on these topics on the additional basis that he "last worked as a sworn officers in 2015" and "retired his civilian employment with

MPD in 2019," prior to the October 2020 events of this case. Id. at 8. Mr. Sutton responds that "Sgt. Brennan's personal experience with the Crime Suppression Team and its prior iterations provides him the specialized experience and knowledge to opine on the Crime Suppression Team's training, their mission and objectives, and their authority to employ certain tactics." Sutton Opp. at 3.

      The Court agrees with Mr. Sutton that certain opinions that the government challenges are within the scope of Mr. Brennan's expertise as a police procedure and MPD policies expert, especially given Mr. Brennan's "experience with the Crime Suppression Team and its prior iterations." Sutton Opp. at 3. Discussions of national or local police standards – and the defendants' conformity with these standards – are not outside the scope of Mr. Brennan's expertise, and as detailed in Section II.A.1, supra, any risk of this testimony "mislead[ing] the jury" does not substantially outweigh the probative value of Mr. Brennan's expert opinion on these topics. See FED. R. EVID. 403. Mr. Brennan, therefore, may opine on whether Mr. Sutton's occasional use of his siren and emergency lights was consistent with applicable MPD policies "to alert citizens to the police activity in their neighborhood," Sutton Discl. at 3, and on whether Mr. Sutton should have "notif[ied] either MPD Major Crash or MPD Internal Affairs Division regarding the collision." Id. at 4.

      The Court agrees with the government that the following opinions are outside of the scope of Mr. Brennan's expertise on police procedures:

- Whether Mr. Sutton was "one of the most experienced and honored CST officers within MPD."

- Whether "[t]he CST units would have been in dereliction of their duty had they not followed Hylton-Brown . . . ."

- Whether "Officer Sutton's occasional increase in speed, travel through intersections, and U turns . . . endanger[ed] any member of the public."

- Whether "[a]fter the collision, Officer Sutton appropriately began to investigate the circumstances surrounding the event."

- Whether, "until Officer Sutton was relieved, his conduct was appropriate, the report accurate, and his conduct was fully consistent with his duties at the time . . . ."

- Whether "[b]ased on the declining medical condition of Hylton-Brown at the hospital . . . it was inevitable that Major Crash and IAD would be notified . . . ."

Sutton Discl. at 2-4. Mr. Brennan, as a policing expert, does not have any expertise on, special insight into, or personal knowledge of the "experience" or "honors" of Mr. Sutton; whether Mr. Sutton would have been derelict in his duty had he not followed Mr. Hylton-Brown; whether Mr. Sutton's driving "endanger[ed]" any member of the public; the appropriateness of Mr. Sutton's investigation of the accident scene; or the "declining medical condition" of Mr. Hylton-Brown. Id.

In addition, the Court agrees with the government that Mr. Brennan may not provide testimony on certain topics on the grounds that "[t]here is no basis for Sgt. Brennan to testify to any of these facts, as he has no personal knowledge of them, they were not grounded on any expertise he has, and they are not contained in the materials he reviewed." Gov't Mot. at 11. Mr. Brennan is prohibited from providing testimony on whether "[t]he CST units received information from uniformed officers on Kennedy Street that decedent Hylton-Brown was observed earlier engaged in a heated verbal argument with another dealer" and whether "[u]niformed officers thought Hylton-Brown was intoxicated on some substance, and they feared his return." Sutton Discl. at 2.

The government also challenges as unreliable certain proffered opinions from

Mr. Wear.  See Gov't Mot. at 21-22 (citing FED. R. EVID. 702).  The Court declines to exclude

Mr. Wear's testimony that "Officer Sutton's following of Hylton-Brown would not be classified

as a police pursuit under the MPD's pursuit policy in effect on October 23, 2020."  Sutton Discl.

at 8.  In the context of Mr. Wear's testimony as a policing expert, reliable data and methods are

based on his years of experience in law enforcement.  See FED. R. EVID. 702.  And the Court

previously ruled that Mr. Sutton may "offer evidence and elicit testimony about how the MPD

General Orders differ and what specific changes were made to new versions" and "about how the

new General Orders would have applied to defendants' conduct."  United States v. Sutton, 2022

WL 13940371, at *7.  The Court will exclude Mr. Wear's opinion that during the period in

which Officer Sutton followed Mr. Hylton-Brown, "there was no threat to the safety of the

general public, Officer Sutton, or any law enforcement officers" because expert testimony on this

point is not necessary to help the jury determine whether there was a threat to safety – that is

something the jury can determine for itself.  Sutton Discl. at 8; see FED. R. EVID. 702(a).

