UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

     v.

ROBERT SYLVESTER KELLY, aka
"R. Kelly,"
DERREL McDAVID, and
MILTON BROWN, aka "June Brown"

Case No. 19 CR 567

Judge Harry D. Leinenweber

**GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTIONS
FOR JUDGMENT OF ACQUITTAL AT
CONCLUSION OF GOVERNMENT'S EVIDENCE**

The UNITED STATES OF AMERICA, by and through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits this consolidated response in opposition to the post-trial motions filed by defendants Robert Sylvester Kelly (R. 294), Derrel McDavid (R. 293), and Milton ("June") Brown (R. 292).

The government has presented sufficient evidence for a rational jury to convict each of the three named defendants on each of the thirteen counts in the superseding indictment. The government proved that defendant Kelly used a minor, "Jane," to engage in sexually explicit conduct for the purpose of producing Video 1, Video 2, Video 3, and Video 4, and that each of these four depictions of child pornography actually traveled in interstate commerce. The government proved that defendant Kelly enticed five minors to engage in unlawful sexual conduct using a facility or means of interstate commerce based on the testimony of Jane, "Nia," "Pauline," and "Tracy." The government proved that all three defendants conspired to receive child

pornography videos and that defendants McDavid and Kelly actually received child pornography videos from Keith Murrell, and Charles Freeman. And the government proved that defendants Kelly and McDavid conspired to obstruct justice in an effort to cover up Kelly's illicit sexual contacts with minors and his creation of child pornography. Despite this, each of the three defendants moved, under Rule 29, for a judgment of acquittal. The defendants' motions should be denied for the reasons set forth below.

## BACKGROUND

### *The Charges*

The superseding indictment alleges that, from approximately 1996 to 2001, Robert Sylvester Kelly engaged in unlawful sexual conduct with minors, including minors referred to in the indictment as Minor 1 ("Jane"), Minor 3 ("Nia"), Minor 4 ("Tracy"), Minor 5 ("Pauline"), and Minor 6 ("Brittany"). R. 93. As part of this abuse, Kelly recorded himself engaged in sexually explicit conduct with minors on videotape. *Id.* at 1-4; 8, 17-19. According to the indictment, Derrel McDavid—who worked as Kelly's accountant and business manager from approximately 1991 until 2014— and others knew of Kelly's unlawful sexual contacts with minors, including, specifically, that Kelly had recorded himself engaged in such conduct on videotape. R. 93 at 8. McDavid conspired with Kelly, and with others, to protect Kelly from allegations of child sexual abuse and exploitation, including by, *inter alia*, concealing evidence and pressuring others to do so, and paying others to collect and return incriminating videotapes. *Id.* at 8-13. Based on this conduct, McDavid and Kelly, and another of

Kelly's employees, Milton ("June") Brown, are charged in this case with federal offenses including sexual exploitation of a minor (Kelly), conspiracy to obstruct justice (McDavid and Kelly), conspiracy to receive child pornography (Kelly, McDavid, and Brown), receipt of child pornography (Kelly, McDavid), and enticement of minors to engage in unlawful sexual conduct (Kelly).

The case proceed to trial beginning on August 15, 2022, and the government rested its case in chief on August 30, 2022. Thereafter, all three defendants filed motions for judgment of acquittal under Fed. R. Crim. P. 29(a).

## ARGUMENT

Rule 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In reviewing the evidence for purposes of determining a motion for judgment of acquittal, the Court "do[es] not weigh the evidence or assess the credibility of witnesses." *United States v. Howard*, 619 F.3d 723, 726–27 (7th Cir. 2010) (internal quotation marks and citations omitted). Instead, the Court must "bear[]in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences." *United States v. Hagan*, 913 F.2d 1278, 1281 (7th Cir. 1990) (citations and internal quotation marks omitted).

## I. The Government Presented Evidence Sufficient to Sustain Convictions of Kelly on Counts One Through Four.

Counts One through Four charge that Kelly "did knowingly employ, use, persuade, induce, entice, and coerce a minor, namely Minor 1 ["Jane"], to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, in violation of 18 U.S.C. § 2251(a).[1] In order to sustain a conviction of Kelly on each these counts, the government must prove: (1) at the time, Jane was under the age of eighteen years; (2) Kelly, for the purpose of producing a visual depiction of such conduct, employed, used, persuaded, or coerced Jane to take part in sexually explicit conduct, in the manner described in the particular count; and (3) the visual depiction was mailed or actually transported across state lines or in foreign commerce.

