```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2

3        United States of America,        )
                                          ) Criminal Action
4                        Plaintiff,       ) No. 21-cr-598
                                          )
5        vs.                              ) JURY TRIAL - DAY 7
                                          ) MORNING SESSION
6        Terence Sutton,                  )
         Andrew Zabavsky,                 ) Washington, DC
7                                         ) November 3, 2022
                         Defendants.      ) Time:  9:30 a.m.
8        _____

9                    TRANSCRIPT OF JURY TRIAL - DAY 7
                              HELD BEFORE
10             THE HONORABLE JUDGE PAUL L. FRIEDMAN
                     UNITED STATES DISTRICT JUDGE
11       _____

12                       A P P E A R A N C E S

13       For Plaintiff:          Risa Berkower
                                 Ahmed Baset
14                               U.S. Attorney's Office
                                 555 Fourth Street, N.W., Room 5409
15                               Washington, DC  20530
                                 Email:  Risa.berkower@usdoj.gov
16                               Email:  Ahmed.baset@usdoj.gov
         For Defendant
17         Terence Sutton:       J. Michael Hannon
                                 Hannon Law Group, LLP
18                               1800 M Street, N.W., Suite 850 S
                                 Washington, DC  20036
19                               Email:  Jhannon@hannonlawgroup.com

20         Andrew Zabavsky:      Christopher Zampogna
                                 Zampogna, P.C.
21                               1776 K Street, N.W., Suite 700
                                 Washington, DC  20006
22                               Email:  Caz@zampognalaw.com
         _____
23
         Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
24                               United States Courthouse, Room 6523
                                 333 Constitution Avenue, NW
25                               Washington, DC  20001
                                 202-354-3267
```

```
 1              THE COURTROOM DEPUTY:  Your Honor, this is criminal
 2    case 21-598, United States of America versus Terence Sutton and
 3    Andrew Zabavsky.  Will the parties please come forward to the
 4    lectern and identify yourself for the record.  And we'll start
 5    with defense counsel this morning.
 6              MR. HANNON:  Good morning, Your Honor.  May it please
 7    the Court.  Michael Hannon with Rachel Amster for
 8    Officer Sutton.
 9              MR. ZAMPOGNA:  Good morning, Your Honor.  Christopher
10    Zampogna for Lieutenant Zabavsky.
11              THE COURT:  Good morning.
12              MS. BERKOWER:  Good morning, Your Honor.  Risa
13    Berkower and Ahmed Baset for the government.
14              THE COURT:  Good morning.  I think we have at least
15    two issues that we need to talk about at some point before we
16    get the jury in.  One has to do with the jury instruction
17    that's been requested.  And there have been a lot of emails
18    back and forth with respect to what, if anything, I should say
19    to the jury about Mr. Drago's proposed testimony and the MPD
20    general order on pursuit.
21         And the other is -- has to do with my exclusion of
22    Mrs. Hylton-Brown from the courtroom yesterday and creating a
23    separate courtroom where she and any other members of the
24    public or the press can view the trial without being in this
25    courtroom.  And I think we were going to put a notice of that
```

1    up on the -- either the court website or the docket sheet.  And

2    I think Mr. Coats was going to talk with Mr. Adaway, see if

3    that can be done, or has been done.  And that courtroom is

4    equipped with the most modern technology, so that anyone in

5    that courtroom can see the proceedings here, can see the

6    witnesses, can see the lawyers asking questions, they can see

7    and hear, see and hear them, they can see and hear all the

8    videos and body-worn cameras.

9          The government filed a motion yesterday, which can

10   either be interpreted as a motion to reconsider or a motion to

11   stay.  I think Mr. Baset said it was intended to be a motion to

12   stay.  And then the lawyer for Mrs. Hylton-Brown filed a

13   petition for a writ of mandamus in the Court of Appeals

14   yesterday afternoon, I guess -- or, late afternoon.  And that's

15   pending in the Court of Appeals.  And I'm sure they will want

16   to act expeditiously.  And we were notified and counsel were

17   notified that this had been done, and we were provided copies

18   of it by counsel for Mrs. Hylton-Brown.

19         At my request, direction, counsel for Mr. Zabavsky and

20   counsel for Mr. Sutton filed, by 9 o'clock this morning,

21   responses to the government's motion to stay or to reconsider.

22   And the Court of Appeals has advised that they would like me to

23   decide the motion filed by the government before they move

24   forward to consider the writ of mandamus, because it may well

25   affect the need for them to act or the extent to which they

 1    must act.

 2         And, helpfully, also at my request, there was an email

 3    that was sent by the government this morning which says that I

 4    do have authority to -- I do have authority to consider the

 5    question of a stay or to reconsider, even though a writ of

 6    mandamus has been filed.  Here's the email that was sent by

 7    Ms. Berkower this morning, with cases saying the writ of

 8    mandamus generally does not divest the district court of

 9    jurisdiction over the underlying proceedings.

10         So, those are the -- I think those are the issues that

11    are before us.  And I don't know when we should deal with the

12    motion to stay or reconsider.  And I note that in his filings,

13    counsel for Ms. Hylton-Brown told the Court of Appeals that he

14    understood we were not reconvening in this case until 10:30

15    this morning.  And that, obviously, was incorrect.  I don't

16    know whether anybody thinks he needs to be here for that

17    discussion or not.

18         So those are the two things that I think we have on our

19    agenda:  The instruction with respect to Mr. Drago and the

20    mandamus question, motion to reconsider, motion for stay

21    question.  And, of course, we would like to not waste the

22    jurors' time and would like to get to the jury as soon as we

23    can and to move forward with Mr. Drago.

24         It was agreed yesterday that the cross and redirect of

25    Officer Tejera would be postponed to try to accommodate

1    Mr. Drago's travel schedule.

2         So, how does everybody think we should proceed today?

3         MS. BERKOWER:  Well, Your Honor, I can update the

4    Court, that I know the Court of Appeals clerk contacted the

5    government yesterday evening asking about whether the

6    government would file anything in relation to the mandamus

7    petition.  I know that there is an anticipated filing this

8    morning at 11.  So, I think it would be useful to know the

9    timing we're going to address this motion here, just for

10   purposes of informing that filing to some degree and whether it

11   still needs to go forward.

12        To that end, I have a couple of questions for the Court

13   that I think would be useful --

14        THE COURT:  Can I interrupt you just one second to

15   say one other thing.  The filings with respect to mandamus have

16   been before me, and the motion to stay and all that have been

17   on the public record, on the docket.

18        MS. BERKOWER:  Yes.

19        THE COURT:  The question about the jury instructions,

20   as well as many other things, pursuant to our agreement have

21   been mostly by email.  And I will remind everybody again, if

22   there are any important issues that are, quote/unquote, briefed

23   by email, you need to -- at some point need to convert them to

24   a filing on the record, if you want to preserve your points for

25   any possible appeal or, who knows, maybe a further mandamus.  I

1    feel like Royce Lamberth here.  Go ahead.

2              MS. BERKOWER:  Would Your Honor permit it to be a

3    notice of filing with the emails attached?

4              THE COURT:  Sure.  That's fine with me.

5              MS. BERKOWER:  Then we'll do that in the next few

6    days, to make sure we're caught up.

7              THE COURT:  Just go back and look.  All counsel, go

8    back and look at your emails and see what you want on the

9    public record.  Because, you know, if this case ever gets on

10   appeal, at whatever point, I don't want anybody to forgo their

11   arguments or to be told they have haven't preserved certain

12   things.

13             MS. BERKOWER:  Thank you.  A couple of just questions

14   with regard to the logistics of the alternative courtroom.  I

15   know that in the past when I've had that set up, like several

16   months back when it was required for purposes of public

17   viewing, there was someone who -- some court staff member who

18   was monitoring the courtroom to see if there are any technical

19   problems and could address those.  And I was wondering if the

20   Court knew whether or not that would be available to ensure

21   that there be, like, a continuous video feed and none of those

22   issues.

23             THE COURT:  I guess I could ask Mr. Coats if he would

24   ask Mr. Cramer to go by every morning and every afternoon and

25   check to make sure everything is under control.

1        And is there anybody there with Ms. Hylton-Brown?  Is

2    somebody from your office there, or her lawyer?

3        MS. BERKOWER:  I think our victim coordinator was

4    planning to sit there with her, at least during portions of the

5    day.

6        THE COURT:  I think we should ask Mr. Cramer to

7    check.  And maybe there will be an alternative person, too,

8    every morning and every afternoon, and I think we should ask --

9    make sure that your victim/witness coordinators have phone

10   numbers and emails for Mr. Cramer and whoever else he

11   designates, maybe Mr. Hylton, I'm not sure, Tommy Hilton.

12       Mark, could you --

13       THE COURTROOM DEPUTY:  Yes, yes.

14       THE COURT:  -- deal with that?

15       MS. BERKOWER:  I know there would often be delays in

16   those circumstances because for some reason or another there

17   would be some problem with the feed.  So, thank you.

18       THE COURT:  And if your victim/witness coordinator is

19   going to be there part of the time, he or she can notify you by

20   email.  And if Mr. Cramer or Mr. Hilton notice a problem, they

21   can notify Mark and we can stop, so she can make sure that

22   she's seeing everything and hearing everything properly.

23       MS. BERKOWER:  Thank you for clarifying that.

24       MR. ZAMPOGNA:  Just as a -- I don't know what you

25   want to call it -- a point of order, I think you said there

1    were two things on the agenda.  I believe it was still

2    outstanding our -- the defense's objections to the PowerPoints,

3    maybe, as well.

4            THE COURT:  What are the objections to the

5    PowerPoints?

6            MR. ZAMPOGNA:  You had given us a half an hour -- we

7    never got to those, whether they would be objectionable.  The

8    demonstrative -- I'm sorry, the PowerPoints, I didn't describe

9    it well enough.  For the expert witness, Mr. Drago, that we

10   received yesterday.

11           THE COURT:  You have not had time to fully review

12   them.

13           MR. ZAMPOGNA:  I think that's outstanding.

14           THE COURT:  So that's a third issue we should talk

15   about this morning.

16       So where do you want to start?  Which issue do you want

17   to start with?  I think Ms. Berkower was suggesting maybe we

18   should start with the motion to stay or reconsideration so that

19   her office could be advised before they have to file something

20   by 11 a.m.  Unless the government thinks that

21   Ms. Hylton-Brown's lawyer should be here?

22           Mr. Hannon, you were going to say something else?

23           MR. HANNON:  Just to complete the record, we spoke

24   with Alison --

25           THE COURT:  Grossman.

1          MR. HANNON:  -- Grossman, senior counsel with the

2     circuit court, and she asked us whether we were responding to

3     the writ of mandamus.  And I indicated to her that we would

4     not, because our view was that that was filed against the Court

5     and it wouldn't be appropriate for us to file anything at this

6     point.  I indicated to her that if the matter is heard by the

7     Court and there is an answer to the writ, we might consider

8     intervening.

9          She asked if we were going to be filing an opposition to

10    the government's motion and I told her that we would.  She

11    wanted to know if it was going to be on ECF.  I told her, yes,

12    it would be, and that we would send her a courtesy copy, which

13    we have done.

14          Simply from a record standpoint, I would state that

15    Ms. Hylton has not been in the courtroom every day, has not

16    been in the courtroom all day.  And I don't know whether we've

17    made a record as to when the alternative courtroom became

18    available.

19          THE COURT:  Oh, I think the record was made

20    yesterday.  You can all remind me if I'm wrong about this, that

21    Mr. Coats -- and you can speak to this, Mr. Coats, if I got

22    anything wrong -- communicated with the powers that be about

23    our need for the courtroom immediately by email.  Mr. Aaron

24    Adaway, shortly thereafter, showed up in our courtroom, my

25    courtroom.  Mr. Adaway -- I don't know what his title is.  He's

```
1    jack of all trades.

2              MR. HANNON:  Grand Poobah.

3              THE COURT:  Jack of all trades.  And I said, on the

4    record I believe, Mr. Adaway, we want a courtroom set up with

5    this done.  And he said it's already been done, Your Honor.  I

6    believe that's on the record.

7              MR. HANNON:  Yes.  Thank you.

8              THE COURT:  So within five or ten minutes of the time

9    she was excluded from the courtroom, the alternative courtroom

10   with all of the equipment was already set up.

11             MR. HANNON:  And do we know whether Ms. Hylton has

12   attended the trial in that space?

13             THE COURT:  I do not.

14             MR. HANNON:  So with respect --

15             THE COURT:  But she has had the opportunity to do so.

16             MR. HANNON:  Of course.  So with respect to this

17   issue, unless the Court has any questions of us, we think our

18   pleading this morning is sufficient.  And we're happy to

19   respond to any questions, if Your Honor wishes to take up that

20   issue.

21             THE COURT:  I'm assuming that Mr. Baset is going to

22   argue it further and then you may want to respond orally to

23   what he says.

24             MR. HANNON:  Happy to.

25              And with respect to the instruction, our position has
```

1    already been stated on the record and I don't need to state it

2    any further.  We expect the Court to give the instruction that

3    its provided to counsel --

4               THE COURT:  Thank you.

5               MR. HANNON:  -- without prejudice to Lieutenant

6    Zabavsky.

7               THE COURT:  And with the understanding that final

8    instructions are a different story and this may or may not be

9    what is said in final instructions.

10              MR. HANNON:  Thank you.

11              MR. ZAMPOGNA:  Can I speak from here, Your Honor?

12              THE COURT:  Sure.

13              MR. ZAMPOGNA:  Just to add, I was on the call to the

14   Court of Appeals as well and agree with what -- for the record,

15   what Mr. Hannon has stated regarding the writ of mandamus.

16   Thank you.

17              THE COURT:  Thank you.  I think that what -- the

18   relevant documents from this court will be at the Court of

19   Appeals, regardless, as part of the record.  And the Court of

20   Appeals, the court reporter will be happy to know, will want a

21   transcript of the proceedings promptly; like today.  So we'll

22   have to figure that out.

23              So what's the plan?  Are we going to go ahead and talk

24   about the motion to reconsider a stay or do you feel the need

25   to notify Ms. Hylton-Brown's lawyer first?

1          MR. BASET:  We are comfortable with proceeding

2     without him currently.

3          Good morning, Your Honor.  We only have really one point

4     to make on this issue.  And I just wanted to draw the Court's

5     attention specifically to 18 U.S.C. 3771, this is under

6     provision (b).  And under this provision it states, "In any

7     court proceeding" -- this is the Crime Victim's Rights Act.

8     "In any court proceeding involving an offense against a crime

9     victim, the Court shall ensure that the crime victim is

10    afforded the rights described in subsection (a) before making a

11    determination described in (a)(3), the Court shall make every

12    effort to permit the fullest attendance possible by the victim

13    and shall consider reasonable alternatives to the exclusion of

14    the victim from the criminal proceeding."

15         We believe --

16         THE COURT:  I'm sorry, can you tell me which

17    provision you were just reading from?  I now have the statute

18    in front of me.

19         MR. BASET:  Sure, 178 U.S.C. 3771(b).

20         THE COURT:  Yes.

21         MR. BASET:  And so, as we read that, the question

22    becomes what are the most reasonable accommodations that can be

23    made?  And we understand that the Court has endeavored to do

24    that through setting up a room for Ms. Hylton-Brown to view the

25    proceedings outside of the actual courtroom.  We believe that

1     the Act requires every reasonable means to keep her in this

2     courtroom.  And we believe that the more reasonable and more

3     narrowly tailored and least respective approach here would be

4     to do the following:  To allow her presence in this courtroom,

5     but also in attendance would be a victim/witness advocate.

6          In addition, there can be an instruction to the jury

7     indicating that they are not to consider at all anything that

8     Ms. Hylton-Brown does in this courtroom.  To be sure, this is a

9     murder trial and the jury is aware of that and they understand

10    that a victim's mother or family member could be in the

11    courtroom, and that that person would be upset by what's being

12    viewed.  And so I think that's an understanding that all jurors

13    probably come in this courtroom with and would be able to be

14    effectively instructed about.

15         The third thing that could happen is to give her a

16    warning, a direct warning, as to say that this -- and I

17    understand that the Court has endeavored at some level to do

18    that, but to make it expressly clear to her that any sort of

19    disturbance would not be permitted.

20         We do believe that the Act itself recognizes that among

21    the crime victims can be a mother of a homicide and it does not

22    require the victim to sit in a room as an automaton or a robot.

23    They come in here with their own emotions and understanding of

24    the case.  The key is that it does not disturb or bias -- or

25    create favor for her from the jury.  And we think that a better

1          remedy would be the one that we propose.

2                  The other point here -- and I only mentioned that I'd

3          make one point, but I suppose I have two.  The second is that

4          the standard here is one of clear and convincing.  And on this

5          record we don't believe that that standard is set forth.  And

6          we say that because on one hand we have allegations made by

7          Mr. Hannon, and it includes allegations of a member of

8          Mr. Sutton's family.  That individual has not been asked any

9          questions about his account.

10                 In fact, the opposite has been shown.  We put the juror

11         in question under oath.  That individual stated unequivocally

12         that she only had two very brief conversations with men, not

13         Ms. Hylton-Brown.  We also have on this record that there's a

14         member of this court staff that would refute that position.  In

15         addition -- and I think she came up here to mention that on the

16         record.  The government has --

17                 THE COURT:  Who are you talking about?

18                 MR. BASET:  I believe it was one of the CSOs that was

19         here who indicated that she did not observe what the allegation

20         was.

21                 The third is that we also have someone from our office

22         who observed that proceeding, who would be able to testify

23         under oath.  So you have three people, at least, that the

24         government can provide, two of which have already spoken under

25         oath and contradicted the account.  Otherwise, the only

1    evidence here is not evidence.  It's only Mr. Hannon's

2    allegations.  So we believe that on this record there's no

3    clear and convincing standard that could be met and, as a

4    result, Ms. Hylton-Brown should remain in this courtroom.  I'm

5    prepared to answer any questions you may have.

6              THE COURT:  Let me go back to a couple of things you

7    said, actually.  The CSO who we talked about bringing into the

8    courtroom to testify, to see if she corroborated what the juror

9    herself said, we never actually had her get on the witness

10   stand and testify.  Did you say that you talked to her or

11   somebody talked to her?

12             MR. BASET:  No, we're not representing that.  In

13   fact, Ms. Berkower just reminded me, it's actually the deputy

14   marshal who was here on that day.  And I believe she spoke

15   before Your Honor, she wasn't under oath or on the witness

16   stand.

17             THE COURT:  She doesn't have to be under oath.

18             MR. BASET:  And so her representation should stand on

19   its own.

20             THE COURT:  Whatever she says is fine with me.  She's

21   been around a while.  She's an officer of the court and the

22   marshal service.

23             MR. BASET:  So we stand on our position.  If Your

24   Honor has any additional questions, I'm happy to answer them.

25             THE COURT:  Okay.  There are cases cited in the writ

1   of mandamus.  I mean, he does emphasize the point that you just

2   emphasized, the clear and convincing evidence point.  And he

3   also -- I don't recall whether you cited them in your papers,

4   too, but in the mandamus papers he cites cases from other

5   circuits, I believe, about victims often get emotional in the

6   courtroom and that there are court decisions that say that

7   limiting instructions are appropriate and may be sufficient.

8        Obviously, each case is different and the facts of each

9   case is different and what -- I'll just say the facts are

10  different in each case.  But there are those cases cited in the

11  petition for writ of mandamus.  And the statute does say --

12  where does it say clear and convincing evidence?  I know it's

13  here.

14       MR. BASET:  It does.  And it actually says it with

15  respect to a crime victim who is also a witness.  And as Your

16  Honor has pointed out in this case, it's important for a

17  witness not to be tainted by testimony from other people.  And,

18  yet, in that scenario even -- from other witnesses.  And in

19  this scenario, clear and convincing standard applies.

20       And so here, we don't even have a crime victim who's a

21  witness, we just have simply the mother of a decedent.  And so

22  we think that the clear and convincing standard here most

23  certainly applies.  I'm trying to find the actual provision of

24  the statute that mentions that.

25       THE COURT:  Oh, I see it.

1          MR. BASET:  And that probation is (a)(3), where it

2     mentions the standard.

3          THE COURT:  Unrelated, can I ask you this question:

4     When we get to Mr. Drago's testimony and you're going to be

5     examining him, might he mention the Bromwich report that's been

6     mentioned in some of the pleadings?

7          MR. BASET:  We do not intend to get into that at all.

8          THE COURT:  It just crossed my mind for some strange

9     reason that maybe I should ask Mr. Bromwich to represent me in

10    this Court of Appeals on this writ of mandamus.  He used to be

11    a good lawyer.

12         MR. BASET:  His son, I believe, is at the U.S.

13    Attorney's Office currently.

14         THE COURT:  Oh, is he?

15         MR. BASET:  Yes.

16         THE COURT:  Mr. Bromwich and I worked together at

17    the -- on the Iran Contra investigation a long time ago.  We

18    both have gray hair and gray beards now.  Okay.

19         MR. BASET:  I did have two points to make on

20    Mr. Drago's testimony for the Court, if you're ready.

21         THE COURT:  Do you want to deal with that separately?

22         MR. BASET:  Sure, we're happy to.  Thanks.

23         THE COURT:  So, I'll ask counsel from the defendants

24    if they want to respond.  I have read the -- obviously,

25    Mr. Baset was just arguing his motion to reconsider or for a

1    stay.  And the stay, as I understand it, would have me -- or at

2    least bring her back into the courtroom -- well, I'm not sure

3    how -- for how long.  But if it's viewed as a motion to

4    reconsider, then I would have her in the courtroom under

5    conditions like the ones Mr. Baset mentioned.

6          And, so, the -- Mr. Zabavsky and Mr. Sutton have

7    responded to the motion this morning by 9 o'clock, and I would

8    be happy to hear from both counsel.

9          MR. HANNON:  We haven't heard from the courtroom

10   security officer, of course, but there is in the courtroom an

11   attorney, not yet admitted, who is with Steptoe and Johnson and

12   observing the case.  We spoke to her, she did say that

13   Ms. Hylton did sit in the second row of the jurors and spoke

14   briefly to --

15         THE COURT:  In the second row -- let's be clear.  I

16   believe, from when the last time we discussed this, a few days

17   ago, you are talking about the day, which I believe was a

18   Tuesday, somebody will remind me of the date, when we had --

19   everybody had already exercised their preliminaries and we

20   brought 20 people back and the first 16 were going to be the

21   jurors and the alternates and the others were going to be

22   released.  Is that the day we're talking about?

23         MR. HANNON:  Yes.

24         THE COURT:  Not the day when the preemptories were

25   exercised, when we had 42 people.

1            MR. HANNON:  Correct.

2            THE COURT:  So on that day you say that the lawyer

3     from Steptoe and Johnson told you what?

4            MR. HANNON:  That she saw Ms. Hylton go into the

5     second row adjacent to the jurors.  And she said it wasn't --

6     she wasn't there for three or four minutes, which was the

7     recollection of Scott Goodman.  But, the point to be made is

8     that the proposal of the government has already --

9            THE COURT:  Did she, the Steptoe lawyer, say that she

10    saw this person talking to the juror that we had interviewed,

11    that we brought in here?  She's here?

12           MR. HANNON:  She is here, Your Honor.

13           THE COURT:  Why doesn't she come up, if you don't

14    mind.  She's an officer of the court.  We don't have to swear

15    her?

16           Good morning.  Why don't you tell us who you are?

17           MS. LEWIS:  I'm Meredith Lewis with Steptoe and

18    Johnson.

19           THE COURT:  First, let me ask you:  Were you here the

20    day we brought the juror in and asked the juror if she had any

21    conversation with anybody?

22           MS. LEWIS:  I was, yes.

23           THE COURT:  So you know which juror we're talking

24    about, the juror in seat number 7?

25           MS. LEWIS:  I was, um-hum.

1          THE COURT:  So what do you say you observed on the

2     day that Mr. Hannon is referring to?

3          MS. LEWIS:  So I was here for jury selection when

4     Mrs. Hylton-Brown had the outburst at Mr. Sutton.  So I

5     remembered her and what she looked like.  And I just remember

6     her going to sit down in the second row, about where the woman

7     in the blue blazer is sitting.  And she sat down, and it was

8     pretty brief.  And they whispered something, it was very brief.

9          THE COURT:  Whispered something to someone?

10         MS. LEWIS:  Yes.  And I believe the marshal kind of

11    ushered her away, it was, like, go sit on the other side.

12         THE COURT:  And two questions for you:  Was the

13    person you say you saw her whisper to the same juror that was

14    here?

15         MS. LEWIS:  I don't recall.  I wasn't sure which

16    juror it was.  I wasn't really paying attention.

17         THE COURT:  And when you say that the marshal whisked

18    her away, are you talking about this marshal sitting over here?

19         MS. LEWIS:  Yes.  Yes, sir.

20         THE COURT:  As opposed to someone dressed like the

21    gentleman in the back, who's a court security officer?

22         MS. LEWIS:  I believe so.  It was just -- it was a

23    very brief, like, Oh, go over there.

24         THE COURT:  So my question is:  The person that got

25    her to leave, was it a man or woman?

1              MS. LEWIS:  A woman.

2              THE COURT:  And to the best of your recollection, was

3     it a woman who was wearing a blue jacket, similar to the

4     gentleman in the back?  He's a court security officer.  Or was

5     it somebody who was not wearing that kind of coat?

6              MS. LEWIS:  I think it was somebody in court security

7     officer jacket.

8              THE COURT:  So then it probably is not the deputy

9     marshal that is here today, because she's a marshal, she

10    doesn't wear that kind of clothing.

11             MS. LEWIS:  But I'm not sure.  Sorry.

12             THE COURT:  That's fine.  Anything else you want to

13    tell us?

14             MS. LEWIS:  That's it.

15             MS. BERKOWER:  Your Honor, we have a question.  I've

16    seen this woman, this attorney, conferring with the defendants

17    and the defense and I would like to know what her relationship

18    is to them.

19             MS. LEWIS:  I'm just -- I'm with Michael Bromwich,

20    we're -- so that's why, we're with Steptoe, and I met them on

21    the first day.  They asked me if I was a reporter.  So, just

22    been chatting.

23             THE COURT:  Are you -- unless Mr. Hannon objects to

24    my asking the question -- are you and Mr. Bromwich consulting

25    with the defense, or are you just here as an observer?

1          MS. LEWIS:  No, not at all.  Unbiased observer.  Just

2     taking notes about each day of the trial.

3          MS. BERKOWER:  And I would note, she's never

4     introduced herself to the government.  And was seen conferring

5     with the defendants directly this morning by myself.

6          MS. LEWIS:  I said hi.

7          THE COURT:  There's no reason why she can't talk

8     to --

9          MS. LEWIS:  They introduced themselves to me.

10         THE COURT:  Pardon?

11         MS. LEWIS:  The defendants introduced themselves to

12    me.

13         THE COURT:  Okay.  Thank you.  Mr. Bromwich has

14    arrived, too, which is why I made my facetious remarks before

15    about our friendship and relationship.

16         MR. ZAMPOGNA:  She did ask me who might be a witness

17    today.  That's what she asked me.  I said who I thought might

18    be a witness today.

19         THE COURT:  As long as we're getting representations,

20    I'll ask the deputy marshal to come over and identify herself

21    for the record as well, because she has been here for most days

22    in this trial, and very experienced deputy, United States

23    marshal, so --

24         THE MARSHAL:  Good morning, sir.  My recollection --

25         THE COURT:  Well, identify yourself.

```
1              THE MARSHAL:  Sorry.  Taylor, Charlayna Taylor.

2         So, my recollection from the other day, the attorney

3    from Steptoe, that she didn't know exactly what row

4    Ms. Hylton-Brown was in; but this morning it's the second row.

5         We escorted her out.  She had the outburst at the

6    beginning of the recess, when you decided to recess.

7              THE COURT:  On that day?

8              THE MARSHAL:  Yes.  So we both escorted her out,

9    myself and the CSO.

10             THE COURT:  And when you say, when we had a recess --

11             THE MARSHAL:  Yeah, you had a recess and she said --

12             THE COURT:  -- was the jury panel still sitting here,

13   though?

14             THE MARSHAL:  They were getting up.

15             THE COURT:  People in the gallery?

16             THE MARSHAL:  Yes.  And she had just arrived.  She

17   wasn't here the whole morning, so...

18             THE COURT:  Do you see her near one of the jurors?

19             THE MARSHAL:  No.

20             THE COURT:  Okay.

21             THE MARSHAL:  We got her out because of the outburst

22   that she had when she realized who Mr. Sutton was.  She said

23   she had never seen him before, and that's where the outburst

24   came from.

25             THE COURT:  Do you know whether the CSO is here
```

```
1    today?

2              THE MARSHAL:  She was here yesterday.  I'm not

3    certain --

4              THE CSO:  (Raises her hand.)

5              THE COURT:  Just one second.  Before you say

6    anything, I have another question for you.

7         Now, I recall the day of the outburst -- I'm not sure

8    it's the outburst you're talking about.  I thought the day of

9    the outburst was a different day, not the day that there were

10   20 people sitting on the right-hand side.  Is that --

11             THE DEPUTY MARSHAL:  She had a minor one.  She had

12   one when we recessed before the jurors were right there.  And

13   she had another minor one, she became emotional about something

14   else.

15             THE COURT:  Another day?

16             THE MARSHAL:  Yes.  And I requested she not come back

17   during jury selection, she come back the 17th, when we

18   thought -- no, I'm sorry, the 24th, when we thought the trial

19   was going to start.

20             THE COURT:  You asked her that?

21             THE MARSHAL:  I did.  I did.

22             THE COURT:  Thank you.

23        So are you the CSO we're talking about?

24             THE CSO:  No, Your Honor.  I wanted to let you know

25   that the CSO is at work today, that was working that day.
```

```
1              THE COURT:  That's Kathy --

2              THE MARSHAL:  Jackson.

3              THE COURT:  Could you get her?

4              THE CSO:  Sure.

5              THE COURT:  That would be great.

6         So before anybody else says anything, the reason I'm

7    doing this now is after we heard representations about the

8    alleged contact between Ms. Hylton-Brown and a juror in

9    question, we had the juror in question come in and testify

10   under oath.  The Court of Appeals needs a transcript of that.

11   I'll ask the government to try to get it and provide it.  And

12   then I asked whether anybody wanted to hear from other

13   witnesses, and I think the deputy marshal may have said

14   something on that day.

15        We talked about whether to -- we tried to see if the CSO

16   was here; she wasn't that day.  I offered the parties the

17   opportunity to interrogate the CSO on another day and everybody

18   said no, we don't need to do that.

19        I accepted Mr. Hannon's representations about what the

20   lawyer from Steptoe would say, but I did not ask her to come

21   forward on that day.  There were also some other proffered

22   witnesses about various events.  But I think everybody

23   seemed -- well, I don't want to speak for everybody, but after

24   we heard from the juror, under oath, the only people she talked

25   to were men, two men -- or, who talked to her were two men, we
```

1    decided not to inquire further.  But now that the writ of

2    mandamus has been filed and a motion to reconsider my earlier

3    ruling has been filed, and the government is arguing here, and

4    Ms. Hylton-Brown's lawyer is arguing in the Court of Appeals,

5    that I have to make findings by clear and convincing evidence.

6         Okay.  So we're putting a few people under oath in that

7    regard.  My question, while we're waiting for the defense,

8    is -- one of my questions for the defense is:  What is your

9    argument?  That I have made findings under a clear and

10   convincing evidence standard?  And do I need to make findings

11   under this statute of fact in every single allegation that Mr.

12   Hannon raises about what he and others at his table say they

13   observed?  Do I need to put them under oath?  And if there's no

14   one to contradict them, is that clear and convincing evidence?

15   Or do I need to or can I accept their observations as officers

16   of the court?

17        I mean, basically what has happened, is on several

18   occasions Mr. Hannon and Mr. Zabavsky stood up and said this is

19   what we observed.  And they put a lot of what they say they

20   observed in their filings from 9 o'clock this morning.  And

21   then the government says, Well, we didn't see that.  And maybe

22   they were just looking at the television screen and maybe they

23   weren't looking at the defendants, or whatever.  And, you know,

24   that lawyer is making representations.

25        A, I don't want to put lawyers under oath.  They're

1    officers of the court.  And if there are other witnesses, maybe

2    they are people in the gallery.  And the last thing we need to

3    do, is to have a mini trial in the middle of the criminal

4    trial.  And I'm not even sure if I'm going to take testimony

5    from them.

6         The defense counsel, who are officers of the court, have

7    said what they observed.  Some of it may be their

8    interpretation of what they observed.  But they have said what

9    they have observed on multiple occasions.  The government -- or

10   maybe it's not you, Mr. Baset, maybe it's counsel for

11   Ms. Hylton-Brown in her mandamus petitions -- says these are

12   only allegations.  Well, is it?  They're more than allegations.

13        If Mr. Hannon, counsel for one of the defendants, says

14   this is what he saw.  And Mr. Zampogna, counsel for the other

15   defendant, says this is what he saw.  Do I have to put lawyers

16   on the stand, under oath, in order to satisfy the clear and

17   convincing evidence standard of the Victim and Witness

18   Protection Act?  I can't imagine that anyone, neither the

19   congress or Professor Cassell, who is responsible for this

20   statute, or the Court of Appeals would want to turn lawyers

21   into witnesses.  We should be able to accept their

22   representations as to what they said they saw, and just as I

23   accept the government's representations, we didn't see it or we

24   didn't interpret it that way.

25        But, "We didn't see it" is like saying -- is different

1   from saying I saw something different.

2           MR. HANNON:  To be specific, I mean, the problem, as

3   we indicated --

4           THE COURT:  Before we do that, the CSO is here and I

5   don't want anybody -- I want to hear her independent

6   recollection.  So before anybody puts facts on the record or

7   alleges facts --

8           MR. HANNON:  And I also have another question,

9   because the report of these two outbursts is something I didn't

10  observe and I would like to -- for the Court, to invite the

11  marshal to describe those two outbursts.

12          THE COURT:  We can do that.  So why don't I ask the

13  CSO -- do you want to say something first, Mr. Baset?

14          MR. BASET:  No, we can proceed with the CSO.  I would

15  like to address that.

16          THE COURT:  I don't think I need to put her under

17  oath either, unless anybody insists on it.

18       Do you want me to put her under oath?

19          MR. BASET:  I don't think it's necessary.  I think

20  she, as an officer of the court, her account should stand.

21       But to your point, I -- we are not disputing necessarily

22  the perceptions of Mr. Hannon or people at his table.  I don't

23  think there's a way for us to be able to do that as the

24  government -- as they perceive it, that's how they take it.

25  But I think the standard is a little higher than that.  It is

1    what objective information there is of Ms. Hylton-Brown's

2    conduct.  And we, frankly, don't think that Ms. Hylton-Brown,

3    looking over at the only TV that displays exhibits for her, or

4    looking even at the defense table, is -- rises to a level of

5    clear and convincing.

6         Now, could it be that people at the table perceive how

7    she's looking at them in a way that is offensive or that they

8    don't appreciate?  Sure.  Absolutely.  That's quite possible.

9    We don't doubt that.  But we think that the standard is higher

10   than that because the Crime Victims' Rights Act envisions a

11   victim who is upset, who is witnessing difficult testimony, but

12   that they still have a right to be here, and that that doesn't

13   interfere with the jury's obligation to objectively assess the

14   evidence and apply it to the law.  That's really the question.

15        And, so, we understand that it might bother them that

16   she's here, that she may look upset, and they might perceive

17   that a particular way -- and we don't quibble with their

18   perception -- it's just what is the objective evidence?  And we

19   think that's where the clear and convincing standard lies, is

20   beyond just representations.  And, so, to the extent there has

21   been testimony that's been presented, it's contradicted, the

22   accounts.  And, so, we just think it's higher than simply

23   Mr. Hannon indicating something.

24        We don't dispute what his perception is, but we think

25   that it has to be something objective.  And while he might

1    perceive something a particular way, that might not have been

2    Ms. Hylton-Brown's intention.

3              THE COURT:  And how are we going to find out?

4              MR. BASET:  It is --

5              THE COURT:  What do you mean by "objective"?

6              MR. BASET:  Well, we think something that

7    indicates --  like, for instance, the outburst that has been

8    described on day one during the opening, I -- that was

9    something that people observed.  That is objective information.

10   And there's people who can take account of that.  But, a woman

11   whimpering because she sees her son dying on the screen, I

12   don't think meets that standard.

13             THE COURT:  All right.  Let me ask the CSO who has

14   just arrived to come up, if you would.  And come to the podium

15   please, the middle here.

16        And what I'm going to do is I'm going to ask her a few

17   questions and then I'll let counsel ask her some questions.

18        Would you mind taking off your mask?

19             CSO JACKSON:  Sure.

20             THE COURT:  How are you?

21             CSO JACKSON:  I'm doing fine, Your Honor.

22             THE COURT:  What's your name again?

23             CSO JACKSON:  My name is Kathy Jackson.

24             THE COURT:  Right.  Okay.  So would you tell us what

25   you saw -- I'm not sure what day we're talking about, but I

1    think the -- the day that I think we're focusing on, if this is

2    a day you remember anything about, is there were 20 potential

3    jurors, approximately 20 potential jurors sitting on this side

4    of the courtroom, my right, your left.  And there has been an

5    assertion that something happened, and that maybe

6    Ms. Hylton-Brown, the mother of the victim in this case, had

7    some contact with some of the jurors and that you took some

8    action as a result.

9            CSO JACKSON:  No.  When the jurors was sitting to my

10   left as you come into the court --

11           THE COURT:  Yes?

12           CSO JACKSON:  -- the decedent's mother was not in the

13   courtroom at the time.  To my recollection, she did not come in

14   until after all the jurors was up in their seating.

15           THE COURT:  In the jury box?

16           CSO JACKSON:  Yes.

17           THE COURT:  Do you have -- maybe I am misremembering

18   what was said about what you did.  Was there a time when you

19   had to remove anybody or ask anybody to leave the courtroom

20   because of some conduct?

21           CSO JACKSON:  That was not -- to my recollection, the

22   decedent's mother was sitting to my left, after the jurors here

23   (indicating).  To my right there was some spectators.  I don't

24   know who they were, but they was conversing among themselves

25   and I asked them if they could stop talking.  And at one time I

1    do believe that someone's cell phone did go off and I asked

2    them, could they step out in the hall.  And I told them if they

3    was going to remain in the courtroom, that they have to cut

4    their phone off while the court is in process.  That's the only

5    thing I can remember.  Any interaction with the decedent's

6    mother, no.

7              THE COURT:  All right.  Counsel have any questions

8    they want to ask Ms. Park (sic)?

9              MR. HANNON:  Ms. Park (sic), do you recall, late that

10   day you asked us to remain in the courtroom until Ms. Hylton

11   left?

12             CSO JACKSON:  Okay.  From my experience, many years

13   as a law enforcement officer, when I see something that's out

14   of the norm, I try to be proactive.  When I noticed that the

15   decedent's mother was standing in the back of the courtroom,

16   after you had given everyone -- I think it was the lunch break.

17   I didn't want any problems, because she stood at the backdoor.

18   And I noticed that the team, the defendant, defendant's team

19   was to my right, and I just asked them could they remain in the

20   courtroom?  Nothing taking place, but I just wanted to be

21   proactive because she stood at the backdoor.  Why?  I have no

22   idea.

23             THE COURT:  So you wanted to wait until she had left

24   the courtroom before the two defendants and their lawyers left

25   the courtroom?

 1          CSO JACKSON:  Yes.  And I did state that to the

 2    defense attorney, the gentleman that was just standing, Please

 3    remain here because I don't want any problems.  I'm not saying

 4    that anything was going to erupt, I just didn't want that to

 5    happen, with my experience dealing with defendants and the

 6    complainants.

 7          THE COURT:  Okay.  So what agents -- what law

 8    enforcement agency were you with before you became a CSO?

 9          CSO JACKSON:  I'm -- sir, I'm so sorry.  Repeat that,

10    please.

11          THE COURT:  What law enforcement agency were you with

12    before you became a CSO.

13          CSO JACKSON:  I was a detective, domestic violence

14    detective for over 15 years with the Metropolitan Police

15    Department, successfully retired after 29 years and 9 months.

16          THE COURT:  And then somebody said, You want to be a

17    CSO?  So here you are.

18          CSO JACKSON:  Yes.

19          THE COURT:  Well, we're glad we're here.

20          CSO JACKSON:  Thank you, Your Honor.

21          THE COURT:  Does the government counsel have any

22    questions, or Mr. Zampogna?

23          MS. BERKOWER:  Nothing from the government.  Thank

24    you, ma'am.

25          MR. ZAMPOGNA:  Nothing for myself, Your Honor.

1              THE COURT:  All right.  Thank you, Ms. Park.

2      Appreciate it.

3              CSO JACKSON:  Jackson.

4              THE COURT:  You can go back to work.

5              CSO JACKSON:  Thank you, Your Honor.  Have a good

6      one.

7              THE COURT:  I want to make one thing clear for the

8      record, and then I thought there may be a question or two for

9      the deputy marshal.  I'm saying this for the record, because

10     this transcript will be going to the Court of Appeals, I

11     assume, if the mandamus petition is going to go forward.

12             As I face the back of the courtroom, prosecution table

13     is to my right, closest to the jury, the defense table is to my

14     left, furthest from the jury.  The only monitor that shows

15     videos and the body-worn cameras is also to my left, facing the

16     gallery.  So that -- and there have been a lot of body-worn

17     camera and other videos in this trial so far.  Sitting --

18     defense counsel table is kind of -- Mr. Sutton and

19     Mr. Zabavsky, the two defendants and their lawyers.  And the

20     lawyers and Mr. Sutton are directly facing the jury and

21     Mr. Zabavsky typically is sitting at the end of the table.

22             So if somebody on my right side in the gallery is

23     looking at the video, they will necessarily be looking over

24     the -- slightly above the heads of the defense counsel and

25     defendants.  And, so, the government has maintained that she

1    probably was just looking at the videos.  Mr. Hannon and

2    Mr. Zampogna have said sometimes maybe she was, but they had

3    pointed to specific instances that they have observed when

4    Mrs. Hylton was looking in that direction and was not looking

5    at or exclusively at the videos, but was either staring down

6    the defendants or making gestures or other things, some of

7    which Mr. Hannon and Mr. Zampogna put on the record, some of

8    which are in their filings this morning.

9         So, first, were there any further questions for the

10   deputy marshal before we get to arguments, further arguments on

11   this question?

12        MS. BERKOWER:  Not from the government.

13        MR. HANNON:  I have not gotten any details about the

14   two outbursts that were mentioned.

15        THE COURT:  So why don't you come back, Deputy

16   Marshal, and tell us about the two outbursts you referred to

17   and when they occurred, as you recall them.

18        THE MARSHAL:  Good morning again.  Mr. Zampogna

19   informed me that Mrs. Hylton-Brown actually was putting her

20   middle finger up at him.  And I think that was the second day.

21        THE COURT:  And you saw that?

22        THE MARSHAL:  No, this is what he reported to me.

23   And I spoke with her about that and, of course, she denied it.

24   The second time the jurors were still in the ceremonial

25   courtroom and she had the outburst at the recess.  You called

1    recess, and she said that was the first time she had seen

2    Officer Sutton.  So I said that she not come back until the

3    24th, which is when the trial was supposed to start.  So that

4    may have been like the 17th or 18th.  Anything else I haven't

5    considered an outburst.  I heard her sigh when she's viewed

6    something on the television, or something like that.

7         But I distinctly asked the CSOs to place her right here

8    in the corner, instead of over to the right, so that if she had

9    to look this way, it wouldn't appear that she was looking at

10   them, she can look at the camera right there.

11        So, I don't know if anyone noticed yesterday, the CSOs

12   would get up and allow her to sit right here at the corner, so

13   that I could look at her anytime I saw something on the

14   monitor.

15              THE COURT:  So as of yesterday -- you know, we

16   started this jury selection on the 17th of October, and it's

17   now November 3rd.  As of yesterday she's been asked to move?

18              THE MARSHAL:  No.  I was hoping you'd noticed that

19   yesterday.  I asked that she be removed from the middle section

20   when we had the complaint, when the juror was up here

21   testifying.  And she was nowhere near the second row.  She was

22   always in the back.  She's never been in the front.

23              THE COURT:  No, no.  But she was in the second row on

24   the day of jury selection.  She told us that.  She herself told

25   us that.

```
1              THE MARSHAL:  Ms.  Hylton-Brown is who I'm talking

2      about.

3              THE COURT:  No, right.  The juror was in the second

4      row.

5              THE MARSHAL:  Yes.  She's never -- she's always late.

6      And I wanted her in the back, too, because she's going in and

7      out.  So, yes.  And that's it, Your Honor.

8              THE COURT:  All right.  Thanks.

9          Anything else -- okay.  What do you want to do?  Do you

10     want to make some further arguments on this?  Further points

11     that counsel would like to make?

12             MR. HANNON:  I just want to confirm that Mr. Zampogna

13     did report to me that he saw, as did his client,

14     Ms. Hylton-Brown holding up her middle finger, just constantly

15     at him.

16             THE COURT:  What does "constantly" mean?

17             MR. HANNON:  Well, I didn't witness it.

18             THE COURT:  Why don't we have Mr. Zampogna tell us

19     what he observed.

20             MR. HANNON:  And the representation I made regarding

21     her calling Officer Sutton out was reported to me by Officer

22     Sutton.  I did see her standing, looking over here at that

23     time.

24             THE COURT:  What do you mean by "calling him out"?

25             MR. HANNON:  She was -- she was saying, "Come
```

```
1    outside, come outside."  Challenging him to come outside, to
2    engage with her.
3              THE COURT:  When was this, Mr. Hannon?
4              MR. HANNON:  It was before the jury was picked.
5              THE COURT:  Was the jury in the room when this
6    happened?
7              MR. HANNON:  He doesn't believe so.
8              THE COURT:  Okay.  And this is alluded to or
9    mentioned in your papers?
10             MR. HANNON:  Yes, sir.
11             THE COURT:  Mr. Zampogna, would you tell me factually
12   some of the things that you wanted to raise, or clarify what
13   Mr. Hannon just said?
14             MR. ZAMPOGNA:  Yeah, I think I did.  I didn't look at
15   the record as to what I said that day because I know I pointed
16   it out to Your Honor when it happened.  I don't want to -- I
17   don't think it was more than 10 or 20 seconds.
18             THE COURT:  What --
19             MR. ZAMPOGNA:  The gesture, I think I called it the
20   bird that day, if you recall.  So, you know, I've broken off
21   eye contact with her, even now, just to not have any potential
22   thing happen, because she looks in this direction for whatever
23   reason, I don't know.  But for that incident, that's all that I
24   would point out factually.  I think I already said that, but I
25   don't -- thank you, Your Honor.
```

```
1              THE COURT:  Is there anything anybody else wants to
2       say on the motion to reconsider my ruling to exclude
3       Ms. Hylton-Brown?
4              (No response.)
5              THE COURT:  Okay, I did want to ask the government to
6       respond to one specific thing.
7              Yes, Mr. Baset?
8              MR. BASET:  Did you want me to respond to something?
9              THE COURT:  Yeah, I'm looking for the paper.  Okay.
10      Mr. Zampogna makes the following point, separate and apart from
11      Mr. Sutton's arguments, beginning on page 3 of his filings this
12      morning, 3 and 4, docket 338:  Ms. Hylton-Brown has zero rights
13      under the Victim Crime Act with respect to Mr. Zabavsky.  She
14      is not a victim of his conduct.  She is the victim of
15      Mr. Sutton's alleged conduct.  Mr. Sutton is charged with
16      second degree murder of Mr. Hylton-Brown.
17             And, according to Mr. Zampogna's filing, Mrs. Hylton
18      does not meet the definition of a victim of any crime allegedly
19      committed by Lieutenant Zabavsky who, as we all know, is
20      charged with obstruction of justice and conspiracy to obstruct
21      justice, but not with victimizing through an act which caused
22      the death of Mr. Hylton-Brown; only Mr. Sutton is charged with
23      that crime.
24             So, he would say that he has a right -- in the case of
25      Mr. Sutton, I think I'm balancing the rights of the criminal
```

1   defendant, Mr. Sutton, against the rights -- constitutional

2   rights of the criminal defendant against the statutory rights

3   of the victim, Mrs. Hylton-Brown.  In Mr. Zabavsky's case I

4   don't have to consider the statute at all, he has an absolute

5   right to not have the jury prejudiced and I could exclude any

6   person from the courtroom who is not defined as a victim.

7   That's Mr. Zabavsky's argument.

8          MR. BASET:  So I have two points to that.  The first

9   is that it assumes -- and perhaps correctly, that someone who

10  is charged with obstruction cannot victimize another person.

11  And, even if that is true, I think that there is a rich irony

12  here.  And that is, Ms. Hylton-Brown, under the Crime Victim

13  Rights Act, has a right to be in this courtroom and listen to

14  the evidence, in part because she has a right to know what

15  happened in her son's case and what the facts are that resulted

16  in his death.

17         She certainly has been interested from day one.  The

18  government has not been in a position to share any of that

19  information with her.  And she's articulated that a major

20  reason she's here, because she wants to know what happened to

21  her son.  Interestingly, Mr. Zabavsky is charged with the crime

22  of cover-up, of obstruction, so that she could never find that

23  truth out.  And, so, part of the reason she is here today is to

24  learn that truth, that same truth that Mr. Zabavsky tried to

25  cover up.

1          Now, I'm not sure where the law fits on that as I'm

2     standing here, as far as whether she could be a victim in that

3     sense.  But I think, in the spirit, she certainly is.  The

4     second point is that I think that's irrelevant because at which

5     point they are codefendants in this case and Mr. Sutton is a

6     defendant in this case.  And there's no challenge to the fact

7     that she is a victim under the Crime Victims' Rights Act as it

8     relates to Mr. Sutton.  She has every right to be here.  If

9     this was just a trial against Mr. Zabavsky, perhaps he would

10    have a point.  But, it is not.  And, so, she has every right to

11    be here and the fact that he is a joined defendant makes no

12    difference in terms of limiting her rights.

13          THE COURT:  Okay.  The only other point I would

14    make -- observation I would make is there's still pending

15    before me a motion to reconsider my motion not to sever the

16    counts and to try the obstruction count separate from the

17    murder count.  I know it's based on totally different argument.

18    And I will decide it soon.  I want to read the cases that have

19    been cited.  I've reread the transcript of the relevant

20    portions of the opening statement.

21          Okay.  I suggest that we get started with Mr. Drago.

22    And in order to do that, we need to resolve the instruction

23    question so that we don't keep the jury waiting any longer.

24    And at some point in the next several hours I'll decide the

25    motion we've just been debating.

1          So, I sent around -- there have been all sorts of emails

2     back and forth about what instruction I should give.  About the

3     relevance of the police general order on pursuit.  And the

4     early instruction was -- the first iteration of the instruction

5     was a slightly revised version of what Mr. Hannon had proposed.

6     And I believe at some point he said he was satisfied with what

7     I was about to give.

8          The defendant -- I'm sorry, the government wanted me to

9     include a reference to the -- to both defendants in this

10    instruction because, it argued, that Mr. Drago's testimony

11    about the Metropolitan Police Department general order on

12    vehicular pursuits was relevant to both defendants.  Having now

13    read, having now skimmed the demonstrative exhibit that the

14    government intends to use with respect to the testimony of

15    Mr. Drago, I think the government is probably right, although

16    I'll hear from Mr. Zampogna further.

17         Although it seems to me that -- while Mr. Sutton's

18    knowledge about the pursuit order and the fact that it can be

19    one factor, an MPD general order can be a factor in

20    considering -- in the second degree murder, malice,

21    recklessness and so forth, which I've talked about and written

22    about many times before in this case.

23         It seems to me that it's also relevant to obstruction

24    because the point of his testimony, in combination with the

25    testimony of fact witnesses, is what the pursuit order says

1   about the ground rules for pursuits.  And there is already

2   testimony from Officer Tejera and Officer Toth, and maybe

3   others, that Sergeant Zabavsky was part of the pursuit, as well

4   as the senior officer on the scene after the crash, and that,

5   in fact, at some points during the pursuit his car was in

6   front, rather than behind Officer Sutton's.

7        So it seems to me that the relevance of testimony about

8   the MPD general orders, in combination later with fact

9   witnesses who will testify about what happened, and inferences

10  the government may want to draw, suggests that this proposed

11  instruction should apply to both defendants.  And so I've

12  revised it again and sent it around in the most recent email.

13  And I think Mr. Zampogna has -- I can't remember whether the

14  most recent email from Mr. Zampogna came before or after my

15  latest iteration of the instruction I want to give.  But

16  whatever Mr. Hannon and Mr. Zampogna would like to say before

17  we get the jury in, let's do that now.

18       Mr. Hannon, are you satisfied with the most recent

19  iteration of the instruction that we sent out a little while

20  ago?

21            MR. HANNON:  Yes, with the commentary that Your Honor

22  has already made, without prejudice to Mr. Zabavsky's argument.

23            THE COURT:  Please come to a microphone.  Either one.

24            MR. ZAMPOGNA:  Is that all right from here?

25            THE COURT:  Sure.

```
1              MR. ZAMPOGNA:  Yes, Your Honor.  Just to point out,
2    we do object to that inclusion for my client.  I don't believe
3    that we've written it, which is -- which we can attach and put
4    in the record in a notice, I believe you said earlier.  So I
5    don't want to reiterate everything, but I think, it seems to
6    me, there's a recurring theme.  And I argue that this
7    attachment to 301.03 relates to the attempted murder in the
8    second -- I'm sorry, murder in the second degree charge.  So
9    it's another attempt to connect my client to that charge.
10             THE COURT:  You think that the discussion of the
11   pursuit order is related to the murder charge?
12             MR. ZAMPOGNA:  Yeah, I do believe that because --
13   well, I mean, I'm just surmising the prosecution's argument
14   is -- well, I think they even said it, that the cause of the
15   death was the car being driven by Mr. Sutton.  I believe they
16   said that in their opening, which relates to how it's been
17   driven and how it pursued, under this statute,
18   Mr. Hylton-Brown.
19        So, the only other point I bring out is I don't believe,
20   even in the indictment -- I know this isn't, you know,
21   completely controlling in here -- I don't believe they have any
22   mention of my client's driving in the charges against him.
23        So, having said that, I'll file what's been done as an
24   objection, as a notice on the record, because I don't want to
25   keep the Court from the witness.  Thank you, Your Honor.
```

1           THE COURT:  Thank you.  Mr. Baset?

2           MR. BASET:  The general order on vehicular pursuits

3    has provisions in there that relate to, quote, a field

4    supervisor who is on the scene and the obligations of that

5    field supervisor.  That is a direct line to Mr. Zabavsky.  That

6    is a reference to the role he played that night as the field

7    supervisor.  And among the responsibilities that that

8    individual has is to notify major crash and IAD.  That's

9    explicit in the general order.  That relates directly to the

10   obstruction charge.

11          So the general order, the provisions within it speak to

12   the mental state of Mr. Zabavsky at the time he was

13   obstructing.  And, so, we do believe he is directly within the

14   ambit of this general order.

15          THE COURT:  And how -- and the general order, I think

16   you just said this, relates to the responsibilities of IAD and

17   major crash, and their varying fact witnesses who testified

18   about who's supposed to notify those people, and it's the

19   senior official on the scene, as I recall the testimony so far.

20          MR. BASET:  That's right.

21          THE COURT:  All right.  Anything else on this?

22          MR. BASET:  I want to --

23          THE COURT:  Go ahead.

24          MR. BASET:  I want to tee up a couple other issues

25   with respect to Mr. Drago that are not related to that.

1          THE COURT:  And then Mr. Zampogna wanted to raise

2    questions about the demonstrative, or at least wanted to

3    reiterate that there were some issues.

4          MR. ZAMPOGNA:  No, we're fine.

5          THE COURT:  No, wait, wait, because yesterday at the

6    time Mr. Hannon and Mr. Zampogna said something about the

7    captions that have been added to the general orders and the

8    captions on the demonstrative, they said they had not had time

9    to thoroughly review it.  Now that they've had time to

10   thoroughly review it, they can say whatever they want by way of

11   objections to the demonstrative.

12         MR. ZAMPOGNA:  Yeah, I didn't -- we aren't going to

13   object to anything at this point, Your Honor.  I want to clear

14   that up, so we didn't spend any more time.

15         THE COURT:  And the demonstrative is just that it's a

16   demonstrative, it's not going back to the jury during its

17   deliberations.

18         So what else did you want to raise about Mr. Drago?

19         MR. BASET:  To make this as smooth as possible, I

20   want to be clear, the proffer the government gave was that

21   Mr. Drago's testimony would relate to the general order on

22   vehicular pursuits.  We indicated that we would not be

23   discussing, or that his testimony wouldn't relate directly to

24   use of force.  I want to be clear that the general order on

25   vehicular pursuits has a provision that relates back to the use

1    of force provision and with respect to fleeing felons.  And so

2    I want to talk about that because it is in the general order,

3    but I do not intend to talk about use of force generally.  I

4    just wanted to -- and that's reflected in the demonstrative

5    that I gave to counsel.

6         The second point I wanted to raise is under the general

7    order, it requires that a police officer, to pursue, has to

8    have probable cause, belief that the individual had committed

9    or was about to commit a serious violent felony.  I wanted to

10   just flag for the Court that as it relates to this word

11   "probable cause" that appears throughout the general order, I

12   wanted the witness to be able to just relate back to the

13   definition that's provided for probable cause in the general

14   order.  That's it.

15        And I wanted to just flag that for the court and for

16   counsel.  It is reflected in the demonstratives that I gave

17   them.  But I hope that that -- to limit the testimony to just

18   those aspects of --

19        THE COURT:  Anything, Mr. Hannon, Mr. Zampogna, you

20   want to say about that before we get started?

21        MR. HANNON:  So, the general order speaks for itself.

22   This is the second time that the government is making an effort

23   to bring use of force into this case.  And Your Honor has made

24   it very clear that this is to be a national standard on

25   pursuit.  It's not to get into a constitutional area having to

1    do with what's force, what's not force.

2         If you recall, Agent Ricardi very conveniently talked

3    about a seizure, which the Court struck.  And this has no place

4    in the case.  There's no reason for them to accentuate any part

5    of the general order that talks about use of force.

6         THE COURT:  Mr. Zampogna, anything you want to say

7    about what Mr. Baset just said?

8         MR. ZAMPOGNA:  No.  Thank you, Your Honor.  No.

9         MR. BASET:  I would note that Agent Ricardi did not

10   testify as an expert.  Mr. Drago will be --

11        THE COURT:  The question is, is it relevant?

12        MR. BASET:  And I can show you, if I can --

13        THE COURT:  Make your argument.  I don't want to see

14   it.  I want to get started.

15        MR. BASET:  It is relevant because it is in the

16   general order.  It is --

17        THE COURT:  Not everything in the general order is

18   relevant.

19        MR. BASET:  So the very first rule in the general

20   order about whether to engage in vehicular pursuit requires an

21   assessment by the police officer, whether there's probable

22   cause to pursue.

23        THE COURT:  Okay.  I got that point.

24        MR. BASET:  So I don't want the jury to be --

25        THE COURT:  His question is about the use of force

1    part of it.

2              MR. BASET:  So the 2003 order relates back to the use

3    of force, and specifically the provision on a fleeing felon.

4    And I wanted to relate back to that.  That's it.

5              MR. HANNON:  That's only in the case with a force.

6    There's no force in this case and they're trying to create a

7    constitutional issue where one doesn't --

8              THE COURT:  If they create a constitutional issue and

9    open a door that you want to run through, maybe you'll be able

10   to run through it and raise some things that I've already

11   excluded from evidence.

12             MR. HANNON:  Your Honor, I would rather that the

13   Court prohibit what is, I think, the Court is recognizing is

14   improper in this case, rather than giving us the opportunity to

15   run through an open door.  We don't think that's the

16   appropriate remedy.  We think the appropriate remedy is to

17   preclude it because there's no use of force here.

18             MR. BASET:  It's already in evidence at this point.

19   It's in the general order.  The jury is going to be looking at

20   it.  It's part of their analysis.  We just want them to be

21   educated on this point.  We're not making argument about

22   probable cause here.

23             THE COURT:  Well, we'll see what happens.  You're

24   going to do what you're going to do, and if there's an

25   objection, I'll deal with the objection when it arises.  And

```
 1        let's just get started.
 2                  MR. BASET:  Great.
 3                  THE COURT:  Let's take a ten-minute break and then
 4        we'll get the jury in and start with Mr. Drago.  I'll start
 5        with the instruction.  And I don't want any other issues to
 6        arise in the next ten minutes.
 7                  MR. HANNON:  May I say hello to Mr. Bromwich?
 8                  THE COURT:  You may say hello to Mr. Bromwich.  You
 9        can all say hello to Mr. Bromwich.
10             You've come a long way since 1986, Mr. Bromwich.
11             Okay.  Ten minutes.
12             (Recess.)
13                  THE COURT:  Can we get the jurors?
14                  MR. BASET:  One moment.
15             (Off-the-record discussion between counsel.)
16                  THE COURT:  We're ready?
17                  MR. BASET:  Yeah.
18                  THE COURT:  Okay.
19                  MR. HANNON:  Quickly, Mr. Baset wanted to use
20        exhibits -- wanted to admit Exhibits 413-A, B, C, G, and H with
21        this witness, on the condition that they will later be
22        identified by Officer Totaro as being either training that
23        Officer Sutton received, or current training that's virtually
24        the same.
25                  THE COURT:  All right.
```

```
 1              MR. BASET:  That's our understanding, yes.
 2              THE COURT:  So given that proffer and the ability to
 3     connect it up later, I take it you don't have an objection, so
 4     long as -- and his representation that he will connect it up
 5     later.
 6              MR. HANNON:  Correct.  Thank you.
 7              MR. BASET:  There is also 413-I and J.  Those are two
 8     of the other exhibits, but it is within the training.
 9              MR. HANNON:  I and J as well.
10              THE COURT:  And the representations will be connected
11     up later.
12              MR. BASET:  Yes.
13              THE COURTROOM DEPUTY:  Your Honor, the jury.
14          (Whereupon the jurors enter the courtroom.)
15              THE COURT:  All right.  Welcome back.  Good morning,
16     everybody.
17              THE JURORS:  Good morning.
18              THE COURT:  I hope you all bring something to read
19     with you when you come.
20          My predictions about how efficient we're going to be is
21     almost always wrong.  Apologize for that.
22          So, if you all are ready, note pads out and so forth.
23     The government -- I'm going to give you an instruction right
24     now.  There will be more instructions at the end of the case,
25     obviously.
```

1        The government previously has introduced evidence

2    regarding certain MPD general orders.  And one in particular is

3    the MPD general order on vehicular pursuits.  The next witness

4    is an expert witness called by the government.  The MPD general

5    orders set internal policy for the Metropolitan Police

6    Department.  The general orders are not laws.  They're

7    provisions that are administered exclusively by the

8    Metropolitan Police Department.

9        It is up to you whether to accept or reject this

10   evidence that you're about to hear, and any testimony from any

11   witnesses about the Metropolitan Police Department general

12   order on vehicular pursuits.  If you find, at the end of the

13   case, when you deliberate, that one or more of the officers on

14   trial violated this general order, you may consider the general

15   order.  And the relevant training is only one factor in

16   deciding whether the defendants had the necessary mental state,

17   state of mind underlying the crimes charged.

18       And I gave you preliminary instructions on the crimes

19   charged before we started.  I will give you more detailed

20   instructions on the crimes and on the law generally at the

21   close of the case.

22       You may not find either defendant guilty of anything

23   merely because they violated the general order, if you conclude

24   that they did violate the general order.

25       Okay.  With that, why don't you call your next witness.

```
 1              MR. BASET:  The government calls Mr. Robert Drago.

 2              THE WITNESS:  Good morning.

 3                         ROBERT DRAGO,

 4   was called as a witness and, having been first duly sworn, was

 5   examined and testified as follows:

 6              THE WITNESS:  Take my mask off?

 7              THE COURTROOM DEPUTY:  Yes.

 8          Your Honor, may the record reflect that Mr. Drago is now

 9   sworn.

10              THE COURT:  Sir, good morning.

11              THE WITNESS:  Good morning, sir.

12              THE COURT:  Make sure you're close enough to the

13   microphone so that the jurors and the court reporter can hear

14   you.  Thank you.

15                       DIRECT EXAMINATION

16   BY MR. BASET:

17   Q.  Good morning.

18   A.  Good morning, sir.

19   Q.  In a loud, clear voice, can you please state and spell your

20   name?

21   A.  Robert, R-O-B-E-R-T, Drago, D-R-A-G-O.

22   Q.  And please feel free to use -- make liberal use of your

23   microphone so everyone can hear.

24          Mr. Drago, where do you reside?

25   A.  Lake Worth, Florida.
```

1    Q.  And so you traveled up here to D.C.?

2    A.  Yes.

3    Q.  Just for this?

4    A.  Yes.

5    Q.  And you've been here since when?

6    A.  Saturday.

7    Q.  Now, are you familiar the case of the *United States versus*

8    *Terence Sutton* and *United States versus Andrew Zabavsky*?

9    A.  Yes.

10   Q.  Are you here on that witness stand in relation to work that

11   you did on behalf of those cases -- or, for those cases?

12   A.  Yes.

13   Q.  And what is your highest level of education?

14   A.  I have a bachelor's degree in criminal justice from Florida

15   Atlantic University.

16   Q.  And do you have any prior law enforcement experience?

17   A.  38 years.

18   Q.  Which police departments?

19   A.  City of Pompano Beach in south Florida and Broward County

20   Sheriff's Office, which is where Fort Lauderdale is located,

21   for most people to know where that is.

22   Q.  We'll get to that a little bit more on your experience

23   there.  But generally, when did you start your law enforcement

24   career?

25   A.  I entered the police academy in 1979.

1    Q.  And are you currently retired from law enforcement?

2    A.  I've been retired since 2017.

3    Q.  And what rank did you hold when you left law enforcement?

4    A.  I was a lieutenant colonel.

5    Q.  Why is it that you pursued a career in law enforcement?

6    A.  It seemed like an exciting career that, you know, that was

7    interesting, you had a lot of different things that you got

8    involved in, and they told me I could drive and -- you know,

9    cars, fancy cars and what have you.  And it seemed, as a young

10   man, like this was interesting.

11   Q.  And I know you mentioned you are retired, but you are here

12   on a Thursday on this witness stand, which does not sound like

13   much of a retirement.  Have you found paid work since

14   retirement started for you?

15   A.  I own my own company now, Eye to Eye Consultants, which I

16   do as, more or less, a part-time.

17   Q.  And you said that's Eye to Eye.  Is it E-Y-E to E-Y-E, for

18   the record?

19   A.  Yes.

20   Q.  Now, what kind of work does this company do that you

21   started?

22   A.  I do expert witness testimony and I do consulting and

23   training.

24   Q.  And in what field?

25   A.  In law enforcement.

1    Q.  When did you start this company?

2    A.  2017.

3    Q.  And do you have any other companies that you currently run,

4    or businesses?

5    A.  I am involved in a dog breeding business with my son.  I'm

6    not actually part of the business.  I guess I'm a volunteer,

7    working with him.

8    Q.  And I got to ask, what kind of dogs do you tend to breed?

9    A.  Cavapoos, which are a mixture between King Charles

10   Cavaliers and Poodles.

11   Q.  Now I want to jump to a bit more about your experience.

12   Have you previously testified in legal matters concerning

13   national model police policies, practices and standards?

14   A.  In deposition, yes.

15   Q.  And those are civil cases then?

16   A.  Yes, they were all civil cases.

17   Q.  Approximately how many?

18   A.  Ten.

19   Q.  Federal or state court, or both?

20   A.  Both.

21   Q.  And have you been hired as a consultant for both the

22   plaintiff's side and the defense side, or one side only?

23   A.  Both sides.

24   Q.  In fact, who is your next client after -- after your work

25   here?

1    A.   The Gilchrist County Sheriff's Office.

2    Q.   You're representing a police department?

3    A.   Yes, I am.

4    Q.   Now let's jump into Pompano Beach.  When did you -- you

5    started there in what year?

6    A.   I went to the police academy in 1979.  Actually entered the

7    road, I guess, in early 1980.

8    Q.   Just as a bit of background about Pompano Beach and the

9    police department that you were working at there, what was the

10   population of Pompano Beach in that area?

11   A.   At the time I started or time I left?

12   Q.   Um --

13   A.   Time I started was about 50,000, by the time I retired from

14   there it was, about, over 100.

15   Q.   And what year did you leave Pompano Beach?

16   A.   1999.

17   Q.   What's the size of the police force there?

18   A.   In Pompano Beach?

19   Q.   Yes.

20   A.   It was 325, approximately, employees, of which about 225

21   were police officers.

22   Q.   And would you describe that as an urban, rural, or suburban

23   setting?

24   A.   Urban.

25   Q.   What's the largest city in Pompano Beach, in that --

1    A.  In that county, it's Fort Lauderdale.

2    Q.  During your time at Pompano Beach, what assignments did you

3    hold?

4    A.  I was in patrol, I was in street crimes, I was in marine

5    patrol, I was in the detective bureau, I was in training.  And

6    then as supervisors I was in different task forces that they

7    had.

8    Q.  While at Pompano Beach, how many of those years that you

9    served there were as a supervisor?

10   A.  Twelve.

11   Q.  And the rank that you held when you left Pompano Beach?

12   A.  Commander, district commander.

13   Q.  Now, while you were a patrol officer, did you drive police

14   cars?  Those fancy police cars that you mentioned?

15   A.  Yes.

16   Q.  And what crimes did you generally respond to, could you

17   give us a range, while in Pompano Beach?

18   A.  The full range of misdemeanor and felony crimes that you

19   would have in any urban area.  Everything from traffic to

20   homicide.

21   Q.  Now let's talk a little bit about your experience at

22   Broward County.  What was the population when you started and

23   when you left?

24   A.  It was about 1.5 million, I believe, when I started and

25   about 1.7 million when I left, roughly.

1    Q.   Urban setting, as well?

2    A.   Yes.

3    Q.   Largest city in Broward County?

4    A.   Fort Lauderdale.

5    Q.   What assignments did you maintain while there?

6    A.   I was an operations commander, I was a district chief, I

7    was a regional commander, I was a lieutenant colonel.  I was

8    lieutenant colonel over a lot of administrative different

9    duties at that time.

10   Q.   And lieutenant colonel, where does that fall within the

11   rank structure of the department?

12   A.   You have the sheriff and you have colonels, then you have

13   lieutenant colonel.

14   Q.   So you're third in command when you retired?

15   A.   Third rank, yes.

16   Q.   And of those years that you were at Broward County, what

17   was the range again?  The range of your time, at what year did

18   you start?

19   A.   1999 to 2017.

20   Q.   Of those years, how many of those years did you spend

21   supervising other police officers?

22   A.   All of them.

23   Q.   And generally, what duties and responsibilities did you

24   have during your time there?

25   A.   I was a chief in the district.  I was operations commander

1    in the district.  So I would have shifts reporting to me, I

2    would have a whole district reporting to me.  Then as the

3    regional district commander I had, like, five or six districts

4    reporting to me.  And then when I went to lieutenant colonel I

5    had, like, five or six different regions in what we call

6    special operation areas; like the airport, the port, the

7    courthouse all came under my command, as well as a number of

8    administrative duties, such as negotiating contracts, labor

9    contracts, city municipal contracts.

10   Q.  And based on your training and experience, I have some

11   questions about some basic terminology that we will be using

12   other moving forward.  Do you know what a police general order

13   is?

14   A.  Yes.

15   Q.  What would you -- what do you understand that to be?

16   A.  A police general order gives directions and guidelines for

17   the officers to follow.

18   Q.  What about police policy?

19   A.  The policies are a more overall goal of what those -- of

20   what you want to accomplish, and the general orders are how you

21   accomplish it.

22   Q.  How are police general orders and policies taught to police

23   officers?

24   A.  Through training, through the training department.  And in

25   roll call -- so there's a number of different types.  You could

1    have roll call training, you could have mandatory retraining,

2    you can have formal training, you can have online training.

3    But to make it more general, it's through training that they

4    receive them and then they learn about that general order.

5    Q.  Can that training also be hands-on?

6    A.  Yes.

7    Q.  Does that training, in your experience, include training on

8    legal consequences of policing?

9    A.  Yes.

10   Q.  As it relates more specifically to vehicular pursuits --

11   which is something we'll talk a little bit more about a

12   definition, we'll delve into it in a bit.  I wanted to, first,

13   though, cover a bit more detail the tasks that you performed

14   when wearing all those hats over the last 38 years of your law

15   enforcement career.

16         The first is:  Have you ever directly participated in a

17   vehicular pursuit by driving a police car in one?

18   A.  Yes.

19   Q.  And in what roles or assignments did you do that?

20   A.  More in my patrol days, before I was promoted into

21   supervision.  I've been involved in a number of police pursuits

22   where I actually was involved in the pursuit driving, both on

23   land and water, because in the marine patrol for a while, so I

24   actually was either the primary or the secondary unit in

25   probably about 25 or 30 pursuits.

1    Q.  And when you say 25, 30 pursuits, does that include both on

2    land and on water?

3    A.  That's mostly land.  Probably another ten on water.

4    Q.  Have you ever directly supervised vehicular pursuits?  And

5    what I mean by that is give permission to monitor a subordinate

6    officer or to -- monitor a police officer as to whether they

7    can engage in a vehicular pursuit?

8    A.  Yes.

9    Q.  And approximately -- well, in what roles or assignments did

10   you do that?

11   A.  When I was a field supervisor, as a sergeant, and/or as a

12   lieutenant, depending on who was in the pursuit.  I would be

13   the supervisor on the radio that would supervise the pursuit as

14   it occurred.  I wouldn't actually be involved in it, but I

15   would be monitoring it and giving direction.

16   Q.  Would that also include giving approval or terminating a

17   pursuit in real time?

18   A.  Yes.

19   Q.  Which police departments?

20   A.  City of Pompano Beach and Broward County.

21   Q.  And approximately how many vehicular pursuits have you

22   supervised over?

23   A.  25 to 30.

24   Q.  Throughout your career?

25   A.  Yes.

1    Q.  Now, at either of those departments that you worked at have

2    you ever provided input into shaping or formulating vehicular

3    pursuit policies and general orders?

4    A.  Yes, both departments.

5    Q.  And if you could briefly explain how it is that you

6    provided that input?

7    A.  So when I was with the city of Pompano Beach, I was the

8    training supervisor for a period of time.  And when you have

9    policies, mostly of any type, just like pursuit, but they

10   always bring in a training representative to be on the

11   committee, to give some input, discuss issues that might also

12   affect training issues.  So as a training supervisor I sat on a

13   number of policy committees.

14   Q.  How many officers were under your purview as the training

15   supervisor?

16   A.  In the city of Pompano there was only one.

17   Q.  One officer?

18   A.  That was actually assigned to me, beside myself.

19   Q.  Let me be more clear in my question.  How many officers

20   took the training that you --

21   A.  Oh, I'm sorry, 225 officers.

22   Q.  Got it.

23               THE COURT:  225 officers during your entire time as a

24   training officer?

25               THE WITNESS:  Yes, there were 225 officers that would

1    attend training that I presented.

2    BY MR. BASET:

3    Q.   How many years did you do that for?

4    A.   Three years.

5    Q.   Did either of the departments that you've worked at -- have

6    you ever had a direct role in conceiving or drafting the

7    language or the policies behind vehicular pursuits?

8    A.   I did.

9    Q.   Now, let's talk about that a bit more.  In what capacity

10   did you do that?

11   A.   When I was with the Broward Sheriff's Office I actually

12   chaired the vehicle pursuit committee that formulated the

13   policies.

14   Q.   How many people were on this committee?

15   A.   There was about six or seven of us.

16   Q.   What types of folks or roles were represented in that

17   committee?

18   A.   Again, a representative from training, you had a

19   representative from legal, you had a representative from

20   research and development.  We had a gentleman that worked for

21   us that spent many years in law enforcement and then he worked

22   for us and he also does expert witness reports.  So we brought

23   him in because he testified and been involved in a number of

24   cases that involved vehicular pursuits.

25   Q.   Can you briefly explain how that process worked in

1    conceiving and formulating vehicular pursuits policies and

2    general orders?

3    A.  I chaired the committee, so it was my job to bring everyone

4    together and then direct the members of the committee on items

5    that we needed, to be able to do this research and formulate a

6    policy.  So I would send them out there with -- you know, get

7    us this policy, that policy, let's look at this, let's look at

8    that.  You know, bring us this data, this information, and then

9    we would compile it.  And usually research would compile it and

10   then we would go into the meeting and review it.

11   Q.  How long of a process was this?

12   A.  It was pretty lengthy, actually.  Again, it's a committee

13   that forms and then you come together every so often when -- so

14   in other words, you do some work, and then there's always some

15   things that you need to do more, so then you -- when that's

16   done, then you set the next meeting, and it kind of works like

17   that.  It was probably about a year before we finally finished

18   up.

19   Q.  Was it a collaborative process?

20   A.  Yes.

21   Q.  And during that time and in that work, did it require your

22   consideration of national model policies and practices on

23   vehicular pursuits?

24   A.  Yes, we did use national policies, model policies.

25   Q.  And what type of information or data was considered?

1    A.  We used the national model policies from police

2    professional organizations, like the IACP, the International

3    Association of Chiefs of Police.  We also took other local

4    jurisdictions that were similar in demographics to our own.

5    For instance, next to Broward county is Dade County, so we use

6    theirs.  Next to -- on the other side is Palm Beach County, so

7    we use theirs.

8         We took Florida Highway Patrol because they're -- on

9    this particular -- you might not do that on all of them, but

10   because this was vehicles and that's what Florida Highway

11   Patrol does, we took their policy.  And then we went out west

12   and took LA's policy and looked at that and incorporated some

13   things from there into our policy.

14   Q.  All your work in that committee as the chair, did it result

15   in any concrete changes or modifications to the vehicular

16   pursuit policy that was in existence at the time?

17   A.  Yes, it did.

18   Q.  Tell us about that.

19   A.  Well, we had some substance differences to it, such as

20   failure to yield would be one of them.  That was not in our

21   prior policy.  We borrowed that from Los Angeles, who had it,

22   and we added in some -- defined some terms more, such as, you

23   know, a discussion always of vehicular pursuits is people state

24   whether they're following, whether they're doing this, whether

25   they're doing that.  We specified words that -- don't use these

1    words to say that you're not in a pursuit:  Don't say I'm

2    following, mirroring, tracking.  We actually put a policy in

3    there that said, no, that's not going to work.  If you're in a

4    pursuit, you're in a pursuit.

5            So we added that in there.  We added in what's known

6    as a pit maneuver, a pursuit intervention technique which was

7    used out west, where your car bumps the back of a car and sends

8    it into a spin to stop the pursuit.  So there was some

9    substantial changes in it.

10   Q.  You mentioned failure to yield.  Can you please elaborate

11   on what that actually means?

12   A.  Sometimes when a police officer goes to stop a car, they

13   don't stop right away.  It's actually not that uncommon because

14   they're not sure if you're trying to stop them, they're not

15   sure if you're going around them.  Sometimes people just get

16   nervous and they don't know which way to pull over.  So they

17   just continue, but they're not trying to elude you, they're

18   not -- they're just not sure -- it takes them a few minutes to

19   kind of decide what action they want to take.

20           So to be able to classify that -- it wasn't

21   classified as a pursuit.  There's no evasion, no traffic things

22   being violated.  We made it a term, so that you go on and say I

23   have a failure to yield.  So the supervisor monitoring and

24   everybody monitoring would know, okay, this is not a pursuit,

25   they just haven't pulled over yet.

1    Q.  And during your career, have you ever sat on any police

2    discipline review boards?

3    A.  I have.

4    Q.  In which roles and assignments did you do that?

5    A.  Actually, in a number of ranks I was, I've sat on the

6    boards, because I've sat on it in different capacities.  What I

7    mean by that is I sat on -- I was a union representative, so I

8    sat on it a number of times as a union representative.  And

9    then I sat it as parts of the department as well, in different

10   rank structures.  And depending on whatever the discipline was,

11   I might have been a lieutenant at the time and then I might

12   have been, you know, the major colonel on another time.

13   Q.  And discipline review boards, if you could just briefly

14   describe what function that --

15   A.  So when IA is completed, a decision is made on what the

16   discipline is to be, and then we allow them to go in front of a

17   review board and say anything or add anything else they wanted,

18   if they didn't think that discipline was proper and that they

19   should have a lesser discipline.  And we would never raise the

20   discipline but we could lower the discipline.

21         Now, again, when I say lower, that recommendation

22   went to the sheriff.  He's the only one that can make the final

23   decision.  But we would then send that recommendation, that we

24   think this is more appropriate after listening.

25   Q.  I did neglect to ask you one question.  If I could just

1    reverse course for a moment.  When you were a chair of the

2    vehicular pursuit committee, when exactly was that?

3    A.   2014.

4    Q.   And how many years did you do that for?

5    A.   It was about a year we had that.

6    Q.   On to my next question.  Internal affairs investigations.

7    Have you ever conducted any?

8    A.   I have.

9    Q.   And which departments?

10   A.   Both Pompano Beach and the Broward Sheriff's Office.

11   Q.   And typically what do those duties and responsibilities

12   include when you were conducting internal affairs

13   investigations?

14   A.   So when I was with Pompano, I was with the detective

15   bureau.  I wasn't actually part of the internal affairs unit.

16   But the internal affairs unit would then farm out

17   investigations, depending on what it was, to a detective of

18   rank.  I was a sergeant at the time.  A detective of rank to

19   then handle that investigation, get the findings and then

20   return it to them.

21   Q.   Did you ever investigate vehicular pursuits and the

22   efficacy of -- the appropriateness --

23   A.   I did with Broward, not with Pompano.

24   Q.   And approximately how many internal affairs investigations

25   have you conducted throughout the course of your career?

1    A.  20, 25.

2    Q.  Are you certified to provide any law enforcement-related

3    training?

4    A.  I was certified when I was -- when I was active duty, yes.

5              THE COURT:  Certified?  What was the question again?

6              MR. BASET:  In providing law enforcement training.

7    A.  I was a certified law enforcement instructor, firearms

8    instructor, self-defense instructor.

9    BY MR. BASET:

10   Q.  Anything else?

11   A.  No.

12   Q.  During your career have you ever taken vehicular pursuit

13   and police driving training courses yourself?

14   A.  I did, yes.

15   Q.  Over what timeframe?

16   A.  When I started we had a training course, and then over the

17   years we would have updates, online courses, things of that

18   nature.  It doesn't just cover pursuits, but safety driving in

19   general, emergency operation.

20   Q.  And was that over the course of your career that you'd

21   received such training or for a particular time?

22   A.  It occurs more in the lower ranks than it does when you

23   move up, you tend to be sent more to training leadership

24   courses than you do operational courses.

25   Q.  That training, was it hands-on and course work?  Or what

1   type of work or training in particular?

2   A.  Well, initially the training is hands-on.  You're actually

3   put in cars and you drive around and hit skid pans and

4   whatever.  Later on they went to a simulator that they tried to

5   use instead of actually doing hands-on cars.  But I don't think

6   it worked out all that well over time.

7   Q.  Do you have to pass any tests as it relates to vehicular

8   pursuit training?

9   A.  It gives you a readout of what you -- you know, mistakes

10  you might have made or the amount of time it took you to brake,

11  things of that nature, that was the test.

12  Q.  Now, do you have any relevant law enforcement affiliations?

13  A.  Yes.

14  Q.  Now, you did mention IACP International Association of

15  Police Chiefs.  Are you a member of that organization?

16  A.  I am.

17  Q.  I'm sorry?

18  A.  Yes, I am.

19  Q.  What about the Florida Police Chiefs Association?

20  A.  I was.  I'm no longer a member.

21  Q.  And Fraternal Order of Police?

22  A.  Same.  I was, but I'm no longer a member.

23  Q.  And if you could explain what the Fraternal Order of

24  Police, or FOP, is?

25  A.  Depending on different agencies, the FOP is a law

1    enforcement agency -- I mean, law enforcement professional

2    organization.  In some agencies it's the union, in other

3    agencies it's a social organization.  So, again, it varies.

4    Where I come from the Police Benevolent Association was the

5    union and the FOP was the social organization.

6    Q.  And were you a member of the Benevolent Association in

7    Broward County?

8    A.  Yes.

9    Q.  And did you hold leadership positions in both the FOP and

10   the Benevolent Association?

11   A.  I was the president in the FOP, which is an elected

12   position.  You're elected by the officers to that.  And then I

13   was a representative, union representative, what I'll refer to,

14   with the PBA, which was also an elected position.

15   Q.  Now, let's transition a bit.  Are you being paid to be here

16   today?

17   A.  Yes.

18   Q.  And is it the U.S. Attorney's Office for Washington, D.C.

19   that is making that payment to you?

20   A.  Yes.

21   Q.  Is it in relation to testimony that you're providing at the

22   moment in this particular case?

23   A.  Yes.

24   Q.  And around when did you -- well, did you sign a contract

25   with the U.S. Attorney's Office for D.C.?

1     A.  I did.

2     Q.  And around when did that occur?

3     A.  July.

4     Q.  Of this year?

5     A.  Of this year.

6     Q.  Before your involvement in this case, were you at all

7     familiar with *U.S. v. Sutton* or *Zabavsky*?

8     A.  No.

9     Q.  Did you know who the defendants were?

10    A.  No.

11    Q.  And before you were ever approached by our office, did you

12    know any of the facts of the case?

13    A.  No.

14    Q.  Now, specifically what services does your contract with the

15    U.S. Attorney's Office obligate you to provide?

16    A.  I was contracted to examine and analyze a number of

17    documents that were provided to me and then provide my opinion

18    on the case, as well as coming here today to testify.

19    Q.  You mentioned consult, does that include by phone?

20    A.  Phone, Zoom.

21    Q.  In person?

22    A.  In person.

23    Q.  And that's consulting with myself and Ms. Berkower, is that

24    right?

25    A.  That's correct.

1    Q.  You're here in D.C.  Are you being compensated for your

2    travel here?

3    A.  Yes.

4    Q.  Since Saturday?

5    A.  Yes.

6    Q.  And did you prepare any reports?

7    A.  Just an initial opinion letter.

8    Q.  Now, in rendering these services, did you have to prepare

9    at all?

10   A.  Yes.

11   Q.  And how did you prepare?

12   A.  By examining, reviewing and analyzing the documents that

13   were provided to me.

14   Q.  And as far as materials that you reviewed in your

15   preparation, did it include surveillance videos?

16   A.  Yes.

17   Q.  Body-worn cameras?

18   A.  Yes.

19   Q.  Police reports?

20   A.  Yes.

21   Q.  Did you see any photographs?

22   A.  No individual photographs.

23   Q.  What about police -- MPD police training materials?

24   A.  Yes.

25   Q.  Did it include the following materials -- and I'm going to

1    list a few here:  Did it include training materials provided to

2    MPD officers on driving -- driver training written tests, with

3    and without answers?

4    A.  Yes.

5    Q.  What about driver training written -- or, rather,

6    instructional overview PowerPoint?

7    A.  Yes.

8    Q.  A vehicular pursuit training?

9    A.  You mean the course?

10   Q.  Yes.

11   A.  Yes.

12   Q.  And these are PowerPoint slides?

13   A.  Yes.

14   Q.  What about legal aspects of vehicular pursuits?

15   A.  Yes.

16   Q.  And pursuit techniques?

17   A.  Yes.

18   Q.  And what about emergency response techniques?

19   A.  Yes.

20   Q.  Did you review any MPD general orders?

21   A.  Yes.

22   Q.  Did that include a general order 301.03 on vehicular

23   pursuits?

24   A.  Yes.

25   Q.  And are there -- did you review a general order from 2003,

1    as well as one from 2021, December, specifically?

2    A.  Yes.

3    Q.  Now -- well, you've mentioned or testified already that you

4    are charging for these services, correct?

5    A.  Yes.

6    Q.  And thus -- or, so far, as of right now, what's the grand

7    total?  As far as what you're charging.

8    A.  I actually haven't added up all of it because I wasn't

9    expecting to be here this long.  So I actually haven't added up

10   all the hours.  I can only tell you what my hourly fee is.

11   Q.  Sure.

12   A.  I get $200 an hour to examine and analyze and $300 an hour

13   to testify, do depositions, and in-person meetings.

14   Q.  And roughly how many hours have you spent preparing for

15   your testimony today?

16   A.  Just in case preparation alone, it was like ten hours.  But

17   then there's meetings and other things that I've had to do that

18   you'll be charged for.

19   Q.  We're certainly awaiting the bill.

20           And you've been here since Saturday.  And you've stayed

21   here in D.C. throughout the course of those days?

22   A.  Yes.

23   Q.  Have you enjoyed your time here, at least?

24   A.  It's a beautiful city and very friendly people.

25   Q.  Now, as it relates to the testimony you were expecting to

1   provide here today regarding vehicular pursuit national model

2   policies and standards and how they relate to MPD standards --

3   well, let me actually skip that question.  I'll move on.

4        Before we discuss MPD and policies on vehicular

5   pursuits, I want to touch on what, if any, model policies and

6   standards exist for particular aspects of vehicular pursuits.

7        Now, to be clear, is there any one national standard

8   when it comes to vehicular pursuits and how they're supposed to

9   be conducted, monitored, and investigated?

10        MR. HANNON:  Your Honor, is Mr. Baset going to

11   proffer Mr. Drago as an expert witness?

12        THE COURT:  Good question.

13        MR. BASET:  So, I'll preview here.  I do intend to do

14   that.

15        MR. HANNON:  I'm sorry.  I don't want to be

16   premature.  I thought this might be the time.

17        MR. BASET:  Sure.  If, Mr. Hannon -- I'm happy to

18   proffer Mr. Drago at this moment.  I wanted to initially talk

19   about what his understanding was of national policies, so the

20   court and the parties would have a knowledge of what his

21   knowledge base was.  But I'm happy to proffer him at that time.

22        THE COURT:  Sure.

23   BY MR. BASET:

24   Q.  Sure.  So --

25        MR. HANNON:  May I inquire briefly?

1          THE COURT:  Wait.  He is about to tell us, I believe,

2    he's proffering him as an expert on --

3          MR. BASET:  And we are proffering him as an expert on

4    professional training and national police practices, as an

5    expert in those fields.

6          THE COURT:  An expert on police training and

7    national -- what did you say?

8          MR. BASET:  National model police practices and

9    policies.

10          And if additional foundation is necessary, we're

11    happy to ask additional questions.  But we would, at this

12    point, ask that he be recognized as an expert in this field.

13          THE COURT:  Mr. Hannon would like to ask a few

14    questions.  With respect to his qualifications only, right?

15          MR. HANNON:  Yes, sir.

16        May I approach Mr. Drago?

17          MR. BASET:  Mr. Hannon, let me get this out of your

18    way.

19          MR. HANNON:  I'm sorry.

20        May I approach Mr. Drago to show him an exhibit?

21          THE COURT:  Sure.

22          MR. HANNON:  This is -- excuse me.  This is Sutton

23    Exhibit No. 608.

24        Mr. Drago, Mr. Baset was kind enough to share with us

25    your resumé -- and I'm hoping that that is it.  It's dated

1   December 2017.  Do you recognize that as your resumé?

2          THE WITNESS:  Yes.

3          MR. HANNON:  And is there anything to be added since

4   September of 2017.

5          THE COURT:  For example, further testimony for, sort

6   of, expert consulting or other consulting work in the last five

7   years?

8          THE WITNESS:  Yes, that's why -- no, there's none of

9   that in here, of any of my consulting work that I've done or

10  testifying for other cases.  Or even some of the training that

11  I've done, the courses that I've developed and done are not

12  listed in here.

13         THE COURT:  So whatever you've done in the last five

14  years or so is not in it?

15         THE WITNESS:  That would be a correct statement, Your

16  Honor.

17         MR. HANNON:  But you told us about your testimony

18  since 2017, is that right?

19         THE WITNESS:  Yes.  What I was asked about I told you

20  about, yes.

21         MR. HANNON:  And what's missing are additional

22  training contracts that you may have had over time?

23         THE WITNESS:  The course that I teach, that I've

24  taught on negotiations and deescalation, that I've trained

25  officers on, and the cases that I've been involved in, yes.

```
 1            MR. HANNON:  Okay.  Is there any additional training
 2    that's relevant to this case that you would like to tell the
 3    jury about that is not in here?
 4            THE WITNESS:  Only that I stay, you know, frequent on
 5    law enforcement field through the International Association of
 6    Chief of Police.  I get their magazines, I read their bulletins
 7    and things of that nature.  That's not listed in here.
 8            MR. HANNON:  Thank you.  So as I understand it,
 9    you've given ten depositions in civil cases, is that correct?
10            THE WITNESS:  Approximately.
11            MR. HANNON:  But this is your first time testifying
12    in court?
13            THE WITNESS:  Yes, sir.
14            MR. HANNON:  Welcome.
15            THE WITNESS:  Thank you.
16            MR. HANNON:  And is this your first criminal case?
17            THE WITNESS:  I've consulted on another minor
18    criminal case.  This is my first actual criminal case --
19            MR. HANNON:  Testifying.
20            THE WITNESS:  -- that I'm testifying, yes.
21            MR. HANNON:  Thank you.  I have no objection and no
22    other questions, Your Honor.
23            THE COURT:  Thank you, Mr. Hannon.
24            MR. HANNON:  Could you hold on to the -- just keep
25    that document up there with you.
```

```
 1                    THE WITNESS:  I will, sir.

 2                    MR. HANNON:  Thank you.

 3                    THE COURT:  Mr. Zampogna?

 4                    MR. ZAMPOGNA:  If I may from back here.  No

 5       objection.

 6                    THE COURT:  Yes, sir.  No objection.

 7               All right.  So with that, I will qualify Mr. Drago and

 8       permit him to testify as an expert on police training and

 9       national model police practices, procedures and policies.

10                    MR. HANNON:  Does Your Honor have the instruction, or

11       not?  If it's available to the Court --

12                    THE COURT:  I gave it.

13                    MR. HANNON:  On expert witnesses, Your Honor?

14                    THE COURT:  Oh, not the one that we debated this

15       morning and that I gave?

16                    MR. HANNON:  No, just the general expert instruction

17       from the Red Book.

18                    THE COURT:  Just a moment.

19                    MR. BASET:  Your Honor, we --

20                    THE COURT:  Just a moment, please.

21                    MR. HANNON:  We can --

22                    THE COURT:  Wait.  Can I -- I asked you to wait.

23                    MR. HANNON:  Yes, sir.

24                    MR. BASET:  We would object to an additional

25       instruction at this point.  This is the first time it's being
```

1   requested, and the jury will be instructed on this.  We believe

2   it's more appropriate at the end of --

3          THE COURT:  I will instruct the jury.

4       Ladies and gentlemen, this relates to expert witnesses

5   generally.  Ordinarily a witness may not testify as to his or

6   her opinions or conclusions.  There's an exception for expert

7   witnesses.  Expert witnesses are allowed to give opinions or

8   conclusions and the reasons for those opinions or conclusions

9   because they have become an expert in some art, science,

10  profession or calling.  In this case, Mr. Drago has been

11  qualified as an expert on police training and national model

12  police practices, procedures and policies.

13      The jury is not bound by an expert's opinions.  If you

14  find that any opinion an expert gives is not based on

15  sufficient education or practical experience, or that the

16  reasons that support his opinion or conclusion are not sound or

17  that the opinion or conclusion is outweighed by other evidence.

18  You may disregard either completely or partially some or all of

19  the expert's opinions or conclusions.  You should consider

20  expert testimony along with all the other evidence in the case

21  and give it as much weight as you think it fairly deserves.

22  BY MR. BASET:

23  Q.  So, I wanted to talk about -- with you now your knowledge

24  base for national policies and standards.  I think the question

25  I left off at was:  Is there any one particular national model

1    policy and standard for how to conduct and monitor and

2    investigate vehicular pursuits?

3    A.   The International Association Chief of Police is a

4    nonprofit professional organization that's been around probably

5    over 100 years and they are probably the most well-recognized

6    resource for police officers and police departments.

7    Q.   What is it that they do?

8    A.   They provide model policies, that they do research.

9    They're given grants by, you know, like, by the National

10   Institute of Justice and other private organizations to do

11   research into criminal justice, different issues.  And so they

12   develop model policies so that police departments have a model

13   policy to look at when they create their own.  They also give

14   consideration papers.  So besides the policy, they'll write

15   papers that say these are considerations you should take into

16   effect.  And then they also have concept and issue papers,

17   different concepts and issues in law enforcement through their

18   research that they believe you should consider when you create

19   your own policies.  So in -- so given a broad view of it, I

20   mean, there's 18,000 police departments in the United States

21   and they all come from -- some rural, some urban.  So they come

22   up with a broad, umbrella-type policy and then they give

23   considerations and different issues to consider.  And then each

24   agency then develops their own policy from theirs, from the

25   information they receive, along with like we did, we take other

1    department's policies.

2    Q.  What's the membership size of this group?

3    A.  It's over 30,000 members and I think over 150 countries.

4    Q.  Does it -- you mentioned it receives funding.  Is any of

5    that funding from the federal government?

6    A.  Yes.

7    Q.  The Department of Justice?

8    A.  Yes.

9    Q.  And you've been a member for how long?

10   A.  12, 15 years.

11   Q.  And did you rely at all on IACP when you were the chair of

12   the vehicular pursuit committee in Broward County?

13   A.  Yes, we did.

14   Q.  How is it that IACP collects information about vehicular

15   pursuits throughout the country or the world?

16   A.  They will contract with different individuals to do data

17   collection or different experts in the field.  And today, of

18   course, with technology being what it is, they do a lot more

19   research into different technology.  So they'll contract with

20   people that are, you know, scientific, not just criminal

21   justice people.  But they'll bring together different

22   disciplines to work on things together.  And, again, they're

23   funded through private and public funds.

24   Q.  And do they analyze the data and research that they obtain

25   or the information they obtain?

1    A.  Yes, they analyze it and, you know, they bring it together

2    in some type of document or report, you know, and then they

3    distribute it.  And the purpose is to, again, to provide

4    guidance and directives to local law enforcement and state and

5    law enforcement agencies so they can use it to design their

6    policies and general orders.

7    Q.  As far as how they disseminate this information.  Does it

8    include at conferences?

9    A.  Yes.

10   Q.  What about, do they host seminars?

11   A.  Yes, they have seminars.  They have what they claim the

12   largest law enforcement conference every year.  And then they

13   have seminars, they have individual trainings.  They're very

14   active in training.  So they can have training classes they put

15   on online and in person.

16   Q.  Have you participated in any of these conferences or

17   seminars that they've hosted?

18   A.  I have.

19   Q.  Have you taken any of their trainings?

20   A.  I have.

21   Q.  And do they issue any publications that includes the

22   research and the analysis that they produce?

23   A.  Yes.  Once a month they put out a magazine.  And usually

24   every month has a theme.  So one might be recruiting, one might

25   be diversity, one might be use of force.  Each month we have a

1    theme of -- and in that is their, you know, articles written by

2    people that they've contracted with, or sent them information

3    on that they discuss, and then on a daily basis you get a daily

4    newsletter when you're a member there, telling you the latest

5    updates.

6    Q.  Your testimony that you're going to provide today, does it

7    at all rely on the research and information and analysis from

8    IAPS?

9    A.  Yes.

10   Q.  Now, I want to talk about one more organization called

11   CALEA, C-A-L-E-A.  Do you know what that stands for?

12   A.  Because it's always -- it's CALEA, I have to -- Commission

13   on Accreditation Law Enforcement Agencies.

14   Q.  Can you briefly describe what role they play in the

15   national --

16   A.  They are another organization that started back in about

17   1979, 1980 and their purpose is a little different.  Their

18   purpose to set standards that they believe police departments

19   should meet.  They don't give you a policy, they write

20   standards and then when you do your policies, you will write in

21   your policies that this meets this CALEA standard or that CALEA

22   standard.

23   Q.  Is CALEA, et al., designed for implementation of standards,

24   or it just tries to set a standard?

25   A.  It sets a standard.

1    Q.  Any other relevant organizations that you rely on for your

2    testimony today?

3    A.  Those are the most prominent ones.

4              MR. BASET:  So before proceeding forward, I do want

5    to admit and publish to the jury certain evidence, including

6    MPD general orders and training materials that we'll be

7    discussing moving forward.  Specifically, the government at

8    this time would move to -- and I believe 401-D is already in

9    evidence, I believe, and that's the general order on vehicular

10   pursuits.

11             THE COURT:  I'm sorry, what?  401 what?

12             MR. BASET:  D, as in David, and that's the one from

13   2003.  And there's an additional general order, also about

14   vehicular pursuits, except this one is from December 2021.  And

15   that's going to be Government's Exhibit 401-K.

16             THE COURT:  A?

17             MR. BASET:  K, as in kits.

18             THE COURT:  K, sorry.

19             MR. BASET:  And then the MPD training materials that

20   were discussed previously, that includes the following:

21   Exhibits 413-A, which is a driver training written test with

22   answers.  There's 413-B, as in boy, which is driver training

23   written test without answers.  There's 413-C, which is an

24   instructional overview PowerPoint.  413-G, which is a vehicular

25   pursuit PowerPoint training.  413-H, which is PowerPoint

1    training on legal aspects.  413-I, which is a PowerPoint

2    training on pursuit techniques.  And last, but not least, is

3    the PowerPoint training on emergency response techniques,

4    that's going to be 413-J.

5              THE COURT:  So I understand it, it's 413-A, B, C, and

6    then we jump to G, H, I, J, is that correct?

7              MR. BASET:  Yes.

8              THE COURT:  All right.  So subject to the

9    conversation we had earlier and the representation this will be

10   connected up in other ways, does the defense have any objection

11   to any of these being admitted in evidence?

12             MR. HANNON:  No, Your Honor.  Thank you.

13             THE COURT:  Mr. Zampogna?

14             MR. ZAMPOGNA:  No, Your Honor.

15             THE COURT:  These exhibits will be admitted in

16   evidence and can be used with Mr. Drago's testimony.

17             MR. BASET:  Thank you.

18   BY MR. BASET:

19   Q.  Now, generally is there any definition or a general

20   understanding of what constitutes a vehicular pursuit from a

21   national perspective?

22   A.  A vehicular pursuit takes place in a vehicle and it's

23   anytime another vehicle starts to take evasive action -- your

24   actions are causing their actions and they take evasive action

25   and/or violate standing laws.

1    Q.  When you say your actions are causing their actions, can

2    you please elaborate on what you mean by that?

3    A.  So in other words, if you weren't there, you know, would

4    they behave in that manner?  So you're causing their actions by

5    being there.

6    Q.  In your opinion, is there any difference between a

7    vehicular pursuit and a chase?

8              THE COURT:  A vehicular pursuit and a what?

9              MR. BASET:  A chase, and the use of those two terms.

10   A.  That's very broad.  I'm not sure what you mean by -- when

11   I'm talking about vehicular pursuit, I'm referring to police

12   vehicular pursuits on -- I mean, someone might use "chase" as

13   interchangeable, but I don't know that it is.

14   BY MR. BASET:

15   Q.  What's the difference?

16   A.  Well, is it a foot chase?  Is it a bike chase?  Is it a --

17   you know, it's -- chase is not a common word that's used in law

18   enforcement.

19   Q.  Understood.

20   A.  It's always referred to as a vehicular pursuit.

21   Q.  Now, what is the overall goal for setting national model

22   policies and standards?

23   A.  To provide guidance and directions to the law enforcement

24   agencies across the United States.  And there's 18,000

25   different law enforcement agencies and about 25 percent of them

1    are three or less officers, so they don't really have a large

2    training and/or budget to be able to build policies, so they --

3    IACP allows that for the smaller agencies, to give them

4    direction.  And then for the larger agencies that do have a

5    larger budget in training, it still gives them the ability to

6    scan a much larger data of information than each department

7    having to go out and look for the same information.

8    Q.  The guidelines, what is the overall objective of those

9    guidelines?  What are they trying to achieve at the end of the

10   day?

11   A.  In vehicular pursuits?

12   Q.  Yes.

13   A.  Safety.

14   Q.  Is that what your goal was while you were chief of the

15   committee of vehicular pursuits in Broward County?

16   A.  Safety is always the primary focus of a vehicle pursuit

17   policy.  You're always weighing the safety of that pursuit

18   versus any dangers or risks to the public.

19   Q.  And when you talk about safety, does that include the

20   safety of the fleeing motorist during a vehicular pursuit?

21   A.  All humans.

22   Q.  What percentage of police departments require police

23   officers to exercise some baseline standard of care for the

24   safety of a fleeing motorist?

25   A.  Approximately 97 percent of police departments have a

1       vehicle pursuit policy.  They differ, but they all have a

2       vehicular pursuit policy.

3                   THE COURT:  So just to go back to what you said, when

4       you just said 97 percent of the departments have a vehicular

5       pursuit policy, is some percent -- some portion of that 97

6       percent include the smaller departments which may have just

7       adopted the national standard, rather than tailor them to their

8       own needs?

9                   THE WITNESS:  They would have a policy.  They may

10      have just adopted the IACP, but it doesn't separate that out in

11      the reports that I've read.  But 97 percent have some form of a

12      policy.

13                  THE COURT:  Thank you.

14      BY MR. BASET:

15      Q.  Now, generally, do police department policies in general

16      orders fall within a spectrum with respect to their

17      restrictiveness?  And what I mean by that is restrictiveness in

18      terms of permitting officers the discretion to engage in

19      vehicular pursuits.

20      A.  Different policies -- it's more of a sliding scale.  There

21      is -- some policies are very restrictive and some policy that

22      have a lot less restrictions.

23      Q.  How restrictive can it get?

24      A.  To no vehicular pursuits at all.

25      Q.  Period?

1    A.  Period.

2    Q.  Under any circumstances?

3    A.  Under any circumstances.

4    Q.  And if you were to classify maybe what's one rung under

5    that as far as restrictiveness, what would you consider that?

6    A.  It would be a policy that's filled with a number of

7    guidance and directives of when you can perform a pursuit.

8    Q.  And does that -- as it relates to violent crimes as a basis

9    for the pursuit, are there jurisdictions that limit pursuits to

10   only pursuing a motorist that is under suspicion for having

11   committed or is about to commit a violent crime?

12   A.  Yes.

13   Q.  And where do they fall?  Where do those jurisdictions fall

14   in terms of the spectrum of restrictiveness?

15   A.  Those would be known as the more restrictive vehicle

16   pursuit policies that have put in a number of directives and

17   guidance in there to limit vehicular pursuits.

18   Q.  And what would you consider on the other end of that

19   spectrum in terms of least restrictive?  What does that, kind

20   of, a general order or policy look like?

21   A.  That would be a general order where the police officer

22   actually carrying out the pursuit would have the most

23   discretion.  So as you get more restrictive, they take

24   discretion away from the police officer who is actually doing

25   the supervision.  As you get less restrictive, they put more in

1    the lowest rung.

2    Q.  And based on your training and experience and study, what's

3    been the national trend on the spectrum?  Is it moving towards

4    less restrictions or more restrictions?

5    A.  For the last 20 years it's been moving towards more

6    restrictions.

7    Q.  And is there an impetus behind that?  Is there a reason for

8    that, would you say?

9              MR. HANNON:  Objection, relevance.

10             MR. BASET:  It speaks to --

11             THE COURT:  Overruled.

12             MR. HANNON:  Prejudicial, Your Honor.

13             THE COURT:  Overruled.  General order on pursuit.  Go

14   ahead.  In your experience, is there a reason for that?

15             THE WITNESS:  Yes.  I believe that the trend is to

16   move towards safety much more than maybe it had been in the

17   past.  And because of some changing things that have happened

18   in police work and how police work is done, that there was a

19   need to put in more restrictive policies.

20   BY MR. BASET:

21   Q.  What type of police work are you speaking of?

22   A.  Well, as you come out of the '90s police work tends to get

23   a lot more proactive, where earlier on it was more reactive to

24   911 calls.  Then the late '90s, as we start to move forward, we

25   start to see police departments get a lot more proactive in

1    attempting to control their crime.  So as you get more

2    proactive, you're going to have the ability or the opportunity

3    for more pursuits.  So as that occurred, they started putting

4    in more and more restrictions.

5    Q.  When you say "proactive," what's your understanding of

6    that?

7    A.  Proactive is actually going out and looking for crime or

8    taking actions on your own, without being directed.  That would

9    be reactive.

10   Q.  Where would you say D.C.'s general orders on vehicular

11   pursuits, and its policies generally, where does it fall within

12   that spectrum, based on your training and experience and study?

13   A.  It's a restrictive policy.

14   Q.  And is it among the more restrictive or the lesser

15   restrictive?

16   A.  It's under the more restrictive.

17   Q.  Is there a defining feature or characteristic of the

18   general order here in D.C. that makes it among the more

19   restrictive?

20   A.  It just -- it maintains a lot of directives and guidance in

21   there that makes it more restrictive.

22   Q.  We'll talk about those in a bit.

23        The next question is this:  Let's talk -- transition a

24   bit to your understanding of what those national model policies

25   and standards on vehicular pursuits are.

1          Now, when it comes to serious -- or, the severity of the

2     crime, how serious does a crime have to be to justify a

3     vehicular pursuit of a fleeing motorist?  What is the trend in

4     that regard?

5     A.  The trend is towards felony crimes and/or crimes of

6     violence.

7     Q.  What's the general trend or the general model policy when

8     it comes to vehicular pursuits to enforce traffic offenses?

9     A.  The model policy says that you will not do a vehicular

10    pursuit to enforce traffic.

11    Q.  And is that a trend or has that just been the case for some

12    time?

13    A.  That's been the case for some time.  In most of the larger

14    urban police departments, the policies that I've seen have that

15    in there.

16    Q.  What police -- is there a national model policy or standard

17    for what police officers should do if they know the fleeing

18    motorist?

19              THE COURT:  If they know what?

20              MR. BASET:  If they know who the fleeing motorist is.

21    A.  They should cease the pursuit.

22    BY MR. BASET:

23    Q.  And you say that's the national model policy?

24    A.  It says that, actually, in the model policy, yes.

25    Q.  What about if they know the person that they're pursuing,

1    by cutting off the pursuit would enable an ongoing and serious

2    threat to the public safety?  Is there a distinction there?

3    A.  If the -- if allowing them to go is more dangerous than to

4    stop them, is how it's viewed, then you pursue them.  If it's

5    more dangerous to pursue them, you know, than to stop, then you

6    stop.  So, it's -- sometimes the wording in this policy is they

7    use "imminent," you know, that it's immediate, the violence has

8    to be immediate.  And if it's not immediate, then you don't

9    pursue.

10   Q.  You said "this policy," you're talking about the MPD

11   policy?

12   A.  Yes.  I'm sorry.

13   Q.  What about when it comes to the use of emergency lights and

14   sirens and whether they need to be activated during a vehicular

15   pursuit?  What's the national model policy or standard on that?

16   A.  That they -- the emergency equipment encompass it all.

17              THE COURT:  I'm sorry?

18              THE WITNESS:  Emergency equipment.

19              THE COURT:  What did you say?

20              THE WITNESS:  Encompasses it all.  In other words

21   running the lights, sirens.  Emergency equipment encompasses it

22   all, that they should be on at all times during a pursuit.

23   BY MR. BASET:

24   Q.  What about, is there a national model policy or standard

25   when it comes to how often police officers need to assess

1    safety risks during a pursuit?

2    A.  Yes, it does say that.

3    Q.  What would you say that model policy or standard is?

4    A.  It doesn't actually specify a time.  It actually says,

5    though, that it should be -- there should be a specified time

6    as to how often they should be updating, but it doesn't give an

7    actual number.

8    Q.  So what's your understanding of it then, if there's no

9    number?

10   A.  That it's left up to the department.  Again, so you'll have

11   some departments that might state it one way -- again, the

12   policy at hand here, they say constantly, that's what they use.

13   Q.  What about notifications and the manner in which

14   notifications need to be made before vehicular pursuit is to

15   start?  Is there a standard on that or a model standard or

16   policy on that?

17   A.  Immediately when a pursuit is started you're supposed to

18   notify communications.

19   Q.  And who should those notifications be made to?

20   A.  It should be made to the central communications center.

21   They go by different names, but the central communications

22   center and advise them immediately that you are initiating a

23   pursuit.

24   Q.  Is there a national model policy or standard when it comes

25   to senior officials monitoring an ongoing vehicular pursuit?

1    A.   In the communications center -- in most policies, model

2    policies, notify a field supervisor and/or supervisor that such

3    is occurring so they can monitor.

4    Q.   What about if a police officer should be able to make

5    direct contact with a fleeing motorist's car or force a car

6    into another object or the street?  Is there a national model

7    policy or standard?

8    A.   That should be avoided.  You should not do that.

9    Q.   What about minimum speed?  Is there any national policy or

10   standard as far as what a minimum speed is in order for it to

11   be considered a vehicular pursuit?

12   A.   No.

13   Q.   And why is that?

14   A.   Because the pursuit is based on the evasive actions, not --

15   if somebody is going slow but driving over sidewalks and doing

16   things of that nature, disobeying traffic control devices --

17   it's a totality of circumstances view.  You take it all.  So

18   it's not any one item, just say, oh, well, they were driving

19   slow.  But they were driving on the sidewalks, so they were

20   evading you, so you were in a pursuit.

21              THE COURT:  It depends on the circumstances the

22   officers are facing?

23              THE WITNESS:  As a whole, the total circumstances.

24   BY MR. BASET:

25   Q.   Can you have a vehicular pursuit, quote, with low speeds,

1    as well as with high speeds?

2    A.  Yes.

3    Q.  Now, what about when it comes to using an unmarked police

4    car during a vehicular pursuit?  Is there a national policy or

5    standard or model policy or standard when it comes to that?

6    A.  Yes.

7    Q.  What is it?

8    A.  That unmarked cars may be used in a police pursuit, but

9    they are to break off as soon as a marked patrol car becomes

10   available.

11           THE COURT:  You should break off what?

12           THE WITNESS:  Break off the pursuit.  Stop.

13           THE COURT:  I missed the last part.  Break off the

14   pursuit when?

15           THE WITNESS:  When a marked police unit arrives.

16   BY MR. BASET:

17   Q.  Do you know why that is?

18   A.  Yes.

19   Q.  Why?

20   A.  Because marked police units are far more visible.  They

21   have markings on them, they tend to have more available

22   emergency equipment.  They're -- patrol cars normally come with

23   what's known as a police package, which means they have bigger

24   braking systems, you know, bigger alternators, things of that

25   nature to do that kind of function, where unmarked cars tend

1    not to be like that.

2    Q.  Is there a national policy or model policy or standard when

3    it comes to whether police officers have to abide, at some

4    level, to traffic control signs during a vehicular pursuit?

5    A.  They always have to abide by them unless they can safely,

6    you know, disobey them.

7             THE COURT:  They always have to abide by what?

8             THE WITNESS:  By the traffic control devices, unless

9    they can safely --

10            THE COURT:  Stop signs?

11            THE WITNESS:  Yes.

12            THE COURT:  And red lights?

13            THE WITNESS:  Yes.

14            THE COURT:  Okay.

15   BY MR. BASET:

16   Q.  Well, I guess my follow-up question will be:  Can you give

17   an example of how that works?  Because in a vehicular

18   pursuit -- let me start with a more baseline question.

19            In a vehicular pursuit are police officers -- are they

20   given some latitude to break traffic laws?

21   A.  Yes, but they must do it safely.

22   Q.  Okay.  And so do -- is the national policy or trend in that

23   regard to require -- what is it in terms of what it means to be

24   doing it safely?

25   A.  Well, some policies will tell you that.  So, again, if the

1    policy -- for this agency here, they actually tell you that you

2    should stop at a stop sign or a red light and, you know, slow

3    down, they actually direct you.  Some others will not be as

4    direct.  That's where it's less restrictive, they'll tell you

5    to proceed safely and then it's up to the officer to use his

6    discretion or her discretion as to what is "safely."

7    Q.  Now, is there -- we talked about officers having to make

8    constant assessments -- or assessments, rather, as they're

9    engaged in a vehicular pursuit.  Is there a national policy or

10   standard when it comes to what the ultimate assessment is that

11   a police officer has to make during a vehicular pursuit?  What

12   are they weighing in the overall calculus?

13   A.  They're always weighing, in every vehicular pursuit policy,

14   safety versus risk versus crime control.  That's the difficult

15   goal that they have, they have to be able to lower risk,

16   maintain safety, but still have to try to be able to do their

17   job and control crime.

18   Q.  Are there -- based on national model policies and

19   standards, are there certain environmental factors that a

20   police officer should be considering in deciding whether to

21   begin, continue or terminate a vehicular pursuit?

22   A.  Yes.

23   Q.  What about weather?  How does that factor in?

24   A.  It is a major factor, weather.

25   Q.  And can you give us a scenario of where it is more

1    dangerous?

2    A.  Heavy rains, I would imagine snow here, things of that

3    nature.  Fog.  All those things would come into play.

4    Q.  What about consideration of population density?

5    A.  Population density, yes.  Residential versus more rural

6    areas would definitely come into effect.  Number of people out,

7    time of day, lighting, all of that.

8    Q.  You mentioned residential settings.  Does that entail more

9    or less risk?

10   A.  More risk.

11   Q.  Why is that?

12   A.  Well, couple of reasons.  One is you tend to have more

13   people at risk.  There's more people there, so there's more

14   opportunity for injury.  Residentials also usually present

15   another problem in that their intersections, you don't have a

16   wide view because the houses are built right up, as you would

17   in a business intersection.  So when you come to those

18   intersections your view is limited and it makes it more

19   dangerous.

20   Q.  Road configuration, does that ever matter when it comes to

21   determining whether to engage in vehicular pursuit?

22   A.  Road configuration, traffic control devices that are there,

23   yes.

24   Q.  And performance capability of the vehicles involved, how

25   does that play into that determination of whether to pursue?

1    A.  They both do, actually.  The performance ability of the

2    vehicle that's doing the pursuing, as well as the vehicle

3    that's being pursued should be considered.

4    Q.  Can you explain a bit what that consideration is exactly?

5    I mean, if you have, let's say, two high-powered cars that have

6    a lot of horsepower, versus a vehicle that has low horsepower,

7    it can't go very fast.  What is the consideration there in

8    terms of risk?

9    A.  If you have a vehicle that you know from past experience is

10   probably what we would call a sports car, that has, you know,

11   tremendous speed and tremendous, you know, turning ability,

12   that could affect your decision to chase that or not because of

13   your lack of ability to catch it.  So should you even go after

14   it to begin with?  Same thing with, like, motorcycles or

15   different types of vehicles.

16          On the other end of the spectrum you'll come up with

17   vehicles that look like, you know, they should have been junked

18   a year ago, and the wheels are falling off and all kinds -- you

19   don't want to pursue that either.  You're not going fast, but

20   the car, you can tell, is not -- is not something that they can

21   drive, you know, that it could easily go off the road.

22   Q.  What kind of risk is entailed when pursuing a scooter?

23   A.  A scooter?

24   Q.  Yes.

25   A.  The driver of the scooter obviously is going to have less

1    safety equipment, you know, and probably -- at greater danger

2    for greater injury.

3    Q.  Last question on this topic:  Is there a national model

4    standard as to who ultimately bears the responsibility for any

5    consequences that may result for engaging in a vehicular

6    pursuit?

7                THE COURT:  Do you understand the question?

8                THE WITNESS:  Yes, I do.

9                THE COURT:  Good.  I'm glad you do.

10   BY MR. BASET:

11   Q.  I can rephrase it, if it would be easier.

12   A.  So if you look at the model policy -- that's why I'm

13   hesitating, I don't know how well it spells that out.  But if

14   you are a member of a local police department or whatever and

15   have had training, they usually tell you in there that the

16   responsibility is ultimately on law enforcement because they

17   have the training, they have the knowledge, not the person

18   you're pursuing.

19               So, if we go back to the beginning of my career, it

20   was completely opposite.  It was the person being pursued was

21   always at fault because they were violating the law.  That has

22   changed over the years until now the law enforcement agency now

23   has the responsibility, based on their training and

24   understanding of pursuits, that they have to break it off.

25   Q.  And is there something within the law enforcement

1    department that ultimately bears that responsibility because

2    they're -- as you've testified, there are various roles or

3    people involved in the decisionmaking there?  Who ultimately

4    bears that responsibility?

5    A.  The police officers that are involved in the pursuit are

6    ultimately and/or any supervisor that is monitoring that

7    pursuit, the responsibility is on both of them.  It's shared.

8    Q.  All right.  Now I want to jump to the general orders

9    themselves.  We're going to talk about that first and then

10   we'll slide into training materials.

11        We'll start with the general orders.  And I would like

12   to direct your attention to this first slide, which is actually

13   from yesterday because we were expecting you then, but we are

14   starting today.  I'm going to jump here to slide 3.  This is

15   going to be 401-D, as in David.  Do you recognize what this is?

16   A.  Yes, what you just said, general order.

17   Q.  And what year is it from?

18   A.  2003.

19   Q.  And February 25th?

20   A.  February 25th, yes.

21   Q.  And fair to say that as far as what this general order

22   covers, you can see here, listed at the bottom of this heading,

23   including background policy, definitions, rules, regulations,

24   procedural guidelines, cross references?

25   A.  Yes.

1          THE COURT:  So what's on the screen, ladies and

2     gentlemen, is what we call a demonstrative evidence or evidence

3     or PowerPoint that -- similar PowerPoint was used in opening

4     statements, too.  The PowerPoint itself is not evidence in the

5     case and it won't go back to the jury with you.  But I believe

6     some of what Mr. Baset is going to ask about are the exhibits,

7     or excerpts from the exhibits that he -- that I have admitted

8     in evidence.  Of course, exhibits will be with you during

9     deliberations.  So the purpose of the PowerPoint is to assist

10    the witness in answering questions and to assist you in

11    understanding where we're going.  But it's not evidence itself

12    but certain things alluded to here or quoted here will be or

13    are in evidence.  Fair enough?

14          MR. BASET:  Thank you, yes.

15    BY MR. BASET:

16    Q.  Moving on.  Let's talk about some definitions here so that

17    we're all on the same page.  Vehicular pursuits.  This is from

18    the MPD general order.  It's defined here as, "An attempt by a

19    member of this department to apprehend a fleeing felon while in

20    an authorized emergency vehicle with all emergency warning

21    devices activated."

22          Did I read that correctly?

23    A.  Yes.

24    Q.  And I want to first talk about fleeing felon.  Does it --

25    does this mean that if you ar not a fleeing felon, that you

1    cannot be engaged in vehicular pursuit?

2    A.  It means you're not authorized to pursue it.

3    Q.  What about all emergency warning devices activated?  Can

4    you be in a vehicular pursuit without all your emergency lights

5    activated?

6    A.  You can be in a pursuit --

7              MR. HANNON:  Your Honor, if I may?

8              THE COURT:  Yes.

9              MR. HANNON:  The general order speaks for itself and

10   I object to the witness interpreting it and --

11             MR. BASET:  He's being proffered here as an expert in

12   this area.  He's testified that he's reviewed these general

13   orders and he will explain how this comports with national

14   standards.  So --

15             THE COURT:  Well, I've already qualified him as an

16   expert.  I think the objection Mr. Hannon raised has been

17   raised before.  And the general order in some respects does

18   speak for itself and the jury will have the general order.  The

19   expert has been qualified as an expert on police practices and

20   procedures, guidance, and based on his review of the general

21   orders and his background and training in national standards, I

22   don't see anything improper about his testimony at this point.

23   So you may proceed.

24             MR. BASET:  Thank you.

25             MR. HANNON:  Can it be limited to discussing its

1    relationship to what he's been calling the national standard,

2    as opposed to trying to interpret it in a way different from

3    its words, quite frankly.

4         THE COURT:  Different from what?

5         MR. HANNON:  Different from its words.  He can

6    testify as to the national standard, which he's already done,

7    and if he has a comment about whether this meets a national

8    standard, then I think that's fair.  But otherwise he's not an

9    expert in reading and, so, I would object to him, you know,

10   commenting on what these mean on their face unless he's talking

11   about in comparison to national standards.  This is a very long

12   PowerPoint, Your Honor.

13        THE COURT:  It is a very long PowerPoint.  And do you

14   want to respond?

15        MR. BASET:  Yes.  I think for him, for this expert

16   witness to be able to testify about what he's here for, he

17   needs to be able to define and give some understanding of what

18   he recognizes these words to mean.  I think, to Mr. Hannon's

19   point, that's what cross-examination is for, if he disagrees.

20        So, he needs to be able to at least explain his

21   understanding as it relates to national standard policies in

22   explaining these general orders.

23        THE COURT:  Well, I discuss this and explain why the

24   MPD general orders are admissible in my opinion of October 23,

25   2022.  I believe, beginning on page 6 through 10, although,

1    admittedly, that was only a partial explanation in view of the

2    specific question presented.  And it goes on on pages 12

3    through 13 to discuss that more.

4         And the jury can read the MPD general orders for

5    themselves, that is true.  But to a certain extent it's a

6    complicated policy.  And he can explain to the jury his

7    understanding based on his expertise and experience, which has

8    just been testified about at length.  And since I gave the jury

9    an instruction about how to -- frankly, over the government's

10   objection at this point -- about how the government should

11   evaluate an expert's testimony in conjunction with all the

12   other evidence before it, including other testimony and

13   exhibits, I think what Mr. Baset is doing is appropriate and

14   the jury will give it the weight that it deserves in the jury's

15   view.

16             MR. BASET:  May I proceed?

17             THE COURT:  You may proceed.

18             MR. BASET:  Thank you.

19   BY MR. BASET:

20   Q.  Let's move on to the definitions of marked versus unmarked

21   vehicles.  You've discussed this before.  And I will move on,

22   but I just want to make sure that we are aware that this

23   definition exists.

24        Now, primary versus secondary units.  You've referenced

25   that earlier.  Can you explain what your understanding is of

1    the primary unit?

2    A.  A primary unit is normally the officer who started the

3    pursuit and is first in line in the pursuit.  And then the

4    secondary officer is usually an additional officer that comes

5    after.

6            Now, that can change, but that's how it starts.

7    Q.  Let's now move on to some basic can rules that are

8    described in the general order.  We'll start with the very

9    first paragraph of those rules.  I'll just read it.  It states,

10   "Any member engaging in a vehicular pursuit must follow the

11   conditions that are set forth under part V -- or, part V,

12   section D-2, quote, fleeing felon of general order RAR 901.07

13   on the use of force as described below.

14           Did you have an opportunity to review that?

15           THE COURT:  Review what?

16           MR. BASET:  The fleeing felon, use of force.

17           THE COURT:  The question is whether he's reviewed

18   this particular portion of the vehicles pursuit policy?

19           MR. BASET:  Yes.

20           THE COURT:  All right.  I -- didn't you already

21   testify that he reviewed -- maybe you didn't -- the entirety of

22   the MPD general order on vehicular pursuit?

23   A.  I did, Your Honor.

24           MR. BASET:  Our understanding is that this is a

25   reference to another general order.

1           THE COURT:  Well -- okay.  You read this sentence,

2    right?

3           MR. BASET:  Yes, I did.

4           THE COURT:  So what's your question?

5           MR. BASET:  Because it is referencing --

6           THE COURT:  What is your question?

7    BY MR. BASET:

8    Q.  Did you review the general order that's being referenced in

9    this paragraph?

10   A.  I did.

11   Q.  Okay.  That's it.

12          As far as -- we'll move on from this slide.

13          But, this is the (A) provision within the rules, states

14   "Members may use deadly force to apprehend a fleeing felon."

15   And then there's certain conditions that exist for that.  Did

16   you -- I wanted to ask you a couple questions.  Under subpart

17   (A)(1) it states that "The suspect poses an immediate threat of

18   death or serious bodily injury to the member or others.

19          How does that compare to the national model policy and

20   standard?

21          MR. HANNON:  Your Honor, I object to this portion on

22   relevance grounds.  It has nothing to do with this case.

23          THE COURT:  Which page are you on here?

24          MR. BASET:  In terms of the general order.

25          THE COURT:  Wait, wait, wait.  This is (4)(A),

```
1     correct?  I don't have the first -- hard copy.
2               MR. BASET:  I'll provide --
3               THE COURT:  Quiet, quiet.  So -- all right, so we are
4     (A).  What's your objection?
5               MR. HANNON:  That he's asking about a section having
6     to do with deadly force.  It has nothing to do with this force.
7     Objection on relevance grounds.
8               THE COURT:  You may need a bench conference about
9     this?
10              MR. HANNON:  I'm sorry, Your Honor.
11              THE COURT:  Do you need a bench conference about
12    this?  Let's go.
13         The court reporters ask that the jurors not chat while
14    we're at the bench conference because she has trouble hearing
15    us.
16              (Bench discussion:)
17              THE COURT:  Anybody?  Mr. Hannon?
18              MR. HANNON:  I don't think that anything about the
19    use of deadly force is relevant to the case.  It's incredibly
20    prejudicial.  For example, Mr. Baset has told the jury in the
21    opening that Officer Sutton killed Karon Hylton-Brown with his
22    vehicle, which is hyperbole, and it would very inappropriate to
23    go into use of force.
24              MR. BASET:  This tells officers when they can engage
25    in a vehicular pursuit.  It is the very fundamental rule of the
```

1    vehicle pursuit policy.  It is the very first rule that is

2    referenced here.  Sets the standard.  That's that's what I'm

3    reading and that's what --

4                   THE COURT:  What's the predicate for that?

5                   MR. BASET:  The predicate, as far as -- this is why I

6    wanted to just sort of -- so you can see, it starts with

7    definitions, it moves on to rules.  This is the rule for

8    chasing, for the vehicular pursuit.  So this is the very first

9    rule, that it has to be -- it is considered deadly force --

10                  THE COURT:  You need to say Deadly Force Rule.

11                  MR. BASET:  It's in the provision, it's not my word.

12                  THE COURT:  There's a lot of things in the provision

13   that's not relevant.  They might pursue several persons who

14   aren't using deadly force, right?

15                  MR. BASET:  No, it is considered the use of deadly

16   force when you are envisioning, in a vehicular pursuit of

17   somebody who's a fleeing felon who meets these condition.  Only

18   under those circumstances can someone pursue --

19                  THE COURT:  Any fleeing felon?  I don't understand.

20                  MR. BASET:  This is just --

21                  THE COURT:  I do not understand why we have to talk

22   about deadly force.

23                  MR. BASET:  It is the language of the general order.

24                  THE COURT:  I know it's a language of the general

25   order, so are lots of things that aren't relevant.

```
 1              MR. BASET:  So it's a cross-reference --
 2              THE COURT:  There's lots of things that are cross
 3     references that aren't relevant.
 4              MR. BASET:  To be fair --
 5              THE COURT:  I stained the objection.  Move on to
 6     something else.
 7              MR. BASET:  If I could just make a record here?
 8              THE COURT:  Move on to something else.
 9              MR. BASET:  All right.
10         (Open court:)
11              THE COURT:  Okay.  Move on.  Objection is sustained.
12         Oh, we're missing a juror.  So while we're
13     off-the-record and waiting for the jury --
14         (Off-the-record discussion.)
15              THE COURT:  How much longer is your direct
16     examination?
17              MR. BASET:  About 20 minutes.
18              THE COURT:  Okay.
19         MR. BASET:  May I direct the witness on this point
20     without elaborating or mentioning the words that Your Honor has
21     highlighted?
22              THE COURT:  You can rephrase the question, in view of
23     the objection.
24     BY MR. BASET:
25     Q.  Now, the general rule of vehicular pursuits and whether a
```

1    police officer can engage in them, I'm going to ask you whether

2    what I'm about to state is accurate as far as your

3    understanding of that, that the --

4              MR. HANNON:  What page, please?

5              THE COURT:  He's not on a page.  He's asking a

6    question.  He doesn't have to use the demonstrative exhibit.

7    BY MR. BASET:

8    Q.  Is it the case that in order for an MPD officer to engage

9    in a vehicular pursuit, that the fleeing motorist is under

10   suspicion of having committed or is about to commit a series

11   violent felony?

12   A.  Yes.

13   Q.  Is it the case that that motorist must also pose some

14   immediate serious risk to the safety of the public?

15   A.  Yes.

16   Q.  And is it also required, in order for a police officer to

17   engage in a vehicular pursuit, that by doing so it won't

18   endanger the lives of others?

19   A.  That the risk is less to not pursue than to allow them to

20   get away, yes.

21   Q.  Got it.

22             THE COURT:  Does that go back to your earlier

23   testimony that -- or is this a different point -- that the

24   pursuing officer must always weigh safety, risk, and crime

25   control, or is this a different point you're making now?

1           THE WITNESS:  No, that's the exact point.

2    BY MR. BASET:

3    Q.  Now, in terms of the imminence of the threat of death or

4    serious bodily injury to the public that the fleeing motorist

5    creates, is that -- how is that compared to the national policy

6    or trend?

7    A.  That is the national policy.

8    Q.  Okay.  I'll move on.

9           THE COURT:  So the question is, are there things

10   within that general order that reflect that national policy?

11          THE WITNESS:  Yes.

12   BY MR. BASET:

13   Q.  Let's talk specifically about some tactics, traffic stops,

14   and notifications and what that MPD general order has to say

15   about that.

16          Looking first at the (B) provision here, it states that

17   members involved in a vehicular pursuit of a suspect --

18          THE COURT:  Do you want to put the demonstrative back

19   on?  It's not on the screen at the moment.

20          MR. BASET:  Oh, my apologies.  Yes.

21   BY MR. BASET:

22   Q.  So this (B) provision states:  Members involved in a

23   vehicular pursuit of a suspect shall not intentionally cause

24   physical contact between their vehicle and the fleeing vehicle,

25   nor shall the member attempt to force the vehicle into another

1    object or off the roadway.

2         Can you explain what your understanding is of what it

3    means to force a vehicle into -- or, off of -- or, into another

4    roadway or an object?

5    A.   The first, probably, most common way to explain that is you

6    can't ram anybody.  Don't use your vehicle as a battering ram

7    and ram somebody.

8         The second part of that is don't drive in such a

9    manner that you direct somebody into an object that they don't

10   have an area of escape.

11   Q.   Now, the (D) provision here as it relates to immediately

12   notify the dispatcher.  Is that consistent with the national

13   trend or standard?

14   A.   Yes.

15   Q.   What about here:  Members are prohibited from pursuing a

16   vehicle for the purpose of effecting a stop for a traffic

17   violation?

18   A.   That is contained in the model policy, yes.

19   Q.   Let's move on to dispatcher notifications.  I want to focus

20   specifically here on the (C) provision:  The primary unit shall

21   provide the dispatcher with, among other things, the suspected

22   criminal violation.

23        Why is that -- well, one, is that consistent with the

24   national trend?

25   A.   Yes.

1    Q.  And why is that important?

2    A.  Because that defines directly whether the pursuit is

3    allowable by the policy.

4    Q.  Let's move on to subpart VI(A)(4) [sic] of the general

5    order:  The dispatcher shall control all communications on the

6    channel where the pursuit is being conducted and radio

7    transmissions shall be confined to those units involved in the

8    pursuit.

9         How does that compare with the national standard or

10   trend?

11   A.  That is the national standard as well.

12   Q.  Why is that necessary?

13   A.  So that all other units in the area are also aware what's

14   occurring, they're not going to put anybody else at risk,

15   meaning other law enforcement officers.  As well as to know

16   that they're all on the same channel so that they can clear

17   that channel for the pursuit, so that people don't break in and

18   talk about other things during the pursuit.

19   Q.  Now, as far as the manner in which a pursuit is to occur,

20   maintaining a safe distance, this is subpart V(C):  Members in

21   both the primary and secondary unit shall maintain a safe

22   distance between their vehicle and the fleeing vehicle to

23   ensure that there is enough reaction time, should the fleeing

24   vehicle suddenly turn or brake.

25        How does that compare with the national model policy or

1   standard?

2   A.  Again, it falls under safety, that you have to maintain a

3   safe distance or perform a vehicle pursuit safely.

4   Q.  Moving on to what the general order has to say about

5   speeds.  It notes here under subpart VI(A)(3) that the

6   vehicles -- well, that members shall not operate department

7   vehicles at speeds where they cannot control vehicle and

8   thereby endangering lives.  They're not allowed to do that.

9        How does that compare with the national standard?

10  A.  Again, yes, that's all part of the safety.

11  Q.  Now, your use of emergency equipment, it notes:

12  Immediately notify the dispatcher, as well as activate all

13  emergency equipment.

14       You've testified earlier that that is the national

15  standard, is that correct?

16  A.  Yes.

17  Q.  And the use of sirens, here under subpart VI(C) of the

18  general ordinance, the wail position, what does that mean?

19  A.  It's the type of siren, the sound that it gives off.

20  Q.  Can you please describe what that is, versus, as it notes

21  here, the yelp position?

22  A.  You want me to simulate?

23  Q.  No, we can bypass that.  But what is the general --

24  A.  Wail will go up and down, where yep is more continuous.

25  Q.  And it states here that the primary is supposed to use the

1    wail, versus the secondary is supposed to use the yelp, is that

2    correct?

3    A.  Yes.

4    Q.  Now we'll talk about navigating intersections.  You

5    testified earlier that when police officers approach a traffic

6    control device, that they're going to have to follow that at

7    some level.  This (D) provision, V(D), it notes at several

8    areas that officers are required to top at intersections.  Is

9    that -- how does that compare with the national standard?

10   A.  That is probably more restrictive than the national

11   standard.  They will tell you, once again, on a more broad

12   umbrella that you need to drive safely.  This policy actually

13   gives more guidance and more directive.

14   Q.  And at certain areas it also says you can slow, as opposed

15   to have to stop, as well, is that right?

16   A.  Yes.

17   Q.  Okay.  We'll move onto unmarked vehicles.  Here, under

18   VI(6)(A)(6), it states that department vehicles may continue a

19   vehicular pursuit until a marked unit joins, at which point the

20   listed vehicle shall immediately discontinue their

21   participation.  It applies to, as VI(C) notes, an unmarked

22   sedan equipped with emergency devices.  Is that consistent with

23   the national trend?

24   A.  That is contained in the model policy, yes.

25   Q.  Now, assessments that are made during the pursuit, I think

1    you've testified earlier that there has to be an assessment

2    that occurs throughout, is that right?

3    A.  Yes, being cording to the model policy.  Yes.

4    Q.  And according to the general order, it is required

5    continuously, is that right?

6    A.  It then makes it more restrictive and defines it, yes.

7    Q.  Now, the monitoring field supervisor or the watch commander

8    has the ability to terminate the pursuit, according to the

9    general order.  What is your understanding as far as how that

10   compares to the national standard?

11   A.  That is the common practice.

12   Q.  Now, is the monitoring field supervisor normally on the

13   scene?

14   A.  Not necessarily, no.

15            THE COURT:  Is the watch commander normally on the

16   scene.

17            THE WITNESS:  Not necessarily, no.

18   BY MR. BASET:

19   Q.  It also states, in the last line, that this does not

20   replace the obligation to adhere to a lawful order given by

21   official.

22        Is that the national standard or trend in that regard?

23   A.  In all matters of police work following orders is the

24   trend.

25   Q.  What about unlawful versus lawful orders?

1    A.   You do not have to follow an unlawful order.

2    Q.   Moving on to the manner of pursuit.  These are conditions

3    under which a vehicle pursuit shall be terminated.  And you've

4    reviewed this, is that right, before --

5    A.   Yes.

6    Q.   And are these provisions consistent with the national

7    standards on when to terminate?

8    A.   They are consistent with safety, but probably a little bit

9    more directive and guidance than you might find in the model

10   policy.

11   Q.   So it's more expressed here?

12   A.   I believe so, yes.

13   Q.   Now I want to focus specifically here on (d), 10(d):  The

14   violator was identified so that a warrant can be obtained for

15   his or her arrest and failure to apprehend does not pose an

16   immediate threat of death or serious injury to another person.

17        How does that compare with the national standard?

18   A.   That is in the national standard.

19   Q.   And we'll move on.  This indicates, under VI(A)(11), that a

20   vehicle pursuit, once it's terminated, there still has to be

21   notifications to the dispatch, is that accurate?

22   A.   Yes.

23   Q.   Is that consistent with the national standard?

24   A.   Yes.

25   Q.   Let's talk about roles of officers in a pursuit.  One of

1    the roles is a field supervisor --

2             THE COURT:  We're still talking about this MPD

3    general order, correct?

4             THE WITNESS:  I think he asked me about the

5    national --

6             THE COURT:  No, I understand that, but he's comparing

7    the two.  But the document you're talking about is the general

8    order.  We haven't moved on to any other policies or training

9    yet, correct?

10            THE WITNESS:  No, Your Honor.  It's the one on the

11   screen.

12   BY MR. BASET:

13   Q.  Now, the field supervisor -- I just want to focus on a

14   couple points here.  Specifically, the continuous monitoring of

15   radio transmissions under subpart (E)(4), is that consistent

16   with the national standard?

17   A.  Yes.

18   Q.  Now, the field supervisor under subpart 7, are they

19   required on this order to conduct an administrative review?

20   A.  Yes.

21   Q.  Does that assume that they are not involved in the pursuit

22   themselves directly, or not?  What is your understanding?

23   A.  My understanding in this policy, at that level, that would

24   be people that were involved in the pursuit.

25   Q.  I want to focus on subpart 8, in terms of the requirement

1    to notify a watch commander.  And then subpart 9, a form 845.

2    What do you understand that to be, a PD form 845?

3    A.  The model policy and the best practices in law enforcement

4    today is that when -- anytime you have a pursuit, that the

5    department have a pursuit vehicle form that's separate from the

6    actual incident reports that you do because they actually go in

7    different locations and then they are used at the end of the

8    year for training and policy modification.  So for data

9    collection.

10   Q.  When you say different locations, what do you mean by that?

11   A.  A police report, incident report might go in one direction

12   towards a report room and then -- but it might not go -- this

13   one ensures that it goes to training, internal affairs, policy.

14   And then at the end of the year you don't have to go pull out

15   every incident report to do a review, you have a separate form

16   that you can look at and analyze and use that data.

17   Q.  Now, when it comes to the role of the watch commander, is

18   it accurate that the general order requires them to review the

19   vehicular pursuit report or the PD 845 to confirm the

20   provisions were followed?

21   A.  Yes.

22   Q.  Is there typically somebody within police departments

23   naturally that operates in the same way?

24   A.  That's -- that is pretty much common practice, that the

25   watch commander will then review it before sending it on with

1    his determinations.

2    Q.  Okay.  And finally, as far as roles are concerned, the

3    commanding officer -- I want to focus on number 2.  The

4    commanding officer is typically who within the police

5    department?

6    A.  I'm sorry, repeat that again.

7    Q.  Who is -- what is considered a commanding officer within a

8    police department?

9    A.  It will vary from department to department.  So depending

10   on the size of the department, number of people, sometimes the

11   commanding officer could be a captain, sometimes it could be a

12   major.  It's more of a function than an actual rank.  So, you

13   know, D.C. may have a -- I don't know how they -- where they

14   put that in there.

15   Q.  Is it a senior official though?

16   A.  They are a senior official.

17   Q.  And they're supposed to assign a non-involved element

18   official, the rank of captain or above, to conduct an

19   investigation into facts and circumstances surrounding all

20   vehicular pursuits involving MPD vehicles.

21        What's the purpose of having a noninvolved element

22   official doing the review?

23   A.  To have a totally separate, non-biased reviewer.

24   Q.  Moving on, let's talk about the major crash unit and how

25   it's discussed in the general order.  It includes that they

1    would investigate vehicular pursuits involving fatalities in

2    conjunction with the office of internal affairs.  I'll move on,

3    but is there any distinction between how it is set up here in

4    D.C. versus the national standard?

5    A.  No, most major departments have that.

6    Q.  What about an office of internal affairs?  And specifically

7    as it relates to a provision 2, that they monitor, investigate

8    a vehicular pursuit involving a fatality, in conjunction with a

9    major crash unit.  Is that typically the case throughout the

10   country?

11   A.  Yes, that's also common in police departments.

12            THE COURT:  Before you move on, two-minute break.

13   Everybody just hang in here and stretch, if you want.

14            MR. BASET:  Thank you.

15            THE COURT:  You reach a certain age --

16            THE WITNESS:  Can I stretch?

17            THE COURT:  Yes.

18            THE WITNESS:  I'm with you.

19        (Recess.)

20            THE COURT:  All right.  Everybody is here.  I think

21   everybody is back.  Go ahead.

22            MR. BASET:  Just for scheduling purposes, I just

23   wanted to note, I'm on the last section here on training.  I

24   know we're at 1 o'clock and I know we're ending today.

25            THE COURT:  About how much longer do you think?

```
1              MR. BASET:  These should be five to ten minutes.

2              THE COURT:  If we can do that finished with direct.

3              MR. BASET:  Great.  Thank you.

4    BY MR. BASET:

5    Q.  Let's talk about training, and MPD training in particular.

6    This is Exhibit 413-C, it's an instructional overview

7    PowerPoint.  Do you understand that this is a PowerPoint that's

8    provided or given to police officers at MPD?

9    A.  This is just a cover.  You mean what's coming?

10   Q.  Yes.

11   A.  Yes.

12   Q.  This training in particular?

13   A.  Yes.

14   Q.  And I just wanted to focus on here, the second bullet:  The

15   desired goal is to teach accident avoidance and develop a

16   professional driving attitude.  Is that consistent with the

17   national model policy and standard on what the goal is of

18   driver training for police officers?

19   A.  Yes.

20   Q.  Moving on, I want to move on to 413-G, which is the

21   PowerPoint presentation for general order 301.03 and vehicular

22   pursuits.

23         Specifically, the first slide here in that training

24   combines law, policy, and an explanation of civil liability

25   within this training.  It's called the big three.  Is that
```

1    consistent with national model policy and standards as far as

2    how training is typically approached, to include policy, law

3    and civil liability discussion?

4    A.  I would concur with that, yes.

5    Q.  All right.  Department regulation.  Moving on to the next

6    slide of the training, indicating that members shall weigh

7    whether the immediate danger the pursuit presents to the member

8    and the public is less than the immediate for potential danger

9    the suspect presents to the public, should the suspect remain

10   at large.

11        Is that what you'd been testifying to earlier, as far as

12   the overall calculus for a police officer in engaging in a

13   pursue?

14   A.  Yes, it is.

15   Q.  Moving on to the next training that's provided on legal

16   aspects and civil liability of law enforcement driving.  This

17   is Exhibit 413-H.  Now, I want to focus on this first bullet:

18   All states require the operator of an emergency vehicle

19   operating in an emergency mode to drive with due regard, which

20   is defined as driving in a manner which does not endanger life

21   or property.  Is that consistent with the approach nationally

22   when it comes to legal aspects and considerations for police

23   officers and the training that they receive?

24   A.  Of the state statutes I've seen, that is consistent, yes.

25   Q.  Now, I want to jump through to exemptions for authorized

1   emergency vehicles.  Nationally, do police departments and the

2   officers who engage in pursuits, do they typically have some

3   exemptions as far as laws that they have to follow when

4   engaging in a vehicular pursuit?

5   A.  Yes, they can disobey traffic control devices and things

6   like that as long as they can do it safely.

7   Q.  Does it assume that they're actually involved in a real,

8   actual emergency call?

9   A.  Yes.

10  Q.  Now, specifically here there's a provision, a statute

11  2002.1.  What do you understand that statute to be a reference

12  to?

13  A.  What you just discussed, the state statute that allows you

14  to disobey traffic control devices and state laws reference

15  traffic.

16  Q.  Okay.  And I want to focus here, the third bullet:  Exceed

17  the prima facie speed limit, so long as it does not endanger

18  life or property.  What do you understand that that mean?

19          MR. HANNON:  Your Honor, I object.  This is the law

20  on which Your Honor is the determiner of what it means.

21          THE COURT:  Well, this document is part of the

22  training materials?

23          MR. BASET:  It is.

24          THE COURT:  So I agree with Mr. Hannon, that I'm

25  going to instruct the jury on what the relevant law is when we

1    get to that point.  But it seems to me that this testimony is

2    relevant to -- for the jury to consider whether this was part

3    of the guidance and message delivered to those trained by the

4    MPD training people.  So this is a document relating to

5    training materials.  It may or may not state statutory law or

6    regulations or whatever.  But the question is, what does the

7    training include, and whether that has any relevance when it's

8    tied to other testimony later.  So I'll permit Mr. Baset to

9    continue.

10   BY MR. BASET:

11   Q.  Now, the -- I'll move on.  The exemptions, does it require

12   here in D.C. that emergency lights -- or, emergency vehicle

13   applies -- rather, let me back up.  That these exemptions only

14   apply if your emergency vehicle alerts are activated at all

15   times?

16   A.  You are required to use your emergency equipment, yes.

17   Q.  Okay.  Now, we'll move on to pursuit techniques.  This is

18   Exhibit 413-I in the PowerPoint training slides.  Training

19   objective here, that they understand the fundamental --

20          THE COURT:  Did you just say "I"?  Because in the

21   upper left it still says "H."

22          MR. BASET:  This should be -- brief indulgence.

23          THE COURT:  Maybe it's a typo at the top of the --

24          MR. BASET:  It should be I.

25          THE COURT:  Okay.

1          MR. BASET:  Thank you.

2          THE COURT:  So the record is clear, the exhibit that

3     has been admitted, that we're now discussing is 413-I, and

4     demonstrative has a typo at the top.  We're talking about

5     413-I.

6          MR. BASET:  Thank you.

7     BY MR. BASET:

8     Q.  And number 3 is what I want to focus on, that the student

9     must display a clear understanding of the importance of the

10    safety to the public and the officer.

11          Is it your understanding this is something that's tested

12    in departments throughout the country?

13    A.  Yes.

14    Q.  What about in MPD?

15    A.  Yes.

16    Q.  Now, vehicle spacing, is there instructions to MPD officers

17    on how that's supposed to occur?

18    A.  According to the slide, yes.

19    Q.  Now, tunnel vision is what is included in the parenthesis.

20    What do you understand that to mean?

21    A.  Tunnel vision is where your perception closes down.  You

22    see less peripheral, and starts to close down through stress

23    and how fast you're going.  It all starts to close down.

24    Q.  And how does that work the longer a pursuit occurs?

25    A.  It can get more restricted as -- the longer, the faster,

1    the more stress.

2    Q.  So more tunnel vision?

3    A.  More tunnel vision.

4    Q.  Moving on to -- well, we'll move on to the rules of

5    engagement here.  The first highlighted or underlined sentence

6    is:  Never attempt to block the escape path of the suspect

7    vehicle.  What does that mean?

8    A.  You always have to leave them an out.  As I mentioned

9    earlier, you can't run them into an abutment or block where

10   they have no area of escape.

11   Q.  The second bullet:  Don't attempt to funnel the vehicle

12   into certain areas.  What do you understand that to mean?

13   A.  What I just said, don't drive them into a river where they

14   can't get away.  They have to have a safe way to stop.

15   Q.  Now, I'll move on here to the safety of the public and the

16   officer.  The first line, is that consistent with what we've

17   been talking about as far as the paramount concern being

18   safety?

19   A.  Yes.

20   Q.  Now, the final present -- or, training slides here are

21   about emergency response techniques.  This is Exhibit 413-J,

22   the training objectives here.  Is this just to understand how

23   best to operate your vehicle during an emergency situation?

24   A.  This is to assist the officer in understanding how vehicles

25   operate and what to expect.

1    Q.  And is this a typical training that's received at the

2    national level for police officers?

3    A.  I would say yes, this is the common training you receive in

4    the police academy.

5    Q.  And as it relates to narrow streets, are these all factors

6    that officers are trained on considering when they're

7    approaching narrow streets?

8    A.  Those are the common environmental factors that they would

9    be trained on, yes.

10   Q.  Are officers throughout the country trained similarly?

11   A.  Yes.

12   Q.  As far as considerations of speed, the first bullet is that

13   it must be consistent with the environment.  What do you

14   understand that to mean?

15   A.  It means, depending on where the pursuit is taking place,

16   the weather, the time of day, that can all change depending on

17   other environmental factors around it.

18   Q.  And is that consistent with the training that officers

19   throughout the country receive?

20   A.  Yes.

21   Q.  Now, entering our last few slides here.  Attitude and

22   emotion.  What factor does that typically play in an officer's

23   training and how does that compare nationally?

24   A.  You do see training on that, to be aware of how your

25   emotions can be affected during a pursuit.

1    Q.  Is there a general understanding of how that works during a

2    vehicular pursuit?

3    A.  A general understanding that your adrenaline could build

4    and you could end up -- you got to be aware that you know you

5    don't get taken away by emotions and excitement.

6    Q.  We've discussed siren.  But there's training on this here

7    at MPD.  Is that typical of police departments throughout the

8    country?

9    A.  That would be consistent, yes.

10   Q.  As well, lights, we talked a bit about emergency lights.

11   Is that also something that officers are trained on throughout

12   the country?

13   A.  Yes.

14   Q.  And last two questions here.  Is it pretty typical that

15   officers throughout the country are tested on their knowledge

16   of vehicular pursuits based off of what they're trained on?

17   A.  All valid training will have a testing process at the end

18   to ensure that you've met the objectives, yes.

19   Q.  And D.C., is that training -- or, is that test -- well, is

20   that training both hands-on, as well as through PowerPoints

21   like this?

22   A.  Yes.

23   Q.  Is that consistent with the national approach to training

24   police officers on vehicular pursuits?

25   A.  Yes.

1    Q.  Last question:  We talked earlier about following lawful

2    versus an unlawful order.  Can you just explain that, what it

3    means to disobey an unlawful order?  Is that something officers

4    can do?

5    A.  An unlawful order?

6    Q.  Yes.

7    A.  No, you can disobey an unlawful order.

8              MR. BASET:  Okay.  I have no additional questions.

9    Thank you.

10             THE COURT:  Okay.  Why don't we come to the bench for

11   a second.  Everybody stay where you are.

12             (Bench discussion:)

13             THE COURT:  So I wanted to inquire of Mr. Hannon and

14   Zampogna, how long they thought realistically thought their

15   cross examination would be of this witness?

16             MR. ZAMPOGNA:  I think less than 15 minutes for me.

17             MR. HANNON:  15.  15 or 20.

18             THE COURT:  So we should be able to finish with him

19   today?

20             MR. ZAMPOGNA:  I believe so, yes.

21             MR. HANNON:  Are you talking about before lunch?

22             THE COURT:  No.

23             MR. ZAMPOGNA:  Today, he said.

24             THE COURT:  Why don't we do this, just to build in a

25   cushion:  I told the jury we'll end today by 3.  I'll ask them

```
1    if they're able to stay until 4.  Okay?  I'll ask them if
2    they're all able to stay until 4, if need be.
3                 MR. BASET:  That's just to fit in Mr. Drago's
4    testimony, just in case?
5                 MR. ZAMPOGNA:  If redirect or something goes longer?
6                 MR. HANNON:  So we're not going to try to get to the
7    cross of Tejera today?
8                 THE COURT:  I don't know.  But they've been
9    instructed they can leave by 3, and I'm not sure we'll get
10   Drago done by 4, but I don't want to mess up Mr. Drago's travel
11   plans.
12                MR. ZAMPOGNA:  Just as a point, I'm looking to the
13   witness area and there's a lawyer for Ms. Hylton-Brown, I
14   believe, is there, and I think he's loaded for bear to say
15   something.
16                THE COURT:  I know.  I wanted to let the jury go.
17                MR. BASET:  Thank you.
18              (Open court:)
19                THE COURT:  All right.  Ladies and gentlemen --
20   Mr. Drago, you can step down for a minute.  You're still under
21   oath, and you'll be back on the witness stand after lunch.
22                THE WITNESS:  Okay.  Thank you.
23                THE COURT:  Ladies and gentlemen, I had advised you
24   all some time ago that we would end today by 3 o'clock.  If
25   necessary, is everybody able to stay as late as 4 o'clock, but
```

 1    no later?  Is there anybody that has a problem if we have to go

 2    until 4, instead of 3 today?

 3           (Jurors shake heads.)

 4           THE COURT:  Nobody is saying anything.  That would be

 5    great.  I appreciate it.  And tomorrow we will end by 1 for

 6    sure.

 7           So, why don't you go to lunch.  Remember, the cafeteria

 8    closes at 2.  And please come back by 2:30, in the jury room.

 9           And then I have a few things I have to say after the

10    jury leaves.  You're not leaving yet.

11           (Whereupon the jurors leave the courtroom.)

12           THE COURT:  Okay.  Everybody can sit down.  Just one

13    minute, please.  I'm going to hear from you, I promise you.

14           Two less controversial things.  We have two jury issues

15    that I want you all to think about, how we're going to deal

16    with it.  You will recall that one juror has told us that she

17    has a doctor's appointment on Wednesday, November the 9th.  She

18    originally had told us Monday, she was wrong.  And she's given

19    me documentation, the appointment is at 1, which would mean she

20    would have to leave before 1.  What should we ask her?  What

21    should we tell her?

22           Two, we have a message from another juror with respect

23    to travel plans for Thanksgiving.  And she says in her email --

24    this is juror in seat number 3 -- "Mr. Coats, I spoke with you

25    the other day about travel plans for Thanksgiving.  Earlier in

1    the trial Judge Friedman mentioned to let him know if anything

2    came up regarding Thanksgiving.  I wanted to let you know I was

3    unable to get a flight back on Sunday, November 27.  So I will

4    be out on Monday, November 28th, to fly back to D.C.  The

5    flight is in the evening, so I would have to miss the entire

6    day on Monday, November 28.

7         "Sorry for the inconvenience.  Please let me know if you

8    or the judge need any additional information."

9         So that, we have to deal with her at some point.  And

10   sooner than that we have to deal with juror in seat number 7, I

11   believe, about the medical problem.  I don't need an answer

12   now, but I think we need to talk about it.

13        What I do think is more pressing, frankly, is the

14   mandamus question.  And this morning the lawyers for the

15   defendants in this case filed responses to Mr. Baset's, the

16   government's motion, which I'm treating as a motion to

17   reconsider my earlier ruling.  And I heard argument from

18   counsel on that this morning and I also heard some additional

19   representations from three individuals who were in the

20   courtroom at various times when various incidents may or may

21   not have taken place.

22        I've told the Court of Appeals, they have inquired -- I

23   think I put this on the record earlier -- they wanted to know

24   when I decide, and what I decide, with respect to the

25   government's motion to reconsider, because that could have an

1   impact on their -- the course they take with respect to the

2   mandamus.  And I have advised them, through my career law clerk

3   this morning, that I would not be making a decision on that

4   until this afternoon.

5           So, unless anybody wants to say anything more before I

6   hear from Ms. Hylton-Brown's lawyer, is that the state of play

7   as far as the lawyers in the well understand it?

8           MS. BERKOWER:  Yes, Judge.

9           THE COURT:  Okay.  So I would like to hear from

10  Ms. Hylton-Brown's lawyer.

11          Good afternoon again.

12          MR. GERSTEIN:  Thank you, Your Honor.  I think the

13  best thing to do now --

14          THE COURT:  Will you state your name?  This is a

15  different court reporter.

16          MR. GERSTEIN:  Oh, excuse me.  I'm Charles Gerstein,

17  G-E-R-S-T-E-I-N.

18          Thank you, Your Honor.  So, I think the best thing to do

19  now is for me to just make a record of what I understand to be

20  happening and then to note our objection.

21          So, my understanding is that this morning testimony was

22  heard at which Ms. Hylton was accused of, at some unspecified

23  point, contacting a juror.  My understanding is that that is

24  being used as a basis for continuing to ban her physical

25  presence in this courtroom.  I did not receive notice that

1   testimony would be --

2        THE COURT:  I asked the government specifically

3   whether they wanted us to notify you before we proceeded this

4   morning, whether we should wait for you, whether we should

5   email you.  And the assistant United States attorneys said no.

6   They are on your side of this motion, but they said no.

7        MR. GERSTEIN:  I didn't --

8        THE COURT:  I'm just making a record.

9        MR. GERSTEIN:  I don't know that to either be true or

10  false.  I received no notice of this.  Ms. Hylton received no

11  notice of this.

12       At this hearing, I understand Ms. Hylton to have been

13  accused of speaking with jurors, and perhaps other things that

14  I, at the moment, don't know about.  I believe that currently

15  to be a basis, or at least one of the bases for banning her

16  from this courtroom.  We object to any further testimony coming

17  in while this court's order banning her from this courtroom is

18  still in effect.  We object to any further testimony coming in

19  until she has a full and fair opportunity to be heard on these

20  allegations against her.

21       We'll note that this, additionally, violates the due

22  process clause.  She's being banned from this courtroom without

23  notice, without a hearing, on the basis of allegations that

24  have not been presented to her, that allege, so far as I can

25  tell, misconduct.  We'll also note that it now appears that the

1    ban from the courtroom, to the extent that it is based on

2    allegations that she has spoken with a juror, is punitive and

3    that it is meant in some sense to remedy something that took

4    place in the past, not to prevent anything that could happen in

5    the future.  Because, as I understand it, there's no allegation

6    that she has communicated with the juror within this courtroom

7    during this trial.

8         We'll note that we also dispute, as we noted in the

9    petition for mandamus, almost all of the factual

10   representations that the defense has made here, and that we

11   continue our objection to the original basis for banning

12   Ms. Hylton from the courtroom to the extent we understand it,

13   which is that she was crying during videos of the death of her

14   son being played, that she stood up and quickly left upon

15   learning that, and that she is looking at the defense table.

16        THE COURT:  Mr. Gerstein, let me ask you at least one

17   question:  Are you requesting that I hear from Ms. Hylton-Brown

18   under oath before I rule on the motion to reconsider filed by

19   the government?

20        MR. GERSTEIN:  No, Your Honor.

21        THE COURT:  Okay.

22        MR. GERSTEIN:  I'll also note, just from a practical

23   perspective, she's not present right now.  So if the Court

24   lifted its order banning her while she is not presently here,

25   on an interim basis to continue testimony.  And if she shows

1    up, we can address that.  But we would object to any testimony

2    coming in during the pendency of this Court's current order,

3    which we believe is unconstitutional under both the First

4    Amendment and the due process clause and violates the Crime

5    Victims' Rights Act, and particularly during the pendency of

6    the petition for mandamus.

7              THE COURT:  Thank you.

8              MR. GERSTEIN:  Thank you.

9         Oh, I also need -- I'm sorry.  I need to put one more

10   thing on the record.  I did not want to interrupt testimony

11   while the jury was here.  This, right now, is the first

12   opportunity I've had to get on the record since I knew that

13   this hearing took place while the jury was not present.

14             THE COURT:  I understand that.  You objected

15   yesterday to continuing any testimony in this trial in her

16   absence.  I view that as a continuing objection.  So, I don't

17   think you or the Court of Appeals needs to worry about the fact

18   that you were kind enough not to try to interrupt while the

19   jury was here.

20             MR. GERSTEIN:  We are adding one more basis, though,

21   which is that now she's subject to accusations that she has not

22   been heard, and that is a separate due process violation.  So

23   we'll note that also as a continuing objection.

24             THE COURT:  But you don't want me to hear from her

25   before I decide the motion?

1          MR. GERSTEIN:  I would like you to hear from her

2    through counsel.

3          THE COURT:  Okay.

4          MR. GERSTEIN:  And I would like the opportunity to

5    cross-examine any witness that's being presented against her, I

6    would like to call witnesses and to have sufficient time to

7    discover who those witnesses would be.

8          THE COURT:  The only witnesses who testified -- the

9    only persons who spoke this morning and made representations,

10   none of them were put under oath.  Two of them are court

11   employees; a deputy United States marshal, who is an officer of

12   the court and the marshal service, the other is a court

13   security officer who is a retired police detective after 27

14   years.  And she's been here as a court security officer for a

15   number of -- I don't know how many years.  I forget what she

16   said.  And they stood at the podium and made representations.

17   And the other person is an associate from Steptoe and Johnson

18   who testified -- who came to the podium and made

19   representations about what she saw.  So those are the three

20   people I heard from this morning.

21         MR. GERSTEIN:  Can I ask two clarifying questions,

22   Your Honor?  First, I understand that there's been no sworn

23   evidence presented in support of banning Ms. Hylton-Brown from

24   the courtroom.

25         THE COURT:  Correct.

1              MR. GERSTEIN:  Second, can you please tell me those

2      people's names?  Or can someone else tell me those people's

3      names?

4              THE COURT:  All right.  The lawyer from Steptoe is

5      Meredith Lewis, correct?

6              MS. LEWIS:  Yes.

7              THE COURT:  And she's right there.

8          The deputy United States marshal is Charlayna Taylor,

9      and she's right there (indicating).  And the court security

10     officer, Kathy Jackson, who was here earlier today.  She's in

11     the building and she's at work today and I'm sure that you can

12     be put in touch with her, if you would like to talk with her.

13             MR. GERSTEIN:  Thank you, Your Honor.  If you have no

14     further questions, I'll sit down.

15             THE COURT:  Let me ask any of the lawyers -- I don't

16     want to prolong this, but let me ask any of the lawyers if

17     there's anything they want to say in light of what Mr. Gerstein

18     has just said?

19             MS. BERKOWER:  Just briefly, Your Honor, to make a

20     record of our -- what occurred this morning with regard to

21     notice to Mr. Gerstein.  Your Honor did ask the government if

22     we thought we needed to get in touch with him in any more

23     specific way.  We did say we thought we could proceed.  In our

24     view, while the CVRA does require notice, we believe that

25     adequate notice was provided by the fact that there is a daily

1    trial here that is publically noticed, that Your Honor issued a

2    minute order yesterday ordering briefing by the defense on the

3    government's motion to be submitted by 9 a.m., indicating that

4    would be ripe for argument and decision today.  And the fact

5    that routinely motions come up and are addressed and argued in

6    open court during the trial day.

7         So in our view, to the extent that -- that is the basis

8    for why we thought there was adequate notice.  There was

9    nothing preventing Mr. Gerstein from attending trial today, as

10   he has been here on most days.  And, so, in our view there was

11   adequate notice that that could be taken up by the Court, the

12   government's motion may be taken up by the Court.

13        I'd also notice Mr. Gerstein is not a party to that

14   motion.  That is a motion filed by the government.  And, so, we

15   believe that the notice to Ms. Hylton and her counsel was

16   adequate.

17        With regard to the remedy, in our view we believe that

18   the appropriate remedy here is to reconsider or stay the

19   Court's order barring Ms. Hylton, and that would obviate the

20   need to stay the proceedings.  Thank you.

21             THE COURT:  Anything from Mr. Hannon or Mr. Zampogna?

22             MR. HANNON:  Nothing from me, Your Honor.

23             MR. ZAMPOGNA:  Nothing from me.

24             THE COURT:  Okay.  And I'm going to ask, if we

25   haven't already asked -- our court reporter -- there's going to

1    be a different court reporter this afternoon, correct?

2                  THE COURT REPORTER:  (Nods head.)

3                  THE COURT:  I'm going to ask our court reporter to

4    make an immediate transcript, create an immediate transcript of

5    everything that happened from the time that we started this

6    morning until we took our break.  Because we dealt with all of

7    these issues before we took our break and then the jury came in

8    and then we were only talking about Mr. Drago and how to

9    proceed with the witness.  As well as the portion of the

10   transcript that began just now, ten or 15 minutes ago, after

11   the jury left the room, so that those are available to the

12   Court of Appeals, if need be.

13        I will also advise Mr. Gerstein and the Court of

14   Appeals -- and the reason I didn't decide this this morning,

15   despite the urgency, is that, frankly, I wanted to have some

16   deeper thought, which I've done in part while I'm sitting here.

17   But I now have an hour over lunch, and that's what I intend to

18   do over lunch, to consider the government's motion to

19   reconsider.

20        When we come back at, hopefully, close to 2:30, we will

21   again, despite the urgency, we will begin with the cross-

22   examination of the witness because he's been here since

23   Saturday and has changed his travel plans over and over again.

24   And he's a paid expert and I don't know when he's next

25   available.  And counsel has represented -- defense counsel has

1    represented that their cross-examination will be brief.  And

2    when I finish with him, I will let the jury go for the day and

3    orally rule on the motion to reconsider.

4         Yes, sir?

5         MR. GERSTEIN:  Practical -- just to be very, very

6    clear, if Ms. Hylton comes here, she is not permitted in this

7    room during cross-examination, is that correct, while we're

8    waiting for the final --

9         THE COURT:  That is true.

10        MR. GERSTEIN:  Okay.  Thank you.

11        THE COURT:  Anything else, anybody?  If not, we told

12   the jury 2:30, and I guess they're going to wait a little bit

13   because -- let's all be here by 2:30.  It's only an hour, but

14   let's do it and try to get done with Mr. Drago quickly, if we

15   can.

16                          *   *   *

17

18

19

20

21

22

23

24

25

148

```
1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4     foregoing constitutes a true and accurate transcript of my

5     stenographic notes and is a full, true and complete transcript

6     of the proceedings to the best of my ability.

7                              Dated this 4th day of October 2022

8

9

10                      _____

11                      Janice E. Dickman, CRR, CMR, CCR
                        Official Court Reporter
12                      Room 6523
                        333 Constitution Avenue, N.W.
13                      Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25
```

**$**

**$200** [1] - 76:12
**$300** [1] - 76:12

**'**

**'90s** [2] - 93:22, 93:24

**1**

**1** [4] - 126:24, 137:5, 137:19, 137:20
**1.5** [1] - 58:24
**1.7** [1] - 58:25
**10** [2] - 38:17, 108:25
**10(d** [1] - 122:13
**100** [2] - 57:14, 83:5
**10:30** [1] - 4:14
**11** [2] - 5:8, 8:20
**12** [2] - 84:10, 109:2
**13** [1] - 109:3
**15** [6] - 33:14, 84:10, 135:16, 135:17, 146:10
**150** [1] - 84:3
**16** [1] - 18:20
**1776** [1] - 1:21
**178** [1] - 12:19
**17th** [3] - 24:17, 36:4, 36:16
**18** [1] - 12:5
**18,000** [2] - 83:20, 89:24
**1800** [1] - 1:18
**18th** [1] - 36:4
**1979** [3] - 54:25, 57:6, 86:17
**1980** [2] - 57:7, 86:17
**1986** [1] - 50:10
**1999** [2] - 57:16, 59:19

**2**

**2** [3] - 125:3, 126:7, 137:8
**20** [9] - 18:20, 24:10, 31:2, 31:3, 38:17, 70:1, 93:5, 114:17, 135:17
**20001** [2] - 1:25, 148:13
**20006** [1] - 1:21
**2002.1** [1] - 129:11
**2003** [4] - 49:2, 75:25, 87:13, 105:18
**20036** [1] - 1:18
**2014** [1] - 69:3
**2017** [6] - 55:2, 56:2, 59:19, 79:1, 79:4, 79:18
**202-354-3267** [1] -

1:25
**2021** [2] - 76:1, 87:14
**2022** [3] - 1:7, 108:25, 148:7
**20530** [1] - 1:15
**21-598** [1] - 2:2
**21-cr-598** [1] - 1:4
**225** [4] - 57:20, 63:21, 63:23, 63:25
**23** [1] - 108:24
**24th** [2] - 24:18, 36:3
**25** [5] - 61:25, 62:1, 62:23, 70:1, 89:25
**25th** [2] - 105:19, 105:20
**27** [2] - 138:3, 143:13
**28** [1] - 138:6
**28th** [1] - 138:4
**29** [1] - 33:15
**2:00** [1] - 1:7
**2:30** [4] - 137:8, 146:20, 147:12, 147:13

**3**

**3** [10] - 1:7, 39:11, 39:12, 105:14, 131:8, 135:25, 136:9, 136:24, 137:2, 137:24
**30** [2] - 61:25, 62:1, 62:23
**30,000** [1] - 84:3
**301.03** [3] - 44:7, 75:22, 127:21
**325** [1] - 57:20
**333** [2] - 1:24, 148:12
**338** [1] - 39:12
**3771** [1] - 12:5
**3771(b)** [1] - 12:19
**38** [2] - 54:17, 61:14
**3rd** [1] - 36:17

**4**

**4** [6] - 39:12, 136:1, 136:2, 136:10, 136:25, 137:2
**4)(A** [1] - 111:25
**401** [1] - 87:11
**401-D** [2] - 87:8, 105:15
**401-K** [1] - 87:15
**413-A** [3] - 50:20, 87:21, 88:5
**413-B** [1] - 87:22
**413-C** [2] - 87:23, 127:6
**413-G** [2] - 87:24, 127:20
**413-H** [2] - 87:25,

128:17
**413-I** [5] - 51:7, 88:1, 130:18, 131:3, 131:5
**413-J** [2] - 88:4, 132:21
**42** [1] - 18:25
**4th** [1] - 148:7

**5**

**50,000** [1] - 57:13
**5409** [1] - 1:14
**555** [1] - 1:14

**6**

**6** [1] - 108:25
**608** [1] - 78:23
**6523** [2] - 1:24, 148:12

**7**

**7** [5] - 1:5, 1:9, 19:24, 123:18, 138:10
**700** [1] - 1:21

**8**

**8** [1] - 123:25
**845** [3] - 124:1, 124:2, 124:19
**850** [1] - 1:18

**9**

**9** [6] - 3:20, 18:7, 26:20, 33:15, 124:1, 145:3
**901.07** [1] - 110:12
**911** [1] - 93:24
**97** [4] - 90:25, 91:4, 91:5, 91:11
**9th** [1] - 137:17

**A**

**A)** [1] - 112:4
**A)(1** [1] - 111:17
**a)(3** [2] - 12:11, 17:1
**a.m** [2] - 8:20, 145:3
**Aaron** [1] - 9:23
**abide** [3] - 100:3, 100:5, 100:7
**ability** [8] - 51:2, 90:5, 94:2, 103:1, 103:11, 103:13, 121:8, 148:6
**able** [19] - 13:13, 14:22, 27:21, 28:23, 47:12, 49:9, 65:5, 67:20, 90:2, 98:4,

101:15, 101:16, 108:16, 108:17, 108:20, 135:18, 136:1, 136:2, 136:25
**absence** [1] - 142:16
**absolute** [1] - 40:4
**absolutely** [1] - 29:8
**abutment** [1] - 132:9
**academy** [3] - 54:25, 57:6, 133:4
**accentuate** [1] - 48:4
**accept** [4] - 26:15, 27:21, 27:23, 52:9
**accepted** [1] - 25:19
**accident** [1] - 127:15
**accommodate** [1] - 4:25
**accommodations** [1] - 12:22
**accomplish** [2] - 60:20, 60:21
**according** [4] - 39:17, 121:4, 121:8, 131:18
**account** [4] - 14:9, 14:25, 28:20, 30:10
**accounts** [1] - 29:22
**Accreditation** [1] - 86:13
**accurate** [4] - 115:2, 122:21, 124:18, 148:4
**accusations** [1] - 142:21
**accused** [2] - 139:22, 140:13
**achieve** [1] - 90:9
**Act** [9] - 12:7, 13:1, 13:20, 27:18, 29:10, 39:13, 40:13, 41:7, 142:5
**act** [4] - 3:16, 3:25, 4:1, 39:21
**action** [4] - 31:8, 67:19, 88:23, 88:24
**Action** [1] - 1:3
**actions** [7] - 88:24, 89:1, 89:4, 94:8, 98:14
**activate** [1] - 119:12
**activated** [5] - 96:14, 106:21, 107:3, 107:5, 130:14
**active** [2] - 70:4, 85:14
**actual** [7] - 12:25, 16:23, 80:18, 97:7, 124:6, 125:12, 129:8
**Adaway** [3] - 3:2, 9:24, 10:4
**adaway** [1] - 9:25
**add** [2] - 11:13, 68:17
**added** [7] - 46:7, 66:22, 67:5, 76:8, 76:9,

79:3
**adding** [1] - 142:20
**addition** [2] - 13:6, 14:15
**additional** [11] - 15:24, 78:10, 78:11, 79:21, 80:1, 81:24, 87:13, 110:4, 135:8, 138:8, 138:18
**additionally** [1] - 140:21
**address** [4] - 5:9, 6:19, 28:15, 142:1
**addressed** [1] - 145:5
**adequate** [4] - 144:25, 145:8, 145:11, 145:16
**adhere** [1] - 121:20
**adjacent** [1] - 19:5
**administered** [1] - 52:7
**administrative** [3] - 59:8, 60:8, 123:19
**admissible** [1] - 108:24
**admit** [2] - 50:20, 87:5
**admitted** [5] - 18:11, 88:11, 88:15, 106:7, 131:3
**admittedly** [1] - 109:1
**adopted** [2] - 91:7, 91:10
**adrenaline** [1] - 134:3
**advise** [2] - 97:22, 146:13
**advised** [4] - 3:22, 8:19, 136:23, 139:2
**advocate** [1] - 13:5
**affairs** [8] - 69:6, 69:12, 69:15, 69:16, 69:24, 124:13, 126:2, 126:6
**affect** [3] - 3:25, 63:12, 103:12
**affected** [1] - 133:25
**affiliations** [1] - 71:12
**afforded** [1] - 12:10
**AFTERNOON** [1] - 1:5
**afternoon** [7] - 3:14, 6:24, 7:8, 139:4, 139:11, 146:1
**age** [1] - 126:15
**Agencies** [1] - 86:13
**agencies** [8] - 71:25, 72:2, 72:3, 85:5, 89:24, 89:25, 90:3, 90:4
**agency** [6] - 33:8, 33:11, 72:1, 83:24, 101:1, 104:22
**agenda** [2] - 4:19, 8:1
**Agent** [2] - 48:2, 48:9

**agents** [1] - 33:7
**ago** [6] - 17:17, 18:17, 43:20, 103:18, 136:24, 146:10
**agree** [2] - 11:14, 129:24
**agreed** [1] - 4:24
**agreement** [1] - 5:20
**ahead** [5] - 6:1, 11:23, 45:23, 93:14, 126:21
**Ahmed** [2] - 1:13, 2:13
**ahmed.baset@usdoj .gov** [1] - 1:16
**airport** [1] - 60:6
**al** [1] - 86:23
**alerts** [1] - 130:14
**Alison** [1] - 8:24
**allegation** [3] - 14:19, 26:11, 141:5
**allegations** [8] - 14:6, 14:7, 15:2, 27:12, 140:20, 140:23, 141:2
**allege** [1] - 140:24
**alleged** [2] - 25:8, 39:15
**allegedly** [1] - 39:18
**alleges** [1] - 28:7
**allow** [4] - 13:4, 36:12, 68:16, 115:19
**allowable** [1] - 118:3
**allowed** [2] - 82:7, 119:8
**allowing** [1] - 96:3
**allows** [2] - 90:3, 129:13
**alluded** [2] - 38:8, 106:12
**almost** [2] - 51:21, 141:9
**alone** [1] - 76:16
**alternates** [1] - 18:21
**alternative** [4] - 6:14, 7:7, 9:17, 10:9
**alternatives** [1] - 12:13
**alternators** [1] - 99:24
**ambit** [1] - 45:14
**Amendment** [1] - 142:4
**America** [2] - 1:3, 2:2
**amount** [1] - 71:10
**Amster** [1] - 2:7
**analysis** [3] - 49:20, 85:22, 86:7
**analyze** [5] - 73:16, 76:12, 84:24, 85:1, 124:16
**analyzing** [1] - 74:12
**Andrew** [4] - 1:6, 1:20, 2:3, 54:8

**Angeles** [1] - 66:21
**answer** [4] - 9:7, 15:5, 15:24, 138:11
**answering** [1] - 106:10
**answers** [3] - 75:3, 87:22, 87:23
**anticipated** [1] - 5:7
**anytime** [3] - 36:13, 88:23, 124:4
**apart** [1] - 39:10
**apologies** [1] - 116:20
**apologize** [1] - 51:21
**appeal** [2] - 5:25, 6:10
**Appeals** [17] - 3:13, 3:15, 3:22, 4:13, 5:4, 11:14, 11:19, 11:20, 17:10, 25:10, 26:4, 27:20, 34:10, 138:22, 142:17, 146:12, 146:14
**appear** [1] - 36:9
**applies** [4] - 16:19, 16:23, 120:21, 130:13
**apply** [3] - 29:14, 43:11, 130:14
**appointment** [2] - 137:17, 137:19
**appreciate** [2] - 29:8, 137:5
**Appreciate** [1] - 34:2
**apprehend** [3] - 106:19, 111:14, 122:15
**approach** [6] - 13:3, 78:16, 78:20, 120:5, 128:21, 134:23
**approached** [2] - 73:11, 128:2
**approaching** [1] - 133:7
**appropriate** [8] - 9:5, 16:7, 49:16, 68:24, 82:2, 109:13, 145:18
**appropriateness** [1] - 69:22
**approval** [1] - 62:16
**ar** [1] - 106:25
**area** [8] - 47:25, 57:10, 58:19, 107:12, 117:10, 118:13, 132:10, 136:13
**areas** [5] - 60:6, 102:6, 120:8, 120:14, 132:12
**argue** [2] - 10:22, 44:6
**argued** [2] - 42:10, 145:5
**arguing** [3] - 17:25, 26:3, 26:4
**argument** [9] - 26:9, 40:7, 41:17, 43:22, 44:13, 48:13, 49:21, 138:17, 145:4

**arguments** [5] - 6:11, 35:10, 37:10, 39:11
**arise** [1] - 50:6
**arises** [1] - 49:25
**arrest** [1] - 122:15
**arrived** [3] - 22:14, 23:16, 30:14
**arrives** [1] - 99:15
**art** [1] - 82:9
**articles** [1] - 86:1
**articulated** [1] - 40:19
**aspects** [6] - 47:18, 75:14, 77:6, 88:1, 128:16, 128:22
**assertion** [1] - 31:5
**assess** [2] - 29:13, 96:25
**assessment** [3] - 48:21, 101:10, 121:1
**assessments** [3] - 101:8, 120:25
**assign** [1] - 125:17
**assigned** [1] - 63:18
**assignments** [5] - 58:2, 59:5, 61:19, 62:9, 68:4
**assist** [3] - 106:9, 106:10, 132:24
**assistant** [1] - 140:5
**associate** [1] - 143:17
**Association** [8] - 66:3, 71:14, 71:19, 72:4, 72:6, 72:10, 80:5, 83:3
**assume** [3] - 34:11, 123:21, 129:7
**assumes** [1] - 40:9
**assuming** [1] - 10:21
**Atlantic** [1] - 54:15
**attach** [1] - 44:3
**attached** [1] - 6:3
**attachment** [1] - 44:7
**attempt** [5] - 44:9, 106:18, 116:25, 132:6, 132:11
**attempted** [1] - 44:7
**attempting** [1] - 94:1
**attend** [1] - 64:1
**attendance** [2] - 12:12, 13:5
**attended** [1] - 10:12
**attending** [1] - 145:9
**attention** [3] - 12:5, 20:16, 105:12
**attitude** [2] - 127:16, 133:21
**attorney** [4] - 18:11, 21:16, 23:2, 33:2
**Attorney's** [5] - 1:14, 17:13, 72:18, 72:25, 73:15

**attorneys** [1] - 140:5
**authority** [2] - 4:4
**authorized** [3] - 106:20, 107:2, 128:25
**automaton** [1] - 13:22
**available** [7] - 6:20, 9:18, 81:11, 99:10, 99:21, 146:11, 146:25
**Avenue** [2] - 1:24, 148:12
**avoidance** [1] - 127:15
**avoided** [1] - 98:8
**awaiting** [1] - 76:19
**aware** [5] - 13:9, 109:22, 118:13, 133:24, 134:4

# B

**b)** [1] - 12:6
**bachelor's** [1] - 54:14
**backdoor** [2] - 32:17, 32:21
**background** [3] - 57:8, 105:23, 107:21
**balancing** [1] - 39:25
**ban** [2] - 139:24, 141:1
**banned** [1] - 140:22
**banning** [5] - 140:15, 140:17, 141:11, 141:24, 143:23
**barring** [1] - 145:19
**base** [2] - 77:21, 82:24
**based** [12] - 41:17, 60:10, 82:14, 93:2, 94:12, 98:14, 101:18, 104:23, 107:20, 109:7, 134:16, 141:1
**baseline** [2] - 90:23, 100:18
**bases** [1] - 140:15
**BASET** [122] - 12:1, 12:19, 12:21, 14:18, 15:12, 15:18, 15:23, 16:14, 17:1, 17:7, 17:12, 17:15, 17:19, 17:22, 28:14, 28:19, 30:4, 30:6, 39:8, 40:8, 45:2, 45:20, 45:22, 45:24, 46:19, 48:9, 48:12, 48:15, 48:19, 48:24, 49:2, 49:18, 50:2, 50:14, 50:17, 51:1, 51:7, 51:12, 53:1, 53:16, 64:2, 70:6, 70:9, 77:13, 77:17, 77:23, 78:3, 78:8, 78:17, 81:19, 81:24, 82:22, 87:4, 87:12, 87:17, 87:19, 88:7, 88:17,

88:18, 89:9, 89:14, 91:14, 93:10, 93:20, 95:20, 95:22, 96:23, 98:24, 99:16, 100:15, 104:10, 106:14, 106:15, 107:11, 107:24, 108:15, 109:16, 109:18, 109:19, 110:16, 110:19, 110:24, 111:3, 111:5, 111:7, 111:24, 112:2, 112:24, 113:5, 113:11, 113:15, 113:20, 113:23, 114:1, 114:4, 114:7, 114:9, 114:17, 114:19, 114:24, 115:7, 116:2, 116:12, 116:20, 116:21, 121:18, 123:12, 126:14, 126:22, 127:1, 127:3, 127:4, 129:23, 130:10, 130:22, 130:24, 131:1, 131:6, 131:7, 135:8, 136:3, 136:17
**Baset** [18] - 1:13, 2:13, 3:11, 10:21, 17:25, 18:15, 27:10, 28:13, 39:7, 45:1, 48:7, 50:19, 77:10, 78:24, 106:6, 109:13, 112:20, 130:8
**Baset's** [1] - 138:15
**basic** [2] - 60:11, 110:7
**basis** [9] - 86:3, 92:8, 139:24, 140:15, 140:23, 141:11, 141:25, 142:20, 145:7
**battering** [1] - 117:6
**Beach** [15] - 54:19, 57:4, 57:8, 57:10, 57:15, 57:18, 57:25, 58:2, 58:8, 58:11, 58:17, 62:20, 63:7, 66:6, 69:10
**bear** [1] - 136:14
**beards** [1] - 17:18
**bears** [3] - 104:2, 105:1, 105:4
**beautiful** [1] - 76:24
**became** [4] - 9:17, 24:13, 33:8, 33:12
**become** [1] - 82:9
**becomes** [2] - 12:22, 99:9
**BEFORE** [1] - 1:9
**began** [1] - 146:10
**begin** [3] - 101:21, 103:14, 146:21
**beginning** [4] - 23:6,

39:11, 104:19, 108:25
**behalf** [1] - 54:11
**behave** [1] - 89:4
**behind** [3] - 43:6, 64:7, 93:7
**belief** [1] - 47:8
**below** [1] - 110:13
**bench** [5] - 112:8, 112:11, 112:14, 135:10, 135:12
**Bench** [1] - 112:16
**Benevolent** [3] - 72:4, 72:6, 72:10
**BERKOWER** [15] - 2:12, 5:3, 5:18, 6:2, 6:5, 6:13, 7:3, 7:15, 7:23, 21:15, 22:3, 33:23, 35:12, 139:8, 144:19
**Berkower** [6] - 1:13, 2:13, 4:7, 8:17, 15:13, 73:23
**beside** [1] - 63:18
**best** [6] - 21:2, 124:3, 132:23, 139:13, 139:18, 148:6
**better** [1] - 13:25
**between** [7] - 25:8, 50:15, 56:9, 89:6, 116:24, 118:22, 126:3
**beyond** [1] - 29:20
**bias** [1] - 13:24
**biased** [1] - 125:23
**big** [1] - 127:25
**bigger** [2] - 99:23, 99:24
**bike** [1] - 89:16
**bill** [1] - 76:19
**bird** [1] - 38:20
**bit** [15] - 54:22, 56:11, 57:8, 58:21, 61:11, 61:12, 61:13, 64:9, 72:15, 94:22, 94:24, 103:4, 122:8, 134:10, 147:12
**blazer** [1] - 20:7
**block** [2] - 132:6, 132:9
**blue** [2] - 20:7, 21:3
**board** [1] - 68:17
**boards** [3] - 68:2, 68:6, 68:13
**bodily** [2] - 111:18, 116:4
**body** [4] - 3:8, 34:15, 34:16, 74:17
**body-worn** [4] - 3:8, 34:15, 34:16, 74:17
**Book** [1] - 81:17
**borrowed** [1] - 66:21

**bother** [1] - 29:15
**bottom** [1] - 105:22
**bound** [1] - 82:13
**box** [1] - 31:15
**boy** [1] - 87:22
**brake** [2] - 71:10, 118:24
**braking** [1] - 99:24
**break** [12] - 32:16, 50:3, 99:9, 99:11, 99:12, 99:13, 100:20, 104:24, 118:17, 126:12, 146:6, 146:7
**breed** [1] - 56:8
**breeding** [1] - 56:5
**brief** [6] - 14:12, 20:8, 20:23, 130:22, 147:1
**briefed** [1] - 5:22
**briefing** [1] - 145:2
**briefly** [7] - 18:14, 63:5, 64:25, 68:13, 77:25, 86:14, 144:19
**bring** [9] - 18:2, 44:19, 47:23, 51:18, 63:10, 65:3, 65:8, 84:21, 85:1
**bringing** [1] - 15:7
**broad** [4] - 83:19, 83:22, 89:10, 120:11
**broken** [1] - 38:20
**Bromwich** [10] - 17:5, 17:9, 17:16, 21:19, 21:24, 22:13, 50:7, 50:8, 50:9, 50:10
**brought** [4] - 18:20, 19:11, 19:20, 64:22
**Broward** [12] - 54:19, 58:22, 59:3, 59:16, 62:20, 64:11, 66:5, 69:10, 69:23, 72:7, 84:12, 90:15
**Brown** [29] - 2:22, 3:12, 3:18, 4:13, 7:1, 12:24, 13:8, 14:13, 15:4, 20:4, 23:4, 25:8, 27:11, 29:2, 31:6, 35:19, 37:1, 37:14, 39:3, 39:12, 39:16, 39:22, 40:3, 40:12, 44:18, 112:21, 136:13, 141:17, 143:23
**Brown's** [7] - 8:21, 11:25, 26:4, 29:1, 30:2, 139:6, 139:10
**budget** [2] - 90:2, 90:5
**build** [3] - 90:2, 134:3, 135:24
**building** [1] - 144:11
**built** [1] - 102:16
**bullet** [5] - 127:14, 128:17, 129:16,

132:11, 133:12
**bulletins** [1] - 80:6
**bumps** [1] - 67:7
**bureau** [2] - 58:5, 69:15
**business** [3] - 56:5, 56:6, 102:17
**businesses** [1] - 56:4
**BY** [26] - 53:16, 64:2, 70:9, 77:23, 82:22, 88:18, 89:14, 91:14, 93:20, 96:23, 98:24, 99:16, 100:15, 106:15, 109:19, 111:7, 114:24, 115:7, 116:2, 116:12, 116:21, 121:18, 123:12, 127:4, 130:10, 131:7
**bypass** [1] - 119:23

**C**

**C-A-L-E-A** [1] - 86:11
**cafeteria** [1] - 137:7
**calculus** [2] - 101:12, 128:12
**CALEA** [5] - 86:11, 86:12, 86:21, 86:23
**camera** [2] - 34:17, 36:10
**cameras** [3] - 3:8, 34:15, 74:17
**cannot** [3] - 40:10, 107:1, 119:7
**capability** [1] - 102:24
**capacities** [1] - 68:6
**capacity** [1] - 64:9
**captain** [2] - 125:11, 125:18
**captions** [2] - 46:7, 46:8
**car** [12] - 43:5, 44:15, 61:17, 67:7, 67:12, 98:5, 99:4, 99:9, 103:10, 103:20
**care** [1] - 90:23
**career** [11] - 54:24, 55:5, 55:6, 61:15, 62:24, 68:1, 69:25, 70:12, 70:20, 104:19, 139:2
**carrying** [1] - 92:22
**cars** [10] - 55:9, 58:14, 71:3, 71:5, 99:8, 99:22, 99:25, 103:5
**case** [46] - 2:2, 4:14, 6:9, 13:24, 16:8, 16:9, 16:10, 16:16, 18:12, 31:6, 39:24, 40:3, 40:15, 41:5, 41:6,

42:22, 47:23, 48:4, 49:5, 49:6, 49:14, 51:24, 52:13, 52:21, 54:7, 72:22, 73:6, 73:12, 73:18, 76:16, 80:2, 80:16, 80:18, 82:10, 82:20, 95:11, 95:13, 106:5, 111:22, 112:19, 115:8, 115:13, 126:9, 136:4, 138:15
**cases** [13] - 4:7, 15:25, 16:4, 16:10, 41:18, 54:11, 56:15, 56:16, 64:24, 79:10, 79:25, 80:9
**Cassell** [1] - 27:19
**catch** [1] - 103:13
**caught** [1] - 6:6
**caused** [1] - 39:21
**causing** [3] - 88:24, 89:1, 89:4
**Cavaliers** [1] - 56:10
**Cavapoos** [1] - 56:9
**caz@zampognalaw.com** [1] - 1:22
**CCR** [1] - 148:11
**cease** [1] - 95:21
**cell** [1] - 32:1
**center** [3] - 97:20, 97:22, 98:1
**central** [2] - 97:20, 97:21
**ceremonial** [1] - 35:24
**certain** [11] - 6:11, 24:3, 52:2, 87:5, 101:19, 106:12, 109:5, 111:15, 120:14, 126:15, 132:12
**certainly** [4] - 16:23, 40:17, 41:3, 76:19
**CERTIFICATE** [1] - 148:1
**certified** [4] - 70:2, 70:4, 70:5, 70:7
**certify** [1] - 148:3
**chair** [3] - 66:14, 69:1, 84:11
**chaired** [1] - 64:12, 65:3
**challenge** [1] - 41:6
**challenging** [1] - 38:1
**change** [1] - 110:6, 133:16
**changed** [2] - 104:22, 146:23
**changes** [2] - 66:15, 67:9
**changing** [1] - 93:17
**channel** [3] - 118:6, 118:16, 118:17

**characteristic** [1] - 94:17
**charge** [4] - 44:8, 44:9, 44:11, 45:10
**charged** [8] - 39:15, 39:20, 39:22, 40:10, 40:21, 52:17, 52:19, 76:18
**charges** [1] - 44:22
**charging** [2] - 76:4, 76:7
**Charlayna** [2] - 23:1, 144:8
**Charles** [2] - 56:9, 139:16
**chase** [7] - 89:7, 89:9, 89:12, 89:16, 89:17, 103:12
**chasing** [1] - 113:8
**chat** [1] - 112:13
**chatting** [1] - 21:22
**check** [2] - 6:25, 7:7
**Chief** [2] - 80:6, 83:3
**chief** [3] - 59:6, 59:25, 90:14
**Chiefs** [3] - 66:3, 71:15, 71:19
**Christopher** [2] - 1:20, 2:9
**circuit** [1] - 9:2
**circuits** [1] - 16:5
**circumstances** [8] - 7:16, 92:2, 92:3, 98:17, 98:21, 98:23, 113:18, 125:19
**cited** [4] - 15:25, 16:3, 16:10, 41:19
**cites** [1] - 16:4
**City** [1] - 54:19
**city** [7] - 57:25, 59:3, 60:9, 62:20, 63:7, 63:16, 76:24
**civil** [6] - 56:15, 56:16, 80:9, 127:24, 128:3, 128:16
**claim** [1] - 85:11
**clarify** [1] - 38:12
**clarifying** [2] - 7:23, 143:21
**classes** [1] - 85:14
**classified** [1] - 67:21
**classify** [2] - 67:20, 92:4
**clause** [2] - 140:22, 142:4
**clear** [26] - 13:18, 14:4, 15:3, 16:2, 16:12, 16:19, 16:22, 18:15, 26:5, 26:9, 26:14, 27:16, 29:5, 29:19,

34:7, 46:13, 46:20, 46:24, 47:24, 53:19, 63:19, 77:7, 118:16, 131:2, 131:9, 147:6
**clerk** [2] - 5:4, 139:2
**client** [4] - 37:13, 44:2, 44:9, 56:24
**client's** [1] - 44:22
**close** [5] - 52:21, 53:12, 131:22, 131:23, 146:20
**closes** [2] - 131:21, 137:8
**closest** [1] - 34:13
**clothing** [1] - 21:10
**CMR** [1] - 148:11
**coat** [1] - 21:5
**coats** [5] - 3:2, 6:23, 9:21, 137:24
**codefendants** [1] - 41:5
**collaborative** [1] - 65:19
**collection** [2] - 84:17, 124:9
**collects** [1] - 84:14
**colonel** [7] - 55:4, 59:7, 59:8, 59:10, 59:13, 60:4, 68:12
**colonels** [1] - 59:12
**COLUMBIA** [1] - 1:1
**combination** [2] - 42:24, 43:8
**combines** [1] - 127:24
**comfortable** [1] - 12:1
**coming** [5] - 73:18, 127:9, 140:16, 140:18, 142:2
**command** [2] - 59:14, 60:7
**commander** [11] - 58:12, 59:6, 59:7, 59:25, 60:3, 121:7, 121:15, 124:1, 124:17, 124:25
**commanding** [4] - 125:3, 125:4, 125:7, 125:11
**comment** [1] - 108:7
**commentary** [1] - 43:21
**commenting** [1] - 108:10
**Commission** [1] - 86:12
**commit** [3] - 47:9, 92:11, 115:10
**committed** [4] - 39:19, 47:8, 92:11, 115:10
**committee** [11] -

63:11, 64:12, 64:14,
64:17, 65:3, 65:4,
65:12, 66:14, 69:2,
84:12, 90:15
**committees** [1] -
63:13
**common** [7] - 89:17,
117:5, 121:11, 124:24,
126:11, 133:3, 133:8
**communicated** [2] -
9:22, 141:6
**communications** [5] -
97:18, 97:20, 97:21,
98:1, 118:5
**companies** [1] - 56:3
**company** [3] - 55:15,
55:20, 56:1
**compare** [7] - 111:19,
118:9, 118:25, 119:9,
120:9, 122:17, 133:23
**compared** [1] - 116:5
**compares** [1] - 121:10
**comparing** [1] - 123:6
**comparison** [1] -
108:11
**compensated** [1] -
74:1
**compile** [2] - 65:9
**complainants** [1] -
33:6
**complaint** [1] - 36:20
**complete** [2] - 8:23,
148:5
**completed** [1] - 68:15
**completely** [3] - 44:21,
82:18, 104:20
**complicated** [1] -
109:6
**comports** [1] - 107:13
**conceiving** [2] - 64:6,
65:1
**concept** [1] - 83:16
**concepts** [1] - 83:17
**concern** [1] - 132:17
**concerned** [1] - 125:2
**concerning** [1] - 56:12
**conclude** [1] - 52:23
**conclusion** [2] -
82:16, 82:17
**conclusions** [4] -
82:6, 82:8, 82:19
**concrete** [1] - 66:15
**concur** [1] - 128:4
**condition** [2] - 50:21,
113:17
**conditions** [4] - 18:5,
110:11, 111:15, 122:2
**conduct** [5] - 29:2,
31:20, 39:14, 39:15,
83:1, 123:19, 125:18

**conducted** [4] - 69:7,
69:25, 77:9, 118:6
**conducting** [1] - 69:12
**conference** [4] -
85:12, 112:8, 112:11,
112:14
**conferences** [2] -
85:8, 85:16
**conferring** [2] - 21:16,
22:4
**configuration** [2] -
102:20, 102:22
**confined** [1] - 118:7
**confirm** [2] - 37:12,
124:19
**congress** [1] - 27:19
**conjunction** [3] -
109:11, 126:2, 126:8
**connect** [3] - 44:9,
51:3, 51:4
**connected** [2] - 51:10,
88:10
**consequences** [2] -
61:8, 104:5
**consider** [14] - 3:24,
4:4, 9:7, 12:13, 13:7,
40:4, 52:14, 82:19,
83:18, 83:23, 92:5,
92:18, 130:2, 146:18
**consideration** [5] -
65:22, 83:14, 102:4,
103:4, 103:7
**considerations** [4] -
83:15, 83:23, 128:22,
133:12
**considered** [7] - 36:5,
65:25, 98:11, 103:3,
113:9, 113:15, 125:7
**considering** [3] -
42:20, 101:20, 133:6
**consistent** [16] -
117:12, 117:23,
120:22, 122:6, 122:8,
122:23, 123:15,
127:16, 128:1, 128:21,
128:24, 132:16,
133:13, 133:18, 134:9,
134:23
**conspiracy** [1] - 39:20
**constant** [1] - 101:8
**constantly** [3] - 37:14,
37:16, 97:12
**constitutes** [2] -
88:20, 148:4
**Constitution** [2] -
1:24, 148:12
**constitutional** [4] -
40:1, 47:25, 49:7, 49:8
**consult** [2] - 73:19
**consultant** [1] - 56:21

**Consultants** [1] -
55:15
**consulted** [1] - 80:17
**consulting** [6] - 21:24,
55:22, 73:23, 79:6,
79:9
**contact** [5] - 25:8,
31:7, 38:21, 98:5,
116:24
**contacted** [1] - 5:4
**contacting** [1] -
139:23
**contained** [2] -
117:18, 120:24
**continue** [6] - 67:17,
101:21, 120:18, 130:9,
141:11, 141:25
**continuing** [4] -
139:24, 142:15,
142:16, 142:23
**continuous** [3] - 6:21,
119:24, 123:14
**continuously** [1] -
121:5
**Contra** [1] - 17:17
**contract** [4] - 72:24,
73:14, 84:16, 84:19
**contracted** [2] - 73:16,
86:2
**contracts** [4] - 60:8,
60:9, 79:22
**contradict** [1] - 26:14
**contradicted** [2] -
14:25, 29:21
**control** [14] - 6:25,
94:1, 98:16, 100:4,
100:8, 101:14, 101:17,
102:22, 115:25, 118:5,
119:7, 120:6, 129:5,
129:14
**controlling** [1] - 44:21
**controversial** [1] -
137:14
**conveniently** [1] -
48:2
**conversation** [2] -
19:21, 88:9
**conversations** [1] -
14:12
**conversing** [1] - 31:24
**convert** [1] - 5:23
**convincing** [12] - 14:4,
15:3, 16:2, 16:12,
16:19, 16:22, 26:5,
26:10, 26:14, 27:17,
29:5, 29:19
**coordinator** [2] - 7:3,
7:18
**coordinators** [1] - 7:9
**copies** [1] - 3:17

**copy** [2] - 9:12, 112:1
**cording** [1] - 121:3
**corner** [2] - 36:8,
36:12
**Correct** [1] - 143:25
**correct** [15] - 19:1,
51:6, 73:25, 76:4,
79:15, 80:9, 88:6,
112:1, 119:15, 120:2,
123:3, 123:9, 144:5,
146:1, 147:7
**correctly** [2] - 40:9,
106:22
**corroborated** [1] -
15:8
**counsel** [29] - 2:5,
3:16, 3:18, 3:19, 3:20,
4:13, 6:7, 9:11, 11:3,
17:23, 18:8, 27:6,
27:10, 27:13, 27:14,
30:17, 32:7, 33:21,
34:18, 34:24, 37:11,
47:5, 47:16, 50:15,
138:18, 143:2, 145:15,
146:25
**count** [2] - 41:16,
41:17
**countries** [1] - 84:3
**country** [8] - 84:15,
126:10, 131:12,
133:10, 133:19, 134:8,
134:12, 134:15
**counts** [1] - 41:16
**County** [11] - 54:19,
57:1, 58:22, 59:3,
59:16, 62:20, 66:5,
66:6, 72:7, 84:12,
90:15
**county** [2] - 58:1, 66:5
**couple** [7] - 5:12, 6:13,
15:6, 45:24, 102:12,
111:16, 123:14
**course** [15] - 4:21,
10:16, 18:10, 35:23,
69:1, 69:25, 70:16,
70:20, 70:25, 75:9,
76:21, 79:23, 84:18,
106:8, 139:1
**courses** [5] - 70:13,
70:17, 70:24, 79:11
**Court** [42] - 1:23, 2:7,
3:13, 3:15, 3:22, 4:13,
5:4, 5:12, 6:20, 9:4,
9:7, 10:17, 11:2, 11:14,
11:18, 11:19, 12:9,
12:11, 12:23, 13:17,
17:10, 17:20, 25:10,
26:4, 27:20, 28:10,
34:10, 44:25, 47:10,
48:3, 49:13, 81:11,

138:22, 141:23,
142:17, 145:11,
145:12, 146:12,
146:13, 148:11
  **court** [39] - 3:1, 4:8,
6:17, 9:2, 11:18, 11:20,
12:7, 12:8, 14:14,
15:21, 16:6, 19:14,
20:21, 21:4, 21:6,
26:16, 27:1, 27:6,
28:20, 31:10, 32:4,
47:15, 53:13, 56:19,
77:20, 80:12, 112:13,
114:10, 136:18,
139:15, 143:10,
143:12, 143:14, 144:9,
145:6, 145:25, 146:1,
146:3
  **COURT** [273] - 1:1,
2:11, 2:14, 5:14, 5:19,
6:4, 6:7, 6:23, 7:6,
7:14, 7:18, 8:4, 8:11,
8:14, 8:25, 9:19, 10:3,
10:8, 10:13, 10:15,
10:21, 11:4, 11:7,
11:12, 11:17, 12:16,
12:20, 14:17, 15:6,
15:17, 15:20, 15:25,
16:25, 17:3, 17:8,
17:14, 17:16, 17:21,
17:23, 18:15, 18:24,
19:2, 19:9, 19:13,
19:19, 19:23, 20:1,
20:9, 20:12, 20:17,
20:20, 20:24, 21:2,
21:8, 21:12, 21:23,
22:7, 22:10, 22:13,
22:19, 22:25, 23:7,
23:10, 23:12, 23:15,
23:18, 23:20, 23:25,
24:5, 24:15, 24:20,
24:22, 25:1, 25:3, 25:5,
28:4, 28:12, 28:16,
30:3, 30:5, 30:13,
30:20, 30:22, 30:24,
31:11, 31:15, 31:17,
32:7, 32:23, 33:7,
33:11, 33:16, 33:19,
33:21, 34:1, 34:4, 34:7,
35:15, 35:21, 36:15,
36:23, 37:3, 37:8,
37:16, 37:18, 37:24,
38:3, 38:5, 38:8, 38:11,
38:18, 39:1, 39:5, 39:9,
41:13, 43:23, 43:25,
44:10, 45:1, 45:15,
45:21, 45:23, 46:1,
46:5, 46:15, 47:19,
48:6, 48:11, 48:13,
48:17, 48:23, 48:25,
49:8, 49:23, 50:3, 50:8,

50:13, 50:16, 50:18,
50:25, 51:2, 51:10,
51:15, 51:18, 53:10,
53:12, 63:23, 70:5,
77:12, 77:22, 78:1,
78:6, 78:13, 78:21,
79:5, 79:13, 80:23,
81:3, 81:6, 81:12,
81:14, 81:18, 81:20,
81:22, 82:3, 87:11,
87:16, 87:18, 88:5,
88:8, 88:13, 88:15,
89:8, 91:3, 91:13,
93:11, 93:13, 95:19,
96:17, 96:19, 98:21,
99:11, 99:13, 100:7,
100:10, 100:12,
100:14, 104:7, 104:9,
106:1, 107:8, 107:15,
108:4, 108:13, 108:23,
109:17, 110:15,
110:17, 110:20, 111:1,
111:4, 111:6, 111:23,
111:25, 112:3, 112:8,
112:11, 112:17, 113:4,
113:10, 113:12,
113:19, 113:21,
113:24, 114:2, 114:5,
114:8, 114:11, 114:15,
114:18, 114:22, 115:5,
115:22, 116:9, 116:18,
121:15, 123:2, 123:6,
126:12, 126:15,
126:17, 126:20,
126:25, 127:2, 129:21,
129:24, 130:20,
130:23, 130:25, 131:2,
135:10, 135:13,
135:18, 135:22,
135:24, 136:8, 136:16,
136:19, 136:23, 137:4,
137:12, 139:9, 139:14,
140:2, 140:8, 141:16,
141:21, 142:7, 142:14,
142:24, 143:3, 143:8,
143:25, 144:4, 144:7,
144:15, 145:21,
145:24, 146:2, 146:3,
147:9, 147:11, 148:1
  **Court's** [3] - 12:4,
142:2, 145:19
  **court's** [1] - 140:17
  **courtesy** [1] - 9:12
  **Courthouse** [1] - 1:24
  **courthouse** [1] - 60:7
  **courtroom** [53] - 2:22,
2:23, 2:25, 3:3, 3:5,
6:14, 6:18, 9:15, 9:16,
9:17, 9:23, 9:24, 9:25,
10:4, 10:9, 12:25, 13:2,

13:4, 13:8, 13:11,
13:13, 15:4, 15:8, 16:6,
18:2, 18:4, 18:9, 18:10,
31:4, 31:13, 31:19,
32:3, 32:10, 32:15,
32:20, 32:24, 32:25,
34:12, 35:25, 40:6,
40:13, 51:14, 137:11,
138:20, 139:25,
140:16, 140:17,
140:22, 141:1, 141:6,
141:12, 143:24
  **COURTROOM** [4] -
2:1, 7:13, 51:13, 53:7
  **cover** [5] - 40:22,
40:25, 61:13, 70:18,
127:9
  **cover-up** [1] - 40:22
  **covers** [1] - 105:22
  **Cramer** [4] - 6:24, 7:6,
7:10, 7:20
  **crash** [5] - 43:4, 45:8,
45:17, 125:24, 126:9
  **CRC** [1] - 1:23
  **create** [6] - 13:25,
49:6, 49:8, 83:13,
83:18, 146:4
  **creates** [1] - 116:5
  **creating** [1] - 2:22
  **Crime** [6] - 12:7,
29:10, 39:13, 40:12,
41:7, 142:4
  **crime** [16] - 12:8, 12:9,
13:21, 16:15, 16:20,
39:18, 39:23, 40:21,
92:11, 94:1, 94:7, 95:2,
101:14, 101:17, 115:24
  **crimes** [9] - 52:17,
52:18, 52:20, 58:4,
58:16, 58:18, 92:8,
95:5
  **Criminal** [1] - 1:3
  **criminal** [12] - 2:1,
12:14, 27:3, 39:25,
40:2, 54:14, 80:16,
80:18, 83:11, 84:20,
117:22
  **cross** [11] - 4:24,
105:24, 108:19, 114:1,
114:2, 135:15, 136:7,
143:5, 146:21, 147:1,
147:7
  **cross-examination** [3]
- 108:19, 147:1, 147:7
  **cross-examine** [1] -
143:5
  **cross-reference** [1] -
114:1
  **crossed** [1] - 17:8
  **CRR** [2] - 1:23, 148:11

**crying** [1] - 141:13
  **CSO** [32] - 15:7, 23:9,
23:25, 24:4, 24:23,
24:24, 24:25, 25:4,
25:15, 25:17, 28:4,
28:13, 28:14, 30:13,
30:19, 30:21, 30:23,
31:9, 31:12, 31:16,
31:21, 32:12, 33:1,
33:8, 33:9, 33:12,
33:13, 33:17, 33:18,
33:20, 34:3, 34:5
  **CSOs** [3] - 14:18,
36:7, 36:11
  **current** [2] - 50:23,
142:2
  **cushion** [1] - 135:25
  **cut** [1] - 32:3
  **cutting** [1] - 96:1
  **CVRA** [1] - 144:24

# D

  **D-2** [1] - 110:12
  **D-R-A-G-O** [1] - 53:21
  **D.C** [12] - 54:1, 72:18,
72:25, 74:1, 76:21,
94:18, 125:13, 126:4,
130:12, 134:19, 138:4,
148:13
  **D.C.'s** [1] - 94:10
  **Dade** [1] - 66:5
  **daily** [3] - 86:3, 144:25
  **danger** [3] - 104:1,
128:7, 128:8
  **dangerous** [4] - 96:3,
96:5, 102:1, 102:19
  **dangers** [1] - 90:18
  **data** [7] - 65:8, 65:25,
84:16, 84:24, 90:6,
124:8, 124:16
  **date** [1] - 18:18
  **dated** [1] - 78:25
  **Dated** [1] - 148:7
  **David** [2] - 87:12,
105:15
  **DAY** [2] - 1:5, 1:9
  **days** [6] - 6:6, 18:16,
22:21, 61:20, 76:21,
145:10
  **DC** [5] - 1:6, 1:15,
1:18, 1:21, 1:25
  **Deadly** [1] - 113:10
  **deadly** [7] - 111:14,
112:6, 112:19, 113:9,
113:14, 113:15, 113:22
  **deal** [7] - 4:11, 7:14,
17:21, 49:25, 137:15,
138:9, 138:10
  **dealing** [1] - 33:5

dealt [1] - 146:6
death [7] - 39:22, 40:16, 44:15, 111:18, 116:3, 122:16, 141:13
debated [1] - 81:14
debating [1] - 41:25
decedent [1] - 16:21
decedent's [4] - 31:12, 31:22, 32:5, 32:15
December [3] - 76:1, 79:1, 87:14
decide [8] - 3:23, 41:18, 41:24, 67:19, 138:24, 142:25, 146:14
decided [2] - 23:6, 26:1
deciding [2] - 52:16, 101:20
decision [5] - 68:15, 68:23, 103:12, 139:3, 145:4
decisionmaking [1] - 105:3
decisions [1] - 16:6
deeper [1] - 146:16
deescalation [1] - 79:24
Defendant [1] - 1:16
defendant [8] - 27:15, 32:18, 40:1, 40:2, 41:6, 41:11, 42:8, 52:22
defendant's [1] - 32:18
defendants [17] - 17:23, 21:16, 22:5, 22:11, 26:23, 27:13, 32:24, 33:5, 34:19, 34:25, 35:6, 42:9, 42:12, 43:11, 52:16, 73:9, 138:15
Defendants [1] - 1:7
defense [18] - 2:5, 21:17, 21:25, 26:7, 26:8, 27:6, 29:4, 33:2, 34:13, 34:18, 34:24, 56:22, 70:8, 88:10, 141:10, 141:15, 145:2, 146:25
defense's [1] - 8:2
define [1] - 108:17
defined [4] - 40:6, 66:22, 106:18, 128:20
defines [2] - 118:2, 121:6
defining [1] - 94:17
definitely [1] - 102:6
definition [5] - 39:18, 47:13, 61:12, 88:19, 109:23
definitions [4] -

105:23, 106:16, 109:20, 113:7
degree [5] - 5:10, 39:16, 42:20, 44:8, 54:14
delays [1] - 7:15
deliberate [1] - 52:13
deliberations [2] - 46:17, 106:9
delivered [1] - 130:3
delve [1] - 61:12
demographics [1] - 66:4
demonstrative [12] - 8:8, 42:13, 46:2, 46:8, 46:11, 46:15, 46:16, 47:4, 106:2, 115:6, 116:18, 131:4
demonstratives [1] - 47:16
denied [1] - 35:23
density [1] - 102:4, 102:5
Department [6] - 33:15, 42:11, 52:6, 52:8, 52:11, 84:7
department [20] - 57:2, 57:9, 59:11, 60:24, 68:9, 90:6, 91:15, 97:10, 104:14, 105:1, 106:19, 119:6, 120:18, 124:5, 125:5, 125:8, 125:9, 125:10, 128:5
department's [1] - 84:1
departments [23] - 54:18, 62:19, 63:1, 63:4, 64:5, 69:9, 83:6, 83:12, 83:20, 86:18, 90:22, 90:25, 91:4, 91:6, 93:25, 95:14, 97:11, 124:22, 126:5, 126:11, 129:1, 131:12, 134:7
deposition [1] - 56:14
depositions [2] - 76:13, 80:9
DEPUTY [5] - 2:1, 7:13, 24:11, 51:13, 53:7
deputy [9] - 15:13, 21:8, 22:20, 22:22, 25:13, 34:9, 35:10, 143:11, 144:8
Deputy [1] - 35:15
describe [6] - 8:8, 28:11, 57:22, 68:14, 86:14, 119:20
described [5] - 12:10,

12:11, 30:8, 110:8, 110:13
deserves [2] - 82:21, 109:14
design [1] - 85:5
designates [1] - 7:11
designed [1] - 86:23
desired [1] - 127:15
despite [2] - 146:15, 146:21
detail [1] - 61:13
detailed [1] - 52:19
details [1] - 35:13
detective [7] - 33:13, 33:14, 58:5, 69:14, 69:17, 69:18, 143:13
determination [2] - 12:11, 102:25
determinations [1] - 125:1
determiner [1] - 129:20
determining [1] - 102:21
develop [2] - 83:12, 127:15
developed [1] - 79:11
development [1] - 64:20
develops [1] - 83:24
device [1] - 120:6
devices [8] - 98:16, 100:8, 102:22, 106:21, 107:3, 120:22, 129:5, 129:14
DICKMAN [1] - 148:3
Dickman [2] - 1:23, 148:11
differ [1] - 91:1
difference [3] - 41:12, 89:6, 89:15
differences [1] - 66:19
different [37] - 11:8, 16:8, 16:9, 16:10, 24:9, 27:25, 28:1, 41:17, 55:7, 58:6, 59:8, 60:5, 60:25, 68:6, 68:9, 71:25, 83:11, 83:17, 83:23, 84:16, 84:17, 84:19, 84:21, 86:17, 89:25, 91:20, 97:21, 103:15, 108:2, 108:4, 108:5, 115:23, 115:25, 124:7, 124:10, 139:15, 146:1
difficult [2] - 29:11, 101:14
direct [12] - 13:16, 45:5, 64:6, 65:4, 98:5, 101:3, 101:4, 105:12,

114:15, 114:19, 117:9, 127:2
DIRECT [1] - 53:15
directed [1] - 94:8
direction [6] - 3:19, 35:4, 38:22, 62:15, 90:4, 124:11
directions [2] - 60:16, 89:23
directive [1] - 120:13, 122:9
directives [4] - 85:4, 92:7, 92:16, 94:20
directly [9] - 22:5, 34:20, 45:9, 45:13, 46:23, 61:16, 62:4, 118:2, 123:22
disagrees [1] - 108:19
discipline [8] - 68:2, 68:10, 68:13, 68:16, 68:18, 68:19, 68:20
disciplines [1] - 84:22
discontinue [1] - 120:20
discover [1] - 143:7
discretion [5] - 91:18, 92:23, 92:24, 101:6
discuss [5] - 63:11, 77:4, 86:3, 108:23, 109:3
discussed [6] - 18:16, 87:20, 109:21, 125:25, 129:13, 134:6
discussing [4] - 46:23, 87:7, 107:25, 131:3
discussion [8] - 4:17, 44:10, 50:15, 66:23, 112:16, 114:14, 128:3, 135:12
disobey [5] - 100:6, 129:5, 129:14, 135:3, 135:7
disobeying [1] - 98:16
dispatch [1] - 122:21
dispatcher [5] - 117:12, 117:19, 117:21, 118:5, 119:12
display [1] - 131:9
displays [1] - 29:3
dispute [2] - 29:24, 141:8
disputing [1] - 28:21
disregard [1] - 82:18
disseminate [1] - 85:7
distance [3] - 118:20, 118:22, 119:3
distinction [2] - 96:2, 126:3
distinctly [1] - 36:7

**distribute** [1] - 85:3
**district** [7] - 4:8,
58:12, 59:6, 59:25,
60:1, 60:2, 60:3
**DISTRICT** [3] - 1:1,
1:1, 1:10
**districts** [1] - 60:3
**disturb** [1] - 13:24
**disturbance** [1] -
13:19
**diversity** [1] - 85:25
**divest** [1] - 4:8
**docket** [3] - 3:1, 5:17,
39:12
**doctor's** [1] - 137:17
**document** [5] - 80:25,
85:2, 123:7, 129:21,
130:4
**documentation** [1] -
137:19
**documents** [3] -
11:18, 73:17, 74:12
**dog** [1] - 56:5
**dogs** [1] - 56:8
**domestic** [1] - 33:13
**done** [17] - 3:3, 3:17,
9:13, 10:5, 44:23,
65:16, 79:9, 79:11,
79:13, 93:18, 108:6,
136:10, 146:16, 147:14
**door** [2] - 49:9, 49:15
**doubt** [1] - 29:9
**down** [11] - 20:6, 20:7,
35:5, 101:3, 119:24,
131:21, 131:22,
131:23, 136:20,
137:12, 144:14
**drafting** [1] - 64:6
**Drago** [24] - 4:19,
4:23, 8:9, 41:21, 42:15,
45:25, 46:18, 48:10,
50:4, 53:1, 53:8, 53:21,
53:24, 77:11, 77:18,
78:16, 78:20, 78:24,
81:7, 82:10, 136:10,
136:20, 146:8, 147:14
**DRAGO** [1] - 53:3
**Drago's** [9] - 2:19, 5:1,
17:4, 17:20, 42:10,
46:21, 88:16, 136:3,
136:10
**draw** [2] - 12:4, 43:10
**dressed** [1] - 20:20
**drive** [8] - 55:8, 58:13,
71:3, 103:21, 117:8,
120:12, 128:19, 132:13
**driven** [2] - 44:15,
44:17
**driver** [6] - 75:2, 75:5,
87:21, 87:22, 103:25,
127:18
**driving** [12] - 44:22,
61:17, 61:22, 70:13,
70:18, 75:2, 98:15,
98:18, 98:19, 127:16,
128:16, 128:20
**due** [4] - 128:19,
140:21, 142:4, 142:22
**duly** [1] - 53:4
**during** [30] - 7:4,
24:17, 30:8, 43:5,
46:16, 58:2, 59:24,
63:23, 65:21, 68:1,
70:12, 90:20, 96:14,
96:22, 97:1, 99:4,
100:4, 101:11, 106:8,
118:18, 120:25,
132:23, 133:25, 134:1,
141:7, 141:13, 142:2,
142:5, 145:6, 147:7
**duties** [4] - 59:7,
59:23, 60:8, 69:11
**duty** [1] - 70:4
**dying** [1] - 30:11

# E

**E)(4** [1] - 123:15
**early** [2] - 42:4, 57:7
**easier** [1] - 104:11
**easily** [1] - 103:21
**ECF** [1] - 9:11
**educated** [1] - 49:21
**education** [2] - 54:13,
82:15
**effect** [3] - 83:16,
102:6, 140:18
**effecting** [1] - 117:16
**effectively** [1] - 13:14
**efficacy** [1] - 69:22
**efficient** [1] - 51:20
**effort** [2] - 12:12,
47:22
**either** [13] - 3:1, 3:10,
28:17, 35:5, 43:23,
50:22, 52:22, 61:24,
63:1, 64:5, 82:18,
103:19, 140:9
**elaborate** [2] - 67:10,
89:2
**elaborating** [1] -
114:20
**elected** [3] - 72:11,
72:12, 72:14
**element** [2] - 125:17,
125:21
**elude** [1] - 67:17
**Email** [4] - 1:15, 1:16,
1:19, 1:22
**email** [10] - 4:2, 4:6,
5:21, 5:23, 7:20, 9:23,
43:12, 43:14, 137:23,
140:5
**emails** [5] - 2:17, 6:3,
6:8, 7:10, 42:1
**emergency** [26] -
70:19, 75:18, 88:3,
96:13, 96:16, 96:18,
96:21, 99:22, 106:20,
107:3, 107:4, 119:11,
119:13, 120:22,
128:18, 128:19, 129:1,
129:8, 130:12, 130:14,
130:16, 132:21,
132:23, 134:10
**emotion** [1] - 133:22
**emotional** [2] - 16:5,
24:13
**emotions** [3] - 13:23,
133:25, 134:5
**emphasize** [1] - 16:1
**emphasized** [1] - 16:2
**employees** [2] - 57:20,
143:11
**enable** [1] - 96:1
**encompass** [1] -
96:16
**encompasses** [2] -
96:20, 96:21
**end** [15] - 5:12, 34:21,
51:24, 52:12, 82:2,
90:9, 92:18, 103:16,
124:7, 124:14, 134:4,
134:17, 135:25,
136:24, 137:5
**endanger** [3] - 115:18,
128:20, 129:17
**endangering** [1] -
119:8
**endeavored** [2] -
12:23, 13:17
**ending** [1] - 126:24
**enforce** [2] - 95:8,
95:10
**Enforcement** [1] -
86:13
**enforcement** [31] -
32:13, 33:8, 33:11,
54:16, 54:23, 55:1,
55:3, 55:5, 55:25,
61:15, 64:21, 70:2,
70:6, 70:7, 71:12, 72:1,
80:5, 83:17, 85:4, 85:5,
85:12, 89:18, 89:23,
89:25, 104:16, 104:22,
104:25, 118:15, 124:3,
128:16
**enforcement-related**
[1] - 70:2
**engage** [10] - 38:2,
48:20, 62:7, 91:18,
102:21, 112:24, 115:1,
115:8, 115:17, 129:2
**engaged** [2] - 101:9,
107:1
**engagement** [1] -
132:5
**engaging** [4] - 104:5,
110:10, 128:12, 129:4
**enjoyed** [1] - 76:23
**ensure** [4] - 6:20,
12:9, 118:23, 134:18
**ensures** [1] - 124:13
**entail** [1] - 102:8
**entailed** [1] - 103:22
**enter** [1] - 51:14
**entered** [2] - 54:25,
57:6
**entering** [1] - 133:21
**entire** [2] - 63:23,
138:5
**entirety** [1] - 110:21
**environment** [1] -
133:13
**environmental** [3] -
101:19, 133:8, 133:17
**envisioning** [1] -
113:16
**envisions** [1] - 29:10
**equipment** [9] - 10:10,
96:16, 96:18, 96:21,
99:22, 104:1, 119:11,
119:13, 130:16
**equipped** [2] - 3:4,
120:22
**erupt** [1] - 33:4
**escape** [3] - 117:10,
132:6, 132:10
**escorted** [2] - 23:5,
23:8
**et** [1] - 86:23
**evading** [1] - 98:20
**evaluate** [1] - 109:11
**evasion** [1] - 67:21
**evasive** [3] - 88:23,
88:24, 98:14
**evening** [2] - 5:5,
138:5
**events** [1] - 25:22
**evidence** [29] - 15:1,
16:2, 16:12, 26:5,
26:10, 26:14, 27:17,
29:14, 29:18, 40:14,
49:11, 49:18, 52:1,
52:10, 82:17, 82:20,
87:5, 87:9, 88:11,
88:16, 106:2, 106:4,
106:8, 106:11, 106:13,
109:12, 143:23
**exact** [1] - 116:1

**exactly** [3] - 23:3, 69:2, 103:4
**EXAMINATION** [1] - 53:15
**examination** [6] - 108:19, 114:16, 135:15, 146:22, 147:1, 147:7
**examine** [3] - 73:16, 76:12, 143:5
**examined** [1] - 53:5
**examining** [2] - 17:5, 74:12
**example** [3] - 79:5, 100:17, 112:20
**exceed** [1] - 129:16
**except** [1] - 87:14
**exception** [1] - 82:6
**excerpts** [1] - 106:7
**excitement** [1] - 134:5
**exciting** [1] - 55:6
**exclude** [2] - 39:2, 40:5
**excluded** [2] - 10:9, 49:11
**exclusion** [2] - 2:21, 12:13
**exclusively** [2] - 35:5, 52:7
**excuse** [2] - 78:22, 139:16
**exemptions** [4] - 128:25, 129:3, 130:11, 130:13
**exercise** [1] - 90:23
**exercised** [2] - 18:19, 18:25
**Exhibit** [6] - 78:23, 87:15, 127:6, 128:17, 130:18, 132:21
**exhibit** [4] - 42:13, 78:20, 115:6, 131:2
**exhibits** [9] - 29:3, 50:20, 51:8, 87:21, 88:15, 106:6, 106:7, 106:8, 109:13
**Exhibits** [1] - 50:20
**exist** [2] - 77:6, 111:15
**existence** [1] - 66:16
**exists** [1] - 109:23
**expect** [2] - 11:2, 132:25
**expecting** [3] - 76:9, 76:25, 105:13
**expeditiously** [1] - 3:16
**experience** [14] - 32:12, 33:5, 54:16, 54:22, 56:11, 58:21, 60:10, 61:7, 82:15,

93:2, 93:14, 94:12, 103:9, 109:7
**experienced** [1] - 22:22
**expert** [29] - 8:9, 48:10, 52:4, 55:22, 64:22, 77:11, 78:2, 78:3, 78:5, 78:6, 78:12, 79:6, 81:8, 81:13, 81:16, 82:4, 82:6, 82:7, 82:9, 82:11, 82:14, 82:20, 107:11, 107:16, 107:19, 108:9, 108:15, 146:24
**expert's** [3] - 82:13, 82:19, 109:11
**expertise** [1] - 109:7
**experts** [1] - 84:17
**explain** [12] - 63:5, 64:25, 71:23, 103:4, 107:13, 108:20, 108:23, 109:6, 109:25, 117:2, 117:5, 135:2
**explaining** [1] - 108:22
**explanation** [2] - 109:1, 127:24
**explicit** [1] - 45:9
**expressed** [1] - 122:11
**expressly** [1] - 13:18
**extent** [6] - 3:25, 29:20, 109:5, 141:1, 141:12, 145:7
**Eye** [4] - 55:15, 55:17
**eye** [1] - 38:21
**EYE** [2] - 55:17

# F

**face** [2] - 34:12, 108:10
**facetious** [1] - 22:14
**facie** [1] - 129:17
**facing** [3] - 34:15, 34:20, 98:22
**fact** [14] - 14:10, 15:13, 26:11, 41:6, 41:11, 42:18, 42:25, 43:5, 43:8, 45:17, 56:24, 142:17, 144:25, 145:4
**factor** [6] - 42:19, 52:15, 101:23, 101:24, 133:22
**factors** [4] - 101:19, 133:5, 133:8, 133:17
**facts** [7] - 16:8, 16:9, 28:6, 28:7, 40:15, 73:12, 125:19
**factual** [1] - 141:9

**factually** [2] - 38:11, 38:24
**failure** [4] - 66:20, 67:10, 67:23, 122:15
**fair** [5] - 105:21, 106:13, 108:8, 114:4, 140:19
**fairly** [1] - 82:21
**fall** [5] - 59:10, 91:16, 92:13, 94:11
**falling** [1] - 103:18
**falls** [1] - 119:2
**false** [1] - 140:10
**familiar** [2] - 54:7, 73:7
**family** [2] - 13:10, 14:8
**fancy** [2] - 55:9, 58:14
**far** [24] - 34:17, 41:2, 45:19, 74:14, 76:6, 76:7, 85:7, 92:5, 98:10, 99:20, 105:21, 111:12, 113:5, 115:2, 118:19, 121:9, 125:2, 128:1, 128:11, 129:3, 132:17, 133:12, 139:7, 140:24
**farm** [1] - 69:16
**fast** [3] - 103:7, 103:19, 131:23
**faster** [1] - 131:25
**fatalities** [1] - 126:1
**fatality** [1] - 126:8
**fault** [1] - 104:21
**favor** [1] - 13:25
**feature** [1] - 94:17
**February** [2] - 105:19, 105:20
**federal** [2] - 56:19, 84:5
**fee** [1] - 76:10
**feed** [2] - 6:21, 7:17
**felon** [9] - 49:3, 106:19, 106:24, 106:25, 110:12, 110:16, 111:14, 113:17, 113:19
**felons** [1] - 47:1
**felony** [4] - 47:9, 58:18, 95:5, 115:11
**few** [9] - 6:5, 18:16, 26:6, 30:16, 67:18, 75:1, 78:13, 133:21, 137:9
**field** [14] - 45:3, 45:5, 45:6, 55:24, 62:11, 78:12, 80:5, 84:17, 98:2, 121:7, 121:12, 123:1, 123:13, 123:18
**fields** [1] - 78:5
**figure** [1] - 11:22
**file** [4] - 5:6, 8:19, 9:5,

44:23
**filed** [11] - 3:9, 3:12, 3:20, 3:23, 4:6, 9:4, 26:2, 26:3, 138:15, 141:18, 145:14
**filing** [6] - 5:7, 5:10, 5:24, 6:3, 9:9, 39:17
**filings** [5] - 4:12, 5:15, 26:20, 35:8, 39:11
**filled** [1] - 92:6
**final** [5] - 11:7, 11:9, 68:22, 132:20, 147:8
**finally** [2] - 65:17, 125:2
**findings** [4] - 26:5, 26:9, 26:10, 69:19
**fine** [5] - 6:4, 15:20, 21:12, 30:21, 46:4
**finger** [2] - 35:20, 37:14
**finish** [2] - 135:18, 147:2
**finished** [2] - 65:17, 127:2
**firearms** [1] - 70:7
**first** [34] - 11:25, 18:20, 19:19, 21:21, 28:13, 35:9, 36:1, 40:8, 42:4, 48:19, 53:4, 61:12, 61:16, 80:11, 80:16, 80:18, 81:25, 105:9, 105:12, 106:24, 110:3, 110:9, 112:1, 113:1, 113:8, 116:16, 117:5, 127:23, 128:17, 132:5, 132:16, 133:12, 142:11, 143:22
**First** [1] - 142:3
**fit** [1] - 136:3
**fits** [1] - 41:1
**five** [6] - 10:8, 60:3, 60:5, 79:6, 79:13, 127:1
**flag** [2] - 47:10, 47:15
**fleeing** [21] - 47:1, 49:3, 90:20, 90:24, 95:3, 95:17, 95:20, 98:5, 106:19, 106:24, 106:25, 110:12, 110:16, 111:14, 113:17, 113:19, 115:9, 116:4, 116:24, 118:22, 118:23
**flight** [2] - 138:3, 138:5
**Florida** [6] - 53:25, 54:14, 54:19, 66:8, 66:10, 71:19
**fly** [1] - 138:4
**focus** [10] - 90:16,

117:19, 122:13, 123:13, 123:25, 125:3, 127:14, 128:17, 129:16, 131:8
**focusing** [1] - 31:1
**fog** [1] - 102:3
**folks** [1] - 64:16
**follow** [6] - 60:17, 100:16, 110:10, 120:6, 122:1, 129:3
**follow-up** [1] - 100:16
**followed** [1] - 124:20
**following** [8] - 13:4, 39:10, 66:24, 67:2, 74:25, 87:20, 121:23, 135:1
**follows** [1] - 53:5
**foot** [1] - 89:16
**FOP** [5] - 71:24, 71:25, 72:5, 72:9, 72:11
**FOR** [1] - 1:1
**Force** [1] - 113:10
**force** [28] - 46:24, 47:1, 47:3, 47:23, 48:1, 48:5, 48:25, 49:3, 49:5, 49:6, 49:17, 57:17, 85:25, 98:5, 110:13, 110:16, 111:14, 112:6, 112:19, 112:23, 113:9, 113:14, 113:16, 113:22, 116:25, 117:3
**forces** [1] - 58:6
**foregoing** [1] - 148:4
**forget** [1] - 143:15
**forgo** [1] - 6:10
**form** [5] - 91:11, 124:1, 124:2, 124:5, 124:15
**formal** [1] - 61:2
**forms** [1] - 65:13
**formulate** [1] - 65:5
**formulated** [1] - 64:12
**formulating** [2] - 63:2, 65:1
**Fort** [3] - 54:20, 58:1, 59:4
**forth** [6] - 2:18, 14:5, 42:2, 42:21, 51:22, 110:11
**forward** [10] - 2:3, 3:24, 4:23, 5:11, 25:21, 34:11, 60:12, 87:4, 87:7, 93:24
**foundation** [1] - 78:10
**four** [1] - 19:6
**Fourth** [1] - 1:14
**frankly** [5] - 29:2, 108:3, 109:9, 138:13, 146:15
**Fraternal** [2] - 71:21,

71:23
**free** [1] - 53:22
**frequent** [1] - 80:4
**FRIEDMAN** [1] - 1:10
**Friedman** [1] - 138:1
**friendly** [1] - 76:24
**friendship** [1] - 22:15
**front** [4] - 12:18, 36:22, 43:6, 68:16
**full** [3] - 58:18, 140:19, 148:5
**fullest** [1] - 12:12
**fully** [1] - 8:11
**function** [3] - 68:14, 99:25, 125:12
**fundamental** [2] - 112:25, 130:19
**funded** [1] - 84:23
**funding** [2] - 84:4, 84:5
**funds** [1] - 84:23
**funnel** [1] - 132:11
**furthest** [1] - 34:14
**future** [1] - 141:5

**G**

**G-E-R-S-T-E-I-N** [1] - 139:17
**gallery** [4] - 23:15, 27:2, 34:16, 34:22
**general** [95] - 2:20, 42:3, 42:11, 42:19, 43:8, 45:2, 45:9, 45:11, 45:14, 45:15, 46:7, 46:21, 46:24, 47:2, 47:6, 47:11, 47:13, 47:21, 48:5, 48:16, 48:17, 48:19, 49:19, 52:2, 52:3, 52:4, 52:6, 52:11, 52:14, 52:23, 52:24, 60:12, 60:16, 60:20, 60:22, 61:3, 61:4, 63:3, 65:2, 70:19, 75:20, 75:22, 75:25, 81:16, 85:6, 87:6, 87:9, 87:13, 88:19, 91:15, 92:20, 92:21, 93:13, 94:10, 94:18, 95:7, 105:8, 105:11, 105:16, 105:21, 106:18, 107:9, 107:12, 107:17, 107:18, 107:20, 108:22, 108:24, 109:4, 110:8, 110:12, 110:22, 110:25, 111:8, 111:24, 113:23, 113:24, 114:25, 116:10, 116:14, 118:4, 119:4, 119:18, 119:23, 121:4,

121:9, 123:3, 123:7, 124:18, 125:25, 127:21, 134:1, 134:3
**generally** [10] - 4:8, 47:3, 52:20, 54:23, 58:16, 59:23, 82:5, 88:19, 91:15, 94:11
**gentleman** [4] - 20:21, 21:4, 33:2, 64:20
**gentlemen** [4] - 82:4, 106:2, 136:19, 136:23
**GERSTEIN** [15] - 139:12, 139:16, 140:7, 140:9, 141:20, 141:22, 142:8, 142:20, 143:1, 143:4, 143:21, 144:1, 144:13, 147:5, 147:10
**Gerstein** [7] - 139:16, 141:16, 144:17, 144:21, 145:9, 145:13, 146:13
**gesture** [1] - 38:19
**gestures** [1] - 35:6
**Gilchrist** [1] - 57:1
**given** [10] - 8:6, 32:16, 51:2, 80:9, 83:9, 83:19, 100:20, 121:20, 127:8, 137:18
**glad** [2] - 33:19, 104:9
**goal** [6] - 60:19, 89:21, 90:14, 101:15, 127:15, 127:17
**Goodman** [1] - 19:7
**government** [39] - 2:13, 3:9, 3:23, 4:3, 5:5, 5:6, 8:20, 14:16, 14:24, 19:8, 22:4, 25:11, 26:3, 26:21, 27:9, 28:24, 33:21, 33:23, 34:25, 35:12, 39:5, 40:18, 42:8, 42:14, 42:15, 43:10, 46:20, 47:22, 51:23, 52:1, 52:4, 53:1, 84:5, 87:7, 109:10, 140:2, 141:19, 144:21, 145:14
**Government's** [1] - 87:15
**government's** [9] - 3:21, 9:10, 27:23, 109:9, 138:16, 138:25, 145:3, 145:12, 146:18
**grand** [2] - 10:2, 76:6
**grants** [1] - 83:9
**gray** [2] - 17:18
**great** [4] - 25:5, 50:2, 127:3, 137:5
**greater** [2] - 104:1, 104:2
**grossman** [1] - 8:25

**Grossman** [1] - 9:1
**ground** [1] - 43:1
**grounds** [2] - 111:22, 112:7
**group** [1] - 84:2
**Group** [1] - 1:17
**guess** [6] - 3:14, 6:23, 56:6, 57:7, 100:16, 147:12
**guidance** [9] - 85:4, 89:23, 92:7, 92:17, 94:20, 107:20, 120:13, 122:9, 130:3
**guidelines** [4] - 60:16, 90:8, 90:9, 105:24
**guilty** [1] - 52:22

**H**

**hair** [1] - 17:18
**half** [1] - 8:6
**hall** [1] - 32:2
**hand** [4] - 14:6, 24:4, 24:10, 97:12
**handle** [1] - 69:19
**hands** [5] - 61:5, 70:25, 71:2, 71:5, 134:20
**hands-on** [5] - 61:5, 70:25, 71:2, 71:5, 134:20
**hang** [1] - 126:13
**HANNON** [75] - 2:6, 8:23, 9:1, 10:2, 10:7, 10:11, 10:14, 10:16, 10:24, 11:5, 11:10, 18:9, 18:23, 19:1, 19:4, 19:12, 28:2, 28:8, 32:9, 35:13, 37:12, 37:17, 37:20, 37:25, 38:4, 38:7, 38:10, 43:21, 47:21, 49:5, 49:12, 50:7, 50:19, 51:6, 51:9, 77:10, 77:15, 77:25, 78:15, 78:19, 78:22, 79:3, 79:17, 79:21, 80:1, 80:8, 80:11, 80:14, 80:16, 80:19, 80:21, 80:24, 81:2, 81:10, 81:13, 81:16, 81:21, 81:23, 88:12, 93:9, 93:12, 107:7, 107:9, 107:25, 108:5, 111:21, 112:5, 112:10, 112:18, 115:4, 129:19, 135:17, 135:21, 136:6, 145:22
**Hannon** [31] - 1:17, 1:17, 2:7, 8:22, 11:15, 14:7, 20:2, 21:23,

26:12, 26:18, 27:13, 28:22, 29:23, 35:1, 35:7, 38:3, 38:13, 42:5, 43:16, 43:18, 46:6, 47:19, 77:17, 78:13, 78:17, 80:23, 107:16, 112:17, 129:24, 135:13, 145:21

**Hannon's** [3] - 15:1, 25:19, 108:18

**happy** [9] - 10:18, 10:24, 11:20, 15:24, 17:22, 18:8, 77:17, 77:21, 78:11

**hard** [1] - 112:1

**hats** [1] - 61:14

**head** [1] - 146:2

**heading** [1] - 105:22

**heads** [2] - 34:24, 137:3

**hear** [16] - 3:7, 18:8, 25:12, 28:5, 42:16, 52:10, 53:13, 53:23, 137:13, 139:6, 139:9, 141:17, 142:24, 143:1

**heard** [11] - 9:6, 18:9, 25:7, 25:24, 36:5, 138:17, 138:18, 139:22, 140:19, 142:22, 143:20

**hearing** [5] - 7:22, 112:14, 140:12, 140:23, 142:13

**heavy** [1] - 102:2

**HELD** [1] - 1:9

**held** [1] - 58:11

**hello** [3] - 50:7, 50:8, 50:9

**helpfully** [1] - 4:2

**hereby** [1] - 148:3

**herself** [4] - 15:9, 22:4, 22:20, 36:24

**hesitating** [1] - 104:13

**hi** [1] - 22:6

**high** [2] - 99:1, 103:5

**high-powered** [1] - 103:5

**higher** [3] - 28:25, 29:9, 29:22

**highest** [1] - 54:13

**highlighted** [2] - 114:21, 132:5

**Highway** [2] - 66:8, 66:10

**Hilton** [2] - 7:11, 7:20

**hired** [1] - 56:21

**hit** [1] - 71:3

**hold** [4] - 55:3, 58:3, 72:9, 80:24

**holding** [1] - 37:14

**homicide** [2] - 13:21, 58:20

**Honor** [59] - 2:1, 2:6, 2:9, 2:12, 5:3, 6:2, 10:5, 10:19, 11:11, 12:3, 15:15, 15:24, 16:16, 19:12, 21:15, 24:24, 30:21, 33:20, 33:25, 34:5, 37:7, 38:16, 38:25, 43:21, 44:1, 44:25, 46:13, 47:23, 48:8, 49:12, 51:13, 53:8, 77:10, 79:16, 80:22, 81:10, 81:13, 81:19, 88:12, 88:14, 93:12, 107:7, 108:12, 110:23, 111:21, 112:10, 114:20, 123:10, 129:19, 129:20, 139:12, 139:18, 141:20, 143:22, 144:13, 144:19, 144:21, 145:1, 145:22

**HONORABLE** [1] - 1:10

**hope** [2] - 47:17, 51:18

**hopefully** [1] - 146:20

**hoping** [2] - 36:18, 78:25

**horsepower** [2] - 103:6

**host** [1] - 85:10

**hosted** [1] - 85:17

**hour** [5] - 8:6, 76:12, 146:17, 147:13

**hourly** [1] - 76:10

**hours** [4] - 41:24, 76:10, 76:14, 76:16

**houses** [1] - 102:16

**hum** [1] - 19:25

**humans** [1] - 90:21

**Hylton** [51] - 2:22, 3:12, 3:18, 4:13, 7:1, 7:11, 8:21, 9:15, 10:11, 11:25, 12:24, 13:8, 14:13, 15:4, 18:13, 19:4, 20:4, 23:4, 25:8, 26:4, 27:11, 29:1, 29:2, 30:2, 31:6, 32:10, 35:4, 35:19, 37:1, 37:14, 39:3, 39:12, 39:16, 39:17, 39:22, 40:3, 40:12, 44:18, 112:21, 136:13, 139:6, 139:10, 139:22, 140:10, 140:12, 141:12, 141:17, 143:23, 145:15, 145:19, 147:6

**Hylton-Brown** [29] -

2:22, 3:12, 3:18, 4:13, 7:1, 12:24, 13:8, 14:13, 15:4, 20:4, 23:4, 25:8, 27:11, 29:2, 31:6, 35:19, 37:1, 37:14, 39:3, 39:12, 39:16, 39:22, 40:3, 40:12, 44:18, 112:21, 136:13, 141:17, 143:23

**Hylton-Brown's** [7] - 8:21, 11:25, 26:4, 29:1, 30:2, 139:6, 139:10

**hyperbole** [1] - 112:22

# I

**IA** [1] - 68:15

**IACP** [6] - 66:2, 71:14, 84:11, 84:14, 90:3, 91:10

**IAD** [2] - 45:8, 45:16

**IAPS** [1] - 86:8

**idea** [1] - 32:22

**identified** [2] - 50:22, 122:14

**identify** [3] - 2:4, 22:20, 22:25

**imagine** [2] - 27:18, 102:2

**immediate** [10] - 96:7, 96:8, 111:17, 115:14, 122:16, 128:7, 128:8, 146:4

**immediately** [6] - 9:23, 97:17, 97:22, 117:11, 119:12, 120:20

**imminence** [1] - 116:3

**imminent** [1] - 96:7

**impact** [1] - 139:1

**impetus** [1] - 93:7

**implementation** [1] - 86:23

**importance** [1] - 131:9

**important** [3] - 5:22, 16:16, 118:1

**improper** [1] - 49:14, 107:22

**IN** [1] - 1:1

**in-person** [1] - 76:13

**inappropriate** [1] - 112:22

**incident** [4] - 38:23, 124:6, 124:11, 124:15

**incidents** [1] - 138:20

**include** [15] - 42:9, 61:7, 62:1, 62:16, 69:12, 73:19, 74:15, 74:25, 75:1, 75:22, 85:8, 90:19, 91:6, 128:2, 130:7

**included** [1] - 131:19

**includes** [4] - 14:7, 85:21, 87:20, 125:25

**including** [3] - 87:5, 105:23, 109:12

**inclusion** [1] - 44:2

**inconvenience** [1] - 138:7

**incorporated** [1] - 66:12

**incorrect** [1] - 4:15

**incredibly** [1] - 112:19

**independent** [1] - 28:5

**indicated** [5] - 9:3, 9:6, 14:19, 28:3, 46:22

**indicates** [2] - 30:7, 122:19

**indicating** [3] - 13:7, 29:23, 128:6, 145:3

**indicating)** [2] - 31:23, 144:9

**indictment** [1] - 44:20

**individual** [6] - 14:8, 14:11, 45:8, 47:8, 74:22, 85:13

**individuals** [2] - 84:16, 138:19

**indulgence** [1] - 130:22

**inferences** [1] - 43:9

**information** [14] - 29:1, 30:9, 40:19, 65:8, 65:25, 83:25, 84:14, 84:25, 85:7, 86:2, 86:7, 90:6, 90:7, 138:8

**informed** [1] - 35:19

**informing** [1] - 5:10

**initial** [1] - 74:7

**initiating** [1] - 97:22

**injury** [5] - 102:14, 104:2, 111:18, 116:4, 122:16

**input** [3] - 63:2, 63:6, 63:11

**inquire** [3] - 26:1, 77:25, 135:13

**inquired** [1] - 138:22

**insists** [1] - 28:17

**instance** [2] - 30:7, 66:5

**instances** [1] - 35:3

**instead** [3] - 36:8, 71:5, 137:2

**Institute** [1] - 83:10

**instruct** [1] - 82:3, 129:25

**instructed** [3] - 13:14, 82:1, 136:9

**instruction** [19] - 2:16, 4:19, 10:25, 11:2, 13:6,

41:22, 42:2, 42:4,
42:10, 43:11, 43:15,
43:19, 50:5, 51:23,
81:10, 81:16, 81:25,
109:9
**instructional** [3] -
75:6, 87:24, 127:6
**instructions** [8] - 5:19,
11:8, 11:9, 16:7, 51:24,
52:18, 52:20, 131:16
**instructor** [3] - 70:7,
70:8
**intend** [4] - 17:7, 47:3,
77:13, 146:17
**intended** [1] - 3:11
**intends** [1] - 42:14
**intention** [1] - 30:2
**intentionally** [1] -
116:23
**interaction** [1] - 32:5
**interchangeable** [1] -
89:13
**interested** [1] - 40:17
**interesting** [2] - 55:7,
55:10
**interestingly** [1] -
40:21
**interfere** [1] - 29:13
**interim** [1] - 141:25
**internal** [9] - 52:5,
69:6, 69:12, 69:15,
69:16, 69:24, 124:13,
126:2, 126:6
**International** [4] -
66:2, 71:14, 80:5, 83:3
**interpret** [2] - 27:24,
108:2
**interpretation** [1] -
27:8
**interpreted** [1] - 3:10
**interpreting** [1] -
107:10
**interrogate** [1] - 25:17
**interrupt** [3] - 5:14,
142:10, 142:18
**intersection** [1] -
102:17
**intersections** [4] -
102:15, 102:18, 120:4,
120:8
**intervening** [1] - 9:8
**intervention** [1] - 67:6
**interviewed** [1] -
19:10
**introduced** [4] - 22:4,
22:9, 22:11, 52:1
**investigate** [4] -
69:21, 83:2, 126:1,
126:7
**investigated** [1] - 77:9

**investigation** [3] -
17:17, 69:19, 125:19
**investigations** [4] -
69:6, 69:13, 69:17,
69:24
**invite** [1] - 28:10
**involved** [18] - 55:8,
56:5, 61:21, 61:22,
62:14, 64:23, 64:24,
79:25, 102:24, 105:3,
105:5, 116:17, 116:22,
118:7, 123:21, 123:24,
125:17, 129:7
**involvement** [1] - 73:6
**involving** [4] - 12:8,
125:20, 126:1, 126:8
**Iran** [1] - 17:17
**irony** [1] - 40:11
**irrelevant** [1] - 41:4
**issue** [9] - 8:14, 8:16,
10:17, 10:20, 12:4,
49:7, 49:8, 83:16,
85:21
**issued** [1] - 145:1
**issues** [14] - 2:15,
4:10, 5:22, 6:22, 45:24,
46:3, 50:5, 63:11,
63:12, 83:11, 83:17,
83:23, 137:14, 146:7
**item** [1] - 98:18
**items** [1] - 65:4
**iteration** [3] - 42:4,
43:15, 43:19
**itself** [6] - 13:20,
47:21, 106:4, 106:11,
107:9, 107:18

## J

**jack** [1] - 10:1
**Jack** [1] - 10:3
**jacket** [2] - 21:3, 21:7
**JACKSON** [15] -
30:19, 30:21, 30:23,
31:9, 31:12, 31:16,
31:21, 32:12, 33:1,
33:9, 33:13, 33:18,
33:20, 34:3, 34:5
**Jackson** [4] - 25:2,
30:23, 34:3, 144:10
**JANICE** [1] - 148:3
**Janice** [2] - 1:23,
148:11
**jhannon@**
**hannonlawgroup.com**
[1] - 1:19
**job** [2] - 65:3, 101:17
**Johnson** [4] - 18:11,
19:3, 19:18, 143:17
**joined** [1] - 41:11

**joins** [1] - 120:19
**Judge** [2] - 138:1,
139:8
**judge** [1] - 138:8
**JUDGE** [2] - 1:10, 1:10
**July** [1] - 73:3
**jump** [6] - 56:11, 57:4,
88:6, 105:8, 105:14,
128:25
**junked** [1] - 103:17
**jurisdiction** [1] - 4:9
**jurisdictions** [3] -
66:4, 92:9, 92:13
**juror** [22] - 14:10, 15:8,
19:10, 19:20, 19:23,
19:24, 20:13, 20:16,
25:8, 25:9, 25:24,
36:20, 37:3, 114:12,
137:16, 137:22,
137:24, 138:10,
139:23, 141:2, 141:6
**JURORS** [1] - 51:17
**jurors** [20] - 13:12,
18:13, 18:21, 19:5,
23:18, 24:12, 31:3,
31:7, 31:9, 31:14,
31:22, 35:24, 50:13,
51:14, 53:13, 112:13,
137:3, 137:11, 140:13
**jurors'** [1] - 4:22
**jury** [54] - 2:16, 2:19,
4:22, 5:19, 13:6, 13:9,
13:25, 20:3, 23:12,
24:17, 31:15, 34:13,
34:14, 34:20, 36:16,
36:24, 38:4, 38:5, 40:5,
41:23, 43:17, 46:16,
48:24, 49:19, 50:4,
51:13, 80:3, 82:1, 82:3,
82:13, 87:5, 106:5,
107:18, 109:4, 109:6,
109:8, 109:14, 112:20,
114:13, 129:25, 130:2,
135:25, 136:16, 137:8,
137:10, 137:14,
142:11, 142:13,
142:19, 146:7, 146:11,
147:2, 147:12
**JURY** [2] - 1:5, 1:9
**jury's** [2] - 29:13,
109:14
**Justice** [2] - 83:10,
84:7
**justice** [5] - 39:20,
39:21, 54:14, 83:11,
84:21
**justify** [1] - 95:2

## K

**Karon** [1] - 112:21
**Kathy** [3] - 25:1,
30:23, 144:10
**keep** [4] - 13:1, 41:23,
44:25, 80:24
**key** [1] - 13:24
**killed** [1] - 112:21
**kind** [13] - 20:10, 21:5,
21:10, 34:18, 55:20,
56:8, 65:16, 67:19,
78:24, 92:19, 99:25,
103:22, 142:18
**kinds** [1] - 103:18
**King** [1] - 56:9
**kits** [1] - 87:17
**knowledge** [6] - 42:18,
77:20, 77:21, 82:23,
104:17, 134:15
**known** [3] - 67:5,
92:15, 99:23
**knows** [1] - 5:25

## L

**LA's** [1] - 66:12
**labor** [1] - 60:8
**lack** [1] - 103:13
**ladies** [4] - 82:4,
106:1, 136:19, 136:23
**lake** [1] - 53:25
**Lamberth** [1] - 6:1
**land** [3] - 61:23, 62:2,
62:3
**language** [3] - 64:7,
113:23, 113:24
**large** [2] - 90:1, 128:10
**larger** [4] - 90:4, 90:5,
90:6, 95:13
**largest** [3] - 57:25,
59:3, 85:12
**last** [14] - 18:16, 27:2,
61:14, 79:6, 79:13,
88:2, 93:5, 99:13,
104:3, 121:19, 126:23,
133:21, 134:14, 135:1
**late** [5] - 3:14, 32:9,
37:5, 93:24, 136:25
**latest** [2] - 43:15, 86:4
**latitude** [1] - 100:20
**Lauderdale** [3] -
54:20, 58:1, 59:4
**law** [41] - 29:14, 32:13,
33:7, 33:11, 41:1,
52:20, 54:16, 54:23,
55:1, 55:3, 55:5, 55:25,
61:14, 64:21, 70:2,
70:6, 70:7, 71:12,
71:25, 72:1, 80:5,

83:17, 85:4, 85:5, 85:12, 89:17, 89:23, 89:25, 104:16, 104:21, 104:22, 104:25, 118:15, 124:3, 127:24, 128:2, 128:16, 129:19, 129:25, 130:5, 139:2
**Law** [2] - 1:17, 86:13
**lawful** [3] - 121:20, 121:25, 135:1
**laws** [5] - 52:6, 88:25, 100:20, 129:3, 129:14
**lawyer** [14] - 3:12, 7:2, 8:21, 11:25, 17:11, 19:2, 19:9, 25:20, 26:4, 26:24, 136:13, 139:6, 139:10, 144:4
**lawyers** [11] - 3:6, 26:25, 27:15, 27:20, 32:24, 34:19, 34:20, 138:14, 139:7, 144:15, 144:16
**leadership** [2] - 70:23, 72:9
**learn** [2] - 40:24, 61:4
**learning** [1] - 141:15
**least** [12] - 2:14, 7:4, 13:3, 14:23, 18:2, 46:2, 76:23, 88:2, 92:19, 108:20, 140:15, 141:16
**leave** [7] - 20:25, 31:19, 57:15, 132:8, 136:9, 137:11, 137:20
**leaves** [1] - 137:10
**leaving** [1] - 137:10
**lectern** [1] - 2:4
**left** [18] - 31:4, 31:10, 31:22, 32:11, 32:23, 32:24, 34:14, 34:15, 55:3, 57:11, 58:11, 58:23, 58:25, 82:25, 97:10, 130:21, 141:14, 146:11
**legal** [7] - 56:12, 61:8, 64:19, 75:14, 88:1, 128:15, 128:22
**length** [1] - 109:8
**lengthy** [1] - 65:12
**less** [13] - 55:16, 90:1, 91:22, 92:25, 93:4, 101:4, 102:9, 103:25, 115:19, 128:8, 131:22, 135:16, 137:14
**lesser** [2] - 68:19, 94:14
**letter** [1] - 74:7
**level** [7] - 13:17, 29:4, 54:13, 100:4, 120:7, 123:23, 133:2
**lEWIS** [1] - 22:6

**LEWIS** [17] - 19:17, 19:22, 19:25, 20:3, 20:10, 20:15, 20:19, 20:22, 21:1, 21:6, 21:11, 21:14, 21:19, 22:1, 22:9, 22:11, 144:6
**Lewis** [2] - 19:17, 144:5
**liability** [3] - 127:24, 128:3, 128:16
**liberal** [1] - 53:22
**lies** [1] - 29:19
**lieutenant** [8] - 55:4, 59:7, 59:8, 59:10, 59:13, 60:4, 62:12, 68:11
**Lieutenant** [3] - 2:10, 11:5, 39:19
**life** [2] - 128:20, 129:18
**lifted** [1] - 141:24
**light** [2] - 101:2, 144:17
**lighting** [1] - 102:7
**lights** [7] - 96:13, 96:21, 100:12, 107:4, 130:12, 134:10
**limit** [4] - 47:17, 92:9, 92:17, 129:17
**limited** [2] - 102:18, 107:25
**limiting** [1] - 16:7, 41:12
**line** [4] - 45:5, 110:3, 121:19, 132:16
**list** [1] - 75:1
**listed** [4] - 79:12, 80:7, 105:22, 120:20
**listen** [1] - 40:13
**listening** [1] - 68:24
**lives** [2] - 115:18, 119:8
**LLP** [1] - 1:17
**loaded** [1] - 136:14
**local** [3] - 66:3, 85:4, 104:14
**located** [1] - 54:20
**locations** [2] - 124:7, 124:10
**logistics** [1] - 6:14
**look** [15] - 6:7, 6:8, 29:16, 36:9, 36:10, 36:13, 38:14, 65:7, 83:13, 90:7, 92:20, 103:17, 104:12, 124:16
**looked** [2] - 20:5, 66:12
**looking** [18] - 26:22, 26:23, 29:3, 29:4, 29:7,

34:23, 35:1, 35:4, 36:9, 37:22, 39:9, 49:19, 94:7, 116:16, 136:12, 141:15
**looks** [1] - 38:22
**Los** [1] - 66:21
**loud** [1] - 53:19
**low** [2] - 98:25, 103:6
**lower** [4] - 68:20, 68:21, 70:22, 101:15
**lowest** [1] - 93:1
**lunch** [6] - 32:16, 135:21, 136:21, 137:7, 146:17, 146:18

# M

**ma'am** [1] - 33:24
**magazine** [1] - 85:23
**magazines** [1] - 80:6
**maintain** [4] - 59:5, 101:16, 118:21, 119:2
**maintained** [1] - 34:25
**maintaining** [1] - 118:20
**maintains** [1] - 94:20
**major** [9] - 40:19, 45:8, 45:17, 68:12, 101:24, 125:12, 125:24, 126:5, 126:9
**malice** [1] - 42:20
**man** [2] - 20:25, 55:10
**mandamus** [21] - 3:13, 3:24, 4:6, 4:8, 4:20, 5:6, 5:15, 5:25, 9:3, 11:15, 16:1, 16:4, 16:11, 17:10, 26:2, 27:11, 34:11, 138:14, 139:2, 141:9, 142:6
**mandatory** [1] - 61:1
**maneuver** [1] - 67:6
**manner** [6] - 89:4, 97:13, 117:9, 118:19, 122:2, 128:20
**marine** [2] - 58:4, 61:23
**mark** [1] - 7:12
**Mark** [1] - 7:21
**marked** [5] - 99:9, 99:15, 99:20, 109:20, 120:19
**markings** [1] - 99:21
**marshal** [16] - 15:14, 15:22, 20:10, 20:17, 20:18, 21:9, 22:20, 22:23, 25:13, 28:11, 34:9, 35:10, 143:11, 143:12, 143:8
**MARSHAL** [18] - 22:24, 23:1, 23:8,

23:11, 23:14, 23:16, 23:19, 23:21, 24:2, 24:11, 24:16, 24:21, 25:2, 35:18, 35:22, 36:18, 37:1, 37:5
**Marshal** [1] - 35:16
**mask** [2] - 30:18, 53:6
**materials** [9] - 74:14, 74:23, 74:25, 75:1, 87:6, 87:19, 105:10, 129:22, 130:5
**matter** [2] - 9:6, 102:20
**matters** [2] - 56:12, 121:23
**mean** [29] - 16:1, 26:17, 28:2, 30:5, 37:16, 37:24, 44:13, 62:5, 68:7, 72:1, 75:9, 83:20, 89:2, 89:10, 89:12, 91:17, 103:5, 106:25, 108:10, 108:18, 119:18, 124:10, 127:9, 129:18, 131:20, 132:7, 132:12, 133:14, 137:19
**meaning** [1] - 118:15
**means** [9] - 13:1, 67:11, 99:23, 100:23, 107:2, 117:3, 129:20, 133:15, 135:3
**meant** [1] - 141:3
**medical** [1] - 138:11
**meet** [2] - 39:18, 86:19
**meeting** [2] - 65:10, 65:16
**meetings** [2] - 76:13, 76:17
**meets** [4] - 30:12, 86:21, 108:7, 113:17
**member** [16] - 6:17, 13:10, 14:7, 14:14, 71:15, 71:20, 71:22, 72:6, 84:9, 86:4, 104:14, 106:19, 110:10, 111:18, 116:25, 128:7
**Members** [1] - 111:14
**members** [9] - 2:23, 65:4, 84:3, 116:17, 116:22, 117:15, 118:20, 119:6, 128:6
**membership** [1] - 84:2
**men** [4] - 14:12, 25:25
**mental** [2] - 45:12, 52:16
**mention** [4] - 14:15, 17:5, 44:22, 71:14
**mentioned** [14] - 14:2, 17:6, 18:5, 35:14, 38:9,

55:11, 58:14, 67:10,
73:19, 76:3, 84:4,
102:8, 132:8, 138:1
**mentioning** [1] -
114:20
**mentions** [2] - 16:24,
17:2
**Meredith** [2] - 19:17,
144:5
**merely** [1] - 52:23
**mess** [1] - 136:10
**message** [2] - 130:3,
137:22
**met** [3] - 15:3, 21:20,
134:18
**Metropolitan** [5] -
33:14, 42:11, 52:5,
52:8, 52:11
**Michael** [3] - 1:17, 2:7,
21:19
**microphone** [3] -
43:23, 53:13, 53:23
**middle** [5] - 27:3,
30:15, 35:20, 36:19,
37:14
**might** [23] - 9:7, 17:5,
22:16, 22:17, 29:15,
29:16, 29:25, 30:1,
63:11, 66:9, 68:11,
71:10, 77:16, 85:24,
85:25, 89:12, 97:11,
113:13, 122:9, 124:11,
124:12
**million** [2] - 58:24,
58:25
**mind** [4] - 17:8, 19:14,
30:18, 52:17
**mini** [1] - 27:3
**minimum** [2] - 98:9,
98:10
**minor** [3] - 24:11,
24:13, 80:17
**minute** [5] - 50:3,
126:12, 136:20,
137:13, 145:2
**minutes** [9] - 10:8,
19:6, 50:6, 50:11,
67:18, 114:17, 127:1,
135:16, 146:10
**mirroring** [1] - 67:2
**misconduct** [1] -
140:25
**misdemeanor** [1] -
58:18
**misremembering** [1] -
31:17
**miss** [1] - 138:5
**missed** [1] - 99:13
**missing** [2] - 79:21,
114:12

**mistakes** [1] - 71:9
**mixture** [1] - 56:9
**mode** [1] - 128:19
**model** [41] - 56:13,
65:22, 65:24, 66:1,
77:1, 77:5, 78:8, 81:9,
82:11, 82:25, 83:8,
83:12, 89:21, 94:24,
95:7, 95:9, 95:16,
95:23, 95:24, 96:15,
96:24, 97:3, 97:15,
97:24, 98:1, 98:6, 99:5,
100:2, 101:18, 104:3,
104:12, 111:19,
117:18, 118:25,
120:24, 121:3, 122:9,
124:3, 127:17, 128:1
**modern** [1] - 3:4
**modification** [1] -
124:8
**modifications** [1] -
66:15
**moment** [8] - 50:14,
69:1, 72:22, 77:18,
81:18, 81:20, 116:19,
140:14
**Monday** [3] - 137:18,
138:4, 138:6
**monitor** [7] - 34:14,
36:14, 62:5, 62:6, 83:1,
98:3, 126:7
**monitored** [1] - 77:9
**monitoring** [9] - 6:18,
62:15, 67:23, 67:24,
97:25, 105:6, 121:7,
121:12, 123:14
**month** [3] - 85:23,
85:24, 85:25
**months** [2] - 6:16,
33:15
**morning** [44] - 2:5,
2:6, 2:9, 2:11, 2:12,
2:14, 3:20, 4:3, 4:7,
4:15, 5:8, 6:24, 7:8,
8:15, 10:18, 12:3, 18:7,
19:16, 22:5, 22:24,
23:4, 23:17, 26:20,
35:8, 35:18, 39:12,
51:15, 51:17, 53:2,
53:10, 53:11, 53:17,
53:18, 81:15, 138:14,
138:18, 139:3, 139:21,
140:4, 143:9, 143:20,
144:20, 146:6, 146:14
**most** [16] - 3:4, 12:22,
16:22, 22:21, 43:12,
43:14, 43:18, 54:21,
83:5, 87:3, 92:22,
95:13, 98:1, 117:5,
126:5, 145:10

**mostly** [3] - 5:21, 62:3,
63:9
**mother** [8] - 13:10,
13:21, 16:21, 31:6,
31:12, 31:22, 32:6,
32:15
**motion** [34] - 3:9, 3:10,
3:11, 3:21, 3:23, 4:12,
4:20, 5:9, 5:16, 8:18,
9:10, 11:24, 17:25,
18:3, 18:7, 26:2, 39:2,
41:15, 41:25, 138:16,
138:25, 140:6, 141:18,
142:25, 145:3, 145:12,
145:14, 146:18, 147:3
**motions** [1] - 145:5
**motorcycles** [1] -
103:14
**motorist** [9] - 90:20,
90:24, 92:10, 95:3,
95:18, 95:20, 115:9,
115:13, 116:4
**motorist's** [1] - 98:5
**move** [27] - 3:23, 4:23,
36:17, 70:23, 77:3,
87:8, 93:16, 93:24,
109:20, 109:21, 110:7,
111:12, 114:5, 114:8,
114:11, 116:8, 117:19,
118:4, 120:17, 122:19,
126:2, 126:12, 127:20,
130:11, 130:17, 132:4,
132:15
**moved** [1] - 123:8
**moves** [1] - 113:7
**moving** [12] - 60:12,
87:7, 93:3, 93:5,
106:16, 119:4, 122:2,
125:24, 127:20, 128:5,
128:15, 132:4
**MPD** [28] - 2:19, 42:19,
43:8, 52:2, 52:3, 52:4,
74:23, 75:2, 75:20,
77:2, 77:4, 87:6, 87:19,
96:10, 106:18, 108:24,
109:4, 110:22, 115:8,
116:14, 123:2, 125:20,
127:5, 127:8, 130:4,
131:14, 131:16, 134:7
**MR** [234] - 2:6, 2:9,
7:24, 8:6, 8:13, 8:23,
9:1, 10:2, 10:7, 10:11,
10:14, 10:16, 11:5,
11:10, 11:11, 11:13,
12:1, 12:19, 12:21,
14:18, 15:12, 15:18,
15:23, 16:14, 17:1,
17:7, 17:12, 17:15,
17:19, 17:22, 18:9,
18:23, 19:1, 19:4,

19:12, 22:16, 28:2,
28:8, 28:14, 28:19,
30:4, 30:6, 32:9, 33:25,
35:13, 37:12, 37:17,
37:20, 37:25, 38:4,
38:7, 38:10, 38:14,
38:19, 39:8, 40:8,
43:21, 43:24, 44:1,
44:12, 45:2, 45:20,
45:22, 45:24, 46:4,
46:12, 46:19, 47:21,
48:8, 48:9, 48:12,
48:15, 48:19, 48:24,
49:2, 49:5, 49:12,
49:18, 50:2, 50:7,
50:14, 50:17, 50:19,
51:1, 51:6, 51:7, 51:9,
51:12, 53:1, 53:16,
64:2, 70:6, 70:9, 77:10,
77:13, 77:15, 77:17,
77:23, 77:25, 78:3,
78:8, 78:15, 78:17,
78:19, 78:22, 79:3,
79:17, 79:21, 80:1,
80:8, 80:14, 80:16,
80:19, 80:21, 80:24,
81:2, 81:4, 81:10,
81:13, 81:16, 81:19,
81:21, 81:23, 81:24,
82:22, 87:4, 87:12,
87:17, 87:19, 88:7,
88:12, 88:14, 88:17,
88:18, 89:9, 89:14,
91:14, 93:9, 93:10,
93:12, 93:20, 95:20,
95:22, 96:23, 98:24,
99:16, 100:15, 104:10,
106:14, 106:15, 107:7,
107:9, 107:11, 107:24,
107:25, 108:5, 108:15,
109:16, 109:18,
109:19, 110:16,
110:19, 110:24, 111:3,
111:5, 111:7, 111:21,
111:24, 112:2, 112:5,
112:10, 112:18,
112:24, 113:5, 113:11,
113:15, 113:20,
113:23, 114:1, 114:4,
114:7, 114:9, 114:17,
114:19, 114:24, 115:4,
115:7, 116:2, 116:12,
116:20, 116:21,
121:18, 123:12,
126:14, 126:22, 127:1,
127:3, 127:4, 129:19,
129:23, 130:10,
130:22, 130:24, 131:1,
131:6, 131:7, 135:8,
135:16, 135:17,
135:20, 135:21,

135:23, 136:3, 136:5, 136:6, 136:12, 136:17, 139:12, 139:16, 140:7, 140:9, 141:20, 141:22, 142:8, 142:20, 143:1, 143:4, 143:21, 144:1, 144:13, 145:22, 145:23, 147:5, 147:10
**MS** [32] - 2:12, 5:3, 5:18, 6:2, 6:5, 6:13, 7:3, 7:15, 7:23, 19:17, 19:22, 20:3, 20:10, 20:15, 20:19, 20:22, 21:1, 21:6, 21:11, 21:14, 21:15, 21:19, 22:1, 22:3, 22:6, 22:9, 22:11, 33:23, 35:12, 139:8, 144:6, 144:19
**multiple** [1] - 27:9
**municipal** [1] - 60:9
**murder** [7] - 13:9, 39:16, 41:17, 42:20, 44:7, 44:8, 44:11
**must** [7] - 4:1, 100:21, 110:10, 115:13, 115:24, 131:9, 133:13

## N

**N.W** [4] - 1:14, 1:18, 1:21, 148:12
**name** [4] - 30:22, 30:23, 53:20, 139:14
**names** [3] - 97:21, 144:2, 144:3
**narrow** [2] - 133:5, 133:7
**narrowly** [1] - 13:3
**national** [68] - 47:24, 56:13, 65:22, 65:24, 66:1, 77:1, 77:7, 77:19, 78:4, 78:7, 78:8, 81:9, 82:11, 82:24, 82:25, 86:15, 88:21, 89:21, 91:7, 93:3, 94:24, 95:16, 95:23, 96:15, 96:24, 97:24, 98:6, 98:9, 99:4, 100:2, 100:22, 101:9, 101:18, 104:3, 107:13, 107:21, 108:1, 108:6, 108:7, 108:11, 108:21, 111:19, 116:5, 116:7, 116:10, 117:12, 117:24, 118:9, 118:11, 118:25, 119:9, 119:14, 120:9, 120:10, 120:23, 121:10, 121:22, 122:6, 122:17, 122:18, 122:23, 123:5, 123:16,

126:4, 127:17, 128:1, 133:2, 134:23
**National** [1] - 83:9
**nationally** [2] - 128:21, 133:23
**Nationally** [1] - 129:1
**naturally** [1] - 124:23
**nature** [6] - 70:18, 71:11, 80:7, 98:16, 99:25, 102:3
**navigating** [1] - 120:4
**near** [2] - 23:18, 36:21
**necessarily** [4] - 28:21, 34:23, 121:14, 121:17
**necessary** [5] - 28:19, 52:16, 78:10, 118:12, 136:25
**need** [31] - 2:15, 3:25, 5:23, 9:23, 11:1, 11:24, 25:18, 26:10, 26:13, 26:15, 27:2, 28:16, 41:22, 65:15, 93:19, 96:14, 96:25, 97:14, 112:8, 112:11, 113:10, 120:12, 136:2, 138:8, 138:11, 138:12, 142:9, 145:20, 146:12
**needed** [2] - 65:5, 144:22
**needs** [7] - 4:16, 5:11, 25:10, 91:8, 108:17, 108:20, 142:17
**neglect** [1] - 68:25
**negotiating** [1] - 60:8
**negotiations** [1] - 79:24
**nervous** [1] - 67:16
**never** [9] - 8:7, 15:9, 22:3, 23:23, 36:22, 37:5, 40:22, 68:19, 132:6
**newsletter** [1] - 86:4
**next** [14] - 6:5, 41:24, 50:6, 52:3, 52:25, 56:24, 65:16, 66:5, 66:6, 69:6, 94:23, 128:5, 128:15, 146:24
**night** [1] - 45:6
**nobody** [1] - 137:4
**non** [2] - 125:17, 125:23
**non-biased** [1] - 125:23
**non-involved** [1] - 125:17
**none** [3] - 6:21, 79:8, 143:10
**noninvolved** [1] - 125:21

**nonprofit** [1] - 83:4
**norm** [1] - 32:14
**normally** [4] - 99:22, 110:2, 121:12, 121:15
**note** [11] - 4:12, 22:3, 48:9, 51:22, 126:23, 139:20, 140:21, 140:25, 141:8, 141:22, 142:23
**noted** [1] - 141:8
**notes** [7] - 22:2, 119:5, 119:11, 119:20, 120:7, 120:21, 148:5
**nothing** [8] - 32:20, 33:23, 33:25, 111:22, 112:6, 145:9, 145:22, 145:23
**notice** [16] - 2:25, 6:3, 7:20, 44:4, 44:24, 139:25, 140:10, 140:11, 140:23, 144:21, 144:24, 144:25, 145:8, 145:11, 145:13, 145:15
**noticed** [5] - 32:14, 32:18, 36:11, 36:18, 145:1
**notifications** [6] - 97:13, 97:14, 97:19, 116:14, 117:19, 122:21
**notified** [2] - 3:16, 3:17
**notify** [11] - 7:19, 7:21, 11:25, 45:8, 45:18, 97:18, 98:2, 117:12, 119:12, 124:1, 140:3
**November** [6] - 1:7, 36:17, 137:17, 138:3, 138:4, 138:6
**nowhere** [1] - 36:21
**number** [20] - 19:24, 60:7, 60:25, 61:21, 63:13, 64:23, 68:5, 68:8, 73:16, 92:6, 92:16, 97:7, 97:9, 102:6, 125:3, 125:10, 131:8, 137:24, 138:10, 143:15
**numbers** [1] - 7:10
**NW** [1] - 1:24

## O

**o'clock** [6] - 3:20, 18:7, 26:20, 126:24, 136:24, 136:25
**oath** [16] - 14:11, 14:23, 14:25, 15:15, 15:17, 25:10, 25:24, 26:6, 26:13, 26:25,

27:16, 28:17, 28:18, 136:21, 141:18, 143:10
**object** [14] - 44:2, 46:13, 81:24, 98:6, 107:10, 108:9, 111:21, 117:1, 117:4, 117:9, 129:19, 140:16, 140:18, 142:1
**objected** [1] - 142:14
**objection** [20] - 44:24, 49:25, 51:3, 80:21, 81:5, 81:6, 88:10, 93:9, 107:16, 109:10, 112:4, 112:7, 114:5, 114:11, 114:23, 139:20, 141:11, 142:16, 142:23
**objectionable** [1] - 8:7
**objections** [3] - 8:2, 8:4, 46:11
**objective** [7] - 29:1, 29:18, 29:25, 30:5, 30:9, 90:8, 130:19
**objectively** [1] - 29:13
**objectives** [2] - 132:22, 134:18
**objects** [1] - 21:23
**obligate** [1] - 73:15
**obligation** [2] - 29:13, 121:20
**obligations** [1] - 45:4
**observation** [1] - 41:14
**observations** [1] - 26:15
**observe** [2] - 14:19, 28:10
**observed** [11] - 14:22, 20:1, 26:13, 26:19, 26:20, 27:7, 27:8, 27:9, 30:9, 35:3, 37:19
**observer** [2] - 21:25, 22:1
**observing** [1] - 18:12
**obstruct** [1] - 39:20
**obstructing** [1] - 45:13
**obstruction** [6] - 39:20, 40:10, 40:22, 41:16, 42:23, 45:10
**obtain** [2] - 84:24, 84:25
**obtained** [1] - 122:14
**obviate** [1] - 145:19
**obviously** [5] - 4:15, 16:8, 17:24, 51:25, 103:25
**occasions** [2] - 26:18, 27:9
**occur** [3] - 73:2, 118:19, 131:17

**occurred** [4] - 35:17, 62:14, 94:3, 144:20
**occurring** [2] - 98:3, 118:14
**occurs** [3] - 70:22, 121:2, 131:24
**October** [3] - 36:16, 108:24, 148:7
**OF** [3] - 1:1, 1:9, 148:1
**off-the-record** [3] - 50:15, 114:13, 114:14
**offense** [1] - 12:8
**offenses** [1] - 95:8
**offensive** [1] - 29:7
**offered** [1] - 25:16
**Office** [9] - 1:14, 17:13, 54:20, 57:1, 64:11, 69:10, 72:18, 72:25, 73:15
**office** [6] - 7:2, 8:19, 14:21, 73:11, 126:2, 126:6
**officer** [42] - 15:21, 18:10, 19:14, 20:21, 21:4, 21:7, 28:20, 32:13, 43:4, 47:7, 48:21, 58:13, 62:6, 63:17, 63:24, 67:12, 92:21, 92:24, 98:4, 101:5, 101:11, 101:20, 110:2, 110:4, 115:1, 115:8, 115:16, 115:24, 125:3, 125:4, 125:7, 125:11, 128:12, 131:10, 132:16, 132:24, 143:11, 143:13, 143:14, 144:10
**Officer** [11] - 2:8, 4:25, 36:2, 37:21, 43:2, 43:6, 50:22, 50:23, 112:21
**officer's** [1] - 133:22
**officers** [45] - 26:15, 27:1, 27:6, 52:13, 57:21, 59:21, 60:17, 60:23, 63:14, 63:19, 63:21, 63:23, 63:25, 72:12, 75:2, 79:25, 83:6, 90:1, 90:23, 91:18, 95:17, 96:25, 98:22, 100:3, 100:19, 101:7, 105:5, 112:24, 118:15, 120:5, 120:8, 122:25, 127:8, 127:18, 128:23, 129:2, 131:16, 133:2, 133:6, 133:10, 133:18, 134:11, 134:15, 134:24, 135:3
**official** [6] - 45:19, 121:21, 125:15, 125:16, 125:18, 125:22

**OFFICIAL** [1] - 148:1
**Official** [1] - 148:11
**officials** [1] - 97:25
**often** [5] - 7:15, 16:5, 65:13, 96:25, 97:6
**once** [3] - 85:23, 120:11, 122:20
**one** [62] - 2:16, 5:14, 5:15, 12:3, 14:1, 14:3, 14:4, 14:6, 14:18, 23:18, 24:5, 24:11, 24:12, 24:13, 26:8, 26:14, 27:13, 30:8, 31:25, 34:6, 34:7, 39:6, 40:17, 42:19, 43:23, 49:7, 50:14, 52:2, 52:13, 52:15, 56:22, 61:17, 63:16, 63:17, 66:20, 68:22, 68:25, 76:1, 77:7, 81:14, 82:25, 85:24, 85:25, 86:10, 87:12, 87:14, 92:4, 97:11, 98:18, 102:12, 117:23, 122:25, 123:10, 124:11, 124:13, 137:12, 137:16, 140:15, 141:16, 142:9, 142:20
**ones** [2] - 18:5, 87:3
**ongoing** [2] - 96:1, 97:25
**online** [3] - 61:2, 70:17, 85:15
**open** [5] - 49:9, 49:15, 114:10, 136:18, 145:6
**opening** [5] - 30:8, 41:20, 44:16, 106:3, 112:21
**operate** [3] - 119:6, 132:23, 132:25
**operates** [1] - 124:23
**operating** [1] - 128:19
**operation** [2] - 60:6, 70:19
**operational** [1] - 70:24
**operations** [2] - 59:6, 59:25
**operator** [1] - 128:18
**opinion** [7] - 73:17, 74:7, 82:14, 82:16, 82:17, 89:6, 108:24
**opinions** [5] - 82:6, 82:7, 82:8, 82:13, 82:19
**opportunity** [9] - 10:15, 25:17, 49:14, 94:2, 102:14, 110:14, 140:19, 142:12, 143:4
**opposed** [3] - 20:20,

108:2, 120:14
**opposite** [2] - 14:10, 104:20
**opposition** [1] - 9:9
**orally** [2] - 10:22, 147:3
**Order** [2] - 71:21, 71:23
**order** [85] - 2:20, 7:25, 27:16, 41:22, 42:3, 42:11, 42:18, 42:19, 42:25, 44:11, 45:2, 45:9, 45:11, 45:14, 45:15, 46:21, 46:24, 47:2, 47:7, 47:11, 47:14, 47:21, 48:5, 48:16, 48:17, 48:20, 49:2, 49:19, 52:3, 52:12, 52:14, 52:15, 52:23, 52:24, 60:12, 60:16, 61:4, 75:22, 75:25, 87:9, 87:13, 92:20, 92:21, 93:13, 94:18, 98:10, 105:16, 105:21, 106:18, 107:9, 107:17, 107:18, 110:8, 110:12, 110:22, 110:25, 111:8, 111:24, 113:23, 113:25, 115:8, 115:16, 116:10, 116:14, 118:5, 119:4, 121:4, 121:9, 121:20, 122:1, 123:3, 123:8, 123:19, 124:18, 125:25, 127:21, 135:2, 135:3, 135:5, 135:7, 140:17, 141:24, 142:2, 145:2, 145:19
**ordering** [1] - 145:2
**orders** [23] - 43:8, 46:7, 52:2, 52:5, 52:6, 60:20, 60:22, 63:3, 65:2, 75:20, 85:6, 87:6, 91:16, 94:10, 105:8, 105:11, 107:13, 107:21, 108:22, 108:24, 109:4, 121:23, 121:25
**ordinance** [1] - 119:18
**ordinarily** [1] - 82:5
**organization** [7] - 71:15, 72:2, 72:3, 72:5, 83:4, 86:10, 86:16
**organizations** [3] - 66:2, 83:10, 87:1
**original** [1] - 141:11
**originally** [1] - 137:18
**otherwise** [2] - 14:25, 108:8
**outburst** [10] - 20:4,

23:5, 23:21, 23:23, 24:7, 24:8, 24:9, 30:7, 35:25, 36:5
**outbursts** [4] - 28:9, 28:11, 35:14, 35:16
**outside** [4] - 12:25, 38:1
**outstanding** [2] - 8:2, 8:13
**outweighed** [1] - 82:17
**overall** [5] - 60:19, 89:21, 90:8, 101:12, 128:12
**overruled** [2] - 93:11, 93:13
**overview** [3] - 75:6, 87:24, 127:6
**own** [10] - 13:23, 15:19, 55:15, 66:4, 83:13, 83:19, 83:24, 91:8, 94:8

## P

**P.C** [1] - 1:20
**p.m** [1] - 1:7
**package** [1] - 99:23
**pads** [1] - 51:22
**page** [6] - 39:11, 106:17, 108:25, 111:23, 115:4, 115:5
**pages** [1] - 109:2
**paid** [3] - 55:13, 72:15, 146:24
**Palm** [1] - 66:6
**panel** [1] - 23:12
**pans** [1] - 71:3
**paper** [1] - 39:9
**papers** [6] - 16:3, 16:4, 38:9, 83:14, 83:15, 83:16
**paragraph** [2] - 110:9, 111:9
**paramount** [1] - 132:17
**Pardon** [1] - 22:10
**parenthesis** [1] - 131:19
**Park** [1] - 32:8
**park** [2] - 32:9, 34:1
**part** [19] - 7:19, 11:19, 40:14, 40:23, 43:3, 48:4, 49:1, 49:20, 55:16, 56:6, 69:15, 99:13, 110:11, 117:8, 119:10, 129:21, 130:2, 146:16
**part-time** [1] - 55:16
**partial** [1] - 109:1

**partially** [1] - 82:18
**participated** [2] - 61:16, 85:16
**participation** [1] - 120:21
**particular** [12] - 29:17, 30:1, 52:2, 66:9, 70:21, 71:1, 72:22, 77:6, 82:25, 110:18, 127:5, 127:12
**particularly** [1] - 142:5
**parties** [3] - 2:3, 25:16, 77:20
**parts** [1] - 68:9
**party** [1] - 145:13
**pass** [1] - 71:7
**past** [4] - 6:15, 93:17, 103:9, 141:4
**path** [1] - 132:6
**patrol** [7] - 58:4, 58:5, 58:13, 61:20, 61:23, 99:9, 99:22
**Patrol** [2] - 66:8, 66:11
**PAUL** [1] - 1:10
**paying** [1] - 20:16
**payment** [1] - 72:19
**PBA** [1] - 72:14
**PD** [2] - 124:2, 124:19
**pendency** [2] - 142:2, 142:5
**pending** [2] - 3:15, 41:14
**people** [31] - 14:23, 16:17, 18:20, 18:25, 23:15, 24:10, 25:24, 26:6, 27:2, 28:22, 29:6, 30:9, 30:10, 45:18, 54:21, 64:14, 66:23, 67:15, 76:24, 84:20, 84:21, 86:2, 102:6, 102:13, 105:3, 118:17, 123:24, 125:10, 130:4, 143:20
**people's** [2] - 144:2
**perceive** [4] - 28:24, 29:6, 29:16, 30:1
**percent** [6] - 89:25, 90:25, 91:4, 91:5, 91:6, 91:11
**percentage** [1] - 90:22
**perception** [3] - 29:18, 29:24, 131:21
**perceptions** [1] - 28:22
**perform** [2] - 92:7, 119:3
**performance** [2] - 102:24, 103:1
**performed** [1] - 61:13
**perhaps** [3] - 40:9,

41:9, 140:13
**period** [3] - 63:8, 91:25, 92:1
**peripheral** [1] - 131:22
**permission** [1] - 62:5
**permit** [4] - 6:2, 12:12, 81:8, 130:8
**permitted** [2] - 13:19, 147:6
**permitting** [1] - 91:18
**person** [16] - 7:7, 13:11, 19:10, 20:13, 20:24, 40:6, 40:10, 73:21, 73:22, 76:13, 85:15, 95:25, 104:17, 104:20, 122:16, 143:17
**persons** [2] - 113:13, 143:9
**perspective** [2] - 88:21, 141:23
**petition** [6] - 3:13, 5:7, 16:11, 34:11, 141:9, 142:6
**petitions** [1] - 27:11
**phone** [5] - 7:9, 32:1, 32:4, 73:19, 73:20
**photographs** [2] - 74:21, 74:22
**physical** [2] - 116:24, 139:24
**picked** [1] - 38:4
**pit** [1] - 67:6
**place** [8] - 32:20, 36:7, 48:3, 88:22, 133:15, 138:21, 141:4, 142:13
**Plaintiff** [2] - 1:4, 1:13
**plaintiff's** [1] - 56:22
**plan** [1] - 11:23
**planning** [1] - 7:4
**plans** [4] - 136:11, 137:23, 137:25, 146:23
**play** [5] - 86:14, 102:3, 102:25, 133:22, 139:6
**played** [2] - 45:6, 141:14
**pleading** [1] - 10:18
**pleadings** [1] - 17:6
**podium** [3] - 30:14, 143:16, 143:18
**point** [42] - 2:15, 5:23, 6:10, 7:25, 9:6, 12:3, 14:2, 14:3, 16:1, 16:2, 19:7, 28:21, 38:24, 39:10, 41:4, 41:5, 41:10, 41:13, 41:24, 42:6, 42:24, 44:1, 44:19, 46:13, 47:6, 48:23, 49:18, 49:21, 78:12, 81:25, 107:22, 108:19, 109:10,

114:19, 115:23, 115:25, 116:1, 120:19, 130:1, 136:12, 138:9, 139:23
**pointed** [3] - 16:16, 35:3, 38:15
**points** [6] - 5:24, 17:19, 37:10, 40:8, 43:5, 123:14
**police** [90] - 42:3, 47:7, 48:21, 54:18, 54:25, 56:13, 57:2, 57:6, 57:9, 57:17, 57:21, 58:13, 58:14, 59:21, 60:12, 60:16, 60:18, 60:22, 61:17, 61:21, 62:6, 62:19, 66:1, 67:12, 68:1, 70:13, 74:19, 74:23, 78:4, 78:6, 78:8, 81:8, 81:9, 82:11, 82:12, 83:6, 83:12, 83:20, 86:18, 89:11, 90:22, 90:25, 91:15, 92:21, 92:24, 93:18, 93:21, 93:22, 93:25, 95:14, 95:16, 95:17, 96:25, 98:4, 99:3, 99:8, 99:15, 99:20, 99:23, 100:3, 100:19, 101:11, 101:20, 104:14, 105:5, 107:19, 115:1, 115:16, 120:5, 121:23, 124:11, 124:22, 125:4, 125:8, 126:11, 127:8, 127:18, 128:12, 128:22, 129:1, 133:2, 133:4, 134:7, 134:24, 143:13
**Police** [13] - 33:14, 42:11, 52:5, 52:8, 52:11, 66:3, 71:15, 71:19, 71:21, 71:24, 72:4, 80:6, 83:3
**policies** [43] - 56:13, 60:19, 60:22, 63:3, 63:9, 64:7, 64:13, 65:1, 65:22, 65:24, 66:1, 77:2, 77:4, 77:5, 77:19, 78:9, 81:9, 82:12, 82:24, 83:8, 83:12, 83:19, 84:1, 85:6, 86:20, 86:21, 89:22, 90:2, 91:15, 91:20, 91:21, 92:16, 93:19, 94:11, 94:24, 95:14, 98:1, 98:2, 100:25, 101:18, 108:21, 123:8
**policing** [1] - 61:8
**policy** [76] - 52:5, 60:18, 63:13, 65:6,

65:7, 66:11, 66:12, 66:13, 66:16, 66:21, 67:2, 83:1, 83:13, 83:14, 83:22, 83:24, 86:19, 90:17, 91:1, 91:2, 91:5, 91:9, 91:12, 91:21, 92:6, 92:20, 94:13, 95:7, 95:9, 95:16, 95:23, 95:24, 96:6, 96:10, 96:11, 96:15, 96:24, 97:3, 97:12, 97:16, 97:24, 98:7, 98:9, 99:4, 99:5, 100:2, 100:22, 101:1, 101:9, 101:13, 104:12, 105:23, 109:6, 110:18, 111:19, 113:1, 116:5, 116:7, 116:10, 117:18, 118:3, 118:25, 120:12, 120:24, 121:3, 122:10, 123:23, 124:3, 124:8, 124:13, 127:17, 127:24, 128:1, 128:2
**Pompano** [17] - 54:19, 57:4, 57:8, 57:10, 57:15, 57:18, 57:25, 58:2, 58:8, 58:11, 58:17, 62:20, 63:7, 63:16, 69:10, 69:14, 69:23
**Poobah** [1] - 10:2
**Poodles** [1] - 56:10
**population** [4] - 57:10, 58:22, 102:4, 102:5
**port** [1] - 60:6
**portion** [4] - 91:5, 110:18, 111:21, 146:9
**portions** [2] - 7:4, 41:20
**pose** [2] - 115:13, 122:15
**poses** [1] - 111:17
**position** [8] - 10:25, 14:14, 15:23, 40:18, 72:12, 72:14, 119:18, 119:21
**positions** [1] - 72:9
**possible** [4] - 5:25, 12:12, 29:8, 46:19
**postponed** [1] - 4:25
**potential** [4] - 31:2, 31:3, 38:21, 128:8
**powered** [1] - 103:5
**PowerPoint** [17] - 75:6, 75:12, 87:24, 87:25, 88:1, 88:3, 106:3, 106:4, 106:9, 108:12, 108:13, 127:7, 127:21, 130:18
**PowerPoints** [4] - 8:2,

8:5, 8:8, 134:20
**powers** [1] - 9:22
**practical** [3] - 82:15, 141:22, 147:5
**practice** [2] - 121:11, 124:24
**practices** [8] - 56:13, 65:22, 78:4, 78:8, 81:9, 82:12, 107:19, 124:3
**preclude** [1] - 49:17
**predicate** [2] - 113:4, 113:5
**predictions** [1] - 51:20
**preemptories** [1] - 18:24
**prejudice** [2] - 11:5, 43:22
**prejudiced** [1] - 40:5
**prejudicial** [2] - 93:12, 112:20
**preliminaries** [1] - 18:19
**preliminary** [1] - 52:18
**premature** [1] - 77:16
**preparation** [2] - 74:15, 76:16
**prepare** [3] - 74:6, 74:8, 74:11
**prepared** [1] - 15:5
**preparing** [1] - 76:14
**presence** [2] - 13:4, 139:25
**present** [4] - 102:14, 132:20, 141:23, 142:13
**presentation** [1] - 127:21
**presented** [6] - 29:21, 64:1, 109:2, 140:24, 143:5, 143:23
**presently** [1] - 141:24
**presents** [2] - 128:7, 128:9
**preserve** [1] - 5:24
**preserved** [1] - 6:11
**president** [1] - 72:11
**press** [1] - 2:24
**pressing** [1] - 138:13
**pretty** [4] - 20:8, 65:12, 124:24, 134:14
**prevent** [1] - 141:4
**preventing** [1] - 145:9
**preview** [1] - 77:13
**previously** [3] - 52:1, 56:12, 87:20
**prima** [1] - 129:17
**primary** [8] - 61:24, 90:16, 109:24, 110:1, 110:2, 117:20, 118:21, 119:25
**private** [2] - 83:10,

84:23
**proactive** [7] - 32:14, 32:21, 93:23, 93:25, 94:2, 94:5, 94:7
**probable** [5] - 47:8, 47:11, 47:13, 48:21, 49:22
**probation** [1] - 17:1
**problem** [6] - 7:17, 7:20, 28:2, 102:15, 137:1, 138:11
**problems** [3] - 6:19, 32:17, 33:3
**procedural** [1] - 105:24
**procedures** [3] - 81:9, 82:12, 107:20
**proceed** [8] - 5:2, 28:14, 101:5, 107:23, 109:16, 109:17, 144:23, 146:9
**proceeded** [1] - 140:3
**proceeding** [6] - 12:1, 12:7, 12:8, 12:14, 14:22, 87:4
**proceedings** [6] - 3:5, 4:9, 11:21, 12:25, 145:20, 148:6
**process** [8] - 32:4, 64:25, 65:11, 65:19, 134:17, 140:22, 142:4, 142:22
**produce** [1] - 85:22
**profession** [1] - 82:10
**professional** [5] - 66:2, 72:1, 78:4, 83:4, 127:16
**Professor** [1] - 27:19
**proffer** [5] - 46:20, 51:2, 77:11, 77:18, 77:21
**proffered** [2] - 25:21, 107:11
**proffering** [2] - 78:2, 78:3
**prohibit** [1] - 49:13
**prohibited** [1] - 117:15
**prolong** [1] - 144:16
**prominent** [1] - 87:3
**promise** [1] - 137:13
**promoted** [1] - 61:20
**promptly** [1] - 11:21
**proper** [1] - 68:18
**properly** [1] - 7:22
**property** [2] - 128:21, 129:18
**proposal** [1] - 19:8
**propose** [1] - 14:1
**proposed** [3] - 2:19, 42:5, 43:10

**prosecution** [1] - 34:12
**prosecution's** [1] - 44:13
**Protection** [1] - 27:18
**provide** [12] - 14:24, 25:11, 70:2, 73:15, 73:17, 77:1, 83:8, 85:3, 86:6, 89:23, 112:2, 117:21
**provided** [11] - 3:17, 11:3, 47:13, 63:2, 63:6, 73:17, 74:13, 75:1, 127:8, 128:15, 144:25
**providing** [2] - 70:6, 72:21
**provision** [17] - 12:6, 12:17, 16:23, 46:25, 47:1, 49:3, 111:13, 113:11, 113:12, 116:16, 116:22, 117:11, 117:20, 120:7, 126:7, 129:10
**provisions** [5] - 45:3, 45:11, 52:7, 122:6, 124:20
**public** [13] - 2:24, 5:17, 6:9, 6:16, 84:23, 90:18, 96:2, 115:14, 116:4, 128:8, 128:9, 131:10, 132:15
**publically** [1] - 145:1
**publications** [1] - 85:21
**publish** [1] - 87:5
**pull** [2] - 67:16, 124:14
**pulled** [1] - 67:25
**punitive** [1] - 141:2
**purpose** [6] - 85:3, 86:17, 86:18, 106:9, 117:16, 125:21
**purposes** [3] - 5:10, 6:16, 126:22
**pursuant** [1] - 5:20
**pursue** [12] - 47:7, 48:22, 96:4, 96:5, 96:9, 102:25, 103:19, 107:2, 113:13, 113:18, 115:19, 128:13
**pursued** [4] - 44:17, 55:5, 103:3, 104:20
**pursuing** [7] - 92:10, 95:25, 103:2, 103:22, 104:18, 115:24, 117:15
**pursuit** [125] - 2:20, 42:3, 42:18, 42:25, 43:3, 43:5, 44:11, 47:25, 48:20, 61:17, 61:22, 62:7, 62:12, 62:13, 62:17, 63:3,

63:9, 64:12, 66:16, 67:1, 67:4, 67:6, 67:8, 67:21, 67:24, 69:2, 70:12, 71:8, 75:8, 75:16, 77:1, 84:12, 87:25, 88:2, 88:20, 88:22, 89:7, 89:8, 89:11, 89:20, 90:16, 90:17, 90:20, 91:1, 91:2, 91:5, 92:7, 92:9, 92:16, 92:22, 93:13, 95:3, 95:10, 95:21, 96:1, 96:15, 96:22, 97:1, 97:14, 97:17, 97:23, 97:25, 98:11, 98:14, 98:20, 98:25, 99:4, 99:8, 99:12, 99:14, 100:4, 100:18, 100:19, 101:9, 101:11, 101:13, 101:21, 102:21, 104:6, 105:5, 105:7, 107:1, 107:4, 107:6, 110:3, 110:10, 110:18, 110:22, 112:25, 113:1, 113:8, 113:16, 115:9, 115:17, 116:17, 116:23, 118:2, 118:6, 118:8, 118:17, 118:18, 118:19, 119:3, 120:19, 120:25, 121:8, 122:2, 122:3, 122:20, 122:25, 123:21, 123:24, 124:4, 124:5, 124:19, 126:8, 128:7, 129:4, 130:17, 131:24, 133:15, 133:25, 134:2
**pursuits** [49] - 42:12, 43:1, 45:2, 46:22, 46:25, 52:3, 52:12, 61:10, 61:21, 61:25, 62:1, 62:4, 62:21, 64:7, 64:24, 65:1, 65:23, 66:23, 69:21, 70:18, 75:14, 75:23, 77:5, 77:6, 77:8, 83:2, 84:15, 87:10, 87:14, 89:12, 90:11, 90:15, 91:19, 91:24, 92:9, 92:17, 94:3, 94:11, 94:25, 95:8, 104:24, 106:17, 114:25, 115:20, 126:1, 127:22, 129:2, 134:16, 134:24
**purview** [1] - 63:14
**put** [24] - 2:25, 14:10, 26:13, 26:19, 26:25, 27:15, 28:16, 28:18, 35:7, 44:3, 67:2, 71:3, 85:14, 85:23, 92:16, 92:25, 93:19, 116:18, 118:14, 125:14,

138:23, 142:9, 143:10, 144:12
**puts** [1] - 28:6
**putting** [3] - 26:6, 35:19, 94:3

## Q

**qualifications** [1] - 78:14
**qualified** [3] - 82:11, 107:15, 107:19
**qualify** [1] - 81:7
**questions** [26] - 3:6, 5:12, 6:13, 10:17, 10:19, 14:9, 15:5, 15:24, 20:12, 26:8, 30:17, 32:7, 33:22, 35:9, 46:2, 60:11, 78:11, 78:14, 80:22, 106:10, 111:16, 134:14, 135:8, 143:21, 144:14
**quibble** [1] - 29:17
**quickly** [3] - 50:19, 141:14, 147:14
**quiet** [2] - 112:3
**quite** [2] - 29:8, 108:3
**quote** [3] - 45:3, 98:25, 110:12
**quote/unquote** [1] - 5:22
**quoted** [1] - 106:12

## R

**Rachel** [1] - 2:7
**radio** [3] - 62:13, 118:6, 123:15
**rains** [1] - 102:2
**raise** [6] - 38:12, 46:1, 46:18, 47:6, 49:10, 68:19
**raised** [2] - 107:16, 107:17
**Raises** [1] - 24:4
**raises** [1] - 26:12
**ram** [3] - 117:6, 117:7
**range** [4] - 58:17, 58:18, 59:17
**rank** [9] - 55:3, 58:11, 59:11, 59:15, 68:10, 69:18, 125:12, 125:18
**ranks** [2] - 68:5, 70:22
**RAR** [1] - 110:12
**rather** [7] - 43:6, 49:12, 49:14, 75:5, 91:7, 101:8, 130:13
**reach** [1] - 126:15
**reaction** [1] - 118:23

**reactive** [2] - 93:23, 94:9
**read** [11] - 12:21, 17:24, 41:18, 42:13, 51:18, 80:6, 91:11, 106:22, 109:4, 110:9, 111:1
**reading** [3] - 12:17, 108:9, 113:3
**readout** [1] - 71:9
**ready** [3] - 17:20, 50:16, 51:22
**real** [2] - 62:17, 129:7
**realistically** [1] - 135:14
**realized** [1] - 23:22
**really** [4] - 12:3, 20:16, 29:14, 90:1
**reason** [11] - 7:16, 17:9, 22:7, 25:6, 38:23, 40:20, 40:23, 48:4, 93:7, 93:14, 146:14
**reasonable** [4] - 12:13, 12:22, 13:1, 13:2
**reasons** [3] - 82:8, 82:16, 102:12
**receive** [6] - 61:4, 83:25, 128:23, 133:3, 133:19, 139:25
**received** [6] - 8:10, 50:23, 70:21, 133:1, 140:10
**receives** [1] - 84:4
**recent** [3] - 43:12, 43:14, 43:18
**recess** [8] - 23:6, 23:10, 23:11, 35:25, 36:1, 50:12, 126:19
**recessed** [1] - 24:12
**recklessness** [1] - 42:21
**recognize** [2] - 79:1, 105:15
**recognized** [2] - 78:12, 83:5
**recognizes** [2] - 13:20, 108:18
**recognizing** [1] - 49:13
**recollection** [7] - 19:7, 21:2, 22:24, 23:2, 28:6, 31:13, 31:21
**recommendation** [2] - 68:21, 68:23
**reconsider** [17] - 3:10, 3:21, 4:5, 4:12, 4:20, 11:24, 17:25, 18:4, 26:2, 39:2, 41:15, 138:17, 138:25,

141:18, 145:18, 146:19, 147:3
**reconsideration** [1] - 8:18
**reconvening** [1] - 4:14
**record** [38] - 2:4, 5:17, 5:24, 6:9, 8:23, 9:14, 9:17, 9:19, 10:4, 10:6, 11:1, 11:14, 11:19, 14:5, 14:13, 14:16, 15:2, 22:21, 28:6, 34:8, 34:9, 35:7, 38:15, 44:4, 44:24, 50:15, 53:8, 55:18, 114:7, 114:13, 114:14, 131:2, 138:23, 139:19, 140:8, 142:10, 142:12, 144:20
**recruiting** [1] - 85:24
**recurring** [1] - 44:6
**red** [2] - 100:12, 101:2
**Red** [1] - 81:17
**redirect** [2] - 4:24, 136:5
**refer** [1] - 72:13
**reference** [6] - 42:9, 45:6, 110:25, 114:1, 129:11, 129:14
**referenced** [3] - 109:24, 111:8, 113:2
**references** [2] - 105:24, 114:3
**referencing** [1] - 111:5
**referred** [2] - 35:16, 89:20
**referring** [2] - 20:2, 89:11
**reflect** [2] - 53:8, 116:10
**reflected** [2] - 47:4, 47:16
**refute** [1] - 14:14
**regard** [8] - 6:14, 26:7, 95:4, 100:23, 121:22, 128:19, 144:20, 145:17
**regarding** [5] - 11:15, 37:20, 52:2, 77:1, 138:2
**regardless** [1] - 11:19
**regional** [2] - 59:7, 60:3
**regions** [1] - 60:5
**regulation** [1] - 128:5
**regulations** [2] - 105:23, 130:6
**reiterate** [2] - 44:5, 46:3
**reject** [1] - 52:9
**relate** [6] - 45:3, 46:21, 46:23, 47:12, 49:4, 77:2

**related** [3] - 44:11, 45:25, 70:2
**relates** [17] - 41:8, 44:7, 44:16, 45:9, 45:16, 46:25, 47:10, 49:2, 61:10, 71:7, 76:25, 82:4, 92:8, 108:21, 117:11, 126:7, 133:5
**relating** [1] - 130:4
**relation** [3] - 5:6, 54:10, 72:21
**relationship** [3] - 21:17, 22:15, 108:1
**released** [1] - 18:22
**relevance** [6] - 42:3, 43:7, 93:9, 111:22, 112:7, 130:7
**relevant** [17] - 11:18, 41:19, 42:12, 42:23, 48:11, 48:15, 48:18, 52:15, 71:12, 80:2, 87:1, 112:19, 113:13, 113:25, 114:3, 129:25, 130:2
**rely** [3] - 84:11, 86:7, 87:1
**remain** [6] - 15:4, 32:3, 32:10, 32:19, 33:3, 128:9
**remarks** [1] - 22:14
**remedy** [6] - 14:1, 49:16, 141:3, 145:17, 145:18
**remember** [5] - 20:5, 31:2, 32:5, 43:13, 137:7
**remembered** [1] - 20:5
**remind** [3] - 5:21, 9:20, 18:18
**reminded** [1] - 15:13
**remove** [1] - 31:19
**removed** [1] - 36:19
**rendering** [1] - 74:8
**repeat** [2] - 33:9, 125:6
**rephrase** [2] - 104:11, 114:22
**replace** [1] - 121:20
**report** [9] - 17:5, 28:9, 37:13, 85:2, 124:11, 124:12, 124:15, 124:19
**reported** [2] - 35:22, 37:21
**Reporter** [2] - 1:23, 148:11
**reporter** [7] - 11:20, 21:21, 53:13, 139:15, 145:25, 146:1, 146:3
**REPORTER** [2] -

146:2, 148:1
**reporters** [1] - 112:13
**reporting** [3] - 60:1, 60:2, 60:4
**reports** [5] - 64:22, 74:6, 74:19, 91:11, 124:6
**represent** [1] - 17:9
**representation** [4] - 15:18, 37:20, 51:4, 88:9
**representations** [13] - 22:19, 25:7, 25:19, 26:24, 27:22, 27:23, 29:20, 51:10, 138:19, 141:10, 143:9, 143:16, 143:19
**representative** [8] - 63:10, 64:18, 64:19, 68:7, 68:8, 72:13
**represented** [3] - 64:16, 146:25, 147:1
**representing** [2] - 15:12, 57:2
**request** [2] - 3:19, 4:2
**requested** [3] - 2:17, 24:16, 82:1
**requesting** [1] - 141:17
**require** [7] - 13:22, 65:21, 90:22, 100:23, 128:18, 130:11, 144:24
**required** [6] - 6:16, 115:16, 120:8, 121:4, 123:19, 130:16
**requirement** [1] - 123:25
**requires** [4] - 13:1, 47:7, 48:20, 124:18
**reread** [1] - 41:19
**research** [10] - 64:20, 65:5, 65:9, 83:8, 83:11, 83:18, 84:19, 84:24, 85:22, 86:7
**reside** [1] - 53:24
**residential** [2] - 102:5, 102:8
**residentials** [1] - 102:14
**resolve** [1] - 41:22
**resource** [1] - 83:6
**respect** [16] - 2:18, 4:19, 5:15, 10:14, 10:16, 10:25, 16:15, 39:13, 42:14, 45:25, 47:1, 78:14, 91:16, 137:22, 138:24, 139:1
**respective** [1] - 13:3
**respects** [1] - 107:17
**respond** [7] - 10:19,

10:22, 17:24, 39:6, 39:8, 58:16, 108:14
**responded** [1] - 18:7
**responding** [1] - 9:2
**response** [4] - 39:4, 75:18, 88:3, 132:21
**responses** [2] - 3:21, 138:15
**responsibilities** [4] - 45:7, 45:16, 59:23, 69:11
**responsibility** [6] - 104:4, 104:16, 104:23, 105:1, 105:4, 105:7
**responsible** [1] - 27:19
**restricted** [1] - 131:25
**restrictions** [5] - 91:22, 93:4, 93:6, 94:4
**restrictive** [16] - 91:21, 91:23, 92:15, 92:19, 92:23, 92:25, 93:19, 94:13, 94:14, 94:15, 94:16, 94:19, 94:21, 101:4, 120:10, 121:6
**restrictiveness** [4] - 91:17, 92:5, 92:14
**result** [4] - 15:4, 31:8, 66:14, 104:5
**resulted** [1] - 40:15
**resumé** [2] - 78:25, 79:1
**retired** [7] - 33:15, 55:1, 55:2, 55:11, 57:13, 59:14, 143:13
**retirement** [2] - 55:13, 55:14
**retraining** [1] - 61:1
**return** [1] - 69:20
**reverse** [1] - 69:1
**review** [18] - 8:11, 46:9, 46:10, 65:10, 68:2, 68:13, 68:17, 75:20, 75:25, 107:20, 110:14, 110:15, 111:8, 123:19, 124:15, 124:18, 124:25, 125:22
**reviewed** [5] - 74:14, 107:12, 110:17, 110:21, 122:4
**reviewer** [1] - 125:23
**reviewing** [1] - 74:12
**revised** [2] - 42:5, 43:12
**Ricardi** [2] - 48:2, 48:9
**rich** [1] - 40:11
**right-hand** [1] - 24:10
**Rights** [5] - 12:7, 29:10, 40:13, 41:7, 142:5

**rights** [7] - 12:10, 39:12, 39:25, 40:1, 40:2, 41:12
**ripe** [1] - 145:4
**Risa** [2] - 1:13, 2:12
**risa.berkower@
usdoj.gov** [1] - 1:15
**rises** [1] - 29:4
**risk** [11] - 101:14, 101:15, 102:9, 102:10, 102:13, 103:8, 103:22, 115:14, 115:19, 115:24, 118:14
**risks** [2] - 90:18, 97:1
**river** [1] - 132:13
**RMR** [1] - 1:23
**road** [4] - 57:7, 102:20, 102:22, 103:21
**roadway** [2] - 117:1, 117:4
**Robert** [2] - 53:1, 53:21
**ROBERT** [2] - 53:3, 53:21
**robot** [1] - 13:22
**role** [4] - 45:6, 64:6, 86:14, 124:17
**roles** [8] - 61:19, 62:9, 64:16, 68:4, 105:2, 122:25, 123:1, 125:2
**roll** [2] - 60:25, 61:1
**Room** [3] - 1:14, 1:24, 148:12
**room** [7] - 12:24, 13:22, 38:5, 124:12, 137:8, 146:11, 147:7
**roughly** [2] - 58:25, 76:14
**routinely** [1] - 145:5
**row** [9] - 18:13, 18:15, 19:5, 20:6, 23:3, 23:4, 36:21, 36:23, 37:4
**Royce** [1] - 6:1
**rule** [8] - 48:19, 112:25, 113:1, 113:7, 113:9, 114:25, 141:18, 147:3
**Rule** [1] - 113:10
**rules** [7] - 43:1, 105:23, 110:7, 110:9, 111:13, 113:7, 132:4
**ruling** [3] - 26:3, 39:2, 138:17
**run** [5] - 49:9, 49:10, 49:15, 56:3, 132:9
**rung** [2] - 92:4, 93:1
**running** [1] - 96:21
**rural** [3] - 57:22, 83:21, 102:5

# S

**safe** [4] - 118:20, 118:21, 119:3, 132:14
**safely** [9] - 100:5, 100:9, 100:21, 100:24, 101:5, 101:6, 119:3, 120:12, 129:6
**safety** [21] - 70:18, 90:13, 90:16, 90:17, 90:19, 90:20, 90:24, 93:16, 96:2, 97:1, 101:14, 101:16, 104:1, 115:14, 115:24, 119:2, 119:10, 122:8, 131:10, 132:15, 132:18
**sat** [8] - 20:7, 63:12, 68:1, 68:5, 68:6, 68:7, 68:8, 68:9
**satisfied** [2] - 42:6, 43:18
**satisfy** [1] - 27:16
**Saturday** [4] - 54:6, 74:4, 76:20, 146:23
**saw** [12] - 19:4, 19:10, 20:13, 27:14, 27:15, 27:22, 28:1, 30:25, 35:21, 36:13, 37:13, 143:19
**scale** [1] - 91:20
**scan** [1] - 90:6
**scenario** [3] - 16:18, 16:19, 101:25
**scene** [5] - 43:4, 45:4, 45:19, 121:13, 121:16
**schedule** [1] - 5:1
**scheduling** [1] - 126:22
**science** [1] - 82:9
**scientific** [1] - 84:20
**scooter** [3] - 103:22, 103:23, 103:25
**Scott** [1] - 19:7
**screen** [5] - 26:22, 30:11, 106:1, 116:19, 123:11
**seat** [3] - 19:24, 137:24, 138:10
**seating** [1] - 31:14
**second** [25] - 5:14, 14:3, 18:13, 18:15, 19:5, 20:6, 23:4, 24:5, 35:20, 35:24, 36:21, 36:23, 37:3, 39:16, 41:4, 42:20, 44:8, 47:6, 47:22, 117:8, 127:14, 132:11, 135:11, 144:1
**secondary** [5] - 61:24, 109:24, 110:4, 118:21, 120:1

**seconds** [1] - 38:17
**section** [4] - 36:19, 110:12, 112:5, 126:23
**security** [7] - 18:10, 20:21, 21:4, 21:6, 143:13, 143:14, 144:9
**sedan** [1] - 120:22
**see** [27] - 3:2, 3:5, 3:6, 3:7, 6:8, 6:18, 15:8, 16:25, 23:18, 25:15, 26:21, 27:23, 27:25, 32:13, 37:22, 48:13, 49:23, 74:21, 93:25, 105:22, 107:22, 113:6, 131:22, 133:24
**seeing** [1] - 7:22
**sees** [1] - 30:11
**seizure** [1] - 48:3
**selection** [4] - 20:3, 24:17, 36:16, 36:24
**self** [1] - 70:8
**self-defense** [1] - 70:8
**seminars** [4] - 85:10, 85:11, 85:13, 85:17
**send** [3] - 9:12, 65:6, 68:23
**sending** [1] - 124:25
**sends** [1] - 67:7
**senior** [6] - 9:1, 43:4, 45:19, 97:25, 125:15, 125:16
**sense** [2] - 41:3, 141:3
**sent** [7] - 4:3, 4:6, 42:1, 43:12, 43:19, 70:23, 86:2
**sentence** [2] - 111:1, 132:5
**separate** [8] - 2:23, 39:10, 41:16, 91:10, 124:5, 124:15, 125:23, 142:22
**separately** [1] - 17:21
**September** [1] - 79:4
**sergeant** [2] - 62:11, 69:18
**Sergeant** [1] - 43:3
**series** [1] - 115:10
**serious** [8] - 47:9, 95:1, 95:2, 96:1, 111:18, 115:14, 116:4, 122:16
**served** [1] - 58:9
**service** [2] - 15:22, 143:12
**services** [3] - 73:14, 74:8, 76:4
**SESSION** [1] - 1:5
**set** [10] - 6:15, 10:4, 10:10, 14:5, 52:5, 65:16, 86:18, 86:24,

110:11, 126:3
**sets** [2] - 86:25, 113:2
**setting** [4] - 12:24, 57:23, 59:1, 89:21
**settings** [1] - 102:8
**seven** [1] - 64:15
**sever** [1] - 41:15
**several** [5] - 6:15, 26:17, 41:24, 113:13, 120:7
**severity** [1] - 95:1
**shake** [1] - 137:3
**shall** [13] - 12:9, 12:11, 12:13, 116:23, 116:25, 117:20, 118:5, 118:7, 118:21, 119:6, 120:20, 122:3, 128:6
**shaping** [1] - 63:2
**share** [2] - 40:18, 78:24
**shared** [1] - 105:7
**sheet** [1] - 3:1
**sheriff** [2] - 59:12, 68:22
**Sheriff's** [4] - 54:20, 57:1, 64:11, 69:10
**shifts** [1] - 60:1
**shortly** [1] - 9:24
**show** [2] - 48:12, 78:20
**showed** [1] - 9:24
**shown** [1] - 14:10
**shows** [2] - 34:14, 141:25
**sic** [3] - 32:8, 32:9, 118:4
**side** [9] - 20:11, 24:10, 31:3, 34:22, 56:22, 66:6, 140:6
**sides** [1] - 56:23
**sidewalks** [2] - 98:15, 98:19
**sigh** [1] - 36:5
**sign** [2] - 72:24, 101:2
**signs** [2] - 100:4, 100:10
**similar** [3] - 21:3, 66:4, 106:3
**similarly** [1] - 133:10
**simply** [3] - 9:14, 16:21, 29:22
**simulate** [1] - 119:22
**simulator** [1] - 71:4
**single** [1] - 26:11
**siren** [2] - 119:19, 134:6
**sirens** [3] - 96:14, 96:21, 119:17
**sit** [8] - 7:4, 13:22, 18:13, 20:6, 20:11,

36:12, 137:12, 144:14
**sitting** [10] - 20:7, 20:18, 23:12, 24:10, 31:3, 31:9, 31:22, 34:17, 34:21, 146:16
**situation** [1] - 132:23
**six** [3] - 60:3, 60:5, 64:15
**size** [3] - 57:17, 84:2, 125:10
**skid** [1] - 71:3
**skimmed** [1] - 42:13
**skip** [1] - 77:3
**slide** [7] - 105:10, 105:12, 105:14, 111:12, 127:23, 128:6, 131:18
**slides** [4] - 75:12, 130:18, 132:20, 133:21
**sliding** [1] - 91:20
**slightly** [2] - 34:24, 42:5
**slow** [4] - 98:15, 98:19, 101:2, 120:14
**smaller** [2] - 90:3, 91:6
**smooth** [1] - 46:19
**snow** [1] - 102:2
**so..** [1] - 23:17
**social** [2] - 72:3, 72:5
**someone** [8] - 6:17, 14:21, 20:9, 20:20, 40:9, 89:12, 113:18, 144:2
**sometimes** [6] - 35:2, 67:12, 67:15, 96:6, 125:10, 125:11
**son** [5] - 17:12, 30:11, 40:21, 56:5, 141:14
**son's** [1] - 40:15
**soon** [3] - 4:22, 41:18, 99:9
**sooner** [1] - 138:10
**sorry** [19] - 8:8, 12:16, 21:11, 24:18, 33:9, 42:8, 44:8, 63:21, 71:17, 77:15, 78:19, 87:11, 87:18, 96:12, 96:17, 112:10, 125:6, 138:7, 142:9
**Sorry** [1] - 23:1
**sort** [3] - 13:18, 79:5, 113:6
**sorts** [1] - 42:1
**sound** [3] - 55:12, 82:16, 119:19
**south** [1] - 54:19
**space** [1] - 10:12
**spacing** [1] - 131:16
**speaking** [2] - 93:21, 140:13

**speaks** [3] - 47:21, 93:10, 107:9
**special** [1] - 60:6
**specific** [5] - 28:2, 35:3, 39:6, 109:2, 144:23
**specifically** [14] - 12:5, 49:3, 61:10, 73:14, 76:1, 87:7, 116:13, 117:20, 122:13, 123:14, 126:6, 127:23, 129:10, 140:2
**specified** [2] - 66:25, 97:5
**specify** [1] - 97:4
**spectators** [1] - 31:23
**spectrum** [6] - 91:16, 92:14, 92:19, 93:3, 94:12, 103:16
**speed** [5] - 98:9, 98:10, 103:11, 129:17, 133:12
**speeds** [4] - 98:25, 99:1, 119:5, 119:7
**spell** [1] - 53:19
**spells** [1] - 104:13
**spend** [2] - 46:14, 59:20
**spent** [2] - 64:21, 76:14
**spin** [1] - 67:8
**spirit** [1] - 41:3
**spoken** [2] - 14:24, 141:2
**sports** [1] - 103:10
**staff** [2] - 6:17, 14:14
**stained** [1] - 114:5
**stand** [9] - 15:10, 15:16, 15:18, 15:23, 27:16, 28:20, 54:10, 55:12, 136:21
**standard** [57] - 14:4, 14:5, 15:3, 16:19, 16:22, 17:2, 26:10, 27:17, 28:25, 29:9, 29:19, 30:12, 47:24, 77:7, 83:1, 86:21, 86:22, 86:24, 86:25, 90:23, 91:7, 95:16, 96:15, 96:24, 97:3, 97:15, 97:24, 98:7, 98:10, 99:5, 100:2, 101:10, 104:4, 108:1, 108:6, 108:8, 108:21, 111:20, 113:2, 117:13, 118:9, 118:11, 119:1, 119:9, 119:15, 120:9, 120:11, 121:10, 121:22, 122:17, 122:18, 122:23,

123:16, 126:4, 127:17
**standards** [16] - 56:13,
77:2, 77:6, 82:24,
86:18, 86:20, 86:23,
89:22, 94:25, 101:19,
107:14, 107:21,
108:11, 122:7, 128:1
**standing** [5] - 32:15,
33:2, 37:22, 41:2,
88:25
**standpoint** [1] - 9:14
**stands** [1] - 86:11
**staring** [1] - 35:5
**start** [17] - 2:4, 8:16,
8:17, 8:18, 24:19, 36:3,
50:4, 54:23, 56:1,
59:18, 93:24, 93:25,
97:15, 100:18, 105:11,
110:8
**started** [19] - 36:16,
41:21, 47:20, 48:14,
50:1, 52:19, 55:14,
55:21, 57:5, 57:11,
57:13, 58:22, 58:24,
70:16, 86:16, 94:3,
97:17, 110:2, 146:5
**starting** [1] - 105:14
**starts** [5] - 88:23,
110:6, 113:6, 131:22,
131:23
**state** [18] - 9:14, 11:1,
33:1, 45:12, 52:16,
52:17, 53:19, 56:19,
66:23, 85:4, 97:11,
115:2, 128:24, 129:13,
129:14, 130:5, 139:6,
139:14
**statement** [2] - 41:20,
79:15
**statements** [1] - 106:4
**STATES** [2] - 1:1, 1:10
**states** [10] - 12:6,
110:9, 111:13, 111:17,
116:16, 116:22,
119:25, 120:18,
121:19, 128:18
**States** [11] - 1:3, 1:24,
2:2, 22:22, 54:7, 54:8,
83:20, 89:24, 140:5,
143:11, 144:8
**statute** [10] - 12:17,
16:11, 16:24, 26:11,
27:20, 40:4, 44:17,
129:10, 129:11, 129:13
**statutes** [1] - 128:24
**statutory** [2] - 40:2,
130:5
**stay** [18] - 3:11, 3:12,
3:21, 4:5, 4:12, 4:20,
5:16, 8:18, 11:24, 18:1,

80:4, 135:11, 136:1,
136:2, 136:25, 145:18,
145:20
**stayed** [1] - 76:20
**stenographic** [1] -
148:5
**step** [2] - 32:2, 136:20
**Steptoe** [9] - 18:11,
19:3, 19:9, 19:17,
21:20, 23:3, 25:20,
143:17, 144:4
**still** [13] - 5:11, 8:1,
23:12, 29:12, 35:24,
41:14, 90:5, 101:16,
122:20, 123:2, 130:21,
136:20, 140:18
**stood** [5] - 26:18,
32:17, 32:21, 141:14,
143:16
**stop** [16] - 7:21, 31:25,
67:8, 67:12, 67:13,
67:14, 96:4, 96:5, 96:6,
99:12, 100:10, 101:2,
117:16, 120:15, 132:14
**stops** [1] - 116:13
**story** [1] - 11:8
**strange** [1] - 17:8
**street** [2] - 58:4, 98:6
**Street** [3] - 1:14, 1:18,
1:21
**streets** [2] - 133:5,
133:7
**stress** [2] - 131:22,
132:1
**stretch** [2] - 126:13,
126:16
**struck** [1] - 48:3
**structure** [1] - 59:11
**structures** [1] - 68:10
**student** [1] - 131:8
**study** [2] - 93:2, 94:12
**subject** [2] - 88:8,
142:21
**submitted** [1] - 145:3
**subordinate** [1] - 62:5
**subpart** [9] - 111:16,
118:4, 118:20, 119:5,
119:17, 123:15,
123:18, 123:25, 124:1
**subsection** [1] - 12:10
**substance** [1] - 66:19
**substantial** [1] - 67:9
**suburban** [1] - 57:22
**successfully** [1] -
33:15
**suddenly** [1] - 118:24
**sufficient** [4] - 10:18,
16:7, 82:15, 143:6
**suggest** [1] - 41:21
**suggesting** [1] - 8:17

**suggests** [1] - 43:10
**Suite** [2] - 1:18, 1:21
**Sunday** [1] - 138:3
**supervise** [1] - 62:13
**supervised** [2] - 62:4,
62:22
**supervising** [1] -
59:21
**supervision** [2] -
61:21, 92:25
**supervisor** [18] - 45:4,
45:5, 45:7, 58:9, 62:11,
62:13, 63:8, 63:12,
63:15, 67:23, 98:2,
105:6, 121:7, 121:12,
123:1, 123:13, 123:18
**supervisors** [1] - 58:6
**support** [2] - 82:16,
143:23
**suppose** [1] - 14:3
**supposed** [8] - 36:3,
45:18, 77:8, 97:17,
119:25, 120:1, 125:17,
131:17
**surmising** [1] - 44:13
**surrounding** [1] -
125:19
**surveillance** [1] -
74:15
**suspect** [6] - 111:17,
116:17, 116:23, 128:9,
132:6
**suspected** [1] -
117:21
**suspicion** [2] - 92:10,
115:10
**sustained** [1] - 114:11
**Sutton** [25] - 1:6, 1:17,
2:2, 2:8, 3:20, 18:6,
20:4, 23:22, 34:18,
34:20, 36:2, 37:21,
37:22, 39:15, 39:22,
39:25, 40:1, 41:5, 41:8,
44:15, 50:23, 54:8,
73:7, 78:22, 112:21
**Sutton's** [5] - 14:8,
39:11, 39:15, 42:17,
43:6
**swear** [1] - 19:14
**sworn** [3] - 53:4, 53:9,
143:22
**systems** [1] - 99:24

## T

**table** [9] - 26:12,
28:22, 29:4, 29:6,
34:12, 34:13, 34:18,
34:21, 141:15
**tactics** [1] - 116:13

**tailor** [1] - 91:7
**tailored** [1] - 13:3
**tainted** [1] - 16:17
**talks** [1] - 48:5
**task** [1] - 58:6
**tasks** [1] - 61:13
**taught** [2] - 60:22,
79:24
**Taylor** [3] - 23:1, 144:8
127:15
**teach** [2] - 79:23,
127:15
**team** [2] - 32:18
**technical** [1] - 6:18
**technique** [1] - 67:6
**techniques** [6] -
75:16, 75:18, 88:2,
88:3, 130:17, 132:21
**technology** [3] - 3:4,
84:18, 84:19
**tee** [1] - 45:24
**Tejera** [3] - 4:25, 43:2,
136:7
**television** [2] - 26:22,
36:6
**ten** [10] - 10:8, 50:3,
50:6, 50:11, 56:18,
62:3, 76:16, 80:9,
127:1, 146:10
**ten-minute** [1] - 50:3
**tend** [5] - 56:8, 70:23,
99:21, 99:25, 102:12
**tends** [1] - 93:22
**Terence** [4] - 1:6, 1:17,
2:2, 54:8
**term** [1] - 67:22
**terminate** [3] - 101:21,
121:8, 122:7
**terminated** [2] - 122:3,
122:20
**terminating** [1] - 62:16
**terminology** [1] -
60:11
**terms** [11] - 41:12,
66:22, 89:9, 91:18,
92:14, 92:19, 100:23,
103:8, 111:24, 116:3,
123:25
**test** [4] - 71:11, 87:21,
87:23, 134:19
**tested** [2] - 131:11,
134:15
**testified** [13] - 45:17,
53:5, 56:12, 64:23,
76:3, 105:2, 107:12,
109:8, 119:14, 120:5,
121:1, 143:8, 143:18
**testify** [13] - 14:22,
15:8, 15:10, 25:9, 43:9,
48:10, 73:18, 76:13,
81:8, 82:5, 108:6,

108:16, 110:21
**testifying** [6] - 36:21,
79:10, 80:11, 80:19,
80:20, 128:11
**testimony** [43] - 2:19,
16:17, 17:4, 17:20,
27:4, 29:11, 29:21,
42:10, 42:14, 42:24,
42:25, 43:2, 43:7,
45:19, 46:21, 46:23,
47:17, 52:10, 55:22,
72:21, 76:15, 76:25,
79:5, 79:17, 82:20,
86:6, 87:2, 88:16,
107:22, 109:11,
109:12, 115:23, 130:1,
130:8, 136:4, 139:21,
140:1, 140:16, 140:18,
141:25, 142:1, 142:10,
142:15
**testing** [1] - 134:17
**tests** [2] - 71:7, 75:2
**Thanksgiving** [3] -
137:23, 137:25, 138:2
**THE** [335] - 1:1, 1:1,
1:10, 2:1, 2:11, 2:14,
5:14, 5:19, 6:4, 6:7,
6:23, 7:6, 7:13, 7:14,
7:18, 8:4, 8:11, 8:14,
8:25, 9:19, 10:3, 10:8,
10:13, 10:15, 10:21,
11:4, 11:7, 11:12,
11:17, 12:16, 12:20,
14:17, 15:6, 15:17,
15:20, 15:25, 16:25,
17:3, 17:8, 17:14,
17:16, 17:21, 17:23,
18:15, 18:24, 19:2,
19:9, 19:13, 19:19,
19:23, 20:1, 20:9,
20:12, 20:17, 20:20,
20:24, 21:2, 21:8,
21:12, 21:23, 22:7,
22:10, 22:13, 22:19,
22:24, 22:25, 23:1,
23:7, 23:8, 23:10,
23:11, 23:12, 23:14,
23:15, 23:16, 23:18,
23:19, 23:20, 23:21,
23:25, 24:2, 24:4, 24:5,
24:11, 24:15, 24:16,
24:20, 24:21, 24:22,
24:24, 25:1, 25:2, 25:3,
25:4, 25:5, 28:4, 28:12,
28:16, 30:3, 30:5,
30:13, 30:20, 30:22,
30:24, 31:11, 31:15,
31:17, 32:7, 32:23,
33:7, 33:11, 33:16,
33:19, 33:21, 34:1,

34:4, 34:7, 35:15,
35:18, 35:21, 35:22,
36:15, 36:18, 36:23,
37:1, 37:3, 37:5, 37:8,
37:16, 37:18, 37:24,
38:3, 38:5, 38:8, 38:11,
38:18, 39:1, 39:5, 39:9,
41:13, 43:23, 43:25,
44:10, 45:1, 45:15,
45:21, 45:23, 46:1,
46:5, 46:15, 47:19,
48:6, 48:11, 48:13,
48:17, 48:23, 48:25,
49:8, 49:23, 50:3, 50:8,
50:13, 50:16, 50:18,
50:25, 51:2, 51:10,
51:13, 51:15, 51:17,
51:18, 53:2, 53:6, 53:7,
53:10, 53:11, 53:12,
63:23, 63:25, 70:5,
77:12, 77:22, 78:1,
78:6, 78:13, 78:21,
79:2, 79:5, 79:8, 79:13,
79:15, 79:19, 79:23,
80:4, 80:10, 80:13,
80:15, 80:17, 80:20,
80:23, 81:1, 81:3, 81:6,
81:12, 81:14, 81:18,
81:20, 81:22, 82:3,
87:11, 87:16, 87:18,
88:5, 88:8, 88:13,
88:15, 89:8, 91:3, 91:9,
91:13, 93:11, 93:13,
93:15, 95:19, 96:17,
96:18, 96:19, 96:20,
98:21, 98:23, 99:11,
99:12, 99:13, 99:15,
100:7, 100:8, 100:10,
100:11, 100:12,
100:13, 100:14, 104:7,
104:8, 104:9, 106:1,
107:8, 107:15, 108:4,
108:13, 108:23,
109:17, 110:15,
110:17, 110:20, 111:1,
111:4, 111:6, 111:23,
111:25, 112:3, 112:8,
112:11, 112:17, 113:4,
113:10, 113:12,
113:19, 113:21,
113:24, 114:2, 114:5,
114:8, 114:11, 114:15,
114:18, 114:22, 115:5,
115:22, 116:1, 116:9,
116:11, 116:18,
121:15, 121:17, 123:2,
123:4, 123:6, 123:10,
126:12, 126:15,
126:16, 126:17,
126:18, 126:20,
126:25, 127:2, 129:21,

129:24, 130:20,
130:23, 130:25, 131:2,
135:10, 135:13,
135:18, 135:22,
135:24, 136:8, 136:16,
136:19, 136:22,
136:23, 137:4, 137:12,
139:9, 139:14, 140:2,
140:8, 141:16, 141:21,
142:7, 142:14, 142:24,
143:3, 143:8, 143:25,
144:4, 144:7, 144:15,
145:21, 145:24, 146:2,
146:3, 147:9, 147:11
**theirs** [3] - 66:6, 66:7,
83:24
**theme** [3] - 44:6,
85:24, 86:1
**themselves** [6] - 22:9,
22:11, 31:24, 105:9,
109:5, 123:22
**thereafter** [1] - 9:24
**thereby** [1] - 119:8
**they've** [4] - 46:9,
85:17, 86:2, 136:8
**thinks** [2] - 4:16, 8:20
**third** [6] - 8:14, 13:15,
14:21, 59:14, 59:15,
129:16
**thoroughly** [2] - 46:9,
46:10
**threat** [4] - 96:2,
111:17, 116:3, 122:16
**three** [7] - 14:23, 19:6,
64:4, 90:1, 127:25,
138:19, 143:19
**throughout** [13] -
47:11, 62:24, 69:25,
76:21, 84:15, 121:2,
126:9, 131:12, 133:10,
133:19, 134:7, 134:11,
134:15
**Thursday** [1] - 55:12
**tied** [1] - 130:8
**timeframe** [1] - 70:15
**timing** [1] - 5:9
**title** [1] - 9:25
**today** [28] - 5:2, 11:21,
21:9, 22:17, 22:18,
24:1, 24:25, 40:23,
72:16, 73:18, 76:15,
77:1, 84:17, 86:6, 87:2,
105:14, 124:4, 126:24,
135:19, 135:23,
135:25, 136:7, 136:24,
137:2, 140:10, 144:11,
145:4, 145:9
**together** [6] - 17:16,
65:4, 65:13, 84:21,
84:22, 85:1

**Tommy** [1] - 7:11
**tomorrow** [1] - 137:5
**took** [11] - 31:7, 63:20,
66:3, 66:8, 66:11,
66:12, 71:10, 141:3,
142:13, 146:6, 146:7
**top** [3] - 120:8, 130:23,
131:4
**topic** [1] - 104:3
**total** [2] - 76:7, 98:23
**totality** [1] - 98:17
**totally** [2] - 41:17,
125:23
**Totaro** [1] - 50:22
**Toth** [1] - 43:2
**touch** [3] - 77:5,
144:12, 144:22
**towards** [5] - 93:3,
93:5, 93:16, 95:5,
124:12
**tracking** [1] - 67:2
**trades** [2] - 10:1, 10:3
**traffic** [15] - 58:19,
67:21, 95:8, 95:10,
98:16, 100:4, 100:8,
100:20, 102:22,
116:13, 117:16, 120:5,
129:5, 129:14, 129:15
**trained** [7] - 79:24,
130:3, 133:6, 133:9,
133:10, 134:11, 134:16
**training** [98] - 50:22,
50:23, 51:8, 52:15,
55:23, 58:5, 60:10,
60:24, 61:1, 61:2, 61:3,
61:5, 61:7, 63:8, 63:10,
63:12, 63:14, 63:20,
63:24, 64:1, 64:18,
70:3, 70:6, 70:13,
70:16, 70:21, 70:23,
70:25, 71:1, 71:2, 71:8,
74:23, 75:1, 75:2, 75:5,
75:8, 78:4, 78:6, 79:10,
79:22, 80:1, 81:8,
82:11, 85:14, 87:6,
87:19, 87:21, 87:22,
87:25, 88:1, 88:2, 88:3,
90:2, 90:5, 93:2, 94:12,
104:15, 104:17,
104:23, 105:10,
107:21, 123:8, 124:8,
124:13, 126:23, 127:5,
127:12, 127:18,
127:23, 127:25, 128:2,
128:6, 128:15, 128:23,
129:22, 130:4, 130:5,
130:7, 130:18, 132:20,
132:22, 133:1, 133:3,
133:18, 133:23,
133:24, 134:6, 134:17,

134:19, 134:20, 134:23
**trainings** [2] - 85:13, 85:19
**transcript** [9] - 11:21, 25:10, 34:10, 41:19, 146:4, 146:10, 148:4, 148:5
**TRANSCRIPT** [1] - 1:9
**transition** [2] - 72:15, 94:23
**transmissions** [2] - 118:7, 123:15
**travel** [6] - 5:1, 74:2, 136:10, 137:23, 137:25, 146:23
**traveled** [1] - 54:1
**treating** [1] - 138:16
**tremendous** [2] - 103:11
**trend** [14] - 93:3, 93:15, 95:3, 95:5, 95:7, 95:11, 100:22, 116:6, 117:13, 117:24, 118:10, 120:23, 121:22, 121:24
**trial** [18] - 2:24, 10:12, 13:9, 22:2, 22:22, 24:18, 27:3, 27:4, 34:17, 36:3, 41:9, 52:14, 138:1, 141:7, 142:15, 145:1, 145:6, 145:9
**TRIAL** [2] - 1:5, 1:9
**tried** [3] - 25:15, 40:24, 71:4
**tries** [1] - 86:24
**trouble** [1] - 112:14
**true** [6] - 40:11, 109:5, 140:9, 147:9, 148:4, 148:5
**truth** [3] - 40:23, 40:24
**try** [8] - 4:25, 25:11, 32:14, 41:16, 101:16, 136:6, 142:18, 147:14
**trying** [6] - 16:23, 49:6, 67:14, 67:17, 90:9, 108:2
**Tuesday** [1] - 18:18
**tunnel** [4] - 131:19, 131:21, 132:2, 132:3
**turn** [2] - 27:20, 118:24
**turning** [1] - 103:11
**TV** [1] - 29:3
**twelve** [1] - 58:10
**Two** [1] - 137:22
**two** [28] - 2:15, 4:18, 8:1, 14:3, 14:12, 14:24, 17:19, 20:12, 25:25, 28:9, 28:11, 32:24,

34:8, 34:19, 35:14, 35:16, 40:8, 51:7, 89:9, 103:5, 123:7, 126:12, 134:14, 137:14, 143:10, 143:21
**two-minute** [1] - 126:12
**type** [7] - 63:9, 65:25, 71:1, 83:22, 85:2, 93:21, 119:19
**types** [3] - 60:25, 64:16, 103:15
**typical** [3] - 133:1, 134:7, 134:14
**typically** [8] - 34:21, 69:11, 124:22, 125:4, 126:9, 128:2, 129:2, 133:22
**typo** [2] - 130:23, 131:4

# U

**U.S** [6] - 1:14, 17:12, 72:18, 72:25, 73:7, 73:15
**U.S.C** [2] - 12:5, 12:19
**ultimate** [1] - 101:10
**ultimately** [5] - 104:4, 104:16, 105:1, 105:3, 105:6
**um-hum** [1] - 19:25
**umbrella** [2] - 83:22, 120:12
**umbrella-type** [1] - 83:22
**unable** [1] - 138:3
**Unbiased** [1] - 22:1
**uncommon** [1] - 67:13
**unconstitutional** [1] - 142:3
**under** [47] - 6:25, 12:5, 12:6, 14:11, 14:23, 14:24, 15:15, 15:17, 18:4, 25:10, 25:24, 26:6, 26:9, 26:11, 26:13, 26:25, 27:16, 28:16, 28:18, 39:13, 40:12, 41:7, 44:17, 47:6, 60:7, 63:14, 92:2, 92:3, 92:4, 92:10, 94:16, 110:11, 111:16, 113:18, 115:9, 119:2, 119:5, 119:17, 120:17, 122:3, 122:19, 123:15, 123:18, 136:20, 141:18, 142:3, 143:10
**underlined** [1] - 132:5
**underlying** [2] - 4:9, 52:17

**understood** [2] - 4:14, 89:19
**unequivocally** [1] - 14:11
**union** [5] - 68:7, 68:8, 72:2, 72:5, 72:13
**unit** [11] - 61:24, 69:15, 69:16, 99:15, 110:1, 110:2, 117:20, 118:21, 120:19, 125:24, 126:9
**UNITED** [2] - 1:1, 1:10
**United** [11] - 1:3, 1:24, 2:2, 22:22, 54:7, 54:8, 83:20, 89:24, 140:5, 143:11, 144:8
**units** [4] - 99:20, 109:24, 118:7, 118:13
**University** [1] - 54:15
**unlawful** [6] - 121:25, 122:1, 135:2, 135:3, 135:5, 135:7
**unless** [8] - 8:20, 10:17, 21:23, 28:17, 100:5, 100:8, 108:10, 139:5
**unmarked** [1] - 99:3, 99:8, 99:25, 109:20, 120:17, 120:21
**unrelated** [1] - 17:3
**unspecified** [1] - 139:22
**up** [50] - 3:1, 6:6, 6:15, 9:24, 10:4, 10:10, 10:19, 12:24, 14:15, 19:13, 23:14, 26:18, 30:14, 31:14, 35:20, 36:12, 36:20, 37:14, 40:22, 40:25, 45:24, 46:14, 51:3, 51:4, 51:11, 52:9, 54:1, 65:18, 70:23, 76:8, 76:9, 80:25, 83:22, 88:10, 97:10, 100:16, 101:5, 102:16, 103:16, 119:24, 126:3, 130:13, 134:4, 136:10, 138:2, 141:14, 142:1, 145:5, 145:11, 145:12
**update** [1] - 5:3
**updates** [2] - 70:17, 86:5
**updating** [1] - 97:6
**upper** [1] - 130:21
**upset** [3] - 13:11, 29:11, 29:16
**urban** [6] - 57:22, 57:24, 58:19, 59:1, 83:21, 95:14
**urgency** [2] - 146:15,

146:21
**useful** [2] - 5:8, 5:13
**ushered** [1] - 20:11

# V

**V(C** [1] - 118:20
**V(D** [1] - 120:7
**valid** [1] - 134:17
**varies** [1] - 72:3
**various** [4] - 25:22, 105:2, 138:20
**vary** [1] - 125:9
**varying** [1] - 45:17
**vehicle** [35] - 64:12, 88:22, 88:23, 90:16, 91:1, 92:15, 103:2, 103:6, 103:9, 106:20, 112:22, 113:1, 116:24, 116:25, 117:3, 117:6, 117:16, 118:22, 118:24, 119:3, 119:7, 120:20, 122:3, 122:20, 124:5, 128:18, 130:12, 130:14, 131:16, 132:7, 132:11, 132:23
**vehicles** [13] - 66:10, 102:24, 103:15, 103:17, 109:21, 110:18, 119:6, 119:7, 120:17, 120:18, 125:20, 129:1, 132:24
**vehicular** [94] - 42:12, 45:2, 46:22, 46:25, 48:20, 52:3, 52:12, 61:10, 61:17, 62:4, 62:7, 62:21, 63:2, 64:7, 64:24, 65:1, 65:23, 66:15, 66:23, 69:2, 69:21, 70:12, 71:7, 75:8, 75:14, 75:22, 77:1, 77:4, 77:6, 77:8, 83:2, 84:12, 84:14, 87:9, 87:14, 87:24, 88:20, 88:22, 89:7, 89:8, 89:11, 89:12, 89:20, 90:11, 90:15, 91:20, 91:2, 91:4, 91:19, 91:24, 92:17, 94:10, 94:25, 95:3, 95:8, 95:9, 96:14, 97:14, 97:25, 98:11, 98:25, 99:4, 100:4, 100:17, 100:19, 101:9, 101:11, 101:13, 101:21, 102:21, 104:5, 106:17, 107:1, 107:4, 110:10, 110:22, 112:25, 113:8, 113:16, 114:25, 115:9, 115:17,

116:17, 116:23, 120:19, 124:19, 125:20, 126:1, 126:8, 127:21, 129:4, 134:2, 134:16, 134:24
**version** [1] - 42:5
**versus** [15] - 2:2, 54:7, 54:8, 90:18, 101:14, 102:5, 103:6, 109:20, 109:24, 119:20, 120:1, 121:25, 126:4, 135:2
**VI(6)(A)(6** [1] - 120:18
**VI(A)(11** [1] - 122:19
**VI(A)(3** [1] - 119:5
**VI(A)(4** [1] - 118:4
**VI(C** [2] - 119:17, 120:21
**Victim** [3] - 27:17, 39:13, 40:12
**victim** [17] - 7:3, 12:9, 12:12, 12:14, 13:22, 16:15, 16:20, 29:11, 31:6, 39:14, 39:18, 40:3, 40:6, 41:2, 41:7
**Victim's** [1] - 12:7
**victim's** [1] - 13:10
**victim/witness** [3] - 7:9, 7:18, 13:5
**victimize** [1] - 40:10
**victimizing** [1] - 39:21
**victims** [2] - 13:21, 16:5
**Victims'** [3] - 29:10, 41:7, 142:5
**video** [2] - 6:21, 34:23
**videos** [7] - 3:8, 34:15, 34:17, 35:1, 35:5, 74:15, 141:13
**view** [15] - 2:24, 9:4, 12:24, 83:19, 98:17, 102:16, 102:18, 109:1, 109:15, 114:22, 142:16, 144:24, 145:7, 145:10, 145:17
**viewed** [4] - 13:12, 18:3, 36:5, 96:4
**viewing** [1] - 6:17
**violate** [2] - 52:24, 88:25
**violated** [3] - 52:14, 52:23, 67:22
**violates** [2] - 140:21, 142:4
**violating** [1] - 104:21
**violation** [3] - 117:17, 117:22, 142:22
**violator** [1] - 122:14
**violence** [3] - 33:13, 95:6, 96:7
**violent** [4] - 47:9, 92:8,

92:11, 115:11
**virtually** [1] - 50:23
**visible** [1] - 99:20
**vision** [4] - 131:19, 131:21, 132:2, 132:3
**voice** [1] - 53:19
**volunteer** [1] - 56:6
**vs** [1] - 1:5

## W

**wail** [2] - 119:18, 120:1
**Wail** [1] - 119:24
**wait** [11] - 32:23, 46:5, 78:1, 81:22, 111:25, 140:4, 147:12
**waiting** [4] - 26:7, 41:23, 114:13, 147:8
**wants** [3] - 39:1, 40:20, 139:5
**warning** [4] - 13:16, 106:20, 107:3
**warrant** [1] - 122:14
**Washington** [7] - 1:6, 1:15, 1:18, 1:21, 1:25, 72:18, 148:13
**waste** [1] - 4:21
**watch** [5] - 121:7, 121:15, 124:1, 124:17, 124:25
**water** [3] - 61:23, 62:2, 62:3
**ways** [1] - 88:10
**wear** [1] - 21:10
**wearing** [3] - 21:3, 21:5, 61:14
**weather** [3] - 101:23, 101:24, 133:16
**website** [1] - 3:1
**Wednesday** [1] - 137:17
**weigh** [2] - 115:24, 128:6
**weighing** [3] - 90:17, 101:12, 101:13
**weight** [2] - 82:21, 109:14
**welcome** [2] - 51:15, 80:14
**well-recognized** [1] - 83:5
**west** [2] - 66:11, 67:7
**wheels** [1] - 103:18
**whimpering** [1] - 30:11
**whisked** [1] - 20:17
**whisper** [1] - 20:13
**whispered** [2] - 20:8, 20:9

**whole** [3] - 23:17, 60:2, 98:23
**wide** [1] - 102:16
**wishes** [1] - 10:19
**Witness** [1] - 27:17
**witness** [32] - 8:9, 15:9, 15:15, 16:15, 16:17, 16:21, 22:16, 22:18, 37:17, 44:25, 47:12, 50:21, 52:3, 52:4, 52:25, 53:4, 54:10, 55:12, 55:22, 64:22, 77:11, 82:5, 106:10, 107:10, 108:16, 114:19, 135:15, 136:13, 136:21, 143:5, 146:9, 146:22
**WITNESS** [35] - 53:2, 53:6, 53:11, 63:25, 79:2, 79:8, 79:15, 79:19, 79:23, 80:4, 80:10, 80:13, 80:15, 80:17, 80:20, 81:1, 91:9, 93:15, 96:18, 96:20, 98:23, 99:12, 99:15, 100:8, 100:11, 100:13, 104:8, 116:1, 116:11, 121:17, 123:4, 123:10, 126:16, 126:18, 136:22
**witnesses** [17] - 3:6, 16:18, 25:13, 25:22, 27:1, 27:21, 42:25, 43:9, 45:17, 52:11, 81:13, 82:4, 82:7, 143:6, 143:7, 143:8
**witnessing** [1] - 29:11
**woman** [6] - 20:6, 20:25, 21:1, 21:3, 21:16, 30:10
**wondering** [1] - 6:19
**word** [3] - 47:10, 89:17, 113:11
**wording** [1] - 96:6
**words** [9] - 65:14, 66:25, 67:1, 89:3, 96:20, 108:3, 108:5, 108:18, 114:20
**works** [3] - 65:16, 100:17, 134:1
**world** [1] - 84:15
**worn** [4] - 3:8, 34:15, 34:16, 74:17
**worry** [1] - 142:17
**Worth** [1] - 53:25
**writ** [11] - 3:13, 3:24, 4:5, 4:7, 9:3, 9:7, 11:15, 15:25, 16:11, 17:10, 26:1

**write** [3] - 83:14, 86:19, 86:20
**written** [7] - 42:21, 44:3, 75:2, 75:5, 86:1, 87:21, 87:23

## Y

**year** [12] - 57:5, 57:15, 59:17, 65:17, 69:5, 73:4, 73:5, 85:12, 103:18, 105:17, 124:8, 124:14
**years** [22] - 32:12, 33:14, 33:15, 54:17, 58:8, 59:16, 59:20, 61:14, 64:3, 64:4, 64:21, 69:4, 70:17, 79:7, 79:14, 83:5, 84:10, 93:5, 104:22, 143:14, 143:15
**yelp** [2] - 119:21, 120:1
**yesterday** [16] - 2:22, 3:9, 3:14, 4:24, 5:5, 8:10, 9:20, 24:2, 36:11, 36:15, 36:17, 36:19, 46:5, 105:13, 142:15, 145:2
**yield** [3] - 66:20, 67:10, 67:23
**young** [1] - 55:9
**yourself** [3] - 2:4, 22:25, 70:13

## Z

**Zabavsky** [20] - 1:6, 1:20, 2:3, 2:10, 3:19, 11:6, 18:6, 26:18, 34:19, 34:21, 39:13, 39:19, 40:21, 40:24, 41:9, 43:3, 45:5, 45:12, 54:8, 73:7
**Zabavsky's** [3] - 40:3, 40:7, 43:22
**zampogna** [1] - 33:22
**Zampogna** [23] - 1:20, 1:20, 2:10, 27:14, 35:2, 35:7, 35:18, 37:12, 37:18, 38:11, 39:10, 42:16, 43:13, 43:14, 43:16, 46:1, 46:6, 47:19, 48:6, 81:3, 88:13, 135:14, 145:21
**ZAMPOGNA** [24] - 2:9, 7:24, 8:6, 8:13, 11:11, 11:13, 22:16, 33:25, 38:14, 38:19, 43:24, 44:1, 44:12, 46:4,

46:12, 48:8, 81:4,
88:14, 135:16, 135:20,
135:23, 136:5, 136:12,
145:23
 **Zampogna's** [1] -
39:17
  **zero** [1] - 39:12
  **Zoom** [1] - 73:20