UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>TERENCE SUTTON )<br>    and )<br>ANDREW ZABAVSKY, )<br>)<br>    Defendants. )<br>)| Criminal No. 21-0598 (PLF) |

## OPINION AND ORDER

Defendants Terence Sutton and Andrew Zabavsky have filed post-trial motions for Brady sanctions, arguing that the government failed to produce prior statements by two testifying witnesses in a timely fashion and that the suppression of these statements caused them prejudice at trial. See Terence D. Sutton, Jr.'s Motion for Brady Sanctions [Dkt. No. 441]; Andrew Zabavsky's Motion for Brady Sanctions [Dkt. No. 442]. The motions concern the government's post-verdict disclosure of notes from witness interviews with defense witnesses Detective Victor DePeralta and Dr. Samantha Tolliver. Mr. Sutton and Mr. Zabavsky request that the Court impose sanctions and convene a hearing on the alleged Brady violations. After careful consideration of the parties' written arguments, the Court will deny both motions in full.[1]

---

[1] Among the documents the Court has reviewed in connection with the pending motions are the following: Indictment [Dkt. No. 1]; Final Instructions to Jury ("Jury Instructions") [Dkt. No. 435]; Terence D. Sutton, Jr.'s Motion for Brady Sanctions ("DePeralta Mot.") [Dkt. No. 441]; Andrew Zabavsky's Motion for Brady Sanctions ("Tolliver Mot.") [Dkt. No. 442]; Government's Opposition to Defendant Zabavsky's Motion for Brady Sanctions ("Tolliver Opp.") [Dkt. No. 451]; Government's Opposition to Defendant Sutton's Motion for Brady Sanctions ("DePeralta Opp.") [Dkt. No. 452]; Exhibit 1 of Government's Opposition to Defendant Sutton's Motion for Brady Sanctions ("DePeralta Interview") [Dkt. No. 452-1];

## I. BACKGROUND

Prior opinions summarize the factual and procedural history in this case. See, e.g., United States v. Sutton, Crim. No. 21-0598, 2022 WL 2383974 (D.D.C. July 1, 2022); United States v. Sutton, Crim. No. 21-0598, 2022 WL 1202741 (D.D.C. Apr. 22, 2022); United States v. Sutton, Crim. No. 21-0598, 2022 WL 4653216 (D.D.C. Sept. 30, 2022).

On September 23, 2021, a grand jury returned an indictment charging Mr. Sutton with one count of murder in the second degree, in violation of D.C. Code § 22-2103, and charging both Mr. Sutton and Mr. Zabavsky, two Metropolitan Police Department ("MPD") officers, with conspiracy to obstruct justice, in violation of 18 U.S.C. § 371, and obstruction of justice, in violation of 18 U.S.C. §§ 1512(b)(3), 2. See Indictment ¶¶ 29, 31, 50.

The indictment alleges that on October 23, 2020, Mr. Sutton caused the death of Karon Hylton-Brown by recklessly pursuing him in a police vehicle for several blocks at high speeds. See Indictment ¶¶ 1-2, 10-12, 20-27. Mr. Hylton-Brown, who was riding a rental moped, was mortally wounded when he exited an alleyway and was hit by oncoming traffic, suffering severe head trauma; he died two days later. See id. ¶¶ 13, 18, 28. The indictment also alleges that Mr. Sutton and his supervisor, Mr. Zabavsky, conspired to cover up their involvement in these events by, among other things, willfully neglecting to collect and preserve evidence at the site of the collision and providing misleading and incomplete details of the incident to their superiors. See id. ¶¶ 33-48. According to the indictment, the defendants obfuscated "the circumstances of the traffic collision leading to Hylton-Brown's death, to

---

Terence D. Sutton, Jr.'s Reply to the Government's Opposition to his Motion for Brady Sanctions ("DePeralta Reply") [Dkt. No. 453]; and Zabavsky's Reply in Support of Motion for Brady Sanctions ("Tolliver Reply") [Dkt. No. 455]. The Court has also reviewed trial transcripts from various dates, which are cited as follows: Trial Tr. [Date] [Time] [Page:Line].

prevent an internal investigation of the incident and referral of the matter to federal authorities for a criminal civil rights investigation." Id. ¶ 32. Trial began on October 25, 2022 and concluded with final jury instructions on December 15, 2022. On December 21, 2022, the jury returned a verdict of guilty on all counts. See Verdict Form [Dkt. No. 426].

