UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
        v.                              )
                                        )        Criminal No. 21-0598 (PLF)
TERENCE SUTTON                          )
    and                                 )
ANDREW ZABAVSKY,                        )
                                        )
                Defendants.             )
_____ )


<u>OPINION AND ORDER</u>

        After a nine-week trial, a jury convicted defendant Terence Sutton of second

degree murder, conspiracy, and obstruction of justice, and defendant Andrew Zabavsky of

conspiracy and obstruction of justice.[1]   At the time that the events giving rise to this case

_____

[1]        The Court has reviewed the following documents and attachments thereto in
connection with the pending motions:  Indictment [Dkt. No. 1]; Final Instructions to Jury ("Jury
Instructions") [Dkt. No. 435]; Terence D. Sutton Jr.'s Motion for Judgment of Acquittal ("Sutton
Mot.") [Dkt. No. 447]; Andrew Zabavsky's Motion for Judgment of Acquittal ("Zabavsky
Mot.") [Dkt. No. 445]; United States' Opposition to Defendants' Motions for Judgment of
Acquittal, New Trial, and Arrest of Judgment ("Gov't Opp") [Dkt. No. 456]; Terence D. Sutton
Jr.'s Reply in Support of his Motion for Judgment of Acquittal ("Sutton Reply") [Dkt. No. 465];
Andrew Zabavsky's Reply in Support of Zabavsky's Motion for Judgment of Acquittal and
Zabavsky's Motion for New Trial and Arrest of Judgment ("Zabavsky Reply") [Dkt. No. 461];
Brief of the National Fraternal Order of Police, as <u>Amicus Curiae</u> in Support of Defendant
Terence Sutton's Post-trial Motions [Dkt. No. 481]; Notice of Supplemental Authorities [Dkt.
No. 490]; Notice of Filing ("June 5, 2023 Argument Outline") [Dkt. No. 491]; Second Motions
Hearing Transcript, <u>United States v. Sutton</u>, Crim. No. 21-0598 (June 5, 2023) ("June 5, 2023
Hearing Tr.") [Dkt. No. 506]; First Motions Hearing Transcript, <u>United States v. Sutton</u>, Crim.
No. 21-0598 (May 17, 2023) ("May 17, 2023 Hearing Tr.") [Dkt. No. 497]; and Government
Exhibits ("Gov't Ex.") [Dkt. No. 430].

        In their motions, Mr. Sutton and Mr. Zabavsky raise several issues that the Court
has addressed previously in written and oral opinions.  The Court has reviewed the following
prior opinions in consideration of the pending motions:  <u>United States v. Sutton</u>, 636 F. Supp. 3d

occurred, Mr. Sutton and Mr. Zabavsky were employees of the Metropolitan Police Department. On October 23, 2020, while operating an unmarked police vehicle, Mr. Sutton encountered a young man named Karon Hylton-Brown. Mr. Sutton knew Mr. Hylton-Brown from previous encounters. That night, Mr. Hylton-Brown was riding an electric scooter (or moped) without a helmet. Mr. Sutton tried to initiate a traffic stop of Mr. Hylton-Brown. When Mr. Hylton-Brown refused to stop, Mr. Sutton followed him through the Kennedy Street neighborhood of Northwest D.C. After being chased for about two minutes, Mr. Hylton-Brown turned into an alleyway, where Mr. Sutton continued pursuing him. When Mr. Hylton-Brown exited the alleyway, he was struck by an oncoming vehicle. Mr. Hylton-Brown died several hours later.

In the aftermath of the collision, Mr. Sutton and his supervisor, Lieutenant Andrew Zabavsky, failed to make immediate notification to the Major Crash Unit, the unit within the Metropolitan Police Department that investigates traffic collisions resulting in death or serious bodily injury. Mr. Sutton and Mr. Zabavsky also failed to make immediate notification to the Internal Affairs Division, the department responsible for investigating officer misconduct, uses of force, and non-compliance with internal police policies. They failed to ensure that

---

179 (D.D.C. 2022) ("First Mot. in Limine Op."); United States v. Sutton, Crim. No. 21-0598, 2022 WL 17335969 (D.D.C. Nov. 30, 2022) ("Second Mot. in Limine Op."); United States v. Sutton, Crim. No. 21-0598, 2022 WL 11744415 (D.D.C. Oct. 20, 2022) ("Mot. to Sever Op."); United States v. Sutton, Crim. No. 21-0598, 2022 WL 3134449 (D.D.C. Aug. 5, 2022) ("August Mot. to Compel Op."); Mot. to Dismiss Oral Ruling Transcript, United States v. Sutton, Crim. No. 21-0598 (Aug. 3, 2022) ("Mot. to Dismiss Oral Ruling") [Dkt. No. 217]; United States v. Sutton, Crim. No. 21-0598, 2022 WL 2828995 (D.D.C. July 20, 2022) ("July Mot. to Compel Op."); United States v. Sutton, Crim. No. 21-0598, 2022 WL 1183797 (D.D.C. Apr. 21, 2022) ("Bill of Particulars Op."); United States v. Sutton, Crim. No. 21-0598, 2022 WL 1202741 (D.D.C. Apr. 22, 2022) ("April Mot. to Compel Op."); and United States v. Sutton, 642 F. Supp. 3d 57 (D.D.C. 2022) ("Daubert Op.").

During trial, the court reporters provided daily transcripts of each day's proceedings to the Court and the parties. Those transcripts are cited as: Trial Tr. [Date] [Time] at [Page:Line].

adequate steps were taken to preserve the crash scene for subsequent investigation.  And they failed to provide a full, truthful, and unambiguous account of the pursuit and collision to their superior officer, the watch commander who was on duty that night.

At the close of the government's case in chief, both Mr. Sutton and Mr. Zabavsky moved for judgment of acquittal.  They renewed their motions at the close of all the evidence. And they renewed their motions after the jury returned a guilty verdict on all counts.  The Court heard oral argument on the motions for judgment of acquittal on June 5, 2023.  The Court has reviewed the parties' written submissions, the relevant authorities, the parties' presentations at oral argument, and the trial record.  For the following reasons, Mr. Sutton's and Mr. Zabavsky's motions for judgment of acquittal are denied.

## TABLE OF CONTENTS

I. BACKGROUND ................................................................................................................ 5

II. LEGAL STANDARD ...................................................................................................... 9

III. COUNT ONE:  SECOND DEGREE MURDER ............................................................ 10

  A. Elements of the Offense ............................................................................................. 10

    1. Malice Aforethought ............................................................................................. 10

    2. Causation ............................................................................................................... 13

  B. Facts Established at Trial ............................................................................................ 18

    1. Events Preceding the Pursuit ................................................................................ 18

    2. The Pursuit and the Collision ............................................................................... 21

    3. Mr. Sutton's Subjective Awareness of the Extreme Risk of Death or Serious Harm .... 26

  C. The Government Met Its Burden as to Second Degree Murder ................................. 32

    1. Malice Aforethought ............................................................................................. 32

    2. Causation ............................................................................................................... 40

IV. COUNT THREE AND COUNT TWO: ........................................................................ 44

OBSTRUCTION OF JUSTICE AND CONSPIRACY TO OBSTRUCT JUSTICE .................. 44

  A. Elements of the Offenses ........................................................................................... 44

    1. Obstruction of Justice ........................................................................................... 44

2. Conspiracy ......................................................................................................... 50

B. Facts Established at Trial ...................................................................................... 51

   1. The Pursuit ........................................................................................................ 51

   2. The Crash Site ................................................................................................... 53

   3. The Fourth District Police Station .................................................................... 57

      a. Captain Porter ............................................................................................ 57

      b. Mr. Sutton's Draft Report .......................................................................... 63

   4. Major Crash Unit Investigation ........................................................................ 65

   5. Internal Affairs Division Investigation ............................................................. 67

   6. Evidence Relating to a Federal Nexus .............................................................. 70

C. The Government Has Met Its Burden as to Obstruction of Justice ....................... 75

   1. Misleading Conduct .......................................................................................... 75

   2. Knowledge ......................................................................................................... 81

   3. Specific Intent to Hinder, Delay, or Prevent ..................................................... 84

   4. Communication to a Law Enforcement Officer of the United States ............... 87

   5. Commission or Possible Commission of a Federal Offense .............................. 90

D. The Government Has Met Its Burden as to Conspiracy to Obstruct Justice ......... 93

   1. Agreement and Intent ....................................................................................... 93

   2. Overt Act ........................................................................................................... 95

V. CONCLUSION ........................................................................................................ 98

I.  BACKGROUND

On September 23, 2021, a grand jury indictment was unsealed charging Terence Sutton and Andrew Zabavsky, both officers of the Metropolitan Police Department of the District of Columbia ("MPD"), with conspiracy to obstruct justice, in violation of 18 U.S.C. § 371, and obstruction of justice and aiding and abetting, in violation of 18 U.S.C. § 1512(b)(3), 2.  See Indictment [Dkt. No. 1].  Mr. Sutton was also charged with second degree murder in violation of D.C. Code § 22-2103.  Id.

The parties engaged in extensive pretrial litigation, and the Court issued more than twenty-eight written and oral rulings on the legal and evidentiary issues presented.  The post-trial motions implicate many of the Court's previous evidentiary and legal rulings. Specifically, the Court determined and elaborated on the elements of each of the charged offenses in various opinions.  See generally April Mot. to Compel Op.; August Mot. to Compel Op.; Mot. to Dismiss Oral Ruling; First Mot. in Limine Op.; Daubert Op.  Relevant portions of those opinions are quoted at length below.

Trial commenced on October 25, 2022.  During its case in chief, the government presented testimony from fifteen witnesses, including:  Sean Ricardi, who works as a special agent at the United States Attorney's Office and was the case agent assigned to this prosecution; Kevonn Mason, who grew up with Mr. Hylton-Brown and saw him the evening of the collision; Gonthel Tolliver, an EMT who responded to the collision site; MPD Officer Tyler Toth, who was patrolling the Kennedy Street area and responded to the collision site; MPD Officer Carlos Tejera, a member of MPD's Crime Suppression Team ("CST") who sat in the front passenger seat of the vehicle that Mr. Sutton drove the night of the collision; Joseph Della Camera, an agent at MPD's Internal Affairs Division ("IAD") who investigated Mr. Sutton's involvement in

5

the pursuit and collision; MPD Officer Nicole Arnone, who responded to the collision site; MPD

Officer Jeffrey Folts, who was assigned to the MPD's Major Crash Unit the night of the

collision; MPD Officers Cory Novick and Ahmed Al-Shrawi, who were both members of the

CST and were seated in the back seat of the police vehicle that Mr. Sutton drove the night of the

collision; James Street, an emergency room doctor who works at the MedStar Washington

Hospital Center; MPD Captain Franklin Porter, who was on duty as the Fourth District's watch

commander the night of the collision; and Justin White, who works at a software company that

provides records management services to police departments.

The government also presented testimony from two experts:  Robert Drago, a

consultant and former law enforcement officer who was qualified as an expert in police training

and national model police practices, procedures, and policies; and MPD Officer Carolyn Totaro,

who was qualified as an expert in the driving training offered to MPD officers and in the MPD

pursuit policies as those policies are taught to officers.

Throughout its case in chief, the government introduced a great deal of body worn

camera footage into evidence.  As multiple witnesses explained, MPD body worn cameras work

as follows:  officers wear their body worn cameras affixed to the front of their uniforms on their

chests.  Trial Tr. Oct. 26, 2022 p.m. at 22:17-23:1 (Ricardi testimony).  By pressing a button,

officers can turn their cameras on and off.  Id. at 23:2-7.  When turned on, the cameras "capture

all video and sound of what is within its field of view until it is turned off."  Id.  Once activated,

the body worn camera's footage will include video of the two minutes preceding activation.  Id.

at 23:12-20.  The two minutes of video captured in this "buffer period" do not contain any sound.

Id.  Officers are required to activate their body worn cameras at the beginning of any "contacts"

with civilians, including "stops" and "frisks."  See Gov't Ex. 401-G (MPD General Order on

Body-Worn Camera Program) at 7 (explaining that officers "shall activate" their body worn cameras for "[a]ll contacts initiated pursuant to a law enforcement investigation," "[a]ll stops (i.e., traffic, pedestrian, and bicycle) and frisks," and "[a]ll traffic crash scenes").  See also Trial Tr. Nov. 2, 2022 p.m. at 59:1-60:6 (Officer Tejera testimony regarding what his body worn camera captured the night of the collision); Trial Tr. Nov. 2, 2022 a.m. at 32:1-13 (Officer Toth testimony describing what his body worn camera captured the night of the collision); Trial Tr. Nov. 8, 2022 p.m. at 46:23-47:24 (Officer Arnone testimony about how body worn cameras function).

The government rested its case in chief on November 21, 2022, at which time counsel for Mr. Sutton and counsel for Mr. Zabavsky moved orally for judgment of acquittal on all counts.  The Court reserved ruling on the motion pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure until the close of all the evidence.  See FED. R. CRIM. P. 29(b).

In the defense case in chief, Mr. Sutton and Mr. Zabavsky presented evidence from twenty witnesses, including:  MPD Sergeant Gregory Hubyk, who supervises the CST; MPD Officer Kathryn Pitt, who Mr. Sutton and Mr. Zabavsky spoke with earlier in the day on October 23, 2020; Jonathan Urrutia-Chavez, the driver of the Scion that struck Mr. Hylton-Brown; MPD Detective Victor DePeralta, an investigator with MPD's Major Crash Unit who investigated the collision that resulted in Mr. Hylton-Brown's death; MPD Captain Sean Connors, who testified about Mr. Sutton's commendation awards from MPD; MPD Senior Sergeant Brian Bray, who is assigned to the Internal Affairs Division; MPD Lieutenant Raul Figueras, who is assigned to the bureau that oversees the Internal Affairs Division; MPD Detective Alfonso Matos and MPD Officer John Paul Gautreaux, who worked extensively with Mr. Sutton; MPD Assistant Chief Wilfredo Manlapaz, who testified about Mr. Sutton's

performance on MPD's Crime Suppression Team; and retired MPD Lieutenant Derek Gray, who worked closely with Mr. Zabavsky.  The defense re-called several government witnesses, including Officer Tyler Toth, Officer Cory Novick, EMT Gonthel Tolliver, and Special Agent Sean Ricardi.

The defense also presented expert testimony from:  Thomas Langley, who was qualified as an expert in accident reconstruction; Dr. Samantha Tolliver, the Chief Toxicologist at the Washington, D.C. Office of the Chief Medical Examiner, who was qualified as an expert in forensic toxicology; Michael Wear, a retired MPD sergeant who was qualified as an expert on police procedures and MPD policies; John Brennan, a retired MPD sergeant who was also qualified as an expert on police procedures and MPD policies; and Michael Miller, a retired MPD detective who was qualified as an expert in police procedures involving crash investigations.

On December 9, 2022, the defense rested its case in chief, and counsel for Mr. Sutton and Mr. Zabavsky renewed their motions for judgment of acquittal.  The Court reserved ruling once more and, after giving the final jury instructions on December 15, 2022, sent the case to the jury for deliberations.  The jury returned a verdict on December 21, 2022, finding Mr. Sutton guilty of second-degree murder, obstruction of justice, and conspiracy to obstruct justice, and finding Mr. Zabavsky guilty of obstruction of justice and conspiracy to obstruct justice.

After the verdict, the Court set a schedule for briefing on the Rule 29 motions. On February 27, 2023, Mr. Sutton and Mr. Zabavsky filed written submissions in support of their motions for judgment of acquittal.  The government opposed, and Mr. Sutton and Mr. Zabavsky submitted replies.  The Court heard oral argument on the motions for judgment of acquittal on June 5, 2023.  The Court also heard argument on May 17, 2023 on the defendants' motions under

Rule 33 and Rule 34 of the Federal Rules of Criminal Procedure.  Some of Mr. Sutton and Mr.

Zabavsky's arguments as to the Rule 33 and Rule 34 motions relate to issues that are raised in

the Rule 29 motions, and the Court has considered the parties' relevant written submissions and

oral presentations in resolving the Rule 29 motions.

## II.  LEGAL STANDARD

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "[a]fter the

government closes its evidence or after the close of all the evidence, the court on the defendant's

motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to

sustain a conviction." FED. R. CRIM. P. 29(a); see United States v. Kayode, 254 F.3d 204, 212-13

(D.C. Cir. 2001); United States v. Harrington, 108 F.3d 1460, 1464 (D.C. Cir. 1997).  "To

succeed on a Rule 29 motion, a defendant must clear a 'very high' hurdle."  United States v.

Hale-Cusanelli, 628 F. Supp. 3d 320, 324 (D.D.C. 2022) (quoting United States v. Pasha, 797

F.3d 1122, 1135 n.9 (D.C. Cir. 2015)).  Granting a defendant's motion for judgment of acquittal

"is appropriate only when there is no evidence upon which a reasonable juror might fairly

conclude guilt beyond a reasonable doubt."  United States v. Weisz, 718 F.2d 413, 438 (D.C. Cir.

1983); see United States v. Campbell, 702 F.2d 262, 264-65 (D.C. Cir. 1983).  Judgment of

acquittal is inappropriate where "any reasonable factfinder could conclude that the evidence,

viewed most favorably to the government, satisfied each element [of the offense] beyond a

reasonable doubt."  United States v. Slatten, 865 F.3d 767, 781 (D.C. Cir. 2017); see United

States v. Safavian, 644 F. Supp. 2d 1, 8 (D.D.C. 2009); United States v. Jabr, Crim. No. 18-0105,

2019 WL 13110682, at *3 (D.D.C. May 16, 2019).

In other words, a motion for judgment of acquittal should be granted only when

"viewing the evidence most favorably to the government and according the government the

benefit of all legitimate inferences therefrom, a reasonable juror <u>must necessarily</u> have had a reasonable doubt as to the defendants' guilt."  <u>United States v. Weisz</u>, 718 F.2d at 437.  When ruling on a motion for judgment of acquittal, the Court must "presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences."  <u>United States v. Campbell</u>, 702 F.2d at 264; <u>see</u> <u>United States v. Jabr</u>, 2019 WL 13110682, at *3.

### III.  COUNT ONE:  SECOND DEGREE MURDER

#### A.  Elements of the Offense

Mr. Sutton was charged with second degree murder under the District of Columbia code, which provides:  "Whoever with malice aforethought . . . kills another, is guilty of murder in the second degree."  D.C. Code § 22-2103.  For the government to have proved Mr. Sutton guilty of this offense, it must have established beyond a reasonable doubt (1) that Mr. Sutton killed Mr. Hylton-Brown, meaning that Mr. Sutton caused Mr. Hylton-Brown's death, <u>see</u> <u>Williams v. United States</u>, 52 A.3d 25, 31-32 (D.C. 2012); and (2) that Mr. Sutton acted with malice aforethought.  <u>See</u> <u>id</u>.  The Court applies District of Columbia law when determining the elements of this D.C. Code offense.  <u>See</u> April Mot. to Compel Op. at *10; July Mot. to Compel Op. at *2-3; August Mot. to Compel Op. at *7.

#### 1.  Malice Aforethought

The government can prove that a person acted with malice aforethought if it shows that the person "acted with a 'depraved heart' – that is, that the defendant engaged in conduct that 'involve[s] such a wanton and willful disregard of an unreasonable human risk as to constitute malice aforethought even if there is not actual intent to kill or injure.'"  July Mot. to

Compel Op. at *2 (quoting <u>Comber v. United States</u>, 584 A.2d 26, 38-39 (D.C. 1990) (en banc)).

As the Court has explained:

> "Malice aforethought" can be satisfied in one of four ways.  <u>See</u> <u>Jennings v. United States</u>, 993 A.2d 1077, 1080 (D.C. 2010).  As relevant here, the government alleges . . . that Mr. Sutton acted with malice aforethought because he subjectively knew that his conduct "created an extreme risk of death or serious bodily injury, but engaged in that conduct nonetheless." <u>Williams v. United States</u>, 858 A.2d 984, 998 (D.C. 2004) (quoting <u>Comber v. United States</u>, 584 A.2d at 39 & n.12). . . . "[M]alice 'may be found where conduct is reckless and wanton, and a gross deviation from a reasonable standard of care, or [of] such a nature that a jury is warranted in inferring that the defendant was aware of a serious risk of death or serious bodily harm.'" <u>Comber v. United States</u>, 584 A.2d at 39 (quoting <u>Logan v. United States</u>, 483 A.2d 664, 671 (D.C. 1984)); <u>accord</u> <u>Wilson-Bey v. United States</u>, 903 A.2d 818, 838 n.36 (D.C. 2006). . . .
>
> Second degree murder "can only be found where the perpetrator of the act [himself] 'was subjectively aware that his or her conduct created an extreme risk of death or serious bodily injury, but engaged in that conduct nonetheless.'" <u>Jennings v. United States</u>, 993 A.2d at 1080 (quoting <u>Comber v. United States</u>, 584 A.2d at 39).  This in turn "may be shown by a 'gross deviation from a reasonable standard of care' or by other acts that may lead the finder of fact to determine that the 'defendant was aware of a serious risk of death or serious bodily harm.'"  <u>Id</u>. (quoting <u>Comber v. United States</u>, 584 A.2d at 39).

April Mot. to Compel Op. at *10, 12.

> The Court has also explained that:
>
> Whether a particular defendant acted with a "depraved heart" "may be shown by a 'gross deviation from a reasonable standard of care' or by other acts that may lead the finder of fact to determine that the 'defendant was aware of a serious risk of death or serious bodily harm.'"  <u>Jennings v. United States</u>, 993 A.2d at 1080 (quoting <u>Comber v. United States</u>, 584 A.2d at 39) (emphasis added). . . .
>
> [W]hether conduct was done with a "depraved heart" turns on whether the defendant was subjectively aware of the risk created by his or her conduct.  <u>See</u> <u>Comber v. United States</u>, 584 A.2d at 39.  But whether there was a "gross deviation from a reasonable standard

> of care" – a potential predicate of that subjective inquiry – is necessarily objective:  What is the applicable standard of care, and did the defendant grossly deviate from it?  See id.

July Mot. to Compel Op. at *3 (emphasis omitted); see August Mot. to Compel Op. at *7; First

Mot. in Limine Op. at 191-92.

Consistent with its prior opinions and with District of Columbia law, the Court

instructed the jury in this case:

> The Indictment charges that on or about October 23, 2020, in the District of Columbia, defendant Terence Sutton, acting with conscious disregard of an extreme risk of death and serious bodily injury to Karon Hylton-Brown, caused Mr. Hylton-Brown's death – that is Mr. Sutton caused a traffic collision from which Mr. Hylton-Brown sustained injuries and died.

Jury Instructions at 27. [2]  After the jurors requested additional explanation of the terms "conscious

disregard" and "extreme risk," see Jury Note 01 [Dkt. No. 419], and after conferring with counsel,

the Court explained that:

> The government must prove beyond a reasonable doubt that Mr. Sutton acted with a reckless and wanton disregard for human life that was extreme in nature, and that Mr. Sutton was aware that his conduct created an extreme risk of death or serious bodily injury.  In other words, the government must show that Mr. Sutton acted with callous and wanton disregard of human life and an extreme indifference to the value of human life.
>
> The fact that a reasonable person would have been aware of the risk will not sustain a finding of conscious disregard.  You must find that Mr. Sutton himself was aware of or knew about the risk.

