UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                       )
UNITED STATES OF AMERICA               )
                                       )
        v.                             )        Criminal No. 21-0598 (PLF)
                                       )
TERENCE SUTTON                         )
        and                            )
ANDREW ZABAVSKY,                       )
                                       )
                Defendants.            )
_____        )

<u>OPINION AND ORDER</u>

        Following a nine-week jury trial and a verdict of guilty on all counts, defendants

Terence Sutton and Andrew Zabavsky have moved for arrest of judgment and a new trial. They

raise myriad arguments about the Court's legal and evidentiary rulings, as well as arguments

about the propriety of the Court's and the government's conduct during trial. The Court has

addressed many of these arguments previously. For the reasons given below, the Court

concludes that it has jurisdiction over this case and that arrest of judgment therefore is not

warranted. The Court also concludes that the interests of justice do not warrant granting Mr.

Sutton or Mr. Zabavsky a new trial. Their motions are denied.[1]

_____

[1]        The Court has reviewed the following documents and attachments thereto in
connection with the pending motions: Indictment [Dkt. No. 1]; Final Instructions to Jury ("Jury
Instructions") [Dkt. No. 435]; Terence D. Sutton Jr.'s Motion for a New Trial and Arrest of
Judgment ("Sutton Mot.") [Dkt. No. 449]; Andrew Zabavsky's Motion for a New Trial and
Arrest of Judgment ("Zabavsky Mot.") [Dkt. No. 448]; United States' Opposition to
Defendants' Motions for Judgment of Acquittal, New Trial, and Arrest of Judgment ("Gov't
Opp.") [Dkt. No. 456]; Terence D. Sutton Jr.'s Reply in Support of his Motion for a New Trial
and Arrest of Judgment ("Sutton Reply") [Dkt. No. 467]; Andrew Zabavsky's Reply in Support
of Zabavsky's Motion for Judgment of Acquittal and Zabavsky's Motion for New Trial and

TABLE OF CONTENTS

I. BACKGROUND ................................................................................................................4

II. ARREST OF JUDGMENT ...............................................................................................5

   A. Legal Standard ...........................................................................................................5

   B. Discussion ..................................................................................................................6

      1. Whether a "Possible" Federal Civil Rights Offense Occurred ........................7

      2. Abuse of Prosecutorial Discretion ..................................................................11

      3. Selective Prosecution ......................................................................................13

III. NEW TRIAL .................................................................................................................15

   A. Legal Standard .........................................................................................................15

Arrest of Judgment ("Zabavsky Reply") [Dkt. No. 461]; Brief of the National Fraternal Order of Police, as <u>Amicus Curiae</u> in Support of Defendant Terence Sutton's Post-trial Motions ("Amicus Br.") [Dkt. No. 481]; First Motions Hearing Transcript, <u>United States v. Sutton</u>, Crim. No. 21-0598 (May 17, 2023) ("May 17, 2023 Hearing Tr.") [Dkt. No. 497]; Second Motions Hearing Transcript, <u>United States v. Sutton</u>, Crim. No. 21-0598 (June 5, 2023) ("June 5, 2023 Hearing Tr.") [Dkt. No. 506]; and Government Exhibits ("Gov't Ex.") [Dkt. No. 430].

      In their motions, Mr. Sutton and Mr. Zabavsky raise several issues that the Court has addressed previously in written and oral opinions. The Court has reviewed the following prior opinions in consideration of the pending motions: <u>United States v. Sutton</u>, Crim. No. 21-0598, 2022 WL 1183797 (D.D.C. Apr. 21, 2022) ("Bill of Particulars Op."); <u>United States v. Sutton</u>, Crim. No. 21-0598, 2022 WL 1202741 (D.D.C. Apr. 22, 2022) ("April Mot. to Compel Op."); <u>United States v. Sutton</u>, Crim. No. 21-0598, 2022 WL 2383974 (D.D.C. July 1, 2022) ("Pretrial <u>Brady</u> Op."); <u>United States v. Sutton</u>, Crim. No. 21-0598, 2022 WL 2828995 (D.D.C. July 20, 2022) ("July Mot. to Compel Op."); Mot. to Dismiss Oral Ruling Transcript, <u>United States v. Sutton</u>, Crim. No. 21-0598 (D.D.C. Aug. 3, 2022) ("Mot. to Dismiss Oral Ruling") [Dkt. No. 217]; <u>United States v. Sutton</u>, Crim. No. 21-0598, 2022 WL 3134449 (D.D.C. Aug. 5, 2022) ("August Mot. to Compel Op."); <u>United States v. Sutton</u>, 636 F. Supp. 3d 179 (D.D.C. 2022) ("First Mot. <u>in Limine</u> Op."); <u>United States v. Sutton</u>, Crim. No. 21-0598, 2022 WL 11744415 (D.D.C. Oct. 20, 2022) ("Mot. to Sever Op."); <u>United States v. Sutton</u>, 642 F. Supp. 3d 57 (D.D.C. 2022) ("<u>Daubert</u> Op."); <u>United States v. Sutton</u>, Crim. No. 21-0598, 2022 WL 17335969 (D.D.C. Nov. 30, 2022) ("Second Mot. <u>in Limine</u> Op."); <u>United States v. Sutton</u>, Crim. No. 21-0598, 2023 WL 5827718 (D.D.C. Sept. 8, 2023) ("Post-trial Mot. to Compel Op."); <u>United States v. Sutton</u>, Crim. No. 21-0598, 2023 WL 6230727 (D.D.C. Sept. 26, 2023) ("Post-trial <u>Brady</u> Op."); <u>United States v. Sutton</u>, Crim. No. 21-0598, 2023 WL 6446185 (D.D.C. Oct. 3, 2023) ("Post-trial Mot. to Dismiss Op."); and <u>United States v. Sutton</u>, Crim. No. 21-0598, 2023 WL 8472628 (D.D.C. Dec. 8, 2023) ("Rule 29 Op.").

      During trial, the court reporters provided daily transcripts of each day's proceedings to the Court and the parties. Those transcripts are cited as: Trial Tr. [Date] [Time] at [Page:Line].

B. Second Degree Murder .................................................................................. 16

   1. Right to Present a Defense ...................................................................... 22

     a. Expert Witnesses ............................................................................. 26

     b. Evidence of Mr. Hylton-Brown's Criminal Conduct ................................. 27

   2. Jury Instructions .................................................................................. 31

C. Obstruction of Justice and Conspiracy to Obstruct Justice ................................... 38

D. Alleged Prosecutorial and Judicial Misconduct ................................................. 43

   1. Prosecutorial Misconduct ....................................................................... 43

     a. "Perjured" Testimony of Kevonn Mason .............................................. 43

     b. Opening Statement and Closing Arguments .......................................... 50

       i. Opening Statement ...................................................................... 50

       ii. Closing Arguments ...................................................................... 53

   2. Judicial Misconduct .............................................................................. 60

     a. The Court's Statements to Counsel ..................................................... 60

     b. The Court's Examination of Witnesses ................................................ 64

E. Exclusion or Limitation of Evidence ................................................................ 65

   1. Lay Opinion Testimony .......................................................................... 65

   2. Exclusion of Expert Witness James Dahlquist ............................................ 66

F. Testimony From and About Chinendu Ukeekwe .................................................. 68

   1. Restrictions on Mr. Ukeekwe's Testimony ................................................ 72

   2. Cross Examination of Special Agent Ricardi .............................................. 74

G. Miscellaneous Other Arguments ..................................................................... 76

   1. Alleged Jencks Act Violation ................................................................... 76

   2. Seating Arrangements ............................................................................ 78

   3. Conduct of Karen Hylton ....................................................................... 79

IV. CONCLUSION ............................................................................................ 80

## I.  BACKGROUND

The Court described at length the procedural history of this case and the facts that were elicited at trial in its opinion denying Mr. Sutton and Mr. Zabavsky's motions for judgment of acquittal.  See generally Rule 29 Op.  At the time that the events giving rise to this case occurred, Mr. Sutton and Mr. Zabavsky were employees of the Metropolitan Police Department ("MPD").  On October 23, 2020, while operating an unmarked police vehicle, Mr. Sutton encountered a young man named Karon Hylton-Brown.  Mr. Sutton knew Mr. Hylton-Brown from previous encounters. That night, Mr. Hylton-Brown was riding an electric scooter (or moped) without a helmet.  Mr. Sutton tried to initiate a traffic stop of Mr. Hylton-Brown. When Mr. Hylton-Brown refused to stop, Mr. Sutton followed him through the Kennedy Street neighborhood of Northwest D.C.  After being chased for about two minutes, Mr. Hylton-Brown turned into an alleyway, where Mr. Sutton continued pursuing him.  When Mr. Hylton-Brown exited the alleyway, he was struck by an oncoming vehicle. Mr. Hylton-Brown died from his injuries several hours later.

In the aftermath of the collision, Mr. Sutton and his supervisor, Lieutenant Andrew Zabavsky, failed to make immediate notification to the Major Crash Unit, the unit within MPD that investigates traffic collisions resulting in death or serious bodily injury.  Mr. Sutton and Mr. Zabavsky also failed to make immediate notification to the Internal Affairs Division, the department responsible for investigating officer misconduct, uses of force, and non-compliance with internal police policies.  Mr. Sutton and Mr. Zabavsky failed to ensure that adequate steps were taken to preserve the crash scene for subsequent investigation.  And they failed to provide a full, truthful, and unambiguous account of the pursuit and collision to their superior officer, the watch commander who was on duty that night.

4

On September 23, 2021, a grand jury indictment was unsealed charging Mr. Sutton and Mr. Zabavsky with conspiracy to obstruct justice, in violation of 18 U.S.C. § 371, and obstruction of justice and aiding and abetting, in violation of 18 U.S.C. § 1512(b)(3), 2. See Indictment [Dkt. No. 1].  Mr. Sutton was also charged with second degree murder in violation of D.C. Code § 22-2103.  Id.

Trial began on October 25, 2022 and the jury returned a verdict on December 21, 2022.  After the verdict, the Court set a schedule for briefing on the post-trial motions.  On February 27, 2023, Mr. Sutton and Mr. Zabavsky submitted motions for arrest of judgment under Rule 34 of the Federal Rules of Criminal Procedure and motions for new trial under Rule 33 of the Federal Rules of Criminal Procedure.  The government opposed, and Mr. Sutton and Mr. Zabavsky submitted replies.  The Court heard oral argument on the motions and on related issues on May 17, 2023.  The Court also heard oral argument on Mr. Sutton and Mr. Zabavsky's motions for judgment of acquittal on June 5, 2023.  Some of Mr. Sutton and Mr. Zabavsky's arguments as to the Rule 33 and Rule 34 motions relate to issues that were raised in the Rule 29 motions, and the Court has considered the parties' relevant written submissions and oral presentations in resolving the Rule 33 and Rule 34 motions.

## II.  ARREST OF JUDGMENT

### A.  Legal Standard

Under Rule 34 of the Federal Rules of Criminal Procedure, "the court must arrest judgment if the court does not have jurisdiction of the charged offense."  FED. R. CRIM. P. 34(a).  "The purpose of a motion to arrest judgment . . . is to give the trial judge another chance to invalidate a judgment due to a fundamental error appearing on the face of the record."  3 CHARLES ALAN WRIGHT & SARAH N. WELLING, FEDERAL PRACTICE AND PROCEDURE CRIM.

§ 601 (4th ed. 2022); see United States v. Sisson, 399 U.S. 267, 279-80 (1970).  The "record"

for Rule 34 purposes includes the indictment, the plea, the verdict, and the sentence; it does not

include any of the evidence introduced at trial.  3 WRIGHT & WELLING, FEDERAL PRACTICE AND

PROCEDURE CRIM. § 601 (citing People of Territory of Guam v. Palomo, 511 F.2d 255, 259 (9th

Cir. 1975)).  "Rule 34(a) recognizes only one ground to arrest judgment:  that the court does not

have jurisdiction over the charged offense."  Id.  "[D]efects in an indictment do not deprive the

court of subject-matter jurisdiction."  United States v. Muresanu, 951 F.3d 833, 839 (7th Cir.

2020); see United States v. Cotton, 535 U.S. 625, 631 (2002); United States v. Reffitt, 602 F.

Supp. 3d 85, 90 (D.D.C. 2022).

### B.  Discussion

Mr. Sutton and Mr. Zabavsky raise three arguments in support of their motions

to arrest judgment.  First, they argue that the allegations contained in the indictment are not

sufficient to establish the "possible commission of a federal offense," and thus, the indictment

does not allege a federal crime and the Court is deprived of jurisdiction to adjudicate that

offense.  See Sutton Mot. at 4-7; Sutton Reply at 3-5; Zabavsky Mot. at 4-5.  Second, Mr.

Sutton argues that the Court is deprived of jurisdiction over this case because the U.S. Attorney

"abused his authority" by prosecuting this case in federal court as opposed to the District of

Columbia Superior Court.  Sutton Mot. at 7.  Third, Mr. Zabavsky argues that the Court is

deprived of jurisdiction over his charges because the government selectively prosecuted him

due to his race and occupation.  Zabavsky Mot. at 6-9.  The Court addresses each argument in

turn.

1.   Whether a "Possible" Federal Civil Rights Offense Occurred

Mr. Sutton and Mr. Zabavsky argue that the indictment does not allege that they or any other officer "used force against Hylton-Brown which could constitute a federal civil rights violation."  Sutton Mot. at 4.  They contend that, on the facts alleged in the indictment, a "prosecution for a federal civil rights violation was impossible."  Id. at 6; see Sutton Reply at 2 ("The facts alleged in the Indictment do not establish even the possibility of a federal civil rights offense.").  Because a federal civil rights violation is "impossible" on the facts as alleged in the indictment, they argue, the Court is deprived of jurisdiction over the obstruction of justice charge, which requires as an element the "commission or possible commission of a Federal offense."  18 U.S.C. § 1512(b)(3).  Having no jurisdiction over obstruction of justice, Mr. Sutton and Mr. Zabavsky argue that the Court is also deprived of jurisdiction over conspiracy to obstruct justice and the D.C. Code second degree murder charge.  Sutton Mot. at 7-8; see Zabavsky Mot. at 4 (arguing for arrest of judgment because "no civil rights violation occurred").

The Court disagrees.  Even if there were defects in the indictment, such defects are not "jurisdictional" and "do not deprive a court of its power to adjudicate a case."  United States v. Cotton, 535 U.S. at 630-31.  "[E]ven when an indictment fails to state an offense," such a defect is not "jurisdictional."  United States v. Muresanu, 951 F.3d at 838; see United States v. De Vaughn, 694 F.3d 1141, 1148-49 (10th Cir. 2012); United States v. Cothran, 302 F.3d 279, 283 (5th Cir. 2002).  Mr. Sutton and Mr. Zabavsky's argument – that the allegations in the indictment are insufficient to establish the "possible commission of a federal offense" element of obstruction of justice – lead them to conclude that the indictment is defective because it fails to state a federal offense.  See Sutton Mot. at 5; Zabavsky Mot. at 4-5.  But "indictment defects go to the merits of the case – not the court's power to hear [the case]."

7

United States v. Muresanu, 951 F.3d at 839.  Thus, even if the indictment were defective because it failed to state an offense, such a defect would not deprive the Court of jurisdiction. Rather, the Court would grant a motion to dismiss for failure to state an offense under Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure.  See Mot. to Sever Op. at *3 (declining to reconsider its decision denying Mr. Sutton's motion to dismiss for failure to state an offense in view of Mr. Sutton's new arguments about whether the government could prove an "actual" federal civil rights offense on the facts alleged in the indictment).  This argument provides no basis for arrest of judgment.

Furthermore, the Court concludes that the indictment in this case does contain sufficient allegations to make out the "possible commission of a federal offense" element of obstruction of justice.  The Court addressed this question in part during its oral ruling denying Mr. Sutton's motion to dismiss the indictment.  See Mot. to Dismiss Oral Ruling at 28:3-7.  Mr. Sutton and Mr. Zabavsky had previously argued that the indictment failed to state a federal offense because it did not allege sufficient facts to establish "a 'reasonable likelihood' of a federal investigation."  See Terence D. Sutton, Jr.'s Motion to Dismiss the Indictment Pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v) [Dkt. No. 188] at 31; Mot. to Dismiss Oral Ruling at 25:21-26:10 (restating Mr. Sutton and Mr. Zabavsky's arguments in support of their motions to dismiss).  The Court clarified that the obstruction of justice statute does not require that a federal investigation actually occur:  "all that's required is the possibility of such investigation." Mot. to Dismiss Oral Ruling at 27:3-8, 28:10-19.  The Court concluded that the indictment was sufficient because it alleged that "Mr. Sutton and Mr. Zabavsky engaged in misleading conduct with intent to hinder communication . . . with respect to authorities who might investigate the matter as a [federal] civil rights violation."  Id. at 28:23-29:2.

The argument that Mr. Sutton and Mr. Zabavsky raise now is somewhat different from the argument that the Court addressed at the motion to dismiss stage.  Instead of arguing that the indictment does not allege sufficient facts to establish a "reasonable likelihood of communication to federal law enforcement officers," Mr. Sutton and Mr. Zabavsky argue that the indictment fails to allege sufficient facts that any communication to federal authorities would concern the "commission or possible commission of a federal offense."  See Sutton Mot. at 6; Zabavsky Mot. at 4.  Otherwise stated, Mr. Sutton and Mr. Zabavsky now argue that, if the chase resulting in Mr. Hylton-Brown's death could not possibly constitute a violation of Mr. Hylton-Brown's federal civil rights, then Mr. Sutton and Mr. Zabavsky could not possibly have obstructed justice, even if they did intentionally mislead law enforcement with the intent of hindering communication to federal authorities about their involvement in the pursuit.  See Sutton Mot. at 6; Sutton Reply at 2 ("[O]ne cannot act with an 'intent to prevent' something that could not possibly have taken place regardless.") (quoting Fowler v. United States, 563 U.S. 668, 674 (2011)).

The Court has explained repeatedly that "the fifth element of obstruction of justice . . . does not require that the government prove that a federal offense actually has occurred, nor does it require that a federal offense has in fact been investigated or charged." Rule 29 Op. at *22; see Bill of Particulars Op. at *8; April Mot. to Compel Op. at *7; Mot. to Dismiss Oral Ruling at 26:21-27:1.  It is sufficient if the facts in the indictment make out a "possible commission of a federal offense."  Something that is "possible" is "capable of being;" it "may or can exist, be done, or happen."  Possible, OXFORD ENGLISH DICTIONARY (2d ed. 1989); see Possibility, BLACK'S LAW DICTIONARY (11th ed. 2022) ("The quality, state, or

condition of being conceivable in theory or in practice. . . .  An event that may or may not happen; something that might plausibly occur or take place.").

Perhaps a prosecution under 18 U.S.C. § 242 for a federal civil rights offense would not have been successful.  But the Court cannot conclude on the facts as alleged in the indictment that it would have been "impossible."  Sutton Mot. at 4.  The facts contained in the indictment are sufficient to make out a "possible federal offense" as the object of Mr. Sutton and Mr. Zabavsky's misleading conduct.  Accordingly, the Court finds that it does have jurisdiction over the offenses alleged in the indictment – federal obstruction of justice, conspiracy to obstruct justice, and second degree murder under the D.C. Code.

