# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 21-cr-598-PLF |
| | : | |
| v. | : | |
| | : | |
| TERENCE SUTTON, | : | |
| | : | |
| Defendant. | : | |

## UNITED STATES' SENTENCING MEMORANDUM

Terence Sutton, an on-duty Metropolitan Police Department (MPD) officer, murdered Karon Hylton-Brown by engaging him in a sustained, dangerous, unauthorized police pursuit that ended in a gruesome and fatal collision. As Hylton-Brown lay unconscious in the street in a pool of his own blood, Sutton and his co-defendant, MPD lieutenant Andrew Zabavsky, agreed to cover up what Sutton had done to prevent any further investigation of the incident. For these crimes, the jury convicted Sutton of Second Degree Murder, Conspiracy and Obstruction of Justice, finding that Sutton persisted in his minutes-long pursuit with conscious disregard of an extreme risk of death or serious bodily injury to Hylton-Brown. This outrageous conduct by a sworn law enforcement officer warrants a substantial punishment. Consistent with the applicable sentencing guidelines, the Court should sentence the defendant to concurrent sentences of 216 months imprisonment for the murder, 121 months imprisonment for obstruction, and 60 months imprisonment for the conspiracy. The Court should also order the defendant to report to the custody of the Bureau of Prisons upon imposing this sentence, given D.C Code § 23–1325, and 18 U.S.C. § 3143, requiring incarceration pending appeal.

## I.   BACKGROUND

### a.  Factual Background

#### i.  Defendant Sutton's Murder of Hylton-Brown

On October 23, 2020, while on-duty as an MPD Crime Suppression Team (CST) officer, defendant Sutton used an undercover police car to chase civilian Karon Hylton-Brown, who was riding an electric moped without a helmet.  At the time, defendant Sutton had three passenger CST officers with him, and his commanding MPD Lieutenant, co-defendant Andrew Zabavsky, was riding in a separate marked MPD SUV nearby.  The pursuit began when the officers spotted Hylton-Brown riding the moped on the sidewalk.  Defendant Sutton attempted to initiate a traffic stop, but Hylton-Brown ignored him and drove off.  Both defendants then engaged in a police pursuit to try to pull him over; initially, defendant Zabavsky led this effort, but after several blocks defendant Sutton took the lead and Zabavsky tracked the chase from a parallel position.

The pursuit lasted nearly three minutes and spanned ten city blocks, passing through neighborhood streets, two alleys, and multiple "STOP" signs, at one point proceeding the wrong way up a one-way street.  During the pursuit defendant Sutton periodically accelerated to as much as 45 mph, more than double the residential speed limit.  Throughout, body worn camera (BWC) from defendant Sutton's front seat passenger shows that the defendant kept Hylton-Brown within the officers' line of sight, and that the officers in defendant Sutton's car had several opportunities to observe Hylton-Brown at close range.  Trial testimony established that none of the passenger officers in the defendant's car saw Hylton-Brown with a weapon or observed any indicia of him having a weapon, nor did anyone (including the defendant) articulate having seen such.  The trial testimony further established that the officers did not see Hylton-Brown commit any felony offense, nor did they have information indicating he was involved in one that evening.  Because the officers recognized Hylton-Brown, one officer suggested obtaining a misdemeanor warrant for fleeing the traffic stop instead of continuing the pursuit.  Regardless, despite having received MPD

training that safety concerns, D.C. law, and MPD policy prohibit officers from engaging in police pursuits under the circumstances presented, Sutton continued the chase.

In the pursuit's final moments, defendant Sutton followed Hylton-Brown into an alley, turned off his car's emergency lights and siren, and accelerated behind the moped.  When Hylton-Brown reached the street at the mouth of the alley, he was struck by an uninvolved oncoming motorist.  BWC from defendant Sutton's front seat passenger shows that the crash unfolded mere feet in front of defendant Sutton's car: the force of the impact crushed the moped, ejected Hylton-Brown's body into the air, and threw him the full width of the alley.  He landed in the street near a parked car where he lay unconscious, bleeding profusely from his head.  An uninvolved MPD officer who happened to be patrolling nearby saw and heard the horrific crash.  That officer made an immediate emergency notification to dispatch, drawing all available officers nearby to the scene to assist, and called for an ambulance.

