## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES** | * | |
| | * | |
| **v.** | * | **Case No. 21-cr-598-1 (PLF)** |
| | * | |
| **TERENCE D. SUTTON** | * | |
| | * | |
| **Defendants.** | * | |

## MEMORANDUM IN AID OF SENTENCING
## SUBMITTED BY TERENCE D. SUTTON

### Introduction

No one regrets the loss of Karon Hylton-Brown's tragic death more than Officer Sutton. Hylton-Brown's death was tragic for his family and friends and anathema to everything that Officer Sutton strove to accomplish while serving with distinction in the Fourth District – to diffuse confrontation and protect the residents of the 4th District.

Despite the violence and proliferation of guns that prevailed in the Kennedy Street area, Officer Sutton never once discharged his firearm during his 13 years of service, even in situations when other officers did so. He was never found to have used excessive force. When the Crime Suppression Team ("CST") was first formed in an attempt to prevent violent crimes in the City, his Commanding Officer selected Officer Sutton to serve on the team because of his professionalism, dedication and ability to tamp down violence. As the Court heard during the trial and will read in the many letters to be submitted on his behalf, Officer Sutton was universally respected and liked by the officers who worked alongside him and by his superior

officers for his dedication, his friendly nature and his ability to diffuse difficult situations. During his 13 years on the force, Officer Sutton received more than 60 commendations and was named Officer of the Year.

Each day, Officer Sutton put his life on the line to serve and protect the people who live and work in the 4th District and he did so with "integrity and compassion."

> Terence is a great person. He has a wonderful spirit and amazing personality.  Terence is a hard worker with the best work ethic any employer would be lucky to have. He is a tremendous Police Officer.  Terence is one of the best members on the entire Metropolitan Police Department in my 15 years of service.  He is brave and policed with integrity and compassion.  He took pride in his position as a Law Enforcement Officer.
>
> Terence would laugh with the citizens. He served and protected the citizens of DC with a smile each day. I watched in awe as he lighted the mood with prisoners, complainants and even suspects. Every scene I can remember Terence was excellent at building a rapport with everyone and at the end they would laugh with Officer Sutton as they were being arrested or interviewed. He was a positive influence.  I witnessed the joy he had while working in patrol and responding to juvenile disorderly calls at Emery Recreation and the Kennedy Street area. The juveniles responded well to Officer Sutton.  They would laugh and joke with him.  I recall on one of our scenes involving juveniles, they jokingly called Officer Sutton "Sunny".
>
> Terence was truly an asset to the Police Department. Because of him and officers like him, DC was a safer place.[1]

On the fateful night when Karon Hylton-Brown was killed in the collision with oncoming traffic, Officer Sutton and his fellow CST Officers well understood what the

---

[1]  Excerpt of letter from former MPD Detective, an African American Officer who worked with Officer Sutton. Letters will be filed as exhibits.

United States has now publicly acknowledged about the violent nature of the Kennedy Street Crew, which operated in the area they were patrolling:

> A direct consequence of the KDY crew's drug trafficking operation, in conjunction with its expansion and protection of crew-controlled territory, is a marked rise in crimes of violence and homicides in the Kennedy Street neighborhood. *Over the duration of the charged conspiracy, from June 2019 to present, the following crimes of violence have occurred in the Kennedy Street Neighborhood: five homicides, resulting in the deaths of seven and the wounding of six additional individuals; one assault with the intent to kill, which resulted in the wounding of three individuals; and 19 assaults with a deadly weapon, which have produced approximately two dozen adult victims. In addition to the seven dead and approximately three-dozen additional victims, seven juveniles have also been victims of the above-listed crimes of violence. Beyond these incidents, during the same time period, there have been approximately 70 additional reports of unlawful discharges in the Kennedy Street Neighborhood during the same time period.* Notably, these statistics only account for crimes of violence and firearms-related incidents in one neighborhood during the time period alleged in the indictment; it is difficult to estimate with any degree of precision the number of retaliatory and/or crew-related shootings involving KDY in and around the District of Columbia. Put simply, the KDY crew is a driver of the cycle of violence associated with drug trafficking and firearms that has plagued the Kennedy Street Neighborhood for years.[2]

The CST Officers' understanding of the risk of violence that Hylton-Brown and his fellow members of the Kennedy Street Crew posed led Officer Pitt to grow suspicious when she observed Hylton-Brown three times earlier that day, arguing with another man over money, appearing intoxicated, being present on Georgia and Kennedy, an area that was not his usual haunt, and returning to the area acting in a manner that raised suspicion that he might be looking to retaliate against the person

---

[2]  Government's Omnibus Memorandum In Support Of Pretrial Detention As To All Defendants, KDY Indictment, No. 23-CR-202  (ECF 38) at 3-4 (emphasis added).

with whom he had been arguing.[3]   In turn, when Officer Sutton and Lieutenant Zavabsky received Officer Pitt's report, their knowledge of KDY as well as their personal experience interacting with Hylton-Brown and the other KDY members weighed into their decision to seek to stop Hylton-Brown almost immediately after Officer Pitt's report.

Officer Sutton had no intent to cause harm to Hylton-Brown that evening.  His only motive was to conduct an investigatory stop to make sure that Hylton-Brown was not armed so as to prevent any further violence.  The fact that Hylton-Brown then ran a red light, drove on sidewalks, failed to stop at stop signs, drove the wrong way, and fled added to Officer Sutton's decision to try to stop him confirmed by the conduct of his supervisor Lt. Zabavsky.

In determining a sentence that is "sufficient, but not greater than necessary," as required by 18 U.S.C. § 3553(a), this Honorable Court considers not only the facts presented at trial but also any other facts which are relevant to the § 3553(a) factors and which may mitigate the punishment that the Court will impose.[4]

With respect to the DC Voluntary Sentencing Guidelines or the United States Sentencing Guidelines, this case is outside the heartland of cases that either

---

[3]   *See* Instagram message which the government describes as KDY members discussing "shifting their operations from Georgia and Kennedy Street NW to 5th and Kennedy to avoid getting hit by gunfire."  KDY Case (ECF 105) at 14-15.

[4]   "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.

Sentencing Commission considered in establishing the guidelines, thus warranting a departure or variance from a guideline sentence.

First and foremost, there is no case in this district where a police officer or a civilian has been charged with second degree murder where there was no contact between the defendant and the decedent.[5]  Every second degree murder charged in this district involved a situation where a defendant shot, stabbed, or physically assaulted the decedent.   The only second degree murder charge involving a vehicle collision involved a case where the driver of a commercial truck with faulty brakes, for which he had been previously cited, slammed into the back of another car, causing the death of the driver.  Even in that case, the jury acquitted of second degree murder.

There is also no case in this district where a police officer has been charged with murder based on a violation of an MPD General Order, where a shooting, beating or other physical contact was not involved.

With respect to traffic accidents, there is no case where a person driving at 25 miles per hour, more than 40 feet behind another vehicle, has been charged with second degree murder or even involuntary manslaughter.  Indeed, such a factual scenario would not even give rise to a misdemeanor violation for reckless driving.

Similarly, there is no case in this district or throughout the United States where a police officer has been charged with a violation of civil rights under color of law where the facts even remotely resemble the facts of this case.  Again, counsel are

---

[5]  The only possible exceptions are murder-for-hire situations where the defendant hires another to commit the murder; or where vicarious liability is imposed. While counsel has not identified such cases, counsel acknowledge that exception.

not aware of any civil rights prosecution of a police officer where there was no felonious contact with the decedent.[6]

With respect to the obstruction count, there is no case in this district where there was a prosecution for obstruction based on a "draft report" which the officer had not completed, and which required several layers of review and approval. Nor has the Government contested our assertion that out of 588 obstruction cases charged by the Government, only 1 did not include a companion federal offense as the target of the obstruction. Sutton Reply in Support of Motion for Arrest of Judgment and New Trial (ECF 4670) at 5.

A number of other factors also warrant a variance. *First,* Officer Sutton's personal characteristics which include his impeccable record – not a single conviction or traffic citation; his distinguished record as a police officer; his compassion and good works; and the aberrant nature of the conduct – show that there is zero likelihood of recidivism. *Second,* Mr. Hylton-Brown's conduct – failure to wear a helmet, intoxication, failure to yield the right of way, and reckless driving – also contributed to his own death, warranting a variance from the guidelines sentence. *Third*, a police officer is uniquely susceptible to abuse in prison, and any prison sentence would need to be served in protective custody, which results in a fortuitous worsening of the conditions of detention. *Fourth,* Officer Sutton's back injury, derived from his years of service is another mitigating factor. *Fifth,* the loss of a career he loved and at which

---

[6]  A separate class of cases, not relevant to the instant case, involve civil rights violations where the defendant is charged with deliberate indifference to medical needs.

he excelled is also a mitigating factor. *Lastly*, the Court is required to avoid unwarranted sentencing disparity, which in this case is also a prominent basis for a variance.

Objections to the application of the Sentencing Guidelines are set out below, as well as Officer Sutton's particularized arguments for departures and variances. Lastly, the D.C. Voluntary Sentencing Guidelines are discussed..

## I.   Officer Sutton's History and Characteristics Warrant a Sentence Below The Guideline Range Under the Federal and DC Code Guidelines

Terence Dale Sutton, Jr., is a compassionate young man, who loves people.[7] He is a good friend. He is hard-working and diligent at whatever job he undertakes. He is funny and tries to put people at ease. He is law-abiding and honest. Each one of these personal characteristics is present in his personal life and in his professional conduct as a police officer. The many letters that the Court will receive confirm those good qualities. All of these qualities, alone and in combination are grounds for a downward variance. They reflect that this conviction represents aberrant behavior and that there is no likelihood of recidivism. *See, e.g., Gall v. United States,* 552 U.S. 38, 47 (2007) (affirming sentence of probation based on a combination of factors for a defendant convicted of conspiring to distribute ecstasy where, among other things, he had withdrawn from the conspiracy and begun to rehabilitate himself).