### c.  Legal Conclusions

Some of the opinions proffered by Mr. Brennan and Mr. Wear go beyond policing

practices and policies.  As the government points out, some of Mr. Brennan's and Mr. Wear's

proffered opinions constitute inadmissible legal opinions that "infringe on the jury's role as the

sole fact-finder," and some are "irrelevant [and] will mislead the jury."  Gov't Mot. at 5-6, 20;

see FED. R. EVID. 702(a); FED. R. EVID. 403.  As noted supra in Section I, an expert's legal

opinions are inadmissible because these opinions "cannot properly assist the trier of fact" in

"understand[ing] the evidence or . . . determin[ing] a fact in issue."  Burkhart v. Wash. Metro.

Area Transit Auth., 112 F.3d at 1212 (quoting FED. R. EVID. 702(a)).  Thus, "an expert may offer

his opinion as to facts that, if found [by the jury], would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." Id. at 1212-13.

In particular, on the question of Terry stops, the Court has already ruled that "Mr. Sutton is prohibited from presenting a legal argument about whether he was entitled to conduct a Terry stop of Mr. Hylton-Brown" because "[t]he probative value of any legal determination of a Terry stop is substantially outweighed by the risk of confusion, misleading the jury, or permitting them to make decisions about the law." United States v. Sutton, 2022 WL 13940371, at *19 (citing FED. R. EVID. 403). In the context of expert testimony, not only does an opinion about whether Mr. Sutton had sufficient grounds to conduct a Terry stop risk misleading the jury under Rule 403, it is also inadmissible under Rule 702(a) as a legal opinion. Mr. Sutton is, however, permitted to present testimony "concerning his knowledge and training related to the MPD General Order on Field Contacts, Stops, and Protective Pat Downs." Id. at *18. Accordingly, Mr. Brennan is prohibited from testifying about whether Mr. Sutton had legal cause to conduct a Terry stop of Mr. Hylton-Brown, but not about whether Mr. Sutton's conduct complied with MPD training concerning contacts and stops. See Restivo v. Hessemann, 846 F.3d at 579-80 ("When an expert offers an opinion relevant to applying a legal standard . . . the expert's role is limited to describing sound professional standards and identifying departures from them." (quoting Jimenez v. City of Chicago, 732 F.3d 710, 721 (7th Cir. 2013))). References to decisions of the Supreme Court, "constitutional policing standards," and other similar matters are also prohibited. See Sutton Discl. at 2.

The government challenges the following opinion proffered by Mr. Brennan: "The officers did not pursue Hylton-Brown, but rather followed him as Hylton-Brown remained

in the area yet alluding [sic] police. This 'following' is a conventional and lawful tactic utilized

by CST units, their predecessors and other specialized units of MPD." Sutton Discl. at 3. The

Court concludes that Mr. Brennan may provide an opinion on whether Mr. Sutton and

Mr. Zabavsky "pursued" Mr. Hylton-Brown, as "pursuit" is defined within the MPD vehicular

pursuit policy. See Section II.A.1, supra. Mr. Brennan may also provide an opinion on whether

Mr. Sutton's and Mr. Zabavsky's actions prior to the collision were "conventional" tactics

utilized by other CST units of MPD. Mr. Brennan, however, may not opine on whether Mr.

Sutton's or Mr. Zabavsky's actions were "lawful," as this is a legal conclusion and therefore

inadmissible. See, e.g., United States v. Perkins, 470 F.3d at 158 ("[Testimony involving] the

use of terms with considerable legal baggage . . . nearly always invades the province of the

jury."); Richman v. Sheahan, 415 F. Supp. 2d at 946 (noting that "a number of courts have been

unwilling to allow" testimony on whether a defendant acted "reasonably" or "appropriately" "on

the theory that the opinion constitutes an impermissible legal conclusion").

   The government also challenges the following opinion proffered by Mr. Brennan:

"MPD officers are privileged to violate D.C. traffic laws in the performance of their duties.

Officer Sutton's conduct in following Hylton-Brown was consistent with this privilege." Sutton

Discl. at 3. The Court rules that Mr. Brennan may provide an opinion on whether MPD officers

are exempted from D.C. traffic laws and whether Mr. Sutton's conduct was consistent with this

exemption, as "exemptions" are discussed in MPD Institute of Police Science's "Legal Aspects

and Civil Liability of Law Enforcement Driving" presentation, already admitted into evidence as

Exhibit 413-H. See Gov't Trial Ex. 413-H (titled "USAO_010309 legal aspects ppt training").