Kelly argues that the government failed to present sufficient evidence to for a rational jury to convict of Counts One through Four, in that (1) the evidence of "inducement" and "enticement" was weak; (2) the evidence failed to show that Kelly acted for the purpose of producing the visual depiction; and (3) the evidence failed to show that Kelly knew or had reason to know that any of the visual depictions charged

---

[1] Section 2251(a) provides:

Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed.

in Counts 1 through 4 would be transported in interstate or foreign commerce. None of Kelly's arguments has any merit.

The government presented ample evidence showing that Kelly knowingly employed, used, persuaded, induced, enticed, and coerced Jane to engage in sexually explicit conduct for the purpose of producing Video 1, Video 2, Video 3, and Video 4. As Jane testified, and the video clips shown to the jury reflected, Kelly engaged her in sex acts, knowing that he was recording them, and specifically for the purpose of making a visual depiction of them. Jane testified that, the first time Kelly recorded Jane engaged in sexually explicit conduct, she saw Kelly set up the camcorder, arrange the lighting, and position the camera to get certain angles. *See* Tr. 767:7-17. Jane also testified that she saw the video camera while Video 1, Video 2, and Video 3 were being recorded. Tr. 774:9-14. Lisa Van Allen also testified that she saw the video camera being set up while Video 4 was being recorded. Tr. 807:18–808:5; 1817:24–1818:21. Ms. Van Allen also testified that she saw Kelly adjust and check on the camera while Video 4 was being recorded. Tr. 1818:2-21. Jane testified that she would say things while Kelly was recording their sexual activity because Kelly wanted her to say those things for the camera. Tr. 774:1-14.

Sometimes the sex acts in which Kelly engaged Jane were "simulated" for purposes of the camera. Specifically, Jane testified that she did not have sexual intercourse with Kelly until she was 15 years old; therefore, any visual depictions of intercourse between her and Kelly when she was 14 years old were simulated. Jane was 14 years old in Video 1, Video 2, and Video 3. *See* Tr. 755:5-18. Jane specifically

5

testified that in Video 3 that she and Kelly were "simulating" sexual intercourse. Tr. 773:19-25. Jane also testified that Kelly handed her money at the start and conclusion of Video 1 because Kelly wanted it to appear to a viewer of Video 1 that Jane was a prostitute. Tr. 780:12-25 – 781:1-3.

Contrary to Kelly's suggestion, the government need not prove that Kelly's "sole" purpose in engaging Jane in sexually explicit conduct was to produce a visual depiction. *See*, *e.g.*, *United States v. Sirois*, 87 F.3d 34, 39 (2d Cir. 1996) ("[A] person who transports children across state lines both to engage in sexual intercourse with them and to photograph that activity is no less a child pornographer simply because he is also a pedophile."); *United States v. McCauley¸* 983 F.3d 690, 697 (4th Cir. 2020) (noting that a requirement that recording be the defendant's sole purpose would lead to unacceptable and unintended results"); *United States v. Lebowitz*, 676 F.3d 1000, 1013 (11th Cir. 2012) (government need not prove that the defendant "was single-minded in his purpose"). Here the evidence showed that production of the visual depictions referred to as Videos 1, 2, 3, and 4 was a motivating purpose for Kelly.

The government also presented ample evidence establishing federal jurisdiction, based on the fact that Videos 1, 2, 3, and 4 all actually traveled in interstate commerce. Jane testified that Video 1, Video 2, Video 3, and Video 4 were produced in Illinois. Betty Allwang from NCMEC testified that law enforcement agencies in numerous states other than Illinois submitted Video 1 to NCMEC. Charles Freeman, Lisa Van Allen, and Keith Murrell all testified that they either viewed Video 2, Video 3, and Video 4 in states other than Illinois, or transported Video

2, Video 3, and Video 4 to states other than Illinois. Specifically, Lisa Van Allen testified that she transported Video 2, Video 3, and Video 4 from Illinois to Missouri. Charles Freeman testified that he transported Video 2 and Video 3 from Georgia to Missouri. And Keith Murrell testified that he transported Video 4 from Missouri to Illinois, and viewed Video 2 and Video 3 in Missouri with Charles Freeman.