On December 1, 2022, during the defense case, Dr. Samantha Tolliver, the Chief Toxicologist at the Washington, D.C. Office of the Chief Medical Examiner ("OCME"), testified as an expert in forensic toxicology. See Trial Tr. Dec. 1, 2022 a.m. at 47:15-48:1, 51:19-23. Dr. Tolliver handled Mr. Hylton-Brown's post-mortem toxicology. Id. at 52:1-6. She explained that forensic toxicologists are responsible for conducting post-mortem testing to determine, for example, "if drugs contributed to one's death." Id. at 48:12-25. Dr. Tolliver also explained to the jury that THC was detected in Mr. Hylton-Brown's blood. Id. at 54:9-16. She explained how, among members of the general population, THC can cause impairment of a person's cognitive abilities and motor skills. Id. at 56:23-58:5. Dr. Tolliver further explained that Mr. Hylton-Brown's blood tested positive for oxycodone, a depressant, which also may cause slowed reaction times and impaired motor skills. Id. at 58:6-59:12. On cross examination, Dr. Tolliver testified that Mr. Hylton-Brown was tested for "ethanol, or drinking alcohol, and [the toxicologists] did not detect any." Trial Tr. Dec. 1, 2022 p.m. at 13:16-25.

On December 6, 2022, Detective Victor DePeralta, an investigator with MPD's Major Crash Unit, testified at trial as a defense witness. See Trial Tr. Dec. 6, 2022 a.m. at 24:9-17. Detective DePeralta was assigned to conduct a Major Crash Unit investigation into the collision that resulted in Mr. Hylton-Brown's death. Id. at 24:20-25:6. During his investigation, Detective DePeralta responded to the collision site and reviewed the body worn camera footage of officers who observed the collision. Id. at 26:18-28:2, 38:8-18. He also

received a copy of the draft traffic crash report that Mr. Sutton had started to prepare. Id. at 28:9-15. After conducting his investigation, Detective DePeralta concluded that Mr. Hylton-Brown "entered the roadway when it was unsafe to do so." Id. at 60:9-13. Detective DePeralta also explained, based on his review of body worn camera footage, that Mr. Hylton-Brown "appeared in control of his moped up until the moment of the crash" and that Mr. Sutton "was driving in a reckless manner leading up to the crash." Id. at 69:8-18. Detective DePeralta testified, however, that he did not consider Mr. Sutton's driving when assessing how the collision occurred; he only considered the vehicles that were actually involved in the collision when making his assessment. Id. at 60:14-20; 66:5-12.

On December 23, 2022, two days after the verdict was returned in this case, prosecutors provided defense counsel with notes and memoranda of investigation from interviews with Dr. Tolliver and Detective DePeralta. See Tolliver Mot. at 1; DePeralta Mot. at 1-2. Approximately one week before her trial testimony, on November 25, 2022, prosecutors interviewed Dr. Tolliver. Tolliver Mot. at 2. The government's belatedly produced, handwritten notes from that interview suggest that Dr. Tolliver told the government's attorneys that post-mortem testing on Mr. Hylton-Brown revealed "a small amount of acetone, not enough to impair" in his system. Tolliver Mot. at 2, Ex. 2.

Prosecutors also interviewed Detective DePeralta on November 25, 2022, ten days before he testified at trial. See DePeralta Mot. at 2. Notes from that interview reflect that Detective DePeralta told prosecutors: "If someone is being chased, even if they are being chased by the police, drivers still have to obey traffic laws, and, for example, cannot ride on the wrong side of the road." Id. at 2; DePeralta Interview at 1. The belatedly produced interview notes also indicate that "DePeralta advised that while someone can still run from the police, he/she cannot

4

blame anyone else for what he/she did. The operator of the vehicle still has to control his/her speed, and other rules of the road." DePeralta Mot. at 2; DePeralta Interview at 2.