---

[2]     "[M]otions for an acquittal based on insufficient evidence cannot depend on jury instructions."  United States v. Khatallah, 41 F.4th 608, 626 (D.C. Cir. 2022); see Musacchio v. United States, 577 U.S. 237, 243 (2016); United States v. Hillie, 39 F.4th 674, 679-80 (D.C. Cir. 2022).  The Court includes its jury instructions here only to provide a concise summary of the relevant law.

Answer to Jury Note 01 [Dkt. No. 421]; see Trial Tr. Dec. 20, 2022 a.m. at 8:5-28:2 (parties'

discussion of their proposed responses to the jury's request for additional explanation of the

terms "conscious disregard" and "extreme risk").

### 2.   Causation

In addition to acting with malice aforethought, a conviction for second degree

murder requires the government to prove that a person has killed another.  D.C. Code § 22-2103.

Under District of Columbia law, the requirement that a person "kills another" under

Section 22-2103 is understood to mean that a person "caused the death of" another.  Fleming v.

United States, 224 A.3d 213, 220 (D.C. 2020) (en banc) (citing Williams v. United States, 52

A.3d at 31).  This Court has consistently applied the D.C. Court of Appeals' decision in Fleming

v. United States when defining this element.  See, e.g., First Mot. in Limine Op.; Second Mot. in

Limine Op.; Mot. to Dismiss Oral Ruling.  As the Court has explained:

> Under the D.C. second degree murder statute, "'a defendant
> generally may not be convicted unless his conduct is both (1) the
> actual cause, and (2) the legal cause (often called the proximate
> cause) of the result.'"  Fleming v. United States, 224 A.3d at 221
> (quoting Burrage v. United States, 571 U.S. 204, 210 (2014)).
> Actual causation "'requires proof that the harm would not have
> occurred in the absence of – that is, but for – the defendant's
> conduct.'"  Id. (quoting Burrage v. United States, 571 U.S. at 211).
> Proximate causation "'preclude[s] liability in situations where the
> causal link between conduct and result is so attenuated that the
> consequence is more aptly described as mere fortuity.'"  Id. at 224
> (quoting Paroline v. United States, 572 U.S. 434, 444-45 (2014)).
> The D.C. Court of Appeals has made clear, however, that "the
> intervening actions of a third party do not by themselves defeat
> proximate cause if those intervening actions were reasonably
> foreseeable to the defendant."  Id. at 226 (emphasis added).

Second Mot. in Limine Op. at *5; see Mot. to Dismiss Oral Ruling at 7:21-8:4 (the majority

decision in Fleming is "the most recent statement of the law on second degree murder in the

District of Columbia").  Accordingly, the government's burden in this case was to establish that

Mr. Sutton was both the but-for cause of Mr. Hylton-Brown's death as well as the proximate

cause of his death.  See Fleming v. United States, 224 A.3d at 221-23 (citing Burrage v. United

States, 571 U.S. at 210).

       Importantly, the Fleming majority reiterated the principle that a person can be

held responsible for a death "even though the death would not have occurred but for the

reasonably foreseeable intervening acts of another."  Fleming v. United States, 224 A.3d at 225.

Thus, a person need not deliver the fatal blow or fire the fatal shot to bear responsibility for

another's death, so long as there is a sufficiently close connection between the person's conduct

and the resulting death, and that the third-party's fatal action was a "reasonably foreseeable"

consequence of the person's conduct.  Id. at 224-25, 229.

       The D.C. Court of Appeals' en banc decision in Fleming v. United States includes

two concurring opinions, neither of which changes this Court's assessment of the controlling

District of Columbia law on causation for second-degree murder.  Judge McLeese's majority

decision is unequivocally controlling.  See Mot. to Dismiss Oral Ruling at 7:19-8:4 (holding that

the majority opinion in Fleming is the controlling law in this case).[3]  Because counsel for Mr.

Sutton has invoked the Fleming concurrences in his motion for judgment of acquittal, see June 5,

2023 Hearing Tr. at 18:8-19, 54:21-24, the Court will reiterate why the two concurrences do not

alter the applicable law.

---

[3]     At the time Fleming was decided, the en banc D.C. Court of Appeals consisted of
eight judges:  Chief Judge Blackburne-Rigsby, Judge Glickman, Judge Fisher, Judge Thompson,
Judge Beckwith, Judge Easterly, and Judge McLeese.  Joining Judge McLeese's majority
opinion in Fleming were Chief Judge Blackburne-Rigsby, Judge Glickman, Judge Fisher, and
Judge Thompson.  Judge Fisher also authored a concurring opinion, in which he was joined by
Judge Thompson.  Judge Easterly and Judge Beckwith concurred in the judgment but did not join
Judge McLeese's majority opinion.  See Fleming v. United States, 224 A.3d at 217.

The first concurrence, authored by Judge Fisher and joined by Judge Thompson, provides no reason to believe that Judge McLeese's lead opinion is not a controlling majority opinion. Fleming v. United States, 224 A.3d at 231 (Fisher & Thompson, JJ., concurring) ("We join the opinion of the court but add this brief concurring statement to emphasize key principles on which the court relies."). In his concurring opinion, Judge Fisher highlighted the majority's holding that "to kill" – as the term is used in District of Columbia homicide statutes – means "to cause death." Id. Judge Fisher also reiterated the majority's conclusion that a person can be held responsible for a death resulting from a third-party's intervening actions where such third-party intervention was "reasonably foreseeable." Id. Judge Fisher went on to discuss how principles of vicarious liability and but-for causation interact in the "urban gun battle" context. Id. at 232.[4]

---

[4]    At oral argument, counsel for Mr. Sutton suggested that Judge Fisher and Judge Thompson did not join in the majority's "advisory opinion" regarding proximate causation. See June 5, 2023 Hearing Tr. at 98:17-23. Judge Fisher and Judge Thompson observed that "this court will need to devote more effort to explaining the interaction of but-for causation and vicarious liability in the context of a gun battle (and to crafting an instruction which describes that interaction for the jury)." Fleming v. United States, 224 A.3d at 232 (Fisher & Thompson, JJ., concurring) (emphasis added). Mr. Sutton reasons that Judge Fisher and Judge Thompson thus did not adopt the majority opinion's sample jury instruction for second degree murder. See June 5, 2023 Hearing Tr. at 98:17-23.

The Court disagrees with Mr. Sutton's reading of the concurrence. Judge Fisher and Judge Thompson very clearly joined in the entire majority opinion, writing:

> We join the opinion of the court but add this brief concurring statement to emphasize key principles on which the court relies. We also attempt to make a few points about issues that will arise in future cases like this. There inevitably will be such cases because gun battles occur on the streets of the District of Columbia with depressing frequency, often with lethal results.

Fleming v. United States, 224 A.3d at 231 (Fisher & Thompson, JJ., concurring). If Judge Fisher and Judge Thompson had wanted to narrow the scope of their agreement with Judge McLeese's majority opinion, the concurring judges could and would have said so explicitly or could have joined the majority as to all but Section IV.B.2, which contained the sample jury instructions. Moreover, to the extent that Judge Fisher and Judge Thompson expressed caution regarding the

Likewise, Judge Easterly's concurrence, joined only by Judge Beckwith, does not give the Court any reason to reconsider its position about which <u>Fleming</u> opinion is controlling, regardless of the fact that Judge Easterly and Judge Beckwith concurred only in the judgment. <u>See</u> <u>Fleming v. United States</u>, 224 A.3d at 232 (Easterly, J., concurring in the judgment).  This separate concurrence "endorse[d] and fortif[ied]" several "pillars of the majority opinion's analysis," including the principle that second degree murder requires a showing that "the defendant's action was not only a but-for cause [of the resulting death] but had 'a sufficient connection to the result,' often (but not exclusively) analyzed in terms of timing and reasonable foreseeability."  <u>Id.</u> at 233 (quoting <u>Paroline v. United States</u>, 572 U.S. at 444).  Judge Easterly and Judge Beckwith, however, would not allow second degree murder to reach circumstances where "a defendant has taken an earlier action in the causal chain of a death, notwithstanding that a third party voluntarily and independently takes a later action that is both a but-for and a more immediate cause of death."  <u>Id.</u> at 234.  Judge Easterly criticized the majority's broad interpretation of the D.C. second-degree murder statute for failing to recognize the "common law prohibition on criminally punishing individuals for the independent, voluntary actions of others." <u>Id.</u> at 236.

Repeatedly – before, during, and after trial – Mr. Sutton has urged this Court to adopt Judge Easterly's analysis rather than Judge McLeese's analysis.  <u>See</u>, <u>e.g.</u>, June 5, 2023 Hearing Tr. at 21:2-3 (counsel for Mr. Sutton reiterating his position that the majority opinion in <u>Fleming</u> is not controlling in this case because Mr. Hylton-Brown's death was not caused by an

---

majority opinion's sample jury instructions, that concern was specifically limited to the "context of a gun battle."  <u>Id.</u> at 232.  Nothing in the concurrence suggests that Judge Fisher or Judge Thompson would object to applying the majority's jury instruction to other sets of facts, such as the facts at issue in this case.

"intervening" third-party for whom Mr. Sutton bore vicarious liability); id. at 94:6-98:10
(counsel for Mr. Sutton explaining his reading of the Fleming opinions).  The Court has
consistently declined to reject the Fleming majority opinion in favor of the concurring view of
two judges and sees no reason to reconsider this ruling.

Thus, consistent with the majority opinion in Fleming, the Court instructed the
jury that a finding of guilt as to second-degree murder required the government to prove beyond
a reasonable doubt that "Terence Sutton caused the death of Karon Hylton-Brown."  Jury
Instructions at 27.  The Court further instructed that the government had to prove both "actual
causation" and "proximate causation" beyond a reasonable doubt.  Id. at 29.  The Court defined
those terms as follows:

> [A]ctual causation – that Mr. Hylton-Brown's death occurred as a
> result of an action by defendant Sutton.  In other words, the
> government must prove that in the absence of an action by defendant
> Sutton, Mr. Hylton-Brown's death would not have occurred. . . .
>
> [P]roximate causation – that there is a close connection between
> defendant Sutton's action and Mr. Hylton-Brown's death.  You may
> find that a close connection exists if, at the time of defendant
> Sutton's action, the defendant knew or reasonably should have
> known that the action might result in the death of or serious bodily
> injury to Mr. Hylton-Brown.  On the other hand, you may not find
> that a close connection exists if the series of events leading from
> defendant Sutton's action to Mr. Hylton-Brown's death is highly
> unusual, abnormal, or extraordinary.

Jury Instructions at 29.  The Court further instructed the jury that:

> There is evidence in this case that defendant Sutton did not
> personally inflict Mr. Hylton-Brown's fatal injury and that Mr.
> Hylton-Brown's fatal injury instead was inflicted by a third party.
> Under such circumstances, defendant Sutton can be found to have
> caused Mr. Hylton-Brown's death only if, applying the instruction
> you were just given, Mr. Hylton-Brown's death occurred as a result
> of the defendant's action and there is a close connection between the
> defendant's action and Mr. Hylton-Brown's death.

Id.  See Fleming v. United States, 224 A.3d at 221 ("[T]he actual-cause requirement means that

the United States must prove that, if one subtracted the defendant's actions from the chain of

events, the decedent would not have been killed."); id. at 224 ("[A] criminal defendant

proximately causes, and thus can be held criminally accountable for, all harms that are

reasonably foreseeable consequences of his or her actions." (quoting Blaize v. United States, 21

A.3d 78, 81 (D.C. 2011)).[5]

## B. Facts Established at Trial

### 1. Events Preceding the Pursuit

On October 23, 2020, Mr. Sutton was on duty, operating an unmarked police

vehicle, and working as a member of MPD's Crime Suppression Team ("CST").  When

members of the CST are on patrol, they typically operate with four officers in one unmarked

vehicle.  That day, Mr. Sutton was driving; Officer Carlos Tejera sat in the front passenger seat;

and Officers Cory Novick and Ahmed Al-Shrawi were seated in the left and right rear seats,

respectively.  See Trial Tr. Nov. 2, 2022 p.m. at 18:22-19:2, 40:9-19 (Tejera testimony); Trial Tr.

Nov. 10, 2022 p.m. at 90:13-14 (Al-Shrawi testimony).

It was clear from the evidence at trial that Mr. Hylton-Brown was known to the

CST officers, including Mr. Sutton – and that Mr. Sutton was known to Mr. Hylton-Brown –

---

[5]        The Court also gave a lesser included offense instruction as to involuntary
manslaughter.  Involuntary manslaughter requires the government to prove that Mr. Sutton
caused the death of Mr. Hylton-Brown; that the "conduct which caused the death was a gross
deviation from a reasonable standard of care"; and that the "conduct that caused the death
created an extreme risk of death or serious bodily injury."  Jury Instructions at 27.  The Court
distinguished involuntary manslaughter from second degree murder by explaining that "[t]o
show guilt of second degree murder, the government must prove that defendant Sutton was
aware of the extreme risk of death or serious bodily injury," whereas involuntary manslaughter
only required that "he should have been aware" of the risk of death or serious bodily injury.  Id.
at 28.

prior to the chase and fatal collision.  Surveillance footage showed that at about 10:00 p.m. on

October 23, 2020, Mr. Sutton's CST vehicle was parked at Seventh Street and Kennedy Street,

Northwest, with all four officers seated inside.  Trial Tr. Nov. 10, 2022 p.m. at 38:6-40:22 (Al-

Shrawi testimony); Trial Tr. Nov. 2, 2022 p.m. at 44:6-12 (Tejera testimony).  At that time, Mr.

Zabavsky stood outside of the CST vehicle with MPD Officers Kathryn Pitt, Tyler Toth, and

Nicole Arnone.  See Gov't Ex. 303 (MPD Traffic Cameras, Seventh and Kennedy); Trial Tr.

Nov. 10, 2022 p.m. at 39:1-40:14 (Al-Shrawi testimony).  Officer Pitt spoke to the officers

seated inside the CST vehicle, including Mr. Sutton, and told them that Mr. Hylton-Brown had

been involved in an altercation earlier in the day and that he had made a derogatory statement

directed toward her.  Id. at 40:15-21, 41:21-23 (Al-Shrawi testimony).  Officer Al-Shrawi

clarified that he did not recall Officer Pitt mentioning anything about Mr. Hylton-Brown being

involved in any violence or a physical fight, see id. at 41:7-43:11, and he did not hear anything

about Mr. Hylton-Brown posing any kind of safety threat.  Id. at 45:3-6; see Trial Tr. Nov. 2,

2022 p.m. at 44:6-47:15 (Officer Tejera described the conversation with Officer Pitt and

explained that he learned no information about whether Mr. Hylton-Brown had committed a

crime during that conversation).  Agent Ricardi explained that he interviewed Officer Pitt during

his investigation, and she told him that when she saw Mr. Hylton-Brown driving the moped on

the sidewalk earlier that day, she believed he was high or intoxicated.  Trial Tr. Oct. 31, 2022

p.m. at 24:23-26:1.

          After the CST officers finished talking with Officer Pitt, the CST vehicle drove

off, heading east on Kennedy Street towards the intersection of Fifth Street and Kennedy Street,

Northwest.  Trial Tr. Nov. 10, 2022 p.m. at 49:13-24 (Al-Shrawi testimony).  Mr. Zabavsky

followed them, driving a marked police vehicle.  Id.  The CST vehicle, driven by Mr. Sutton,

then encountered Mr. Hylton-Brown.  Id. at 48:7-13.  Mr. Hylton-Brown was stationary, seated

on a Revel moped on the sidewalk near Fifth Street and Kennedy Street, Northwest.  Id.

at 52:21-54:6.  Mr. Sutton called out to Mr. Hylton-Brown, "What are you doing? Where your

helmet at?"  Id. at 55:21-24.  Mr. Sutton initially drove past Mr. Hylton-Brown, but then did a U-

turn and reapproached him.  Id. at 57:14-58:15; Trial Tr. Nov. 2, 2022 p.m. at 49:1-50:6 (Tejera

testimony).

        At that time, Mr. Sutton activated his emergency lights.  Trial Tr. Nov. 10, 2022

p.m. at 61:19-24 (Al-Shrawi testimony).  Mr. Sutton did not explain to the other CST officers

why he did so, nor did he say anything else to or about Mr. Hylton-Brown.  Id. at 62:21-22.

According to Officer Tejera, the CST officers "tried to initiate a traffic stop on Mr. Hylton," and

"Officer Sutton turned on the lights on the vehicle and that's how the traffic stop was attempted."

Trial Tr. Nov. 2, 2022 p.m. at 51:1-4.  Officer Al-Shrawi similarly testified that he "was under

the impression" that Mr. Sutton was trying to stop Mr. Hylton-Brown.  Trial Tr. Nov. 10, 2022

p.m. at 62:4-24.  Mr. Hylton-Brown, however, rode the moped southbound on Fifth Street, away

from the CST vehicle, and did not stop.  Trial Tr. Nov. 2, 2022 p.m. at 53:3-7 (Tejera testimony).

When Mr. Hylton-Brown rode away on the moped, Mr. Sutton turned off the CST vehicle's

emergency lights and followed him.  Trial Tr. Nov. 10, 2022 p.m. at 63:10-16 (Al-Shrawi

testimony).  Behind Mr. Sutton, Mr. Zabavsky also followed Mr. Hylton-Brown in the other

MPD vehicle.  Trial Tr. Nov. 2, 2022 p.m. at 55:15-18 (Tejera testimony).

        Both Officer Tejera and Officer Al-Shrawi testified that, at the moment Mr.

Sutton began following Mr. Hylton-Brown, they did not suspect that Mr. Hylton-Brown had

committed a felony or violent crime; nor did they have reason to believe that Mr. Sutton

suspected Mr. Hylton-Brown of committing a felony or violent crime.  Trial Tr. Nov. 10, 2022

p.m. at 64:22-65:3 (Al-Shrawi testimony); Trial Tr. Nov. 2, 2022 p.m. at 54:20-55:3 (Tejera

testimony).  According to Officer Al-Shrawi, the only crime that Mr. Hylton-Brown was

suspected of before Mr. Sutton tried to stop him was driving a moped without a helmet.  Trial Tr.

Nov. 10, 2022 p.m. at 74:19-22 (Al-Shrawi testimony); Trial Tr. Nov. 14, 2022 p.m. at 24:14-24

(Officer Al-Shrawi explained that he was prepared to jump out of the CST vehicle and stop Mr.

Hylton-Brown for not wearing a helmet).  Officer Tejera believed that Mr. Sutton was trying to

initiate a traffic stop because "Mr. Hylton was operating the moped on the sidewalk."  Trial Tr.

Nov. 2, 2022 p.m. at 51:15-19.  Officer Tejera and Officer Al-Shrawi both testified that they

never observed Mr. Hylton-Brown carrying a weapon, and that none of the officers in the CST

vehicle mentioned seeing anything of the sort.  Id. at 56:4-25 (Tejera testimony); Trial Tr.

Nov. 14, 2022 p.m. at 25:8-16 (Officer Al-Shrawi testified that no one mentioned seeing Mr.

Hylton-Brown with a weapon and "[i]f someone saw a weapon, I would expect them to say

something"); Trial Tr. Nov. 7, 2022 a.m. at 46:3-25 (Officer Tejera explained that Mr. Hylton-

Brown's body language did not suggest he was concealing a weapon).  When it became clear

that Mr. Hylton-Brown was not going to pull over, Officer Tejera suggested getting a warrant for

his arrest – for the misdemeanor criminal offense of fleeing from law enforcement – rather than

continuing to try to effectuate a traffic stop.  Trial Tr. Nov. 7, 2022 a.m. at 68:10-70:14.

### 2. The Pursuit and the Collision

In their separate vehicles, Mr. Sutton and Mr. Zabavsky followed Mr. Hylton-

Brown through the neighborhood for approximately two minutes.  See Trial Tr. Nov. 17, 2022

a.m. at 54:10-22 (Porter testimony); Gov't Ex. 204 (Zabavsky body worn camera); Gov't Ex.

200 (Sutton body worn camera); Gov't Ex. 202 (Tejera body worn camera).  The government

also offered recordings of MPD radio transmissions from the night of the collision.  Two radio

21

recordings were admitted:  a recording of the "main" radio channel, which every officer in the Fourth District had access to; and a recording of the "Ops" channel, a special channel that was only available to members of the CST.  See Gov't Ex. 221-A (Ops channel radio recording); Gov't Ex. 221-B (Fourth District radio channel recording).

Seated in the front passenger seat, Officer Tejera was able to observe Mr. Hylton-Brown riding on the moped while the MPD vehicles followed him, and Officer Tejera's body worn camera captured video of Mr. Hylton-Brown as Mr. Sutton followed him.  See Gov't Ex. 202.  Officer Tejera's body worn camera footage depicts Mr. Hylton-Brown riding away, with the CST vehicle speeding up to catch him.  From Officer Tejera's vantage point, houses and apartments blurred as the CST vehicle accelerated.  The red and blue lights from the CST vehicle reflected on the vehicle's front windshield, disappearing and reappearing when Mr. Sutton turned the vehicle's emergency lights off and on.  See Gov't Ex. 202.  While Mr. Sutton and Mr. Zabavsky followed Mr. Hylton-Brown, both of them spoke over the Ops radio channel.  Mr. Zabavsky says, "Seventh and Ingraham," and then, "We're chasing Karon on a scooter right now."  Gov't Ex. 221-A.  A few seconds later, Mr. Sutton says, "He's going up Seventh," then "Eighth and Jefferson.  Karon Hylton.  He's going toward Kennedy on Eighth Street."  Id.

About forty-five seconds before the collision, Mr. Hylton-Brown did a U-turn in the street, momentarily moving out of view of Officer Tejera's body worn camera.  Officer Sutton maneuvered the MPD vehicle in a multi-point turn to continue following him.  See Gov't Ex. 202; see Trial Tr. Oct. 26, 2022 p.m. (Agent Ricardi explained that the CST vehicle "perform[ed] a turn in the intersection of Eighth and Kennedy" then continued following Mr. Hylton-Brown down Eighth Street toward Jefferson Street, Northwest).  Seconds after the CST vehicle turned around, Officer Tejera lifted his arm and pointed, and as the CST vehicle drove

22

forward, Mr. Hylton-Brown came back into view.  Mr. Sutton took a left turn, following Mr.

Hylton-Brown onto Jefferson Street, and quickly thereafter made another left turn, following Mr.

Hylton-Brown down a narrow alleyway.  A few seconds after making the left turn into the alley,

Mr. Sutton turned off the CST vehicle's emergency lights.  See Gov't Ex. 202 (Tejera body worn

camera); Gov't Ex. 111-C (map of Kennedy Street, Northwest neighborhood).

   The government also introduced images from Mr. Sutton's body worn camera

footage.  See Gov't Exs. 101-B, 101-C, 101-D (Sutton body worn camera screenshots).  From his

seat behind the wheel, Mr. Sutton's camera captured the CST vehicle's speedometer.  The

footage his body worn camera recorded indicates that the CST vehicle's speed reached up to

forty-five miles-per-hour as Mr. Sutton pursued Mr. Hylton-Brown through the neighborhood.