The indictment here alleges sufficient facts to make out a possible civil rights offense.  It alleges that Mr. Sutton, an MPD officer, chose to chase Mr. Hylton-Brown at night, at high speeds, with the awareness that Mr. Hylton-Brown wore no helmet, and that the manner in which Mr. Sutton followed Mr. Hylton-Brown conflicted with Mr. Sutton's police training.  See Indictment ¶¶ 21-29; Rule 29 Op. at *9-15.  Mr. Sutton's pursuit of Mr. Hylton-Brown for several minutes, in a manner that violated MPD policies, while Mr. Hylton-Brown rode a moped without a helmet put Mr. Hylton-Brown in more danger than he would have been in had Mr. Sutton never acted at all.  See Moses v. District of Columbia, 741 F. Supp. 2d 123, 129 (D.D.C. 2010); see also Rule 29 Op. at *9-18 (describing the events that gave rise to the fatal collision).  And Mr. Hylton-Brown died from the injuries he sustained as a result of the pursuit. Rule 29 Op. at *11.

Perhaps a prosecution under 18 U.S.C. § 242 for a federal civil rights offense would not have been successful.  But the Court cannot conclude on the facts as alleged in the indictment that it would have been "impossible."  Sutton Mot. at 4.  The facts contained in the indictment are sufficient to make out a "possible federal offense" as the object of Mr. Sutton and Mr. Zabavsky's misleading conduct.  Accordingly, the Court finds that it does have jurisdiction over the offenses alleged in the indictment – federal obstruction of justice, conspiracy to obstruct justice, and second degree murder under the D.C. Code.

2.  Abuse of Prosecutorial Discretion

Mr. Sutton alleges that the U.S. Attorney's Office abused its discretion "by including the federal offense of obstruction of justice in the Indictment."  Sutton Mot. at 7.  He argues that:

> This is obvious for three reasons:  obstruction of justice is available as a criminal charge in the Superior Court; no case law justifies federal jurisdiction of the obstruction charge on the facts of this case; and, the U.S. Attorney has chosen to decline to produce to the Court evidence that the Civil Rights Division of [the Department of Justice] approved both the initiation and criminal investigation of the actual Indictment in this case.

Sutton Mot. at 7.

Mr. Sutton's arguments are unavailing. "In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978); see United States v. Batchelder, 442 U.S. 114, 124 (1979).  In this circuit, the United States Attorney's Office – which, by statute, is responsible for both federal and local prosecutions in the District of Columbia – may "choose to prosecute under a federal statute [rather] than an identical D.C. statute" without abusing prosecutorial discretion.  United States v. Shepard, 515 F.2d 1324, 1332 (D.C. Cir. 1975); see United States v. Simmons, Crim. No. 18-0344, 2022 WL 1302888, at *6-7 (D.D.C. May 2, 2022); D.C. Code § 23-101(c). "Whether prosecution is brought in this jurisdiction under the D.C. Code or whether it is brought under an applicable section of the United States Code is a matter confided solely to the discretion of the United States Attorney."  United States v. Greene, 489 F.2d 1145, 1151 (D.C. Cir. 1973).

Beyond that, Mr. Sutton has not presented "clear evidence" to rebut the "'presumption of regularity' [that] applies to 'prosecutorial decisions.'"  United States v. Fokker Servs. B.V., 818 F.3d 733, 741 (D.C. Cir. 2016) (quoting United States v. Armstrong, 517 U.S. 456, 464 (1996)).  The mere fact that the U.S. Attorney's Office exercised its discretion does not suggest that the U.S. Attorney's Office abused his discretion.  Nor does the "novelty" of this prosecution or the asserted lack of factually analogous prior cases suggest that the U.S. Attorney's Office has not "properly discharged [its] official duties" by bringing this case in federal court.  United States v. Armstrong, 517 U.S. at 464 (quoting United States v. Chemical Foundation, Inc., 272 U.S. 1, 15 (1926)); United States v. Fokker Servs. B.V., 818 F.3d at 751 (quoting In re Kellogg Brown & Root, Inc., 756 F.3d 754, 763 (2014)).

The Court also rejects Mr. Sutton's argument that the government's failure to produce "evidence that the Civil Rights Division . . . approved both the initiation and criminal investigation [of] this case" demonstrates that the U.S. Attorney's Office abused its discretion.  Sutton Mot. at 7.  The Court has repeatedly explained that the alleged failure of the U.S. Attorney's Office to comply with internal Department of Justice policies for investigating and charging civil rights offenses is irrelevant to the charged offenses and the propriety of this prosecution.  See Post-trial Mot. to Compel Op. at *9; April Mot. to Compel Op. at *4-6. Internal Department of Justice policies are "not substantive rules that create individual rights," United States v. Manafort, 312 F. Supp. 3d 60, 75 (D.D.C. 2018), and the U.S. Attorney's Office's alleged noncompliance with these policies does not suggest that the U.S. Attorney abused its discretion or provide "clear evidence" rebutting the presumption of prosecutorial regularity.  See United States v. Fokker Servs. B.V., 818 F.3d at 741.

Furthermore, Mr. Sutton cites no authority for the proposition that an abuse of prosecutorial discretion would deprive the Court of jurisdiction over the charged offenses. Mr. Sutton's assertions that the U.S. Attorney's Office has "abused its discretion" provide no reason for the Court to grant his motion for arrest of judgment.

### 3. Selective Prosecution

Mr. Zabavsky asks the Court to grant his motion for arrest of judgment because the U.S. Attorney's Office "singled [him] out due to his race and for executing constitutionally protected activity of being a police officer." Zabavsky Mot. at 7.[2] Prior to trial, the Court denied Mr. Zabavsky's motion to dismiss the indictment for selective prosecution because he had not made a showing of either discriminatory intent or discriminatory effect, both of which are required to prevail on a claim of selective prosecution. See Mot. to Dismiss Oral Ruling at 31:11-33:25; see also Branch Ministries, Inc. v. Rossotti, 40 F. Supp. 2d 15, 21 (D.D.C. 1999); United States v. Hsia, 24 F. Supp. 2d 33, 48 (D.D.C. 1998). Specifically, the Court held that Mr. Zabavsky's proffer – that "two white officers were prosecuted [and] two non-white officers were not" – was insufficient to make out a selective prosecution claim. Mot. to Dismiss Oral Ruling at 32:19-20.

---

[2] Mr. Zabavsky also suggests that "the government selectively and vindictively prosecuted officer Zabavsky." Zabavsky Mot. at 7. Separate and apart from Mr. Zabavsky's selective prosecution claim, this language seems to invoke a vindictive prosecution claim – that some aspect of the government's prosecution of the case is improper because it was pursued "to retaliate against a defendant for exercising a legal right." United States v. Slatten, 865 F.3d 767, 799 (D.C. Cir. 2017). Despite using this "vindictive prosecution" language, Mr. Zabavsky has not asserted in his written submissions or at oral argument that the government has taken any action against Mr. Zabavsky because he chose to exercise a legal right, such as his right to a jury trial.

In support of his post-trial motion, Mr. Zabavsky points out that the government now has formally declined to prosecute the two non-white officers and one white officer who were on duty with Mr. Sutton the night Mr. Hylton-Brown was killed.  See Zabavsky Mot. at 6-9; id. at Ex. 1 (declination letter).  He asserts that this "new evidence proves that the government selectively and vindictively prosecuted Officer Zabavsky."  Id. at 7-8.  The declination letter proves no such thing.  Mr. Zabavsky's post-trial proffer is not meaningfully different from the evidence he presented before trial:  that "two white officers were prosecuted [and] two nonwhite officers were not."  Mot. to Dismiss Oral Ruling at 32:18-20.  Mr. Zabavsky's selective prosecution argument fares no better than it did before trial, even in light of the U.S. Attorney's Office final declination decision.

Mr. Zabavsky also suggests that his outstanding Freedom of Information Act ("FOIA") request would lend support to his selective prosecution argument.  See Zabavsky Reply at 7-8.  Mr. Zabavsky's FOIA request seeks "records regarding charges brought against police officers for obstruction of justice under 18 U.S.C. § 1512(b)(3) as well as a murder charge."  Id. at Ex. 1.  The Court has already explained that a selective prosecution claim must be "based on reasons forbidden by the Constitution," and thus Mr. Zabavsky's "occupational argument" – that he is being selectively prosecuted because he is a police officer – "has no merit."  Mot. to Dismiss Oral Ruling at 33:10-12.  For that reason, the Court rejects Mr. Zabavsky's assertion that information about prior prosecutions of police officers would support his selective prosecution claim.

Furthermore, even if the declination letter or FOIA records about police prosecutions could be construed as evidence of disparate treatment, Mr. Zabavsky has still failed to put forth any evidence of discriminatory motivation or purpose.  See Branch

Ministries, Inc. v. Rossotti, 40 F. Supp. 2d at 21 (citing United States v. Armstrong, 517 U.S. at 464).  He has also not established that his selective prosecution would deprive the Court of jurisdiction.  His motion for arrest of judgment based on his selective prosecution claim is denied.

## III.  NEW TRIAL

### A.  Legal Standard

Rule 33 of the Federal Rules of Criminal Procedure provides that the Court "may vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P.33(a).  When determining whether to grant a new trial, the Court "essentially sits as a 'thirteenth juror.'"  United States v. Borda, 786 F. Supp. 2d 25, 32 (D.D.C. 2011) (quoting Tibbs v. Florida, 457 U.S. 31, 42 (1982)).  Granting a new trial "is warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'"  United States v. Wheeler, 753 F.3d 200, 208 (D.C. Cir. 2014) (quoting United States v. Rogers, 918 F.2d 207, 213 (D.C. Cir. 1990)); see United States v. Borda, 786 F. Supp. 2d at 32.  The Court should only grant a motion for new trial if the defendant establishes that an error at trial "was substantial, not harmless, and that the error affected the defendant's substantial rights."  United States v. Safavian, 644 F. Supp. 2d 1, 8 (D.D.C. 2009) (quoting United States v. Walker, 899 F. Supp. 14, 15 (D.D.C. 1995), aff'd 99 F.3d 439 (D.C. Cir. 1996) (internal quotation marks omitted)).  "An error affecting 'substantial rights' must have a 'substantial and injurious effect or influence in determining the . . . verdict.'"  United States v. Lawson, 494 F.3d 1046, 1053 (D.C. Cir. 2007) (quoting United States v. Dominguez Benitez, 542 U.S. 74, 81 (2004)).  "Whether to grant a motion for a new trial is a decision committed to the Court's sound discretion."  United States v. Neill, 964 F. Supp. 438, 441 (D.D.C. 1997); see WRIGHT &

WELLING, FEDERAL PRACTICE AND PROCEDURE CRIM. § 581.  The party seeking a new trial

bears the burden of showing that a new trial is justified.  See United States v. Mangieri, 694

F.2d 1270, 1285 (D.C. Cir. 1982).[3]

### B.  Second Degree Murder

Mr. Sutton raises myriad claims in support of his motion for new trial.  Two

issues in particular – constant themes, raised before, during, and now after trial – have

dominated his written submissions, presentations at oral argument, and objections throughout

trial:  first, the issue of the "constitutional policing" defense that Mr. Sutton sought to assert;

and second, the government's use of MPD general orders to demonstrate the appropriate

standard of care that Mr. Sutton's conduct should have conformed with.

Mr. Sutton's arguments are not new.  For months before trial and throughout the

trial, Mr. Sutton argued that he should be permitted to present a constitutional policing defense

to the second degree murder charge and that MPD general orders should not be presented as a

way for the jury to evaluate the reasonableness of a police officer's conduct.  The Court has

repeatedly rejected these arguments.  Because Mr. Sutton was charged with second degree

murder under D.C. Code § 22-2103 – and not with violating Mr. Hylton-Brown's constitutional

rights under 18 U.S.C. § 242 – he was permitted to assert the same defenses to second degree

murder that would be available to any defendant charged under that statute.  He was not entitled

---

[3]    Mr. Sutton and Mr. Zabavsky raise multiple arguments in support of their
Rule 33 motions.  Some of the arguments they raise have been previously and extensively
addressed by the Court.  To the extent that the parties make arguments that are not addressed in
this opinion, those arguments are either without merit or have been sufficiently addressed and
rejected in prior opinions.

to assert a defense available only to the special class of state actors charged with civil rights

violations under federal law.  As the Court explained:

> "[Q]uestions concerning whether defendant Sutton committed any
> constitutional violations, acted reasonably under constitutional
> precedents, or violated Hylton-Brown's constitutional rights during
> this incident are wholly irrelevant to this case."  [Government's
> Motion in <u>Limine</u> to Exclude Inadmissible Expert Testimony [Dkt.
> No. 219] at 13]. . . .  The Court has made clear that the D.C. second
> degree murder statute – a criminal statute of general applicability –
> does <u>not</u> require that the government meet the test for
> reasonableness under the Fourth Amendment to the United States
> Constitution.  <u>See</u> Mot. to Dismiss Oral Ruling at 11:21-19:9.
> Furthermore, the government need not prove a constitutional
> violation to demonstrate that Mr. Sutton's conduct violated the D.C.
> second degree murder statute.  "[P]olice officers like everyone else
> are subject to generally applicable laws unless there's an express
> [exemption] made and the Constitution does not give them an
> exemption." <u>Id.</u> at 18:25-19:3.

<u>Daubert</u> Op. at 79; <u>see</u> First Mot. <u>in Limine</u> Op. at 210-11 (prohibiting Mr. Sutton from arguing

to the jury that Mr. Sutton was legally entitled to stop Mr. Hylton-Brown under <u>Terry v. Ohio</u>,

381 U.S. 1 (1968)); Bill of Particulars Op. at *5 ("[E]vidence such as whether the defendants

'were engaged in a lawful Terry stop . . .' or 'violated any constitutional rights of Mr. Hylton-

Brown' are legal issues that have no relevance to the sufficiency of the charge of second degree

murder as set forth in the indictment.").

Under the District of Columbia second degree murder statute, the government

was required to prove that Mr. Sutton was subjectively aware of an extreme risk of death or

serious bodily injury to Mr. Hylton-Brown, and that Mr. Sutton acted in conscious disregard of

that risk.  <u>See</u> Rule 29 Op. at *5-6.  Whether Mr. Sutton's conduct violated Mr. Hylton-Brown's

constitutional rights is a completely separate and irrelevant inquiry.  For that reason, the Court

prohibited Mr. Sutton from asserting his proffered defense of "constitutional policing" – that his

conduct was reasonable under the Constitution and thus could not amount to malice for second degree murder.

Mr. Sutton also objects to the introduction of MPD general orders – specifically, General Order 301.03 on Vehicular Pursuits – as the government's "exclusive" evidence of the standard of care that Mr. Sutton was expected to comply with.  See Sutton Mot. at 20-21, 60. His argument that the government "use[d] the MPD General Orders as the only standard of care applicable in this case" misconstrues the Court's ruling on the general orders' admissibility.  Id. The Court concluded that the jury "may consider the general order as only one factor in deciding whether the defendants had the necessary mental state or state of mind underlying the crimes charged," and that the jury "may not find either defendant guilty of anything merely because they violated the general order."  Jury Instructions at 17 (emphasis added). Accordingly, if the jury concluded that Mr. Sutton violated General Order 301.03, that fact alone would not be sufficient to establish Mr. Sutton's guilt – but the jury was permitted to consider this fact as but one factor in its analysis about whether Mr. Sutton acted with malice. See id.

Mr. Sutton argues now, as he did before trial, that the MPD general orders should not have been admitted at trial because "[t]he policies are not co-extensive with constitutional law."  Sutton Mot. at 26.  The Court erred in admitting the MPD general orders as evidence of the appropriate standard of care, he says, because "his conduct is to be measured by the same standard of a reasonably prudent police officer as established in Graham v. Connor, 490 U.S. 386 (1989)."  Id. at 24.  In denying Mr. Sutton's motion in limine to exclude evidence about General Order 301.03, the Court rejected this argument:

> [Mr. Sutton] argues that a "violation of the MPD General Order on
> vehicular pursuits is not relevant in this case because General Orders

do not establish a standard or evidence of any sort for criminal or civil cases." [Terence D. Sutton, Jr.'s, Motion in Limine to Exclude Evidence Regarding the Metropolitan Police Department's General Order on Vehicular Pursuits] [Dkt. No. 260] at 2. Instead, Mr. Sutton maintains that "the only standard upon which the jury can evaluate his conduct is that applicable to every law enforcement officer in the United States, Graham v. Connor." Id. at 7. . . . The Court agrees with the government that MPD General Order 301.03 is admissible and concludes that this evidence is probative of Mr. Sutton's state of mind as it relates to the second degree murder charge. . . . [T]he Court rejects Mr. Sutton's contention that "the only standard upon which the jury can evaluate his conduct" is under the Supreme Court's jurisprudence under the Fourth Amendment. . . .

The government's theory in this case is that Mr. Sutton's conduct constitutes a violation of the D.C. second degree murder statute because he subjectively knew that his conduct "created an extreme risk of death or serious bodily injury, but engaged in that conduct nonetheless." Williams v. United States, 858 A.2d 984, 998 (D.C. 2004) (quoting Comber v. United States, 584 A.2d 26, 39 & n.12 (D.C. 1990) (en banc)) (emphasis added); see also Indictment ¶ 29 (alleging that Mr. Sutton "act[ed] with conscious disregard of an extreme risk of death or serious bodily injury to Karon Hylton-Brown"). . . . The government asserts that at trial it will present "evidence that shows the defendant subjectively knew that the driving decisions he made on the night of this chase were highly unsafe and created serious risks to Hylton-Brown." [Government's Opposition to Sutton's Motion in Limine to Exclude Evidence Regarding the Metropolitan Police Department's General Order on Vehicular Pursuits] [Dkt. No. 269] at 2. To do this, the government states that it will elicit testimony regarding the training that Mr. Sutton received to operate an MPD vehicle, which "encompasse[d] instruction on . . . the MPD vehicular pursuit policy." Id. at 3. . . .

[T]he Court concludes that the order is relevant under Rule 401 of the Federal Rules of Evidence. See FED. R. EVID. 401 (the evidence has a tendency to support the government's assertion that Mr. Sutton had the requisite mental state under D.C. Code § 22-2013, which "is of consequence in determining the action."). In addition, the Court agrees with the government that "[b]ecause evidence concerning the vehicular pursuit policy will be tied to the defendant's subjective knowledge of the risks he was aware of . . . when he chased Hylton-Brown[,] . . . this evidence is highly probative of an essential element of Count 1." [Government's Opposition to Sutton's Motion in Limine to Exclude Evidence Regarding the Metropolitan Police

Department's General Order on Vehicular Pursuits] [Dkt. No. 269] at 3. . . .  The government does not, as Mr. Sutton suggests, seek to introduce MPD General Order 301.03 to prove that a violation of the order is <u>per se</u> evidence of malice under the second degree murder statute. . . .  Rather, evidence of Mr. Sutton's training on the General Order will be just <u>one factor</u> the jury may consider in determining Mr. Sutton's subjective state of mind at the time of events at issue.

First Mot. <u>in</u> <u>Limine</u> Op. at 191-92.