### ii.  The Conspiracy to Cover-Up Defendant Sutton's Conduct

In the moments after the collision, defendant Sutton put his own car into park, walked over to Hylton-Brown's motionless body, and then quickly walked away.  Hylton-Brown was unconscious and unresponsive as he lay in a growing pool of his own blood.  Defendant Sutton never returned to check on Hylton-Brown's condition, but defendant Zabavsky positioned himself nearby Hylton-Brown's body while two of defendant Sutton's backseat passengers attempted first aid as they waited for the ambulance.  MPD officer witnesses testified at trial that they observed Hylton-Brown's condition continuously worsen during this time.  Hylton-Brown never regained consciousness, and at one point his breathing became loud, audibly ragged, and he vomited.  When the ambulance arrived, paramedics immediately transported Hylton-Brown to a trauma center where he later died from his overwhelming injuries.

Back at the scene, defendants Sutton and Zabavsky quickly began the cover up of this serious, officer-involved incident.  Even though a rookie officer uninvolved in the pursuit had started gathering information to write a police report, the defendants agreed that Sutton would instead prepare it, and they told the rookie to stand down.  After taking charge of the scene, both defendants deliberately avoided taking routine steps to collect evidence relevant to a serious traffic crash investigation.  One eyewitness to defendant Sutton's original attempted traffic stop tried to talk to both defendant Sutton and Zabavsky about what he had seen, but each defendant separately waved the witness away and did not take down his information or witness account.  Neither defendant Sutton, as the lead officer at the scene, nor defendant Zabavsky, the ranking MPD official, preserved the crash scene for investigators; indeed, they allowed the driver of the car that struck Hylton-Brown to leave the scene within 20 minutes of the crash.  They then turned off their own BWCs, conferred privately, and left.  Defendant Zabavsky designated no other MPD official to supervise the scene upon his own departure.  Defendant Sutton further compromised the integrity of the crash scene by driving his MPD car directly over the crash site, audibly crushing pieces of debris from the collision as he left.  At no point did either defendant contact MPD's Major Crash Unit (MCU) or its Internal Affairs Division (IAD) to initiate an investigation by those units.

The defendants continued the cover up back at the police station.  First, they misled their commanding officer, Captain Franklin Porter, about the nature of the incident by substantially downplaying its seriousness, denying that a police chase had even occurred, and omitting any mention of Hylton-Brown's critical injuries.  Defendant Zabavsky also falsely implied to Captain Porter that Hylton-Brown had been a drunk driver.  Both defendants also hid defendant Zabavksy's

direct involvement in the incident, thereby avoiding the assignment of other, uninvolved MPD officials to address what had happened.

Next, as the defendants had agreed at the scene, and during the same time period in which an MPD officer at the hospital called them multiple times with updates about Hylton-Brown's dire condition, defendant Sutton drafted a police report that memorialized a false narrative of the incident. Despite video evidence to the contrary, his false narrative gave the impression that no police pursuit had occurred, that officers had lost sight of Hylton-Brown and were engaged in a "canvass" of him in the area until shortly before the crash, and that the officers were wholly uninvolved with the fatal collision in any way. The defendant's account also described Hylton-Brown's observable injuries only as "superficial abrasions on [his] left eyebrow line," even though one of the officers who had provided first aid at the scene reviewed that language in the report and told defendant Sutton that it was not accurate, because Hylton-Brown had clearly sustained severe head trauma.