---

[7] In the letters submitted to the Court by those who have known Officer Sutton from his childhood they often refer to him by his name, "Dale" because as a child to avoid confusion with his dad that is how he was called.

1.     **Compassion, Integrity and a Desire to Help Others**

Following are excerpts from some of the letters that will be submitted in full to the Court.  The letters written by friends, family and colleagues speak more eloquently about Officer Sutton than anything counsel can write:

> I am a Detective within the Metropolitan Police Department, where I have worked for over 17 years. I have had the privilege of working with Sutton for over 5 of those years. In my time working with Sutton, I have gained firsthand knowledge of his dedication and work ethic. Sutton was always the first to arrive each day, meticulously preparing for his duties. He took great pride in his uniform appearance and had an exceptional ability to communicate with the citizens on his beat.
>
> Terence Sutton was well-known along the Kennedy Street corridor as a fair and friendly officer. He made it a point to engage with everyone, from homeowners to the homeless. Officer Sutton would frequently visit businesses along his beat and check in on them. Most would immediately greet him by name and feel comfortable enough to share information about what they had witnessed in the neighborhood. This is uncommon in that area, where many people are typically reluctant to talk to the police, let alone provide information on crime. However, his genuine personality made people feel at ease.
>
> His reputation for honesty and integrity is well-deserved. I recall numerous occasions when individuals we arrested, especially from the Kennedy corridor, would specifically request Officer Sutton to come to the scene. He never took advantage of situations. For instance, when he slipped on ice and sustained a head injury requiring immediate medical attention, many encouraged him to sue the DC government, but he refused. Officer Sutton was the type of person who would not leave work early, even when everyone else did. He worked his full tour of duty, always giving 100 percent of his time and effort to serving the citizens of DC.
>
> I also remember how he handled personal tragedies, such as the loss of his father, who was his best friend, and his mother's health issues, all within a few months apart. Despite these challenges, he remained professional and friendly at work. Throughout the

years I have known him, Ofc. Sutton has consistently
demonstrated a commitment to doing the right thing, regardless
of the situation. I cannot stress enough how much of an
upstanding, hardworking individual he is.

Another letter from an MPD colleague relates the same admirable qualities,

excellence and commitment to his job:

I am a Sergeant with the Second District, Metropolitan Police
Department. I have been serving with the DC Police since October
of 2009, and was formerly assigned to the Fourth District.

I first met Terence in October of 2019, and had the honor and
pleasure of serving with him for a year while I was assigned to
the Fourth District, riding with him on almost a daily basis.

Having had ten years on the department at the time, and then
riding with Terence almost daily for a year, I quickly realized
what a talented and gifted Police Officer he was. He knew the
Fourth District better than any of the other Officers I had met.
He knew where the crime was, what type of crime was where,
names and faces, and the geography of the streets like the back of
his hand. He had no problem handling any type of scene, and
would just as easily respond to a murder as a theft at the local
convenience store.

One of the things that amazed me the most about Terence was his
gift and ability to talk to people. Terence is a talker, and he loved
to talk to everyone from all the other Officers in the station, to the
residents of the Fourth District, to the local business owners, to
anybody passing by on the street. They all knew his name, and he
knew theirs. But the one common theme was that almost every
interaction always involved a big smile on everyone's faces. I truly
believe it and mean it, when I say everyone genuinely enjoyed
talking to Terence, and he genuinely enjoyed talking to them.

Terence truly loved his job as a Police Officer, and he loved to help
and protect people.  When riding with Terence every day, I got to
see how friendly and funny he was when talking to people, and
how he put them at ease. Many times I heard people make
comments to him after meeting him for the first time to the effect
of, you're not like the other Officers, you actually know how to

talk to people. They would add, the other Officers are like robots and don't know how to talk to people.

One day in the late summer of 2020, I was riding with Terence and remember responding to a call at Kennedy and Georgia for some type of disorderly. I remember arriving on scene, and a large group of subjects hanging out on the corner. The situation felt tense honestly, and you could almost feel the tension. I remember getting out of the car and walking around, how hot it was that day, and saying hi and not receiving a reply from anyone. A short while later after not seeing anything suspicious and being ready to go, I remember looking over and seeing Terence talking and laughing with all the guys from the corner. I wondered what they were talking about, and as I got closer I heard them discussing Cardi B's new song, WAP. I remember laughing to myself and thinking, that's Terence, he always has something to talk about with everybody.

As I reflect on the current situation that Terence is in, it pains me and saddens me. Terence is a good person, a good man, and a great Officer. Having rode with him for a year, I know deep down Terence truly cared for people and wanted to help them.

Another letter expressing the same sentiments:

Currently, I am and have been a police officer in the Metropolitan Police Department for the past seventeen years. . . . I have worked many different aspects and roles in the department. These roles have taught me a great deal about respect for the community of DC and the people who reside there.

In January 2013, I began my career at the Fourth District Police Station. During that time, I met Officer Terrence Sutton, both sharing many common values, work ethics, and love for our profession. During my time there, we worked in the same patrol service area. We rode together as partners in the patrol car, on mountain bikes, and attended to community safety as we patrolled our assigned areas. As time passed on, our supervisors knew us to be ethical, compassionate, and law-abiding police officers. We were then detailed to a business beat where we concentrated on all categories of crimes and community relations to help make the area safer. We became known to the good and the bad of the community that we patrolled. We established relationships with community members and gained their trust,

such as community members shared information of the area. Together, we received many awards issued by the Chief of Police and were commended for hard work and service to the community. Officer Sutton established great rapport with some of the roughest criminals in the area. As time passed, Officer Sutton was selected to go to the VICE Unit due to his work ethic and stellar reputation within our district.

The results of this case have affected not only me but many other officers throughout the departments. The apprehension procedures in high crime areas and restrictions placed on police officers has caused crime rates to soar. Because of the disrespect to law enforcement, criminals are allowed to take advantage of the leniency in apprehension.

Officer Terrence Sutton has had a commendable career as a police officer. His work ethic, attention to the chain of command, professionalism, and service to the community has been exemplary.

Another letter from an MDP colleague:

I have known Terence Sutton for roughly 12 years, working alongside him for 3. In my experience, Terrence has consistently demonstrated a strong sense of responsibility and reliability. Both in professional setting within the community he has served and in our personal social circles.

On one occasion, Terence and I were working together when we happened to stop a D.C dispatcher for a motor vehicle violation. During our interaction, the dispatcher remarked to Terence, "I know you. You're a worker", referring to Terence's frequent presence on the airwaves, consistently dedicated to maintaining the community's safety. Remarkably, the dispatcher recognized Terence solely by his voice. This moment brought a big smile to our faces, as being acknowledged as a "worker" is considered a high compliment within our department. That sums up the kind of Officer Terence was, a hard worker that cared about the community.

I am aware of the current legal situation that Terence is facing and would like to express my belief that this incident is not reflective of his true character. I have never witnessed Terence do anything reckless or unsafe during my entire time knowing and

working with him. He has always been a cautious, respectful, and a mindful Officer. Terence has always displayed the upmost professionalism and desire to keep the community he served safe.

A letter from William Wingfield, a life-long friend:

Dale is a good friend of mine who I've known since childhood. For over 30 years, it has been easy to maintain my friendship with Dale because he is honest, sincere, reliable, and a respectful person.

I've never known Dale to hide the truth. Even if there is an opportunity to tell an occasional white lie to spare feelings, it is not in Dale's character to do such. For instance, when we were teenagers, Dale damaged the front of his car. When me and other friends asked him what happened, Dale could've easily lied to avoid embarrassment, but he didn't because it is not in his character to not tell the truth. Another example, when we were younger, I had a girlfriend who cheated on me with a mutual friend of ours. I asked Dale if he knew anything about the situation. He could have easily played a neutral position to preserve his friendship with me and the mutual friend, but he didn't. Instead, Dale told me what he knew to be the truth, knowing that it would cause unnecessary tension for him. I respect Dale for doing that because it is not easy to tell your friend the truth about things that are important to them knowing it will drag you into a difficult position.

Dale is sincere. After my father unexpectedly passed away in 2011, Dale consistently reached out to me with support year after year. He frequently asked how my family and I were doing. I'm greatly appreciative of that. I felt his empathy. Another example of his concern for others, at the end of a night of hanging out, Dale is that one friend who says, "make sure you text me when you get home so I know you made it there safely". Even if I forgot to text him that night confirming that I made it home safely, Dale will follow up the next morning because he genuinely cares about the safety of others.

When we were younger, Dale and I played on the same soccer teams and went to the same schools together. As teammates, I frequently was able to rely on Dale for rides to/from practice and games. Without me even asking, Dale would always offer me a ride because he is considerate of others.  As classmates, I could

rely on Dale to complete his part of a group assignment with accuracy. Dale was a Camp Counselor when he was younger, and it was admirable to see him gain the respect of the Campers and then see them rely on his guidance. I believe the young Campers respected Dale because he reciprocated the same.

All in all, Dale is a decent and respectful person. He demonstrates consideration and regard for those around him. He accepts everyone for who they are and has an array of friends from all different backgrounds. I know Dale very well and he is not a bad character. He does not deserve to be punished for what was an accident. Based on Dale's exemplary history, please accept my request for leniency.

And finally a letter from Officer Sutton's cousin, which is representative of the letters

written by other family members:

My name is Pamela Mathias. I'm the mother of two sons, the proud Meemaw of three amazing grandchildren, and I'm happily married to a retired U.S. Capitol Police Officer. I'm recently retired, after 36 years with the Fish and Wildlife Service, and I currently reside in Southern Maryland with my husband. Terence, or as his many friends and loved one's call him, Dale, is my cousin, and I've known him all his life. He grew up just a few towns over from me, and I can say with absolute certainty that he's a good man now, just as he was a good kid then.