Mr. Brennan may not opine on whether MPD officers are privileged to violate D.C. traffic laws

and whether Mr. Sutton's conduct was consistent with such a privilege. "Privilege" is "a term of

art with a meaning 'separate' and 'distinct' from the vernacular," and the D.C. Circuit has held that expert testimony that invokes a "legal term of art . . . constitute[s] an impermissible legal conclusion." Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d at 1213 (deeming expert's use of the term "as effective" an "impermissible legal conclusion" because "the phrase as used in the [Attorney General's] regulations [implementing the Americans with Disabilities Act] is a term of art with a meaning 'separate' and 'distinct' from the vernacular").

With respect to the government's challenge to Mr. Wear's proffered opinions, Mr. Wear, like Mr. Brennan, is prohibited from offering legal opinions, referring to "constitutional policing," and opining on "whether [Mr. Sutton] was entitled to conduct a Terry stop of Mr. Hylton-Brown." United States v. Sutton, 2022 WL 13940371, at *19. Mr. Wear may provide testimony on whether Mr. Sutton "acted in accordance with his training [and] departmental policy" on the night of the incident, see Section II.A.1, supra, but Mr. Wear may not opine on whether Mr. Sutton had sufficient grounds to conduct a Terry stop of Mr. Hylton-Brown "under the law." Sutton Discl. at 7. Mr. Wear is also prohibited from opining on whether "[i]n the District of Columbia, law enforcement officers are legally permitted to pursue a suspect for any crime committed in the officer's presence, regardless of whether such a pursuit would be authorized under the MPD's vehicular pursuit policy"; whether "[t]he Department's policies . . . create legal standards"; and whether "violations of departmental policy . . . amount to violations of law or legal standards." Sutton Discl. at 7 (emphases added); see FED. R. EVID. 702(a).

### d.   State of Mind Testimony

The government seeks to exclude certain portions of Mr. Brennan's and Mr. Wear's proffered opinions under Rule 704(b) of the Federal Rules of Evidence. With

respect to Mr. Brennan, the government claims that the following opinions "improperly seek to introduce evidence of the defendant's subjective knowledge and state of mind concerning an essential element of the charged crimes." Gov't Mot. at 9. The Court agrees with the government that under Rule 704(b), Mr. Brennan may not testify as to Mr. Sutton's state of mind. See FED. R. EVID. 704(b). Statements about what Mr. Sutton "knew" and "had no reason to believe" are opinions about elements of the crimes charged – they address the question of Mr. Sutton's mens rea required under the obstruction of justice and conspiracy charges. Id.; see also Indictment ¶¶ 31, 50. Accordingly, the following opinions are excluded:

- The draft accident report on which Officer Sutton collaborated with Officer Novick was an appropriate presentation of what [Mr. Sutton] knew at the scene.

- As an experienced CST officer, Officer Sutton knew that his report would not be final until reviewed by his chain of command.

- Officer Sutton had no reason to believe that any of his conduct would be scrutinized by the United States Attorney's Office before he learned that Hylton-Brown was unlikely to survive.

- Officer Sutton had no reason to believe, even after the death of Hylton-Brown, that he would face criminal charges.

Sutton Discl. at 3-4 (emphases added).

Likewise, Mr. Wear may not provide testimony on Mr. Sutton's state of mind. See FED. R. EVID. 704(b). Mr. Wear's opinion that "Officer Sutton had no reason to believe that he would be subjected to criminal charges for any of the actions he took in the late evening of October 23, 2020" is an opinion about the mens rea required under the obstruction of justice and conspiracy charges and is therefore inadmissible under Rule 704(b). Sutton Discl. at 8; see also Indictment ¶¶ 31, 50.

e.    Unprecedented Prosecution Testimony

Mr. Brennan and Mr. Wear proffer opinions relating to defendants' allegations of

selective or unprecedented prosecution in this case.  This Court previously concluded that

"defendants' assertions that this is an unprecedented criminal case" is "irrelevant, inappropriate

for consideration by the jury, invite[s] jury nullification, and distract[s] from the issues at trial."

United States v. Sutton, 2022 WL 13940371, at *18.  For the same reason, the Court will exclude

Mr. Brennan's testimony that "[n]o criminal case has been brought by [the U.S. Attorney's

Office] against an MPD officer who did not inflict a fatal injury on a suspect."  Sutton Discl.

at 4.  Mr. Brennan's knowledge of the types of charges brought against MPD officers in the past

has no bearing on the defendants' states of mind for this case and improperly seeks to make the

jury second guess the charging decisions of the government and grand jury.  Similarly,

Mr. Wear's opinions that he "has never seen a case like the one charged in the Indictment in his

entire career" and "MPD officers are not trained or taught that the conduct alleged in the

Indictment could subject them to criminal prosecution" inappropriately challenge prosecutorial

discretion and the decisions of the grand jury.  Id. at 8.  These opinions are excluded as well.