Contrary to Kelly's suggestion, the government is not required to prove that Kelly knew or had reason to know that any of the visual depictions charged in Counts 1 through 4 would be transported in interstate or foreign commerce. The statute provides three alternative theories for establishing federal jurisdiction. Only the first theory contains a knowledge requirement. Neither the second theory—that the defendant know of the interstate nature of the materials used to produce the pornography—nor the third—that the defendant know or have reason to know of the later interstate transportation of the images—contains a knowledge requirement. *See, e.g.*, *United States v. Smith*, 459 F.3d 1276, 1289 (11th Cir.2006) (holding that second theory does not require knowledge and opining that third theory also does not); *United States v. Jang*, 2007 WL 4616927, at *3 (S.D. Ind. Dec. 27, 2007) (holding that government need not show that defendant knew or had reason to know that the depiction actually traveled in interstate commerce); *Sirois*, 87 F.3d at 38-39 (stating that § 2251(a) requires proof either that the child pornography has actually crossed state lines or that defendant knew or had reason to know it would cross state lines). The government presented evidence to show that Videos 1, 2, 3, and 4 actually traveled in interstate commerce; nothing more was necessary.

7

Finally, with respect to Count Four, Kelly argues that the government's proof is fatally deficient based on the government's failure to present the visual depiction addressed in Count Four to the jury. This is wrong. Ms. Van Allen testified in detail about how Video 4 was created (as a participant in its creation) and what was depicted on Video 4 when she watched it. Specifically, she testified that Video 4 was filmed in the "log cabin room" at defendant's residence, and that, although she believed at the time that Jane was 16, she later learned that Jane was 14 years old at the time Video 4 was filmed. Tr. 1817:4-13; 1825:10 – 18:27:18. Ms. Van Allen testified that she, defendant, and Jane engaged in a threesome including oral sex and intercourse, and that the encounter was video recorded. Tr. 1817:24 – 1818:21. Ms. Van Allen later watched Video 4 and recognized it as a depiction of the occasion on which she, Jane and Kelly engaging in sexual acts in the "log cabin room" while receiving instructions from defendant. Tr. 1836:2-26. Jane testified consistently with this account from Ms. Van Allen. Jane testified that she was 14 when she first met Ms. Van Allen, and that she was 14 when she, Ms. Van Allen, and Kelly had a video-recorded threesome in the "log cabin room" of defendant's residence. Tr. 781:13 – 783-13. So, while Keith Murrell might have testified that Video 4 looked like a "regular" threesome, two of the three participants in Video 4 testified that Jane was 14 when Video 4 was filmed, and that Ms. Van Allen and Jane were participants in the filming of Video 4. Thus, the evidence presented by the government as to Count Four is sufficient to permit a rational jury to find Kelly guilty beyond a reasonable doubt. Accordingly, the evidence is sufficient to sustain a conviction of Kelly on each of

Counts One, Two, Three, and Four, and this Count should deny Kelly's motion and submit these counts to the jury.

## II. The Government Presented Evidence Sufficient to Sustain a Conviction of Kelly and McDavid on Count Five.

Count 5 charges that Kelly and McDavid conspired to obstruct justice, in violation of 18 U.S.C. §§ 371 and 1519.[2] To sustain a conviction on this charge, the government must prove that (1) the conspiracy charged in Count Five existed and subsisted after July 11, 2014; (2) the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and (3) one of the conspirators committed an overt act in an effort to advance the goals of the conspiracy after July 11, 2014. The offense of obstruction of justice is committed when: (1) a person knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object; (2) the person acts with the intent to impede, obstruct, or influence an investigation or proper administration of any matter; and (3) the investigation or matter is within the jurisdiction of an agency of the United States.