On April 6, 2023, after Mr. Zabavsky filed his post-trial Brady motion, the Court ordered the parties to separately submit copies of the OCME forensic toxicology records (the "OCME Report") that were produced and received in discovery. The parties submitted those documents to the Court by email. The documents submitted by the government and by the defendants were identical to each another. The OCME Report contains the results from the toxicology analysis that was done for Mr. Hylton-Brown after the collision. The OCME Report also contains the two-page Toxicology Report summarizing the various tests that the D.C. Office of the Chief Medical Examiner performed and their results. Counsel for Mr. Sutton introduced the Toxicology Report, but not the entire OCME Report, into evidence at trial and asked Dr. Tolliver to explain it to the jury. See Sutton Ex. 500E; Trial Tr. Dec. 1, 2022 a.m. at 52:1-12. The Toxicology Report indicates that Mr. Hylton-Brown's blood was analyzed for the presence of "ethanol, acetone, methanol, and isopropanol," as well as other drugs, such as amphetamines, opiates, and oxycodone. See Sutton Ex. 500E. The full OCME Report, which the government produced to defense counsel in discovery, contains highlighted test results indicating that traces of acetone – in addition to the oxycodone and THC described at trial – were discovered in Mr. Hylton-Brown's system. See Trial Tr. Dec. 1, 2022 a.m. at 54:9-16 (Dr. Tolliver testimony).

## II. LEGAL STANDARD

Pursuant to Brady v. Maryland, 373 U.S. 83 (1963), the government must disclose to the defense "any evidence in its possession that is favorable to the accused and material either to a defendant's guilt or punishment." United States v. Trie, 21 F. Supp. 2d 7, 23 (1998). "'[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due

5

process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" United States v. Sitzmann, 74 F. Supp. 3d 128, 134 (D.D.C. 2014) (quoting Brady v. Maryland, 373 U.S. at 87); see also United States v. Straker, 800 F.3d 570, 602 (D.C. Cir. 2015) (per curiam) ("The Constitution's fair trial guarantee requires the prosecution to timely turn over any information in the government's possession that is materially favorable to a criminal defendant.") (internal quotation omitted).  The government is obligated to disclose such favorable evidence "even in the absence of a defense request." United States v. Celis, 608 F.3d 818, 834 (D.C. Cir. 2010) (per curiam) (citing United States v. Agurs, 427 U.S. 97, 107 (1976)).

To establish that the government has violated its Brady obligations, a defendant "must demonstrate three elements." United States v. Driscoll, 984 F.3d 103, 109 (D.C. Cir. 2021) (quoting United States v. Borda, 848 F.3d 1044, 1066 (D.C. Cir. 2017)).  First, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching." United States v. Robinson, 68 F.4th 1340, 1347 (D.C. Cir. 2023) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)); accord United States v. Bagley, 473 U.S. 667, 676 (1985) (citing Giglio v. United States, 405 U.S. 150, 154 (1972)); United States v. Sitzmann, 893 F.3d 811, 826 (D.C. Cir. 2018).  Second, that favorable evidence must have been suppressed by the government, either willfully or inadvertently.  See United States v. Robinson, 68 F.4th at 1347; see also Strickler v. Greene, 527 U.S. at 288 ("[U]nder Brady an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment.").  Third, "prejudice must have ensued." United States v. Robinson, 68 F.4th at 1347-48 (quoting Strickler v. Greene, 527 U.S. at 288).

6

In order to establish prejudice after a trial has concluded, "the defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" United States v. Sitzmann, 893 F.3d at 826 (quoting United States v. Bagley, 473 U.S. at 682); see United States v. Ballestas, 795 F.3d 138, 149 (D.C. Cir. 2015) ("When a defendant challenges the government's alleged delay in disclosure of exculpatory evidence, the defendant must show a reasonable probability that an earlier disclosure would have changed the trial's result."). "[T]he question is not whether the defendant would more likely than not have received a different verdict, but whether in [the suppressed material's] absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." United States v. Clarke, 767 F. Supp. 2d 12, 40 (D.D.C. 2011) (quoting United States v. Oruche, 484 F.3d 590, 597 (D.C. Cir. 2007)); accord Kyles v. Whitley, 514 U.S. 419, 434 (1995); United States v. Robinson, 68 F.4th at 1348. The burden is on the defendant to establish prejudice. See Strickler v. Greene, 527 U.S. at 282; see also United States v. Sutton, 2022 WL 2383974, at *4 (addressing Mr. Sutton's pre-trial Brady claims).

### III. DISCUSSION

*A. Detective Victor DePeralta*

1. Mr. Sutton's Motion

Mr. Sutton contends that the government's late disclosure of its notes from its interview with Detective DePeralta violated Brady. He asserts that the government's failure to produce these interview notes was not inadvertent, as the government represented. DePeralta Mot. at 3. He also argues that if the interview notes had been produced before Detective DePeralta testified at trial, Mr. Sutton's "direct examination [of Detective DePeralta] would have been entirely different, emphasizing the information contained in the [interview notes]." Id. Mr.