See Gov't Ex. 101-E (Sutton body worn camera screenshot).  The footage also shows that in the

moments before the collision, Mr. Sutton accelerated down the alleyway behind Mr. Hylton-

Brown, reaching a maximum speed of twenty-six miles-per-hour, while deactivating the CST

vehicle's lights and sirens.  See Gov't Exs. 101-B, 101-C, 101-D; Trial Tr. Nov. 15, 2022 p.m. at

77:11-79:9 (Totaro testimony); Trial Tr. Nov. 2, 2022 p.m. at 89:4-22 (Tejera testimony).

Officer Carolyn Totaro testified that the speed limit in residential parts of the District of

Columbia is twenty miles per hour – but in alleyways like the one where Mr. Sutton followed

Mr. Hylton-Brown, the speed limit is fifteen miles per hour.  Trial Tr. Nov. 15, 2022 a.m.

at 61:7-16.

   Video from Officer Tejera's body worn camera also depicts the CST vehicle

accelerating down the alleyway.  See Gov't Ex. 202 (Tejera body worn camera).  Officer

Tejera's body worn camera captured Mr. Hylton-Brown riding the moped as he approached the

end of the alleyway, which opened up onto the 700 block of Kennedy Street.  The brake lights on

his moped glowed red as he reached the end of the alleyway, but the light disappeared as he

exited the alleyway and began veering left onto Kennedy Street.  As Mr. Hylton-Brown began

turning left, visible on the left side of the video screen, another car approached driving eastbound

on Kennedy Street.  The brake lights on Mr. Hylton-Brown's moped flashed red as he continued

making his left turn.  The oncoming car made contact with Mr. Hylton-Brown, and the red light

of the moped's brakes disappeared.  In a blur, the oncoming car continued forward, and its brake

lights flashed on.  Mr. Hylton-Brown is no longer visible on screen.  The CST vehicle comes to a

stop at the end of the alleyway.  Visible on the far-right side of the screen, further east on

Kennedy Street, a different police car – operated by Officer Tyler Toth – turned on its

emergency lights.  Officer Tejera exited the vehicle and activated his body worn camera, which

began recording audio.  He and three other officers approached Kennedy Street, where the

moped was lying in the road.  About six feet to the right of the moped, Mr. Hylton-Brown is seen

lying in the street.  Officer Novick and Officer Al-Shrawi approached Mr. Hylton-Brown and

attempted to render first aid.  <u>See</u> Gov't Ex. 202(Tejera body worn camera); Trial Tr. Nov. 14,

2022 p.m. at 43:3-4, 50:1-15 (Novick testimony).

   The government presented body worn camera footage, pictures, and testimony

about Mr. Hylton-Brown's injuries.  Several police officers attested to the seriousness of Mr.

Hylton-Brown's injuries in the immediate aftermath of the collision.  <u>See</u>, <u>e.g.</u>, Trial Tr. Nov. 2,

2022 a.m. at 23:23-24:7, 27:2-24 (Officer Toth observed "pretty serious" injuries); Trial Tr.

Nov. 2, 2022 p.m. at 66:6-14 (Officer Tejera believed the injuries "could have been something

serious" due to the blood and vomit he observed); Trial Tr. Nov. 8, 2022 p.m. at 56:20-57:23

(Officer Arnone testified that she observed Mr. Hylton-Brown "bleeding from his head" and that

his condition "appeared to worsen" as officers waited for the ambulance); Trial Tr. Nov. 10,

2022 p.m. at 85:9-24 (Officer Al-Shrawi believed Mr. Hylton-Brown's injuries were "life-threatening"). Gonthel Tolliver, a paramedic at the District of Columbia Fire Department, testified that she arrived at the scene of the collision, and after quickly assessing Mr. Hylton-Brown's condition, she immediately put him in the ambulance to take him to the trauma center. Trial Tr. Nov. 1, 2022 p.m. at 54:16-23, 62:1-64:7.

The jury also heard testimony from Dr. James Street, a trauma and acute care surgeon at MedStar Washington Hospital Center. See Trial Tr. Nov. 16, 2022 p.m. at 81:13-20. Dr. Street worked at the emergency room at the MedStar Washington Hospital Center where Mr. Hylton-Brown was taken by ambulance after the collision, and he supervised the team of doctors and nurses who attended to Mr. Hylton-Brown. Id. at 84:7-13, 85:6-12, 86:1-16. Dr. Street testified to the skull fractures that were present when Mr. Hylton-Brown arrived at the hospital, and he explained that by 5:00 a.m. on October 24, 2020, hospital staff had determined that Mr. Hylton-Brown had sustained a "non-survivable injury." Id. at 93:12-94:13, 95:4-8. The government offered photographs of Mr. Hylton-Brown's injuries, which, according to Dr. Street, were taken by an employee of the Medical Examiner's Office after Mr. Hylton-Brown died. Id. at 106:5-21; see Gov't Exs. 100-A, 100-B, 100-C, and 100-D (autopsy photographs); see Trial Tr. Nov. 9, 2022 a.m. at 68:16-20 (Officer Folts explained that he learned from Dr. Street that Mr. Hylton-Brown was going to die). According to testimony and medical records, Mr. Hylton-Brown died at the MedStar Washington Hospital Center in the early morning hours of October 24, 2022. See Trial Tr. Nov. 21, 2022 a.m. at 70:17-71:16 (Ricardi testimony); Gov't Exs. 403-B, 403-D (MedStar Washington Hospital Center records); Gov't Exs. 407-B, 407-C (District of Columbia Office of the Chief Medical Examiner records).

3.  Mr. Sutton's Subjective Awareness of the Extreme Risk of Death or Serious Harm

The government introduced evidence that Mr. Sutton was "pretty experienced" and knowledgeable about MPD protocols and procedures.  Trial Tr. Nov. 10, 2022 p.m. at 31:19-24 (Al-Shrawi testimony).  His police academy materials from 2009, for example, indicate that he passed his vehicle skills course at the police academy with flying colors.  See Gov't Ex. 405-B (Sutton police academy driving training evaluation).  He received a 94 percent on the written test and finished the course – which included a mock vehicular pursuit assessment – with a 97 percent overall.  Trial Tr. Nov. 15, 2022 a.m. at 40:16-24, 41:4-9, 46:3-11 (Totaro testimony).  The government also introduced evidence that, on March 13, 2019, Mr. Sutton received an official reprimand – a censure – for failing to comply with the MPD's policy on vehicular pursuits.  See Trial Tr. Oct. 31, 2022 p.m. at 98:8-101:10 (Ricardi testimony); Gov't Ex. 414-B (Sutton 2019 Reprimand).  The reprimand stated in part:

> You are hereby issued this official reprimand for violating general order 301.03, part VI, 10a, b, which states in part that a vehicular pursuit shall be terminated when it becomes apparent that the vehicular pursuit could lead to unnecessary property damage, injury to citizens or members of the department, and the pursuit is in close proximity to schools and hospitals and other locations with high pedestrian or vehicular activity.

Gov't Ex. 414-B.  The government also presented two expert witnesses, Officer Carolyn Totaro and Robert Drago, who testified about MPD vehicle skills training and the standard of care that Mr. Sutton was expected to adhere to as a police officer engaging in a vehicular chase or pursuit. Both experts testified at length about the MPD policy on vehicular pursuits, General Order 301.03.

a. <u>MPD Training and Testimony of Officer Carolyn Totaro</u>

Officer Totaro works as an instructor at MPD's police academy, where she leads vehicle skills trainings for other officers.  Trial Tr. Nov. 15, 2022 a.m. at 30:17-24, 31:18-21. Officer Totaro testified as an expert witness on the driving training required for MPD officers, as well as the MPD policy on vehicular pursuits that is taught to officers.  In Officer Totaro's expert opinion, Mr. Sutton's operation of the CST vehicle the night of Mr. Hylton-Brown's death was "inconsistent with the MPD training" on vehicular pursuits.  Trial Tr. Nov. 15, 2022 p.m. at 54:4-8.  After reviewing body worn camera footage documenting the initial contact with Mr. Hylton-Brown, Officer Totaro testified that an officer would be instructed to "let it go" rather than engage in a pursuit in that situation.  <u>Id</u>. at 57:11-13.  Only if this were a felony stop or if Mr. Hylton-Brown were armed and a danger to himself or others would a pursuit have been consistent with MPD policy.  <u>Id</u>. at 58:4-18; <u>see</u> Trial Tr. Nov. 17, 2022 a.m. at 32:21-33:1 (Captain Porter explained: "If it comes out and they're just chasing them for traffic, I think it's reasonable to say everyone knows that traffic is not going to result in death or serious bodily harm.  It's not a felony.").

According to Officer Totaro, MPD officers learn to prioritize "safety" and "accident avoidance."  Trial Tr. Nov. 15, 2022 a.m. at 65:17-21 ("Our goal is to get to the call safely and effectively without any incident at all.").  Officer Totaro explained the concept of "due regard," meaning the "protection of life and property" while on patrol.  <u>Id</u>. at 36:8-23; <u>id</u>. at 75:3-8 (the D.C. Code of Municipal Regulations requires MPD officers to "drive with due regard for the safety of all persons"); <u>id</u>. at 77:16-18 (General Order 301.03 states:  "When a member of the [MPD] is engaged in a vehicular pursuit, the overriding responsibilities are the protection of

life and property"); see also Gov't Ex. 401-D (MPD General Order 301.03 on Vehicular

Pursuits) at 1.  Officer Totaro explained that when she instructs students, she tells them:

> You don't have to get them at all.  You don't have to apprehend
> them.  You don't have to keep going after them.  You can let them
> go and that's completely okay.  It's not a reflection upon you as an
> officer or how well you do your job.  It's a city environment.  You
> have to realize where you are.  It's a city environment.  And safety,
> we go right back to due regard.  Due regard is everything.  You
> know, maybe he'll wreck.  Maybe the suspect will wreck or maybe
> he'll do something that's worse, but the thing is, is that we have to
> be professional.  And being professional sometimes means cutting
> off the chase and turning away. . . .
>
> Safety is everything.  Maybe the person that you're getting is driving
> like, kind of like erroneously, disobeying, you already see if they're
> running stop lights and stop signs, sometimes it's worth saying, you
> know what?  It's not worth it.  It's not worth the chase.  It's not
> worth getting them. . . .  I tell the recruits, it's not worth risking your
> job.  It's not worth all these extra steps taken just because of them
> running from you or them fleeing from you.

Trial Tr. Nov. 15, 2022 a.m. at 68:9-23, 70:13-22.

Consistent with the emphasis that MPD training places on the principle of "due

regard," Officer Totaro also explained that if a pursuit "can lead to unnecessary property damage

or injury to anybody else . . . you [the officer] can terminate [the pursuit]. . . . If you see it's

becoming too dangerous, then you have every right as an officer to stop that chase, regardless of

whatever official says continue on."  Trial Tr. Nov. 15, 2022 a.m. at 99:1-21; id. at 101:16-18

("It's always up to the driver to stop or terminate the pursuit, if it seems too dangerous.").  When

teaching classes of new officers about vehicular pursuits, Officer Totaro also tells them about

"tunnel vision," and how it is easy for officers "to become fixated on an object or on something

that [they] need to get to, such that they "ignor[e] all of the conditions around" them.  Id.

at 56:21-57-7.  Officers are trained to "constantly cycle back and slow [themselves] down and

say 'Is this worth going to at this speed?  Is it worth ignoring simple stop signs and stop lights or putting on our blinker?'" in order to stay focused and prevent tunnel vision.  Id. at 57:15-20.

Officer Totaro further explained that an officer's emergency lights and sirens "give warning to the public."  Trial Tr. Nov. 15, 2022 p.m. at 59:15-16.  She explained that Officer Sutton's failure to use the CST vehicle's lights and sirens in the alleyway was inconsistent with MPD policy, which requires the use of lights and sirens at all times during a pursuit to "allow[] the public to know that [officers] are coming, that [they're] going through an area and to take heed of [officers'] approach."  Id. at 75:16-76:1.  In Officer Totaro's opinion, turning off emergency lights and sirens in the alleyway "didn't allow the public to hear that the officer was coming or see them in a consistent way."  Id. at 80:1-6.[6]

### b.  MPD General Order 301.03 on Vehicular Pursuits

In addition to presenting evidence about MPD officers' training, the government also introduced evidence regarding MPD's written policies on vehicular pursuits.  Officer Totaro

---

[6]        On a motion under Rule 29 of the Federal Rules of Criminal Procedure, "any ruling must be decided on the basis of the evidence presented at the time the ruling was reserved."  United States v. Wahl, 290 F.3d 370, 374-75 (D.C. Cir. 2002).  Mr. Sutton and Mr. Zabavsky raised Rule 29 motions at the close of the government's case in chief, and the Court reserved ruling on the motion at that time.  Accordingly, "[a]ny ruling on that motion" must be "made solely on the evidence offered by the government."  Id. at 375; see FED. R. CRIM. P. 29(b).

Although the Court may not – and does not – rely on any evidence presented after it reserved ruling on the Rule 29 motions, the Court notes that the jury heard testimony from Jonathan Urrutia-Chavez, the man who was driving the Scion that collided with Mr. Hylton-Brown on October 23, 2020, during the defense case in chief.  Consistent with Officer Totaro's testimony, Mr. Urrutia-Chavez explained that seeing and hearing police sirens would have changed the way he drove on the night of the collision.  Trial Tr. Nov. 30, 2022 a.m. at 22:3-9. He explained that, ordinarily, he slows down and moves to the side of the road when he sees police vehicle lights and hears sirens.  Id. at 32:21-33:2.  But, in the moments before Mr. Urrutia-Chavez collided with Mr. Hylton-Brown, he "didn't see any lights" or "see any police."  Id. at 33:6-7.

explained that a majority of the vehicle training that officers receive centers on MPD General Order 301.03 on Vehicular Pursuits.  Trial Tr. Nov. 15, 2022 p.m. at 34:22-25; id. at 76:7-13; see generally Gov't Ex. 401-D (MPD General Order 301.03 on Vehicular Pursuits).  Officer Totaro and Officer Tejera both testified that, consistent with General Order 301.03, MPD officers generally can only pursue a person in or on a vehicle who is suspected of a felony offense.  See Trial Tr. Nov. 2, 2022 p.m. at 37:23-39:9 (Tejera testimony); Trial Tr. Nov. 15, 2022 a.m. at 78:16-80:13 (Officer Totaro testified that officers are taught that they need probable cause that a person committed a felony and to believe that the fleeing suspect is a danger to public safety before engaging in a vehicle pursuit); see also Gov't Ex. 401-D at 2-4.

The government's evidence also established that MPD officers generally do not give chase to people only suspected of committing traffic violations.  See Trial Tr. Nov. 17, 2022 a.m. at 104:1-5 (Captain Porter testified that, if someone asked to pursue a suspect for traffic violations, he would tell that officer "come and see me in the captain's office, okay, because I guarantee you that officer knows that we're not going to approve that chase"); Trial Tr. Nov. 8, 2022 p.m. at 34:15-35:10 (Officer Arnone testified that she would not conduct a vehicular pursuit for a misdemeanor offense or a traffic offense such as operating a moped without a helmet).

The MPD pursuit policy instructs officers to "conduct an investigation of the incident and obtain a warrant" when a "fleeing suspect has committed an offense for which a vehicular pursuit is not authorized."  Gov't Ex. 401-D at 5; see Trial Tr. Nov. 2, 2022 p.m. at 39:16-23 (Officer Tejera discussing General Order 301.03); Trial Tr. Nov. 15, 2022 a.m. at 90:24-92:2 (Officer Totaro explained that she instructs officers to get warrants for fleeing suspects who have committed offenses for which pursuits are not authorized).  One of the

policy's "rules" is that officers must "notify the dispatcher and discontinue the pursuit when unsafe conditions exist or it becomes apparent that the vehicular pursuit could result in an accident, property damage, or injury to citizens."  Gov't Ex. 401-D at 3.  The policy also provides that officers pursuing suspects must "[i]mmediately notify the dispatcher" when a pursuit begins and "[m]aintain constant communications with the dispatcher as the pursuit progresses."  Id.

### c.  Testimony of Robert Drago

The government also presented expert testimony from Robert Drago, a retired law enforcement officer and owner of the consulting company Eye to Eye.  Trial Tr. Nov. 3, 2022 p.m. at 55:1-25.  Mr. Drago testified as an expert in police training and national model police practices, procedures, and policies.  Id. at 82:10-12.  Mr. Drago explained that in his opinion, "the responsibility" for the consequences of a particular vehicle pursuit "is ultimately on law enforcement because they have the training, they have the knowledge, not the person [the officer is] pursuing."  Trial Tr. Nov. 3, 2022 p.m. at 104:3-18.

Mr. Drago explained that a number of considerations should factor into an officer's decision about whether and how to engage in a vehicular pursuit.  Officers should consider, for example, the weather conditions during the pursuit and the population density of the area where a pursuit would occur.  Trial Tr. Nov. 3, 2022 a.m. at 101:7-102:23.  Mr. Drago also explained that an officer should consider "the performance ability" of the vehicle that is being pursued – for instance, an officer's decisions about whether and how to pursue a sports car would be different from that officer's decisions about whether and how to pursue a car that "should have been junked a year ago."  Id. at 103:1-21.  When asked about vehicular pursuits of people on scooters, Mr. Drago explained that, "[t]he driver of the scooter obviously is going to

have less safety equipment, you know, and probably [would be] at greater danger for greater injury."  Id. at 103:22-104:2.

Mr. Drago walked through General Order 301.03 and explained that the MPD pursuit policy is similar to the national model policy in several ways.  He explained that the MPD pursuit policy requires that officers suspect that a fleeing motorist has committed a violent felony and poses an immediate, serious risk to public safety before a pursuit can begin.  Trial Tr. Nov. 3, 2022 p.m. at 115:8-116:7.  Like the model national policy, the MPD policy also requires that a pursuing officer "activate all emergency equipment" during a chase.  Id. at 119:11-16; see Trial Tr. Nov. 15, 2022 a.m. at 93:10-19 (Officer Totaro explained that MPD teaches and tests on the requirement to have all emergency equipment activated during a pursuit).  And, consistent with the national standard, the MPD policy provides that a pursuit "shall be terminated" when the fleeing motorist is identified, "so that a warrant can be obtained for his or her arrest."  Trial Tr. Nov. 3, 2022 p.m. at 122:2-18.  Mr. Drago also testified that MPD training regarding vehicular pursuits instructs officers not to chase fleeing suspects into places where they "have no area of escape."  Trial Tr. Nov. 3, 2022 p.m. at 132:4-14; see Gov't Ex. 413-I (MPD vehicle skills training PowerPoint); Trial Tr. Nov. 15, 2022 p.m. at 17:11-14 (Officer Totaro testified, "You should never block . . . a path where they could escape.").

*C.  The Government Met Its Burden as to Second Degree Murder*

1.  Malice Aforethought

The government was required to prove that Mr. Sutton acted with malice; that is, that he acted with conscious disregard of an extreme risk of death or serious bodily injury.  See Jury Instructions at 27.  The government's evidence was sufficient to establish this element of second degree murder.

The government introduced ample evidence of Mr. Sutton's subjective knowledge and training about vehicular pursuits, such that a reasonable jury could have concluded that his actions demonstrated "a wanton and willful disregard of an unreasonable human risk." Comber v. United States, 584 A.2d at 39. Officer Totaro explained in great detail how officers – including Mr. Sutton – are trained to exercise due regard and prioritize the safety of others whenever they are behind the wheel. Several witnesses explained that an MPD officer should never chase a suspect for traffic violations, and Officers Totaro and Tejera both explained that it would be easier to get a warrant for the fleeing person instead of engaging in a pursuit. The government's evidence also made clear that Mr. Hylton-Brown was not suspected of any violent crime or possession of a weapon, and that Mr. Sutton was aware that Mr. Hylton-Brown was riding the moped without a helmet. Officer Totaro and Mr. Drago also testified that a police vehicle's lights and sirens must be consistently activated during a chase to ensure that other people in the area are aware of police presence and can respond appropriately. And, about a year and a half before this incident, Mr. Sutton received an official reprimand for failing to comply with MPD's general order on vehicular pursuits. This reprimand letter restated important aspects of the MPD vehicular pursuit policy.

Despite Mr. Sutton's training, experience, and knowledge of MPD policy, Mr. Sutton continued to pursue Mr. Hylton-Brown through the residential neighborhood for several minutes, making multiple turns and reaching speeds up to forty-five miles per hour to keep Mr. Hylton-Brown in view of the CST vehicle. Mr. Sutton followed Mr. Hylton-Brown into an alleyway, where he turned off the CST vehicle's emergency lights and sirens. Based on these facts, a jury was entitled to infer that Mr. Sutton was subjectively aware that his actions placed Mr. Hylton-Brown, who rode a moped without a helmet, at "a serious risk of death or serious

bodily harm."  Comber v. United States, 584 A.2d at 39 (quoting Logan v. United States, 483

A.2d at 671); see Jennings v. United States, 993 A.2d at 1080.

Mr. Sutton makes several arguments about why the government's evidence was

insufficient to establish that he acted with malice.  He first argues that no rational juror could

conclude that he violated General Order 301.03 on Vehicular Pursuits for a variety of reasons:

the CST vehicle's speed had "nothing to do with compliance with the general order"; Mr.

Zabavsky authorized the pursuit by calling it a "chase" over the Ops radio channel; the general

order does not require officers to consider the safety of fleeing suspects; and, because Mr.

Hylton-Brown was not a "fleeing felon," Mr. Sutton's chase was not technically a "pursuit" as

that term is defined in the general order.  See Sutton Mot. at 14-15.  As the government argues,

Mr. Sutton's assertions on this score fail to consider the evidence in the light most favorable to

the government, as the Court must on a motion under Rule 29.  See Gov't Opp. at 11 n.4; see

also United States v. Kayode, 254 F.3d at 212-13; United States v. Borda, 848 F.3d 1044, 1055

(D.C. Cir. 2017).  Although the jury could have concluded that Mr. Sutton did not violate the

general order, it was also reasonable for the jury to conclude, based on the government's

evidence, that Mr. Sutton did violate the general order:  Mr. Sutton failed to keep his emergency

lights and sirens turned on; he began his pursuit of Mr. Hylton-Brown when Mr. Hylton-Brown

had only committed minor traffic offenses; and he neglected to broadcast his pursuit over the

main radio channel.  Mr. Sutton's argument that no reasonable juror could have concluded that

he violated General Order 301.03 on Vehicular Pursuits is not persuasive.

Mr. Sutton next argues that the government's only evidence of malice is his

alleged noncompliance with the General Order 301.03 on Vehicular Pursuits, and that this

evidence is necessarily insufficient to establish malice.  He asserts that "[t]he government's

entire case . . . was focused exclusively on its contentions that Ofc. Sutton violated the MPD

General Policy on Pursuits.  There is no other evidence of 'depraved heart malice' in this case."

Sutton Mot. at 17; see June 5, 2023 Hearing Tr. at 7:24-8:4 ("[T]he question is whether outside

of the evidence of vehicular pursuit, whether the government has any independent evidence at all

in what they describe as the conduct of Officer Sutton that, as a matter of law, would be

sufficient to support either component of depraved heart malice.").  Because the government

only presented evidence relating to whether Mr. Sutton violated the general order, Mr. Sutton

argues, the government's evidence was necessarily insufficient to establish that he acted with

malice, as the jury was prohibited from relying solely on evidence that Mr. Sutton violated the

general order when determining guilt.  See Sutton Mot. at 13, 17-18; Sutton Reply at 5-6.  To

prove its case, Mr. Sutton contends, the government must present evidence of depraved heart

malice that is "independent of violations of MPD General Orders."  Sutton Reply at 5.