Mr. Sutton also argues that the Court should not have accepted the government's arguments about the relevance of MPD general orders because the government only cited <u>civil</u> cases in support of admitting MPD general orders to demonstrate the applicable standard of care.  <u>See</u> Sutton Mot. at 25-26.  The Court has already rejected that argument, as well, stating:

The Court is also unpersuaded by Mr. Sutton's argument that the government cannot rely on "civil cases from the District of Columbia Court of Appeals construing the 'gross negligence' standard."  [Terence D. Sutton, Jr.'s Reply to Government's Opposition to his Motion <u>in</u> <u>Limine</u> to Exclude Evidence Regarding the Metropolitan Police Department's General Order on Vehicular Pursuits [Dkt. No. 281] at 1].  First, determining the admissibility of evidence "'is a matter [] for the district court's sound judgment under Rules 401 and 403.'"  <u>United States v. Mosquera-Murillo</u>, 153 F. Supp. 3d 130, 175 (D.D.C. 2015) (quoting <u>Sprint/United Mgmt. Co. v. Mendelsohn</u>, 552 U.S. 379, 384 (2008)). . . .  [A]lthough the cases that the government cites arise in the civil context, the Court finds their reasoning and analysis persuasive.  In <u>Tillery v. District of Columbia</u>, the D.C. Court of Appeals permitted a motorist in a civil personal injury action to introduce evidence of an MPD General Order as "<u>a factor</u> the jury can consider in determining whether the officer was grossly negligent in departing from the standard of care."  <u>Tillery v. District of Columbia</u>, 227 A.3d 147, 152 n.17 (D.C. 2020) (emphasis added) (internal quotations omitted).  And in <u>District of Columbia v. Walker</u>, the D.C. Court of Appeals reached a similar conclusion that "[w]hile evidence that the police violated the general order was one factor that the jury could consider, liability would attach only if the MPD officers were grossly negligent with reference to the [applicable] standard of care."  <u>District of Columbia v. Walker</u>, 689 A.2d 40, 47 n.13 (D.C. 1997) (citing <u>District of Columbia v. Banks</u>, 646 A.2d 972, 983 (D.C. 1994)).

First Mot. in Limine Op. at 193.

Finally, Mr. Sutton argues that the MPD general orders should not have been used to establish a standard of care because the general orders are "guidelines" that "do not have the same quality of definitiveness as do the principles of policing based on Supreme Court precedent." Sutton Mot. at 21. He argues that General Order 301.03 is an inappropriate benchmark by which to judge his behavior because MPD officers may choose when to comply with or disregard general orders. See id. The Court rejected this argument in denying Mr. Sutton's motion for judgment of acquittal:

> Although Mr. Sutton may be correct that the general orders are "guidelines for officers subject always to the exercise of discretion" . . . the fact that the MPD general orders require police officers to make judgment calls does not mean that the general orders may not be relevant evidence of Mr. Sutton's subjective awareness of potential risks to human life. A person may have discretion to make a number of choices that constitute reasonable decisions consistent with the appropriate standard of care. It is only when a person's choice "amount[s] to the extremely reckless and wanton disregard for life" that such an exercise of discretion can be said to "grossly deviate" from the standard of care. United States v. Wood, 207 F.3d 1222, 1232-33 (10th Cir. 2008).

Rule 29 Op. at *17 (internal citation omitted); see id. at *18 ("[W]hether the MPD General Order on Vehicular Pursuits provides a 'definitive professional standard [of care]' is not dispositive.").

In his motion for new trial, Mr. Sutton raises these same arguments: that the Court should have permitted him to present a "constitutional policing" defense, and, relatedly, that the Court erred by allowing the government to introduce evidence that Mr. Sutton violated MPD General Order 301.03 on Vehicular Pursuits as evidence that Mr. Sutton acted with malice. See Sutton Mot. at 24-26, 32-36. Many of Mr. Sutton's multiple discrete objections to the Court's rulings about witnesses and evidentiary questions are premised on these broader

arguments about constitutional policing and the propriety of using the MPD general orders as evidence of the standard of care.  Mr. Sutton has not provided the Court with a reason to reconsider its prior decisions on these predicate issues.  Because the Court does not accept either of Mr. Sutton's premises – that he was entitled to present a constitutional policing defense and that the MPD general orders should not have been admitted – his discrete arguments necessarily fail.

For the reasons explained below, the Court concludes that its rulings about constitutional policing and the MPD general orders did not arbitrarily deny Mr. Sutton an opportunity to present a defense.  Instead, the Court excluded irrelevant and confusing evidence and argument about constitutional principles that were not at issue in this criminal prosecution for second degree murder.

### 1.  Right to Present a Defense

"The Constitution guarantees criminal defendants a meaningful 'opportunity to present a complete defense.'"  Nevada v. Jackson, 569 U.S. 505, 509 (2013) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)); see Washington v. Texas, 388 U.S. 14, 19 (1967); United States v. Stewart, 104 F.3d 1377, 1384 (D.C. Cir. 1997).  But the Court "retains broad discretion to control cross-examination" and may "prevent questioning that does not meet 'the basic requirement of relevancy, as well as other factors affecting admissibility.'"  United States v. Hemphill, 514 F.3d 1350, 1360 (D.C. Cir. 2008) (quoting United States v. Anderson, 881 F.2d 1128, 1138-39 (D.C. Cir. 1989)).  Although criminal defendants have a right to present a defense, courts are not required to permit defendants to present to the jury evidence that is not admissible because it is not relevant or probative of a fact of consequence.  See United States v.

Yousef, 327 F.3d 56, 128 (2d Cir. 2003); United States v. Libby, 467 F. Supp. 2d 20, 27 (D.D.C. 2006).

Mr. Sutton maintains – as he did throughout trial – that he should have been permitted to present evidence about his training on constitutional policing to refute the government's evidence that he acted with malice.  Sutton Mot. at 16; see id. at 18 ("Ofc. Sutton was asserting as a defense to the charges that he acted reasonably according to his training in Constitutional Policing."); see also Amicus Br. at 12 (National Fraternal Order of Police arguing that a factfinder should not be permitted to find a police officer guilty of a criminal offense when that officer's conduct is "reasonable and not in violation of any constitutional right").  The Court did not permit Mr. Sutton to present evidence about his training on constitutional policing in his defense.  Mr. Sutton argues that the Court's ruling on this issue deprived him of his right to present a complete defense.  See Sutton Mot. at 32-36.

As the Court has held repeatedly, Mr. Sutton's training on what constitutes a "reasonable" seizure or an unconstitutional "use of force" under the Fourth Amendment simply has nothing to do with whether he acted in conscious disregard of an extreme risk when pursuing Mr. Hylton-Brown.  The constitutional precedents Mr. Sutton continues to cite simply do not speak to the legal standard applicable here:  whether Mr. Sutton acted with "depraved heart malice" as defined by District of Columbia law.  Evidence about these constitutional precedents and Mr. Sutton's compliance with them is thus irrelevant in a prosecution for second degree murder, where the decedent's constitutional rights are not at issue.  See FED. R. EVID. 401; 1 Stephen A. Saltzburg et al., FEDERAL RULES OF EVIDENCE MANUAL § 401.02[2] (12th ed. 2019) (to be relevant, evidence "must relate to issues that are properly in dispute and [] must shed some light on those issues"); see also United States v. Bifield, 702 F.2d 342, 350

(2d Cir. 1983) ("A criminal defendant's right to present a full defense and to receive a fair trial does not entitle him to place before the jury evidence normally inadmissible.").

The Court is also not persuaded by the arguments of amicus curiae, the National Fraternal Order of Police, who contend that "[s]everal state courts have agreed that the Graham v. Connor reasonableness standard is the proper perspective from which a trier-of-fact is to view a police officer's actions – regardless of whether the underlying cause of action is civil or criminal in nature." Amicus Br. at 13. The National Fraternal Order of Police cites state court cases from four jurisdictions and characterizes these cases as instances where a state court has allowed a police officer to assert, as a defense to criminal liability, that their conduct was reasonable under the Constitution. Id. at 13-16.

None of the cited cases is persuasive. Three of the four jurisdictions that amicus references – Connecticut, Alabama, and New Mexico – all make a law enforcement authority defense available by statute to police officers charged with criminal offenses for on-the-job uses of force. See Darby v. State, Crim. No. 20-0919, 2023 WL 2623546, at *8 (Ala. Ct. Crim. App. Mar. 24, 2023) (noting that Officer Darby's "use of deadly force was governed by [ALA. CODE] § 13A-3-27(b)(2)"); State v. Smith, 807 A.2d 500, (Conn. App. Ct. 2002) (referencing Conn. Gen. Stat. § 53a-22, a special self-defense statute available only to police officers); State v. Mantelli, 42 P.3d 272, (N.M. Ct. App. 2002) (reversing conviction for failure to instruct jury in accordance with the justifiable homicide by police officer statute, N.M. Stat. § 30-2-6). District of Columbia law does not provide Mr. Sutton a similar statutory defense. And in the last case that amicus cites, the Maryland state court applied the Graham standard and assessed the officer's conduct against "the actions of an ordinary police officer similarly situated" – but the court did not accept or even address the argument that the officer's conduct was not criminal

24

because the conduct was <u>constitutionally</u> reasonable.  <u>State v. Pagotto</u>, 762 A.2d 97, 111-12 (Md. App. 2000); <u>see</u> <u>Amicus</u> Br. at 13-16.  Instead, the Maryland court applied generally applicable state law on involuntary manslaughter, altering the standard only to measure the defendant's conduct against the "conduct that a reasonable police officer similarly situated would observe" rather than "the conduct of an ordinary and prudent person."  <u>State v. Pagotto</u>, 762 A.2d at 108-09.  <u>Pagotto</u> therefore does not support the proposition that a police officer can assert that his conduct comported with the Fourth or Fourteenth Amendment as a defense in a homicide prosecution.

Accordingly, the Court does not find that its decision to prohibit Mr. Sutton from arguing principles of constitutional policing deprived Mr. Sutton of a legitimate defense to second degree murder or of a fair trial.  Nor does the Court conclude that its ruling resulted in a miscarriage of justice.  Evidence about whether Mr. Sutton's conduct comported with constitutional policing principles has no "probative value . . . on the central issue" in this case. <u>United States v. Libby</u>, 467 F. Supp. 2d at 27 (quoting <u>Chia v. Cambra</u>, 360 F.3d 997, 1004 (9th Cir. 2004)).  Mr. Sutton's training about constitutional police practices is irrelevant to whether he acted with the state of mind required for second degree murder, and the Court did not arbitrarily deny Mr. Sutton the opportunity to present a defense by prohibiting evidence and argument about the constitutional reasonableness of his conduct.

Mr. Sutton's discrete objections that rely on his predicate constitutional policing argument necessarily fail, as the Court explains below.  <u>See</u> Sutton Mot. at 19-23 (arguing that the Court erred by precluding expert witness testimony and cross examination about constitutional policing); <u>id</u>. at 24-26 (the Court erred by prohibiting Mr. Sutton from arguing that constitutional policing principles informed the operative "standard of care"); <u>id</u>. at 27-31

(the Court erred by prohibiting Mr. Sutton from eliciting testimony about Mr. Hylton-Brown's

prior criminal conduct); id. at 29-32 (the Court erred by failing to instruct the jury about

constitutional policing and reasonable suspicion under Terry v. Ohio, 381 U.S. 1 (1968)).

a.  Expert Witnesses

Relying on the mistaken premise that constitutional policing is relevant in this

second degree murder case, Mr. Sutton argues that the Court erred by prohibiting several of his

proffered expert witnesses from testifying about constitutional policing principles, see Sutton

Mot. at 19-21, and that the Court improperly prohibited his attorney from cross examining the

government's expert witnesses about MPD training on constitutional policing.  See id.

at 22-23.  Neither of the Court's rulings deprived Mr. Sutton of his right to present a defense

and neither resulted in a miscarriage of justice that would warrant a new trial.

Mr. Sutton contends that the Court abused its discretion by excluding the

testimony of Bruce-Alan Barnard "solely because he is an attorney."  Sutton Mot. at 20.  The

Court, however, did not exclude Mr. Barnard "solely because he is an attorney" – the Court

excluded Mr. Barnard because his proffered opinions were irrelevant, inadmissible legal

conclusions.  See Daubert Op. at 79-80.  The opinions that Mr. Sutton sought to present through

Mr. Barnard related to "[legal] issues [that] have been squarely decided" and were not

appropriate for the jury's consideration.  Id. at 80 (citing Burkhart v. Wash. Metro. Transit

Auth., 112 F.2d 1207, 1212 (D.C. Cir. 1997)).

Mr. Sutton also argues that the limitations the Court imposed on the testimony of

his expert witnesses – including former MPD Sergeants John Brennan and Michael Wear –

"distorted the actual standard of care applicable to policing."  Sutton Mot. at 20.  Relatedly, Mr.

Sutton argues that he was prejudiced by the Court's decision to prohibit him from cross

26

examining the government's expert witnesses about constitutional policing.  He maintains he should have been permitted to ask Officer Carolyn Totaro, the government's expert on MPD vehicle skills training, about whether officers are trained on constitutional policing principles during their mandatory police training.  Id. at 23.

The Court will repeat itself:  constitutional principles and whether Mr. Sutton's conduct violated Mr. Hylton-Brown's constitutional rights are not relevant to Mr. Sutton's subjective awareness of an extreme risk of death or serious bodily injury when he chased Mr. Hylton-Brown.  Because Mr. Sutton was not entitled to present a constitutional reasonableness defense, the Court's ruling on the scope of his experts' testimony – which enforced Rules 401 and 402 of the Federal Rules of Evidence and prohibited testimony about irrelevant legal concepts – did not deprive Mr. Sutton of a fair trial.  See United States v. Lathern, 488 F.3d 1043, 1045-46 (D.C. Cir. 2007).  Nor did the Court's restriction on Mr. Sutton's cross examination of Officer Totaro infringe on Mr. Sutton's right to confront witnesses against him, as the Court "may prevent questioning that does not meet '[t]he basic requirement of relevancy.'"  United States v. Hemphill, 514 F.3d at 1360 (quoting United States v. Anderson, 88 F.2d at 1138); see United States v. Stewart, 104 F.3d at 1384.

b.  Evidence of Mr. Hylton-Brown's Criminal Conduct

Mr. Sutton argues that a new trial is warranted because "the Court refused to permit Ofc. Sutton to present the full panoply of Hylton-Brown's criminal conduct as a corollary to his Constitutional Policing defense."  Sutton Mot. at 33.  He specifically contends that the Court erred by declining to admit evidence that Mr. Hylton-Brown was wearing an ankle monitor the night of the fatal collision; Mr. Hylton-Brown's prior arrests for handgun offenses; that Mr. Hylton-Brown had a pending criminal case in the District of Columbia

Superior Court; and that Mr. Hylton-Brown had over $3,000 on his person the night of the collision.  See id. at 27.

        The Court issued an oral ruling before trial excluding much of this evidence.  See Trial Tr. Oct. 24, 2022 p.m. at 6:15-23.  The Court excluded information "learned about Mr. Hylton-Brown after the crash occurred" – namely, that he was wearing an ankle monitor and carrying large amounts of cash – because that information could not have "informed Mr. Sutton's state of mind" during the pursuit.  Id. at 9:7-14.  Mr. Sutton had also argued that Mr. Hylton-Brown's prior criminal conduct was indicative of Mr. Hylton-Brown's "motive to flee," but the Court concluded that Mr. Hylton-Brown's motive to flee was not relevant to any fact of consequence.  Trial Tr. Nov. 18, 2022 a.m. at 33:3-4; see Second Mot. in Limine Op. at *5.  The Court also characterized evidence about Mr. Hylton-Brown's prior criminal conduct and prior arrests as "character evidence," the admission or exclusion of which would be governed by Rule 404 of the Federal Rules of Evidence.  See Trial Tr. Oct. 24, 2022 p.m. at 9:19-10:22.[4]

        At oral argument on his motion for new trial, Mr. Sutton suggested that the Court's decision to exclude Rule 404(b) evidence relating to Mr. Hylton-Brown was based on a "false premise":  that Rule 404(b) evidence can only be admitted when "motive or intent is tethered to the elements of the offense the government must prove at trial."  May 17, 2022

---

[4]     Mr. Sutton argues that the Court incorrectly characterized evidence of Mr. Hylton-Brown's criminal and potentially criminal conduct as "character evidence" because "[Mr.] Hylton-Brown is dead."  Sutton Mot. at 29; see id. at 36.  Mr. Sutton is clearly wrong.  Nothing about the plain text of Rule 404 suggests that a person's death makes Rule 404 inapplicable to evidence "of [that] person's character or character trait" when such evidence is used "to prove that on a particular occasion the person acted in accordance with the character or trait."  FED. R. EVID. 404(a).  Courts routinely gatekeep the admission of evidence of a deceased's pertinent character traits, most obviously in self-defense cases.  See, e.g., United States v. Burks, 470 F.3d 432, 437 (D.C. Cir. 1972); Evans v. United States, 277 F.2d 354, 356 (D.C. Cir. 1960).  The Court did not err in treating evidence of Mr. Hylton-Brown's prior criminal conduct as "character evidence."

Hearing Tr. at 12:8-16.  Counsel for Mr. Sutton argued that this premise "belies common sense. It is saying that a defendant cannot introduce any evidence in his or her defense if the defense is not part of the government's elements of proof."  Id. at 12:13-16.

Mr. Sutton is correct that the test of relevance is not whether proffered evidence makes an <u>element</u> of the charged offenses more or less likely.  Instead, the question is whether the proffered evidence makes any <u>fact of consequence</u> more or less likely.  See FED. R. EVID. 401; Saltzburg et al., <u>supra</u> § 401.02[1] ("The question for the trial judge is whether a reasonable person would find the probability of a consequential fact to be altered, one way or the other, by the proffered evidence.").  Facts of consequence include "not only the 'ultimate' facts essential to establishing a charge, claim, or defense, as determined by the applicable substantive law, and 'evidentiary' or 'intermediary' facts from which the ultimate facts can be inferred, but also facts affecting the credibility of testimony or other evidence, even though not part of the chain of inferences to an ultimate fact."  Saltzburg et al., <u>supra</u> § 401.02[2]; <u>see United States v. Hamzeh</u>, 986 F.3d 1048, 1052 (7th Cir. 2021) ("A fact of consequence includes one that is 'ultimate, intermediate, or evidentiary.'" (quoting Advisory Committee Notes to FED. R. EVID. 401)).  Accordingly, although facts of consequence are not limited to the essential facts the government must prove to secure a conviction, "what must be proven at trial . . . is germane to the relevance inquiry."  <u>United States v. Hamzeh</u>, 986 F.3d at 1052; <u>see United States v. Latney</u>, 108 F.3d 1446, 1448 (D.C. Cir. 1997) (noting that the defendant's knowledge was an element of one of the charged offenses "and hence [was] a fact of 'consequence' at his trial" (quoting FED. R. EVID. 401)); <u>United States v. Evans</u>, 216 F.3d 80, 85-86 (D.C. Cir. 2000) (holding that "the agents' motives for investigating . . . never became a fact of consequence to

the determination of the action" because the defendant never raised an allegation that he had "been improperly targeted or selectively prosecuted").