Even after the defendants learned that Hylton-Brown's death was imminent, they continued the cover up. When Captain Porter learned that Hylton-Brown had been fatally injured he decided to examine the BWC himself, and he asked defendant Zabavsky to identify the officers in the CST car so that he could review their BWC videos. In response, defendant Zabavsky provided only defendant Sutton's name—despite the fact that he had already reviewed all four of the involved CST officers' BWCs (as well as his own) and knew that the front seat passenger's camera contained the crucial evidence. As a result, Captain Porter only learned of this key video by happenstance, when he noticed several instances in defendant Sutton's BWC where an arm from the front seat appeared to come into view. Throughout that night, even after Captain Porter called in IAD and MCU to investigate, defendant Zabavsky continued to hide his own involvement in

the incident, which enabled him to remain engaged with those units' investigators. Indeed, several hours later as MCU's investigation got underway, defendant Zabavsky sent the assigned MCU detective defendant Sutton's false draft report to use as a starting point for his investigation. MCU in turn sent the report to IAD, whose investigators relied on it to conduct a preliminary assessment of the case that was then relayed up the MPD chain of command and to make a referral to the U.S. Attorney's Office for prosecutorial review of potential federal civil rights charges.

### b.  The Charges, Verdict, and Statutory Penalties

On September 23, 2021, a grand jury returned a three-count indictment arising from this incident. Count 1 charged defendant Sutton with Second Degree Murder in violation of 22 D.C. Code § 2103 for causing Hylton-Brown's fatal collision. Counts 2 and 3 charged defendants Sutton and Zabavsky with obstruction of justice and conspiring to obstruct justice, in violation of 18 U.S.C. § 371 and 1512(b)(3), for their efforts to prevent MPD internal investigations of the crash and referral of the matter to federal authorities for a criminal civil rights investigation.

On December 21, 2022, following a nine-week trial, a jury found both defendants guilty on all counts for which they were charged. Both defendants' posttrial motions under Rules 29, 33, and 34 to set aside the jury's verdict or otherwise arrest judgment have been denied by this Court. (ECF 526, 530).

Defendant Sutton now must face the consequences of his actions and be sentenced for his crimes. As noted by the U.S. Probation Office, the statutory maximum penalty for Count 1 is 40 years imprisonment (Second Degree Murder); 5 years imprisonment for Count Two (Conspiracy); and 20 years imprisonment for Count 3 (Obstruction). July 22, 2024, Final PSR ¶¶ 119, 121 122.

## II.    APPLICABLE LAW

### a.  General Sentencing Principles

6

For the federal counts of conviction, as the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Once the Court calculates the defendant's advisory Guidelines range applicable to the federal counts of conviction, it should consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). To make this determination, the Court may consider all factual evidence relevant to the conduct of conviction that is proven by a preponderance of the evidence, including evidence not presented to the jury, without regard to the rules of admissibility at trial, subject to basic principles of reliability. *See United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) (citing *Rita v. United States*, 551 U.S. 338, 352 (2007)); U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).

A similar process drives determination of the sentence for the D.C. code offense.  For such violations, the court must begin by referencing the D.C. Voluntary Sentencing Guidelines.  Though voluntary, the D.C. Sentencing Commission anticipates that most defendants will be sentenced to a guideline sentence.  This is because, like the federal guidelines, the D.C. guidelines are formed with the "bedrock principle" that "like offenses/defendants should be sentenced alike."  *See* District of Columbia Sentencing Guidelines Manual at § 5.2.1 (2023).  And though the D.C. guidelines are voluntary, a judge departing from the applicable guideline range must state the reasons for the departure on the record and communicate the reason for any departure to the D.C. Sentencing Commission.  *Id.*

Just as federal law (i.e., § 3553) mandates certain factors that the Court must consider when determining the sentence for the federal offense, the D.C. Code includes a set of factors that must be considered when determining the sentence for the D.C. Code offense.  *See* D.C. Code § 24-403.01(a).  Those D.C. statutory factors mirror the U.S. Code factors and include: the seriousness of the offense and the criminal history of the offender; the need to provide just punishment and afford adequate deterrence; and providing the offender with needed educational or vocational training, medical care, and other correctional treatment.  *Id.*