When Dale was in kindergarten, I used to take him to school. His mother and father shared custody, and his mother worked early mornings, so two weeks out of the month, I drove him in. He was always the sweetest boy—very considerate, very caring, great manners. As he grew up, I remember thinking many times how much kinder Dale was than other boys his age. He always seemed to know when someone needed help, or a friend, or someone to talk to. At family Easter egg hunts, he never raced to pick up the most eggs. He'd stay back with the younger kids and point out eggs to them. It was clear he found more joy in helping others win than he ever did in winning himself.

Even as a kid, Dale was so incredibly empathetic. After my mother died, he'd spend hours with my father, just talking. I think he could sense his loneliness, and he understood, even then, that his kindness and company could bring comfort. Over the

years, I've seen Dale employ this "kindness and company" technique many times, particularly with his cousin, who's been confined to a wheelchair and severely brain damaged since he was run over by a drunken Marine Corps lieutenant at the age of nineteen. Dale is his favorite, because Dale has always taken the time for him. He's always sat with him, and talked with him, and made him feel seen and special.

Dale has always had a soft spot for those who are less fortunate. Whether they're disabled or grieving, homeless, poor, drug-addicted, or bullied, his first thought has always been *what can I do to help?* As a teenager, he'd help our uncle load pickup trucks with food, clothes, and all sorts of household items, then drive them to the poorest towns in West Virginia. In high school, he was known as a popular kid who championed the little guy, who always called out bullies, and who gave everyone a fair shake. He was supportive of, and beloved by, classmates from all walks of life. My son Joshua, who was two years above Dale in school, remembers the crowd of friends who hung around him—friends of all races, religions, and genders, and from every social circle.

Much as it didn't surprise Dale's family, I'm sure it was no great shock to any of these friends that he joined the police force after college. Dale's father, to whom he'd been incredibly close, was a Prince George's County cop, and he'd seen all his life the good police officers can bring to their communities. It was a natural next step. And Dale took to it immediately. He loved being a cop, and he loved his brothers and sisters in blue. They truly became his family. I know because after he joined the force, his real family hardly saw him. He'd pop by for family gatherings here and there, but he could only stay long enough to tell a story or two, and then it was right back to work. His community was his number one priority. He never complained, and we always understood. We were proud of his dedication, just as we were proud to hear of his many commendations and the positive impact he was making with his crime suppression team.

Similarly, we were proud, but not at all surprised, to hear that Dale was named Metropolitan Police Officer of the Year in 2012, and we were proud, but not at all surprised, to hear, on so many occasions, that Dale was someone who was known across his community, even to some of its more nefarious citizens, as someone to be trusted—someone who was fair, and honest, and

14

good. He'd been described that way his entire life. I've seen him act that way his entire life.

So you can imagine my surprise to hear Dale labeled a murderer. To hear that he has a 'depraved heart.' To hear he acted with malice and an intention to kill. You can imagine how heartbreaking it is for me and my family.

Dale is not a murderer, he does not have a 'depraved heart,' and he knows no malice. I'm as sure of that as I am of anything.

## 2.     Work Ethic

After he was suspended without pay, Officer Sutton took a part-time job as a grocery clerk, the only job available to him under the circumstances so that he could pay his bills. Though the work unloading boxes of produce was sometimes hard on his back and the pay low, he did not complain and quickly became an indispensable employee, coming home with funny tales of his escapades learning for the first time of a vegetable known as "okra." He told of contacts with co-workers and customers, including the elderly shoppers who needed help finding produce, carrying packages to their cars, or just having a chat with a friendly person. After he was forced to resign that job because of the lengthy trial, Officer Sutton immediately found another job once the trial ended where he once again became an indispensable employee with a company that distributes landscaping and building materials to job sites. Again neither the pay nor the responsibility is commensurate with Officer Sutton's experience on the police force nor his education, but it is honorable work that pays the bills.

### 3.    Fortuitous Increase in Severity of Conditions of Incarceration

In *United States v. Smith,* 27 F.3d 649 (D.C. Cir. 1994), the D.C. Circuit held that a district court may depart downward from the guideline range based on the fortuitous increase in the severity of his sentence.  In *Smith*, the circumstance was the status of a defendant as a deportable alien.  In the instant case, the fortuitous increase in the severity of the sentence is derived from Officer Sutton's status as a police officer.

Even in the pre-*Booker* era,  the Supreme Court recognized that a defendant's status as a police officer, which makes him "susceptible to prison abuse" is a valid ground for a downward departure. *Koon v. United States*, 518 U.S. 81, 112 (1996). Indeed, news reports reflect that in November 2023, the Officer convicted in April 2021, in the George Floyd case was stabbed multiple times while serving time in a Bureau of Prisons facility.[8]

For imprisoned former police officers often the only alternative to abuse in prison is to seek to be housed in protective custody.  In effect, protective custody has the same or similar effects as solitary confinement, which "imprints on those that it clutches a wide range of psychological scars."  *Apodaca v. Raemisch*, 139 S. Ct. 5, 9 (2018).[9]

---

[8]  https://www.cnn.com/2023/11/24/us/derek-chauvin-stabbed-prison-george-floyd/index.html

[9]  See, *e.g., Davis v. Ayala,* 576 U.S. ——, ——, 135 S.Ct. 2187, 2209, 192 L.Ed.2d 323 (2015) (Kennedy, J., concurring) (detailing psychological effects and citing story of 16–year–old who was held in pretrial solitary confinement for three years and committed suicide two years after his release); *Grissom v. Roberts,* 902 F.3d 1162,

Accordingly, this is another reason to impose a sentence that does not include imprisonment in a case such as this where Officer Sutton's conduct falls so far outside the heartland of second degree murder prosecutions, and where so many other mitigating circumstances exist.

### 4. The Offense In This Case Amounts to a Single Act That is Inconsistent With Officer Sutton's Distinguished Career

As described in the multiple letters from MPD colleagues and the many commendations he received, Officer Sutton's throughout his career sought to help all persons with whom he came in contact and diffuse tensions.  In 13 years, he was never found to have used excessive force.  He never discharged his firearm even when other officers around him did.  The charge in this case is therefore out of character. In such circumstances, this Court should consider a downward variance.  *See* U.S.S.G. Chapter 1, Part A, paragraph 4(b) Probation and Split Sentences (Policy Statement) ("The Commission, of course, has not dealt with the single acts of aberrant behavior that still may justify probation at higher offense levels through departures.").

---

1175–1178 (C.A.10 2018) (Lucero, J., concurring); see also B. Stevenson, *Just Mercy* 153 (2014) (recounting story of juvenile prisoner whose "mental health unraveled" in solitary, yielding self-harm and multiple suicide attempts). *See generally* Bennion, *Banning the Bing: Why Extreme Solitary Confinement Is Cruel and Far Too Usual Punishment*, 90 Ind. L.J. 741, 753–763 (2015); Betts, *Only Once I Thought About Suicide*, 125 Yale L.J. Forum 222 (2016); Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006); Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Justice 441 (2006); Calambokidis, Note, *Beyond Cruel and Unusual: Solitary Confinement and Dignitary Interests*, 68 Ala. L. Rev. 1117, 1150–1155 (2017).  *Apodaca v. Raemisch*, at n. 8.

### 5.      Pre and Post-Offense Conduct Shows No Risk of Recidivism

Officer Sutton's post-sentencing conduct, indeed, his entire life-history, work ethic, and lack of arrests, criminal history or even traffic citations show that there is zero likelihood that he will recidivate.  The Sentencing Commission has explained that it did not adequately take into account that offenders with no criminal history are less likely to recidivate and that education and other rehabilitation efforts also reduce the likelihood of recidivism.  *See, e.g., Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines a Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate* at 15-16 ("offenders with minimal prior criminal history . . . have substantially lower recidivism rates, but they are considered less culpable under the guidelines)."[10]

A defendant's post-sentencing conduct "sheds light on the likelihood that [defendant] will engage in future criminal conduct, a central factor that district courts must assess when imposing sentence."  *Pepper v. United States*,  562 U.S. 476, 492 (2011) ("In assessing ... deterrence, protection of the public, and rehabilitation, 18 U.S.C. § 3553(a)(2)(B)(C) & (D), there would seem to be no better evidence than a defendant's post-incarceration conduct"); *see also United States v. Gomez,*  431 F.3d 818, 825 (D.C. Cir. 2005).

---

[10]  This report may be found on the Sentencing Commission's website at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf

### 6.      Public Service as a Police Officer

In this case, it is clear that Officer Sutton's entire life, before and after these offenses, shows a young man who had tried to live an honest, productive and exemplary life helping and caring for others. Indeed, this Court should consider as a basis for downward variance, Officer Sutton's 13-year selfless and distinguished service as a police officer in one of the most violent and crime-ridden areas in the District of Columbia. *See Rita v. United States,* 551 U.S. 338, 364-65 (2007) ("§ 3553(a) authorizes the sentencing judge to consider" as a basis for a downward variance "military, civic, charitable, or public service").

Officer Sutton placed his life at risk every day to serve and protect the people who live and work in the Fourth District. He received commendations many times for his police work, which took dangerous, armed offenders off the street, placing his life at risk on each of those occasions. Included in these commendations are ones where he pursued and arrested three armed men, who were fleeing after robbing a bank. He also received a commendation for arresting armed men, who had carjacked a civilian's car. The very afternoon of October 23, 2020, Officer Sutton arrested a man wanted on a warrant, who was in possession of a firearm at the time. There are many more such instances where Officer Sutton performed his sworn duties to protect the citizens of the District of Columbia. In none of those cases did he discharge his firearm nor use excessive force.