3.    Carolyn Totaro and Mark Hammond

For the reasons discussed below, the testimony of Carolyn Totaro will be

admitted in part and excluded in part, and the testimony of Mark Hammond will be admitted in

full.

Carolyn Totaro is a vehicle skills instructor at the MPD Training Academy.

Ms. Totaro estimates that she has "provided approximately 520 hours of training as a vehicle

skills instructor at MPD, both to new recruits and to experienced officers who are referred to the

Training Academy for re-training following officer discipline." Gov't Discl. at 2. The government anticipates calling Ms. Totaro as both a fact witness and an expert witness to explain "the training requirements of the driver training course at MPD for new recruits and the topics covered in the course," including "vehicular pursuits." Id. The government also proffers that Ms. Totaro will "opine that defendant Sutton engaged in a pursuit of Hylton-Brown that did not comply with MPD policy or comport with MPD training." Id. at 3.

Mark Hammond is a former vehicle skills instructor at the MPD Training Academy. According to the government, Mr. Hammond "taught the vehicle skills class at the MPD Training Academy that defendant Sutton attended as an MPD recruit." Gov't Discl. at 6. The government anticipates calling Mr. Hammond "primarily as a fact witness" to provide testimony on "the training defendant Sutton received and the concepts and lessons" that Mr. Hammond taught in his vehicle skills class. Id. The government also anticipates that Mr. Hammond will give expert testimony to provide "an explanation of the lesson concepts concerning vehicular pursuits and the relevant MPD general orders that were taught to defendant Sutton's recruit class." Id.

Mr. Sutton seeks to exclude some of Ms. Totaro's opinions on the grounds that they are not relevant or probative. See Sutton Mot. at 16-17, 19-20. For the same reasons that the Court excluded some of Mr. Brennan's and Mr. Wear's proffered opinions on Terry stops, see Section II.A.2.c, supra, the Court concludes that Ms. Totaro may not opine on whether Mr. Sutton had "probable cause" or "reasonable suspicion" to stop Mr. Hylton-Brown. Gov't Discl. at 3; see also United States v. Sutton, 2022 WL 13940371, at *19 (citing FED. R. EVID. 403). Ms. Totaro may, however, opine on whether Mr. Sutton's conduct conformed to MPD policies and training. See Gov't Discl. at 3-4.

Mr. Sutton also seeks to exclude Ms. Totaro's and Mr. Hammond's testimony on the ground that the government anticipates calling them as dual-role fact and expert witnesses. Sutton Mot. at 25.  In this Circuit, there is no bar to dual testimony as both a fact and expert witness.  See United States v. Smith, 640 F.3d 358, 365 n.3 (D.C. Cir. 2011) (citing United States v. Ramsey, 165 F.3d 980, 984 (D.C. Cir. 1999)); see also United States v. Catlett, 97 F.3d 565, 571 (D.C. Cir. 1996) ("[E]very federal court to consider the issue of dual testimony as both a fact and expert witness has concluded that the Federal Rules of Evidence permit such testimony.").  The Court recognizes that in some cases, "concerns about juror confusion may require, under Rule 403, the exclusion altogether of, or imposition of strict scope limits on, the expert portion of a hybrid witness's testimony or the use of other procedural safeguards against jury confusion." Phoenix Restoration Grp., Inc. v. Liberty Mut. Grp. Inc., Civ. Action No. 18-2121, 2020 WL 622152, at *4 (D.D.C. Feb. 10, 2020).  In this case, any risk of jury confusion over hybrid witnesses' testimony does not substantially outweigh the probative value of the testimony of Ms. Totaro or Mr. Hammond.  See FED. R. EVID. 403.  The Court therefore declines to exclude their testimony on the basis of their dual roles as both fact and expert witnesses.

Finally, the Court disagrees with Mr. Sutton regarding the adequacy of the government's disclosure of Ms. Totaro's and Mr. Hammond's proposed testimony under Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure.  Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure requires the government to provide, at the defendant's request, "a written summary of any testimony that the government intends to use" as evidence at trial under Rules 702, 703, or 705 of the Federal Rules of Evidence.  FED. R. CRIM. P. 16(a)(1)(G).  The summary "must describe the witness's opinions, the bases and reasons for those opinions, and

the witness's qualifications." Id. Mr. Sutton argues that the government's disclosure inadequately "justifies or explains the science behind 'high speed pursuit syndrome,' or 'target fixation' which appear[s] to underly the thoughts of Ofc. Totaro . . . and those of Mr. Hammond." Sutton Mot. at 22. The Court concludes that the government's disclosure satisfies the purpose of the Rule to "prevent unfair surprise at trial," to "prepare for cross-examination at trial," and to "provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." United States v. Naegele, 468 F. Supp. 2d 175, 176 (D.D.C. 2007) (discussing the analogous requirements in Rule 16(b)(1)(C)) (internal quotations omitted).