McDavid (with Kelly joining) argues that (1) neither video tapes nor reports of interview or grand jury transcripts constitute records, documents, or "tangible objects" within the meaning of § 1519, and therefore the government's evidence failed

---

[2] Section 1519 provides: Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

to show that any objects falling within the scope of the statute were falsified, destroyed, or concealed; (2) the evidence failed to show that any overt act occurred within the statute of limitations period; and (3) there was no evidence that Kelly or McDavid acted in contemplation of a potential federal investigation.[3] These arguments fail, as a matter of law and fact.

During the trial, the government introduced evidence that, from 2000 to 2015, Kelly and McDavid conspired to obstruct justice by concealing Kelly's sexual exploitation and abuse of minors by, among other things, attempting to recover and conceal visual depictions of such exploitation and abuse, and causing others to conceal evidence regarding the exploitation and abuse, and to cause false entries to be made in documents and records, all with intent to obstruct and impede a potential federal investigation of Kelly's conduct. Between 2000 and 2008 Kelly and McDavid committed numerous overt acts in furtherance of their conspiracy to obstruct conceal and cover up the existence of visual depictions of Jane engaging in sexually explicit conduct with Kelly, specifically, Videos 1, 2, 3, and 4.

The evidence showed that, during the period 2000 to 2015, Kelly made payments to and bought gifts for Jane, Susan, and Brandon, with the intent to persuade and induce them to conceal, cover up, falsify, and make, and cause to be

---

[3] Kelly also argues that § 1519 is unconstitutionally void because it "does not require a defendant to know of an ongoing or contemplated federal investigation when making a false entry," and in this specific case, because "Kelly had no knowledge of an ongoing or contemplated federal investigation at any point, but most certainly in 2014 through 2019 when the government contends the final overt acts of the conspiracy occurred." As several courts have held, § 1519 includes an appropriate scienter requirement and, thus, is not void for vagueness. *See*, *e.g.*, *United States v. Scott*, 979 F.3d 986, 993 (2d Cir. 2020).

made, false entries in records, documents, and tangible objects, all in an effort to obstruct and impede a potential investigation by federal authorities of Kelly's conduct. and existence of multiple visual depictions of Kelly engaging in sexual acts with Jane.

To begin, the financial records introduced and summarized at trial show that Kelly's company, Bass Productions, issued numerous checks to Brandon in the months leading up to and after Kelly's 2008 child pornography trial—after it became known to Brandon that Kelly had filmed his daughter—then a minor—engaged in sexually explicit conduct. Gov. Ex. 411. For example, between February 2007 and May 9, 2008, Kelly paid Brandon $23,300. These payments were made by check and four of them stated that they were "loans" on the memo of the check. Additional payments were made to Brandon after Kelly was acquitted at the 2008 trial on June 13, 2008. On June 20, 2008, Kelly paid Brandon $3,000. On August 25, 2008, McDavid issued on Kelly's behalf a check to Brandon in the amount of $4,792.92 for 2006 property taxes. On August 26, 2008, McDavid issued another check on Kelly's behalf to Brandon in the amount of $10,000, with the memo line noting "ok per DM." On September 17, 2008, McDavid issued for Kelly the largest check to Brandon in the amount of $30,000. There is no memo noted for that large lump sum payment to Brandon.

The evidence showed that, as late as 2014, Kelly's company RSK Enterprises, sent monthly payments to Jane. More specifically, between September 4, 2014, and October 1, 2015, Kelly's company, RSK Enterprises, sent monthly payments to Jane

in the amounts of $1,100 or $1,150. Gov. Ex. 414. The September 4, 2014, payment was made by check and stated "Settlement" in the memo of the check. The October 1, 2014, payment was also made by check and stated "Personal – RK" in the memo of the check. The remaining monthly payments to jail were electronic "ACH" payments from RSK Enterprises to Jane. Each of these payments bore memos indicating that they were "Settlement" payments.

Jane testified that she received the payments from Kelly after she contacted him in 2014. Tr. 840. Kelly agreed to make monthly payments to Jane. Jane testified that she noted that the checks had "Settlement" written on them, which she found unusual because she did not have any settlement agreement with Kelly. During this entire period, neither Jane nor her parents revealed to any law enforcement authority any information regarding the sexual abuse and exploitation she had suffered at Kelly's hands while she was a minor, or any information regarding Kelly's enticement and use of her to produce child pornography.