7

Sutton asserts that Detective DePeralta's statements to prosecutors – that people being chased by police are obligated to follow the rules of the road and that they cannot blame others for their own reckless driving – would have helped him undermine the government's theory that Mr. Sutton "flushed" Mr. Hylton-Brown out of the alley, causing the fatal collision. DePeralta Reply at 1-2. He also objects to a portion of the government's cross examination, during which Detective DePeralta testified that Mr. Sutton was "driving in a reckless manner" leading up to the crash. Id. at 1.

The government opposes Mr. Sutton's motion, arguing that Mr. Sutton's vague and speculative suggestion that his direct examination would have been different if the DePeralta interview notes had been timely produced is "insufficient" to establish prejudice. DePeralta Opp. at 3. Furthermore, the government asserts that Mr. Sutton cannot establish prejudice because all of the information contained in the belatedly disclosed interview notes had been previously provided to defense counsel in other forms – for example, in Detective DePeralta's grand jury testimony and in memoranda of investigation memorializing Detective DePeralta's earlier statements to prosecutors. Id. at 4-5 and Ex. 2. Because the information contained in Detective DePeralta's interview notes "was cumulative of information that was already known to the defense," the government argues that it cannot support Mr. Sutton's Brady claim. Id. at 5.

To establish a Brady violation, Mr. Sutton first must demonstrate that the information at issue was "favorable to the accused, because it is exculpatory, or because it is impeaching." United States v. Robinson, 68 F.4th at 1347. The Court agrees with Mr. Sutton that Detective DePeralta's statements to prosecutors, reflected in the notes belatedly produced, were favorable. Detective DePeralta explained that a person running from the police "still has to control" their vehicle, must abide by rules of the road, and "cannot blame anyone else" for their

8

own conduct. DePeralta Interview at 2. Detective DePeralta also told prosecutors that he "would not have looked at the chase as being a factor" when determining the "cause of the crash." Id. These opinions are consistent with one of Mr. Sutton's defenses: that Mr. Hylton-Brown was solely responsible for the collision resulting in his death and therefore that Mr. Sutton did not cause his death. See, e.g., Terence D. Sutton, Jr.'s Motion for a New Trial and Arrest of Judgment [Dkt. No. 449] at 60, 64-65. Detective DePeralta's statements constitute favorable evidence because they support Mr. Sutton's theory of defense.

Second, Mr. Sutton must show that the information was suppressed, either intentionally or inadvertently, by the government. See United States v. Robinson, 68 F.4th at 1347; United States v. Borda, 848 F.3d at 1066. The government concedes that the interview notes were disclosed after the verdict was returned in this case. DePeralta Opp. at 1-2 (failure to disclose the interview notes in a timely manner was "inadvertent").

Finally, Mr. Sutton must demonstrate that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682; see Kyles v. Whitley, 514 U.S. at 435 (establishing a Brady violation requires "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"). The Court concludes that Mr. Sutton has not demonstrated prejudice under Brady and its progeny because the DePeralta interview notes were cumulative of Detective DePeralta's trial testimony and his other prior statements that the government had produced in advance of trial.

The D.C. Circuit has recently opined on this issue in United States v. Robinson, 68 F.4th 1340 (D.C. Cir. 2023). Mr. Robinson was charged with more than fifty counts of prescribing a controlled substance without a legitimate medical purpose for a scheme in which he

9

allegedly "prescribe[ed] oxycodone to addicted pill-seekers." Id. at 1344. The government presented evidence at trial that Mr. Robinson only accepted cash or money orders as payment, that he treated patients in groups rather than individually, and that his patients perceived his practice as "a place to get easy medication." Id. at 1345. The government, however, failed to provide Mr. Robinson with two Drug Enforcement Agency ("DEA") reports documenting how Mr. Robinson had previously "contacted law enforcement about fraudulent prescriptions and that he told law enforcement that he had lost eighty patients to pill-seeking." Id. at 1349. Mr. Robinson's trial evidence included testimony that he kept a list of "bad" patients and told some patients that he would report them to law enforcement for pill seeking. Id. The district court and the court of appeals agreed that the DEA reports were favorable, but the district court determined that the reports were "cumulative of other evidence Robinson introduced at trial, and therefore their suppression had not hampered Robinson's theory of defense." Id.