   In admitting MPD General Orders, including General Order 301.03, as evidence

of Mr. Sutton's state of mind, the Court instructed the jury that:

> The government has introduced evidence regarding certain MPD
> general orders.  And one in particular is the MPD general order on
> vehicular pursuits.  The MPD general orders set internal policy for
> the Metropolitan Police Department.  The general orders are not
> laws.  Their provisions are administered exclusively by the
> Metropolitan Police Department.
>
> It is up to you whether to accept or reject the evidence that you
> heard, and any testimony from any witnesses about the Metropolitan
> Police Department general order on vehicular pursuits.  If you find
> when you deliberate that one or more of the officers on trial violated
> this general order, you may consider the general order as only one
> factor in deciding whether the defendants had the necessary mental
> state or state of mind underlying the crimes charged.

> <u>You may not find either defendant guilty of anything merely because they violated the general order</u>, if you conclude that they did violate the general order.

Jury Instructions at 17 (emphasis added).

Mr. Sutton is correct that evidence that he violated General Order 301.03 on Vehicular Pursuits is not sufficient, by itself, to prove that he acted with malice – as the jury was instructed. <u>See</u> Jury Instructions at 17. But Mr. Sutton is incorrect that the government's <u>only</u> evidence of malice was his noncompliance with General Order 301.03. The government presented evidence about national policing standards through the expert testimony of Robert Drago and evidence about MPD vehicle skills training through the expert testimony of Carolyn Totaro. Although both Mr. Drago and Officer Totaro discussed General Order 301.03, their testimony provided additional evidence for the jury to consider when determining whether Mr. Sutton acted with malice. Mr. Drago, for example, discussed the weather and vehicle conditions that should factor into an officer's decision to engage in a vehicular pursuit. Officer Totaro provided the jury with additional context for why officers must abide by the rules and regulations provided in General Order 301.03, and after watching Mr. Sutton's body worn camera footage, she explained that she would instruct an officer in Mr. Sutton's position to "let it go" rather than continue the pursuit. <u>See</u> Trial Tr. Nov. 15, 2022 p.m. at 57:13. Officer Totaro also testified at length about the principle of "due regard" and that MPD officers are trained to prioritize safety and accident avoidance. The jury was therefore able to rely on evidence independent of the violation of General Order 301.03 when deliberating.

The Court also disagrees with Mr. Sutton's assertion that a judgment of acquittal is required because the government failed to present evidence that was "independent" of his conduct that potentially violated MPD General Orders. <u>See</u> Sutton Reply at 5. Mr. Sutton

contends that the government's evidence was necessarily insufficient to prove malice because "the government's entire case was based on evidence and argument that Ofc. Sutton violated MPD General Orders," which is insufficient on its own to establish guilt.  See Sutton Mot. at 4; Sutton Reply at 4.  As just discussed, the jury was able to find based on the government's evidence that Mr. Sutton violated General Order 301.03.  But whether Mr. Sutton violated this policy is not the central issue here.  The government appropriately used the standards set forth in General Order 301.03 – and evidence of the training that Mr. Sutton received about vehicular pursuits more broadly – to establish Mr. Sutton's subjective awareness of the level of risk that attended his decision to follow a motorist who wore no helmet, in a city environment, at night, without the consistent use of emergency lights and sirens, and at relatively high speeds.  See June 5, 2023 Hearing Tr. at 58:22-59:7 (government counsel argued that the "MPD general orders tell the jury that [Mr. Sutton] was on notice [of] ways in which he was to behave").  The government also introduced substantial evidence about Mr. Sutton's conduct – his actions, choices, and the circumstances in which he made those choices.  Just because his conduct was "part and parcel of the chase" that could be considered a violation of MPD policy does not make such evidence insufficient as a matter of law to establish malice.  See Sutton Reply at 5.

Relatedly, Mr. Sutton argues that the government's evidence was insufficient to prove malice because the "rules" and "regulations" contained in General Order 301.03 are "discretionary" and "subjective" guidelines.  Sutton Mot. at 16; Sutton Reply at 7-8; see Gov't Ex. 401-D (MPD General Order 301.03 on Vehicular Pursuits) at 1-3.  He maintains that this case is analogous to United States v. Wood, 207 F.3d 1222 (10th Cir. 2008).  There, a medical doctor, Dr. Wood, was prosecuted for second degree murder following the death of a patient who had been "drowning" from "excess fluid in his lungs."  Id. at 1227.  Believing the patient's

condition to be life-threatening, Dr. Wood administered potassium chloride to the patient in an amount and at a pace that exceeded hospital policies.  Id. at 1230, 1232.  The Tenth Circuit held that the district court erred by denying Dr. Wood's motion for judgment of acquittal as to second degree murder.  Id. at 1229.  According to Mr. Sutton, the Tenth Circuit "concluded that the standard of care applicable to the circumstances allowed for a range of justifiable medical judgments," and therefore it was inappropriate to send a charge of second degree murder to the jury.  Sutton Reply at 7-8.  Analogously, Mr. Sutton argues, where MPD general orders "set a policy for policing which is discretionary and subjective," the government's theory that Mr. Sutton "violated professional standards applicable to MPD officers" is insufficient to prove malice as a matter of law.  Id. at 8.

The Tenth Circuit's opinion in United States v. Wood, however, is inapposite. The court in Wood found the facts of that case insufficient to support an inference of malice because:

> Dr. Wood's treatment of [the patient] involved a choice between several courses of action, some of which were more risky, but perhaps more efficacious, than others.  A physician cannot be convicted of murder simply for adopting, in an emergency setting, a risky course of action intended to prolong life that, when carried out, fails to forestall or even hastens death.  Instead, to permit a charge of murder with malice aforethought to go to the jury, that choice must be not only a gross deviation from a reasonable standard of care, but also extremely reckless and wanton.  Dr. Wood's good-faith efforts at treatment simply do not rise to the "extreme" disregard for human life necessary to satisfy the malice aforethought standard.

United States v. Wood, 207 F.3d at 1232 (internal citations omitted).

Unlike Dr. Wood, Mr. Sutton was not responding to a life-threatening emergency. The government's evidence made clear that Mr. Hylton-Brown was not suspected of a violent crime or possessing a firearm; he was being stopped for a traffic violation, and pursued, at best,

for failing to pull over.  Mr. Sutton's decision to chase him through the neighborhood and through a narrow alley was not "a choice between inherently risky courses of action undertaken in a good faith effort to prolong the victim's life." Id. at 1233.  Although Mr. Sutton may be correct that the general orders are "guidelines for officers subject always to the exercise of discretion," see Sutton Mot. at 16, the fact that the MPD general orders require police officers to make judgment calls does not mean that the general orders may not be relevant evidence of Mr. Sutton's subjective awareness of potential risks to human life.  A person may have discretion to make a number of choices that constitute reasonable decisions consistent with the appropriate standard of care.  It is only when a person's choice "amount[s] to the extremely reckless and wanton disregard for life" that such an exercise of discretion can be said to "grossly deviate" from the standard of care.  United States v. Wood, 207 F.3d at 1232-33.  Unlike in United States v. Wood, it was reasonable for the jury in this case to conclude that Mr. Sutton's conduct "display[ed] an extreme disregard for the wellbeing of others" based on the evidence the government presented.  Id. at 1233.

       To prove that Mr. Sutton acted with malice, the government was required to establish that Mr. Sutton acted with a "depraved heart," meaning that he was "subjectively aware that his . . . conduct create[ed] an extreme risk of death or serious bodily injury." Jennings v. United States, 993 A.2d at 1080 (quoting Comber v. United States, 584 A.2d at 39); see July Mot. to Compel Op. at *2.  As the Court has explained:

> Whether a particular defendant acted with a "depraved heart" "may be shown by a 'gross deviation from a reasonable standard of care' or by other acts that may lead the finder of fact to determine that the 'defendant was aware of a serious risk of death or serious bodily harm.'" Jennings v. United States, 993 A.2d at 1080 (quoting Comber v. United States, 584 A.2d at 39).

July Mot. to Compel Op. at *3 (emphasis added).  See Jury Instructions at 27; Answer to Jury Note 01 [Dkt. No. 421] ("The government must prove beyond a reasonable doubt that Mr. Sutton acted with a reckless and wanton disregard for human life that was extreme in nature, and that Mr. Sutton was aware that his conduct created an extreme risk of death or serious bodily injury.").

The jury was tasked with determining whether Mr. Sutton's familiarity with MPD policies, his general training and experience, and his awareness that Mr. Hylton-Brown was not wearing a helmet made him subjectively aware that pursuing Mr. Hylton-Brown in the manner that he did would create an extreme risk of death or serious bodily injury and whether he acted with conscious disregard of that risk.  It was not unreasonable for the jury to conclude, based on the evidence presented by the government, that Mr. Sutton was consciously, subjectively aware of the extreme risk to Mr. Hylton-Brown, and that he chose to disregard that risk when he chased Mr. Hylton-Brown down the alleyway in a manner inconsistent with MPD training and policies.  Because the government was able to establish malice by showing that Mr. Sutton acted with conscious disregard of an extreme risk of death or serious bodily injury, whether the MPD General Order on Vehicular Pursuits provides a "definitive professional standard" is not dispositive.  See Sutton Reply at 8.

2.  Causation

As Officer Tejera's body worn camera footage depicted, Mr. Sutton attempted to initiate a traffic stop on Mr. Hylton-Brown, who did not comply.  Mr. Sutton then pursued Mr. Hylton-Brown for at least two minutes.  Mr. Sutton followed Mr. Hylton-Brown into an alleyway, where Mr. Sutton turned off his emergency lights and sirens; only seconds before the collision, Mr. Sutton accelerated.  Absent Mr. Sutton's decision to pursue, Mr. Hylton-Brown

would not have died.  See June 5, 2023 Hearing Tr. at 53:7-8 (government counsel arguing that, "[a]bsent that pursuit, Mr. Hylton-Brown would be here today"); Fleming v. United States, 224 A.3d at 221 ("[T]he actual-cause requirement means that . . . if one subtracted the defendant's actions from the chain of events, the decedent would not have been killed.").  These facts are sufficient for a reasonable jury to have concluded that Mr. Sutton was the but-for cause of Mr. Hylton-Brown's death.  See Jury Instructions at 29 (defining "but-for cause" and "proximate cause").

   As to proximate cause, it was also reasonable for the jury to find that the government had proved beyond a reasonable doubt that Mr. Sutton's conduct bore a close connection to Mr. Hylton-Brown's death.  The government argues, and the Court agrees, that the jurors saw evidence of proximate causation:  they "saw and heard how in the final ten seconds of the chase, Defendant Sutton followed Hylton-Brown into a narrow alley, turned off his lights and sirens, and accelerated."  June 5, 2023 Hearing Tr. at 53:10-13.  The government also presented testimony from Officer Totaro about how police must keep their lights and sirens on to alert other people, including other drivers, to the presence of police.  Based on this evidence, and with all inferences being drawn in favor of the government, a reasonable jury could conclude that Mr. Hylton-Brown's death was not a "mere fortuity."  Paroline v. United States, 572 U.S. at 445.

   Evidence of Mr. Sutton's training and experience also supports a finding of proximate cause.  Mr. Sutton was familiar with Mr. Hylton-Brown and the Kennedy Street neighborhood.  He had been trained to keep his emergency lights and sirens turned on whenever stopping or pursuing a suspect, to ensure that other drivers are aware of and can account for police activity.  It was not unreasonable for the jury to conclude that it was "reasonably foreseeable" to Mr. Sutton that Mr. Hylton-Brown would be seriously injured as a result of being

41

chased on a moped, without a helmet, through the city's streets at nighttime – particularly given the lack of consistent police lights and sirens.  See Fleming v. United States, 224 A.3d at 225. Notwithstanding evidence and testimony about how far Mr. Sutton's vehicle was from the site of the collision, see Trial Tr. Dec. 9, 2022 p.m. at 40:10-18, the government's evidence was sufficient to establish both but-for and proximate causation.

Mr. Sutton argues that no reasonable juror could find beyond a reasonable doubt that he caused Mr. Hylton-Brown's death because "the cause of the collision was the conduct of Hylton-Brown himself."  Sutton Mot. at 18-19; see Trial Tr. Nov. 21, 2022 p.m. at 25:11-13 (defense counsel argued that Mr. Hylton-Brown's death was caused by "an entirely voluntary act by Karon Hylton-Brown").  He suggests that Officer Tejera's body worn camera footage shows Mr. Hylton-Brown "look to his left in the direction of the oncoming Scion" and "brake twice and turn to the left, at the last second turning a bit more to the left to avoid the oncoming Scion." Sutton Reply at 12.  This argument is one for the jury, not for the Court on a motion for judgment of acquittal.  As the Court has explained, District of Columbia law allows for a person to be held "criminally responsible for causing a death even though the death would not have occurred but for the reasonably foreseeable intervening acts of another."  Fleming v. United States, 224 A.3d at 225.  A jury certainly could have determined that Mr. Hylton-Brown's own actions attenuated the connection between his death and Mr. Sutton's conduct.  But this conclusion is not required as a matter of law, and based on the evidence the government presented at trial, a reasonable juror could find that Mr. Sutton was both the actual and proximate cause of Mr. Hylton-Brown's death.

Mr. Sutton also contends that the government's framing of the evidence – that Mr. Sutton "flushed" Mr. Hylton-Brown into Kennedy Street, where he was struck and killed by

another vehicle – was "not charged in the indictment" and therefore should not be permitted to support the verdict.  Sutton Reply at 10; see Indictment ¶ 29 (alleging that Mr. Sutton "caused a traffic collision from which Hylton-Brown sustained injuries and died").  The Court is not persuaded.  A reasonable jury could conclude that Mr. Sutton caused Mr. Hylton-Brown's death by flushing him out of the alleyway.  Furthermore, as the Court instructed the jury, "statements and arguments of the lawyers . . . are not evidence."  See Jury Instructions at 6.  It is immaterial to the Court's inquiry on a Rule 29 motion whether the government's "flushing" rhetoric appeared in the indictment.  As long as the government's evidence was sufficient to establish both actual and proximate causation, the Court may not enter a judgment of acquittal merely because of the rhetoric used to describe Mr. Sutton's conduct in the arguments of government counsel.

Finally, Mr. Sutton argues that the causation instruction given to the jury amounts to a directed verdict, as it instructed the jury to conclude that Mr. Hylton-Brown's fatal injury was "inflicted by a third party."  Sutton Reply at 13-15 (quoting Jury Instructions at 29).  The jury instructions state, in relevant part, that "[t]here is evidence in this case that defendant Sutton did not personally inflict Mr. Hylton-Brown's fatal injury and that Mr. Hylton-Brown's fatal injury was inflicted by a third party."  Jury Instructions at 29.  Mr. Sutton argues that this instruction "meant that the jury was to disregard Hylton-Brown's conduct as the cause of his own death."  Sutton Reply at 14.  As previously noted, "motions for an acquittal based on insufficient evidence cannot depend on jury instructions."  United States v. Khatallah, 41 F.4th at 626.  This argument is not appropriately raised in Mr. Sutton's motion for judgment of acquittal and is more appropriately addressed in Mr. Sutton's Rule 33 motion.  See id. ("[I]t does not matter for [a defendant's] sufficiency of the evidence challenge if the jury was provided with

an erroneous path to a guilty verdict . . . as long as a properly instructed jury had enough evidence for conviction.").

The government presented substantial evidence that Mr. Sutton was consciously aware of an extreme risk to human life when he chased Mr. Hylton-Brown, but that he disregarded that risk and continued a pursuit in violation of MPD trainings and policies. His motion for judgment of acquittal as to second degree murder is denied.

## IV.  COUNT THREE AND COUNT TWO: OBSTRUCTION OF JUSTICE AND CONSPIRACY TO OBSTRUCT JUSTICE

### A.  Elements of the Offenses

#### 1.  Obstruction of Justice

The obstruction of justice statute makes it a crime to "engage[] in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense."  18 U.S.C. § 1512(b)(3).

The Court explained to the jury that the government must prove the following elements of obstruction of justice beyond a reasonable doubt:

1. The defendant engaged in misleading conduct, or attempted to do so, toward another person – in this case, other officials of the Metropolitan Police Department; and
2. The defendant acted knowingly; and
3. The defendant acted with the specific intent to hinder, delay or prevent the communication of information; and
4. It was reasonably likely that the information would have been communicated to a law enforcement officer of the United States; and
5. That the information related to the commission or the possible commission of a federal offense.

Jury Instructions at 30.  The Court further instructed the jury that:

"Misleading conduct" includes

44

> (1)   knowingly making a false statement;
> (2)   intentionally omitting information from a statement and thereby causing a portion of such statement to be misleading;
> (3)   intentionally concealing a material fact, and thereby creating a false impression by such statement;
> (4)   with the intent to mislead, knowingly submitting or inviting reliance on a writing that is false; or
> (5)   knowingly using a trick, scheme, or device with intent to mislead.

> "Specific intent" means that the defendant did so voluntarily, on purpose, and not by mistake or accident.

Jury Instructions at 30-31. Finally, the Court explained:

> Because the statute explicitly refers to the possible commission of a federal offense, the government need not prove that any person was actually guilty of any underlying federal offense.

Jury Instructions at 31.[7]

The first three elements of the obstruction of justice offense are relatively

straightforward. "Misleading conduct" is defined by statute. See 18 U.S.C. § 1515(a)(3).

---

[7]   The Court also instructed the jury that "the government further alleges that the defendants aided and abetted each other in committing Obstruction of Justice," and that both Mr. Sutton and Mr. Zabavsky could be found guilty of that offense if they "intentionally participate[d] in the commission of [the] crime" even if they did not "personally commit[] each of the acts that make up the crime." Jury Instructions at 32. The Court instructed that, for a conviction based on aiding and abetting, the jury must find that either Mr. Sutton or Mr. Zabavsky

> . . . knowingly associated himself with the commission of the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed. Some affirmative conduct by the defendant in planning or carrying out the crime is necessary. Mere physical presence by a defendant at the place and time the crime is committed is not by itself sufficient to establish his/her guilt. However, mere physical presence is enough if it is intended to help in the commission of the crime. It is not necessary that you find that the defendant was actually present while the crime was committed.

Jury Instructions at 32.

Section 1512(b)(3)'s knowledge element requires that a person knows that his or her conduct toward another person is misleading.  See United States v. Brown, 934 F.3d 1278, 1301 (11th Cir. 2019) (affirming denial of motion for judgment of acquittal where "a reasonable jury could have found that [the defendant's] statements and omissions were knowingly misleading"); United States v. Carson, 560 F.3d 566, 580 (6th Cir. 2009) ("[T]o obtain a conviction for obstruction of justice under 18 U.S.C. § 1512(b)(3), the government must prove that the defendant . . . knowingly and willfully engaged in misleading conduct toward another person."). And Section 1512(b)(3)'s specific intent element requires the government to prove that a person had the purpose of hindering, delaying, or preventing some communication of information to federal law enforcement.  See, e.g., United States v. Hertular, 562 F.3d 433, 443-44 (2d Cir. 2009) ("On this record, a reasonable factfinder could easily have concluded that . . . [the defendant's] specific intent was to hinder or prevent not simply the filing of an indictment but any communication to or among federal law enforcement officials that could lead to his indictment."); United States v. Brown, 934 F.3d at 1300-01 (a reasonable jury could have found that the defendant intended to hinder federal law enforcement officers where the evidence established that he provided misleading statements during an interview with federal investigators).

Mr. Sutton and Mr. Zabavsky's primary focus is on the fourth and fifth elements of obstruction of justice.  The fourth element requires that a federal law enforcement officer be the potential recipient of some communication, and the fifth element requires that the information potentially communicated relates to the commission or possible commission of a federal offense.  The defendants refer to these elements as the "federal nexus," which the government must prove for a person's conduct to constitute federal obstruction of justice.

The Supreme Court's decision in Fowler v. United States, 563 U.S. 668 (2011), elucidates the fourth element of Section 1512.  There, the Court explained that a person does not need to know that a law enforcement officer is a federal officer for their conduct to fall within the bounds of Section 1512(a)(1)(C), which prohibits witness tampering.  Id. at 677-78; see United States v. Johnson, 874 F.3d 1078, 1081 (9th Cir. 2017) (Fowler "applies with equal force to § 1512(b)(3)," obstruction of justice, which shares "the same fundamental purpose and scope as subsection (a)(1)(C)").  The fourth element is satisfied where it is "reasonably likely under the circumstances that . . . at least one of the relevant communications would have been made to a federal officer."  Fowler v. United States, 563 U.S. at 678; see United States v. Snyder, 865 F.3d 490, 496 (7th Cir. 2017) ("[Section] 1512 requires showing a reasonable likelihood" of a communication to "a federal officer, not a state or local officer"); United States v. Ring, 628 F. Supp. 2d 195, 219 (D.D.C. 2009) ("[T]he government need only show that 'the misleading information' was 'likely to be transferred to a federal agent.'") (quoting United States v. Veal, 153 F.3d 1233, 1251 (11th Cir. 1998), rev'd on other grounds by Fowler v. United States, 563 U.S. at 678.  See also United States v. Ronda, 455 F.3d 1273, 1288 (11th Cir. 2006) (Section 1512(b)(3) "criminalizes the transfer of misleading information" (quoting United States v. Veal, 153 F.3d at 1252)).

The fifth element of obstruction of justice requires that the information at issue – the communication of which a defendant intends to hinder, prevent, or delay – relates to some possible federal offense.  See 18 U.S.C. § 1512(b)(3).  Section 1512(b)(3) "does not require that a defendant know the federal nature of the crime" so long as the "misleading information . . . actually relates to a potential federal offense."  United States v. Veal, 153 F.3d at 1252; see United States v. Chafin, 808 F.3d 1263, 1273-74 (11th Cir. 2015).  The statute "applies only to

obstructive behavior that the defendant knows could impede an investigation into conduct that could constitute a federal crime at the time of its commission," though it "does not require that the defendant specifically know that the underlying conduct could constitute a federal offense." United States v. Bailey, 405 F.3d 102, 109 (1st Cir. 2005); id. at 109 n.3; see United States v. Snyder, 865 F.3d at 494 ("The statute does not require proof that the defendant knew the federal status of the officer or underlying proceeding."). See also United States v. Rodriguez-Marrero, 390 F.3d 1, 13 (1st Cir. 2004) (it is "irrelevant" for the purpose of Section 1512 that a person "did not realize that he was helping to conceal a federal crime"); United States v. Hawkins, 185 F. Supp. 3d 114, 124-25 (D.D.C. 2016) (enumerating the elements of obstruction of justice).

During litigation of the pretrial motions in this case, this Court held that the fifth element of Section 1512(b)(3) required the government to "prove 'the possible existence of a federal crime and a defendant's intention to thwart an inquiry into that crime.'" Bill of Particulars Op. at *8 (quoting United States v. Ring, 628 F. Supp. 2d at 200); see id. ("Thwarting an investigation before it can begin is sufficient."). The Court further explained that "the prosecution is not conditioned on a federal civil rights investigation or federal civil rights prosecution ever coming into existence." Mot. to Dismiss Oral Ruling at 28:20-23; see April Mot. to Compel Op. at *7 ("By its own terms, the statute criminalizes obstructing the transmission of information about an actual or potential federal offense.").