The Court thus did not adopt a "false premise" when it decided to exclude character evidence related to Mr. Hylton-Brown. Rather, the Court has held – and continues to hold – that the minimal probative value of Mr. Sutton's proffered evidence of Mr. Hylton-Brown's prior bad acts is substantially outweighed by unfair prejudice and the likelihood to confuse the issues presented to the jury. See FED. R. EVID. 403; Trial Tr. Oct 24, 2022 p.m. at 48:14-49:1.

Mr. Sutton has argued that Mr. Hylton-Brown's prior criminal conduct provided Mr. Sutton with additional reasonable articulable suspicion justifying his attempt to stop Mr. Hylton-Brown. Sutton Mot. at 29-30. He argues that his compliance with the MPD policy on how to perform investigative stops consistent with Terry v. Ohio (392 U.S. 1 (1968)) made his conduct "reasonable" as far as the Fourth Amendment is concerned and prevented the government from proving that he acted with malice. Id. at 30-31. But – as the Court has explained – in a second degree murder case, Mr. Sutton has no legal basis to assert a defense based on constitutional policing or the Fourth Amendment. See Second Mot. in Limine Op. at *4 (prohibiting Mr. Sutton from arguing that his conduct "was justifiable or reasonable under the Fourth Amendment"). Whether Mr. Hylton-Brown's prior criminal conduct provided Mr. Sutton with additional reasonable suspicion to stop Mr. Hylton-Brown for anything more than a traffic violation is only minimally probative, as it does not make any "ultimate" or "intermediate" fact of consequence any more likely. The Court remains convinced that the prejudicial and confusing nature of evidence about Mr. Hylton-Brown's prior bad acts far

outweighed its slight probative value of a peripheral evidentiary issue.  The Court did not err by excluding this evidence.

### 2.   Jury Instructions

"When reviewing a challenge to jury instructions, '[t]he pertinent question is whether, taken as a whole, the instructions accurately state the governing law and provide the jury with sufficient understanding of those issues and applicable standards." United States v. Vega, 826 F.3d 514, 524 (D.C. Cir. 2016) (quoting United States v. Wilson, 605 F.3d 985, 1018 (D.C. Cir. 2010)).

> As a general rule, the refusal to give an instruction requested by a defendant is reversible error only if 'the instruction (1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense.

United States v. Taylor, 997 F.2d 1551, 1558 (D.C. Cir. 1993) (quoting United States v. Grissom, 645 F.2d 461, 464 (5th Cir. 1981)).  Instructions on defense theories are warranted if there is sufficient evidence from which a factfinder could find for the defendant on his theory. United States v. Hurt, 527 F.3d 1347, 1351 (D.C. Cir. 2008) (citing United States v. Glover, 153 F.3d 749, 754 (D.C. Cir. 1998)).  An erroneous jury instruction "will not be grounds for a new trial where 'in light of all the circumstances – the language of the instructions, the arguments of counsel, and the evidence itself – it is highly improbable that the jury convicted on an improper theory.'" United States v. Borda, 786 F. Supp. 2d at 41 (quoting United States v. Rhone, 864 F.2d 832, 835 (D.C. Cir. 1989)).

Mr. Sutton raises various arguments related to the jury instructions that the Court provided.  He argues that the Court erred by not giving his requested instructions about constitutional policing and on Terry v. Ohio, 392 U.S. 1 (1968).  See Sutton Mot. at 32.  As

explained above, the principles of constitutional policing that Mr. Sutton relies on are not relevant to the criminal offenses charged or any defense to those charges. He thus was not entitled to have the jury instructed on those inapplicable legal principles. See United States v. Hurt, 527 F.3d at 1351.

Similarly, Mr. Sutton was not entitled to a jury instruction that whoever recklessly "flees or attempts to elude a law enforcement officer, following a law enforcement officer's signal to bring the motor vehicle to a stop" is "guilty of a felony offense" and is "subject to immediate arrest." Terence D. Sutton, Jr.'s, Proposed Special Jury Instructions [Dkt. No. 403] at 3-4; see D.C. Code § 50-2201.05b. Mr. Sutton had argued that the jury should receive instructions about the D.C. Code flight statute because Mr. Hylton-Brown's flight "would justify stopping, chasing" Mr. Hylton-Brown and that flight alone would establish "probable cause to believe he's committing either a misdemeanor or if he was driving recklessly, a felony." Trial Tr. Oct. 24, 2022 p.m. at 18:14-21. Mr. Sutton also argued that "flight adds to suspicion for a Terry stop." Id. at 18:22-23. The Court ultimately declined to provide the requested instructions because the issue of whether a person violates the D.C. Code "flight" statute "is very fact intensive." Id. at 20:22-23. The Court further reasoned that it "would be highly prejudicial to allow the jury to infer that this statute was violated when the evidence is equivocal" about whether Mr. Hylton-Brown was driving recklessly or whether he could have asserted an affirmative defense under the flight statute. Id. at 25:25-27:5. Ultimately, the Court concluded that "the instruction that [Mr. Sutton] would have me give really basically tells the jury he fled, it's a crime, what more do you need to know. And I'm not going to tell the jury that." Id. at 27:1-5.

Mr. Hylton-Brown's potentially illegal flight from Mr. Sutton did not justify or excuse Mr. Sutton's conscious decision to disregard the extreme risk of death or serious bodily injury that Mr. Hylton-Brown was exposed to – and that Mr. Sutton created – during the pursuit. Nor does it change the fact that Mr. Sutton pursued Mr. Hylton-Brown without consistent use of his vehicle's emergency lights and sirens, without broadcasting the pursuit over the main radio channel, and without getting a warrant.  See Rule 29 Op. at *15, *18.  Because Mr. Sutton was not entitled to present a constitutional policing defense – that his conduct comported with Fourth Amendment reasonableness standards – any probable cause or reasonable suspicion that may have accrued during Mr. Hylton-Brown's flight was simply irrelevant to the issues in this case.  The Court's decision not to give Mr. Sutton's requested instructions on fleeing from police thus did not deprive the jury of a "sufficient understanding" of the "governing law" or "applicable standards."  United States v. Wilson, 605 F.3d at 1018.

Mr. Sutton also argues that in view of the evidence presented to the jury, the jury instructions the Court gave on second degree murder were erroneous.  Sutton Mot. at 41.  He raises familiar objections to the applicable District of Columbia law on second degree murder, which the Court has discussed at length in prior opinions.  See id. at 41-42; Rule 29 Op. at *6-8.  Specifically, Mr. Sutton maintains that the D.C. Court of Appeals' holding in Fleming v. United States, 224 A.3d 213 (D.C. 2020) (en banc), should not have been applied to the facts underlying this case.  See Sutton Mot. at 43 ("[T]here was no evidence whatsoever which would support the Fleming instruction in this case.").

Mr. Sutton argues that the "undisputed evidence" presented at trial supports "only" the conclusion that "the collision was 'caused' by Hylton-Brown's failure to yield right of way," and therefore that the Court erred by instructing the jury about intervening causes of

death.  Sutton Mot. at 43; see Jury Instructions at 29.  He relies principally on the testimony of

Major Crash Unit Detective Victor DePeralta, who concluded after investigating the collision

that Mr. Hylton-Brown "entered the roadway when it was unsafe to do so" and "was driving in

a reckless manner leading up to the crash."  Trial Tr. Dec. 6, 2022 a.m. at 60:9-13, 69:8-18.

The Court does not agree with Mr. Sutton's characterization of the evidence.  As the Court

explained in its opinion denying Mr. Sutton's motion for judgment of acquittal,

> A jury certainly could have determined that Mr. Hylton-Brown's
> own actions attenuated the connection between his death and Mr.
> Sutton's conduct.  But this conclusion is not required as a matter of
> law, and based on the evidence the government presented at trial, a
> reasonable juror could find that Mr. Sutton was both the actual and
> proximate cause of Mr. Hylton-Brown's death.

Rule 29 Op. at *19.

Detective DePeralta, who conducted the Major Crash Unit investigation into Mr.

Hylton-Brown's death, testified that he did not consider Mr. Sutton's vehicle or Mr. Sutton's

conduct when determining the immediate reason for the collision between Mr. Hylton-Brown

and the striking vehicle.  Trial Tr. Dec. 6, 2022 a.m. at 73:20-24; see Post-trial Brady Op. at *5.

Mr. Sutton argues that Detective DePeralta's testimony is "undisputed evidence" of causation.

Sutton Mot. at 42-43.  It is not.  It is one officer's conclusion, based on concededly limited

information, that contradicted a vast amount of other evidence and testimony that the jury was

entitled to consider.  The government's trial evidence established clearly that Mr. Sutton's

conduct put Mr. Hylton-Brown in danger, and therefore that Mr. Sutton could bear

responsibility for Mr. Hylton-Brown's death even though Mr. Sutton himself did not "deliver

the fatal blow or fire the fatal shot."  Rule 29 Op. at *7 (citing Fleming v. United States, 224

A.3d at 225, 229).  Despite Detective DePeralta's testimony, the Court does not find that "the

evidence preponderates heavily against" the jury's conclusion that Mr. Sutton caused Mr.

Hylton-Brown's death.  United States v. Borda, 786 F. Supp. 2d at 32 (quoting United States v. Rogers, 918 F.2d at 213).

   Mr. Sutton further argues that the causation instruction given by the Court "directs the jury to conclude that the fatal injuries were inflicted by 'a third-party,' the Scion" – the vehicle that ultimately struck Mr. Hylton-Brown.  Sutton Mot. at 43 (citing Jury Instructions at 29).  He asserts that "[t]his [instruction] amounts to a critical and prejudicial comment by the Court on the evidence" because "it directs the jury to conclude that the Scion was at fault."  Id.; see Terence D. Sutton, Jr.'s Reply in Support of His Motion for Judgment of Acquittal [Dkt. No. 465] at 13-16 ("This [instruction] meant that the jury was to disregard Hylton-Brown's conduct as the cause of his own death.  The instruction deprived Ofc. Sutton of a jury verdict based on its own interpretation of the facts.").  The contested jury instruction states:  "There is evidence in this case that defendant Sutton did not personally inflict Mr. Hylton-Brown's fatal injury and that Mr. Hylton-Brown's fatal injury was instead inflicted by a third party."  Jury Instructions at 29.

   Mr. Sutton cites two cases in support of his argument:  United States v. Hayward, 420 F.2d 142 (D.C. Cir. 1969) and United States v. Lee, 483 F.2d 959 (5th Cir. 1973).  Neither of these cases lends support to his position.  In United States v. Lee, the trial court "refused to instruct the jury that it was to determine" a particular fact alleged in the indictment – whether the allegedly stolen property arrived at a specific airport on a specific flight at a specific date and time.  Id. at 960.  Instead of explaining that the government was required to prove this fact, "the court's jury instructions impliedly assumed its existence."  Id.  The Fifth Circuit reversed because "it is axiomatic that a defendant cannot be convicted of a crime different from the crime alleged in the indictment," and the jury instructions were

inconsistent with this principle.  Id.  Mr. Sutton does not argue that any necessary fact alleged in the indictment was included or implied in the contested instructions; he argues that the Court improperly commented on the evidence by providing the instruction that it did.  See Sutton Mot. at 43.

United States v. Hayward is no more helpful.  There, the trial judge provided a jury with an alibi defense instruction, telling the jury:  "[If] you find that the Government has failed to prove beyond a reasonable doubt that the Defendant was present at the time when and at the place where the offense charged was allegedly committed, you must find the Defendant not guilty."  United States v. Hayward, 420 F.2d at 143.  The court then added the following language:  "On the other hand, if . . . you find that the Government has proved beyond a reasonable doubt that the Defendant was present at the time when and at the place where the offense charged was committed, then you must find the Defendant guilty."  Id. at 143-44.  Reversing the conviction, the D.C. Circuit explained that the Constitution provides "the right to have [a] jury decide all relevant issues of fact and to weigh the credibility of witnesses."  Id. at 144.  And, "[b]y instructing the jurors that they must find the defendant guilty if they determined that the evidence placed him at the scene of the crime, the court took from the jury an essential element of its function."  Id. (emphasis added).

The Court's instructions on causation in this case did not deprive the jury of its ability to "decide all relevant issues of fact and to weigh the credibility of witnesses," United States v. Hayward, 420 F.2d at 144, nor did they allow the jury to "convict[] on an improper theory."  United States v. Borda, 786 F. Supp. 2d at 41.  The Court's instruction on causation stated:

> There is evidence in this case that defendant Sutton did not personally inflict Mr. Hylton-Brown's fatal injury and that Mr.

> Hylton-Brown's fatal injury instead was inflicted by a third party. <u>Under such circumstances</u>, defendant Sutton can be found to have caused Mr. Hylton-Brown's death <u>only if</u>, applying the instruction you were just given [about actual and proximate causation], Mr. Hylton-Brown's death occurred as a result of the defendant's action and there is a close connection between the defendant's action and Mr. Hylton-Brown's death.

Jury Instructions at 29 (emphasis added).

The Court did not instruct the jury that it "must" find that Mr. Hylton-Brown's fatal injury was inflicted by a third party. <u>Compare</u> <u>United States v. Hayward</u>, 420 F.2d at 144. Instead, the Court told the jury how it should proceed in evaluating Mr. Sutton's guilt <u>if</u> the jury determined that Mr. Hylton-Brown's fatal injury was inflicted by a third party. This additional instruction about how to evaluate guilt in light of potential intervening causes did not in any way reduce the government's burden to prove that Mr. Sutton caused Mr. Hylton-Brown's death, nor did it direct the jury to ignore the arguments of Mr. Sutton's counsel that Mr. Hylton-Brown bore sole responsibility for his death. <u>See</u> Trial Tr. Dec. 14, 2022 a.m. at 72:4-10; Trial Tr. Dec. 14, 2022 p.m. at 22:1-11 (counsel for Mr. Sutton argued in closing, "what starts this is not what [Mr. Sutton] did. What starts this is what Mr. Hylton-Brown did. He fled the police. . . . He started it. He started the chain of events. He could have stopped any time."); <u>id.</u> at 25:10-12 (counsel for Mr. Sutton argued in closing, "we're sorry this young man [referring to Mr. Hylton-Brown] made these choices"). Given the "language of the instructions, the arguments of counsel, and the evidence itself," <u>United States v. Rhone</u>, 864 F.2d at 835, the Court concludes that its causation instructions did not amount to a "directed verdict." <u>See</u> Terence D. Sutton, Jr.'s Reply in Support of His Motion for Judgment of Acquittal [Dkt. No. 465] at 14 .

Last, Mr. Sutton argues that the jury instructions "allow[ed] the jury to find guilt based on a civil standard" because "no 'action' of Ofc. Sutton on the night in question has ever been prosecuted as a homicide in the District of Columbia or likely anywhere.  The instruction allows the government to prove guilt without evidence of any death blow."  Sutton Mot. at 43-45.  As the Court has explained, no "death blow" is necessary to sustain a conviction for second degree murder under District of Columbia law.  See Rule 29 Op. at *6-9.  The examples of depraved heart murder that Mr. Sutton cites – from a D.C. Court of Appeals case that the Court has discussed at length in prior opinions – provide no reason for the Court to reconsider its rulings on the applicable law.  See id.; Sutton Mot. at 44 (citing Comber v. United States, 584 A.2d 26).

Mr. Sutton was not deprived of a fair trial on the second degree murder charge. The Court properly prohibited him from presenting evidence that his conduct did not violate Mr. Hylton-Brown's constitutional rights.  He was not entitled to have the jury instructed on issues related to constitutional policing as a defense to second degree murder.  He was charged under a criminal statute of general applicability, and the jury was properly instructed on the law governing that offense.  The Court concludes that no miscarriage of justice occurred because of the Court's prior rulings about the law applicable to the second degree murder offense and the government's proof of that offense.

## C.  Obstruction of Justice and Conspiracy to Obstruct Justice

Mr. Sutton and Mr. Zabavsky raise several arguments related to the fifth element of obstruction of justice – that the information the defendants sought to "hinder, delay, or prevent the communication" of related to the "commission or possible commission of a federal offense."  See 18 U.S.C. § 1512(b)(3); Rule 29 Op. at *20-22.  None of their arguments

warrants granting either defendant's motion for new trial on the obstruction of justice charges or the related conspiracy charges.[5]

First, Mr. Sutton alleges that the government engaged in a "pretextual effort to obtain federal jurisdiction in this case." Sutton Mot. at 58. He reasons that government's sparse evidence about this element at trial – "hearsay" testimony from two law enforcement officers who spoke with the prosecutors who sought an indictment in federal court – demonstrates that the government deliberately manufactured the "federal nexus" required to charge an offense under 18 U.S.C. § 1512(b)(3). Id.; see Rule 29 Op. at *43; May 17, 2023 Hearing Tr. at 36:15-21. As the Court explained previously, see supra at 11-13, the U.S. Attorney's Office did not act improperly when deciding to bring this case in federal court or to charge federal obstruction of justice rather than obstruction of justice under the D.C. Code. The decision to prosecute Mr. Sutton and Mr. Zabavsky in federal court instead of in the Superior Court of the District of Columbia was a valid exercise of prosecutorial discretion. The Court has no basis to conclude that the U.S. Attorney's Office has "manufactured" or engaged in a "pretextual effort to obtain" jurisdiction in this court. See Sutton Mot. at 58.

_____

[5]      In connection with their Rule 34 and Rule 29 arguments, Mr. Sutton and Mr. Zabavsky maintain that the Court has misconstrued the law on obstruction of justice. They argue that the government was required to prove at trial that "the facts being investigated actually involved a federal crime" in order to establish the fifth element of obstruction of justice under 18 U.S.C. § 1512(b)(3), the "commission or possible commission of a federal offense" element. Sutton Reply at 3; see Zabavsky Mot. at 4-6; Zabavsky Reply at 4-5. They argue that the government's failure to prove obstruction of justice also requires vacating their convictions for conspiracy to obstruct justice. See Sutton Mot. at 8-9; Zabavsky Mot. at 16. The Court disagrees for the reasons expressed earlier in this opinion, as well as in many prior opinions. See, e.g., Rule 29 Op. at *21-22, 41; Bill of Particulars Op. at *8; Post-trial Mot. to Dismiss Op. at *6; April Mot. to Compel Op. at *7. The fact that the defendants disagree with the Court about the substantive law applicable to the charged offenses does not provide grounds for ordering a new trial on the obstruction of justice charges or the conspiracy charges.

Second, Mr. Sutton maintains that he should have been permitted to present evidence about the U.S. Attorney's Office's non-compliance with internal Department of Justice procedures (as set forth in the "Justice Manual") related to civil rights investigations. Sutton Mot. at 11, 58. He argues that the government's refusal to produce discovery related to its compliance with Justice Manual policies – and the Court's refusal to order such discovery – precluded him from "disproving the federal nexus by proof that [the Department of Justice] and the U.S. Attorney never treated this case as a civil rights investigation." Sutton Mot. at 58. This argument has no merit. The Court has repeatedly held that "Mr. Sutton and Mr. Zabavsky would not have been permitted to argue to the jury or present evidence about the U.S. Attorney's Office charging decisions at trial." Post-trial Mot. to Compel Op. at *9. And "the U.S. Attorney's Office's compliance or non-compliance with the Justice Manual in presenting evidence to the grand jury and seeking this indictment is irrelevant to whether the government was able to prove federal obstruction of justice at trial." Id. Mr. Sutton has not presented the Court with any reasons to reconsider its prior decisions about the relevance of the U.S. Attorney's Office compliance or non-compliance with Justice Manual policies.