### b.   Interplay Between the D.C. Code and Federal Offenses

When a defendant is facing sentencing in federal court for both federal and D.C. Code violations — as the defendant is here — the Court should use the D.C. Voluntary Sentencing Guidelines to determine a guidelines range for the D.C. Code offenses and the U.S. Sentencing Guidelines to calculate guidelines for the federal crimes. *United States v. Knight*, 824 F.3d 1105,

1111 (D.C. Cir. 2016) (holding that "the federal Sentencing Guidelines do not apply to the sentencing of D.C. offenses. . . . Likewise, the D.C. Voluntary Sentencing Guidelines do not apply to the sentencing of federal offenses"). Once these guidelines are properly calculated, "how a court is to relate a [federal] Guidelines sentence to a non-[federal] Guidelines sentence is a matter of discretion" for the sentencing court. *Id.* This is because "neither set of guidelines addresses whether sentences for federal offenses should run consecutively or concurrently to the D.C. Code offenses when a defendant is convicted of both." *Id.* Accordingly, the Court here has discretion to fashion a sentence that accounts for both sets of guidelines.

## III.    THE SENTENCING FACTORS

In this case, as described below, consideration of the U.S. Sentencing Guidelines, the D.C. Voluntary Sentencing Guidelines, and the statutory sentencing factors under 18 U.S.C. § 3553(a) and D.C. Code § 24-403.01(a) support a substantial term of incarceration for defendant Sutton. The conduct in this case is egregious: while on-duty as a sworn law enforcement officer, the defendant needlessly caused the death of an unarmed civilian and then conspired with his supervisor to cover up his actions. The defendant's criminal conduct warrants a sentence of incarceration that accounts for both the unnecessary loss of life in this case and the defendant's knowing attempt to get away with his crime, as well as his complete refusal to accept any responsibility for his conduct: 216 months imprisonment for his murder conviction, 121 months imprisonment for his obstruction conviction, and 60 months imprisonment for his conspiracy convictions, to be served concurrently. This reflects a sentence at the midpoint of his D.C. Voluntary Guidelines, and the top of his federal Guidelines range.

### a.   Count One - Applicable D.C. Voluntary Sentencing Guidelines

The Government and the Probation Office agree that the defendant's sentence for Count One is driven by the applicable D.C. Voluntary Sentencing Guidelines, which classify second degree murder as belonging in "Master Group 2" or "M2."  The imprisonment range in M2 for persons with no criminal history, including the defendant, is 144 to 288 months.

### b.  Counts Two and Three - Applicable United States Sentencing Guidelines

The Government and the Probation Office agree on the U.S.S.G. Guidelines calculation applicable to Counts Two and Three, both of which have the same calculation.  Because these Counts involved obstructing an investigation into the underlying offense, the base offense level is calculated using U.S.S.G. § 2X3.1 (Accessory After the Fact).[1]   In turn, because the obstructed investigation concerned a possible violation of 18 U.S.C. § 242, the guideline applicable for that crime, U.S.S.G. § 2H1.1 (Offenses Involving Individual Rights), applies.

Subsection (a)(1) of U.S.S.G. § 2H1.1 requires application of the offense level from the offense guideline applicable to any underlying offense. Here, the underlying offense was second degree murder, which, under § 2A1.2 has a base level offense of 38.  However, § 2X3.1, subsection (a)(1)(3), caps the base level offense at 30.  *See* PSR ¶ 64.

Counts Two and Three group under § 3D1.2(d), which does not result in an increase in offense level.  Further, defendant Sutton is ineligible for the zero-point offender reduction because the offense conduct resulted in death, given that relevant conduct is included.  *See* U.S.S.G. § § 1B1.3 and 4C1.1(a)(4).

Thus, the United States and Probation Office agree that the following Guidelines apply:

**Base Offense Level, U.S.S.G. §§ 2X1.1, 2H1.1, 2A1.2                30**

---

[1] This provision applies to Count 3 through U.S.S.G. § 2J1.2(c), which cross-references to § 2X3.1 (Accessory After the Fact).

**Total Offense Level:**                                                **30**

At a total offense level of 30 and no criminal history, the applicable sentencing guidelines range is 91 to 121 months of incarceration for Counts Two and Three.