Indeed, a federal prosecutor remarked to undersigned counsel that the prosecutor "loved Officer Sutton" whom the prosecutor knew as a result of the

multiple times that Officer Sutton testified in cases where the prosecutor tried cases in Superior Court.  The conversation with the AUSA, who is now a supervisor in the DC-USAO, took place before undersigned counsel entered her appearance.  This reference is not included to suggest that the federal prosecutor intended by the comment to support a downward variance, though the prosecutor might.  The comment is simply included to show that Officer Sutton's work as a police officer was highly regarded by all with whom he came in contact and benefitted the citizens of the District of Columbia.[11]

**7.     Officer Sutton Suffers from Back Injury Caused by His MPD Service**

As a result of his years of service, which require officers to carry heavy gear on their belt for 8-hour shifts or longer, Officer Sutton suffers from a back injury, which causes incapacitating back spasms.  He has been receiving chiropractic treatment for years.

**8.     Karon Hylton-Brown's Conduct Contributed to His Tragic Death**

At the corner of Fifth and Kennedy, Hylton-Brown took a series of steps that contributed to his tragic death minutes later.  As can be seen on a video ("G-USA-014374 KHB Heads South") taken by a pole camera on Fifth and Kennedy Streets, it was Karon Hylton-Brown, who approached Officer Sutton's car almost immediately after Officer Pitt had reported her suspicions to Sutton and Zabvaksy while they were parked at Seventh and Kennedy Streets.  At that moment on Fifth and Kennedy,

---

[11]  The prosecutor has not given permission to be identified.

Hylton-Brown can be seen slowly driving toward Sutton's car, which was stopped at the intersection.  Hylton-Brown stopped a few moments while facing the Sutton car and then took off through a red light causing oncoming traffic with the right of way to have to stop to avoid hitting him.  At that moment, Hylton-Brown could have proceeded forward with the green light, or turned right, or waited until the light turned green if he wished to turn in front of Sutton's car.  Sutton was stopped at that moment.  Instead, Hylton-Brown ran the red light causing Officer Sutton and Lieutenant Zabasvky to follow him with their police lights flashing.

The screenshots below show the sequence.









Thus that initial decision by Hylton-Brown to run a red light in front of the Sutton car precipitated the events that followed.  Notably, at the start of these events that ended so tragically, Hylton-Brown drove recklessly through a red light, without a helmet and while intoxicated.  The fact that Hylton-Brown was anxious to get to the Starlight Market was also of importance to Officer Sutton.

Thereafter, Hylton-Brown continued to violate traffic laws including driving on sidewalks, driving the wrong way on one-way streets, failing to stop at stop signs, all of which Officer Sutton believed created a risk to pedestrians and drivers and provided additional basis to support a reasonable suspicion justifying a stop. The sequence of events culminated in Hylton-Brown failing to yield he right of way to oncoming traffic and hitting the van, which directly caused his fatal injuries.

At the moment of the fatal collision, Officer Sutton was driving at 25 mph, more than 40 feet behind Hylton-Brown.

Under such circumstances, the law provides that the Court may and should depart downward to account for the ensuing events, which led to Hylton-Brown's death. Indeed, in circumstances not as favorable to the defendants, the Supreme Court upheld a 5-level departure under U.S.S.G. § 5K2.10. *See Koon v. United States,* 518 U.S. at 101 (finding a district court acted within its discretion in departing downward 5 levels where the defendants attacked a victim who "posed no objective threat, and the defendants had no reasonable perception of danger," because "the incident would not have escalated to this point, indeed it would not have occurred at all, but for Mr. King's initial misconduct").

**9**.     **Totality of Circumstances**

Under 18 U.S.C. § 3553(a)(1), there is no limitation on the grounds that a district court may consider in varying down from the guidelines range. *Gall*, 552 U.S. at 47 (after *Booker* it is inappropriate to require that mitigating circumstances be "extraordinary" to justify a sentence below the Guidelines range); *Rita v. United States,* 551 U.S. 338, 364-65 (2007) (Matters such as . . . medical condition. . . employment history . . . family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines). *See* United States Sentencing Commission, Guidelines Manual §§ 5H1.1–6, 11, and 12 (Nov.2006). These are, however, matters that § 3553(a) authorizes the sentencing judge to consider. *See*, *e.g.*, 18 U.S.C. § 3553(a)(1).").

Even in a pre-*Booker* case, the D.C. Circuit recognized that a district court may take the totality of circumstances into account in sentencing below the guidelines. Included in those factors are family ties, which the Court well knows is always a good predictor of post-offense success and lack of recidivism. "The Commission does not foreclose the possibility of an extraordinary case that, because of a combination of such characteristics or circumstances, differs significantly from the 'heartland' cases covered by the guidelines....' Guidelines Manual § 5K2.0 (commentary)."[12] *In re Sealed Case*, 292 F.3d 913, 917 (D.C. Cir. 2002) (Tatel, J.).

## II. Nature and Circumstances of the Offense Warrant a Downward Variance

The Court is well aware of the nature and circumstances of the case, which have been clarified by the KDY indictment which has produced multiple public pronouncements from the Government in court-filed pleadings describing the risk of violence that the KDY crew, which operated open-air drug markets at and around Fifth and Kennedy Streets, posed to the community. At the time of these events, the 4th District "Beat Book" prepared by MPD's Intelligence Unit identified Karon Hylton-Brown as a verified member of KDY. The officers knew the risk of violence that the KDY crew created from the information contained in the Beat Book as well as from their own interactions with Hylton-Brown. Officer Pitt's observations and related suspicions were based on that information.

---

[12] The current version of the Guidelines provides that "The court may depart from the applicable guideline range based on a combination of two or more offender characteristics or other circumstances, none of which independently is sufficient to provide a basis for departure." USSG, 5K2.0(c).

The Court is well aware that the Beat Book contained a photograph of Hylton-Brown, as well as other identifying information about the vehicles he was known to drive and prior arrests and conviction.

A number of the other KDY members identified in the Beat Book, who have since been charged in the KDY indictment, were present in the area on the evening of October 23, 2020. It is significant that Officer Sutton did not seek to stop any of the other KDY members that evening. This is because Officer Pitt only described suspicious activity by Hylton-Brown. This provides further evidence that the reason Officer Sutton initiated the stop, a stop sanctioned by Lieutenant Zabavsky, the ranking officer on the scene, is because Sutton and Zabavsky only had reasonable suspicion to stop Hylton-Brown.

Multiple MPD officers were present at the scene, which was somewhat disquieting and shocking for all. Nonetheless, each officer undertook various tasks. One of the officers immediately broadcast the alarm, which set a number of other actions in motion. An ambulance was called to the scene, and an MPD Officer traveled to the hospital with HKB. Officer Sutton can be seen speaking to Officer Arnone who indicates to him that she has gathered investigatory information. He in turn tells her to follow procedures in uploading the information.

Though he is an experienced officer, Officer Sutton was not the ranking officer on the scene. Under MPD protocol, a numbers of steps to be taken at the scene of an incident such as reporting to the Watch Commander, to Major Crash and other similar tasks fall to the ranking officer not to Officer Sutton, no matter the level of

his experience.  In addition, in situations such as this, any officer on the scene can call for an ambulance or other backup.  Indeed, Officer Sutton can be heard asking Lieutenant Zabavsky whether they "were all done here."  When Lt. Zabavsky confirms that they are done, Officer Sutton turns off his BWC camera and drives away.

At the station, Officer Sutton docked his BWC camera as required by MPD protocol to preserve its contents.  At no time did he tamper with the BWC or ask anyone else to do so.  He did not ask any of the other MPD officers in the car or on the scene to make up facts or otherwise tailor their story.  As Captain Porter testified, when they reported to him, it was Lieutenant Zavabsky who was addressed by the Captain and who answered the questions.  Officer Sutton proceeded to begin preparing the report, again as required by protocol.

At some point that evening, apparently once the extent of Hylton-Brown's injuries were determined, Officer Sutton was directed to stop preparing the report. The report therefore remained a draft report.  At no time did Officer Sutton intentionally mislead Captain Porter or anyone else.  He described his conduct accurately as he recalled it.  Indeed, nothing Officer Sutton did or said after the collision that evening materially impacted any subsequent actions or investigations. As the EMT testified, the ambulance arrived without delay.  An MPD officer was dispatched to the hospital to report back on Hylton-Brown's condition.  The Major Crash unit did not lack any necessary information.

Finally, in considering the nature and circumstances of the offense, the Court should also be mindful that the only evidence presented by the Government to prove depraved heart malice consisted of argument that Officer Sutton had violated the MPD Vehicular Pursuit Policy.  The Government argued that his driving during the alleged pursuit evidenced depraved heart malice.

The Government expert witness on police policies, Robert Drago, was questioned by the Court at trial regarding the variability of pursuit policies.  Mr. Drago discussed how pursuit policies became more restrictive nationwide in the mid-90s after departments used data-tracking tools to target their resources.  Tr. Trans., Nov. 3, 2022, at 16.  The variability of pursuit policies has recently been evidenced by one of the foremost policing practice organizations in the country.  *See* Police Executive Research Forum (PERF). *2023. Vehicular Pursuits: A Guide for Law Enforcement Executives on Managing the Associated Risks*. Washington, DC: DOJ Office of Community Oriented Policing Services (COPS).  This report was funded by a federal award, and PERF worked with the Department of Justice Community Oriented Policing Services to produce the guide.

For sentencing purposes, the Court should consider the variability of law enforcement pursuit policies both nationwide and over time.  The pursuit policy applied in Officer Sutton's trial was promulgated by MPD on February 25, 2003.  At the time of trial, MPD had promulgated a new pursuit policy effective December 30, 2021, prompted by extensive criticism of the 2003 pursuit policy in the Bromwich Report, entitled *The Metropolitan Police Department and the Use of Deadly Force:*

*Four Case Studies 2018-2019.*   The MPD pursuit policy was revised again on April 27, 2023, and again on July 20, 2023, which is current.

The current revision of the MPD pursuit policy became effective on July 18, 2024, to coincide with the effective date of D.C. Code § 5–365.02 entitled "Law Enforcement Vehicular Pursuit Reform."   This chapter of the D.C. Code codified a pursuit policy for MPD and is an extension of several emergency and temporary bills to come out of the D.C. Council partly as a result of this case.  The District of Columbia may now be the only state in the country that has a codified police pursuit policy.