The following testimony offered by Ms. Totaro and Mr. Hammond therefore is admissible:

> Officers are [] taught about "high speed pursuit syndrome," in which an officer may develop tunnel vision, and may mirror a suspect's moves, causing the pursuit to become increasingly dangerous. Officers are trained on techniques to avoid these issues, including use of radio communications, slowing down (which may lead the suspect to slow down as well), and to avoid fixation on the suspect vehicle.

Gov't Discl. at 3 (describing portion of Ms. Totaro's anticipated testimony).

> [Mr.] Hammond may also opine on the [body-worn camera] footage of the incident in this case from defendant Sutton's front seat passengers (Tejera), and that the defendant's manner of driving in the final alleyway before the crash suggested target fixation because the defendant's car was moving quickly toward the moped, without concern for fixed objects in the alley such as telephone poles.

Id. at 6 (describing portion of Mr. Hammond's anticipated testimony).

4.    James K. Dahlquist

For the reasons that follow, James K. Dahlquist's testimony is excluded in full.

Before retiring in 2021, Mr. Dahlquist worked for the Cobb County, Georgia police department

for twenty-six years and was a certified Georgia Traffic Accident Reconstruction Specialist.

Mr. Zabavsky noticed Mr. Dahlquist as a crash reconstruction and police procedure expert.

From December 1997 to March 2003, Mr. Dahlquist was a field training officer for the Cobb

County, Georgia police department. See Zabavsky Discl. at 12.  The government challenges

Mr. Dahlquist's qualifications, arguing that "[w]hile Mr. Dahlquist's experience appears to

qualify him as a crash reconstructionist, that is not the purpose for which the defendant seeks to

call him as a witness."  Gov't Mot. at 26.  The government notes that Mr. Zabavsky's notice

"appears to anticipate that Mr. Dahlquist will instead testify as a 'police procedures expert'" and

"[n]othing in his resume indicates he is qualified to serve as an expert on that topic."  Id.  The

government argues that Mr. Dahlquist's opinions on police procedures are beyond the scope of

his expertise.  See id.  Mr. Zabavsky responds that Mr. Dahlquist, during his time as a field

training officer, "was responsible for teaching recruits who had just graduated from the academy

all policies and procedures of his department as well as the proper procedures for daily routines

and other specialty tasks."  Zabavsky Opp. at 4.  Mr. Zabavsky argues that this experience

"qualifies [Mr.] Dahlquist as an expert in police procedures."  Id. at 4-5.

The Court agrees with the government.  Mr. Dahlquist's experience with the Cobb

County, Georgia police department does not qualify him as a police procedures expert, much less

an expert on MPD policies.  Mr. Dahlquist's only experience with training other officers appears

to be his position as a field training officer in Cobb County, Georgia.  Zabavsky Discl. at 12.

According to his CV, he held this position for six years, id., and during that time trained recruits

on the "policies and procedures of <u>his</u> department" only.  Zabavsky Opp. at 4 (emphasis added).

Unlike Mr. Drago, who has experience with "formulat[ing] law enforcement policy" and

"extensive knowledge of national model policing standards," there is no indication that

Mr. Dahlquist has sufficient experience or familiarity with national standards, let alone local

standards in Washington, D.C.  Gov't Discl. at 4-5.

        Moreover, Mr. Dahlquist's proposed testimony covers topics that go beyond the

scope of the expertise of either a crash reconstructionist or a police procedures expert.  For

example, statements that "Mr. Hylton-Brown's visible injuries were minimal"; "[h]uman

biological material at the scene appears to be vomit and not blood"; and "[i]t did not appear that

officers or fire department responders were engaged in cardiopulmonary resuscitation" are better

suited for medical experts or for the jury itself.  Zabavsky Discl. at 4.  Coming from

Mr. Dahlquist, this testimony is neither reliable nor helpful to the trier of fact.  <u>See</u> <u>Halcomb v.</u>

<u>Wash. Metro. Area Transit Auth.</u>, 526 F. Supp. 2d, at 27 ("Rule 702 bars [defendant's police

procedures expert] from offering opinion testimony as to the 'source and severity' of plaintiff's

injuries.  Such opinions would be outside [the expert's] areas of expertise." (citations omitted)).