Contrary to defendants' suggestion, the conspiracy continued well after Kelly was acquitted in 2008. Defendants argue that the payments made to Jane in 2014 and 2015 were unconnected to the conspiracy; but when the evidence of Kelly's payments to Jane are viewed in the light most favorable to the government, it is clear that a rational trier of fact could conclude that Kelly made them to keep Jane from disclosing to authorities evidence concerning Kelly's sexual abuse and exploitation of her when she was a minor, the efforts of Kelly, McDavid, and Brown to recover and conceal visual depictions of that abuse, as well as the efforts of Kelly and McDavid to

12

obstruct the 2008 state court proceedings. Jane's views of Kelly's motivation do not undermine that inference.

### A. The Government's Evidence Was Sufficient to Establish a Conspiracy to Falsify, Destroy or Conceal, Records, Documents and "Tangible Objects" Within the Meaning of § 1519.

Contrary to defendants' contention, visual depictions of child pornography stored on video tape are "tangible objects" within the meaning of § 1519. *See United States v. Atkinson*, 532 F. App'x 873, 874 (11th Cir. 2013); *Yates v. United States*, 574 U.S. 528, 544, 135 S. Ct. 1074, 1085–86 (2015) (holding "tangible objects" within the meaning of § 1519, must be in the nature of records and documents, and indicating that they would include magnetic, optical, digital, other electronic storage devices (citing United States Sentencing Commission, Guidelines Manual § 2J1.2, comment., n. 1 (Nov. 2014)). Here, the evidence showed defendants conspired to recover and conceal child pornography stored on VHS tapes for purposes of hiding Kelly's conduct from others—including state and federal law enforcement authorities.

Moreover, police reports and other reports of interview prepared by law enforcement authorities and attorneys, as well as transcripts of grand jury and other official proceedings constitute records and documents, and defendants conspired to cause victims and witnesses to make false statements which they understood would be documented in such records that could be—and in fact have been—used to obstruct, impede, and influence both criminal and civil actions against Kelly. Such conduct falls well within § 1915's prohibition against falsifying and making a false

13

entry in any record, document, or tangible object, as interpreted by the Supreme Court in *Yates*, and defendants offer no legal authority to the contrary.

**B.    The Evidence Established Overt Acts After July 11, 2014.**

The evidence showed that the conspiracy subsisted after July 11, 2014, in that Kelly continued, in 2014 and 2015, to make payments to both Jane (as described above) and McDavid during that period.

With respect to McDavid, the evidence showed that, on July 3, 2014, after McDavid stopped working as Kelly's business manager, Kelly and McDavid entered into a Confidential Settlement Agreement and Release. Gov. Ex. 337. Pursuant to the Settlement Agreement, Kelly agreed to pay to McDavid $1,361,528.20. The payments were to be made by releasing funds that Kelly held in certain bank accounts and by making 18 monthly payments of $40,000 to McDavid the first day of every month beginning on August 1, 2014, and continuing through January 1, 2016. The Settlement Agreement provided that its terms shall be "strictly confidential." Kelly and McDavid agreed that neither they nor their representatives, agents or attorneys will disclose either directly or indirectly information concerning this agreement to any other person or entity. McDavid further agreed to keep strictly confidential all knowledge and information, either personal or professional, regarding Kelly and Kelly's business entities.

At the time of the Settlement Agreement, Kelly and McDavid also executed a separate Confidentiality Agreement which contained additional provisions. Gov. Ex. 337. Specifically, the Confidentiality Agreement provided that "McDavid agrees to

14

keep strictly confidential all knowledge and information, either personal or professional, regarding R. Kelly, Bass, Touring and Publishing." McDavid acknowledged that all information derived from his relationship with Kelly is confidential and agree that he shall not engage in any publication or exploitation of any Kelly-related content or material in any media, whether now known or hereafter developed. Pursuant to the Confidentiality Agreement, McDavid acknowledged that he "obtained highly personal and confidential information regarding R. Kelly, hereafter 'personal information,' during the time that McDavid provided business management services to Kelly." McDavid agreed that he would "not make any statements, comments or responses, solicited or unsolicited, oral or written, to any person not a party to this confidentiality agreement regarding any personal information."