The court of appeals disagreed with the district court's conclusion that the reports were cumulative, holding instead that:

> We cannot conclude that Robinson's own evidence as to his behavior toward pill-seekers was cumulative of the [reports]. Importantly, the [reports] represent evidence from the government's records themselves that Robinson actually reported his patients' illegal activity to authorities. One or more jurors may have given far greater weight to the government's own reports that Robinson did report the behavior over Robinson's supposedly self-serving evidence testifying he would have reported such behavior. . . . We therefore hold the [reports] were not merely cumulative of evidence Robinson presented at trial. We instead conclude that they are material. The [reports] show that Robinson proactively contacted two groups of law enforcement . . . about pill-seeking behavior, which included the passing of fraudulent prescriptions in his name. They show that he audited his files to ferret out the pill-seekers. And most importantly, they may have raised a reasonable doubt in the mind of one or more jurors as to one or more charges that Robinson was illegally providing prescriptions to pill-seekers because he was in fact calling such behavior to the attention of authorities.

United States v. Robinson, 68 F.4th at 1350 (emphasis omitted).

Unlike the suppressed evidence in Robinson, the belatedly disclosed DePeralta interview notes do not demonstrate a "reasonable probability that the verdict would have been different" or "'undermine confidence in the outcome' of this case." United States v. Robinson, 68 F.4th at 1348, 1350 (quoting United States v. Bagley, 473 U.S. at 682). The statements and conclusions contained in the DePeralta notes are substantially similar to other statements of Detective DePeralta's that the government had produced before trial, and Detective DePeralta's trial testimony was consistent with his prior statements. The Court therefore finds it unlikely that the belated disclosure of the interview notes deprived Mr. Sutton of the opportunity to elicit different or more favorable testimony from Detective DePeralta at trial. Compare DePeralta Interview at 1 (suppressed interview notes indicate that Detective DePeralta told prosecutors that "detectives would not have looked at the chase as being a factor" in the "cause of the crash") with Trial Tr. Dec. 6, 2022 a.m. at 73:20-24 (Detective DePeralta testified that he did not consider Mr. Sutton's vehicle when assessing Mr. Hylton-Brown's collision because that vehicle "had no impact on either" of the vehicles involved in the collision) and DePeralta Opp. at Ex. 2 (in prior statements to prosecutors, Detective DePeralta told them that "in his investigation, he was solely focused on investigating the crash itself, and not the circumstances leading up to the crash"); compare DePeralta Interview at 1 (suppressed interview notes indicate that Detective DePeralta told prosecutors that the operator of a vehicle being chased by police must obey the rules of the road) with Trial Tr. Dec. 6, 2022 a.m. at 43:23-25 (Detective DePeralta testified that Mr. Hylton-Brown "failed to yield right of way") and DePeralta Opp. at Ex. 2 (Detective DePeralta told investigators in prior disclosed statement that "he personally feels that it was

11

reckless for [Mr. Sutton's] vehicle to pursue Hylton but stated that he thought that Hylton was ultimately the cause of the accident as Hylton made the decision to drive into the street").

In view of the similarity of the suppressed interview notes to Detective DePeralta's disclosed prior statements and to the testimony he gave at trial, the Court concludes that Mr. Sutton has not demonstrated a reasonable probability that the outcome at trial would have been any different had the interview notes been produced earlier. See Kyles v. Whitley, 514 U.S. at 434 (quoting United States v. Bagley, 473 U.S. at 678). This is particularly true in light of the Court's ruling that Detective DePeralta was not permitted to testify about the "cause" of the collision, and could only explain that his investigation led him to believed that Mr. Hylton-Brown failed to yield. See Trial Tr. Dec. 6, 2022 a.m. at 72:1-73:11. Accordingly, Mr. Sutton has not demonstrated that he was prejudiced by the delayed disclosure of Detective DePeralta's interview notes.

2. Mr. Zabavsky's Motion

Mr. Zabavsky also argues that the suppression of the Detective DePeralta interview notes prejudiced him. See Tolliver Mot. at 6-7. The interview notes indicate that Detective DePeralta told the prosecutors that he "did not review the narrative portion of [Mr. Sutton's draft] police report because he did not need that information for his investigation. He did not need to know what direction the officers were traveling and on what roads they were travelling." DePeralta Interview at 2. Detective DePeralta also stated that "a report about what happened immediately before a crash would not be something that he would necessarily use for his investigation." Id. Mr. Zabavsky suggests that at trial, the government depicted the Major Crash Unit as "relying on the narrative section of the partially written police report," despite knowing from Detective DePeralta that the narrative section of that report was not important to

his investigation. Tolliver Mot. at 7. Mr. Zabavsky contends that the government's failure to produce these interview notes deprived him of the ability "to properly defend against the charge that he supported a faulty police report in order to push a false narrative." Tolliver Mot. at 7.