Thus, the fifth element of obstruction of justice – commission or possible commission of a federal offense – does not require that the government prove that a federal offense actually has occurred, nor does it require that a federal offense has been in fact investigated or charged. As the Court has explained, the obstruction of justice statute "does not require that any federal civil rights investigation actually have occurred, let alone that the

existence of one be pled in the indictment.  Rather, the government need only prove 'the <u>possible</u> existence of a federal crime.'"  Bill of Particulars Op. at *8 (quoting <u>United States v. Ring</u>, 628 F. Supp. 2d at 220); <u>see</u> April Mot. to Compel Op. at *7; Mot. to Dismiss Oral Ruling at 26:21-27:1.

   This Court's prior rulings are consistent with decisions from courts of appeals. When it comes to the <u>possible</u> federal offense underlying a Section 1512(b)(3) charge, the First Circuit has explained that "the dispositive issue is the federal character of the investigation, not guilty verdicts on any federal offenses that may be charged."  <u>United States v. Baldyga</u>, 233 F.3d 674, 681 (1st Cir. 2000).  The Third Circuit has held that guilt under Section 1512(b)(3) "does not depend on the existence or imminency of a federal investigation but rather on the possible existence of a federal crime."  <u>United States v. Guadalupe</u>, 402 F.3d 409, 411 (3d Cir. 2005).  The Fourth Circuit has rejected the argument that the government failed to satisfy the federal offense element of Section 1512 where a person's underlying offense was ultimately prosecuted as a state crime, concluding that "the fact that the underlying crime could have been prosecuted under both state and federal law" did not preclude prosecution under Section 1512. <u>United States v. Ramos-Cruz</u>, 667 F.3d 487, 498 (4th Cir. 2012).  And the Second Circuit has similarly rejected a defendant's attack on his Section 1512(b)(3) conviction because his ultimate conspiracy prosecution was "a classic state case consisting of classic state charges."  <u>United States v. Veliz</u>, 800 F.3d 63, 74 (2d Cir. 2015).  Where there is a <u>possible</u> federal offense, it is irrelevant under Section 1512(b)(3) that the crimes could also be pursued by state prosecutors or that the underlying offense is never prosecuted at all.  <u>Id.</u>

2.  Conspiracy

To prove a conspiracy, the government must establish that a person (1) "enter[ed] into an agreement with at least one other person to commit a specific offense"; (2) that the person "knowingly participate[ed] in the conspiracy with the intent to commit the offense"; and (3) that at least one member of the conspiracy has committed "at least one overt act . . . in furtherance of the conspiracy."  United States v. Smith, 950 F.3d 893, 895 (D.C. Cir. 2020) (quoting United States v. Gatling, 96 F.3d 1511, 1518 (D.C. Cir. 1996)); see Ocasio v. United States, 578 U.S. 282, 287 (2016) ("[T]he fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense.'") (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)).  An agreement may be "inferred from the facts and circumstances of the case."  Iannelli v. United States, 420 U.S. 770, 777 n.10 (1975).

The Court gave the following jury instructions explaining the elements of conspiracy:

1.  That Terence Sutton and Andrew Zabavsky agreed to commit the crime of Obstruction of Justice. . . .
2.  That Terence Sutton and Andrew Zabavsky intentionally joined in that agreement. . . . [and]
3.  That at least one of the defendants did something for the purpose of carrying out the conspiracy.  This something is referred to as an overt act.

Jury Instructions at 33-34.  The Court provided the jury with an appendix of alleged overt acts, see id. at 36-38, and instructed the jury that it had to unanimously agree on one or more specific overt acts that were committed.  Id. at 34.  The jury unanimously found that the government proved beyond a reasonable doubt Overt Act Thirteen, which stated:

At the Fourth District police station, Sutton and Zabavsky met with the Watch Commander, the senior-most official in charge, and provided him with a misleading account of the incident:

    a. Sutton and Zabavsky portrayed the incident as a brief attempted traffic stop from which a moped driver took off and was then hit by a vehicle;

    b. Sutton minimized his conduct, saying that he did not engage in a vehicular pursuit;

    c. Zabavsky said that he did not know if Sutton had engaged in a vehicular pursuit;

    d. Zabavsky withheld information concerning his own involvement in the pursuit;

    e. Zabavsky said that Hylton-Brown had been drunk and had been slurring his words; and,

    f. Sutton and Zabavsky withheld all information about Hylton-Brown's serious injuries.

Jury Instructions at 37-38; see Verdict Form [Dkt. No. 426] at 2.

## B. Facts Established at Trial

### 1. The Pursuit

In addition to the facts described above, the government produced ample evidence at trial in support of the obstruction of justice and conspiracy counts as to both Mr. Sutton and Mr. Zabavsky.

Testimony from Officer Tejera established that Mr. Zabavsky was involved in the attempted traffic stop and pursuit of Mr. Hylton-Brown from the earliest stages of the chase. Officer Tejera explained that: "He [Mr. Zabavsky] was with us when we were following Karon. He was – for all I know, he was part of the whole incident." Trial Tr. Nov. 2, 2022 p.m. at 66:19-68:1. Similarly, Captain Porter explained that he believed, based on his conversations with Mr. Zabavsky later that night, that Mr. Zabavsky was "paralleling the chase." Trial Tr. Nov. 17, 2022 a.m. at 83:11-84:7; id. at 86:4-13 (Captain Porter believed Mr. Zabavsky was "trying to intercept the moped from a different direction"). Captain Porter also explained that he

concluded definitively that Mr. Sutton was engaged in a chase after reviewing Officer Tejera's body worn camera footage and observing that Mr. Sutton followed Mr. Hylton-Brown the wrong way down a one-way street.  Trial Tr. Nov. 17, 2022 a.m. at 79:14-80:15.

        The government also introduced evidence about MPD's policies for using the shared police radio.  Witnesses explained that all officers have access to the general Fourth District radio channel, also called the "main" channel.  See Trial Tr. Oct. 26, 2022 p.m. at 95:14-99:17 (Ricardi testimony); Trial Tr. Nov. 15, 2022 a.m. at 87:6-88:17 (Totaro testimony).  Officer Totaro explained that part of the reason why officers must broadcast their pursuits on the main channel is so that supervising officers can order that a pursuit be terminated if the pursuit is too dangerous or otherwise violates MPD policies.  Id.  Members of CST also have access to a separate radio channel, just for members of that team, which witnesses referred to as the "Ops" channel.  Id.; see Gov't Ex. 221-A (Ops channel radio recording); Gov't Ex. 221-B (Fourth District main channel radio recording).  Pursuant to MPD General Order 301.03 on Vehicular Pursuits, officers engaged in vehicular pursuits are instructed to broadcast that information over the main channel, so that everyone in the district can be aware of the pursuit's location.  See Gov't Ex. 401-D (MPD General Order 301.03 on Vehicular Pursuits) at 4; Trial Tr. Nov. 15, 2022 p.m. at 61:17-62:22 (Officer Totaro opined that using the Ops channel instead of the main channel to broadcast information about an ongoing pursuit violated General Order 301.03).

        The government's evidence indicated that Mr. Sutton and Mr. Zabavsky only communicated about the chase on the Ops channel, not on the main channel.  See Gov't Ex. 221-A (Ops channel radio recording); Trial Tr. Oct. 26, 2022 p.m. at 95:14-99:17 (Ricardi testimony); id. at 100:10-21.  On the Ops channel recording, Mr. Zabavsky can be heard saying

"We're chasing Karon on a scooter right now."  Gov't Ex. 221-A.  Mr. Sutton's voice can also

be heard on the Ops channel recording, as he broadcasted his location at various intervals during

the pursuit.  Id.  The last location Mr. Sutton announced over the Ops channel radio before the

collision was "Eighth and Jefferson."  Id.; see Trial Tr. Oct. 26, 2022 p.m. at 107:3-108:7

(Ricardi testimony).  The government's evidence suggested that at no time prior to the collision

did any of the four officers in the CST vehicle use the main channel to broadcast information

about their interaction with or pursuit of Mr. Hylton-Brown.  See Trial Tr. Nov. 17, 2022 a.m.

at 47:23-49:19 (Captain Porter testified that he first heard about this incident over the main radio

channel a little after 10:00 p.m. the night of October 23, 2020); Trial Tr. Nov. 11, 2022 p.m.

at 68:11-69:6 (Officer Al-Shrawi testified that Mr. Sutton used the Ops channel, not the main

channel, to broadcast information about the pursuit and the CST vehicle's location); see also

Gov't Ex. 221-E (transcript of the full recording of the main radio channel).

## 2.  The Crash Site

The Court admitted into evidence body worn camera footage from several officers

that captured the scene in the immediate aftermath of the collision.  Officer Tejera's body worn

camera, for example, began recording audio seconds after the collision occurred.  See Gov't

Ex. 202 (Tejera body worn camera).  As the officers – including Mr. Sutton and Mr. Zabavsky –

approached the crash site where Mr. Hylton-Brown and the moped were lying in the street, one

of the officers said, "Holy shit."  Officer Tejera approached Mr. Hylton-Brown and exclaimed,

"What the fuck, man?"  Another officer asked Mr. Hylton-Brown, "Hey, are you good?" to

which Officer Tejera responded, "No, he's bleeding heavy."  Additional officers arrived at the

scene and parked their vehicles up and down the street, activating the emergency lights and

preventing other traffic from coming through as they waited for an ambulance.  See Gov't

Ex. 202.

Body worn camera footage and testimony at trial indicated that Mr. Sutton and

Mr. Zabavsky were aware of the serious nature of Mr. Hylton-Brown's condition.  Officer

Novick and Officer Al-Shrawi, who had been seated in the backseat of the CST vehicle,

crouched near Mr. Hylton-Brown and tried to stop his bleeding.  See Gov't Ex. 201 (Novick

body worn camera); Gov't Ex. 203 (Al-Shrawi body worn camera); Trial Tr. Nov. 14, 2022 p.m.

at 43:3-8 (Novick testimony).  Officer Novick testified that at some point while he and Officer

Al-Shrawi rendered aid to Mr. Hylton-Brown, Mr. Sutton stood about a foot away.  Trial Tr.

Nov. 14, 2022 p.m. at 45:10-25.  Officer Novick also testified that Mr. Zabavsky was nearby Mr.

Hylton-Brown – standing only a foot away at times – as officers rendered aid.  Id. at 47:1-20; id.

at 49:1 (Officer Novick testified that "Lieutenant Zabavsky kind of panned" across the scene

where Mr. Hylton-Brown was); Trial Tr. Nov. 10, 2022 p.m. at 96:16-98:8 (Officer Al-Shrawi

testified that while he and Officer Novick attempted to stop Mr. Hylton-Brown's bleeding, Mr.

Zabavsky was present at the scene); see Gov't Ex. 201 (Novick body worn camera) (depicting

Mr. Zabavsky standing between two and four feet away from Mr. Hylton-Brown's body).

Mr. Sutton's body worn camera shows that Mr. Sutton exited his vehicle and

called out, "Karon!" as he walked over to where Mr. Hylton-Brown lay in the street.  See Gov't

Ex. 200 (Sutton body worn camera).  Mr. Zabavsky's body worn camera depicts Officer Novick

and Officer Al-Shrawi providing first aid to Mr. Hylton-Brown, rolling him on his side and

applying pressure to his head wound in an attempt to stop the bleeding.  Gov't Ex. 204

(Zabavsky body worn camera).  Mr. Zabavsky's body worn camera also captured audio and

video of Mr. Hylton-Brown beginning to vomit.  Id.

The government's evidence demonstrated that multiple officers assumed that Mr. Zabavsky would be in charge of managing the crash scene.  Officer Tejera explained that Mr. Zabavsky, a lieutenant, was the highest ranking official on the scene, and therefore Officer Tejera assumed that Mr. Zabavsky was in charge of the scene.  Trial Tr. Nov. 2, 2022 p.m. at 71:17-24.  Similarly, Officer Arnone believed that Mr. Zabavsky was the only senior MPD official at the crash site, and accordingly, that he would be the person ultimately responsible for managing the scene, ensuring the preservation of evidence, and notifying the Major Crash Unit and the Internal Affairs Division.  Trial Tr. Nov. 8, 2022 p.m. at 53:21-54:14.  Captain Porter explained that a superior officer on the scene of a collision such as this – where a person has serious head injuries – would be expected to "call the watch commander and basically brief them on what steps they have done so far and what information they are waiting on from the officer at the hospital to decide if they are going to notify Major Crash."  Trial Tr. Nov. 17, 2022 a.m. at 68:22-69:10.  Captain Porter testified that he was "confident that a lieutenant would make that notification" if a lieutenant were on the scene.  Id. at 69:11-18; see id. at 44:17-20 (Captain Porter testified that Mr. Zabavsky "knew general orders very well").

Other witnesses testified, however, that while at the crash site, Mr. Zabavsky did not notify senior MPD officials or the Major Crash Unit about the serious nature of Mr. Hylton-Brown's injuries.  See Trial Tr. Nov. 14, 2022 p.m. at 63:12-14 (Officer Novick did not hear anyone call the Major Crash Unit); Trial Tr. Oct. 28, 2022 p.m. at 7:2-15 (Special Agent Ricardi, who reviewed radio runs during his investigation, believed that there was no notification to the Major Crash Unit made by officers at the crash site).

Body worn camera footage shows that as Mr. Hylton-Brown was being lifted into the ambulance, a small crowd of people began to congregate near the mouth of the alleyway.

See Gov't Ex. 200 (Sutton body worn camera); Gov't Ex. 204 (Zabavsky body worn camera). Police remained on the scene, securing the crash site with police tape and trying to ensure that the people who had arrived remained calm. Mr. Zabavsky and Mr. Sutton took photos of Mr. Hylton-Brown's moped, and Mr. Zabavsky spoke with Officer Arnone, ensuring that officers had photos of the other vehicle involved in the collision – the Scion. See Gov't Ex. 200 (Sutton body worn camera); Gov't Ex. 204 (Zabavsky body worn camera). Officer Arnone told Mr. Zabavsky, "I'm assuming I'm the one who's going to be doing the report," to which Mr. Zabavsky replied, "I think Sutton's going to do it." Gov't Ex. 204 (Zabavsky body worn camera); see Trial Tr. Nov. 8, 2022 p.m. at 54:15-22, 83:17-23 (Arnone testimony). Mr. Zabavsky, while standing with Officer Arnone and Mr. Sutton, told Officer Arnone to stay at the scene and wait for the tow truck while he and Mr. Sutton went back to the Fourth District police station. Mr. Sutton and Mr. Zabavsky then walked away from the group of other officers standing at the mouth of the alleyway and both turned off their body worn cameras. See Gov't Ex. 200 (Sutton body worn camera); Gov't Ex. 204 (Zabavsky body worn camera); Trial Tr. Nov. 8, 2022 p.m. at 98:15-16 (Officer Arnone testified: "I do remember seeing Lieutenant Zabavsky and Officer Sutton talking"); Trial Tr. Nov. 2, 2022 p.m. at 99:8-13 (Officer Tejera testified that he observed Officer Sutton and Lieutenant Zabavsky standing together at the collision scene, though he never learned what transpired between them at that time).

Mr. Sutton, Mr. Zabavsky, and the other CST officers then left the scene to head back to the Fourth District police station. Mr. Sutton got back behind the wheel of the CST vehicle and drove away. Officer Arnone, who remained at the scene waiting for the tow truck, testified that she heard "crunching" as Mr. Sutton left the scene because Mr. Sutton "ran over some of the evidence" – a part of Mr. Hylton-Brown's moped. Trial Tr. Nov. 8, 2022 p.m. at

99:11-16; see Trial Tr. Nov. 10, 2022 p.m. at 102:1-2 (Officer Al-Shrawi observed "the vehicle running, going over the part [of] the scooter").  The government offered body worn camera footage depicting Mr. Sutton driving the CST vehicle away from the collision site and capturing the "crunching" noise that Officer Arnone testified about hearing.  See Gov't Ex. 202 (Officer Tejera body worn camera footage and audio); Gov't Ex. 201 (Officer Novick's body worn camera footage and audio).

### 3.  The Fourth District Police Station

Much of the government's case in chief focused on the events that occurred after Mr. Sutton, Mr. Zabavsky, and the other CST officers arrived back at the Fourth District police station following the collision.  Once there, Mr. Sutton and Mr. Zabavsky spoke with Captain Porter, their superior officer, who was on duty as watch commander that night.  In addition, Mr. Sutton drafted a "PD-10" traffic crash report, in which he described the events leading up to the collision.  See Gov't Ex. 404-F (IAD's preliminary investigation packet, which contained a copy of Mr. Sutton's draft traffic crash report).  The government also introduced evidence that Mr. Sutton was "pretty experienced" and knowledgeable about MPD protocols and procedures, see Trial Tr. Nov. 10, 2022 p.m. at 31:19-24 (Al-Shrawi testimony), and that Mr. Zabavsky had "a lot of knowledge when it comes to police work."  Trial Tr. Nov. 17, 2022 a.m. at 42:23-24 (Porter testimony).

### a.  Captain Porter

On October 23, 2020, Captain Franklin Porter was on duty as the watch commander of the Fourth District.  Trial Tr. Nov. 17, 2022 a.m. at 22:17-23 (Porter testimony).  In addition to a captain or lieutenant's ordinary responsibilities, high ranking officers also rotate

through shifts as watch commander, during which they are responsible for supervising the entire

Fourth District – monitoring the district's radio channel and responding to officers and citizens

who call in.  Id. at 26:7-27:4.  Captain Porter explained that the watch commander is responsible

for notifying higher-ups in MPD when certain circumstances arise – for instance, if there is a

shooting.  Id. at 29:9-22.  The watch commander is also expected to be "on top of just about

everything that goes on," as everything that happens while officers are on patrol is expected to

"come through" to the watch commander on duty.  Id. at 26:18-23; id. at 28:24-29:8 ("The watch

commander's phone constantly rings."); Id. at 43:4-14 (Captain Porter testified that, in his

experience working with Mr. Zabavsky, Mr. Zabavsky "would call the watch commander" "all

the time . . . [w]henever there's issues that they are dealing with, he would definitely call the

watch commander for any advice or for just giving me information that I needed").  Captain

Porter explained how Mr. Zabavsky himself had served as a watch commander on multiple other

occasions.  Id. at 43:15-44:3 (Captain Porter estimated that Mr. Zabavsky had served as the

watch commander "between fifty to a hundred times").  Captain Porter further explained that he

had a "personal and professional" relationship with Mr. Zabavsky, that he relied on Mr.

Zabavsky more than he relied on other lieutenants, and that the two men had worked their way

up the MPD chain of command together.  Id. at 41:9-42:21.  Between 10:00 p.m. and 12:00 a.m.

on the evening of the collision, neither Mr. Zabavsky nor Mr. Sutton called Captain Porter.  Id.

at 51:5-12.

One of the watch commander's responsibilities is monitoring MPD officers that

are engaged in vehicular pursuits.  Trial Tr. Nov. 17, 2022 a.m. at 30:17-21 (Porter testimony).

When a vehicular pursuit occurs, a preliminary investigation must be conducted; MPD officials

respond to the scene, gather as much evidence about the pursuit as they can, and then forward

that information to the Internal Affairs Division ("IAD") for review. Id. at 33:16-34:9. IAD reviews the preliminary investigation and determines whether IAD will handle any subsequent investigation into an officer's violation of MPD policy, or whether supervisors in the district where the chase occurred can handle any follow up investigation. Id. at 34:12-35:7. When MPD officers are involved in "serious misconduct that result[s] in a death," IAD may respond to a scene right away to begin collecting information, rather than waiting to receive a preliminary investigation from a district supervisor. Id. at 35:13-36:14.

Around 10:00 p.m. on October 23, 2020, Captain Porter heard over the Fourth District's main radio channel that "someone said we had a moped that just got struck on Kennedy Street." Trial Tr. Nov. 17, 2022 a.m. at 48:1-19 (Porter testimony). This notification gave Captain Porter the impression that "it was just a regular accident with injuries," like MPD officers "hear almost every day." Id. When a crash involves serious injuries, Captain Porter would expect the supervisor on the scene – the sergeant, lieutenant, or highest-ranking officer present – to notify the watch commander of those injuries. Id. at 49:20-50:8. Captain Porter explained that, while working as watch commander, he would want to hear about instances of serious bodily injury over the district's main radio channel from the supervisor on the scene. If someone's injuries might result in death, Captain Porter testified, he would "have the supervisor on the scene give [him] a call" to determine what next steps must be taken, including whether to contact the Major Crash Unit and IAD. Id. at 39:11-40:22. Captain Porter also explained that he would want to hear about a vehicular pursuit over the main radio channel. See id. at 66:11-18 (Captain Porter testified that, once he learned that there had been a pursuit of Mr. Hylton-Brown, his "next question would have been why didn't we come on the Fourth District radio zone to let anyone know that we're chasing someone?").

59

Captain Porter didn't learn anything more about the events leading up to the collision until later that evening, when Mr. Zabavsky and Mr. Sutton walked into his office sometime between 11:00 p.m. and midnight.  Trial Tr. Nov. 17, 2022 a.m. at 53:4-19.  As Captain Porter testified:

> Zabavsky speaks first and he says, "Do you know that accident on Kennedy Street with the moped?"  I said, "Yeah, I heard of it.  I heard it."  He said, "Well, we might have been trying to stop him. . . ."  He said something about, "We want to figure out if this is a chase or not."  And so I started talking to him and I said, "Well, if you tried to stop him and he takes off and goes and [gets] hit, that's not a chase.  That's not your fault."  And then I think Sutton might have picked the conversation up I believe, and he says, "Well, we were following him for a little bit."  And I look at Sutton.  I said, "Well, how long is a little bit?"  He said, "Two minutes."  And I said, "Well, that's a long time."  So, then I looked back at Zabavsky and I said, "Well, have you looked at his body worn camera to see if it was a chase?"  And Lieutenant Zabavsky said, "Not yet."  And I said, "Well, go back and look at his body worn camera and then let me know if it's a chase or not."

Trial Tr. Nov. 17, 2022 a.m. at 54:1-19.

During this initial encounter, Mr. Zabavsky told Captain Porter that "the person that was hit was intoxicated," and that Mr. Hylton-Brown "slurred his words or something."  Id. at 55:16-56:1.  Mr. Zabavsky also told Captain Porter that an officer had accompanied Mr. Hylton-Brown to the hospital.  Id. at 57:1-17.  Captain Porter explained that his initial conversation with Mr. Sutton and Mr. Zabavsky gave him the impression that the CST officers were trying to effectuate a traffic stop on Mr. Hylton-Brown for driving his moped on the sidewalk.  Id. at 58:3-11 ("[Officer Sutton] was trying to stop [Mr. Hylton-Brown] . . . because he was stopping and going on the sidewalk.  That was my understanding.").  During that initial conversation, neither Mr. Sutton nor Mr. Zabavsky mentioned anything about Mr. Hylton-Brown's injuries – all they said was that another officer was at the hospital with Mr. Hylton-

Brown, without further explanation.  Id. at 57:1-13.  See id. at 64:11-25, 65:9-21 (Captain Porter

testified:  "I took that statement, that he was intoxicated, [to mean] that they must have found

that out . . . after the accident when they went up to him and [were] speaking with him, he was

slurring his words.").  Captain Porter also came away from this conversation with Mr. Sutton and

Mr. Zabavsky thinking that an officer was "standing by" with Mr. Hylton-Brown at the hospital

in case Mr. Hylton-Brown would be arrested for driving under the influence.  See id.

at 55:11-57:13.