Finally, Mr. Sutton contends that the Court deprived him of a defense by restricting his ability to present certain testimony from MPD Sergeant Brian Bray, "the most experienced MPD official with knowledge of how the relationship between [the Internal Affairs Division] and the U.S. Attorney's Office actually worked." Sutton Mot. at 58.

Sergeant Bray responded to the scene on the night of the collision and told MPD Captain Franklin Porter that the pursuit would result in "a criminal declination" – "that is, a reference to a decision by the U.S. Attorney's Office to decline to prosecute any criminal case arising from this incident." Government's Motion in Limine to Preclude Defense Witness

Testimony [Dkt. No. 374] at 5 (quoting Sergeant Bray's statement, which was recorded by his body worn camera).  Mr. Sutton sought to elicit testimony that, "[a]lmost immediately upon reaching the scene of the accident . . . [Sergeant] Bray recognized there was no use of force or other conduct which would have justified a civil rights violation."  Ofc. Sutton's Opposition to the Government's Motion in Limine to Preclude Defense Witness Testimony [Dkt. No. 375] at 3.  Mr. Sutton argued that Sergeant Bray's testimony that "this kind of case does not implicate federal criminal charges" was relevant to establishing whether this incident related to the "possible commission of a federal offense."  Id.

The government responded that such testimony from Sergeant Bray would be "irrelevant, self-serving hearsay."  Reply in Support of Government's Motion in Limine to Exclude Inadmissible Defense Witness Testimony [Dkt. No. 379] at 2.  According to the government, Sergeant Bray "had no oversight or responsibility over how or when the Government investigated this particular [matter]," and that his comment about a "declination" would "mislead and confuse the jury."  Id. at 3.  The government also asserted that "Sergeant Bray would testify that his comment about a 'declination' was based on his understanding that unauthorized pursuits are typically not prosecuted and would thus be 'unprecedented.'"  Id. at 4.  But, the government pointed out, the Court had already prohibited testimony about the "unprecedented" nature of this case.  Id.  The government further argued that Sergeant Bray's prediction of a "declination" was based on a "mischaracterization of the law."  Id. at 5.

The Court "reject[ed] the defendants' arguments and embrace[d] the government's arguments for the reasons stated by the government" in its written briefing on this issue.  Trial Tr. Dec. 2, 2022 at 163:19-24.  The Court ruled that

> Sergeant Bray can't talk about . . . an unprecedented prosecution,
> that in his experience there would be a declination.  He's got no

> idea.  He doesn't make those decisions.  Those are made by the
> U.S. Attorney's office.  And I don't care how much experience
> he's got.  It's a legal conclusion.  It's an opinion.

Id. at 164:14-20.  The Court thus limited Sergeant Bray's testimony to "what happened on the

scene, and his conversations with people on the scene."  Id. at 165:8-10; see Trial Tr. Dec. 6,

2022 p.m. at 48:5-49:10.

The Court remains convinced that it properly limited the scope of Sergeant

Bray's testimony.  Sergeant Bray was not qualified as an expert witness, and even if he had

been so qualified, he would not have been allowed to provide legal opinions.  "[A]n expert may

offer his opinion as to facts that, if found, would support a conclusion that the legal standard at

issue was satisfied, but he may not testify as to whether the legal standard has been satisfied."

Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d at 1212-13; see Daubert Op. at *9-10

("[A]n expert's legal opinions are inadmissible because these opinions cannot properly assist

the trier of fact in understand[ing] the evidence or . . . determining a fact in issue." (quotations

omitted)).  Sergeant Bray's proffered testimony that "there was no use of force or other conduct

which would have justified [the investigation of] a civil rights violation" is exactly the kind of

"impermissible legal conclusion[]" that an expert witness may not provide.  Ofc. Sutton's

Opposition to the Government's Motion in Limine to Preclude Defense Witness Testimony

[Dkt. No. 375] at 3; see Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d at 1213.

In addition, Sergeant Bray's opinion that this incident would result in a criminal

declination was rooted in a flawed premise:  that a criminal prosecution would not result unless

the police vehicle had intentionally made contact with the suspect vehicle.  See Grand Jury Tr.

Aug. 3, 2021 p.m. at 39:14-41:4 [Dkt. No. 512-1] (Sergeant Bray's grand jury testimony).  As

the government correctly points out, contact between Mr. Sutton's vehicle and Mr. Hylton-

Brown's vehicle is not required under the D.C. second degree murder statute.  See Reply in Support of Government's Motion in Limine to Exclude Inadmissible Defense Witness Testimony [Dkt. No. 379] at 5 (citing Fleming v. United States, 224 A.3d at 221).  Thus, not only was Sergeant Bray's proffered testimony an impermissible legal conclusion, but it was based on an incorrect assessment of the law.  The Court's decision to exclude his testimony about a "declination" ensured that the jury heard only relevant and reliable testimony that did not consist of impermissible legal opinions or rely on inaccurate legal premises.

### D.  Alleged Prosecutorial and Judicial Misconduct

#### 1.  Prosecutorial Misconduct

It is established that "serious prosecutorial misconduct may so pollute a criminal prosecution as to require dismissal of the indictment or a new trial."  United States v. McCord, 509 F.2d 334, 349 (D.C. Cir. 1974); see United States v. Ring, 768 F. Supp. 2d 302, 310-12 (D.D.C. 2011).  Mr. Sutton and Mr. Zabavsky assert a number of "calculated and intentional" instances of government misconduct.  Sutton Reply at 12; see Zabavsky Mot. at 14-15.  They raise several familiar allegations, many of which the Court has previously addressed.  None warrants granting their motions for new trial.  The Court addresses each claim in turn.

#### a.  "Perjured" Testimony of Kevonn Mason

Mr. Sutton and Mr. Zabavsky argue that they were prejudiced by the testimony of Kevonn Mason, one of the government's witnesses, who they assert lied while testifying during the government's case in chief.  See Sutton Mot. at 48; Zabavsky Mot. at 14.  Mr. Sutton and Mr. Zabavsky contend that Mr. Mason lied when counsel for Mr. Sutton asked Mr. Mason, "So you've stayed out of trouble?" and Mr. Mason answered, "Yeah."  See Sutton Mot. at 49; Zabavsky Mot. at 14; Trial Tr. Nov. 1, 2022 p.m. at 31:15-16.  Mr. Sutton also argues that the

government elicited false testimony from Mr. Mason when the government asked Mr. Mason

what he remembered from the night of Mr. Hylton-Brown's death.  Sutton Mot. at 51.

With respect to Mr. Mason's testimony that he "stayed out of trouble," Mr.

Sutton maintains that this testimony "was a lie" because – as the Court and the parties later

realized – Mr. Mason had been previously arrested and had prior convictions for simple assault

and contempt.  See Sutton Mot. at 49; see Post-trial Mot. to Compel Op. at *3-6; Zabavsky Mot.

at 14.  The Court does not agree with the defendants' characterization of Mr. Mason's statement

as "perjury" and "a lie."  Mr. Mason made this statement during cross examination by counsel

for Mr. Sutton after counsel had first asked Mr. Mason about his observations the night of the

collision.  The full extent of Mr. Mason's original testimony about whether he had "stayed out

of trouble" is as follows:

> Counsel for Mr. Sutton:  So is it pretty true, Mr. Mason, that you've
> been able to pretty much hold a job as best you could ever
> since you graduated from Luke C. Moore, right?
> Mr. Mason:  Yeah.
> Counsel for Mr. Sutton:  And that you're making decent money at
> UPS, but you can make more, right?
> Mr. Mason:  Yes.
> Counsel for Mr. Sutton:  So you think you have a future there?
> Mr. Mason:  Yeah.
> Counsel for Mr. Sutton:  Thank you. . . .  May I ask one last
> question?
> The Court:  Sure.  Yes.
> Counsel for Mr. Sutton:  So you've stayed out of trouble?
> Mr. Mason:  Yeah.
> Counsel for Mr. Sutton:  Thank you.

Trial Tr. Nov. 1, 2022 p.m. at 31:2-17.

The Court understands why counsel for Mr. Sutton did not explicitly ask Mr.

Mason if he had any prior arrests or convictions – based on the government's representations,

counsel believed that the answer to that question would have been "No."  See Sutton Mot. at 49.

But the Court does not agree that Mr. Mason's response to counsel's question "So you've stayed out of trouble?" was knowingly false or intended to deceive.  The question itself did not specify whether counsel was asking if Mr. Mason had stayed out of trouble since graduating from high school, since the night of the collision, since he was contacted by the government to be a witness in this case, or for his whole life.  Based on the ambiguity of the question, the Court does not find that Mr. Mason's response was an intentional "lie," as Mr. Sutton argues. See id.

Furthermore, even if Mr. Mason had knowingly or intentionally lied, his response did not cause Mr. Sutton substantial prejudice.  The Court determined during trial that neither defendant was prejudiced by the belated disclosure of Mr. Mason's criminal history because the Court permitted the government to recall Mr. Mason for the sole purpose of allowing cross examination about Mr. Mason's prior encounters with law enforcement.  As the Court explained:

> The Court agreed with the government during trial and remains convinced that the remedy fashioned at trial – allowing Mr. Sutton to cross-examine Mr. Mason about the previously undisclosed convictions – ameliorated any potential prejudice caused by the government's failure to produce the correct [criminal history] report.  If the government had timely produced the correct [criminal history] report, the result would have been the same as what in fact occurred at trial:  Mr. Sutton was permitted to impeach Mr. Mason using his prior conviction and encounters with law enforcement.  Accordingly, it is not the case that the "result of the proceeding would have been different" had the government timely produced the correct [criminal history report], see United States v. Bagley, 473 U.S. 667, 682 (1985), nor is it the case that the untimely disclosure "put[s] the whole case in such a different light as to undermine confidence in the verdict."  Kyles v. Whitley, 514 U.S. 419, 435 (1995).

Post-trial Mot. to Compel Op. at *7.

The Court reiterates that Mr. Mason's testimony that he "stayed out of trouble" did not cause Mr. Sutton and Mr. Zabavsky substantial prejudice. Counsel for both defendants were permitted to cross examine Mr. Mason not only about his prior convictions and potential bias against law enforcement, but also about his testimony that he "stayed out of trouble," which his prior convictions called into question.

Relatedly, Mr. Zabavsky argues that the Court improperly restricted his ability to impeach Agent Ricardi's credibility by prohibiting counsel for Mr. Zabavsky from cross examining Agent Ricardi about Mr. Mason's testimony. Specifically, Mr. Zabavsky suggests that he should have been able to ask Agent Ricardi why Agent Ricardi did not try to correct Mr. Mason's testimony that he had "stayed out of trouble." Zabavsky Reply at 11-12. Agent Ricardi had previously reviewed Mr. Mason's accurate criminal history report, see Post-trial Mot. to Compel Op. at *3-6, and therefore should have been aware that Mr. Mason had not actually "stayed out of trouble." The Court, however, expressly allowed Mr. Zabavsky to pursue this line of questioning with Agent Ricardi, over the government's objection. See Trial Tr. Nov. 21, 2022 a.m. at 99:20-108:13. Mr. Zabavsky's argument that the Court improperly restricted his right to cross examine witnesses therefore is meritless. See Zabavsky Reply at 11.

With respect to Mr. Sutton's claim that the prosecutors intentionally solicited false testimony from Mr. Mason, Mr. Sutton explains that Mr. Mason "told the jury that he saw Reggie Ruffin turn the moped over to Hylton-Brown directly in front of the bus stop on Kennedy Street next to the Starlight Convenience Store," and that "this event does not appear on the video from the 5th and Kennedy Street police camera." Sutton Mot. at 50.[6] Mr. Sutton

---

[6]     Mr. Mason testified that the night Mr. Hylton-Brown was killed, Mr. Mason went to the Starlight convenience store and got a snack. Trial Tr. Nov. 1, 2022 a.m. at 41:4-17. When he exited the store, he saw two people outside, one of whom was Reggie Ruffin. Id. at

argues that the prosecutor never corrected the record after Mr. Mason recounted a version of

events from that night that video evidence refuted.  Id.

        Following this testimony, however, the prosecutor showed Mr. Mason and the

jury video from police cameras at Fifth Street and Kennedy Street.  See Gov't Ex. 302 (Fifth

and Kennedy Street Cameras); Trial Tr. Nov. 1, 2022 a.m. at 66:2-76:20.  The jury saw what the

police cameras at Fifth and Kennedy Streets captured that evening, which did not include the

hand-off of the Revel scooter that Mr. Mason had previously described.  The prosecutor also

asked Mr. Mason to clarify whether watching the surveillance camera refreshed his memory.

Trial Tr. Nov. 1, 2022 a.m. at 82:20-22; id. at 83:12-14 (during direct examination, Mr. Mason

explained that his memory was "a little off").  Furthermore, Mr. Sutton had the opportunity to

cross examine Mr. Mason about this testimony, and he in fact did so.  See Trial Tr. Nov. 1,

2022 p.m. at 17:1-21:16.  On cross examination, Mr. Mason reiterated that his "time was a little

off" when he initially told investigators what he remembered about the events preceding the

collision.  Id. at 21:16.  The jury therefore was well equipped to make a credibility assessment

about the "apparent discrepancies" in Mr. Mason's testimony.  See Radtke v. Lifecare Mngmt.

Partners, 795 F.3d 159, 166-67 (D.C. Cir. 2015) (trial court did not err in declining to give a

"perjury instruction" after witness testified inconsistently).

        Based on the government's questioning of Mr. Mason and its introduction of the

surveillance video in evidence, the Court does not find that the prosecutors purposefully elicited

false testimony from Mr. Mason.  Rather, the government presented testimony from a witness

---

41:18-22.  Mr. Ruffin had a Revel electric scooter with him at that time.  Id. at 42:9-24.  Mr.
Mason said he saw Mr. Hylton-Brown "[get] the scooter from Reggie."  Id. at 43:5-22.  He
explained that he, Mr. Ruffin, and Mr. Hylton-Brown were "standing on the corner" of Fifth
Street and Kennedy Street, Northwest, "right there at the Ace Check Cashing" when Mr.
Hylton-Brown got the scooter from Mr. Ruffin.  Id. at 44:4-21.

whose memory of that evening was admittedly "a little off."  Trial Tr. Nov. 1, 2022 a.m. at 83:12-14.  The Court also disagrees with Mr. Sutton's assertion that the government "never corrected the record."  Sutton Mot. at 50.  The government remedied Mr. Mason's inaccurate testimony by showing him and the jury the surveillance video from Fifth and Kennedy Streets, asking Mr. Mason to explain what he saw and what the video depicted.  Trial Tr. Nov. 1, 2022 a.m. at 66:2-76:20.  And Mr. Sutton was able to cross examine Mr. Mason about his inaccurate memory.  The Court does not agree that the government solicited or refused to correct "perjured" testimony.  Nor does the Court find "any reasonable likelihood" that Mr. Mason's inaccurate testimony about when and where Mr. Hylton-Brown obtained the Revel moped "could have affected the judgment of the jury."  United States v. Williams, 233 F.3d 592, 594 (D.C. Cir. 2000) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)).

       Mr. Sutton also argues that the prosecutor elicited perjured testimony when he asked Mr. Mason:  "Were you able to forget your dying friend's last words to you?"  Trial Tr. Nov. 1, 2022 p.m. at 33:25-34:2; see Sutton Reply at 13; May 17, 2023 Hearing Tr. at 125:15-126:1.  Mr. Mason replied:  "No."  Trial Tr. Nov. 1, 2022 p.m. at 34:2.  Because Mr. Hylton-Brown "never regained consciousness" after the collision, Mr. Sutton argues, it was improper for the prosecutor to suggest through this question that Mr. Mason and Mr. Hylton-Brown spoke while Mr. Hylton-Brown was lying on the pavement, dying.  See May 17, 2023 Hearing Tr. at 125:15-126:1 (counsel for Mr. Sutton suggested that this question was equivalent to the "solicitation of perjury").

       The Court agrees that the prosecutor's question was misleading.  Because of the reference to Mr. Hylton-Brown's "dying words," the jury could have been momentarily misled into believing that Mr. Mason spoke with Mr. Hylton-Brown after the collision – though it was

clear from the rest of Mr. Mason's testimony and other evidence in the case, including body worn camera footage from multiple officers on the scene, that no such conversation could possibly have occurred.  In view of the other evidence presented, the Court does not find that the prosecutor's singular misleading question warrants granting Mr. Sutton's motion for new trial.

Mr. Mason's response to the prosecutor's misleading question was not likely to have swayed the jury one way or the other.  His response did not "fill[] in all of the gaps of the government's case." United States v. Jones, 84 F. Supp. 2d 124, 126 (D.D.C. 1999).  During his testimony, Mr. Mason admitted that his recollection of that night was not perfect and that he made numerous misstatements, which defense counsel had a full opportunity to highlight during cross examination.  Mr. Mason's testimony helped set the scene for the jury about what Mr. Hylton-Brown was doing before the pursuit occurred, but Mr. Mason did not provide crucial information relating to any of the elements of the charged offenses.  See generally Rule 29 Op. (finding that the government presented sufficient evidence as to second degree murder without relying on Mr. Mason's testimony about Mr. Hylton-Brown's conduct earlier that evening).  In the context of a nine-week trial, the Court is convinced that the convictions in this case did not "hing[e] on the credibility" of Mr. Mason. Stamps v. United States, 406 F.2d 925, 929 (9th Cir. 1969); see United States v. Jones, 84 F. Supp. 2d at 126 (contested testimony was not "material to [the defendant's] conviction").  Because it is not likely that "the jury might have reached a different conclusion" without Mr. Mason's testimony about Mr. Hylton-Brown's "dying words," that testimony is not a sufficient reason for the Court to order a new trial. United States v. Jones, 84 F. Supp. 2d at 126 (citing United States v. Mangieri, 694 F.2d at 1286).

b.  Opening Statement and Closing Arguments

A court may grant a motion for new trial based on a prosecutor's misstatements during opening statements or closing arguments when those statements cause a defendant "substantial prejudice."  United States v. Small, 74 F.3d1276, 1280 (D.C. Cir. 1996) (citing United States v. Perholtz, 842 F.2d 343, 361 (D.C. Cir. 1988)); see United States v. Johnson, 231 F.3d 43, 47 (D.C. Cir. 2000) ("In assessing claims of prosecutorial misstatements, the court is required to determine whether the disputed remarks constituted error and whether they substantially prejudiced the defendant's trial.").  "For a new trial based on opening or closing statements, the Court considers 'the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks.'"  United States v. Hale-Cusanelli, 628 F. Supp. 3d 320, 328 (D.D.C. 2022) (quoting United States v. Monaghan, 741 F.2d 1434, 1443 (D.C. Cir. 1984)); see also United States v. Gaither, 413 F.2d 1061, 1079 (D.C. Cir. 1969).  Improper comments that are "not central to the government's proof of guilt" or are "brief" references "made in passing" are less likely to require a new trial.  See United States v. Valdez, 723 F.3d 206, 209 (D.C. Cir. 2013).  "Where there has been improper argument, the government bears the burden of showing that the argument was not substantially prejudicial – i.e., that the error was 'harmless.'"  United States v. Khatallah, 313 F. Supp. 3d 176, 188 (D.D.C. 2018) (quoting United States v. Johnson, 231 F.3d at 47).

i.  Opening Statement

Mr. Sutton and Mr. Zabavsky object to the government's opening statement, contending that the government wrongfully suggested that they could be convicted of federal obstruction of justice for covering up a "murder" rather than for covering up a federal offense.  See Sutton Mot. at 59; Zabavsky Mot. at 11-12.  They argue that the jury was "hopelessly

ignorant of the elements of Obstruction of Justice" from the beginning of trial, see Sutton Mot. at 59, and that they were prejudiced by the government's opening statement because "the jury believed that they could convict [the defendants] based on an underlying crime of murder." Zabavsky Mot. at 11-12.