### c.  Statutory Sentencing Factors Under 18 U.S.C. § 3553(a)

The statutory sentencing factors support a substantial sentence, including a sentence in the middle of the D.C. Voluntary Guidelines range for the murder and at the top of the federal Guidelines range for the defendant's obstructive conduct.

### i.  The Nature and Circumstances of the Offense Support a Guidelines Sentence

The nature and circumstances of this offense require a significant sentence within the applicable guidelines ranges; they do not support a variance.  At the time of this incident, the defendant was a sworn police officer entrusted with enforcing the law and keeping the public safe. On the night of Hylton-Brown's murder, it was defendant Sutton's duty to protect him, regardless of whether he had been engaged in misconduct.  The training the defendant received, including a week's worth of vehicle skills training when he first joined MPD, emphasized the importance of officers prioritizing safety when in an MPD car.  As trial testimony established, police pursuits are extremely dangerous to everyone involved as well as to those along the pursuit's path.  *See, e.g.* Trial Tr. Nov. 3, 2022 (am session), at 115 (Drago test.).  Officers are trained—and MPD policy reinforces—that officers may engage in such high-risk police action only when the officer is confronted with an emergency situation that justifies the risk:  a fleeing felon, or someone who presents an imminent risk of death or serious harm to another.  *See, e.g.*, Trial Tr. Nov. 15, 2022 (am session), at 78 (Totaro test.).  Indeed, the policy in effect at the time of this incident instructed officers that police pursuits must be limited to the same circumstances that would permit the officer to fire his gun.  Gov. Tr. Ex 401D (pursuit policy).   The defendant passed his training on these

11

topics with a 97% grade.  Trial Tr. Nov. 15, 2022 (pm session), at 33-34 (Totaro test); Gov. Ex. 405B (training record).  He knew full well both of his obligation to protect Hylton-Brown, and how he was supposed to conduct himself in an MPD vehicle, as well as the limited circumstances under which he could use that vehicle to chase someone.

Despite all this, he chose to chase Hylton-Brown even though not one of these circumstances existed.  Hylton-Brown was not a fleeing felon, and trial evidence established the officers had no reason to believe that he was.  PSR ¶ 22. There was also no evidence that he presented any immediate risk of harm to anyone else or that he had a weapon.  PSR ¶¶ 20, 22.  As one of the CST officers in the defendant's car acknowledged during the defense case, the officers first tried to talk to Hylton-Brown on a "hunch" that something might be amiss; they knew nothing that even amounted to reasonable suspicion.  Trial Tr. Dec. 2, 2022, at 14-15.  When Hylton-Brown refused to voluntarily engage with the officers—as was his legal right—they tried to stop him for minor traffic infractions, such as riding on the sidewalk and operating the moped without a helmet.  And when Hylton-Brown did not stop, the defendant chose to engage him in a pursuit. To do so under these circumstances flew in the face of the badge the defendant wore and threw the legal principles of due regard for the safety of others out the window along with all of his training and MPD policy..

That the defendant's pursuit of a helmetless moped driver would end in tragedy was wholly predictable.  And yet, the defendant consciously added to the risks of this reckless pursuit throughout, as most clearly evidenced in the final few seconds: as he followed Hylton-Brown into an alleyway, despite MPD policy that requires the use of lights and sirens throughout the duration of a chase, the defendant *deactivated* his emergency lights and siren and accelerated behind Hylton-Brown as they approached the next street.  Because of the defendant's actions, there was

no way that any driver on that street would know the chase was coming.  As the driver who struck Hylton-Brown testified at trial, he would have slowed down or pulled over to get out of the way if he had seen police lights or heard a siren nearby.  Trial Tr. Nov. 30, 2022 (am session), at 32-33. Instead, unaware of what was headed directly toward him, this driver plowed into Hylton-Brown at full speed.