The "Law Enforcement Vehicular Pursuit Reform" law also codifies for the District of Columbia what Officer Sutton has referred to during this case as the *Graham v. Connor*, 490 U.S. 386 (1989) law enforcement defense to allegations of excessive force.  D.C. Code § 5–365.02(b).  With the enactment of this defense, the District of Columbia now joins every state in the union in affording such a defense to local law enforcement officers; whereas, there was no such codified defense in the District of Columbia at the time of the trial of this case.

## III.   Guideline Calculation

### A.   Base Offense Level Computation
### Count 2 Conspiracy and Count 3 Obstruction of Justice:

The PSR Writer and the Government agree that the guideline analysis for Counts 2 and 3 begins with **§ 2X1.1. (**Conspiracy).

#### 1. Application of § 2X1.1. Conspiracy

The relevant Guideline provision provides:

### § 2X1.1. Attempt, Solicitation, or Conspiracy (Not Covered by a Specific Offense Guideline)

(a) Base Offense Level: The base offense level from *the guideline for the substantive offense*, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty.

(emphasis supplied).   The substantive offense for Conspiracy, according to the Government's Objections to the First Draft PSR, is "only obstruction" which included a charge of Aiding and Abetting, 18 USC § 2.  Government's Objections to First PSR, [ECF No. 538] at 2.

The Guidelines for Aiding and Abetting state: "The offense level is the same level as that for the underlying offense."   USSG § 2X2.1. (Aiding and Abetting). Therefore, the Court need only look to the Guidelines for Obstruction of Justice as the "substantive offense" for Conspiracy.

### USSG § 2J1.2. Obstruction of Justice

Pursuant to USSG § 2J1.2(a), the base offense level for Obstruction of Justice is 14.  None of the Specific Offense Characteristics for Obstruction of Justice apply. The Cross Reference for Obstruction of Justice states: "If the offense involved obstructing the investigation or prosecution of a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, *if the resulting offense level is greater than that determined above*."   USSG § 2J1.2(c)(1) (emphasis supplied).

### USSG § 2X3.1 Accessory After the Fact

USSG § 2X3.1 (Accessory After the Fact) in relevant part provides the following:

(a) Base Offense Level:

>    (1) ***6 levels lower than the offense level for the underlying offense***, except
>    as provided in subdivisions (2) and (3).

(Emphasis supplied).   The remaining provisions of § 2X3.1 do not apply.   The Government states that the substantive offense of the Conspiracy is Obstruction. Since the offense level for Obstruction of Justice is 14, application of USSG § 2X3.1(a)(1) results in a base offense level of 8.

### 2.  Use of Murder as the Underlying Offense

The PSR Writer and the Government follow the analysis above until they apply USSG 2X3.1(a)(1), which they say leads to an "underlying offense" of a civil rights violation.   Then applying USSG § 2H1.1(a)(1) (Civil Rights), they identify the "underlying offense" as Second Degree Murder, presumably because they view it as "the Greatest" base offense level from among the four options under (1)(a).   The PSR Writer and the Government then jump immediately to apply USSG § 2A2.1 (Second Degree Murder) resulting in a base offense level of 38 reduced to 30 by application of USSG § 2X3.1(a)(3)(A).

Officer Sutton contends that jumping to Second Degree Murder is incorrect for the following reasons.   First, the federal court in this district may not use the jury's verdict on a D.C. Code offense for any purpose in fashioning a sentence under the federal Sentencing Guidelines.   The Government acknowledges as much, stating "Paragraph 162 [of the Second Draft PSR, ECF No. 564] suggests that defendant's [*sic*] Sutton's conviction for Second Degree Murder is a basis for the Court to consider a variance for Counts 2 and 3.   It is not."   Citing *United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016), where the Court states the following:

> [T]he federal Sentencing Guidelines do not apply to the sentencing of D.C. offenses. 18 U.S.C. § 3551(a).   Likewise, the D.C. Voluntary Sentencing Guidelines do not apply to the sentencing of federal offenses.

Second, the PSR Writer and the Government automatically conclude that the civil rights offense that was obstructed was Second Degree Murder, obviously relying on the jury's verdict on Count 1 against Officer Sutton.   However, where the D.C. Code offense is joined with the federal obstruction offense, the Court may not automatically apply the federal sentencing guidelines applicable to federal offenses to the D.C. Code offense.   That is so because federal guidelines on murder include several crimes from first degree murder to involuntary manslaughter.   USSG § 2A1.1 to 2A1.4.   Had Count 1 been a conviction under 18 U.S.C. § 1111(a), the automatic application of  USSG § 2A1.2 would be appropriate.

Third, the conviction of Officer Sutton of Second Degree Murder was achieved by application of the jury instruction from *Fleming v. United States*, 224 A.3d 213 (D.C. 2020) (*en banc*) which is unique to certain factual circumstances arising in the District of Columbia under  the D.C. Code.   There is no equivalent case in the federal system where a defendant does not strike a death-dealing blow of any kind, except acting in an accessory role to one who does.   The Court must apply federal guidelines to federal crimes by a review of the facts.   The facts presented to the jury regarding the death of Hylton-Brown do not prove any federal crime.

The Sentencing Guidelines also recognize that facts which may prove a state offense may not prove a parallel federal offence.   The fifty states may treat the elements of similar offenses differently.   To apply state definitions of second degree

murder to an offender being sentenced under a similar federal definition might vary from state to state, depending on state definitions for second degree murder.  The Sentencing Guidelines recognize the potential for inconsistency of sentencing at the federal level if federal sentences are based on the name of state offenses with different elements than the similar federal offenses.

For example, consider 18 U.S.C. § 242, a federal crime for a local law enforcement officer to deprive a person of his civil rights.  In that offense charged in federal court, there would be no local or federal underlying charge identifying what the officer actually did to violate the person's civil rights.  But the officer "could only violate [the person's] civil rights by *doing* something.  It is that something that constitutes the underlying offense for purposes of § 2H1.1."  *United States v. Cozzi,* 613 F.3d 725, 734 (7th Cir. 2010).  That "doing something" might consist of crimes ranging in severity under state law.  To ensure consistency of sentencing, the federal Sentencing Guidelines recognize that if the officer's  conduct on the one hand is more reprehensible or on the other hand less serious than the civil rights violation itself, the defendant's sentence should be on par with other defendants who engaged in *similar conduct within a federal jurisdiction.  Id.* at 733; *United States v. Byrne,* 435 F.3d 16, 27 (1st Cir. 2006).

To achieve this uniformity of sentencing within the federal jurisdiction, the federal courts look to federal law to ascertain how the "underlying conduct" (i.e., the facts) should be evaluated under the guidelines.  *See, e.g.*, *United States v. Slager*, 912 F.3d 224, 235-37 (4th Cir. 2019): *United States v. Coll*, 762 Fed.Appx. 56, 61 (2d

Cir. 2019); *United States v. Velazquez*, 246 F.3d 204, 214 (2d Cir. 2001); *United States v. Causey*, 185 F.3d 407, 420-21 (5th Cir. 1999); and *United States v. Conley*, 186 F.3d 7, 24-5 (1st Cir. 1999).[13]

In the federal sentencing scheme, a similar example is found where a defendant is convicted of obstruction of an investigation which may include more than one target crime of investigation. For sentencing purposes the defendant is entitled to have the court make a factual determination as to which underlying target crime was committed. *United States v. Legins*, No. 3:19cr104 (DJN), 2020 WL 4092366 at *6-9 (E.D. Va. July 20, 2020), *aff'd* 34 F.4th 304 (2022), *cert. denied* 143 S.Ct. 266 (2023). *See also United States v. Dickerson*, 114 F.3d 464, 467 (4th Cir. 1997) (rejecting Government argument that court must automatically use the highest possible target crime for sentencing).

Therefore, unless the Government can prove at sentencing that the evidence presented to the jury constitutes some form of Homicide under federal law, Officer Sutton would be assigned no offense level for the "underlying offense" under USSG § 2H1.1(a)(1). Sections 2H1.1(a)(2) and (a)(3) do not apply. Therefore, the "Greatest" offense level under § 2H1.1(a) is established by (a)(4) which is 6. An additional 6

---

[13]  We have found two Circuit Court cases that do refer to state law offenses when applying federal guidelines; however, as stated above the state definition of an offense is irrelevant to the sentencing judge's choice of the appropriate federal guideline. *See United States. v. Woodlee*, 136 F.3d 1399, 1407 (10th Cir. 1998) ("Under the interpretation urged by the defendants, the Sentencing Guidelines' definition of aggravated assault would be wholly superfluous. In addition, the mere label a state ascribes to its crimes would govern what federal sentencing guideline a federal court is permitted to apply. We do not believe such a result is logical or necessary"); *United States v. Willis*, 550 Fed.Appx. 763, 764 (11th Cir. 2013).

points for acting under color of law is added under USSG § 2H1.1(b)(1)(B) to achieve a guideline score of 12.

This result achieves fairness because Officer Sutton could not have been charged in this or any federal district with violating either 18 U.S.C. § 1111 (Murder) or 18 U.S.C. § 242.  Thus, the unprecedented charging decision by the Government in this case raises a "significant risk to fundamental fairness and, ultimately, to a defendant's constitutional rights."  *See United States v. James*, Case No. 17-184 (RJL), 2019 WL 2516413, at *2–*3 (D.D.C. June 18, 2019) (Leon, J.) (criticizing the Government for repeatedly seeking upward departures for uncharged conduct in sentencing defendants who plead guilty); *United States v. Bell*, 808 F.3d 926, 929 (D.C. Cir. 2015) (Millet, J., concurring in denial of rehearing *en banc*) ("This case is one in an 'unbroken string of cases' encroaching on the Sixth Amendment right to a trial by jury.")  Officer Sutton contends that the Government's unprecedented use of the D.C. Code offense of Second Degree Murder violates his constitutional rights with respect to receiving a fair sentence.  The fortuity of the United States Attorney in this district having jurisdiction over D.C. Code offenses does not justify the abusive and manipulative use of that authority to bring this utterly unprecedented attack on a stellar officer in the summer of George Floyd.