Mr. Dahlquist's proposed testimony that "Lieutenant Zabavsky and other MPD 'members' at the

scene may not have understood the seriousness of Mr. Hylton-Brown's injuries" is similarly

beyond the scope of Mr. Dahlquist's expertise and much too speculative to satisfy the reliability

threshold of Rule 702.  Zabavsky Discl. at 4.  Mr. Dahlquist's testimony is therefore excluded in

full.

### B.  Non-Police Experts

#### 1.  Bruce-Alan Barnard

Mr. Sutton noticed Bruce-Alan Barnard, J.D., LLM, as "an expert in constitutional policing standards and police training." Sutton Discl. at 4. The Court excludes Mr. Barnard's testimony in full.

To start, the government is correct that the Court has already concluded that "questions concerning whether defendant Sutton committed any constitutional violations, acted 'reasonably' under constitutional precedents, or violated Hylton-Brown's constitutional rights during this incident are wholly irrelevant to this case." Gov't Mot. at 13; see also United States v. Sutton, 2022 WL 13940371, at *5-6. The Court has made clear that a violation of the D.C. second degree murder statute – a criminal statute of general applicability – does not require that the government meet the test for reasonableness under the Fourth Amendment to the United States Constitution. See Transcript of Oral Ruling on Motion Hearing, August 3, 2022 ("Oral Ruling Tr.") [Dkt. No. 217] at 11:21-19:9. Furthermore, the government need not prove a constitutional violation to demonstrate that Mr. Sutton's conduct violated the D.C. second degree murder statute. "[P]olice officers like everyone else are subject to generally applicable laws unless there's an express [exemption] made and the Constitution does not give them an exemption." Id. at 18:25-19:3.

Moreover, "Mr. Barnard's other opinions suffer from similar defects." Gov't Mot. at 13. For example, Mr. Sutton states that Mr. Barnard is expected to testify that "Officer Sutton could not have an engaged in a conspiracy to thwart a federal civil rights investigation because officers do not understand policy violations to lead to criminal liability." Sutton Discl. at 6. But this Court has already definitively ruled on this issue. See United States v. Sutton,

Crim. No. 21-0598, 2022 WL 11744415, at *4 (D.D.C. Oct. 20, 2022).[3]  In this case, the

defendants are not charged with committing a civil rights violation.  They are charged with

engaging in misleading conduct with the intent to hinder communication to authorities who

<u>might</u> investigate the matter as a civil rights violation.  <u>See</u> Indictment at ¶ 32.  As the Court has

already stated, "[t]he government need only charge and prove possible existence of a federal

crime and a defendant's intention to thwart an inquiry [into] that crime."  Oral Ruling Tr.

at 26:23-27:1; <u>see also</u> 18 U.S.C. § 1512(b)(3) ("Whoever knowingly . . . engages in misleading

conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to

a law enforcement officer . . . of information relating to the commission or <u>possible</u> commission

of a Federal offense . . . shall be fined under this title or imprisoned not more than 20 years, or

both." (emphasis added)).

        These issues have been squarely decided and may not be the subject of testimony

by an expert witness at trial.  As discussed <u>supra</u> at Section I, the D.C. Circuit has held that

"[e]xpert testimony that consists of legal conclusions cannot properly assist the trier of fact in

either respect, and thus it is not [] admissible."  <u>Burkhart v. Wash. Metro. Area Transit</u>

<u>Auth.</u>, 112 F.3d at 1212 (internal quotations omitted).  And as stated in the Court's opinion

resolving five motions <u>in limine</u> in this case, defendants are not "permitted to present evidence,

or argue to the jury, that they were legally entitled to conduct a <u>Terry</u> stop of Mr. Hylton-Brown

on October 23, 2020, . . . or otherwise put the question to the jury of whether such a procedure

was legally appropriate."  <u>United States v. Sutton</u>, 2022 WL 13940371, at *19 (internal

_____

[3]        Mr. Barnard is also certainly not qualified to opine that "officers do not
understand policy violations to lead to criminal liability."  Sutton Discl. at 6.  This is a blanket
statement about the innerworkings of an entire profession of people.  It is up to the jury to decide
whether Mr. Sutton – as an individual officer – had the requisite mental state under the
obstruction of justice statute.

quotations omitted). These types of legal arguments will not be permitted at trial because "it would risk leading the jurors to believe, erroneously, that they are supposed to make [] legal determination[s] about the <u>Terry</u> stop, or that if the defendants were conducting a legitimate <u>Terry</u> stop, it somehow mitigates defendant Sutton's later conduct as he continued to chase Mr. Hylton-Brown over the course of several minutes." <u>Id.</u> The Court will instruct the jury on the law, as appropriate.[4]

Finally, Mr. Barnard's opinions regarding the adequacy of MPD training materials, and whether or not MPD is accredited, are irrelevant. The government rightly points out that "MPD itself is not on trial here, and its training materials are relevant only to show the defendant's subjective state of mind about what he knew he was allowed to do (and not do) in an MPD vehicle." Gov't Mot. at 17. In sum, Mr. Barnard's testimony will be excluded in full.