After Kelly failed to make the monthly payments to McDavid under the Settlement Agreement, McDavid filed a lawsuit against Kelly alleging breach of contact. Gov. Ex. 339.

Kelly and McDavid argue that these payments had nothing to do with the conspiracy, but—like the payments Kelly continued to make to Jane—a rational jury could infer that the payments were made to keep McDavid from revealing all the information he had gained over the years, including in his role as protector of Kelly's assets and reputation, and overseer of negotiations of numerous actual and potential litigants who accused Kelly of sexual misconduct.

### C.     The Evidence Showed Kelly and McDavid Acted with the Intent to Obstruct Justice.

Defendants argue that there is no evidence to support the inference that they took actions to conceal and falsify records, documents, and tangible objects with intent to obstruct, impede or influence a matter within the jurisdiction of a federal agency.  The evidence is more than sufficient to permit the jury to infer otherwise. Given the multitude of allegations against Kelly, as well as the multiple investigations to which he was subject, a rational juror could infer that defendants could anticipate that a federal investigation and/or prosecution was a realistic probability. That is even more true given that, as Lisa VanAllen testified, she disclosed as part of the state court trial in 2008 that she had received immunity from federal authorities.

## III.     The Government Presented Evidence Sufficient to Sustain Convictions of Kelly, McDavid, and Brown on Count Six, and Convictions of Kelly and McDavid on Counts Seven and Eight.

Defendants Kelly, McDavid, and Brown are charged in Count Six with conspiracy to receive child pornography, in violation of 18 U.S.C. § 371, and defendants Kelly and McDavid are charged in Counts Seven and Eight with receipt of child pornography.[4]  In order to sustain a conviction on Counts Seven and Eight,

---

[4] Section 2252A(a)(2) provides:

Any person who—
knowingly receives or distributes--
(A) any child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; or

16

the government prove that (1) the defendant received certain material; (2) the person knew both that the material depicted one or more minors, and that minors were engaged in sexually explicit conduct; and (4) the material was mailed, shipped, or transported in interstate or foreign commerce by any means. In order to sustain the charge of conspiracy, as charged in Count Six, the government must prove that (1) the conspiracy as charged in Count Six existed; and (2) the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy.

Kelly argues that the government's evidence was insufficient to show that Kelly entered into any agreement to receive child pornography or that he, in fact, received child pornography, and that, at best the evidence showed that Kelly sought to receive, and received, some type of "embarrassing sex tapes – such as a threesome video involving his ex-wife." McDavid argues that the testimony of witnesses Charles Freeman and Lisa Van Allen was unbelievable as a matter of law, and therefore the government's evidence was insufficient. Brown argues that the evidence as to his guilt on Count Six was equally consistent with a theory of innocence as a theory of guilt. None of the defendant's arguments are supported by the record, and none support a judgment of acquittal on Counts Six, Seven, or Eight.

The evidence at trial established that, between 2001 and 2007, defendants conspired with each other and other individuals, including Jack Palladino and

---

(B) any material that contains child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer;
Shall be punished[.]

Charles Freeman, to receive Video 2, Video 3, and Video 4. As discussed above with respect to Counts 1-4, the evidence at trial showed each of these videos depicted Jane engaged in sex acts with Kelly at the age of 14, and that Kelly knew it. The evidence also showed that the videos were transported in interstate commerce.

Specifically, the evidence established that Kelly, McDavid and Brown conspired to receive the videos from Freeman, Van Allen, and Murrell. Freeman testified that, in 2001, Kelly contacted him about recovering videotapes for him. Tr. 1358. Freeman later received a call from McDavid and Palladino about the tapes.

On August 21, 2001, Freeman entered into a contract with Palladino in which Freeman agreed to obtain the tape in exchange for payment. Gov. Ex. 320. Freeman obtained a videotape containing Video 2 and Video 3 in Georgia and provided the tape to McDavid and Palladino. Tr. 1396, 1402. McDavid paid Freeman $200,000 cash in exchange for the tape and further agreed to make additional payments to Freeman every other year. Tr. 1410. Freeman testified that, pursuant to their agreement, McDavid made additional payments to Freeman in 2003, 2005, and 2008. Tr. 1414, 1443, 1460. Freeman further testified that, prior to receiving the 2008 payment from McDavid, he received a payment from Brown in the amount of $10,000. Tr. 1460. According to Freeman, the $10,000 payment was provided by Brown as a sign of "good faith" that McDavid would be following through on the 2008 payment owed to Freeman.