The government concedes that the DePeralta interview notes were not disclosed until after the verdict in this case, see DePeralta Opp. at 1-2, satisfying the first Brady requirement.

As to the favorability of the suppressed evidence, the Court will assume that the interview notes constitute evidence favorable to Mr. Zabavsky, as the notes could have been used to undermine the government's theory that Mr. Zabavsky sought to mislead others by endorsing a misleading police report. Specifically, the jury might have credited Detective DePeralta's statement that Mr. Sutton's draft traffic report "would not be something that [a Major Crash Unit detective] would necessarily use for his investigation." DePeralta Interview at 2. The jury also might have concluded that this statement from Detective DePeralta conflicted with the testimony of government witness Jeffrey Folts. Officer Folts – who, like Detective DePeralta, was assigned to the Major Crash Unit – explained to the jury how the Major Crash Unit usually conducts its investigations. Trial Tr. Nov. 9, 2022 a.m. at 11:1-12:3; id. at 18:13-19:14. Officer Folts testified that he received Mr. Sutton's draft report the night of the collision in an email from Mr. Zabavsky, and that Officer Folts forwarded the draft report to the Internal Affairs Division. Id. at 80:22-83:23. Officer Folts also explained that he "may have" looked at the traffic crash report during his investigation. Id. at 82:9-12. To the extent that Detective DePeralta's statements could have been used to impeach or contradict Officer Folts's testimony, the Court finds that the interview notes constitute favorable evidence subject to disclosure under Brady.

The Court concludes, however, that Mr. Zabavsky was not prejudiced by the delayed disclosure of the interview notes. To find Mr. Zabavsky guilty of conspiracy to obstruct justice, the jury had to find beyond a reasonable doubt that he and Mr. Sutton agreed to commit the crime of obstruction of justice. See Jury Instructions at 33. This it obviously did. See Verdict Form [Dkt. No. 426] at 3. The jury was also instructed that for conspiracy, it must unanimously agree that Mr. Zabavsky or Mr. Sutton committed at least one overt act in furtherance of that conspiracy and that the jury must unanimously agree on which specific overt act or acts were committed. See Jury Instructions at 34. But that is not so with respect to the obstruction of justice count; to convict on the obstruction offense, the jury could find – without specifying – that Mr. Zabavsky committed any act of "misleading" conduct alleged in the indictment, so long as the jury also found all the remaining elements of obstruction of justice. See, e.g., Mathis v. United States, 579 U.S. 500, 506 (2016) (where a statute "specifies diverse means of satisfying a single element" of an offense or "spells out various factual ways of committing some component of the offense," the jury does not need to agree unanimously on the "means" used to complete that offense component); United States v. Adams, 150 F. Supp. 3d 32, 38 (D.D.C. 2015) (explaining that the Supreme Court has "distinguished elements of offenses from means by which such elements are accomplished. While a jury must be unanimous about the former, it typically need not agree on the latter."); see 18 U.S.C. § 1515(a)(3) (enumerating acts that constitute "misleading conduct").

As the verdict form indicates, in finding Mr. Zabavsky and Mr. Sutton guilty of conspiracy to obstruct justice, the jury determined that the government had proved beyond a reasonable doubt that Mr. Zabavsky and Mr. Sutton "provided . . . a misleading account of the incident" when speaking with Captain Porter, the Watch Commander, back at the Fourth District.

See Jury Instructions at 37-38; Verdict Form [Dkt. No. 426] at 2 (indicating that Overt Act 13 supported the findings of guilt as to conspiracy). The jury's finding as to the conspiracy count indicates that the jury determined beyond a reasonable doubt that Mr. Zabavsky engaged in misleading conduct toward an MPD official, the first element of obstruction of justice, when he provided a "misleading account" of the chase and collision to Captain Porter. See Jury Instructions at 30, 37-38. Any effect that the DePeralta interview notes could have had to mitigate or undermine the government's presentation of evidence about Mr. Zabavsky's "support[ of] a faulty police report," Tolliver Mot. at 7, is marginal when compared with the substantial evidence the government presented at trial about Mr. Zabavsky's other "misleading" conduct. There is no "reasonable probability" that providing Mr. Zabavsky with the DePeralta interview notes in advance of Detective DePeralta's testimony would have changed the outcome of trial. See United States v. Straker, 800 F.3d at 604; United States v. Robinson, 68 F.4th at 1348, 1350.