        During this initial conversation, neither Mr. Sutton nor Mr. Zabavsky mentioned

to Captain Porter that Mr. Zabavsky was involved in the chase, leaving Captain Porter with the

impression that "Sutton went to his manager [Lieutenant Zabavsky] to explain the situation,"

rather than both men having been involved from the start.  Trial Tr. Nov. 17, 2022 a.m. at 55:7-9.

Captain Porter testified that he "definitely" would have wanted to know whether Mr. Zabavsky

was involved in the chase before deciding how to proceed with investigating potential

misconduct.  Id. at 59:3-60:6.  And Captain Porter "would not have [asked Mr. Zabavsky to] help

. . . with the investigation" if Mr. Zabavsky was "part of the misconduct."  Id. at 59:23-60:5.

Furthermore, neither Mr. Sutton nor Mr. Zabavsky told Captain Porter that Mr. Hylton-Brown's

injuries were serious during their initial conversation.  Captain Porter testified that "the only time

[Mr. Zabavsky] brought up injuries was because of the intoxication."  Id. at 57:3-9.  Captain

Porter explained that if he had learned right away that this was a pursuit resulting in a serious

injury, he "would have had to make a lot of notifications" to the Major Crash Unit, to IAD, and

to his superiors.  Id. at 60:24-61:23.

        About fifteen minutes after the initial conversation between Mr. Zabavsky, Mr.

Sutton, and Captain Porter, Mr. Zabavsky re-entered Captain Porter's office and told him, "We

have a problem." Trial Tr. Nov. 17, 2022 a.m. at 70:3-10 (Porter testimony). The officer who was at the hospital with Mr. Hylton-Brown, Officer Ernie Davis, reported that Mr. Hylton-Brown had a brain injury and might not make it. Id. Captain Porter "was very surprised" and told Mr. Zabavsky, "we need to notify Major Crash." Id. at 70:11-12. Captain Porter also asked Mr. Zabavsky why Major Crash was not called to the scene immediately, and Mr. Zabavsky replied that he thought Mr. Hylton-Brown's condition was not that critical. Id. at 102:3-5. Captain Porter explained that, upon hearing about Mr. Hylton-Brown's serious condition:

> I said, what, we need to notify Major Crash. And [Mr. Zabavsky] said "I'm on the phone with [them]." And then I said, "Did you look at the body worn camera, it is a chase?" And he said he wasn't sure, but it's up on his computer if I want[ed] to come and look at it. At that point I said no, I'll log in and look at it myself. So I started logging in.

Trial Tr. Nov. 17, 2022 a.m. at 70:11-17 (Porter testimony); see id. at 71:7-14.

Captain Porter began watching the body worn camera footage "less than a minute" after Mr. Zabavsky told him about Mr. Hylton-Brown's condition. Id. at 71:15-17. Captain Porter reviewed Mr. Sutton's body worn camera footage as well as Officer Tejera's. Id. at 75:2-20. While reviewing Officer Tejera's body worn camera footage "from the time it started all the way to the crash," Captain Porter determined that Mr. Sutton had engaged in a pursuit. Id. at 78:13-16. He turned to Mr. Zabavsky, who had come into Captain Porter's office to watch the footage, and said: "This is a chase." Id. at 78:5-8. At that point, Captain Porter immediately began the process for notifying IAD. Id. at 80:1-81:6.

Captain Porter then rushed to the scene of the collision himself, notifying his superior officer, Commander Brian Bray, on the way. Trial Tr. Nov. 17, 2022 a.m. at 81:8-24. Once at the scene, Captain Porter worked with an officer from the Major Crash Unit to investigate. Id. at 82:11-19. Captain Porter testified: "I needed more information because

people were asking me for information, the investigators, the IAD investigator, the Major Crash

investigator was asking me for information I did not have.  So I was relying on Lieutenant

Zabavsky for that information." Id. at 85:24-86:3.  Repeatedly, as Captain Porter assisted with

the investigation at the scene, he called Mr. Zabavsky to ask clarifying questions and get more

information about what had happened before the collision.  Id. at 82:11-84:7.  Mr. Zabavsky

never volunteered that he was involved in the pursuit – even after Captain Porter asked him if he

was.  Id.

### b. Mr. Sutton's Draft Report

Officer Al-Shrawi explained that, once back at the Fourth District, Mr. Zabavsky

and Mr. Sutton spoke with Captain Porter, who told them to review the CST officers' body worn

camera from that evening.  Trial Tr. Nov. 10, 2022 p.m. at 129:4-130:25.  As Mr. Zabavsky and

Officers Novick, Tejera, and Al-Shrawi began watching body worn camera footage, Officer

Sutton sat outside, within earshot of Mr. Zabavsky's office, writing the traffic crash report.  Id.

at 130:20-131:4.  Mr. Sutton's traffic report contained a narrative, which read as follows:

> On the listed date and time officers attempted a traffic stop on
> Vehicle #2 [Mr. Hylton-Brown] at 5th St NW and Kennedy St NW
> after observing the listed driver of Vehicle #2 riding on the sidewalk
> in the 500 block of Kennedy St NW without a helmet.  Vehicle #2
> is a Revel electric scooter.  The driver of Vehicle #2 continued to
> drive at a slow speed while braking and coming to random stops, as
> if he was going to bail off the listed vehicle.  Officers deactivated
> their emergency lights and followed Vehicle #2 at a slow speed with
> distance in between their vehicle and Vehicle #2 into the 700 block
> of Ingraham St NW.  At the time, there was little to no vehicular or
> pedestrian traffic.  Officers observed Vehicle #2 enter an alley in the
> 700 block of Ingraham St NW and lost sight of Vehicle #2 and began
> to canvas the area, in the event that the driver of Vehicle #2 had
> bailed out on foot.  A short time later, Officers turned into the 5400
> block of 8th St NW and observed Vehicle #2 at the intersection of
> 8th St NW and Kennedy St NW.  Officers attempted a traffic stop
> again at 8th St NW and Kennedy St NW when the driver of Vehicle

#2 disregarded again and continued southbound at a slow speed in the 5400 block of 8th St NW. Vehicle #2 made a left turn into the 700 block of Jefferson St NW and immediately into the alley. Officers deactivated their emergency lights again when entering the alley. Vehicle #2 was observed traveling northbound through the alley and failed to come to a stop or even attempt to slow as it exited the mouth of the alley into oncoming traffic in the 700 block of Kennedy St NW at which point Vehicle #1 [the Scion] which was traveling eastbound on Kennedy St NW struck Vehicle #2.

As officers pulled up to the accident, they immediately checked on the welfare of the driver of Vehicle #2. The officers immediately observed the driver of Vehicle #2 was lying on the ground unresponsive, and began to administer first aid. Officer Novick deployed his TECC Kit and gauze was applied to the head of the driver of vehicle #2 to stop bleeding. Officers remained on scene awaiting arrival of DCFEMS (Medic #14) who assumed care of the driver of Vehicle #2. Officers were only able to observe superficial abrasions on left eyebrow line to the driver of Vehicle #2's head. The driver of Vehicle #2 was transported to WHC via Medic #14 from the scene. Vehicle #2 appeared to sustain disabling damage from the collision.

Officers then checked on the welfare of the driver of Vehicle #1. The driver of Vehicle #1 appeared to be normal. The driver stated that he was "just traveling and he popped out of the alley" in reference to the driver of Vehicle #2. The driver of Vehicle #1 did not have any visible injuries and did not complain of any pain. Vehicle #1 had minor damage to the front bumper and a crack to the top passenger side of the windshield. Vehicle #1 was driven away from the scene by the listed owner.

Gov't Ex. 404-F.

Joseph Della Camera, an agent with the MPD Internal Affairs Division, testified that, during the course of his investigation, he determined that the information contained in Officer Sutton's draft traffic crash report was not "accurate or factual." Trial Tr. Nov. 7, 2022 p.m. at 73:1-15. He also testified that "[i]t's very well known" that "[p]olice reports are supposed to contain factual and truthful information." Id. at 74:7-18; see id. (Agent Della Camera explained that it would violate MPD policy to write false or misleading reports).

4. Major Crash Unit Investigation

Officer Jeffrey Folts testified that on the night of the collision, he was working as a senior police officer in MPD's Major Crash Unit. Trial Tr. Nov. 9, 2022 a.m. at 11:19-12:3. Officer Folts told the jury that while he was working the midnight shift on October 23, 2020, he received notification about the collision involving Mr. Hylton-Brown about an hour and a half after the collision occurred. Id. at 26:4-27:20. He explained that, in general, a "delay in notification" can affect a Major Crash Unit investigation by potentially making it harder to collect evidence and identify witnesses. Id. at 28:22-29:3.

Officer Al-Shrawi explained what was happening at the Fourth District police station prior to Officer Folts getting that call. He testified that, between returning to the Fourth District and notifying the Major Crash Unit about the incident, the CST officers received three calls from Officer Ernie Davis, who was at the hospital with Mr. Hylton-Brown. Trial testimony is ambiguous about what was conveyed during the first call, but during the second call, Officer Davis said Mr. Hylton Brown was in "critical condition," and during the third call, Officer Davis said Mr. Hylton Brown was "on a breathing tube and he had a skull fracture." Trial Tr. Nov. 10, 2022 p.m. at 134:1-135:24 (Al-Shrawi testimony). After the third call, Mr. Zabavsky stood up and told the CST officers – for the first time that night – that "they had to notify Major Crash." Id. at 138:15-22. Officer Folts spoke with Mr. Zabavsky for the first time at 12:20 a.m. the morning of October 24, 2020, and a second time around 2:00 or 3:00 a.m. that same morning. Trial Tr. Nov. 9, 2022 a.m. at 34:20-35:4. At no point during these conversations did Mr. Zabavsky disclose to Officer Folts his own involvement in the pursuit. Id. at 46:8-47:15.

While MPD police officers are permitted to handle ordinary traffic collisions, the Major Crash Unit usually gets involved whenever a collision results in the "possibility of death,"

including where injured parties experience "labored breathing, a large amount of blood," "losing consciousness," or "head injur[ies]."  Trial Tr. Nov. 9, 2022 a.m. at 19:16-25, 20:13-21:2 (Folts testimony); id. at 86:19-87:3; see Trial Tr. Nov. 10, 2022 a.m. at 53:23-54:9 (Officer Folts testified that Major Crash should be notified when someone injured in a crash is taken to the hospital); Trial Tr. Nov. 14, 2022 p.m. at 62:7-22 (Officer Novick explained that Major Crash should be called "in the event of a crash that results in a fatality or a very serious injury").  Officers should notify the Major Crash Unit "as soon as possible" after a serious collision, and Officer Folts said he would expect the "most senior official on the scene" to make that notification.  Trial Tr. Nov. 9, 2022 a.m. at 23:15-24:1.

Although the Major Crash investigation was eventually completed by a different officer – Detective Victor DePeralta – Officer Folts responded to the crash site that evening and testified about various ways that the crash site was not properly preserved to facilitate a Major Crash Unit investigation.  He explained that the driver of the Scion, the striking vehicle, "should have remained on the scene so he could be interviewed by someone from Major Crash" and so investigators could have observed and photographed "the condition of the vehicle, to see how much damage has been done, [and] the final resting position of the vehicle."  Trial Tr. Nov. 9, 2022 a.m. at 53:4-8, 54:6-13; see id. at 72:2-5 (Officer Folts testified that he thought the collision scene was "preserved very poorly").  Officer Folts also told the jury that it is MPD policy to have officers "attempt to preserve or freeze" the crash scene in its original condition.  Trial Tr. Nov. 10, 2022 a.m. at 72:7-11.

The government also introduced an email from Mr. Zabavsky to Officer Folts and other officers in the Major Crash Unit.  Trial Tr. Nov. 9, 2022 a.m. at 82:1-83:23; Gov't Ex. 223.  Mr. Zabavsky's email contained, as an attachment, Mr. Sutton's draft traffic crash report.  See

Gov't Ex. 223.  Officer Folts explained that he forwarded this information, including the draft report, to the Internal Affairs Division investigators responsible for investigating the pursuit. Trial Tr. Nov. 9, 2022 a.m. at 82:1-83:23.

### 5.  Internal Affairs Division Investigation

Internal Affairs Division ("IAD") Agent Joseph Della Camera explained that he was the on-call IAD agent on October 23, 2020, when he received a notification about the incident involving Mr. Hylton-Brown.  Trial Tr. Nov. 7, 2022 p.m. at 29:21-30:10.  IAD "investigates serious misconduct" and the use of force by MPD officers.  Id. at 15:18-21.  IAD agents, like Agent Della Camera, are responsible for "gather[ing] all the facts and circumstances" surrounding an incident they are charged with investigating.  Id. at 16:6-10; see id. at 20:1-21:10 (Agent Della Camera testified that when IAD is called to initiate an investigation, the on-call agent will begin collecting "as much information as possible . . . to find out the circumstances and to preserve evidence").  Although IAD agents generally investigate "administrative" violations where MPD staff members are suspected of violating MPD policies and procedures, IAD investigations may also concern "potential criminal violations."  Id. at 16:14-19; see id. at 16:3-25 (Agent Della Camera testified that IAD investigates potential criminal offenses when "officer involved shooting[s], significant injuries to an individual," and "other types of misconduct" occur); Trial Tr. Nov. 8, 2022 p.m. at 30:3-31:1 (Officer Arnone testified that she learned during training that failure to adhere to MPD general orders could result in administrative as well as criminal consequences); Trial Tr. Nov. 15, 2022 p.m. at 9:12-10:16 (Officer Totaro explained that MPD officers learn about the "legal consequences for on-the-job driving incidents," including civil and criminal liability if the officer's conduct violates the law).

Agent Della Camera explained that any time an MPD officer engages in a chase and that chase involves a fatality, that conduct is "automatically subject to" a "start to finish" investigation by IAD.  Trial Tr. Nov. 7, 2022 p.m. at 17:11-15, 18:5-9; see id. at 80:8-12 (Agent Della Camera explained that IAD would not have investigated Mr. Hylton-Brown's death if "no one had mentioned there had been a vehicular pursuit prior to the crash"); Trial Tr. Nov. 17, 2022 a.m. at 88:17-18 (Captain Porter thought that "because of the chase, IAD would probably . . . take the case").  When a vehicular pursuit by a MPD officer results in serious injury or death, IAD and the Major Crash Unit assist one another in conducting their investigations.  Trial Tr. Nov. 7, 2022 p.m. at 21:11-23.

Agent Della Camera testified that he was notified about this incident "sometime after midnight" on October 24, 2020.  Trial Tr. Nov. 7, 2022 p.m. at 30:4-10.  After receiving the notification, Agent Della Camera called Captain Porter, who provided an overview of what had occurred with the CST vehicle that evening.  Id. at 30:11-31:19.  At about 12:40 a.m. – approximately two and a half hours after the collision – Agent Della Camera began reviewing Mr. Sutton's and Officer Tejera's body worn camera footage.  Id. at 40:7-43:24; see Gov't Exs. 219-C, 219-D (body worn camera audit logs indicating that Agent Della Camera accessed Mr. Sutton and Officer Tejera's body worn camera footage on October 24, 2020 at 12:41 a.m. and 12:47 a.m., respectively).  Once he finished reviewing the footage, shortly after 1:00 a.m., Agent Della Camera responded to the scene of the collision to investigate the circumstances surrounding the collision.  Trial Tr. Nov. 7, 2022 p.m. at 44:2-45:8.  Agent Della Camera was concerned that the crash scene "wasn't properly preserved" – the striking vehicle was gone, Mr. Sutton's vehicle was gone, and there were no witnesses on the scene to be interviewed.  Id at 48:12-49:25; see Trial Tr. Nov. 9, 2022 a.m. at 72:2-5 (Folts testimony).

As part of his IAD investigation, Agent Della Camera reviewed Mr. Sutton's draft traffic crash report describing the incident and relied on Mr. Sutton's draft report when writing his own preliminary IAD report.  Trial Tr. Nov. 7, 2022 p.m. at 63:1-19, 66:20-23.  After completing his preliminary report, Agent Della Camera conducted additional investigation, which included reviewing body worn camera footage and surveillance footage from the area where the chase occurred.  Id. at 67:11-22.  After reviewing this footage, Agent Della Camera concluded that the "information [he] had put into [his preliminary] report based on [Officer Sutton's] traffic crash report was not factual."  Id. at 67:24-68:1.

Agent Della Camera explained that Mr. Sutton's draft report stated that officers were "canvassing" the area for Mr. Hylton-Brown – but multiple surveillance videos did not show the CST vehicle canvassing the area.  Trial Tr. Nov. 7, 2022 p.m. at 71:2-15.  Rather, Agent Della Camera described what he saw on surveillance video as Mr. Hylton-Brown's "direct flight from the unmarked vehicle" driven by Mr. Sutton.  Id.  Agent Della Camera similarly concluded that Officer Tejera's body worn camera footage contradicted the information contained in Mr. Sutton's draft report:  that the CST officers "lost sight" of Mr. Hylton-Brown in an alleyway.  See Gov't Ex. 404-F.  A second look at Officer Tejera's body worn camera led Agent Della Camera to determine that "it doesn't appear that they [the CST officers] lost sight of Mr. Hylton at all" during the pursuit.  Trial Tr. Nov. 7, 2022 p.m. at 69:2-70:10.

Ultimately, Agent Della Camera concluded that "the information in the traffic crash report was not accurate or factual. . . .  They [the CST officers] weren't canvassing for him.  They were actually pursuing him."  Id. at 73:1-15.  See Trial Tr. Nov. 8, 2022 a.m. at 40:7-11 (Agent Della Camera testified that the CST vehicle was not "canvassing" for Mr. Hylton-Brown, and the officers were "right behind him"); Trial Tr. Nov. 7, 2022 a.m. 67:2-68:6 (Officer Tejera

testified that during the pursuit, the CST vehicle "always" managed to stay behind Mr. Hylton-Brown, that the officers only lost sight of Mr. Hylton-Brown for "short periods" of time, and that the officers never "lo[st] him for so long [that they] had to canvass the area").

### 6.  Evidence Relating to a Federal Nexus

In addition to explaining his own investigation into the chase that resulted in Mr. Hylton-Brown's death, Agent Della Camera also described general MPD and IAD policies when MPD officers are suspected of misconduct or potential criminal violations.  Agent Della Camera specified that when MPD officers are involved in serious misconduct, serious uses of force, and certain types of vehicular pursuits, IAD investigates those incidents both for potential administrative violations as well as possible criminal offenses, depending on the circumstances. Trial Tr. Nov. 7, 2022 p.m. at 16:14-17:3.  For vehicular pursuits specifically, Agent Della Camera explained that IAD automatically investigates pursuits resulting in fatalities, serious or life-threatening injuries, and serious officer misconduct.  Id. at 18:8-19:16.

Whenever a vehicular pursuit occurs, an MPD official is supposed to collect information related to the pursuit and send that information to the watch commander, who generates a report.  Trial Tr. Nov. 7, 2022 p.m. at 25:18-27:19 (Della Camera testimony).  The initial, district-generated report – the "pursuit package" – ultimately gets submitted to IAD, and IAD may investigate further based on the nature of the officer's conduct and any fatalities or serious injuries that occurred.  Id. at 26:2-29:20; see Trial Tr. Nov. 15, 2022 a.m. at 103:13-104:22, 106:17-107:9 (Officer Totaro explained that MPD officers learn about post-pursuit investigations during their training, including that IAD and the Major Crash Unit will investigate all pursuits involving fatalities or serious bodily injury).

Agent Della Camera also explained IAD's process for referring matters involving MPD officers to the U.S. Attorney's Office.  When an IAD investigation involves potential criminal violations, IAD agents "make notification to the United States Attorney's Office" and "let them know [IAD] ha[s] a criminal referral."  Trial Tr. Nov. 7, 2022 p.m. at 17:4-10.  Agent Della Camera explained that IAD always refers cases involving death or serious injuries to the U.S. Attorney's Office.  Id. at 75:18-76:21.  After receiving an IAD referral, the U.S. Attorney's Office conducts a "prosecutorial review of the circumstances of MPD involvement and what led up to the individual's injuries or death" to determine if there was "criminal wrongdoing on the officer's part."  Id. at 77:24-78:8.

Agent Della Camera testified that he referred this case to the U.S. Attorney's Office within eight hours of the collision, at approximately 6:00 a.m. on October 24, 2020.  See Trial Tr. Nov. 7, 2022 p.m. at 98:2-6; Trial Tr. Nov. 8, 2022 a.m. at 55:2-4.  He explained:

> Prosecutor:  In your time at Internal Affairs, have you referred some of your matters under investigation to the U.S. Attorney's Office?
> Agent Della Camera:  Yes.
> Prosecutor:  Is that part of your job at Internal Affairs?
> Agent Della Camera:  Yes.
> Prosecutor:  And what role do you have after the referral occurs in the investigation that's conducted?
> Agent Della Camera:  Once a referral is made [via] e-mail notification to the U.S. Attorney's Office, I do a presentment report and turn that over to the U.S. Attorney's Office for their review.
> Prosecutor:  Was there a referral to the U.S. Attorney's Office made in this case?
> Agent Della Camera:  Yes.
> Prosecutor:  Who made it?
> Agent Della Camera:  I believe I made it but it may have been someone else in my office.
> Prosecutor:  When was it made?
> Agent Della Camera:  Shortly after getting back to the office on the 24th.
> The Court:  So referral was made that evening or the next morning?

Agent Della Camera:  The next morning, yes.

Prosecutor:  Approximately how many hours after the crash was the referral made?

Agent Della Camera:  Within eight hours.

Prosecutor:  Who was the referral made to?

Agent Della Camera:  Assistant United States Attorney Kendra Briggs.

Prosecutor:  What part, what unit within the U.S. Attorney's Office does she work in?

Counsel for Mr. Sutton:  Objection.

The Court:  [after confirming the question] Overruled.  Go ahead.

Agent Della Camera:  The Public Corruption and Civil Rights Section.

Prosecutor:  Is that on the federal side of the U.S. Attorney's Office or the Superior Court side?

Counsel for Mr. Sutton:  Objection.

The Court:  Overruled, if you know.

Agent Della Camera:  Federal.

The Court:  Did you, in making the referral or the IAD in making the referral, decide who in the U.S. Attorney's Office or what section or unit to refer it to?

Agent Della Camera:  The unit is always the same.  The particular individual who we refer to could change over time.  It depends on who is in that particular role that we have liaison with.

The Court:  Are you saying that any time you make a report or referral from IAD to the U.S. Attorney's Office, it always goes to the Public Corruption and Civil Rights Section?

Agent Della Camera:  Yes, sir.

Trial Tr. Nov. 7, 2022 p.m. at 97:2-99:13.