Mr. Sutton and Mr. Zabavsky raised this issue previously in the context of a motion to dismiss the indictment based on the government's insufficient opening statement. See Post-trial Mot. to Dismiss Op. at *2-3 (restating the contested portions of the government's opening statement). The Court declined to dismiss the indictment based on the government's opening statement because the opening statement did not "establish that this incident was exclusively a murder and a cover-up of that murder." Id. at *7. It is true that "the government did frequently state that this incident was a 'murder and a cover-up'" during its opening statement. Id. But that was not all the government said. As the Court explained, during its opening statement, the "[t]he government alluded to a potential investigation by federal authorities and explained the role of the Internal Affairs Division ('IAD') in referring cases to the United States Attorney's Office for federal investigation." Id. The government also "established that IAD routinely refers cases like this for investigation by federal authorities." Id. Based on these references, the Court held that "the jury could infer from the entirety of the opening statement that evidence would be produced showing that Mr. Sutton and Mr. Zabavsky acted with the purpose of obstructing the communication of information related to some potential federal offense in addition to D.C. Code offenses." Id.

Furthermore, neither Mr. Sutton nor Mr. Zabavsky was prejudiced by the government's repetition of the phrase "a murder and a cover-up" during opening statements. The defendants' argument "depends on the assumption that the jury did not follow the Court's

instructions and instead chose to rely on the government's description" of the offense during the opening statement.  United States v. Ring, 768 F. Supp. 2d at 310.  This, however, "is not the law.  Rather, it is assumed that juries follow the instructions they are given, and there is absolutely no indication here that that did not happen."  Id.  See Samia v. United States, 143 S. Ct. 2004, 2013-14 (2023) (describing the longstanding "assumption that jurors can be relied upon to follow the trial judge's instructions," including limiting instructions); United States v. Cooper, 949 F.3d 744, 752 (D.C. Cir. 2020) ("Juries are presumed to follow their instructions, and the record offers no reason to doubt the validity of that presumption here." (quotations omitted)).  And, as the Court explained, "although the opening statement certainly made reference to obstruction of an investigation into a possible murder, a D.C. Code offense, the government's references in the opening statement to a federal investigation also permitted the inference that Mr. Sutton and Mr. Zabavsky endeavored to hinder an investigation into possible federal offenses as well."  Post-trial Mot. to Dismiss Op. at *7.

The jury was instructed specifically about the elements of obstruction of justice. The Court directed the jury to return a guilty verdict on the obstruction of justice and conspiracy counts only if it determined that the information that Mr. Sutton and Mr. Zabavsky sought to hinder, delay, or prevent the communication of "related to the commission or possible commission of a federal offense."  Jury Instructions at 30.  The Court also instructed the jury that Mr. Sutton and Mr. Zabavsky were charged with "conspiring to obstruct justice to prevent an internal investigation . . . and referral of the matter to the federal authorities for a possible federal criminal civil rights investigation."  Trial Tr. Oct. 25, 2022 a.m. at 30:5-9.  And, during both the governments' and the defendants' closing arguments – which the jury heard

immediately before beginning deliberations, after weeks of testimony – counsel emphasized the "federal" nature of the possible underlying offense.  See Trial Tr. Dec. 14, 2022 a.m. at 46:13-17 (counsel for the government argued:  "And so you knew that within about eight hours . . . federal investigators were already poking around for an investigation into a possible commission of a federal crime."); Trial Tr. Dec. 14, 2022 p.m. at 24:1 (counsel for Mr. Sutton argued that "murder is not a federal offense").  It therefore does not matter whether the jurors initially may have thought – based on the government's opening statement – that obstructing an investigation into a possible murder would be sufficient for guilt on the obstruction of justice and conspiracy counts.  The jury was subsequently told what the elements of obstruction of justice are and that the government must establish a possible federal offense rather than a possible D.C. Code offense.  See Jury Instructions at 30.  The Court assumes that the jurors followed the instructions they were provided.  Samia v. United States, 143 S. Ct. at 2013-14.  Mr. Sutton and Mr. Zabavsky have presented no evidence that the jury did not do as it was instructed, and the Court therefore finds no prejudice arising from the government's opening statement.

### ii.  Closing Arguments

Mr. Sutton raises several arguments about the propriety of the government's closing arguments.  He argues that the government presented a misleading PowerPoint slide, "misstated the law on 'but-for' causation," and "invite[d] the jury to render their verdict as a judgment on what they want to see from their . . . Police Department."  Sutton Mot. at 60-61.

The Court addressed Mr. Sutton's arguments about the government's closing argument PowerPoint at length in a prior opinion.  See Post-trial Mot. to Dismiss Op. at *4-5, *8-11.  The Court agreed with Mr. Sutton that the government had presented a misleading

PowerPoint slide – one that looked like it may have been included in the MPD training materials that Mr. Sutton saw during his police training, but was actually a demonstrative exhibit the prosecution team had created for trial.  Id. at *9.  The Court concluded, however, that Mr. Sutton was not prejudiced by the use of this slide, as the content of the slide did not misstate any of the evidence that the government presented and the jury was instructed that the PowerPoint used in closing argument was not itself evidence.  See id. at *9-10.  Mr. Sutton raises the same arguments he made previously in his motion for new trial, but the Court declines to reconsider its prior decision.

Mr. Sutton also argues that the government misstated the standard for second degree murder during its rebuttal argument, telling the jury that "they can acquit Ofc. Sutton only if Hylton-Brown was the sole cause of his death."  Sutton Mot. at 60-62.  The prosecutor said in rebuttal:

> The second distinction is that [counsel for Mr. Sutton] wants to make this [case] desperately about Mr. Hylton-Brown.  What did he do?  What was he thinking?  Where did he go?  Now, no one here is disputing whether or not Mr. Hylton-Brown should have stopped. It's not a big surprise.  We haven't argued as the government that he had every right to continue on.  And the real question with respect to Mr. Hylton-Brown is if you think that he is the sole cause of his death, that's one thing, but causality and causation and the analysis and the law on that is that if you believe that Mr. Sutton was a but-for cause, in other words, he was a part of the chain of events and if you removed him out of that chain would the crash have occurred, that's the question.
>
> The second question on causation is whether [Mr. Sutton] should have seen this risk, whether he knew, frankly, of this extreme risk, that there was a chance, a possibility that Mr. Hylton-Brown would have died or suffered serious bodily injury.  Did he know?  What was the standard?  What did he know at the moment?  So that's really the analysis there.  And Mr. Hylton-Brown, he could have made mistakes, but it doesn't matter.  It doesn't matter, because he's not on trial.  And what matters is what Mr. Sutton did.  And the real

> issue here that [counsel for Mr. Sutton] doesn't want you to focus
> on are the decisions that Mr. Sutton made that night.

Trial Tr. Dec. 14, 2022 p.m. at 60:12-61:8.

The Court does not agree that the prosecutor misstated the law in his rebuttal. The prosecutor correctly stated that causation for second degree murder requires finding that Mr. Sutton was a "but-for cause" of Mr. Hylton-Brown's death. See Trial Tr. Dec. 14, 2022 p.m. at 60:16-61:1; Jury Instructions at 29. Although the prosecutor stated, "if you think that he is the sole cause of his death, that's one thing," see Trial Tr. Dec. 14, 2022 p.m. at 60:16-17, the prosecutor did not tell the jury that it could acquit Mr. Sutton "only if" Mr. Hylton-Brown was the sole cause of his death. See Sutton Mot. at 60 (emphasis added). This portion of the prosecutor's rebuttal did not misstate the law; rather, the prosecutor presented arguments about the framing of the evidence that the government wanted the jury to focus on. See Trial Tr. Dec. 14, 2022 p.m. at 61:3-8 (prosecutor argued that "what matters is what Mr. Sutton did" and "[counsel for Mr. Sutton] doesn't want you to focus on the decisions that Mr. Sutton made that night"). This portion of the government's closing argument was not erroneous.

Finally, Mr. Sutton argues that the prosecutor's closing arguments invited the jury to "[v]ote on how [they] want policing to work," Sutton Mot. at 61, an argument that Mr. Sutton could not rebut because the Court excluded his constitutional policing defense. Id. Of course, "a prosecutor may not ask jurors to find a defendant guilty as a means of promoting community values, maintaining order, or discouraging future crime." United States v. Johnson, 231 F.3d at 47 (citing United States v. Monaghan, 741 F.2d 1434, 1441 (D.C. Cir. 1984)). Nor may a prosecutor "mislead the jury into considering social issues irrelevant to the defendant's own case," United States v. Monaghan, 741 F.2d at 1440-42, or "urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future

55

lawbreaking." United States v. Davis, 863 F.3d 894, 907 (D.C. Cir. 2017) (quoting United States v. Monaghan, 741 F.2d at 1441).

        The prosecutor's initial closing argument did not defy any of this established law.  The prosecutor made one passing reference to Mr. Sutton's "duty . . . to keep the citizens of this city safe," but that was all.  See Trial Tr. Dec. 14, 2022 a.m. at 20:23-24.  Portions of the prosecutor's rebuttal, however, seemed to appeal to the jury's sense of "community values." United States v. Monaghan, 741 F.2d at 1441.  The prosecutor argued, for example: "No one deserves this, not Karon Hylton-Brown, nobody, for simply minding their own business.  That's why the vehicular pursuit policy is what it is.  That's why we as citizens in this city have decided we don't want vehicular pursuits for people who are not very dangerous."  Trial Tr. Dec. 14, 2022 p.m. at 64:3-8.  The prosecutor also argued:

> Now, [counsel for Mr. Sutton] wants to talk about what-ifs and shoulda, coulda, wouldas, and maybe Mr. Hylton-Brown could have taken a right turn and he almost made it or if he had just gone a little faster.  No, no, this is not a game of Russian Roulette by car.  You don't just get to be like heads you win, tails you lose, sorry, buddy, that's really unfortunate. . . .  This isn't a video game.  You don't get to come back.  That's not how policing works.  You don't get to just go zipping down and hope for the best and maybe they make the right decision and maybe they don't.  That's not what policing is about.  That's not the call to law enforcement. . . .

Trial Tr. Dec. 14, 2022 p.m. at 65:23-66:19.  The prosecutor also made repeated references to "good policing," to how policing "ought to work," and to the ways that the police treat certain neighborhoods – and their residents – differently.  See Sutton Mot. at 61-62; Trial Tr. Dec. 14, 2022 p.m. at 79:13-80:25 ("[Counsel for Mr. Sutton] talks about freedom.  And it's important to emphasize that freedom is not just meant for certain people in this city.  It's not just if you live in a high crime neighborhood you don't get freedom, that if you have an arrest record you don't get freedom.").  Although these aspects of the government's rebuttal may have approached

"[t]he line separating acceptable from improper advocacy," United States v. Young, 470 U.S. 1,

7 (1985), the Court does not agree with Mr. Sutton that the government's rebuttal arguments

were improper.

             Most of the prosecutor's rebuttal argument – including his references to "good

policing" – was appropriate rebuttal "made in response to earlier statements by the defense."

United States v. Monaghan, 741 F.2d at 1443; see United States v. Johnson, 231 F.3d at 48.

During the defense case in chief, Mr. Sutton presented testimony from multiple witnesses about

his exemplary performance as an MPD police officer.  See Rule 29 Op. at *3.  Early in his

closing argument, counsel for Mr. Sutton told the jury:  "Freedom may be one of our most

cherished principles.  Freedom allows us to enjoy the families that we have, the children that we

have."  Trial Tr. Dec. 14, 2022 a.m. at 54:6-8.  The prosecutor's statements about "freedom for

certain people in this city" were thus "invited by – and responded to – defense counsel's

remarks."  United States v. Burnett, 890 F.2d 1233, 1242 (D.C. Cir. 1989).  Counsel for Mr.

Sutton also talked about police officers' duty to "protect the public from people that officers

have reasonable suspicion are armed or engaging in some other criminal activity."  Trial Tr.

Dec. 14, 2022 p.m. at 14:22-25.  He told the jury that, "[e]ven the rookie . . . knows what it

means in that neighborhood, those people."  Id. at 21:4-8.  Mr. Sutton's "defense [was] that he

is doing his job as a police officer . . . .  That's the duty of the officers.  If you do something

wrong and police take action against you, you're responsible for it.  This is about freedom.  This

is about choices, good or ill."  Id. at 22:1-11.  He told the jury:  "[I]f you think anything in this

case is tending towards good police conduct or even innocent conduct . . . you can't find [Mr.

Sutton and Mr. Zabavsky] guilty."  Id. at 23:16-21.  And as he ended his closing argument,

counsel for Mr. Sutton said:  "This man was trying to protect his community. . . .  We all

deserve safety."  Id. at 25:10-11.  The prosecutor's arguments about "good policing" were in

direct response to these assertions about how Mr. Sutton was "doing his job" with his

"community" in mind.

Although the prosecutor commented multiple times about how good policing is

supposed to work, these statements were "fleeting" moments within a lengthy rebuttal.  United

States v. McGill, 815 F.3d 846, 922 (D.C. Cir. 2016) (concluding that the "relatively cabined

nature of the improper conduct mitigated any possible prejudice"); see United States v. Moore,

651 F.3d 30, 53 (D.C. Cir. 2011); ("[h]ere, the severity of what appellants have identified on

appeal as misconduct was limited to relatively small portions of lengthy opening and closing

arguments."); see also United States v. Childress, 58 F.3d at 716; United States v. Hemphill,

514 F.3d at 1361.  In view of the evidence presented in the case and the arguments of defense

counsel, most of the prosecutor's comments were fair rebuttal that were unlikely to have had

any impact on the verdict.  See United States v. Johnson, 231 F.3d at 48.

Even if one were to assume that the government's rebuttal arguments

"overstep[ped] the bounds of proper advocacy," however, the Court does not find that these

remarks "cause[d] substantial prejudice to the defendant."  United States v. Monaghan, 741

F.2d at 1443; see United States v. Hale-Cusanelli, 628 F. Supp. 3d at 328; United States v.

Moore, 651 F.3d at 54 (considering whether prosecutorial misconduct "impermissibly and

prejudicially interfere[d] with the jury's ability to assess the evidence").    The Court adopted

measures to mitigate the prejudicial effects of any potentially improper statements.  The Court

instructed the jury repeatedly that statements of counsel are not evidence, an instruction that "is

usually a strong ameliorative consideration for prosecutorial misconduct during opening and

closing argument."  United States v. Moore, 651 F.3d at 54 (internal citations omitted); see

United States v. Williams-Davis, 90 F.3d 490, 507 (D.C. Cir. 1996). Immediately after the prosecutor's rebuttal argument and before the jurors were excused for the day, the Court told them: "The evidence you've heard and seen is the evidence you've heard and seen. And you've heard this afternoon that there are very different views of how you should evaluate that evidence. That's what lawyers do in their closing arguments. They try to bring it all together for you from their perspective." Trial Tr. Dec. 14, 2022 p.m. at 82:21-25. The next morning, before sending the jurors to deliberate, the Court instructed them that "the statements and arguments of lawyers are not evidence. . . . Their opening statements and closing arguments are not evidence. They are intended to assist you in understanding the evidence." Trial Tr. Dec. 15, 2022 a.m. at 38:24-39:2. And during its deliberations, the jury also had a copy of the jury instructions, which again advised that closing arguments are not evidence and that the only evidence the jury may properly consider consists of witness testimony and exhibits admitted in evidence. See Jury Instructions at 5-6.

In sum, most of the prosecutor's rebuttal argument was appropriate commentary on the evidence and fair response to the arguments and evidence presented by defense counsel. To the extent that the prosecutor's arguments may have occasionally crossed a line, the Court concludes that Mr. Sutton was not substantially prejudiced. The Court cannot overlook the fact that counsel for Mr. Sutton invited many of the statements made in the prosecutor's rebuttal. The jury sat through the testimony of dozens of witnesses during a trial that lasted over two months, and the Court repeatedly told members of the jury to base its verdict on the evidence, not on the statements or arguments of counsel.

## 2.  Judicial Misconduct

"Sharp words spoken by a trial court to counsel do not by themselves establish impermissible bias.'"  United States v. Donato, 99 F.3d 426, 434 (D.C. Cir. 1996) (per curiam). A district court "has discretion to prevent improprieties during the trial" and to "maintain order during the trial."  Alexander v. Parks, 834 F. App'x 778, 781 (4th Cir. 2020) (citing United States v. Logan, 998 F.2d 1025, 1029 (D.C. Cir. 1993)).  A new trial is not warranted where "'rebukes of defense counsel reflected not upon the merits of the case but rather on the way it was being handled.'"  United States v. Edmond, 52 F.3d 1080, 1101 (D.C. Cir. 1995) (quoting United States v. DiTommaso, 817 F.2d 201, 220 (2d Cir. 1987)).  Rather, the Court must consider "the challenged rulings, procedures and comments together in the context of a long and difficult trial" when determining whether a "judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to perfect, trial."  United States v. Carson, 455 F.3d 336, 360 (D.C. Cir. 2006) (quoting United States v. Logan, 998 F.2d at 1029).

### a.  The Court's Statements to Counsel

Mr. Sutton argues that "[a] jurist's conduct at trial may enter the calculus of whether a defendant should be granted a new trial in the interests of justice."  Sutton Mot. at 63. He describes two events during trial when this Court voiced its frustration with defense counsel in a particularly severe manner.  See id. at 63-67.  One of those moments occurred at a bench conference, when Mr. Sutton's counsel pointed out that the government's case in chief took six weeks instead of the anticipated two weeks, and the Court responded:  "[T]hey took six weeks because you objected to every goddamn thing."  Id. at 63 (quoting Trial Tr. Dec. 8, 2022 a.m. at 55:24-25).  Mr. Sutton maintains that, while this exchange occurred at the bench with the husher turned on, the Court spoke loudly enough for the jury to hear.  Id.  The other moment

occurred during the arguments on the Rule 29 motions, when the jury was not present in the courtroom, and the Court instructed counsel for Mr. Sutton to "make your goddamn argument and sit down." Id. at 66 (quoting Trial Tr. Dec. 9, 2022 p.m. at 47:9-10).