The choice to engage Hylton-Brown in this fashion rested entirely with the defendant. That a sworn law enforcement officer affirmatively chose to do this—needlessly risking a civilian's life to follow a mere "hunch" and issue Hylton-Brown traffic infractions—illuminates the egregious nature of the defendant's conduct and how he consciously and deliberately disregarded the extreme risk his conduct created to Hylton-Brown's life.  The nature and circumstances of the murder alone warrant substantial punishment, and certainly more than the minimum proscribed by the Guidelines.

As the trial made clear, however, the defendant's criminal conduct did not end with the crash that killed Hylton-Brown.  BWC from the defendant's front seat passenger showed the horrific crash mere feet in front of the CST car and left no question that the defendant, in the driver's seat, knew the seriousness of what had just occurred.  Yet his coverup began immediately. Within minutes, defendants Sutton and Zabavsky took charge of the crash scene despite both of their direct involvement in the events that caused it.  They agreed defendant Sutton would write the operative police report and took that responsibility away from an uninvolved officer who had started to gather information for it.  They deliberately ignored routine procedures to preserve a serious crash scene and collect evidence.  And they lied to their chain of command about what had really happened: first by misleading their Watch Commander to think that this had been a minor

accident with no officer involvement, and then by writing and circulating a completely false narrative of events, contained within defendant Sutton's falsified draft police report.

The significance of the coverup cannot be understated:  having caused a fatal crash that took a civilian's life, the defendant's immediate reaction—despite being a sworn member of law enforcement—was to cover up the facts.  This concerted effort to sweep this entire incident under the rug further highlights the defendant's callous disregard both for Hylton-Brown's life and for his responsibilities as a law enforcement officer.  The defendant's decision to obstruct any investigation of what he had done merits a sentence at the top of the applicable guidelines for those offenses.  And, in turn, because the top of this guidelines range does not overlap with the guidelines range applicable for the murder—effectively resulting in no additional punishment for the defendant's significant obstructive acts—a higher sentence within the guidelines range for the murder is warranted, to ensure that the defendant's obstructive acts are accounted for in his final sentence.

### ii. Given the Nature of the Defendant's Crimes, His History and Characteristics Support a Guidelines Sentence

The defendant has no prior criminal history and has been a MPD officer since 2009.  Given the facts here, however, this background does not support a lesser punishment – his status as an officer requires the opposite.

First, it is by the very fact of his position as an MPD officer that he was able to commit these crimes.  He used an official MPD vehicle to exert his state-given authority to engage in a vehicle pursuit of Hylton-Brown, despite no lawful reason to do so.  He then used his police powers to continue to pursue him despite clear, known risks.  And after the crash, he used his position to cover up what he had done, misleading senior police officials and drafting a false report.  The defendant was able to do all of these things only because of his job as a police officer.  That he

14

worked in a position of public service and public trust does not weigh in favor of leniency where he used his position to commit crimes.

Second, the defendant's recent MPD disciplinary record serves only to reinforce that, in this case, the defendant knew he should not have engaged Hylton-Brown in this dangerous, needless pursuit. In 2019, the year before the events of this case, the defendant was officially reprimanded by MPD for violating the vehicular pursuit policy. Gov. Tr. Ex. 414B. There, as here, he disregarded established safety protocols for vehicular pursuits: he did not notify the police dispatcher of the pursuit in progress, and he did not terminate the pursuit "when it [became] apparent that the vehicular pursuit could lead to unnecessary property damage, injury to citizens or members of the department." Gov. Tr. Ex. 414B. This disciplinary incident shows that just a year prior to this fatal crash, the defendant had already been warned by MPD not to engage in some of the exact same conduct that contributed to Hylton-Brown's death. The defendant's disregard for this recent history does not favor a lesser sentence, and instead provides an aggravating factor that supports a sentence higher than the minimum guidelines range for the murder.

It is also worth nothing that throughout the course of this case, the defendant has consistently expressed no remorse whatsoever for his conduct. Indeed, to the contrary, he has maintained that the criminal laws used to prosecute him in this case do not apply to him, asserting that because he is a police officer, he is above the law. This wholesale lack of contrition supports the requested sentence.