## B.    Adjustments Under Chapter Three

In light of our discussion of *United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016), the Court must take cognizance of the need to separate consideration of the D.C. Code Second Degree Murder count from the federal Obstruction and

Conspiracy counts.  Therefore, this memorandum will attempt to do the same, and perhaps repeating the caveat that *United States v. Knight* imposes on the Court.  In addition, some of the same elements contained in the federal Sentencing Guidelines are mirrored in the D.C. Sentencing Guidelines.  We shall discuss those guidelines as they apply to Second Degree Murder separately.

### USSG § 3B1.2 -- Minimal Role in the Conduct

Officer Sutton requests that he be given a reduction of the offense level by 4 points because he was a minimal participant in Counts 2 and 3.  *See United States v. Minns*, 540 Fed.Appx. 11, 12 (D.C. Cir. 2013) ("The minor role inquiry thus focuses on the defendant's culpability for the relevant conduct, not the offense charged or the offense of conviction" citing D.C. Cir. cases); *United States v. Bruder*, 103 F.Supp.2d 155, 180 (E.D. N.Y. 2000), *rev'd on other grounds sub nom. United States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002).  USSG § 3B1.2 provides the following:

### § 3B1.2.  Mitigating Role

Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by **4** levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by **2** levels.

In cases falling between (a) and (b), decrease by **3** levels.

Application Note 3(A) provides that "A defendant who is accountable under § 1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in the criminal activity may receive an

adjustment under this guideline." Application Note 3(C) not surprisingly says this assessment requires viewing the "totality of the circumstances . . . heavily dependent upon the facts of the particular case." The Application Note then sets forth a "non-exhaustive list" of 5 criteria to apply to this fact based analysis, on which we will comment *seriatim*:

### (i) the degree to which the defendant understood the scope and structure of the criminal activity;

Officer Sutton as an experienced member and leader of the CST unit at the 4th District earnestly schooled himself in constitutional law as evidenced in a BWC video the Government unsuccessfully sought to introduce as FRE 404(b) evidence. Despite there being at least a dozen police officers at the scene of the stop of a vehicle in which Hylton-Brown was a passenger, Officer Sutton was omni-present talking with the individuals, including Hylton-Brown, and teaching Supreme Court precedent for the officers' actions. The BWC video makes clear he not only was schooled in his job, but also engaged the suspects in a manner which tended to defuse the matter.

The activity which the Government characterized as his "criminal activity" was the bread and butter of the work of the CST units around the City. Ofc. Cory Novick testified as to how Officer Sutton skillfully defused a dangerous situation where their unit culled out and arrested a wanted individual from a large group of known offenders without violence.

The Government also introduced evidence of another pursuit to demonstrate that Officer Sutton understood the MPD Pursuit Policy. Officer Sutton was disciplined only for the failure of his CST unit to maintain "constant communication with the dispatcher." In the course of the pursuit, Officer Sutton did broadcast the lookout and attempted to make a traffic stop, asking for additional units to assist. With significant skill, Officer Sutton's single CST unit stopped the offender's vehicle, and the three dangerous violent criminals were apprehended successfully. When Captain Connor – who was a character witness for Officer Sutton – arrived at the scene and asked whether Officer Sutton had pursued the offenders, he promptly responded yes. This incident actually confirms the credibility of Officer Sutton's denial he engaged in a pursuit of Hylton-Brown.

Therefore, on the night in question, Officer Sutton was doing his job – in his mind not violating the MPD Pursuit Policy as he maintained with Captain Porter. Officer Sutton had absolutely no reason to believe that he would be prosecuted for

second degree murder *even if* his actions caused Hylton-Brown to drive in front of a civilian vehicle.

### (ii) the degree to which the defendant participated in planning or organizing the criminal activity;

Officer Sutton's response to this factor is similar to his response to the first factor. Crime suppressions teams around the nation are proactive and analyzing the information they receive at the moment. These units are trained to apply tactics which are constitutionally permissible and may result in a hunch growing into reasonable suspicion or probable cause to take enforcement action. The "planning and organizing" on which the Government relied in this prosecution is what Officer Sutton and others like him did every day.

### (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

The Metropolitan Police Department is a quasi-military organization. The CST Unit at the 4th District employed the best officers, led by Sergeants and Lieutenants. The CST Unit answered directly to the Commander of the 4th District, not an intermediate official. The night of October 23, 2020, the 4th District officers acted appropriately. Uniformed officers reported to the CST members when they came on the street the behavior of Karon Hylton-Brown that evidenced criminal activity that day and raised suspicions of further criminal activity.

After listening to the uniformed officers, Lt. Zabavsky said "Let's go see." Make no mistake about it, that is a command. When Hylton-Brown fled, Lt. Zabavsky took the lead with lights and siren following Hylton-Brown. That is a confirmation to Officer Sutton to continue. Lt. Zabavsky appropriately engaged in taking a parallel position in the area in an effort to stop Hylton-Brown. During Officer Sutton's efforts to locate and stop Hylton-Brown, he heard Lt. Zabavsky on the radio report to another CST unit that they were "chasing Karon." Officer Sutton did what he was trained to do and followed the leadership of his Lieutenant.

And Lt. Zabavsky did the same thing because that was his job. The MPD General Order on Vehicular Pursuits states explicitly:

A vehicular pursuit shall be continually assessed to determine whether it should be continued, taking into account the associated risk it presents to the member and the public. A decision to continue or terminate a pursuit may be made by the primary pursuit unit, *the monitoring field supervisor* or the Watch Commander. This does not replace the obligation to adhere to a lawful order given by an official.

Sutton Ex. 303B at 7 (emphasis supplied).

> **(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;**

The comments in response to factor (iii) apply equally to this factor. Officer Sutton agreed with Lt. Zabavsky that he would prepare the police report. It made no sense that any other officer prepare the report, as they were unaware of the lead up to Hylton-Brown's flight. Rather than being nefarious, this evidences innocence as the Draft PD-10, drafted by Officer Sutton with the help of Cory Novick, recounted the so-called pursuit.

When Officer Ernie Davis reported by phone to the 4th District that Hylton-Brown might not survive, Captain Porter's reaction to the events of the night took a flip-flop. Lt. Zabavsky initiated investigations by both Major Crash and IAD into the events of the night. Officer Sutton was told to stop writing his report, and the four members of Officer Sutton's CST unit stood down as the process of an administrative investigation began.

The Draft PD-10 was incomplete and could not be finalized without several layers of review within MPD according to the MPD General Order on Traffic Crash Reports. Sutton Exhibit 303D. Nevertheless, Lt. Zabavsky forwarded the Draft PD-10 to assist in the investigation. His doing so was appropriate, even though the PD-10 was only a Draft. No one had any reason to believe that the Government in this prosecution would use the Draft PD-10 to say that Officer Sutton was covering up his conduct that night.

> **(v) the degree to which the defendant stood to benefit from the criminal activity.**

None.

The Government concedes that Officer Sutton's conduct does not violate the United States Constitution. *See Mullenix v. Luna*, 577 U.S. 7 (2015) ("The Court has thus never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity."); *Scott v. Harris*, 550 U.S. 372, 383 (2007).

**§ 3E1.1. Acceptance of Responsibility**

A defendant in a criminal case cannot be punished for requiring the Government to prove his guilt beyond a reasonable doubt. Consequently, the Sentencing Guidelines provide the opportunity for a downward departure even where a defendant puts the Government to the test by going to trial.

USSG § 3E1.1 provides for the following
:

(a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels.

Officer Sutton is entitled to a reduction of the offense level by 2 points because his decision to go to trial was predicated on legal innocence. This case fits squarely within Application Note 2 to the acceptance of responsibility guideline.

2. This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

*United States v. Kirkland*, 104 F.3d 1403 (D.C. Cir. 1997); *United States v. McKinney*, 15 F.3d 849 (9th Cir. 1994) (Application Note 2 is not an exclusive list of factors, and contrition is most important).

The Court perhaps more than any participant in the trial of this case appreciates the many ways in which Officer Sutton challenged the criminal theory

espoused by the Government. Multiple motions were filed challenging the unprecedented application of the D.C. Second Degree Murder statute to the conduct of a police officer. Similarly, Officer Sutton contested the charges based on the absence of notice that his conduct would result in a criminal charge. Also litigated was the equally unprecedented use of police department policies as a foundation for evidence of second degree murder. Officer Sutton also contended that he should not be denied the defense that his conduct complied with his training on constitutional policing. With respect to the obstruction charge, Officer Sutton contended that use of the charge was a pretextual effort to obtain federal jurisdiction for the second degree murder count. *See* Motion for New Trial and Arrest of Judgment [ECF No. 449] at 2 and Reply in Support of Motion for New Trial and Arrest of Judgment [ECF No. 467] at 1. The Court – frequently pointing out that the Government does not have a right to appeal certain rulings – gave the Government its day in Court. Officer Sutton had no choice but to assert his legal defenses as best he could at trial on the Government's playing field.

The events of that night were not much in dispute; however, because of various rulings not all of the facts relevant to sentencing were presented to the jury. Officer Sutton's view of the facts is consistent with his belief in his legal innocence. The verdict cannot fairly be assessed as a contradiction to his belief in his innocence. The Government has never denied that Officer Sutton's conduct comported with constitutional law, and Officer Sutton and his counsel persistently argued that the charge is not supported by binding Supreme Court precedent.