### 2.   Thomas Langley

Mr. Sutton noticed Thomas Langley as an accident reconstruction expert. <u>See</u> Sutton Discl. at 8. For the reasons that follow, Mr. Langley's testimony will be admitted in part and excluded in part.

The government seeks to exclude Mr. Langley's testimony on the grounds that it is "unreliable under <u>Daubert</u>"; "misleading to the jury"; "did not employ reliable methods and principles[] and did not reasonably apply appropriate methods and principles to the facts of the

---

[4]     Beyond the legal issues discussed above, Mr. Barnard's proposed testimony is also inadmissible under Rule 704. <u>See</u> FED. R. EVID. 704(b). Mr. Sutton seeks to elicit opinions from Mr. Barnard regarding the mental state underlying the charges in the Indictment, including that "nothing [Mr. Sutton] did could legitimately be characterized as negligent or grossly negligent as he would have understood those terms from his training," and that Mr. Sutton "would not have understood based on the facts contained in the Indictment" that he could be charged with obstruction. Sutton Discl. at 6. These opinions are not admissible expert testimony.

case"; and "exceeds the scope of [Mr. Langley's] expertise." Gov't Crash Mot. at 1. The Court

concludes that Mr. Langley is a qualified accident reconstruction expert. He is a retired Cobb

County, Georgia police sergeant with twenty-seven years of experience in accident investigation

and reconstruction. See Langley Letter at 8. He is accredited in accident reconstruction through

the Accreditation Commission on Traffic Accident Reconstruction. See id. at 8-9.

      The government raises several arguments with respect to the reliability of

Mr. Langley's proffered opinions and the methodology upon which he relied. First, the

government seeks to exclude as unreliable under Rule 702 Mr. Langley's testimony on "vehicle

speeds at various points in time during the pursuit." Gov't Crash Mot. at 8. Mr. Langley's

report provides the following estimates of the average speeds of vehicles involved in the alleged

pursuit:

- The speed of Mr. Hylton-Brown's Revel moped as he approached the intersection of the alleyway and Kennedy Street.

  o "This gives an average speed across this distance of 22.91 feet per second or 15 miles per hour."

  o "Mr. Hylton-Brown, as he approached the intersection of the alleyway and Kennedy Street, slowed to approximately 15 miles per hour as he was cutting the corner of the turn . . . ."

- The speed of Mr. Hylton-Brown's Revel moped as he turned onto Kennedy Street and into the Scion XB.

  o "Speed of the Revel moped as it approaches the end of the alleyway and into Kennedy [Street] is estimated at 10-12 miles per hour."

  o "Mr. Hylton-Brown was travelling [sic] 10-12 miles per hour as he turned the Revel Moped left and into the passenger front corner of the Scion XB."

- The speed of Mr. Sutton's vehicle as it traveled through the alleyway.

  o "This is an average speed through the alleyway of 21 miles per hour."

  o "After entering the alleyway, Officer Sutton averaged a speed of about 21 miles per hour."

Langley Letter at 5-6.

The government argues that these opinions are unreliable because "there is not enough evidence available in this case to calculate the average speed" of either Mr. Hylton-Brown's or Mr. Sutton's vehicles. Gov't Crash Mot. at 11-12. The government contends that there are "key shortcoming with the specific body-worn camera footage Mr. Langley used for these calculations," including moments when the footage of Mr. Sutton's speedometer or Mr. Hylton-Brown's Revel moped were obscured. Id. at 9-11. Mr. Sutton agrees with the government that "this particular accident lacked the data necessary" to "corroborate [Mr. Langley's] findings regarding the speed of Ofc. Sutton's vehicle and Hylton-Brown's Revel moped." Sutton Crash Opp. at 4. He acknowledges that Mr. Langley's opinions "are limited to calculating the speeds of the moped and Officer Sutton's vehicle" using "basic mathematical formulas." Id. at 4-5. According to Mr. Sutton, Mr. Langley's methodology for arriving at his calculations involved reviewing "frame timing information from the [body-worn camera] footage" and "distance measurements" from a software called Agisoft Metashape and calculating average speed by dividing "the distance by the time elapsed." Id. at 4. Mr. Sutton argues that "video footage is regularly used by law enforcement agencies and crash reconstructionists to calculate distance and time traveled" and that "[t]here is no industry standard dictating that [body-worn camera] footage is an unacceptable or improper source for the purpose of calculating distance and time traveled." Id.