Freeman testified that Kelly and McDavid enlisted him to recover the tape depicting Kelly having sex with Van Allen and Jane (Video 4). Tr. 1423. Freeman met

18

with Kelly, McDavid, and Brown in Chicago around 2003 or 2004 to discuss Video 4. Freeman later participated in a follow-up meeting with McDavid and Brown in Olympia Fields. Tr. 1426, 1434. During this meeting, McDavid played a portion of Video 4 for Freeman so that he would know what video they needed Freeman to obtain. The evidence at trial shows that, at the time of this meeting, McDavid and Brown both knew Jane, and that Jane was the minor in Video 4. In addition, Kelly's child pornography trial involving Jane and Video 1 was pending at the time that McDavid and Brown met with Freeman about obtaining more tapes of Jane and Kelly having sex. For example, Jane testified that Brown took her to get her tattoo of Kelly's name covered up after Jane returned from Mexico and while Jane was 17 years old. Tr. 812.

In March 2007, Kelly learned that Van Allen had taken a videotape containing Video 2, Video 3, and Video 4 from his collection of child pornography. Tr. 1848. Kelly met with Van Allen and offered to pay $250,000 for the return of the tape. After this meeting, Brown made numerous hotel and flight arrangements for the purpose of getting Van Allen and Keith Murrell to Chicago to facilitate getting them to Chicago to return the child pornography. Gov. Ex. 340, 342-A. While in Chicago, Van Allen and Murrell were required to take multiple polygraph examinations in 2007 as part of defendants' efforts to recover all copies of Videos 2, 3, and 4. Gov. Ex. 323-327.

After Kelly agreed to pay Van Allen $250,000 in exchange for the video, McDavid wrote a check in the amount of $200,000 to Brown. Gov. Ex. 423. The $200,000 check was written on April 17, 2007, which is the same day that Van Allen

and Murrell met with McDavid and Brown to return the tape. Brown cashed the $200,000 check on April 17, 2007. Murrell testified that he flew from Kansas City to Chicago with a "snippet" of Video 4 in his possession. Van Allen and Murrell both testified that they met with Brown and McDavid on April 17, 2007 as planned, and that McDavid and Van Allen left the room to go watch Video 4. Tr. 2244. After McDavid learned that Murrell did not bring the full-length tape on April 17, 2007, McDavid paid Murrell and Van Allen $20,000 cash each, as an incentive to return the full-length tape. Brown observed these payments being made to Van Allen and Murrell by McDavid.

On April 20, 2007, Brown made travel arrangements for Murrell to return to Chicago for the purpose of meeting with Brown and McDavid about the Video 4. Brown drove Murrell to the hotel where they met up with McDavid. During the April 20, 2007 meeting, Brown told Murrell that Murrell had the "golden egg," which Murrell testified meant that Brown knew that Murrell was about to be paid for returning the tape. After Murrell passed the polygraph examination, McDavid gave Murrell a hug and paid Murrell $80,000 cash in exchange for the tape. Once again, Brown was in the room and observed the cash payment to Murrell.

Based on the above evidence, a rational jury could find beyond a reasonable doubt that defendants Kelly, McDavid, and Brown conspired to receive child pornography, as charged in Count Six, and that defendants Kelly and McDavid received child pornography, as charged in Counts Seven and Eight.

## IV. The Government Presented Evidence Sufficient to Sustain Convictions of Kelly on Counts Nine through Thirteen.

Kelly is charged in Counts Nine through Thirteen with enticement of a minor to engage in unlawful sexual conduct, in violation of 18 U.S.C. § 2422(b).[5] In order to sustain a conviction of Kelly on each of these counts, the government must prove that: (1) the defendant used a facility or means of interstate commerce to knowingly persuade, induce, entice, or coerce a minor to engage in sexual activity, as charged in the particular count; (2) the minor was less than 18 years of age; (3) the defendant believed that the minor was less than 18 years of age; and (4) if sexual activity had occurred, the defendant would have committed the criminal offense of aggravated criminal sexual abuse.