Furthermore, the government's evidence at trial established that Major Crash Unit officers were not the only ones to investigate this incident. Agent Joseph Della Camera from the Internal Affairs Division ("IAD") also conducted an investigation, and Agent Della Camera explained at trial that he did in fact rely on Mr. Sutton's report during his investigation. See Trial Tr. Nov. 7, 2022 p.m. at 63:1-19, 66:20-23 (Agent Della Camera testified that, as part of his IAD investigation, he reviewed Mr. Sutton's traffic crash report describing the incident and relied on Mr. Sutton's draft report when writing his own preliminary IAD report); Trial Tr. Nov. 8, 2022 a.m. at 63:1-18 (Agent Della Camera relied on Mr. Sutton's draft report to obtain "factual and truthful" information to include in his IAD report). Agent Della Camera also explained that he referred this case to the U.S. Attorney's Office within eight hours of beginning

15

his investigation into this incident. See Trial Tr. Nov. 7, 2022 p.m. at 97:14-98:20. That Detective DePeralta would not necessarily have relied on Mr. Sutton's draft report does not undermine the Court's confidence in the obstruction of justice conviction in view of Agent Della Camera's extensive testimony about his own reliance on Mr. Sutton's draft report and his communications to the U.S. Attorney's Office. See United States v. Bagley, 473 U.S. at 682.

The Court also notes that, despite Detective DePeralta's statements to investigators that he would not "necessarily" rely on an officer's draft traffic crash report when completing a Major Crash Unit investigation, see DePeralta Interview at 2, Detective DePeralta testified at trial that he did in fact use Mr. Sutton's report when generating his Major Crash Unit report. Specifically, Detective DePeralta testified that "some of" the information he included in his Major Crash Unit report came from Mr. Sutton's traffic crash report. Trial Tr. Dec. 6, 2022 a.m. at 42:42:4-6; see id. at 40:6-15 (Detective DePeralta testified that he "basically edited" Mr. Sutton's draft report, and he could not remember exactly what parts of his report he changed). Detective DePeralta's own trial testimony thus is at odds with the favorable statements that the government failed to disclose during trial, casting further doubt on the potential for prejudice to result from the statements' belated disclosure.

In view of the government's other evidence about Mr. Zabavsky's misleading conduct, when compared with the relatively slight impeaching effect that the DePeralta notes might have had, the Court does not find a "reasonable possibility of concrete prejudice." United States v. Straker, 800 F.3d at 604. The Court cannot say that "the result of the proceeding would

have been different" if Mr. Zabavsky had received the DePeralta interview notes in advance of Detective DePeralta's testimony. See United States v. Bagley, 473 U.S. at 682.[2]

### B. Dr. Samantha Tolliver

Mr. Zabavsky argues that he was prejudiced by the delayed disclosure of the government's notes from its interview with Dr. Tolliver. Tolliver Mot. at 3. Specifically, Mr. Zabavsky asserts that "[t]he potential for Hylton-Brown to be intoxicated was a recurring line of questioning throughout trial," and "acetone exposure contains many of the same symptoms of alcohol exposure." Id. He reasons that the presence of acetone in Mr. Hylton-Brown's system supports his theory that Mr. Hylton-Brown was intoxicated and that presenting this evidence at trial might have "undercut the prosecution theory" that Mr. Zabavsky's conduct was misleading when he said that Mr. Hylton-Brown was drunk and slurring his words. Id. (quoting the Court's ruling admitting the Toxicology Report, see Trial Tr. Nov. 18, 2022 a.m. at 32:14-21)).

Mr. Zabavsky further asserts that "[t]he acetone concentration discussed between the government and Dr. Tolliver during their November 25, 2022 conversation was not disclosed" and that "the existence of acetone in Hylton-Brown was hidden from defendants until after the jury had reached a verdict." Tolliver Mot. at 5; see Tolliver Reply at 4. Mr. Zabavsky is wrong. The government produced the OCME Report in discovery to both defendants, and multiple pages of this report clearly reflect the finding that Mr. Zabavsky contends was "hidden from the defendants": that forensic testing revealed acetone in Mr. Hylton-Brown's system.

---

[2] Mr. Zabavsky also suggests that, because of the government's failure to address his argument about the DePeralta interview notes in the government's written opposition, the Court should treat his arguments as conceded by the government. See Tolliver Reply at 5. This argument is meritless and the case he cites in support of it – Bancoult v. McNamara, 227 F. Supp. 2d 44, 149 (D.D.C. 2002) – is inapposite.