After making the referral, there was testimony that the U.S. Attorney's Office began an investigation into the incident.  Agent Della Camera explained that he transmitted documents to the U.S. Attorney's office and "sat in on some of the interviews of witnesses" that the U.S. Attorney's Office conducted.  Trial Tr. Nov. 7, 2022 p.m. at 99:19-100:11.  Based on his participation in meetings with witnesses, prosecutors, and other agents, Agent Della Camera was under the impression that the U.S. Attorney's Office was taking steps to examine whether a

federal civil rights violation had occurred.  Id. at 100:13-101:20.  Agent Della Camera's

testimony was as follows:

> Prosecutor:  After the referral was made, did you have a role in some
> of the initial investigation conducted at the U.S. Attorney's
> Office?
> Agent Della Camera:  Yes.
> Prosecutor:  What role did you have?
> Agent Della Camera:  Initially, I sat in on some of the interviews
> with witnesses.
> The Court:  Sat in on what?
> Agent Della Camera:  I sat in with some of the interviews of the
> witnesses.  I listened to some of the interviews.
> Prosecutor:  Did you also participate in meetings with prosecutors
> and federal agents?
> Agent Della Camera:  Yes.
> Prosecutor:   What was your understanding of what type of
> investigation this was?
> Counsel for Mr. Sutton:  Objection, hearsay.
> The Court:  The objection is noted.  And the question is what is your
> understanding.  Say it again, what was your understanding?
> Prosecutor:   What was your understanding of what type of
> investigation this was?
> Agent Della Camera:  At the time, according to AUSA Baset, it was
> a civil rights investigation.
> Prosecutor:   Court's brief indulgence. . . .  In those witness
> interviews, were investigative steps taken to examine
> whether there was a civil rights violation?
> The Court:  If you know.
> Agent Della Camera:  It's my understanding there were.
> Prosecutor:  Is that based on your participation in those witness
> interviews?
> Agent Della Camera:  Yes.

Trial Tr. Nov. 7, 2022 p.m. at 100:2-101:20.  Agent Della Camera later clarified that the steps

that the U.S. Attorney's Office was taking were to examine whether a possible federal civil

rights offense had occurred.  Trial Tr. Nov. 8, 2022 a.m. at 11:17-12:1.

Special Agent Sean Ricardi also testified about the investigation into this incident

that the U.S. Attorney's Office conducted.  Special Agent Ricardi is "a member of the criminal

investigations unit of the U.S. Attorney's Office, which is a group of special agents who are

assigned to the U.S. Attorney's Office and investigate crimes, generally federal crimes."  Trial

Tr. Oct. 26, 2022 p.m. at 11:8-19.  He explained that he was directed to investigate "the crash

and everything that led up to that crash," as well as "everything that happened at the crash scene

and everything that happened after the crash scene."  Id. at 16:4-8.  The following exchange then

occurred:

> Prosecutor:  And what kind of investigation was this referred for?
> Counsel for Mr. Sutton:  Objection, your honor, legal question, beyond his competence.
> The Court:  You can testify about what you were told you were looking at.  Overruled.
> Agent Ricardi:  We were told this was a civil rights investigation.
> The Court:  Who told you that?
> Agent Ricardi:  That would be my supervisor Special Agent in Charge Bryan Molnar and then Assistant United States Attorney Ahmed Baset when I first met him.
> Prosecutor:  And when you were investigating, did you have particular criminal violations that you were focusing on looking for evidence about?
> Counsel for Mr. Sutton:  Same objection, your honor, calls for hearsay.
> The Court:  This is foundational and talks about what was his state of mind and what motivated his contact and [is] similar to other rulings I have made with respect to other witnesses.  The objection is overruled.
> Prosecutor:  What kinds of criminal violations were you investigating?
> Agent Ricardi:  So we were looking for civil rights violations.  We were looking to see if there was any attempt to cover up or obstruct any potential investigation.  We were looking at if Mr. Hylton were perhaps targeted by any of the officers involved.  We were really trying to look at the initial interaction from all angles.

Trial Tr. Oct. 26, 2022 p.m. at 16:9-17:17.

> The government also elicited the following testimony from Agent Ricardi:

> Prosecutor:  Now you testified . . . when you got this assignment, you were told to do a civil rights investigation.  Do you remember testifying to that?

> Counsel for Mr. Sutton:  Objection.  Asked and answered.  She's going back to testimony –
>
> The Court:  She's laying a foundation for whatever question she is about to ask.
>
> Agent Ricardi:  Yes.  I remember that.
>
> Prosecutor:  When you got that assignment, were you doing an investigation into federal civil rights violations or D.C. code violations?
>
> Agent Ricardi:  Federal civil rights violations.
>
> Prosecutor:  You said you were put in touch with AUSA Ahmed Baset to work on this investigation.  Is that what you testified to the other day?
>
> Agent Ricardi:  Yes.
>
> Prosecutor:  Are you familiar with the organization of the D.C. U.S. Attorney's Office?
>
> Agent Ricardi:  Yes.
>
> Prosecutor:  Does the office have some units that prosecute federal crimes?
>
> Agent Ricardi:  Yes.
>
> Prosecutor:  Do some units prosecute local crimes?
>
> Agent Ricardi:  Yes.
>
> Prosecutor:  What unit was AUSA Baset assigned to?
>
> Agent Ricardi:  He was assigned to Public Corruption and Civil Rights.
>
> Prosecutor:  Does that unit work on federal cases or D.C. Superior Court cases?
>
> Agent Ricardi:  Federal cases.

Trial Tr. Oct. 28, 2022 p.m. at 64:22-66:2.

### C. The Government Has Met Its Burden as to Obstruction of Justice

#### 1. Misleading Conduct

The evidence presented at trial was sufficient for a reasonable jury to conclude that Mr. Sutton and Mr. Zabavsky "engage[d] in misleading conduct toward another person."  18 U.S.C. § 1512(b).  The jury was entitled to rely on the testimony of Captain Porter, with whom Mr. Sutton and Mr. Zabavsky spoke after the collision.  Captain Porter's testimony indicated that Mr. Sutton and Mr. Zabavsky "create[d] a false impression" in Captain Porter's mind about what had occurred that night by "omitting information" and "intentionally concealing [] material

fact[s]." 18 U.S.C. § 1515(a)(3)(b). Captain Porter was led to believe that an officer was standing by at the hospital to potentially arrest Mr. Hylton-Brown for driving under the influence, not to monitor his critical injuries. Captain Porter also thought that Mr. Sutton had talked to Mr. Zabavsky about the chase only after it had occurred, and he was not aware that Mr. Zabavsky himself was involved in the chase from the start. Captain Porter explained that he would have taken different steps if Mr. Sutton and Mr. Zabavsky had been truthful with him during their initial conversation. For instance, Captain Porter testified that if he had known that Mr. Zabavsky was involved in the chase, he would not have enlisted Mr. Zabavsky to review the body worn camera footage to determine whether a chase had occurred or to otherwise participate in the investigation of the incident. Captain Porter also called IAD as soon as he realized that Mr. Sutton had engaged in a pursuit and suggested that he would have called IAD sooner had he known about the pursuit earlier in the evening. On this record, a reasonable jury could find that Mr. Sutton and Mr. Zabavsky engaged in "misleading conduct."

The jury was also entitled to rely on Agent Della Camera's testimony about Mr. Sutton's draft traffic crash report. Agent Della Camera stated explicitly that Mr. Sutton's report contained facts that were not accurate – Mr. Sutton described the CST vehicle as "canvassing" the area for Mr. Hylton-Brown, but both Agent Della Camera and Captain Porter testified that video footage showed that the CST vehicle was not "canvassing" the area at all. Furthermore, the government introduced body worn camera footage from just after the collision, which shows that Mr. Sutton and Mr. Zabavsky were present on the scene and observed Mr. Hylton-Brown's injuries – injuries that many other officers described as "serious." See Gov't Ex. 201 (Novick body worn camera); Gov't Ex. 200 (Sutton body worn camera); Gov't Ex. 204 (Zabavsky body worn camera). Although Mr. Sutton was not one of the officers who rendered aid to Mr. Hylton-

Brown, a reasonable juror could conclude from the body worn camera footage that Mr. Sutton was aware of the serious injuries that Mr. Hylton-Brown sustained and that Mr. Sutton's decision to describe those injuries as "superficial" in his draft report was misleading.  See 18 U.S.C § 1515(a)(3)(B).

Mr. Sutton suggests that no reasonable juror could conclude that the draft traffic crash report he authored was misleading because it was just a draft that would "not become final until extensive review by him and others in the ordinary course."  Sutton Reply at 17; see Trial Tr. Nov. 10, 2022 a.m. at 48:6-20 (Officer Folts explained on cross examination that officers are instructed to submit draft traffic crash reports to their supervisors and revise those reports before they become official).  Because the report was a draft subject to revision and editing, Mr. Sutton asserts that his failure to include information about the severity of Mr. Hylton-Brown's injuries in that report cannot be interpreted as "misleading" conduct.  Sutton Reply at 18-19.  The Court disagrees.  The government's evidence established that Mr. Sutton chased Mr. Hylton-Brown and that Mr. Hylton-Brown sustained serious injuries from a traffic collision, of which Mr. Sutton was aware.  The government also presented evidence that MPD officers receive training about when IAD and the Major Crash Unit conduct investigations, that supervisors within MPD are responsible for making notifications to the appropriate departments, and that Mr. Sutton was well-versed in MPD policies.  Based on this evidence, a reasonable jury could conclude that Mr. Sutton knew that other MPD departments would investigate this incident, and that, because he was involved in this incident, his statements in particular would be reviewed by other MPD officials during their investigations.  Agent Della Camera, for example, did in fact rely on Mr. Sutton's draft report when investigating the pursuit.  Drawing all inferences in the government's

favor, a reasonable juror could conclude that Mr. Sutton's draft report was "misleading" and directed at another MPD officer, even though it was only a draft.

Mr. Sutton also argues that his description of Mr. Hylton-Brown's injuries as "superficial abrasions" was consistent with the descriptions provided by medical professionals and therefore were not misleading. Sutton Mot. at 23-24. The Court also finds this argument unpersuasive. Mr. Sutton was present at the collision site and was in close proximity to Mr. Hylton-Brown's body while other officers tended to Mr. Hylton-Brown, who was unconscious, bleeding from the head, and vomiting. See Gov't Ex. 201 (Novick body worn camera); Gov't Ex. 200 (Sutton body worn camera). Multiple officers at the scene with Mr. Sutton testified that they observed Mr. Hylton-Brown's injuries and that those injuries were serious. Based on this evidence, a reasonable jury could easily conclude that Mr. Sutton was aware of the serious nature of Mr. Hylton-Brown's injuries. A reasonable jury could also conclude that Mr. Sutton's report – which omitted details about the blood and vomit and only described Mr. Hylton-Brown's injuries as "superficial abrasions" – was misleading because it gives a reader an inaccurate impression about the nature of Mr. Hylton-Brown's injuries. See United States v. Veal, 153 F.3d at 1254 (defendants' "intentionally omitting and concealing important, relevant information . . . from the investigators, and, thus, creating a false impression about what had actually occurred . . . constituted 'misleading conduct'"); United States v. Hawkins, 185 F. Supp. 3d at 125 (misleading conduct includes "intentionally concealing material facts"); 18 U.S.C. § 1515(a)(3) (misleading conduct includes "intentionally concealing a material fact, and thereby creating a false impression by such statement").

Mr. Zabavsky argues that the government's evidence about Mr. Sutton's draft traffic crash report "cannot be used as evidence that Zabavsky or Sutton intended to obstruct

justice." Zabavsky Mot. at 14.  He contends that "[t]he Government at trial claimed that

Zabavsky instructed Sutton to write the [traffic crash] report, that it was improper for Sutton to

write the report, and that Zabavsky approved and adopted the report written by Sutton.

However, no reasonable jury could find those facts beyond a reasonable doubt." Id. at 13.  Mr.

Zabavsky misconstrues the government's burden.  The government was not required to prove

that Mr. Zabavsky instructed Mr. Sutton to write the report, that it violated MPD policy for Mr.

Sutton to write the report, or that Mr. Zabavsky adopted the facts contained in Mr. Sutton's

report.  Failure to establish any one of these facts is not dispositive.  Rather, the jury was

permitted to consider evidence about the authorship of the report – for example, that Officer

Arnone expected to write the report and Mr. Zabavsky told her that Mr. Sutton would write the

report instead – when determining whether Mr. Zabavsky's conduct was knowingly

"misleading."  Moreover, in addition to evidence of Mr. Sutton's draft report, the government

introduced other testimony about Mr. Zabavsky's misleading conduct – the most prominent

being that Mr. Zabavsky omitted critical information about Mr. Hylton-Brown's injuries and the

nature of the pursuit when speaking with Captain Porter, and that Mr. Zabavsky suggested that

Mr. Hylton-Brown was intoxicated and was slurring his words, despite the body worn camera

footage showing that Mr. Zabavsky never directly attempted to speak with Mr. Hylton-Brown

that night.  In total, the government presented sufficient evidence for a reasonable jury to

conclude that Mr. Zabavsky's conduct was misleading.

Mr. Sutton and Mr. Zabavsky both argue that they made honest, accurate

statements to Captain Porter, and therefore that no reasonable jury could conclude that their

conduct was misleading.  Mr. Sutton points out that he told Captain Porter that he had followed

Mr. Hylton-Brown for "a little bit" and "for two minutes." See Sutton Mot. at 22-23; Trial Tr.

Nov. 17, 2022 a.m. at 54:10-14 (Porter testimony).  Mr. Zabavsky similarly argues that he

"affirmatively informed his commanding officer of his involvement in the incident" and told

Captain Porter that Mr. Hylton-Brown was at the hospital.  Zabavsky Mot. at 7; Trial Tr.

Nov. 21, 2022 p.m. at 6:16-8:7; id. at 7:1-19 (counsel for Mr. Zabavsky argued that Captain

Porter never testified to being misled).

       That Mr. Sutton and Mr. Zabavsky may have made some truthful statements does

not preclude the jury from determining that their conduct was misleading.  See, e.g., United

States v. Williams, 827 F.3d 1134, 1164 (D.C. Cir. 2016) ("That there may be alternative

interpretations of the evidence is not relevant because the court must presume that the jury

resolved any conflicting inferences supported by the record in the Government's favor."); United

States v. Ronga, 682 F. App'x 849, 854-55 (11th Cir. 2017) (rejecting the argument that "when

an individual abandons his deceptive ways and provides truthful information, the [Section

1512(b)(3)] conviction cannot stand").  "Misleading conduct" includes the "intentional

omission" of certain information or material facts "thereby creating a false impression" in the

mind of the recipient of the information.  18 U.S.C. § 1515(a)(3)(B).  The trial record reflects

that Mr. Sutton and Mr. Zabavsky stood together in Captain Porter's office and failed to mention

the seriousness of Mr. Hylton-Brown's injuries.  They failed to provide Captain Porter with a full

and truthful account of the events leading up to the collision, including the fact that Mr.

Zabavsky was involved in the chase from the very beginning.  Instead, the two of them left

Captain Porter with the impression that Mr. Hylton-Brown might later be arrested for driving

under the influence – not that he might die because of his injuries.  Taken in the light most

favorable to the government, it was not unreasonable for a jury to conclude on this record that

Mr. Sutton's and Mr. Zabavsky's conduct was misleading.

2.  Knowledge

The trial record is sufficient for a reasonable juror to conclude that Mr. Sutton and Mr. Zabavsky knew that their conduct was misleading.  The government introduced significant evidence that both Mr. Sutton and Mr. Zabavsky knew that certain information should have been transmitted to superior officers – specifically, that the Major Crash Unit should be notified when a collision involves serious injuries and that IAD should be notified whenever a pursuit occurs. Instead of making these notifications, Mr. Sutton and Mr. Zabavsky gave Captain Porter an incomplete account of the events leading up to the collision and failed to notify the proper departments within MPD.

The jury could infer Mr. Sutton's and Mr. Zabavsky's knowledge from evidence – including body worn camera footage and testimony from other officers – about Mr. Sutton and Mr. Zabavsky's observations, expectations, and training.  See United States v. Guadalupe, 402 F.3d at 414-15 ("[K]nowledge can be inferred by virtue of the [defendant's] position . . . [and] extensive knowledge of how investigations of the sort involved here proceed."); United States v. Ring, 628 F. Supp. 2d at 214 (defendant's familiarity with disclosure rules was sufficient to establish that he had the requisite knowledge when he made misleading disclosures).  Multiple witnesses described both Mr. Sutton and Mr. Zabavsky as well-versed in MPD policies and procedures.  The jury could infer that Mr. Zabavsky in particular was familiar with MPD policies and expectations of MPD officers because Mr. Zabavsky had previously served as a watch commander more than fifty times, and because a person with the rank of lieutenant would know to notify the watch commander and call the Major Crash Unit given Mr. Hylton-Brown's condition.  Officer Folts explained that, consistent with MPD policies, the Major Crash Unit "should have been notified immediately" once the officers the on scene learned about the serious

nature of Mr. Hylton-Brown's injuries – and Officer Tejera and Officer Arnone both testified that they expected Mr. Zabavsky, the highest-ranking officer at the scene of the collision, to make any required notifications to the Major Crash Unit.

The jury was entitled to consider all of the government's evidence regarding Mr. Sutton's and Mr. Zabavsky's history and experience as MPD officers when determining whether their "statements and omissions were knowingly misleading." United States v. Brown, 934 F.3d at 1301; see United States v. Carson, 560 F.3d at 584 (sufficient evidence to sustain Section 1512(c)(2) conviction where "there [was] ample circumstantial evidence" but "no direct evidence" of knowledge). The jury heard testimony from Officer Arnone that MPD officers are trained on how to write reports and how to process traffic crash scenes. See Trial Tr. Nov. 8, 2022 p.m. at 31:2-14. And the jury heard from Agent Della Camera, who explained that Mr. Sutton's draft report was inconsistent with body worn camera and surveillance footage, even though MPD officers are trained to write truthful, accurate police reports. Officer Folts and Agent Della Camera explained that the crash site was poorly preserved, and the jury heard testimony that Mr. Sutton and Mr. Zabavsky permitted witnesses to leave the scene. Captain Porter also testified about his initial conversation with Mr. Sutton and Mr. Zabavsky, which gave Captain Porter the wrong impression about what had occurred leading up to the collision. Based on this direct and circumstantial evidence, as well as the evidence pertaining to MPD trainings and procedures, a reasonable juror could conclude that Mr. Sutton and Mr. Zabavsky knew that their conduct was misleading.

Mr. Sutton argues that "[t]he requisite criminal intent for obstruction of justice was not proven to have occurred at the scene of the collision." Sutton Mot. at 21 (emphasis added). He contends that his conduct could not be "obstructive" unless he "knew he had

engaged in a criminal act and knew that Hylton-Brown had suffered life threatening injuries and was likely to die as a result" at the time of his "obstructive" actions.  Id.  This argument is not persuasive because Section 1512(b)(3) does not require such a specific showing for the government to prove knowledge.  Rather, as the jury was instructed, a factfinder may infer someone's intent or knowledge from all of the surrounding circumstances.  See Jury Instructions at 40; United States v. Bailey, 405 F.3d at 109 n.3 (Section 1512(b)(3) "does not require that the defendant specifically know that the underlying conduct could constitute a federal offense").  The jury could conclude that Mr. Sutton knew that his conduct – concealing details from Captain Porter and providing a watered-down description of Mr. Hylton-Brown's injuries in his draft report – was misleading even if Mr. Sutton did not know for certain that Mr. Hylton-Brown would die.  And there is certainly no requirement under Section 1512(b)(3) that Mr. Sutton knew that his actions during the pursuit were criminal, as the statute itself prohibits obstruction related to "possible" federal offenses.  See 18 U.S.C. § 1512(b)(3) (emphasis added).  The government presented ample evidence from which a reasonable juror could infer that Mr. Sutton knew that his conduct was misleading, and no more was required:  Mr. Zabavsky described Mr. Sutton's conduct as a "chase" over the Ops radio channel before the collision, which Mr. Sutton was using, but both men refrained from using that language when speaking with Captain Porter; Mr. Sutton failed to preserve evidence at the collision site and provided an incomplete, inaccurate description of the pursuit in his draft report; and Mr. Sutton and Mr. Zabavsky turned off their body worn cameras and had a private conversation at the scene of the collision.

Mr. Zabavsky similarly argues that the government did not prove that he was "aware of the full circumstances of the collision prior to notifying Porter of these circumstances."  Trial Tr. Nov. 21, 2022 p.m. at 8:2-7; see Zabavsky Mot. at 8.  Because he was

not in Officer Sutton's car, and he did not witness the entirety of the chase or the collision, he argues that his representations to Captain Porter were not made with sufficient awareness to be knowingly misleading.  This argument is also not persuasive.  The government established that Mr. Zabavsky spoke over the Ops radio channel and announced that Mr. Sutton was "chasing" Mr. Hylton-Brown.  That Mr. Zabavsky "had no knowledge of the exact location of Hylton-Brown or Sutton at the time of the collision" does not preclude a reasonable juror from finding that he knew his statements to Captain Porter would be misleading.  See Zabavsky Mot. at 8. The government presented sufficient evidence – including body worn camera footage depicting Mr. Zabavsky in close proximity to Mr. Hylton-Brown's body immediately after the collision – for the jury to conclude that, at the time Mr. Zabavsky initially spoke to Captain Porter, he was aware of Mr. Hylton-Brown's serious injuries and he knew those injuries occurred after Mr. Sutton had chased Mr. Hylton-Brown for several minutes.

### 3.  Specific Intent to Hinder, Delay, or Prevent

"In 'most cases in which the defendant's state of mind is at issue, it may be near impossible to establish the requisite mens rea through direct evidence' and therefore proof of intent must be inferred from circumstantial evidence." United States v. Wheeler, 889 F. Supp. 2d 64, 68 (D.D.C. 2012) (quoting United States v. Schaffer, 183 F.3d 833, 843 (D.C. Cir. 1999)). The government introduced more than sufficient evidence for a reasonable juror to infer that both Mr. Sutton and Mr. Zabavsky had the specific intent to hinder, delay, or prevent certain information from being communicated to federal law enforcement.

Officer Folts and Captain Porter both explained that notification to the Major Crash Unit should have been made much earlier by an officer at the scene of the collision; yet neither Mr. Sutton nor Mr. Zabavsky made that call.  Officer Folts also explained that MPD

policies direct MPD officers to "freeze" collision sites in their original condition, yet Mr. Sutton and Mr. Zabavsky failed to do so.  See Trial Tr. Nov. 10, 2022 a.m. at 72:7-11.  Multiple witnesses testified that Mr. Sutton ran over a piece of Mr. Hylton-Brown's moped at the scene instead of ensuring that the scene was properly preserved.  And body worn camera footage indisputably indicates that Mr. Sutton and Mr. Zabavsky turned their body worn cameras off while they spoke privately at the collision site.  After all of this, when Mr. Sutton and Mr. Zabavsky arrived back at the Fourth District, they failed to provide Captain Porter with a complete account of what had occurred.  Taken together, this evidence was sufficient for a reasonable jury to find that Mr. Sutton and Mr. Zabavsky had the purpose of making it harder for Major Crash Unit officers and IAD agents to learn the truth about the pursuit and collision.  Drawing all inferences in the government's favor, the government presented sufficient evidence of Mr. Sutton and Mr. Zabavsky's intent.