As the Court said at the time, it regretted those comments made in the heat of the moment and apologized to Mr. Sutton's counsel immediately. See Trial Tr. Dec. 9, 2022 p.m. at 47:16-49:13. It is difficult for even the most experienced and patient judge not to let frustration get the better of them once in a while. See United States v. Donato, 99 F.3d at 426 ("There is a 'modicum of quick temper that must be allowed even judges.'") (quoting Offutt v. United States, 348 U.S. 11, 17 (1954)). And this was particularly true, unfortunately, in the context of a highly contentious nine-week trial, where many of the same, already-rejected arguments were being raised multiple times. As the Court said to counsel for Mr. Sutton at the end of the government's case in chief:

> I'm sorry if that is offensive [referring to the Court's reference to defense counsel's "goddamn arguments"]. And I shouldn't use that on the record. I agree with that. But, you know, it is difficult for judges as well as for lawyers to maintain their cool every single minute, and after an eight-week trial, I have some moments that I'm not – there's some things that I have said or the way I've said it that perhaps I shouldn't have. But you and I are both adults [addressing counsel for Mr. Sutton], and you've faced worse from judges, and you've faced worse from lawyers on other sides, and so have I. And I apologize to you for that characterization. I do not intend to cut off your argument. I think I've been – I have certain things – I have yelled, and I don't want to pick on people. I have yelled at you. I have yelled at [the prosecutor]. There are things that have been – there are things in this trial that I thought were inappropriate or the way in which it was done was inappropriate or redundant, redundant, redundant, and, you know, I apologize for that – the use of that [phrase "your goddamn arguments"]. Sorry if you're offended by it.
>
> I think I've been – you can argue to the Court of Appeals if there's a conviction, but I think I've been eminently fair to both sides. I've ruled for and against both sides on lots of things. There are a great

> many issues in this case that were very hard issues to decide. I have done what I thought was right. You've disagreed with me on many of them. You've agreed with me on some of them too. The government has disagreed with me on many of them. And, you know, there are some novel issues that have arisen in this case. If there's a conviction, the Court of Appeals will do it.
>
> I'm sorry that I cannot keep my cool from 9:30 every morning until 5 o'clock every night every single day in light of what has happened in this courtroom over an eight-week period.
> If you want to argue that there's – I shouldn't have said that; that it's offensive; that it's – whatever you want to say, but the question before the Court of Appeals – questions before the Court of Appeals will be whether I've been fair to both sides on the merits and on the substance. Whether I've adequately or more than fully considered the arguments that have been made by both sides, and those things that are discretionary with the trial judge, they should – but maybe won't – defer to my judgments. Those things that are questions of law [and they] will exercise their own judgment. Those things that they think I did that caused prejudice, if there were such, that affected the fairness of the verdict, they'll do what they do, you know. I apologize.

Trial Tr. Dec. 9, 2022 p.m. at 47:16-49:13.

The Court agrees with counsel for Mr. Sutton that its statements were improper, but the Court finds that these exchanges between counsel for Mr. Sutton and the Court did not deprive Mr. Sutton of a fair trial. The jury was not present during the Rule 29 arguments, and Mr. Sutton has not demonstrated that any jurors heard or were affected by the Court's statements during the bench conference. See United States v. Logan, 998 F.2d at 1029 (noting that "the jury never heard many of the[] exchanges" that counsel argued caused their clients prejudice). The Court's statements did not deter counsel for Mr. Sutton from zealous advocacy, and counsel for Mr. Sutton in fact has continued to represent his client zealously. See id. ("Despite [counsel's] assertions to the contrary, we find that his exchanges with the district court did not dampen his zealous (perhaps even overly so) representation of [his client]. The record illustrates that [counsel] repeatedly and aggressively pursued his client's cause."). The

Court's statements did not prejudice the jury and did not undermine counsel for Mr. Sutton's ability to advocate zealously on behalf of his client. See id. at 1029-30 ("[D]ifficulties with the judge did not affect [counsels'] representation of their clients so as to deny them a fair trial.").

Finally, on multiple occasions, the Court instructed the jury to disregard what it could perceive as any expressions of the Court's attitude or opinions. Specifically, the Court explained to the jury: "[W]hen sometimes I get upset because of something that happens here and I raise my voice, it is not a reflection on any lawyer or any of that lawyer's clients. . . . So don't blame them. Blame me if I yell sometimes." Trial Tr. Nov. 21, 2022 a.m. at 128:9-18. See also Jury Instructions at 3 ("You may not take anything I may have said or done as indicating how I think you should decide this case. If you believe that I have expressed or indicated any such opinion, you should ignore it."); Trial Tr. Oct. 25, 2022 a.m. at 37:21-38:5 ("During the course of the trial, I may rule on motions and objections made by the lawyers. . . . I may make comments to the lawyers. . . . You should not take any of my statements or any of my actions as any indication of my opinion about how you should decide this case. If you think that somehow I have expressed or even hinted at an opinion as to the facts in this case, you should disregard it."). Absent evidence to the contrary, the Court must presume that the jury followed these instructions. See, e.g., Samia v. United States, 143 S. Ct. at 2013-14 (describing the longstanding "assumption that jurors can be relied upon to follow the trial judge's instructions," including limiting instructions); United States v. Wheeler, 753 F.3d at 208 (improper prejudice may be "cabined by the court's curative instructions"). The Court thus concludes that the exchanges between Mr. Sutton's counsel and the Court – though regrettable – did not affect Mr. Sutton's substantial rights. See United States v. Borda, 786 F. Supp. 2d at 32.

b.  The Court's Examination of Witnesses

A district court judge has "wide discretion in monitoring the flow of a criminal

trial." United States v. Lawson, 494 F.3d at 1054 (quoting United States v. Donato, 99 F.3d at

434).  "A trial judge is not required to sit mute in the courtroom and merely wield his gavel as

moderator." United States v. Jackson, 627 F.2d 1198, 1206 (D.C. Cir. 1980).  Trial judges may

"make proper inquiry of any witness when he deems that the end of justice may be served

thereby and for the purpose of making the case clear to the jurors." Id. (quoting Griffin v.

United States, 164 F.2d 903, 904 (D.C. Cir. 1947), cert. denied, 333 U.S. 857 (1948)).  A trial

judge must, however, remain "a disinterested and objective participant in the proceedings,"

because "of the possible prejudicial consequences of the presider's intervention." United States

v. Barbour, 420 F.2d 1319, 1321-22 (D.C. Cir. 1969) (quoting Billeci v. United States, 184 F.2d

394, 403 (D.C. Cir. 1950) and United States v. Jackson, 627 F.2d at 894).

Mr. Sutton asserts that the Court engaged in the "intimidation of police

witnesses."  Sutton Mot. at 69.  He contends that the Court "asked a number of MPD officers

testifying for Ofc. Sutton intimidating or factually assertive questions," whereas the Court

"allow[ed] everlasting questions and answers of the government's expert witnesses."  Sutton

Mot. at 70.[7]  The Court has reviewed the trial transcripts cited by Mr. Sutton and does not agree

---

[7]     Mr. Sutton asserts that the "most egregious" example of the Court's questioning
of a police officer witness was the Court's questioning of Officer Cory Novick.  During the
government's direct examination of Officer Novick, the Court asked him questions to clarify his
testimony, including:  "Does each CST officer like yourself have an assigned desk or you just
use different desks at different times?"  Trial Tr. Nov. 14, 2022 p.m. at 67:2-5; "May I ask you a
preliminary question?  When you were talking to Officer Davis, you were in your office?";
"And he was at the hospital, is that correct?"; "And were you Zooming with him or was there a
video connection or just an audio connection?"; "Was it on speaker on your end?"  Id.
at 84:13-25; "If I understood what you were saying, tell me if I am wrong – that your intention
was not to arrest him but that you were considering whether to issue a citation or ticket, right?
Is that what you said?"  Id. at 89:18-21.

64

that the Court's questioning was "intimidating or factually assertive."  Sutton Mot. at 70.  Trial

in this case lasted for over two months and featured dozens of witnesses.  The Court interjected

throughout the trial to ask clarifying questions, to ask witnesses to repeat themselves, and to ask

witnesses to speak louder and slower for the court reporter's benefit.  The Court's interventions

were "efforts towards much needed clarification rather than challenges of the testimony."

United States v. Barbour, 420 F.2d at 1322.  The Court does not find that its interjections

intimidated police officer witnesses or affected Mr. Sutton's substantial rights.

### E.  Exclusion or Limitation of Evidence

#### 1.  Lay Opinion Testimony

Mr. Sutton contends that multiple MPD officers were impermissibly permitted to

provide lay opinion testimony about "discretionary MPD General Orders."  Sutton Mot. at 37.

He argues that police officer witnesses should not have been permitted to testify about

"judgment calls" that they would have made when applying MPD general orders.  Specifically,

he objects to the government's questioning of Officer Tyler Toth and Officer Nicole Arnone,

who testified about Mr. Hylton-Brown's injuries, the MPD general order on body worn

cameras, and the MPD general order dictating when the Major Crash Unit needs to be notified

about a serious traffic collision.  Id. at 37-38.  Mr. Sutton asserts that "[t]he subjectivity of

application of the MPD General Orders . . . is simply not a standard that permits lay opinion

testimony."  Id. at 40.

Under Rule 701 of the Federal Rules of Evidence, a lay witness can present

opinion testimony when that testimony is "rationally based on the witness's perception and

helpful to the jury in understanding the witness's testimony or the determination of a 'fact in

issue,' and may not be based on the kind of specialized knowledge possessed by experts."
United States v. Hampton, 718 F.3d 978, 981 (D.C. Cir. 2013).

   The Court reiterates the ruling that it made during trial:  asking MPD officers to
explain what they would do in certain circumstances to comply with MPD policies is "perfectly
appropriate under Rule 701."  Trial Tr. Nov. 1, 2022 p.m. at 91:18-19.  Each officer who
provided lay opinion testimony was asked about what they observed, either during the pursuit or
at the crash site.  See FED. R. EVID. 701(a).  Each officer provided an opinion "not based on
scientific, technical, or other specialized knowledge," but based on their own understandings of
what MPD policies require.  See FED. R. EVID. 701(c).  And their opinions about what they
would expect or what should be done in compliance with MPD policies helped the jury
understand the "fact[s] in issue" – which policies the defendants deviated from during and after
the pursuit.  See FED. R. EVID. 701(b).  The Court concludes that the "subjectivity" of the MPD
general orders in fact makes it more helpful and appropriate for such lay witnesses to help the
jury understand how those policies are in fact applied.  See Sutton Mot. at 40.

### 2.  Exclusion of Expert Witness James Dahlquist

   Mr. Zabavsky argues that he was prejudiced by the Court's "eleventh hour"
decision to strike his expert witness, James Dahlquist.  Zabavsky Mot. at 12.  He contends that
the Court's delayed decision to exclude Mr. Dahlquist "damaged" his "right to a fair trial,"
particularly because the government cross examined Mr. Zabavsky's substitute expert, Michael
Miller, about his preparation for trial – preparation that was necessarily limited, given the
Court's mid-trial decision to exclude Mr. Dahlquist.  Id. at 13.

   Mr. Zabavsky is correct that the Court issued an opinion excluding Mr.
Dahlquist's testimony on November 16, 2022, approximately three weeks after trial began.  See

generally Daubert Op.  Two days before issuing the written opinion excluding Mr. Dahlquist, the Court told Mr. Zabavsky that Mr. Dahlquist's testimony would be excluded in full.  See Trial Tr. Nov. 14, 2022 a.m. at 26:1-4.  On November 24, 2022, Mr. Zabavsky asked the Court to permit him to call a replacement expert.  See Andrew Zabavsky's Motion for Reconsideration of the Court's Order Granting the Government's Motion in Limine to Exclude Inadmissible Expert Testimony [Dkt. No. 373].  The Court allowed him to do so, over the government's objection.  See Memorandum Opinion and Order of December 7, 2022 [Dkt. No. 389].  His replacement witness, Michael Miller, was qualified as an expert in crash investigations, see id., and testified before the jury on December 9, 2022.

        The Court concedes that, in a perfect world, it would have notified Mr. Zabavsky before trial that Mr. Dahlquist would not be permitted to testify.  The Court does not, however, agree that Mr. Zabavsky was so prejudiced by the timing of the Court's decision that he was deprived of a fair trial.  Mr. Zabavsky's replacement expert, Michael Miller, provided thorough and credible testimony about Major Crash Unit investigations and procedures.  Mr. Miller has nearly three decades of experience working in MPD's Major Crash Unit.  Trial Tr. Dec. 9, 2022 a.m. at 12:12-18.  He trained police academy recruits on accident investigation procedures.  Id. at 13:7-21.  He explained that the night Mr. Hylton-Brown was killed, the officers at the crash site gathered information in an appropriate manner given the information available to them at the time.  Id. at 27:17-28:7.  The government's cross examination about Mr. Miller's preparedness did little to undermine his testimony.  Moreover, the Court limited the scope of the government's cross examination of Mr. Miller, explaining that it would not be "fair to talk about when he was hired because it's only because of my decision [to exclude Mr. Dahlquist] that he had to be hired."  Id. at 34:21-23.  The Court's delayed decision to exclude Mr.

Dahlquist therefore caused minimal prejudice, if any, and does not require granting Mr. Zabavsky a new trial.

### F.  Testimony From and About Chinendu Ukeekwe

Mr. Sutton contends that the Court improperly limited the scope of potential testimony from a witness named Chinendu Ukeekwe, and that the Court erred by prohibiting Mr. Sutton from cross examining the government's case agent, Sean Ricardi, about his interactions with Mr. Ukeekwe during Agent Ricardi's investigation into Mr. Hylton-Brown's death.  Sutton Mot. at 45.  As the Court explained in a prior opinion, shortly after the indictment in this case was unsealed and was publicly reported, Mr. Ukeekwe "flagged down" an MPD police officer – Officer Michael Price – and told Officer Price that he was "an eyewitness to the interaction between law enforcement and Mr. Hylton-Brown" the night that Mr. Hylton-Brown was killed.  See Pretrial Brady Op. at *2.  During that conversation with Officer Price, Mr. Ukeekwe "claimed that, before the fatal crash, he observed Mr. Hylton-Brown throw something onto the ground while evading police officers in pursuit."  Id.  Within an hour of this conversation, Officer Price had "provided a summary of this interaction to his superiors and uploaded a copy of [his] body-worn camera footage to an MPD internal database, both of which were forwarded to government counsel and their investigators."  Id.

Subsequently, Special Agent Sean Ricardi – the special agent assigned to the investigation and prosecution of Mr. Sutton and Mr. Zabavsky – called Mr. Ukeekwe to conduct an interview with him.  See Pretrial Brady Op. at *3.  During that call, Mr. Ukeekwe reiterated to Agent Ricardi what he had told Officer Price – that he saw Mr. Hylton-Brown "'stop and throw something' as he was 'running in an alley' away from police."  Id.  Agent Ricardi then "suggested that this telling was inconsistent with investigators' understanding of the incident –

i.e., that Mr. Hylton-Brown was riding a scooter and was not on foot." Id.  At that point, Mr.

Ukeekwe "'changed his story' and agreed that Mr. Hylton-Brown was riding a scooter." Id.

Mr. Ukeekwe expressed that he did not want to meet with investigators or be involved with

court proceedings; Agent Ricardi concluded the phone call by asking Mr. Ukeekwe to take

some time to think about whether he would meet with investigators, and to give Agent Ricardi a

call back in a few days.  Id.

       Special Agent Ricardi did not hear back from Mr. Ukeekwe.  Pretrial Brady Op.

at *3.  He and another agent decided to visit Mr. Ukeekwe's last known address to try to

conduct an interview with him.  Mr. Ukeekwe was not home, but agents spoke with someone

else at the residence and asked that person to tell Mr. Ukeekwe to follow up with the agents.  Id.

       About thirty minutes after agents went to Mr. Ukeekwe's residence, Mr.

Ukeekwe contacted Special Agent Ricardi.  During that call,

> [Mr. Ukeekwe] "appeared to be highly agitated" and "began to
> berate" Special Agent Ricardi for "coming to his residence,
> attempting to interview him when he stated he did not 'want to be
> involved,' and for scaring his [relative]."  Still agitated, [Mr.
> Ukeekwe] exclaimed that he "did not see nothing" and "did not say
> nothing."  Special Agent Ricardi advised that "he believed Mr.
> Ukeekwe may have lied to Officer Price" and told the witness that
> "telling the truth would be the right thing to do."  According to
> Special Agent Ricardi's memorandum of the interview, the witness
> then "admit[ted] that he initially lied to Officer Price."  When asked
> by Special Agent Ricardi whether he was being coerced or
> influenced into changing his story, the witness assertedly replied
> that he did not feel that "he was being intimidated" or "had any fear
> about talking with investigators."

Pre-trial Brady Op. at *3 (quoting October 1, 2021 Memorandum of Investigation by Special

Agent Ricardi [Dkt. No. 67-4]).

       The government did not disclose Mr. Ukeekwe's identity or his various

statements to Mr. Sutton until November 2021, and Mr. Sutton argued that the delayed

disclosure violated the government's <u>Brady</u> obligations.  <u>See</u> Officer Sutton's Motion for <u>Brady</u>

Sanctions [Dkt. No. 67].  The Court held an evidentiary hearing to determine whether Mr.

Ukeekwe had been "improperly influenced into changing his story or discouraged from

testifying" by government investigators and whether Mr. Sutton had been prejudiced by the

delayed disclosure.  <u>See</u> Pretrial <u>Brady</u> Op. at *9.  Agent Ricardi testified at that hearing, but

Mr. Ukeekwe did not.  <u>See</u> Hearing Tr. Aug. 16, 2022 [Dkt. No. 248]; Hearing Tr. Aug. 17,

2022 [Dkt. No. 236].  The Court ultimately concluded that "the government has not violated

<u>Brady v. Maryland</u>, 373 U.S. 83 (1963), or its broad duty of disclosure under the relevant

Federal or Local Rules."  Memorandum Opinion and Order of September 27, 2022 [Dkt.

No. 279] at 2-3.

        Nearly a year later, a few weeks before trial in this case, Mr. Ukeekwe's attorney

contacted counsel for Mr. Sutton and counsel for the government.  <u>See</u> Terence D. Sutton, Jr.'s,

Motion <u>in Limine</u> for Admission of Testimony Regarding Witness Chinendu Ukeekwe [Dkt.

No. 387] at Ex. A.  Mr. Ukeekwe had apparently told his attorney:

> During an October 1, 2021, conversation between Mr. Ukeekwe
> and Sean Ricardi, Mr. Ukeekwe expressed to Sean Ricardi that he
> did not want to have any involvement with the criminal case.  In
> response to Mr. Ukeekwe's expression of the desire not to testify,
> Mr. Ukeekwe stated that Sean Ricardi said that you should "just
> say you lied and you'll never see me again."
>
> Prior to [] October 23, 2020, Mr. Ukeekwe had seen Officer
> Terence Sutton on patrol in his neighborhood and that at some
> point, Mr. Ukeekwe had a single face to face interaction with
> Officer Ter[e]nce Sutton whereby Officer Sutton offered Mr.
> Ukeekwe words of encouragement regarding an issue that was
> upsetting Mr. Ukeekwe on that date.  When Mr. Ukeekwe realized
> that Officer Sutton was the one involved in the incident that Mr.
> Ukeekwe believed that he witnessed is when Mr. Ukeekwe decided
> to contact the police.