Finally, the fact that the defendant has no criminal history does not warrant a sentence below the applicable guidelines. The calculations under both the D.C. Voluntary Guidelines and the federal Guidelines already account for the fact that the defendant has no criminal history. Both

guidelines ranges therefore already give the defendant full credit for his lack of criminal history. Because this consideration has already been accounted for, this fact alone does not support a sentence below either guidelines range.

### iii.   The Need for the Defendant's Sentence to Reflect the Seriousness of the Offense and Promote the Rule of Law Supports a Guidelines Sentence

The defendant's sentence must also reflect the seriousness of the offense and promote the rule of law. As noted, the defendant has expressed no remorse whatsoever for his crimes. Instead, he has maintained throughout this case that the D.C. Second Degree Murder statute does not apply to his actions as a police officer–essentially, that he is above the law. As with the nature and circumstances of the offense, promotion of the rule of law supports a significant sentence of incarceration, and certainly one that is higher than the minimum proscribed by the Guidelines.

Law enforcement officers are a central part of maintaining the rule of law in this country. The defendant's crimes did significant damage to the credibility of law enforcement generally— and MPD specifically—in carrying out this essential role. As the trial made clear, defendant Sutton knowingly engaged in a dangerous police pursuit of Hyton-Brown without any regard for his safety, all based on nothing more than a "hunch" and some minor traffic infractions. That abuse of police power ended a young man's life. And instead of honestly accounting for his choice to pursue Hylton-Brown in this way, the defendant immediately tried to bury the facts to escape the consequences. Egregious conduct like this erodes the public trust in law enforcement. Serious punishment is warranted to show that no one, including officers like the defendant, is above the law. A sentence in the heartland of the defendant's Guidelines for the murder—which will effectively account for both that crime and will provide additional punishment for his obstruction crimes—is appropriate, yet not more than necessary, to achieve this sentencing goal under these facts.

### iv.  The Need for Deterrence Supports a Guidelines Sentence Here

A significant sentence will also provide deterrence.  Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).  The requested sentence will serve both here.

First, a lengthy sentence of incarceration will deter other law enforcement officers not only from engaging in unwarranted, high-risk police action that needlessly endangers human life, but also from obstructing justice.  A police officer covering up the circumstances of an on-duty death he caused is a grave offense and a shocking breach of public trust.  It demands a level of deterrence that conveys that this type of abuse of police power will have serious consequences.

Second, defendant Sutton has never expressed any remorse or contrition throughout the course of this case.  Instead, he has repeatedly attempted to cast himself—rather than Karon Hylton-Brown, the young man he killed —as the victim of a politically-motivated prosecution targeting the police.  While the defendant's convictions will preclude his future employment in law enforcement, his consistently unrepentant position and continuous claims that what transpired did not even amount to a crime warrants a sentence that provides specific deterrence.  Taken together, these facts support a sentence in the middle of the defendant's applicable guidelines for the murder, and the top of his guidelines range for the obstruction crimes.

### v.  A Guidelines Sentence Will Not Create an Unwarranted Sentencing Disparity

Given the facts of this case, the requested guidelines sentence will not create an unwarranted sentencing disparity across similar cases.  This factor requires the Court's sentence to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  To address this

factor, undersigned counsel consulted with the Homicide Section of the U.S. Attorney's Office, as that Section handles most prosecutions for Second Degree Murder brought under 22 D.C. Code § 2103. According to the information provided, most cases involving vehicular homicide, including those charging the defendant with Second Degree Murder, result in guilty pleas to lesser charges of voluntary or involuntary manslaughter. There has been only one recent trial in a vehicular homicide case, in *United States v. Jones*, 2017-CR1-002259 (Beck, J.), which involved an intoxicated driver fatally striking a pedestrian and fleeing the scene. The jury returned a conviction for Second Degree Murder. At sentencing the government sought a sentence within the defendant's D.C. Voluntary Sentencing Guidelines range of 156-360 months imprisonment. Judge Beck varied downward and imposed an 8-year sentence.