In discussing this guideline, it is fair for the Court to focus on the death of Mr. Hylton-Brown.  The conduct of Officer Sutton from the night that Hylton-Brown died is consistent with remorse.  He was placed on administrative leave with pay.  He directed his counsel to make a candid in-person presentation to the Government prior to any decision by the Government to seek an indictment.  The Government was close-mouthed at the meeting, and never gave Officer Sutton's attorneys an opportunity to debate their theory of criminal liability.  Had the Government shared its legal theory before indictment, counsel for Officer Sutton would have engaged in a dialogue, certainly seeking to be heard by the Assistant Attorney General for the Civil Rights Division Criminal Section who must authorize and coordinate all use of force prosecutions of law enforcement officers pursuant to *Justice Manual* 8-300.  Because the Government refused to report whether that supervision actually occurred, law enforcement organizations nationwide are concerned as to what this prosecution means for their members.

After Officer Sutton was initially suspended, he participated in the Metropolitan Police Department's counseling, with several of the other officers, which he found helpful.  Yet, the Government turned this confidential process against Officer Sutton at trial, trying to suggest through his colleagues who testified at the trial that the sessions might prompt them to lie on the witness stand.  *See* Sutton Motion in *Limine* to Preclude Evidence of Referral to the EAP [ECF No. 355].

Officer Sutton turned himself in to the U.S. Marshals when his attorney was given less than 12-hours' notice of his imminent arrest.  During his release, Officer

Sutton has been a model of good behavior, communicating with his several pretrial service monitors regarding every part of his life on release.   He vigilantly noted the status of his ankle monitor, reporting even in the middle of the night when it was not charging.

Officer Sutton was in attendance at every pretrial proceeding, presenting himself to the Court in a professional manner.  His behavior in the courtroom was meticulously respectful, particularly in response to the untenable harassment he endured from the mother of Hylton-Brown.  He silently endured the Government's restriction on his communicating with his fellow officers at the 4th District, who were his friends and part of his personal support system.  He sold his house in anticipation of having to support himself through the trial.  In his personal relationships, people he encountered socially would know of or learn about the charges against him.

The Court also will recall during trial when Officer Sutton's attorney asked the Court to require the Government to play the entirety of Office Sutton's BWC video [Gov't Exhibit 200].  The video showed the collision and Officer Sutton promptly activating his BWC establishing an audio record of the next 17 minutes and 47 seconds.  After the jury and the Court viewed the video, the Court stated he understood why Officer Sutton wanted the jury to see the entire video.  Officer Sutton immediately calls out "Karon" seeing him lying near the bumper of a parked car. Officer Sutton immediately proceeds to handle the scene, while Officers Tejera and Al-Shrawa are paralyzed.  Officer Sutton directs help to Hylton-Brown to which Cory

Novick promptly responds.  As Officer Sutton heads out to find the striking vehicle, he looks back and tells officers to put Hylton-Brown on his side.

Application Note 1 to § 3E1.1. (Acceptance of Responsibility) does not require Officer Sutton plead guilty or demonstrate remorse for his conduct to earn a downward departure.  Officer Sutton is only required to truthfully admit the relevant conduct comprising the offense, and not falsely deny the relevant conduct.  His attorneys served his defense by seeking to introduce evidence regarding Hylton-Brown's long-standing affiliations with the KDY Conspirators and his criminal behavior the night of his death.  Officer Sutton should not be faulted for the strategies of his counsel, and none of the evidence presented was false.  Therefore, in the conduct of his defense, Officer Sutton personally never exhibited anything but regret for the death of Karon Hylton-Brown.  In fact, in his nearly thirteen years on Kennedy Street, Officer Sutton attempted to mentor to hundreds of the young men in the drug business, including Hylton-Brown.  The two of them would talk about the usual topics of interest to young men and Washingtonians when Officer Sutton would encounter Hylton-Brown "minding his own business" on the street.  He encouraged Hylton-Brown into other directions without success.

### C.    Application Of Downward Departures

This case soars into outer space, let alone "outside the heartland of cases" contemplated by the Sentencing Guidelines in several respects.  Officer Sutton requests that the Court apply the following departures to significantly decrease his offense level for the Obstruction and Conspiracy counts.

**USSG § 4C1.1. Adjustment for Zero Point Offenders**

USSG § 4C1.1. provides the following criteria for this departure:

(a) ADJUSTMENT.—If the defendant meets all of the following criteria:

> (1) the defendant did not receive any criminal history points from Chapter Four, Part A;

> (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);

> (3) the defendant did not use violence or credible threats of violence in connection with the offense;

> (4) the offense did not result in death or serious bodily injury;

> (5) the instant offense of conviction is not a sex offense;

> (6) the defendant did not personally cause substantial financial hardship;

> (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

> (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);

> (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and

> (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

This element must be applied in favor of Officer Sutton because the Conspiracy to Obstruct Justice did not result in the death of Hylton-Brown. The Guidelines define "offense" as "the offense of conviction and all relevant conduct under §1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from

the context. The term "instant" is used in connection with "offense," "federal offense," or "offense of conviction," as the case may be, to distinguish the violation for which the defendant is being sentenced from a prior or subsequent offense, or from an offense before another court (e.g., an offense before a state court involving the same underlying conduct). USSG § 1B1.1, application note (1)(l). Thus, the "offense" in 4C1.1 is the obstruction and conspiracy to obstruct, neither of which resulted in death or serious bodily injury.

### USSG § 5K2.0(a)(3) Policy Statement

> (3) DEPARTURES BASED ON CIRCUMSTANCES PRESENT TO A DEGREE NOT ADEQUATELY TAKEN INTO CONSIDERATION.—A departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense.

The PSR Writer's and Government's proposed offense guideline of 30 is substantially in excess of the ordinary.   A conspiracy to obstruct a civil rights investigation never involves the death of a suspect under the circumstances of this case.

### USSG § 5K2.10. Victim Misconduct

The Supreme Court recognizes that, "Victim Misconduct is an encouraged ground for departure." *United States v. United States*, 518 U.S. at 105; *see United States v. Leandre*, 132 F.3d 796, 802 n.6 (D.C. Cir. 1998) (§ 5K2.10 claims "may not be sufficient to provide a full affirmative defense for acquittal, but they may be 'morally salient under the guidelines.' Robert Weisberg, *Guideline Sentencing,*

*Traditional Defenses, and the Evolution of Substantive Criminal Law Doctrine*, 7 Fed. Sentencing Rep. 168, 168 (1995)"). This departure should be applied when the victim's wrongful conduct contributed significantly to provoking the offense behavior.

While the Court must maintain separation between the D.C. and federal sentencing schemes, it seems unduly artificial to discuss USSG § 5K2.10 without reference to the events of the entire night of October 23, 2020. USSG § 5K2.10 sets forth the following factors for the court when considering this departure which we shall address *seriatim*:

**(1) The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant;**

This factor may seem odd in the context of an allegation of police criminal conduct in the performance of duty. Nevertheless, that is exactly what *Koon v. United States* involved. Rodney King was severely intoxicated and fled at speeds up to 100 m.p.h. The officers pursuing were engaged in the performance of their duty. Hylton-Brown was intoxicated by substantial amounts of marijuana, utilizing a moped which is a vehicle of choice to evade police.

**(2) The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation;**

Had Hylton-Brown stopped for the officers, there is no question he would not be dead today. The facts known to the Court regarding Hylton-Brown's behavior that day, involvement with the KDY crew, and criminal background explain why he continued to flee from the officers. Officer Sutton by training in constitutional policing was not obliged to cease his pursuit.

**(3) The danger reasonably perceived by the defendant, including the victim's reputation for violence;**

The facts known to the Court indicate that Officer Sutton had known Hylton-Brown for many years and was aware of his arrests for possession of handguns and the violent proclivities of the KDY crew of which Hylton-Brown was a validated member. The danger perceived by Officer Sutton was Hylton-Brown's danger to the community.

**(4) The danger actually presented by the victim;**

There was no direct evidence presented by the Government that Officer Sutton was aware on the night of October 23, 2020, that his actions would cause the death of Hylton-Brown.

**(5) Any other relevant conduct by the victim that substantially contributed to the danger presented;**

Hylton-Brown was no doubt empowered in his flight by the presence of several of his crew members on the street that night, including many indicted in the KDY Conspiracy.

**(6) The proportionality and reasonableness of the defendant's response to the victim's provocation.**

The Court knows that Office Sutton's actions did not violate the constitutional rights of Hylton-Brown. Moreover, Officer Sutton's response to Hylton-Brown was not at all in proportion to officers who have caused the death of suspects.

Several of these factors weigh in favor of applying this departure. *See United States v. Yellow Earrings*, 891 F.2d 650, 654 (8th Cir. 1989) (victim misconduct departure found reasonable when victim was under influence of alcohol, uttered abusive words, and made physical show of force); *United States v. Trujillo*, No. 08-cr-2575-JB, 2010 WL 5476756, *3 (D. N.M. 2010) (applying departure noting that defendant's belief that victim could have had a weapon was reasonable). *See Koon v. United States*, 518 U.S. at 102 (affirming district court's application of a five-level downward departure based on provocation by victim — noting the incident would not have escalated or occurred at all but for victim's initial misconduct).

At the hospital and at autopsy, Hylton-Brown had a level of .08 mg/l of oxycodone consistent with use and likely to have had an effect on his behavior. Femoral blood at autopsy and at the hospital contained major metabolites of THC,

which is evidence of serious chronic use of marijuana. Also found in his system was trace levels of acetone, a solvent abused by sniffing. Hylton-Brown also had $3,128 in small bills wrapped around his legs in plastic wrap. He was also wearing an ankle monitor ordered by a Montgomery County District Court Judge in a Civil Protective Order proceeding filed against him by his mother. A female friend of Hylton-Brown reported after his death to Investigators for the U.S. Attorney's Office that although she did not have a close relationship with Hylton-Brown's family, "they were all crazy." She stated that Hylton-Brown sometimes acted like he had schizophrenia. She reported that Hylton-Brown used marijuana daily. She knew that Hylton-Brown "occasionally" used drugs such as Percocet and Promethazine, which made him more unpredictable.