Second, the government contests the reliability of Mr. Langley's use of Agisoft Metashape software in his calculations, noting that "the Agisoft Metashape software creates diagrams of scenes" and nothing more. Gov't Crash Mot. at 8. The government argues that the software "is not typically relied upon to accurately calculate distance for a crash reconstruction." Id. In response, Mr. Sutton explained that Mr. Langley's process for using Agisoft Metashape to create a diagram of the scene – a process called "photogrammetry" – was as follows:

> Agisoft Metashape is used internationally for high resolution photogrammetry reconstructions and is considered to be as reliable and accurate as a laser scanner for purposes of scene reconstruction. Mr. Langley took photographs using a Sony A7R full frame camera and took drone scene video footage using a DJI Mavic3 Cine Drone. The videos captured by the drone were then imported into a gaming computer and frames were exported to still images. Over 1,000 photographs and still images were then input into Agisoft Metashape to create a 3D diagram of the scene at 720 Kennedy Street. The 3D map was then reduced to a scaled 2D orthomosaic and imported into AutoCad, an Autodesk diagramming software, to create the scene diagram.

Sutton Crash Opp. at 3. Mr. Sutton argues that the use of "photogrammetry programs like Agisoft is a widely accepted and verified method for accident and crime scene investigation and reconstruction. For decades, courts have not only held photogrammetry to be a reliable method, but have also stated it as a preferred and efficient way to investigate and litigate cases." Id. (citing United States v. Williams, 235 F. App'x 925 (3d Cir. 2007); United States v. Quinn, 18 F.3d 1461 (9th Cir. 1994)). In its reply, the government tries to distinguish the cases that Mr. Sutton cites in support of photogrammetry, noting that in United States v. Williams and United States v. Quinn "the photographs at issue were used to determine a defendant's height" and were "from a fixed surveillance camera." Gov't Crash Reply at 3.

The Court concludes that Mr. Langley may provide testimony regarding his estimates of the speeds of Mr. Sutton's and Mr. Hylton-Brown's vehicles, given that these

estimates were calculated for specific moments of the alleged pursuit only, and through a reliable methodology. The Court agrees with Mr. Sutton that Mr. Langley's methodology – consisting of his renderings of the crash scene using Agisoft Metashape software, his observations from the body-worn camera footage of Mr. Sutton and Officer Carlos Tejera, and his estimates of the time and distance that various vehicles traveled – is reliable under Rule 702. Mr. Langley's use of photogrammetry and Agisoft Metashape software appears sound, given that Mr. Langley took photographs and "drone scene video footage" of the scene and used "[o]ver 1,000 photographs and still images" in creating a diagram of the scene. Sutton Crash Opp. at 3. The appropriate weight to be accorded to Mr. Langley's testimony is a question for the jury. The government may challenge Mr. Langley regarding his calculations through cross-examination.

Mr. Langley may not, however, testify as to whether Mr. Sutton or Mr. Hylton-Brown were traveling "slowly," at a "slow speed," or at a "low speed." Langley Letter at 4-6. This is a subjective characterization and includes inferences the jury can make on its own. There is no need for an expert to testify to this. Similarly, statements that the speed of Mr. Sutton's vehicle "was slow enough to stop without striking Mr. Hylton-Brown" are also impermissible. Id. at 6. Mr. Langley also may not testify that "Mr. Hylton-Brown's low speed is supported by the evidence that he did not sail or slide across the front of the Scion XB but stayed on the passenger side striking the windshield and passenger side rear view mirror." Id. As Mr. Sutton himself noted, Mr. Langley did not have access to data on the Scion XB, including its speed and momentum. See Sutton Crash Opp. at 5. Without this information, any opinion on Mr. Hylton-Brown's speed based solely on his impact with the Scion XB is too speculative and will only serve to mislead rather than edify the jury.

Finally, the government contends that certain topics on which Mr. Langley seeks to testify are beyond the scope of his expertise as an accident reconstructionist. The Court agrees. Mr. Langley may not provide any testimony on the following topics: whether Mr. Hylton-Brown was intoxicated and its possible effects on Mr. Hylton-Brown's control of the Revel moped; Mr. Hylton-Brown's state of mind prior to the collision, including whether he had "regard for persons or property" or whether he was "reckless" in his driving; and whether Mr. Sutton had attempted to perform a "traffic stop" on Mr. Hylton-Brown and whether Mr. Hylton-Brown "refused to stop." See Langley Letter at 4, 6-7.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 11/16/22