Kelly argues that the government's evidence is insufficient to show Kelly's enticement of the minors, and to show that he used a facility of interstate commerce to do it.[6] He is wrong. In fact, the government presented evidence sufficient to prove beyond a reasonable doubt that he committed each of these offenses. For example, Jane testified that defendant gradually over time progressed his sexual advances towards Jane, going from making flirtatious remarks to asking her about her

---

[5] Section 2422 (b) provides:

Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title, imprisoned not more than 15 years, or both.

[6] Kelly also argues, with respect to Count Eleven, that the government failed to establish that the sexual activity he enticed Tracy to engage in violated 18 U.S.C. § 2251(a). As discussed below, this is also is incorrect.

undergarments, to phone sex, to physical touching, to oral sex, and then finally to penetrative sex. Jane testified that defendant explicitly tasked Jane to recruit other minor girls to engage in criminal sexual conduct with defendant as well. Jane testified that defendant specifically asked about other minors, including Brittany and Pauline, and tasked Jane with pitching the idea to Brittany and Pauline to join in defendant's sexual activity with Jane. *See* Tr. 744:19-25–745:1-16. Tracy also testified that defendant employed other minor girls to induce her into committing sex acts with defendant, including Jane, who defendant asked to perform oral sex on Tracy while defendant recorded the act. *See* Tr. 2417:2-24. Nia testified that Kelly, from their initial meeting, provided her with his telephone number when she had only asked for an autograph, and then enticed her over a series of weeks and months to travel to Minnesota and Chicago to engage in criminal sexual behavior with him thereafter.

Kelly's argument that the government has failed to prove that the defendant committed the enticement and inducement counts by using a facility and means of interstate and foreign commerce also lacks merit. Jane testified that the defendant committed sexual acts with Jane on a bus and in hotels in different states, including Florida and New York. Tr. 739:10-25 – 740:1-5. Jane also testified that for the very first sexual encounter between her and defendant, defendant enticed her over the telephone—a facility of interstate commerce. Specifically, Jane testified that defendant's commentary to her first became sexual over the telephone when defendant, for example, asked Jane what color panties she was wearing. Tr. 728:19-25 – 729:20. Jane testified that the conversations progressed to "phone sex." Tr. 730:1-

22

18. The phone sex conversations then graduated into physical touching, Tr. 731:14-25 – 732:1-3.

Nia testified that Kelly used the telephone to induce her to travel to Minnesota (in interstate commerce) on an airplane (a means of interstate commerce), where he then engaged in criminal sexual behavior with her in a hotel room, which also affects interstate commerce. While in the hotel room with his penis out masturbating, Kelly asked Nia to visit him in Chicago from Atlanta. Kelly then spoke to Nia on the phone after she had returned to Atlanta from Minnesota, and again asked Nia to travel in interstate commerce to Chicago, where he then engaged in criminal sexual behavior with Nia. Similarly, Kelly enticed Tracy to visit him in a hotel room at the Westin, where he then had sex with her as a minor. Tr. 2405:14-25 – 2407:2. Tracy also testified about using the phones to communicate with Kelly. Pauline testified that she would regularly call Kelly at Chicago Trax studio using the phone to meet up with him, and that she would regularly engage in sex acts with Kelly thereafter. Pauline testified that she had sex with Jane defendant and Brittany and defendant after using the phone to contact Kelly, and also had sex with Jane and defendant on his tour bus, a facility of interstate commerce.

Accordingly, based on the evidence presented by the jury, a rational jury could find Kelly guilty of Counts Nine through Thirteen, beyond a reasonable doubt, and the counts should therefore be submitted to the jury.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this deny defendants' motions.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:     */s/ Jason A. Julien*
JEANNICE APPENTENG
ELIZABETH R. POZOLO
JASON A. JULIEN
BRIAN WILLIAMSON
Assistant U.S. Attorneys
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-5300

Dated: August 31, 2022

24