17

What was missing from the OCME report and the evidence disclosed to the defense was Dr. Tolliver's statement from her November 25, 2022 interview with prosecutors that the "small amount" of acetone detected in Mr. Hylton-Brown's system was "not enough to impair." See Tolliver Mot. at Ex. 2; Tolliver Opp. at 3. The government concedes that this statement was disclosed only after the verdict in this case was returned. See Tolliver Opp. at 1-3. Nevertheless, the Court concludes that the failure to produce this statement did not violate Brady.

The Court is not convinced that the Tolliver interview notes contain "favorable" information. See United States v. Sitzmann, 893 F.3d at 826. At first glance, the presence of acetone, an alcohol, would seem to bolster the theory that Mr. Hylton-Brown was intoxicated the night of the collision. But Dr. Tolliver's statement that there was not enough acetone in Mr. Hylton-Brown's system to render him impaired undermines this theory. As Mr. Zabavsky observes, however, the government is obligated to produce any evidence that "may be favorable to the accused,'" Tolliver Reply at 2 (quoting United States v. Safavian, 233 F.R.D. 12, 16 (D.D.C. 2005) (quotations omitted) (emphasis added)), and the government did not produce this statement until after trial. The Court will therefore presume for the purpose of this analysis that the Tolliver notes constitute favorable, exculpatory evidence under Brady.

That said, Mr. Zabavsky has failed to demonstrate that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. Mr. Zabavsky contends that if he had "been aware of Dr. Tolliver's knowledge of the alcohol in Hylton-Brown . . . he would have introduced this report containing that information and questioned Dr. Tolliver regarding the effects of acetone." Tolliver Reply at 4. But Mr. Zabavsky was made aware of the fact that Dr. Tolliver knew of the acetone in Mr. Hylton-Brown's system because the

government had produced to Mr. Zabavsky the OCME Report, which Dr. Tolliver was familiar with, showing the presence of acetone. See Trial Tr. Dec. 1, 2022 a.m. at 9:23-10:4, 11:5-7, 52:1-6 (Dr. Tolliver explained that she is responsible for all laboratory operations at OCME and that she handled the toxicology work for Mr. Hylton-Brown). Mr. Zabavsky therefore could have inquired of Dr. Tolliver about the presence of acetone in Mr. Hylton-Brown's system, but he did not. Had the government provided its notes from its interview with Dr. Tolliver in advance of her testimony, Mr. Zabavsky therefore would not have been in a materially different or more favorable position than he already was in at trial.

Mr. Zabavsky also argues that "detail of Dr. Tolliver's knowledge" about the presence of acetone in Mr. Hylton-Brown's system "would further demonstrate the truthfulness of Zabavsky's statements." Tolliver Reply at 4. The Court disagrees. With respect to the conspiracy count, the jury unanimously selected Overt Act 13. See Jury Instructions at 37-38; Verdict Form [Dkt. No. 426] at 2. Overt Act 13 describes various actions that Mr. Sutton and Mr. Zabavsky took to provide the Watch Commander "with a misleading account of the incident." Jury Instructions at 37-38. Among the misleading actions described in Overt Act 13 – which the jury found that the government had proved beyond a reasonable doubt – was Mr. Zabavsky's statement to the Watch Commander "that Hylton-Brown had been drunk and had been slurring his words." Id. at 38. The Court finds that there is no reasonable probability that a jury would have come to a different conclusion had it heard that Dr. Tolliver believed there was "not enough" acetone in Mr. Hylton-Brown's system to render him impaired. Rather, the interview notes suggest that if Dr. Tolliver had been asked about acetone – which she was not – she would have testified that Mr. Hylton-Brown could not have been impaired by acetone because there was an insufficient amount in his system. This opinion would have been

consistent with the jury's finding of guilt. The belated production of the notes from the government's interview with Dr. Tolliver thus does not "undermine[] the confidence in the outcome of the trial." United States v. Bagley, 473 U.S. at 678. Accordingly, Mr. Zabavsky has not established that he was prejudiced by the government's failure to disclose the notes from its interview with Dr. Tolliver.

## IV. CONCLUSION

In view of the foregoing, it is hereby

ORDERED that Terence D. Sutton, Jr.'s Motion for Brady Sanctions [Dkt. No. 441] is DENIED; and it is

FURTHER ORDERED that Andrew Zabavsky's Motion for Brady Sanctions [Dkt. No. 442] is DENIED.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 9/26/23