Mr. Sutton argues that "nothing that was done by the defendants or anyone else in this case prevented [Major Crash] from doing their job."  See Trial Tr. Dec. 9, 2022 p.m. at 30:2-4.  Because the Major Crash Unit was able to do a full investigation, he says, the government could not have established that any communication of information relating to the chase and collision was prevented, hindered, or delayed – let alone that the defendants intended to prevent, hinder, or delay any such communication.  See Sutton Mot. at 24; Sutton Reply at 21 ("Major Crash and IAD were advised of the collision within 3 hours of the event.").  It is irrelevant, however, whether there was any "actual delay" in the Major Crash or IAD investigation, see Sutton Reply at 22, so long as Mr. Sutton intended to bring about a delay in some communication.  See United States v. Perry, 335 F.3d 316, 322 n.9 (4th Cir. 2003) ("[Section 1512(b)(3)] applies to one who engaged in misleading conduct with an intent to

'hinder, delay, or prevent' communication with federal law enforcement officers.  It does not

require that the individual have succeeded."). Based on the evidence established at trial, the jury

was entitled to conclude that Mr. Sutton acted with the requisite intent.

        Mr. Zabavsky argues that the government failed to prove that he acted with the

requisite intent because he took several affirmative steps to share accurate information about the

events leading to Mr. Hylton-Brown's death.  For example, he notified the Major Crash Unit as

soon as he learned that Mr. Hylton-Brown was going to die.  See Zabavsky Mot. at 12.  Within

the MPD's body worn camera video storage system, he also labeled his own body worn camera

footage as relating to "Internal Investigations."  Id.; see Gov't Ex. 219-E (body worn camera

audit log for Mr. Zabavsky's body worn camera footage from October 23, 2020).  Mr. Zabavsky

suggests that these two actions make it impossible for a reasonable juror to have concluded that

he acted with the specific intent to hinder, delay, or prevent the communication of certain

information.  Id.  The Court disagrees.  The two pieces of evidence Mr. Zabavsky cites do not

outweigh the significant other evidence the government introduced about Mr. Zabavsky's intent.

See United States v. Borda, 848 F.3d at 1055 (holding that the government's evidence was

sufficient to affirm conviction despite "numerous examples of evidence [the defendants] believe

to be exculpatory or contradicting"); United States v. Bell, 113 F.3d 1345, 1350 (3d Cir. 1997)

(evidence was sufficient to sustain Section 1512 conviction where defendant was "motivated at

least in part by a desire to prevent" a communication to federal officers concerning the possible

commission of a federal offense); United States v. Ronga, 682 F. App'x at 855 ("Perhaps it is

possible that when an individual comes clean, he or she may no longer possess the necessary

mens rea.  However, the elements of the crime are met before the individual provides truthful

information, and there is no requirement that the individual persist in deceptive behavior to support a conviction.").

Although Mr. Zabavsky labeled his body worn camera as relating to "Internal Investigations," he also obscured his own involvement in the chase when speaking with Captain Porter. And, although he eventually called the Major Crash Unit, he did so more than an hour after the collision had occurred, after the striking vehicle and the CST officers had left the scene. He also told Captain Porter that he was not sure whether Mr. Sutton had engaged in a pursuit, despite broadcasting over the Ops radio that the CST was "chasing Karon." And he and Mr. Sutton turned off their body worn cameras at the crash scene before heading back to the Fourth District. Taken in the light most favorable to the government, a reasonable juror could easily conclude that Mr. Zabavsky acted with the requisite intent, notwithstanding the two "affirmative" actions he identifies in his motion. See Zabavsky Mot. at 12.

### 4. Communication to a Law Enforcement Officer of the United States

The government clearly established that it was reasonably likely that information about the circumstances of Mr. Sutton's and Mr. Zabavsky's involvement in Mr. Hylton-Brown's death would be communicated to a federal law enforcement officer. See Fowler v. United States, 563 U.S. at 678. The government presented testimony about communications that must be made after an incident like this one, including notifications to various departments within MPD and referrals to federal officials at the U.S. Attorney's Office.

Specifically, the government presented testimony about the kinds of incidents that IAD and the Major Crash Unit investigate and the kinds of cases that IAD refers to the U.S. Attorney's Office as a matter of course. The government's evidence established that when an officer engages in a pursuit – and especially when a civilian is killed or sustains serious bodily

injury during or as a result of that pursuit – IAD must be notified and will investigate the matter.

MPD officers learn about this notification process during their training.  When any person

sustains bodily injury or is killed in a vehicle collision, the Major Crash Unit will also

investigate.  MPD officers learn about this during their training, as well.  As Agent Della Camera

and Officer Folts explained, the Major Crash Unit and IAD work together and share information

with one another to complete their investigations.  After an investigation, IAD <u>always</u> refers

misconduct cases involving civilian deaths to the U.S. Attorney's Office for prosecutorial

screening, and MPD officers learn during training that they may be subject to criminal

prosecution for on-the-job misconduct.  Assistant United States Attorneys in the Public

Corruption and Civil Rights Unit and special agents employed by the U.S. Attorney's Office like

Sean Ricardi are federal law enforcement officers who are responsible for investigating incidents

of police misconduct after those incidents are referred to the U.S. Attorney's Office.  <u>See</u> Trial

Tr. Oct. 31, 2022 p.m. at 72:8-13 (Agent Ricardi explained that he is a federal law enforcement

officer whose "ultimate boss" is the United States Attorney, who is the "chief federal officer in

any given federal district").  These notification procedures establish that, in vehicular pursuit

cases involving civilian deaths, communication to a federal law enforcement officer at the U.S.

Attorney's Office is all but guaranteed.

        The government also introduced evidence that certain information was in fact

communicated to federal law enforcement officers following the chase and collision that resulted

in Mr. Hylton-Brown's death.  Captain Porter testified that he called IAD as soon as he reviewed

Officer Tejera's body worn camera footage and realized Mr. Sutton was engaged in a chase.

Agent Della Camera explained that he received Captain Porter's phone call, and within an hour,

had himself reviewed body worn camera footage and responded to the scene to investigate.

Officer Folts testified that he received Mr. Sutton's draft traffic crash report from Mr. Zabavsky, and that he subsequently forwarded that report to IAD. Agent Della Camera also explained that within eight hours of the collision, he referred this matter to the U.S. Attorney's Office for prosecutorial review. Special Agent Ricardi, a federal officer, testified about the investigation he conducted following Agent Della Camera's referral. From this record, the communication of information relating to the chase and death of Mr. Hylton-Brown to a federal law enforcement officer was "more than remote, outlandish, or simply hypothetical." Fowler v. United States, 563 U.S. at 678. [8]

Mr. Zabavsky and Mr. Sutton contend that the communication of information to federal law enforcement was not "reasonably likely" based on the trial record. They argue that the government's evidence established that the Major Crash Unit and IAD "work in parallel," and the fact that information would be communicated to Major Crash does not mean that the same information would necessarily be communicated to the U.S. Attorney's Office through an IAD referral. See Trial Tr. Dec. 9, 2022 p.m. at 24:18-25:13; id. at 26:1-7 ("Communication to Major Crash does not go to the federal government, and it is not reasonably likely to do so."); Zabavsky Mot. at 17-18 ("[T]he government improperly conflated the major crash investigation with the notification to federal authorities made by the Internal Affairs Division.").

---

[8]  Agent Della Camera testified that IAD referrals always go to the same unit within the U.S. Attorney's Office for prosecutorial review and potential prosecution: the Public Corruption and Civil Rights Unit. Trial Tr. Nov. 7, 2022 p.m. at 99:9-13. A reasonable juror could infer, based on that testimony, that it was reasonably likely that a communication – an IAD referral – would be received by federal law enforcement officers – the prosecutors and agents in the Public Corruption and Civil Rights Unit, which are on the "federal side" of the U.S. Attorney's Office in the District of Columbia. Id. at 98:22-99:1; see Fowler v. United States, 563 U.S. at 678.

Mr. Sutton and Mr. Zabavsky's argument directly contradicts the testimony from Agent Della Camera and Officer Folts, who explained that IAD and the Major Crash Unit work together to investigate collisions involving serious injuries and officer misconduct – matters that are typically referred to the U.S. Attorney's Office.  Officer Folts explained that IAD and the Major Crash Unit are supposed to conduct "joint investigation[s]" when serious traffic crashes involve police misconduct.  Trial Tr. Nov. 9, 2022 a.m. at 55:6-3.  Agent Della Camera similarly testified that the two units "divide up the tasks" and "share information" when investigating pursuits that result in fatalities.  Trial Tr. Nov. 7, 2022 p.m. at 21:11-23.  While Officer Folts was at the hospital with Mr. Hylton-Brown, he called Agent Della Camera to give him with "as much information" as Officer Folts could provide.  Trial Tr. Nov. 9, 2022 a.m. at 69:5-70:3.  Officer Folts also sent IAD the draft report that Mr. Sutton wrote, which Agent Della Camera relied on extensively when drafting his preliminary IAD report.  Agent Della Camera eventually did, in fact, make a referral to the U.S. Attorney's Office, and he transmitted related documents about his investigation to the U.S. Attorney's Office.  See Trial Tr. Nov. 7, 2022 p.m. at 99:19-100:11 (Della Camera testimony).  The jury could thus infer that any information communicated to the Major Crash Unit would also be communicated to IAD, and from there, was reasonably likely to eventually be communicated to the U.S. Attorney's Office.  See United States v. Johnson, 874 F.3d at 1081-82 (applying Fowler's reasonable likelihood standard to Section 1512(b)(3) offenses); United States v. Guadalupe, 402 F.3d at 413 (affirming Section 1512(b)(3) conviction where defendant "intended to influence an investigation which later became federal").

### 5. Commission or Possible Commission of a Federal Offense

Finally, the government was required to prove that the information that could have been communicated "relat[ed] to the commission or possible commission of a Federal

offense." 18 U.S.C. § 1512(b)(3).  The government's evidence on this element was not overwhelming, but, drawing all inferences in favor of the government, it was sufficient.

Mr. Sutton, Mr. Zabavsky, and the government all agree that the only evidence tending to establish this element was testimony from Agent Della Camera and Special Agent Ricardi.  Agent Della Camera explained that he understood that the U.S. Attorney's Office was conducting a federal civil rights investigation, and that he attended some witness interviews during that investigation.  He also said that he referred this case to a unit "on the federal side" of the U.S. Attorney's Office for review and potential prosecution.  Special Agent Ricardi similarly testified that he understood that the U.S. Attorney's Office was investigating a possible federal civil rights offense and that he in fact investigated this incident consistent with this impression.  Both witnesses explained that they believed this investigation concerned possible federal civil rights offenses, not only because they had personal knowledge of the investigation, but because members of the prosecution team told them that this was a federal civil rights investigation.  This evidence – Agent Della Camera's and Special Agent Ricardi's testimony about their first-hand participation in a federal civil rights investigation and the statements of others that informed the agents' states of mind – was sufficient to withstand a motion for judgment of acquittal.

Mr. Sutton and Mr. Zabavsky argue that the government failed to prove that "the target offense of the obstruction count was a federal offense," Sutton Mot. at 25, because the government "presented only hearsay testimony" from Special Agent Ricardi and Agent Della Camera that the U.S. Attorney's Office was investigating potential federal civil rights violations. Sutton Reply at 28-29; see Trial Tr. Dec. 9, 2022 p.m. at 50:19-21 (argument of counsel for Mr. Sutton); Trial Tr. Nov. 21, 2022 p.m. at 12:21-13:2 (argument of counsel for Mr. Zabavsky). When Agent Ricardi was asked what kind of investigation this case was referred for, he

explained: "We were told this was a civil rights investigation." Trial Tr. Oct. 26, 2022 p.m. at

16:9-17; see id. at 16:18-21 (Agent Ricardi then explained that his supervisor, Special Agent

Molnar, and Assistant U.S. Attorney Ahmed Baset informed him that this was a civil rights

investigation). When asked about his understanding of the investigation, Agent Della Camera

testified that "according to AUSA Baset, it was a civil rights investigation." Trial Tr. Nov. 7,

2022 p.m. at 100:23-101:1.

       As the Court explained during trial, the testimony of Agent Della Camera and

Special Agent Ricardi about what they were told was not admitted for its truth, but instead was

admitted to establish the agents' motivations for their subsequent actions. Trial Tr. Dec. 6, 2022

p.m. at 48:24-49:2 (the Court concluded that "Ricardi's testimony about the civil rights or

possible civil rights investigation was not hearsay. He was in the meeting, and he took specific

action as a result"). After each agent was told that the U.S. Attorney's Office was conducting a

civil rights investigation, he in fact participated in that investigation. Agent Della Camera

explained that he sat in on witness interviews, and Special Agent Ricardi testified about the "top

to bottom investigation" he conducted into this incident. Trial Tr. Oct. 26, 2022 p.m. at

14:13-17. Because these statements from the prosecutor and from Special Agent Ricardi's

supervisor were admitted foundationally to explain why each agent took certain actions – and not

for their truth – they are not hearsay. See FED. R. EVID. 801(c); United States v. Evans, 216 F.3d

80, 87 (D.C. Cir. 2000) ("[W]hen the 'background' being offered is the state of mind of the

police, it is technically not hearsay at all."); Jones v. United States, 934 F. Supp. 2d 284, 290

(D.D.C. 2013) (statements that were offered "to establish that certain statements were made and

their effect on the listener" were offered for a non-hearsay purpose). From the admittedly

limited evidence presented by the government about Special Agent Ricardi's and Agent Della

Camera's state of mind and about their subsequent actions, a reasonable jury could conclude that Mr. Sutton and Mr. Zabavsky intended to hinder, obstruct, or prevent the communication of information related to the "possible commission of a federal offense."  18 U.S.C. § 1512(b)(3).

### D.  The Government Has Met Its Burden as to Conspiracy to Obstruct Justice

#### 1.  Agreement and Intent

To prove conspiracy, the government was required to establish that Mr. Sutton and Mr. Zabavsky made an agreement to commit the crime of obstruction of justice, and that both Mr. Sutton and Mr. Zabavsky intentionally joined in that agreement.  "[D]irect evidence of agreement is not required, however; the jury may infer conspiratorial agreement from the circumstances and the defendant's knowledge."  United States v. Moore, 651 F.3d 30, 97 (D.C. Cir. 2011) (citing United States v. Childress, 58 F.3d 693, 710 (D.C. Cir. 1995)); see United States v. Paitsel, Crim. No. 19-0156, 2023 WL 2139366, at *4 (D.D.C. Feb. 21, 2023) ("An agreement to join a conspiracy need not be explicit and may be inferred from the facts and circumstances of the case." (citing United States v. Smith, 950 F.3d at 895)).  The Court concludes that the government established sufficient evidence that the defendants intentionally made an agreement to commit the crime of obstruction of justice.

At trial, the government presented evidence documenting how Mr. Sutton and Mr. Zabavsky turned off their body worn cameras and had a private conversation before leaving the collision site and returning to the Fourth District.  The jury also heard testimony about how Mr. Zabavsky followed Mr. Sutton's lead as Mr. Sutton chased Mr. Hylton-Brown for several minutes, "paralleling" Mr. Sutton's route through the neighborhood and explaining on the Ops radio channel that they were "chasing" Mr. Hylton-Brown.  Mr. Zabavsky's body worn camera depicts a conversation he had with Officer Arnone, during which he made clear that Mr. Sutton,

not Officer Arnone, would be responsible for writing the report that was later sent to the Major

Crash Unit and IAD investigators. Both officers left the scene of the collision and returned to the

Fourth District, where they went together to Captain Porter and provided him with a misleading

account of what had happened.

Mr. Sutton and Mr. Zabavsky suggest that evidence "of an agreement to conspire"

is "completely speculative." Sutton Mot. at 25. Although the jury was not permitted to find Mr.

Sutton and Mr. Zabavsky guilty based solely on "mere speculation," the jury was entitled to

"draw a vast range of reasonable inferences from [the] evidence." United States v. Gaskins, 690

F.3d 569, 579 n.3 (D.C. Cir. 2012) (quoting United States v. Long, 905 F.2d 1572, 1576 (D.C.

Cir. 1990)). The Court concludes that the government presented sufficient circumstantial and

indirect evidence of an agreement to conspire, and that the jury was not asked to "cross[] the line

from permissible inference to improper speculation." United States v. Teffera, 985 F.2d 1082,

1088 (D.C. Cir. 1993); see United States v. Gaskins, 690 F.3d at 579 n.3.

The government's evidence was also sufficient to establish that Mr. Sutton and

Mr. Zabavsky had an agreement to violate the law. See United States v. Quinn, 403 F. Supp. 2d

57, 66 (D.D.C. 2005). The government introduced ample evidence that Mr. Sutton and Mr.

Zabavsky "knew their specific conduct . . . was illegal at the time they engaged or planned to

engage in the conduct, and  . . . that, by virtue of that knowledge of illegality, the defendants'

cooperative efforts . . .  constituted an agreement to commit an offense." Id. at 67.

Multiple witnesses testified that the crash site was not adequately preserved, and

the government suggests that the jury can infer from this fact that Mr. Sutton and Mr. Zabavsky

"handled the scene in a manner that would not trigger the kinds of notifications that otherwise

would be triggered." Trial Tr. Nov. 21, 2022 p.m. at 59:7-12. The Court agrees that this is a

reasonable inference, particularly given the testimony from various officers about how Mr.

Sutton and Mr. Zabavsky were knowledgeable about MPD policies and procedures, which

provide guidance on preserving crash sites and making timely notification to the Major Crash

Unit and IAD.  Furthermore, when Mr. Sutton and Mr. Zabavsky spoke to Captain Porter for the

first time that evening together, neither Mr. Sutton nor Mr. Zabavsky provided Captain Porter

with a thorough, truthful account of the events leading up to Mr. Hylton-Brown's death.  The

government presented evidence that both Mr. Sutton and Mr. Zabavsky knew, based on their

training and experience, that they should have told Captain Porter more than they did.  And

testimony from various other officers established MPD's policies and practices about notifying

superior officers and other MPD departments when a pursuit occurs and results in life-

threatening injuries.  Officer Totaro and Agent Della Camera both explained that MPD officers

are taught that they can face criminal penalties for misconduct that occurs on the job, a fact that

the jury was entitled to infer that Mr. Sutton and Mr. Zabavsky were aware of.  Based on this

evidence, the jury was permitted to infer an agreement between Mr. Sutton and Mr. Zabavsky, as

well as their mutual intent to commit the crime of obstruction of justice.

## 2.  Overt Act

The government was also required to prove that Mr. Sutton or Mr. Zabavsky took

some action with the purpose of carrying out the conspiracy.  The jury unanimously found that

the government proved beyond a reasonable doubt Overt Act Thirteen, which stated:

> At the Fourth District police station, Sutton and Zabavsky met with
> the Watch Commander, the senior-most official in charge, and
> provided him with a misleading account of the incident:
>> a. Sutton and Zabavsky portrayed the incident as a brief
>> attempted traffic stop from which a moped driver took off and
>> was then hit by a vehicle;
>> b. Sutton minimized his conduct, saying that he did not engage
>> in a vehicular pursuit;

  c. Zabavsky said that he did not know if Sutton had engaged in a vehicular pursuit;

  d. Zabavsky withheld information concerning his own involvement in the pursuit;

  e. Zabavsky said that Hylton-Brown had been drunk and had been slurring his words; and,

  f. Sutton and Zabavsky withheld all information about Hylton-Brown's serious injuries.

Jury Instructions at 37-38; see Verdict Form [Dkt. No. 426] at 2.  The trial record establishes that it was reasonable for the jury to conclude that an overt act – specifically, Overt Act 13 – was taken in furtherance of the conspiracy.

    Although the government introduced ample evidence about Mr. Sutton and Mr. Zabavsky's misleading conduct, Captain Porter's testimony alone is sufficient for their convictions to withstand a motion for judgment of acquittal.  Captain Porter explained that when Mr. Sutton and Mr. Zabavsky initially came to his office that night, they told him that they "might have been trying to stop" Mr. Hylton-Brown and they were trying to determine if this "[was] a chase or not."  See Trial Tr. Nov. 17, 2022 a.m. at 54:1-19 (Porter testimony).  Mr. Sutton and Mr. Zabavsky made those representations to Captain Porter despite Mr. Sutton following Mr. Hylton-Brown the wrong way down a one-way street and Mr. Zabavsky having already said over the Ops channel radio that they were "chasing" Mr. Hylton-Brown.  Mr. Zabavsky and Mr. Sutton did not mention Mr. Hylton-Brown's head injury or his vomiting, leaving Captain Porter with the mistaken impression that this was an ordinary accident rather than a potentially fatal one.  Captain Porter also testified that Mr. Zabavsky told him that Mr. Hylton-Brown was potentially intoxicated and slurring his words, but Mr. Zabavsky's body worn camera footage does not show him ever speaking to Mr. Hylton-Brown.  Mr. Sutton's and Mr. Zabavsky's representations gave Captain Porter the impression that Mr. Zabavsky was not involved in the incident, and that Mr. Zabavsky would have to review the body worn camera

footage in order to determine whether a chase had occurred – again, despite the fact that Mr. Zabavsky had deemed this a chase while it was happening and had participated in the chase.

An honest conversation with Captain Porter – in which Mr. Sutton and Mr. Zabavsky disclosed the seriousness of Mr. Hylton-Brown's injuries and admitted their involvement in the pursuit – would likely have resulted in immediate notification to IAD, who would have provided a full and accurate account of the investigation to the U.S. Attorney's Office. But Mr. Sutton and Mr. Zabavsky chose to go a different route, and as a result, IAD was not notified about this incident until approximately 12:30 a.m. on October 24, 2020. The government thus presented more than sufficient evidence that Mr. Sutton and Mr. Zabavsky took an overt act in furtherance of the conspiracy during their conversation with Captain Porter.

Mr. Zabavsky raises similar arguments regarding the conspiracy conviction as he raised respecting the obstruction of justice conviction. Specifically, he argues that his truthful statements to Captain Porter make it impossible for a jury to have concluded that he took an overt act in furtherance of a conspiracy to obstruct justice by misleading Captain Porter. See June 5, 2023 Hearing Tr. at 31:3-32:7. He also suggests that he was not aware of all of the circumstances surrounding the collision when he spoke to Captain Porter, and therefore no reasonable juror could have concluded that he knowingly provided Captain Porter with a misleading account of the incident. See id. at 33:3-17. For the same reasons the Court rejected Mr. Zabavsky's argument regarding the misleading nature of his conduct, the Court rejects this argument as it relates to an overt act in furtherance of a conspiracy.

## V.  CONCLUSION

In October of 2020, a police officer engaged in a reckless car chase that cost a young man his life.  The officer and his supervisor worked together in an attempt to prevent the truth about that young man's death from coming to light.  After a nine-week trial, a jury convicted the officer of second-degree murder and the officer and his supervisor of obstruction of justice and conspiring to obstruct justice.  The Court has thoroughly reviewed the extensive evidence presented at trial and finds the evidence sufficient to withstand a motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure.  Accordingly, it is hereby

ORDERED that Terence D. Sutton Jr.'s Motion for Judgment of Acquittal [Dkt. No. 447] as to Count One, Count Two, and Count Three is DENIED; and it is

FURTHER ORDERED that Andrew Zabavsky's Motion for Judgment of Acquittal [Dkt. No. 445] as to Count Two and Count Three is DENIED.

SO ORDERED.

_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  December 6, 2023