Terence D. Sutton, Jr.'s, Motion in Limine for Admission of Testimony Regarding Witness Chinendu Ukeekwe [Dkt. No. 387] at Ex. A.

Mr. Sutton moved to present testimony from Mr. Ukeekwe in order to "challenge the credibility of the government's investigation." Terence D. Sutton, Jr.'s, Motion in Limine for Admission of Testimony Regarding Witness Chinendu Ukeekwe [Dkt. No. 387] at 2-3 (citing Kyles v. Whitley, 514 U.S. at 446). Mr. Sutton explained that Agent Ricardi testified during the government's case in chief "about how he wanted to make sure that no stone was unturned in their investigation" and that he "wanted to identify as many and all eyewitnesses to the incident that he could." Trial Tr. Dec. 6, 2022 a.m. at 14:16-24. Mr. Sutton argued that the way Agent Ricardi treated Mr. Ukeekwe was inconsistent with his proffered desire to leave no stone unturned and identify all eyewitnesses. Id. at 14:25-15:5. Accordingly, Mr. Sutton argued, Mr. Ukeekwe's testimony about his conversations with Agent Ricardi "goes to the credibility of [Agent Ricardi's] testimony and the government's investigation." Trial Tr. Dec. 6, 2022 a.m. at 15:2-3.

The Court denied the motion, concluding that Mr. Ukeweeke's testimony was not probative of the sloppiness or reliability of Agent Ricardi's investigation. Based on Agent Ricardi's testimony at the evidentiary hearing, it was apparent to the Court that the reason that Agent Ricardi did not "move heaven and earth" to get to Mr. Ukeekwe the same way he did to track down other eyewitnesses was because Agent Ricardi thought Mr. Ukeekwe was "totally incredible and the government would never have called him as a witness." Trial Tr. Dec. 6, 2022 a.m. at 16:4-10. Agent Ricardi's statements to Mr. Ukeekwe "ha[d] nothing to do with not leaving a stone unturned." Id. at 16:16-17. The Court therefore concluded that Mr. Ukeweeke's testimony was not relevant to demonstrate a "skewed or biased investigation."

United States v. Aguilar, 831 F. Supp. 2d 1180, 1203 (C.D. Cal. 2011); see Trial Tr. Dec. 6, 2022 a.m. at 17:3-7, 18:4-16.

The Court ultimately cabined the scope of permissible testimony that Mr. Ukeekwe could give:  "What Mr. Ukeekwe says he saw is relevant.  What he said to a police officer [Officer Price] is not relevant.  And Ricardi's interaction with him [is not relevant]."  Trial Tr. Dec. 6, 2022 a.m. at 11:15-18; see id. at 17:3-7 ("If you are not going to call [Mr. Ukeekwe] to ask him about what he saw that night, he's out.").  The Court determined that allowing Mr. Ukeekwe to testify about his various conversations with Agent Ricardi in the presence of the jury would "reopen the Brady prosecutorial misconduct argument," which the Court had already determined was inappropriate for the jury's consideration.  Trial Tr. Dec. 6, 2022 a.m. at 13:3-4; see First Mot. in Limine Op. at 209-210 (testimony regarding alleged Brady violations was "irrelevant, inappropriate for consideration by the jury, invite[s] jury nullification, and distract[s] from the issues at trial").

Mr. Sutton maintains that he should have been permitted to call Mr. Ukeekwe as a witness to "contest the credibility of the government's case agent [Special Agent Ricardi] who testified for four days."  Sutton Mot. at 46.  Mr. Sutton asserts that the Court improperly prohibited him from impeaching Special Agent Ricardi with the extrinsic evidence of Agent Ricardi's statements to Mr. Ukeekwe.  See id. at 47.  Mr. Sutton also wanted to present testimony about Agent Ricardi's conversations with Mr. Ukweeke to show Agent Ricardi's bias and "desire to please" prosecutors.  Id.

### 1.  Restrictions on Mr. Ukeekwe's Testimony

As noted, the Court prohibited any testimony from Mr. Ukeekwe about his interactions with Agent Ricardi, reasoning that this testimony would improperly bring

allegations of government misconduct to the attention of the jury, see Trial Tr. Dec. 6, 2022 a.m. at 7:23-8:20, 11:15-18, and "reopen the Brady prosecutorial misconduct argument" in the presence of the jury. Id. at 13:3-4. In retrospect, the Court now recognizes that Mr. Sutton could have attempted to undermine the reliability of Agent Ricardi's investigation without asking Mr. Ukeekwe any questions about alleged government misconduct, and that Mr. Sutton was entitled to present some evidence to the jury that Agent Ricardi did a less-than-thorough job investigating Mr. Ukeekwe's account of the incident. See United States v. Quinn, 537 F. Supp. 2d 99, 115 (D.D.C. 2008) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation.") (quoting Bowen v. Maynard, 799 F.2d 593, 613 (10th Cir. 1986)); Kyles v. Whitley, 514 U.S. at 444-45 (witness testimony could have been used to attack the "thoroughness," "reliability," and "good faith of the investigation"); United States v. Bagcho, 151 F. Supp. 3d 60, 71 (D.D.C. 2015) (suppressed evidence could have "undermine[d] the reliability of the government's investigation"). Evidence that Agent Ricardi failed to follow up with Mr. Ukeekwe as a possible eyewitness could have been used to attempt to undermine the reliability and thoroughness of Agent Ricardi's investigation in the eyes of the jury. Mr. Ukeekwe also might have testified that he did not feel that Agent Ricardi believed him or took him seriously and that they never met in person.

Although the Court should not have precluded Mr. Sutton from eliciting such testimony from Mr. Ukeewke, the Court finds that Mr. Sutton was not prejudiced by the Court's ruling. It is unlikely that the jury would have credited Mr. Ukeekwe's testimony, as Mr. Ukeekwe gave multiple, inconsistent stories about the night of the collision. He told Officer Price that he saw Mr. Hylton-Brown running down the alley; he told Agent Ricardi he saw Mr. Hylton-Brown ride a moped down the alley; and he subsequently told Agent Ricardi he didn't

see anything at all.  See Hearing Tr. Aug. 16, 2022 [Dkt. No. 248] at 106:24-108:24; Hearing

Tr. Aug. 17, 2022 [Dkt. No. 236] at 59:22-60:6.  The government also could have attempted to

highlight Mr. Ukeekwe's asserted bias in favor of Mr. Sutton, in view of his prior positive

encounter with Mr. Sutton.  See Terence D. Sutton, Jr.'s, Motion in Limine for Admission of

testimony Regarding Witness Chinendu Ukeekwe [Dkt. No. 387] at Ex. A.  And, although Mr.

Sutton is correct that Agent Ricardi was an important government witness who testified over the

course of multiple days, Agent Ricardi was, primarily, a summary witness – he did not

personally observe Mr. Sutton's conduct on the night of the collision, and he only testified

about the facts he learned during the course of his investigation.

       Furthermore, the government likely would have been able to rehabilitate the

caliber of Agent Ricardi's investigation in response to Mr. Ukeekwe's testimony.  The

government likely would have asked Agent Ricardi about the efforts he made to speak with Mr.

Ukeekwe and about Agent Ricardi's conclusion that Mr. Ukeekwe could not be believed.  See

Trial Tr. Dec. 6, 2022 a.m. at 16:4-21 (the Court explained that "based on the testimony at the

Brady hearing, [Agent Ricardi] didn't [move heaven and earth] with Ukeekwe because [Agent

Ricardi] thought [Mr. Ukeekwe] was totally incredible").  Such testimony from Agent Ricardi

would have significantly undermined the probative and impeaching value of Mr. Ukeekwe's

testimony.  The Court's decision to permit Mr. Ukeekwe to testify only about what he observed

the night of the collision thus did not prejudice Mr. Sutton.

### 2.  Cross Examination of Special Agent Ricardi

       Mr. Sutton also argues that he should have been permitted to question Agent

Ricardi about his interaction with Mr. Ukweeke and the substance of their conversations in

order to demonstrate Agent Ricardi's bias and "desire to please" prosecutors.  Sutton Mot. at 45.

Agent Ricardi sat with the prosecutors at counsel table throughout the trial and testified

extensively during the government's case in chief; he was part of the prosecution team.  But, for

the reasons explained above, the Court does not find that "the jury would have received a

significantly different impression" of Agent Ricardi's credibility even if the Court had permitted

cross examination of Agent Ricardi about his interactions with Mr. Ukeekwe.  See United States

v. George, 532 F.3d 933, 936 (D.C. Cir. 2008) (internal citation omitted).

   Because Special Agent Ricardi testified at length during the two-day evidentiary

hearing on Mr. Sutton's pretrial Brady motion, see Hearing Tr. Aug. 16, 2022 [Dkt. No. 248];

Hearing Tr. Aug. 17, 2022 [Dkt. No. 236], the Court can predict with relative confidence how

Agent Ricardi would have responded to questions about Mr. Ukeekwe during trial.  Given Mr.

Ukeekwe's inconsistent statements and asserted bias in favor of Mr. Sutton, the potential

impeachment value of cross examining Agent Ricardi about Mr. Ukeekwe would be slight.

Furthermore, while Mr. Sutton could have asked some questions about the reliability of Agent

Ricardi's investigation, the Court still would have enforced its prior ruling prohibiting Mr.

Sutton from raising "[a]llegations that there was improper conduct by the government with this

witness" in the presence of the jury.  Trial Tr. Dec. 6, 2022 a.m.

at 7:23-8:2.  See First Mot. in Limine Op. at 209 (alleged Brady violations are "inappropriate

for consideration by the jury").  The Court therefore finds that the jury would not have had a

"significantly different impression" of Agent Ricardi's credibility had Mr. Sutton been able to

cross examine him about Mr. Ukeekwe.

   Furthermore, when determining whether to admit extrinsic evidence of a

witness's bias, "what is required . . . is a balancing of the probative value of and need for the

evidence against the prejudicial impact" of that evidence.  United States v. Robinson, 530 F.2d

1076, 1081 (D.C. Cir. 1976); see United States v. Bagcho, 151 F. Supp. 3d at 72; FED. R. EVID. 403.  For the reasons discussed supra at 73-74, the Court does not agree that cross examination of Agent Ricardi about his exchanges with Mr. Ukweeke would have revealed any significant "bias" or "desire to please" the prosecution team.  See Sutton Mot. at 47.  And, Mr. Sutton was permitted to cross examine Agent Ricardi about his "desire to please" members of the prosecution team in general, without specifically referencing Agent Ricardi's interactions with Mr. Ukeekwe.  See, e.g., Trial Tr. Oct. 31, 2022 a.m. at 51:25-52:15.  Given this fact and the limited probative value of such questioning with respect to Mr. Ukweeke, the Court concludes that it did not improperly limit Mr. Sutton's ability to cross examine Agent Ricardi.

### G.  Miscellaneous Other Arguments

#### 1.  Alleged Jencks Act Violation

Mr. Zabavsky argues that he was prejudiced by the Court's ruling regarding Jencks Act materials for Captain Franklin Porter, one of the government's most important witnesses.  See Zabavsky Mot. at 16-18; Zabavsky Reply at 10; Rule 29 Op. at *26-28 (summarizing Captain Porter's testimony).  The Jencks Act requires the government to "produce any statement" of a witness who has testified on direct examination if that statement "relates to the subject matter as to which the witness has testified."  18 U.S.C. § 3500(b).

On November 17, 2022, counsel for Mr. Zabavsky explained that, while viewing body worn camera footage from the night of the collision, "[w]e saw what we thought were notes [Captain] Porter [was] taking during his return to the scene. . . .  I asked the government if we had been provided [those notes] and they [the government] were looking into it."  Trial Tr. Nov. 17, 2022 a.m. at 11:9-13.  The government responded that it did not have handwritten notes from Captain Porter in its case file.  Id. at 11:16-24.  The government checked with

Captain Porter, who confirmed that he took notes that evening – he jotted down the names of individuals who were involved in the investigation – and promised to search his office for those notes so the defendants would have the opportunity to cross examine him about them.  Id. at 12:21-13:15.  Captain Porter, however, was not able to locate the notes he took.  See Trial Tr. Nov. 17, 2022 p.m. at 3:5-4:25.  He was able to locate an email he sent a few days after the collision, in which he wrote that he had reviewed his notebook from the night of the incident but he didn't find any notes about the incident therein.  See Trial Tr. Nov. 18, 2022 a.m. at 3:1-5:20; see also Zabavsky Mot. at 16-18; Zabavsky Reply at 10.

        The Court concluded, based on these representations, that there was no Jencks Act violation because Captain Porter could not locate the notes of the incident.  The Court explained that, "[t]he representations of the government team, as well as Mr. Porter's testimony, to this point is that there are no notes of the incident."  Trial Tr. Nov. 18, 2022 a.m. at 9:13-15.  The Court also clarified that, "[t]he defense can show him [Captain Porter] the body worn camera, question him about it, and attempt to prove he's not telling the truth.  But there's no Jencks Act violation."  Id. at 9:16-18; see id. at 8:23 ("You can't provide something you don't have.").  Based on the government's and Captain Porter's representations at trial, any notes that Captain Porter may have taken that night were lost or disposed of well before trial, and there was no indication that Captain Porter took any action in bad faith to prevent Mr. Zabavsky from getting ahold of those notes.

        Mr. Zabavsky argues now that, "[b]ecause no sanction was given to defendants as a result of the Jencks violation, Zabavsky was prejudiced and was . . . unable to receive a fair trial."  Zabavsky Mot. at 18.  The Court disagrees.  Captain Porter represented that the missing notes contained, at most, names of individuals involved in the investigation.  See Trial Tr. Nov.

17, 2022 a.m. at 12:21-13:15.  Because the content of the notes was – according to Captain

Porter – non-substantive in nature, Mr. Zabavsky would not have been in any better position to

undermine Captain Porter's credibility at trial even if he'd had access to the notes.  See United

States v. Oruche, 484 F.3d 590, 599 (D.C. Cir. 2007) ("[W]e do not see how [the witness's]

jottings on the sheet of notes (three telephone numbers and the words 'O' and 'Girlfriend

(Leslie)') could have been used to undermine [the witness's] credibility."); United States v.

Duran, 884 F. Supp. 570, 572 (D.D.C. 1995) (failure to produce handwritten notes did not

"jeopardize" defendant's case where the content of the notes likely "ha[d] nothing to do with the

merits" of the case).  The Court's trial ruling on Mr. Zabavsky's Jencks argument therefore

caused him no prejudice and did not deprive him of a fair trial.

### 2.  Seating Arrangements

Mr. Zabavsky argues that that Court's decision to require both defendants to sit

at the same table throughout trial "influenced the jury into believing there was cooperation

between the defendants when there was not."  Zabavsky Mot. at 18.  The Supreme Court has

recognized that "certain courtroom practices are so inherently prejudicial that they deprive the

defendant of a fair trial."  Carey v. Musladin, 549 U.S. 70, 72 (2006).  Mr. Zabavsky points to

no authority indicating that seating two co-defendants at the same table in the courtroom creates

such prejudice.

The Court is not persuaded that the seating arrangement of Mr. Sutton and Mr.

Zabavsky and their counsel had any meaningful impact on the jury.  The Court is "confident

that the seating arrangement was simply taken for granted by the jury and . . . conclude[s] that it

was not prejudicial."  United States v. Marks, 530 F.3d 799, 807 (9th Cir. 2008).  See also

United States v. Balsam, 203 F.3d 72, 82 (1st Cir. 2000) (courtroom seating arrangement did

not "undercut the presumption of innocence" even though "the jury may have inferred from the isolated grouping of the defendants that they must be coconspirators, as charged"); <u>United States v. Larson</u>, 460 F.3d 1200, 1215 (9th Cir. 2006), <u>reversed</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>United States v. Larson</u>, 495 F.3d 1094, 1096 (9th Cir. 2007) (en banc) (where defendants were seated not at counsel table but immediately behind their attorneys, "[t]he jury most likely drew no impermissible inference from the arrangement" (quotations omitted)).  In addition, the Court specifically instructed the jury to consider each defendant separately when determining whether the government had proved its case.  <u>See</u> Jury Instructions at 46 ("[E]ach defendant is entitled to have the issue of his guilt . . . determined from his own conduct and from the evidence that applies to him as if he were being tried alone.").  The Court does not believe that requiring Mr. Zabavsky to sit at the same table as Mr. Sutton prevented the jury from making an individual determination about Mr. Zabavsky's guilt.  The Court therefore rejects Mr. Zabavsky's assertion that he was prejudiced because the Court "did not allow the separation of the defendants" at different tables.  Zabavsky Mot. at 18.

### 3.  Conduct of Karen Hylton

Mr. Sutton argues that Mr. Hylton-Brown's mother, Karen Hylton, "interfered with the trial" in a variety of ways.  <u>See</u> Sutton Mot. at 56 (noting that Ms. Hylton had "an outburst before the jury directed at Mr. Sutton" in addition to "audibly crying, sighing, and gasping" and "emotionally walking in and out of the courtroom").  Mr. Sutton faults the government for Ms. Hylton's conduct, as government personnel from the Victim Witness Assistance Program was unable to "ensure proper behavior."  Sutton Mot. at 57.  As the Seventh Circuit has explained, however, "not every outburst or disruption warrants a new trial."

Byers v. Basinger, 610 F.3d 980, 988 (7th Cir. 2010).  The Court concludes that Ms. Hylton's behavior was not likely to have prejudiced Mr. Sutton.

The Seventh Circuit confronted a similar set of circumstances in Whitehead v. Cowan, 263 F.3d 708 (7th Cir. 2001).  There, while the judge was taking a break and while the jury was seated in the jury box, "the victim's mother rose and began shouting at the defendant and crying.  Allegedly, she then asked the [defendant] why he had killed her daughter."  Id. at 723.  The Seventh Circuit held that this outburst did not "automatically require[] a new trial." Id.  The court reasoned that "[a]ny jury would expect that a close relative of the victim would have strong emotions toward the suspected killer," but that the "outburst directed at the accused in the presence of the jury did not provide any information not admitted at trial that could indicate guilt."  Id.  The Court finds this reasoning persuasive.  Although the jury may have noticed Ms. Hylton's behavior, her conduct was an expression of grief, not an indication of guilt.  Accordingly, the Court concludes that Ms. Hylton's conduct does not warrant granting Mr. Sutton's motion for new trial.

## IV.  CONCLUSION

In ruling on a motion for new trial, the Court must "analyze[] each ground for the defendant's motion separately," while also "consider[ing] the cumulative effect of all the prosecution's missteps."  United States v. Khatallah, 313 F. Supp. 3d at 196.  "[A] column of errors may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts."  United States v. Sampson, 486 F.3d 13, 51 (1st Cir. 2007) (quoting United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993)).

The Court has not found any single instance of error or misconduct prejudicial enough to warrant granting Mr. Sutton and Mr. Zabavsky's motions.  Nor does the Court find

that the cumulative effect of the asserted errors warrants granting a new trial.  In view of the

foregoing, it is hereby

ORDERED that Terence D. Sutton, Jr.'s Motion for a New Trial and Arrest of

Judgment [Dkt. No. 449] is DENIED; and it is

FURTHER ORDERED that Andrew Zabavsky's Motion for a New Trial and

Arrest of Judgment [Dkt. No. 448] is DENIED.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE:  1/25/24