The government respectfully submits that several factual differences render *Jones* to be of marginal use as a comparator to this case. The facts of the two cases are quite different: a drunk driver committing a hit-and-run in *Jones*, versus an on-duty, sworn MPD officer using an MPD car to engage in a dangerous pursuit of a civilian riding a moped without a helmet in the instant case. Both cases ended in preventable tragedies and needless losses of life, but the underlying facts could not be more different from each other. Moreover, here defendant Sutton used his official position as a police officer to affirmatively cover up what happened and avoid all responsibility. As a police officer, defendant Sutton was in a unique position to be able to cover up what had occurred, and he made the conscious choice to do so, collaborating with his supervising lieutenant, co-defendant Zabavsky, to put this plan into action. While the defendant in *Jones* did try to flee the crash scene, defendant Sutton's concerted plan to abuse his official position to sweep his culpability for Hylton-Brown's death under the rug is a significant

aggravating factor that resulted in two additional felony convictions, which must be also accounted for in his sentence.

Given these factual differences, imposing the requested in-guidelines sentence for defendant Sutton would not result in an *unwarranted* sentencing disparity "among defendants . . . who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(6). Given the differences between the instant case and *Jones*, the sentence imposed in *Jones* should not weigh heavily, if at all, in the Court's determination of the appropriate sentence here, as the aggravating facts of this case support the significant period of incarceration proscribed by the middle of the defendant's guidelines range for the murder charge.

## IV.   RESTITUTION

### a.   Count 1: 16 D.C. Code § 711

Under 16 D.C. Code § 711, the Court may order defendant Sutton to pay restitution to Hylton-Brown's surviving family members. In fashioning such a restitution order, the Court "shall" consider, among other things, "the actual damage of each victim" and "the resources of the defendant." 16 D.C. Code § 711(b). Restitution is appropriate under the facts of this case. The defendant abused his position as a sworn law enforcement officer to engage Hylton-Brown in an unauthorized police chase. The jury's verdict found that the defendant knew his actions created an extreme risk of death to Hylton-Brown, but he nonetheless chose to ignore those risks. ECF 435, at 27-28 (Final Jury Instructions, Second Degree Murder). Because of the defendant's choices, a twenty-year-old man needlessly lost his life. The defendant's crime shattered the lives of his surviving family members and significantly undermined community trust in the police. The Court should order the defendant to pay restitution to Hylton-Brown's family.

In anticipation of filing this memorandum, the government has been in contact with counsel for Karen Hylton, who is Hylton-Brown's mother, concerning restitution.  Counsel has informed the government that Ms. Hylton intends to address the Court at and/or prior to sentencing.  The government further notes that Ms. Hylton has a pending federal civil lawsuit in this District that seeks damages arising from this incident from defendant Sutton and related defendants, *Jones-Bey v. District of Columbia*, 21-cv-2674-JMC.

**b.  Counts 2 and 3: 18 U.S.C. § 3556**

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  Two general restitution statutes provide such authority.  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096.  Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096.  The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).  The MVRA does not apply to the conduct that gave rise to the defendant's conviction on Counts 2 and 3, and the government is not seeking restitution for these counts.

## V.    FINE

Each of defendant Sutton's felony convictions subject him to a statutory maximum fine of $250,000.  22 D.C. Code § 3571.01(b)(12) (Count 1); 18 U.S.C. § 3571(b)(3) (Counts 2 and 3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.  *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d).  The government is not seeking a fine in this case.

## VI.    CONCLUSION

For the reasons given above, the Court should impose a sentence of 216 months of incarceration for Count 1, 121 months imprisonment for Count 2, and 60 months imprisonment for Count 3, to be served concurrently.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Risa Berkower*
ELIZABETH ALOI
DC Bar No. 1015864
RISA BERKOWER
NY Bar No. 4536538
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D St., N.W.
Washington, D.C. 20532
Phone: (202) 252-7212 (Aloi)
        (202) 252-6782 (Berkower)
Email: Elizabeth.Aloi@usdoj.gov
        risa.berkower@usdoj.gov