The ankle monitor was issued as part of criminal case number 3D00407277 which was pending in Montgomery County the time of Hylton-Brown's death. The circumstances of that case and proceedings regarding Hylton-Brown's extensive involvement in criminal conduct in Montgomery County are recounted in great detail in Officer Sutton's Motion To Admit Evidence of the Ankle Monitor [ECF No. 343] which we ask the Court to consider for sentencing and incorporate into this sentencing memorandum. The evidence presented in that motion demonstrates from the court records in Montgomery County that Hylton-Brown engaged in violent and volatile behavior. He was clearly devolving at a young age due to his life as a KDY Conspirator.

At the time of his death, Hylton-Brown also was on release from a criminal case in the D.C. Superior Court, pending a show cause hearing as to why his release should not be revoked.  In Criminal Case No. 2020 CMD 005163, Hylton-Brown was charged on June 4, 2020, with two counts of Simple Assault on MPD Officers who found him in an alley in the 1200 block of H Street, N.E., where he appeared to be casing garages.  On September 1, 2020, the Court issued an Order to Show Cause why his release conditions should not be revoked for noncompliance.  A hearing was ordered for October 9, 2020, at which Hylton-Brown failed to appear.  The hearing was re-scheduled for November 16, 2020, and any adverse contact with police on the night of October 23, 2020, would have almost surely returned him to the D.C. Jail.

The Court should view again the chilling YouTube video [Sutton Hearing Exhibit 102], which Officer Sutton presented in evidence at the pretrial hearing on his Motion *In Limine* To Permit Evidence Regarding Decedent's Criminal Background.  [ECF No. 257].  The video shows Hylton-Brown in the company of other indicted KDY Conspirators inside and outside the Starlight Market, the center of their drug trade.  Hylton-Brown is shown flashing money, smoking blunts, and making shooting signs.

For all these reasons, Officer Sutton requests that the Court grant a substantial downward departure for the complainant's misconduct, based on what we see as a moral imperative to avoid an unfair sentence.

**USSG § 5K2.0. Susceptibility to Prison Abuse Under**

At this time, most of the KDY Conspirators have been sentenced to prison by Judge Howell.  There is no doubt that they will spread the word of Officer Sutton's incarceration throughout the Bureau of Prisons underground communication system. Courts have agreed that this departure is applicable to law enforcement officers because abuse in prison is not part of an appropriate sentence.   *See, e.g.*, *United States v. Slager*, 2018 WL 445497 No. 2:16-cr-00378-DCN *24 (D. S.C. Jan. 16, 2018); *United States v. Shasky*, 939 F. Supp. 695, 701 (D. Neb. 1996); *Koon v. United States*, 518 U.S. at 116.

The media coverage in this case ensures that other inmates will certainly be aware of Officer Sutton's status as a former police officer, making him vulnerable to abuse.  It is certainly not difficult for other inmates to find out his former occupation and, in this case, it is inevitable. Additionally, USSG § 5K2.0 contemplates any physical or mental condition of a defendant. Officer Sutton currently is being treated conservatively for a ruptured disc in his lumbar spine.  There are occasions when he is incapacitated by the pain in the absence of ongoing medical care.   His physical condition is also relevant for this departure because it affects his ability to defend himself in prison.

**USSG § 5K2.20. Aberrant Behavior (Policy Statement)**

This policy statement provides that the court may depart downward if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3)

represents a marked deviation by the defendant from an otherwise law-abiding life. USSG § 5K2.20 does prohibit a downward departure if the offense involved death.  § 5K2.20(c)(1).  As with application of the zero-point offender reduction under USSG § 4C1.1., that exclusion should not be applied to the counts of Conspiracy to Obstruct Justice.

## IV.    The D.C. Voluntary Sentencing Guidelines

The District of Columbia has its own Sentencing Commission which is responsible for the promulgation of the "Voluntary Sentencing Guidelines Manual of September 1, 2023" ["the D.C. Guidelines"].  The PSR is correct that the guideline range for murder in the second degree is 144 months to 288 months.

The D.C. Guidelines are also the product – as are the U.S. Sentencing Guidelines – of careful and data-driven study of actual sentences in the Superior Court for the District of Columbia.  The sentencing ranges – broadly speaking – are determined by ignoring 25% of all sentences at the top end of severity and the 25% of sentences at the bottom of the severity scale.  The core 50% is then utilized with other data to form the range for a particular sentence.

Like the U.S. Sentencing Guidelines, the second criteria for determining a "guidelines" appropriate sentence range is the defendant's criminal history.  Officer Sutton is at the lowest end.  Thus, the D.C. Guidelines are utterly data driven. Consequently, the "guidelines" appropriate sentence range takes no consideration of the facts of a particular case, the defendant, the victim or other characteristics which predominate in sentencing in this country.  In this case, the D.C. Guidelines are

virtually useless because the data contains only cases where the conduct of the defendant in second degree murder cases in and of itself is capable of causing death. No such conduct exists in this case. Ultimately, sentences under the D.C. Guidelines are discretionary so long as they are within the legal range of the statutory sentence. There are some exceptions which do not apply to Officer Sutton.

The first thing to understand is that the D.C. Guidelines are truly voluntary. And completely discretionary. The Court may chose simply not to follow the Guidelines. There are no sanctions for failing to follow the Guidelines, and any lawful sentence is not appealable based on whether or not it complies with the Guidelines. DCVSG 5.3.

If the Court follows the D.C. Guidelines, they allow for discretion in sentencing. The D.C. Guidelines set forth the considerations for a court in imposing sentence on Count 1, Murder in the Second Degree. DCVSG 5.2.3 (Mitigating Factors) provides the following factors for sentencing of Officer Sutton. The italicized factors are those that apply to Officer Sutton.

> *(1) A victim was an aggressor, initiator, willing participant in, or provoker of the incident to such a degree that the defendant's culpability is substantially less than that typically associated with the offense.*
>
> (2) Before detection in a crime other than a crime of violence, the defendant compensated or made a good faith effort to compensate the victim(s) for any damage or injury sustained.
>
> (3) The defendant participated under duress, coercion, threat, or compulsion insufficient to constitute a complete defense, but which significantly reduces the defendant's culpability.
>
> (4) The offense was principally accomplished by another, and the defendant

manifested extreme caution or sincere concern for the safety and well-being of a victim.

(5) The defendant, with no apparent predisposition to do so, was induced by others to participate in the crime.

(6) The defendant's capacity to appreciate the wrongfulness of their conduct or to conform their conduct to the requirements of law was impaired significantly, though not sufficiently to constitute a complete defense. Voluntary use of alcohol or other drugs should not be considered in relation to this mitigating factor.

(7) The defendant has provided substantial assistance to law enforcement in the detection or prosecution of other defendants, and departure for this reason does not demean the seriousness of the defendant's crime or create an unacceptable risk to the safety of the community.

(8) The Guidelines sentence calls for incarceration but, after consultation with corrections authorities, the court determines that the defendant, by reason of obvious and substantial mental or physical impairment or infirmity, cannot be adequately protected or treated in any available prison facility.

(9) The consecutive/concurrent sentencing policy results in a Guidelines sentence that is so excessive in relation to the seriousness of the offense and history of the defendant that imposition of the Guidelines sentence would result in manifest injustice. A departure based solely on this factor shall not result in a sentence that is less than the sentence that would result if all Guidelines compliant counts were run concurrently.

*(10) There is any other substantial and compelling basis, as articulated by the sentencing judge, comparable in gravity to those listed in 1 to 9 above, which does not amount to a defense, but which substantially mitigates the seriousness of the offense or the defendant's culpability.*

(11) There is a substantial and compelling basis, as articulated by the sentencing judge, to reduce the defendant's applicable guideline sentence due to the invocation of D.C. Code § 11-947 or the circumstances that warranted the invocation of D.C. Code § 11-947.

Subsection (10) of this part of the D.C. Guidelines is recognized as an almost limitless

catch-all to account for those cases found by the sentencing judge to be outside the

contemplation of the Sentencing Commission, referred to in the federal sentencing scheme as the heartland.

The D.C. Guidelines permit this Court to impose a sentence of probation for Officer Sutton even though the applicable GRID (akin to the federal sentencing table) recommends a prison or split sentence. DCVSG 3.3. To impose a sentence of probation (light gray boxes only), the Court should impose a term of incarceration in the appropriate range and the period of supervised release for that offense, suspend execution of all of it (ESS all), and impose any amount of probation up to the five-year maximum with the same terms and conditions that are currently available.

Under the D.C. Guidelines, to justify a sentence the Court may rely on the departure factors listed above, or simply state that the Court will not use the sentencing Guidelines. If the Court finds one mitigating factor in favor of Officer Sutton, the Court is not bound by the GRID options and ranges. DCVSG 5.2.1. In that case, there are no constraints on the Court's sentencing options, and any legal sentence is permitted. DCVSG 5.2.5.

The D.C. Guidelines, like the federal guidelines, permit the Court to consider any information. Officer Sutton relies on the information and arguments presented in Section II and III of this Memorandum in support of his request for a probationary sentence for the D.C. Code offense.

Finally, Officer Sutton has obtained from the D.C. Sentencing Commission a listing of all 52 Second Degree Murder cases from 2014 to 2023 which inform the

D.C. Guidelines.  Counsel are in the process of preparing a report to the Court

identifying the sentences in those cases along with the underlying facts.

Respectfully submitted,

HANNON LAW, PLLC

_s/J. Michael Hannon_

J. Michael Hannon, #352526
2101 L Street, NW
Suite 300
Washington, DC 20037
Tel: (202) 365-5561
jhannon@hannonlawpllc.com

_/s/_

**CARMEN D. HERNANDEZ**
Bar No. MD 03366
7166 Mink Hollow Rd
Highland, MD  20777
(240) 472-3391
Chernan7@aol.com

*Attorney for Defendant Terence D. Sutton, Jr*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Memorandum was served

via ECF on all counsel of record this 6th day August, 2024.

_/s/_

**CARMEN D. HERNANDEZ**