### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Case No. 21-cr-598-PLF |
| | : | |
| TERENCE SUTTON and | : | Hon. Paul L. Friedman |
| ANDREW ZABAVSKY, | : | |
| | : | |
| Defendants. | : | |

### TERENCE D. SUTTON'S REPLY
### TO THE GOVERNMENT'S SENTENCING MEMORANDA

Officer Terence D. Sutton, Jr., through his undersigned counsel respectfully submits this reply to the Government's two sentencing memoranda [ECF Nos. 630 and 642].

In its Reply, the Government misses few opportunities to overstate and misstate the facts, the record and the jury's findings. Whether this is a reflection of the weakness of its case or the Government's disregard for accuracy is unclear but it calls into question each one of its arguments.

It confuses and misapplies the fundamental principles of sentencing under federal law and the DC and federal sentencing guidelines. And, it misconstrues and misreads the substantial mitigating circumstances presented by Officer Sutton.

Most importantly for sentencing, it has conceded Officer Sutton's argument that any sentence the Court imposes that is derived from a guideline system will result in unwarranted disparity that will necessarily bear no logical resemblance to

1

the blameworthiness of Officer Sutton because there are no second degree murder cases involving facts similar in any manner to this case.

These points are addressed more fully below, starting with the Government's concession on the second degree murder guideline.

## I.   The Government Has Conceded that The Second Degree Murder Guideline Will Result in Unwarranted Disparity Which Violates Officer Sutton's Rights to the Due Process of Law

If the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded.[1]

In two interrelated arguments, Officer Sutton argued that he is entitled to a departure or variance from the guidelines for second degree murder because "this case is outside the heartland of cases that either Sentencing Commission considered in establishing the guidelines" and application of the second degree murder guideline to him would result in unwarranted disparity because there are no second degree murder cases that remotely resemble the facts of this case:

First and foremost, there is no case in this district where a police officer or a civilian has been charged with second degree murder where there was no contact between the defendant and the decedent.  Every second degree murder charged in this district involved a situation where a defendant shot, stabbed, or physically assaulted the decedent.   The only second degree murder charge involving a vehicle collision involved a case where the driver of a commercial truck with faulty brakes, for which he had been previously cited, slammed into the back of another car, causing the death of the driver.  Even in that case, the jury acquitted of second degree murder.

---

[1]   *Woodruff v. Peters*, No. CIV.A.05 2071 PLF, 2007 WL 1378486, at *6 (D.D.C. May 9, 2007) (Friedman, J.). *citing, United States v. Real Prop. Identified As: Parcel 03179-005R, 287 F.Supp.2d 45, 61 (D.D.C.2003).*

There is also no case in this district where a police officer has been charged with murder based on a violation of an MPD General Order, where a shooting, beating or other physical contact was not involved. With respect to traffic accidents, there is no case where a person driving at 25 miles per hour, more than 40 feet behind another vehicle, has been charged with second degree murder or even involuntary manslaughter. Indeed, such a factual
scenario would not even give rise to a misdemeanor violation for reckless driving.[2]

And he also argued that

the fact that there are no second degree murder cases involving facts similar in any manner to this case, means that any sentence the Court imposes that is derived from a guideline system will result in unwarranted disparity. As both the federal and DC guidelines are based on a review of sentencing practices in prior cases, any sentencing range or box derived from that system will necessarily bear no logical resemblance to the blameworthiness of the defendant in this case. Treating unlike things similarly is the definition an unwarranted disparity.

.   .   .   .

the fact that no police officer in this jurisdiction or any jurisdiction known to counsel has been charged with murder where the officer was driving at 25 mph (a speed that does not even satisfy the elements of reckless driving), following more than 40 feet behind the vehicle and did not even collide with the fleeing suspect means that any sentence derived from a guideline system based on past sentencing practices will necessarily result in unwarranted disparity. Under those circumstances, no sentence derived from a guideline system results in a proportional and uniform sentence.[3]

The Government failed to address either argument. In response to the argument that

no second degree murder case in this jurisdiction involves a factual scenario where

the defendant did not shoot, stab, hit, or otherwise make contact with the decedent

---

[2]  Memorandum in Aid of Sentencing [ECF 632, filed 8/6/24] at 4-5.

[3]  Supplement to Memorandum in Aid of Sentencing [ECF 633, filed 8/6/24] at 2-3.

or where a police officer engaged in a vehicular pursuit, who made no contact with the driver or his vehicle and the officer was driving at a relatively slow speed a safe distance from the decedent (25 miles per hour more than 40 feet behind), the Government identified no cases.  This is particularly significant as the US Attorney's Office in this district is the sole entity with authority to prosecute second degree murder cases. The Government therefore is in possession of any cases that would refute the defendant's case. By its failure to identify a case or to even respond to the argument, the Court must treat the point as conceded -- there are no second degree cases in this jurisdiction which in any manner resemble the instant case. And that this case is therefore outside the heartland of second degree murder cases.

The Government also failed to address the argument that the DC Sentencing Commission did not consider any cases like the present one in establishing the DC voluntary guidelines.  It has thus also conceded this point.

A sentencing Commission's guidelines are only as good as the empirical data upon which they are based.  *See United States v Kimbrough,* 552 U.S. 85, 108–10 (2007).

> [T]he Commission fills an important institutional role: It has the capacity courts lack to "base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise."
>
> We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." The sentencing judge, on the other hand, has "greater familiarity with ... the individual case and the individual defendant before him than the Commission or the appeals court." He is therefore "in a superior position to find facts and judge their import under §

3553(a)" in each particular case. In light of these discrete institutional strengths, a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case "outside the 'heartland' to which the Commission intends individual Guidelines to apply."

. . . . .

The crack cocaine Guidelines, however, present no occasion for elaborative discussion of this matter because those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role. . . .

Given all this, it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence "greater than necessary" to achieve § 3553(a)'s purposes, even in a mine-run case.

*Id.*

The only response the Government made to the disparity argument is that the defendant had to identify a case exactly similarly situation as his.[4]  As noted in Officer Sutton's sentencing memoranda [ECF 632 and 633], there are no cases with the characteristics of this case.[5]  Accordingly, the Government's argument is not a response.

The Government's failure to respond to the substantive arguments made by Officer Sutton concede both arguments.  Thus, it is clear that application of the second degree murder guideline to Officer Sutton's case would result in unwarranted disparity of a constitutional magnitude.  *See City of Cleburne, Tex. v. Cleburne Living*

_____

[4]  Gov Reply at 9-10.

[5]  The argument made by Officer Sutton is based on his counsel's case law search on Westlaw of second degree murder.

*Ctr.*, 473 U.S. 432, 439 (1985) (equal protection and due process clauses are "essentially a direction that all persons similarly situated should be treated alike"); *see also Kimbrough, supra.*

## II. The Government Fails to Report Accurately the Nature and Circumstances of the Offense.

The Government's Sentencing Memorandum [ECF No. 630] and its Reply to Defendant Sutton's Sentencing Memorandum [ECF No. 642] do not serve the Court well to assess the sentencing factors from 18 U.S.C. § 3553(a).  They contain hyperbole and illogical inferences instead of facts.

In contrast to the unhelpful generalizations in these pleadings, we do commend to the Court the section of the Government's Sentencing Memorandum which accurately describes the duty of the Court at sentencing:

> Once the Court calculates the defendant's advisory Guidelines range applicable to the federal counts of conviction, it should consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). To make this determination, the Court may consider *all factual evidence relevant to the conduct of conviction* that is proven by a preponderance of the evidence, *including evidence not presented to the jury*, without regard to the rules of admissibility at trial, subject to basic principles of reliability. *See United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) (citing *Rita v. United States*, 551 U.S. 338, 352 (2007)); U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

[ECF No. 630] at 7 (emphasis supplied).

In conformity with this directive, Officer Sutton respectfully presents the following factual evidence he deems relevant to the Court's consideration for sentencing.

### 1.   Events Leading up to the Death of Karon Hylton-Brown: Whether Officer Sutton Engaged in a Pursuit or a *Terry* Stop

#### The Relevant Facts:

On October 23, 2020, Officer Sutton was one of the most experienced officers in the 4th District with nearly continuous assignments to PSA 403, the hub of drug-driven violence in the Kennedy Street corridor.   In his 13-year career in the Metropolitan Police Department, he was named Officer of the Year on two separate occasions.   He also received more than 60 commendations during that time.   Officer Sutton routinely exceeded other officers in the 4th District in the number of arrests. This evidence is found in the record in the testimony witnesses and in exhibits. The evidence is also found in the many letters of colleagues and others submitted to the Court for sentencing which we shall submit as an Exhibit to this memorandum.

On October 23, 2020, Officer Sutton was driving the CST vehicle which was his practice as the senior member of the Unit.   He was accompanied in the vehicle by Officers Cory Novick, Ahmed Al-Shwari, and Carlos Tejera.   Novick, a graduate of Towson University, joined MPD despite the wishes of his father who had a 30-year career in the United States Secret Service.   Tr. Trans., Nov. 29, 2022, pm, at 56-57. Novick had been with CST for less than two months.   *Id*. at 59.   Like all four officers, Novick was put on administrative leave after the events of that night.   However, at the time of trial, Novick already had obtained a new position as a deputy sheriff in

Calvert County, despite his being under investigation and on administrative/no-contact status with MPD.  After the trial of this case, Novick then joined the U.S. Marshal's Service as a Deputy Marshal.

Al-Shrawi had been with the CST Unit for two weeks.  Tr. Trans., Nov. 10, 2022, pm, at 17.  He had only ridden with Officer Sutton eight times before October 23.  Id. at 31.   Tejera had been a member of the CST Unit for two years.  Tr. Trans., Nov. 2, 2022, pm, at 19-20.  Al-Shrawi and Tejera were targets of the Government's criminal investigation and represented by counsel at the time of trial.  Both testified for the Government  without any explicit promise of leniency.  After the trial, both returned to active duty with MPD.

Tejera sat in the front passenger seat, where he was responsible for checking police records from a laptop computer and for handling radio transmissions on the 4D city-wide channel.  Tr. Trans., Nov. 7, 2022, am, at 26 (Tejera); Tr. Trans., Nov. 10, 2022, pm, at 21-22 (Al-Shrawi).  Al-Shrawi sat in the right rear seat, acting as a "runner" in the event that a suspect fled on foot.  Novick also acted as a "runner" and was seated behind Officer Sutton.  Id. at 22-23.

Tejera was late for the start of the shift that day.  Officer Sutton, Novick and Al-Shrawi went out on the street without Tejera.  Officer Sutton drove to Morton Place where they arrested Herbert Bender on a warrant.  Tr. Trans., Nov. 14, 2022, am, at 84.  Bender was in a crowd and struggled to resist arrest until Al-Shwari handcuffed him with the help of Novick.  Bender was found to have a gun in his waistband, a not uncommon event for Al-Shwari in the 4th District.  Id. at 85-87.

8

Novick, despite being on CST for less than two months, was also prepared to encounter a wanted person armed with a gun.  Tr. Trans., Nov. 29, 2022, pm, at 63-64.  Shootings in the 4th District were commonplace for these officers.  The CST Unit processed Bender's arrest at the 4th District where Tejera then joined the Unit.  The full complement went back on the street accompanied by CST Unit Lt. Zabavsky in a marked MPD vehicle.

At 10:00 p.m., the two CST Units stopped to meet with 4th District Officer Kathryn Pitt at a permanent MPD post located at 7th and Kennedy Streets.  Pitt is a college athlete and graduate, Captain in the Army Reserve with overseas deployment, and former Field Training Officer.  Tr. Trans., Nov. 28, 2022, pm, at 42-44, 46-47.  She had extensive experience in PSA 403.  She had arrested Karon Hylton-Brown whose criminal background, reputation and involvement with the KDY crew she knew well.  Hr. Trans., Oct. 14, 2022, at 13-14, 15-19.  She also had personally witnessed Hylton-Brown participating in drug transactions in the Kennedy Street corridor.  *Id*. at 16.

Earlier in the day, she saw him nearly get into a fight with another known drug dealer, and she found it "odd" that Hylton-Brown was hanging out in another group's territory that day.  Tr. Trans., Nov. 28, 2022, pm, at 53.  "It was just a little weird to me and off."  *Id*. at 54.  She had also seen him driving recklessly on a scooter, and she thought he was intoxicated on some substance.  *Id*. at 55-59.  "I was concerned about inner [*sic*] fighting that could be going on between Mr. Brown and Mr.

McLaren[6] and if something was going on within the group that they kind of hang out in." *Id*. at 60.  At this response, the Government objected that Ofc. Pitt's use of the word "in-fighting" might imply gang participation in violation of the Court's pre-trial ruling.  *Id*. at 60-62.  The Court then required counsel for Officer Sutton to use leading questions to avoid the objection.  Thereafter, the following exchange occurred:

> MR. HANNON
>
> Q. Going back to your motivation for speaking to the CST group, first, did you have concerns about what you had seen based upon your experience in PSA 403?
>
> A. Yes.
>
> Q. Did you speak to the CST based upon concerns that you had based upon your knowing Mr. Hylton-Brown?
>
> A. Yes.
>
> Q. Did you feel it important to advise CST about what you had observed in case some law enforcement action should be taken?
>
> A. Yes.

*Id*. at 62.  Ofc. Pitt testified that she could have stopped Hylton-Brown that afternoon for several traffic violations; however, she exercised her discretion not to conduct a stop:  "I was by myself at the time, and I don't -- you need more than one person to stop somebody along Kennedy Street because the neighborhood will come out when you stop somebody."  *Id*. at 45; *see also* 57-58 and 80-81.[7]

---

[6] McLaren, J'von Kaseem "Meatbigatre" was in the 4D Beat Book associated with KDY and Hylton-Brown.  Sutton Hearing Exhibit 407.

[7] Officer Tyler Toth also saw Hylton-Brown's behavior that day.  Toth testified he saw Hylton-Brown driving a moped recklessly without a helmet, on the sidewalk, swerving in and out of cars, and running stop signs.  He also saw Hylton-Brown in a

Tejera and Al-Shrawi did not have much of a memory of Ofc. Pitt's report to them as they sat in the CST vehicle.  Tr. Trans., Nov. 14, 2022, am, at 90-94 (Al-Shwari); Tr. Trans., Nov, 2, 2022 pm at 44-45 (Tejera).  However, Novick and Lt. Zabavsky were listening.  From Ofc. Pitt's report to them, Novick thought that her information was worth checking out to see what was going on with Hylton-Brown.  Novick testified he thought he made a comment that it sounded like Hylton-Brown might be back looking for retaliation.  *Id.* at 69.  Then Lt. Zabavsky said something like, "Let's go see."  Novick concluded that Lt. Zabavsky wanted them to go look for Hylton-Brown and at least make a "contact" with Hylton-Brown.  *Id.* at 70.

The two CST Units then headed east on Kennedy Street from the permanent post at 7th Street to look for Hylton-Brown.  After the Units passed 5th Street and the Starlight Market, Novick spotted Hylton-Brown on the north side of Kennedy Street in the 400 block.  Hylton-Brown was standing with a moped near one of his own cars parked at the curb.[8]  Hylton-Brown then got on the moped to ride away westbound on the sidewalk.  Both CST Units turned around.  *Id.* at 73; Tr. Trans., Nov. 10, 2022, pm, at 52-53 (Al-Shrawi).  Officer Sutton was in the lead of Lt. Zabavsky following Hylton-Brown back towards 5th Street.  At the intersection of 5th and Kennedy, Officer

---

verbal altercation with others in the area.  Tr. Trans., Nov. 28, 2022, pm, at 110-113.

[8]   In an interview with the Government, the mother of Hylton-Brown's son told investigators that Hylton-Brown's vehicle was broken into, and all of his money was stolen, shortly after he was admitted to the hospital on the day of the accident. Amaal Jones-Bey stated that she blames Hylton-Brown's friends for breaking into his vehicle.

Sutton yelled at Hylton-Brown to get him to stop.  Hylton-Brown yelled back "Fuck you" and drove across the front of the CST vehicle through a red light and in front of moving traffic, headed southbound towards the Starlight Market on 5th Street.  Tr. Trans., Nov. 28, 2022, pm, at 74.

The CST Officers who heard Pitt's reporting "all kind of had a consensus that that was kind of odd behavior for [Hylton-Brown] and … were concerned based on his history that retaliation might be a possibility and we thought it was worth trying to locate him and conducting a stop." Hr. Trans., Oct. 17, 2022 at 44 (Novick); *see also* Tr. Trans. Nov. 29, 2022, pm, at 69 ("We thought that was something worth noting and thought -- and my understanding was that we thought it was worth checking out to see what was going on with him.  And I believe I made a comment that it sounded something like he might be back looking."

When the officers left 7th and Kennedy to find Hylton-Brown, they had no way of knowing that, when they found him, he would commit new traffic violations in their presence.  Rather, at that time, their "intent was to conduct an investigative stop" based on Officer Pitt's reporting.  Hr. Trans., Oct. 17, 2022 at 63 (Novick ); *see also id.* at 66 (the plan was to conduct an "investigative stop" based on Officer's Pitt's reporting, which "seemed very suspicious … to us"); *id. at* 94 (CST intended to "conduct an investigatory stop to see what was going on" with Hylton-Brown).

Al-Shrawi, the "runner" in the right rear seat, heard Officer Sutton yell at Hylton-Brown "where is your helmet at" as their car approached 5th Street.  Tr. Trans., Nov. 10, 2022, pm, at 62.  Al-Shrawi instinctively opened his door preparing

to jump out and chase Hylton-Brown.  *Id*. at 61-62; Tr. Trans, Nov. 14, 2022, pm, at 5.  Had Officer Sutton continued driving, Al-Shrawi would have run after Hylton-Brown to take him into custody, being wary that Hylton-Brown might have had a weapon.  Tr. Trans., Nov. 14, 2022, am, at 97.  Tejera for his part also thought that Officer Sutton was trying to stop Hylton-Brown for a "traffic" offense.  Tr. Trans., Nov. 2, 2022, pm, at 50-52.

Hylton-Brown then rode across Kennedy Street towards the parking lot in front of Starlight Market, where Officer Sutton again haled Hylton-Brown to stop.  Hylton-Brown refused, and then disappeared for a time from view of the MPD crime cameras by riding under trees in front of the Starlight Market and the alley to the south.  Lt. Zabavsky took the lead turning left on 5th Street with his lights and siren activated.  Officer Sutton followed.  At trial Al-Shrawi was asked his opinion of what was transpiring at this moment:   "So, what's the purpose of pursuing him at this point if you know?"  He answered, "I don't know."  Tr. Trans., Nov. 10, 2022, pm, at 64.  Tejera thought that initially they were stopping Hylton-Brown for riding on the sidewalk.   Then when Hylton-Brown failed to stop, he thought they were pursuing him for fleeing the police which is a crime.  Tr. Trans., Nov. 2, 2022 pm at 54, 86.

At an early point, they lost sight of Hylton-Brown, and turned north through an alley until they reacquired sight of Hylton-Brown at 8th Street and either Jefferson or Ingraham Street.  *Id*. at 78.  The vehicle's emergency lights were not on constantly, being used on occasion to warn motorists.  The CST Unit emerged from the alley and turned left on Jefferson Street traveling towards 8th Street seeing Hylton-Brown's

taillight ahead of them.  They then followed Hylton-Brown north on 8th Street, where he completed a U-turn at Kennedy Street.  Novick readied himself to jump out, but Officer Sutton told him to stay in the vehicle.  *Id.* at 81.  Novick was getting ready to chase Hylton-Brown if Hylton-Brown "bailed out" of the moped.

Similarly, Al-Shwari recalled losing sight of Hylton-Brown; however, he did not know where this occurred because he was not familiar with the area of PSA 403.  Tr. Trans., Nov. 14, 2022, pm, at 11.  Al-Shwari also recalled a second time during their attempt to stop Hylton-Brown when he grabbed the door handle preparing to jump out thinking Hylton-Brown was going to run.  *Id.* at 11.  He thought Hylton-Brown was riding recklessly on the sidewalk.  *Id.* at 12.  During questioning by Baset, Al-Shwari consistently stated that he did not think their following Hylton-Brown was a pursuit in violation of MPD general orders.  Tr. Trans., Nov. 14, 2022, pm, at 121, 132.  Tejera testified that at some point when he could no longer see Hylton-Brown, they could get a warrant because "It would have been easier. . . .  [W]e were close to check off and we could just get a warrant at a later date."  Nov. 2, 2022, pm, at 60.  In response to a question from the Court as to why he made this suggestion, Tejera testified, "Because we could have just take the police report, return to the station, go home and eventually do the warrant at a later date."  *Id.* at 62.  Officer Sutton did not respond to the suggestion.

Tejera also testified that he did not believe that they were engaged in a pursuit.  Tr. Trans., Nov. 7, 2022, am, at 79.  He testified that in his role in the CST vehicle, he would have gone on the 4D city-wide channel if it were a pursuit.  *Id.* at 26.  Officer

14

Sutton routinely kept his radio on the 4D ops channel at high volume without using an earpiece so everyone in the vehicle could hear. Others including Tejera would monitor the 4D city-wide channel. Tr. Trans., Nov. 4, 2022, am, at 32-35 (Tejera).

There is also evidence that Officer Sutton did not believe their Unit had participated in a pursuit in violation of MPD general orders. While Officer Sutton was preparing the PD-10 Crash Report in the bullpen at the 4th District, Lt. Zabavsky along with Novick, Tejera and Al-Shrawi were reviewing BWC in the adjacent office. Al-Shrawi testified that Zabavsky was operating the computer mouse while standing up. Tr. Trans., Nov. 10, 2022, pm, at 115-119. When Zabavsky said it looks like a pursuit, Officer Sutton in the bullpen "looked surprised," spoke up and said "what do you mean a pursuit?" and Al-Shrawi said the same thing. *Id*. at 119.

### Assessment of a *Terry* Stop

The Government has attempted in part to attribute to Officer Sutton the opinions and impressions of the three CST officers riding in his vehicle regarding whether they were engaged in a pursuit or a *Terry* stop. Officer Sutton said very little to his colleagues in the vehicle, intently focusing on Hylton-Brown and communicating with Lt. Zabavsky and the other CST Unit over the 4D ops channel exclusively for use by CST officers. His colleagues in his vehicle were virtual rookies in the business in which they were engaged that night. Novick had been with CST less than two months, Al-Shrawi less than two weeks, and Tejera for two years. As Ofc. Tejera testified at trial regarding himself, he had no idea what Officer Sutton was thinking. Neither did the other two officers.

Nevertheless, this Court routinely assesses whether a police officer has engaged in a *Terry* stop as a matter of law in criminal cases. This issue was not presented to the jury for decision, contrary to the Government's assertion in its Reply Memorandum where it states "As the trial evidence established, the defendant had *no lawful justification* for engaging Hylton-Brown in a police pursuit." [ECF No. 642] at 2. (Emphasis supplied). The jury was given no such charge, as this Court ruled consistently that such legal conclusions were the province of the Court.

Officer Sutton submits that for the purpose of sentencing, he should be entitled to this Court's consideration as to whether his conduct was objectively reasonable in light of his training on a *Terry* stop. That is so because the Indictment invokes Officer Sutton's sworn duty as a law enforcement officer as a predicate for the charges against him and for the severe sentence being sought by the Government, stating:

> MPD is the primary law enforcement agency for the District of Columbia. MPD General Orders provide that "[i]t is the policy of the MPD to ensure its members preserve the peace, protect life and property, prevent crime, apprehend offenders, recover property and enforce all laws and ordinances of the District of Columbia and the United States of America."

[ECF No. 1]. In its Sentencing Memorandum, the Government also states:

> Law enforcement officers are a central part of maintaining the rule of law in this country. The defendant's crimes did significant damage to the credibility of law enforcement generally—and MPD specifically—in carrying out this essential role.

[ECF No. 630] at 16. In its Reply to Officer Sutton's Sentencing Memorandum, the Government also states:

> Because the defendant could not have committed this crime except for
> the fact that he was on-duty MPD officer, his status as a police officer is
> an aggravating [factor].

[ECF No. 642] at 7.

Having set the playing field for a judgment on whether Officer Sutton was attendant to his sworn duties in the profession he loved, the Government cannot complain that Officer Sutton seeks the expert consideration of the Court for the purposes of sentencing as to whether, in fact, Officer Sutton violated his oath.[9]

Officer Sutton was trained by MPD on the elements of a *Terry* stop. Officer Sutton was trained on MPD General Order 304.10, "Field Contacts, Stops, and Protective Pat Downs," July 9, 2019, Sutton Exhibit 303A. Officer Sutton was an MPD Field Training Officer for other officers. Like the MPD Training Academy, the Federal Law Enforcement Training Center trains federal officers on a *Terry* stop. FLTEC presents one of its most popular "FLETC Talks" on *Terry v. Ohio* to its federal trainees, and makes the talk available on its website.[10] Few lawyers today recall the actual facts of *Terry v. Ohio* which have nothing to do with seeing a gun or even a bulge in the pocket of a suspect, and all to do with the officer's experience and observations.

---

[9] To be sure, both Ofc. Pitt and Ofc. Toth had probable cause to arrest Hylton-Brown earlier in the day for reckless driving, which likely would have led to charges of driving under the influence. The same probable cause to arrest still existed at 10:00 p.m. when Ofc. Pitt reported her concerns to Officer Sutton.

[10] *https://www.youtube.com/watch?v=AVDy0EZFv3s*.

The law enforcement officer in *Terry v. Ohio* was Cleveland Police Detective Martin McFadden, a police officer for 39 years, detective for 30 years, and patrolling downtown for shoplifters and pickpockets for 30 years.  While Officer Sutton does not have that many years on the job, he is renowned among his colleagues for his familiarity with the Kennedy Street Corridor where he has patrolled for 13 years and made more arrests than any other officer.

Police are permitted to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  The "reasonable suspicion" needed for a *Terry* stop "is a less demanding standard than probable cause" and simply requires "a minimal level of objective justification for making the stop," i.e., "the officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Wardlow*, 528 U.S. at 123–24 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).  That an "officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Whren v. United States*, 517 U.S. 806, 812–13 (1996).

Here, Officer Sutton encountered Hylton-Brown late at night in a high crime area. *See United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001) ("The probative value of a neighborhood's reputation as a high-crime area is firmly established."). Officer Sutton knew Hylton-Brown had multiple prior arrests, including for gun possession, drug-dealing, and violent crimes, and that the MPD Intelligence Division

had validated Hylton-Brown as a member of a violent street gang. In addition, Officer Sutton was told by an experienced fellow officer that Hylton-Brown got into an altercation on a known drug corner earlier that she believed was indicative of gang "infighting" and that, in her judgment, would have been a physical fight had police not been present, and that Hylton-Brown was now back in the area driving around as though he was "looking for someone." The factors easily meet the low threshold for a *Terry* stop. *See, e.g.*, *Terry*, 392 U.S. at 30 (finding that police "had reasonable grounds to believe that [Terry] was armed and dangerous" based on suspicious pacing consistent with "casing" a store for a robbery).

Hylton-Brown's flight only increased the reasonable suspicion that he was committing or about to commit a more serious offense. *See Wardlow*, 528 U.S. at 124 ("Headlong flight–wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); *Lange v. California*, 141 S. Ct. 2011, 2035 (2021) (Kavanaugh, J., concurring) ("[T]he fact that a suspect flees when suspected of a minor offense could well be indicative of a larger danger, given that he has voluntarily exposed himself to much higher criminal penalties in exchange for the prospect of escaping or delaying arrest."). Indeed, flight in a high crime area, alone, is sufficient for reasonable suspicion. *See Wardlow*, 528 U.S. at 124 (finding reasonable suspicion based on "respondent's presence in an area of heavy narcotics trafficking" and "his unprovoked flight upon noticing the police"); *Edmonds*, 240 F.3d at 60 (finding reasonable suspicion based on the suspect's presence "after hours" in a "open air drug market" and "furtive gestures" combined

19

with his companion's apparent flight); *see also United States v. Wills*, 316 F.Supp.3d 437, 445 (D.D.C. 2018).  This is especially true for Hylton-Brown, who had interacted with CST over 100 times but only fled when in possession of a gun or drugs.

Officer Sutton knew that Hylton-Brown no longer lived in the Brightwood area of the 4th District, and that his presence almost daily in that area was for the purpose of dealing drugs for KDY and protecting the KDY operation.  In addition to Hylton-Brown, other known members of the KDY crew were in the area for no other reason than to deal drugs.  Several have been indicted by the Government.  While the Court does not usually take a prospective view of the evidence in assessing a *Terry* stop, in this case such evidence also supports a legal conclusion that Officer Sutton was engaged in a lawful *Terry* stop.  Before trial, it was known that $3,126 in small bills was inventoried from Hylton-Brown's belongings at Medstar Hospital.  *See* Sutton Exhibit 500G (unredacted).  It was also known that drugs were in his system, including THC, oxycodone, and acetone.  During trial, it was learned that the money was actually wrapped around Hylton-Brown's legs under his sweatpants with plastic wrap.

Therefore, for the purposes of sentencing, the Court should conclude that from an objective standard, Officer Sutton's conduct was lawful.

### The Pursuit Evidence

Officer Sutton also asks the Court to carefully review the evidence regarding violation of the MPD Pursuit Policy in order to ascertain how that evidence should

impact sentencing.  In Officer Sutton's Motion for Judgment of Acquittal, we argued the following:

> The government's entire case – as reflected in the closing argument of Mr. Baset – was focused exclusively on its contentions that Ofc. Sutton violated the MPD General Policy on Pursuits.  There is no other evidence of "depraved heart" malice in the evidence.

[ECF No. 447] at 17.  The Government responded to this very important argument in only a footnote.  *See* United States Opposition To Defendants' Motions For Judgment Of Acquittal, New Trial And Arrest Of Judgment [ECF No. 456] at 10 n.3.  The Government denied that the only evidence consisted of violation of the pursuit policy, stating:

> Rather, the evidence at trial revealed his underlying *conduct* (*e.g.*, the speed, persistence, and dangerousness of his chase). . . .  While various aspects of the conduct were *also* a violation of the MPD  General Orders, the Court was clear in its instructions to the jury – and the Government never argued to the contrary – that it could not find that requisite mental state based on the fact of the violation standing alone, that is, that a General Order violation was *per se* evidence of conscious disregard.

We do not see this argument as a refutation of the use of MPD Policies as the sole standard for depraved heart malice, and the Government's arguments in their reply sentencing memoranda [ECF No. 642] do not cure the weakness of this evidence.  Instead of focusing on the facts, the Government calls Officer Sutton's conduct "a sustained, dangerous, unauthorized police pursuit" and an "unauthorized police chase." [ECF No. 642] at 1.  The Government repeats its preposterous exaggeration that Officer Sutton dangerously "accelerated" 4 m.p.h. in the final alley, "periodically"  reached speeds of 45 m.p.h. [we cannot find proof of this speed in

Officer Sutton's BWC video], traveled the wrong way on a one-way street, and knew pursuits are "extremely dangerous . . . in a crowded city environment." While having little bearing on whether the MPD Pursuit Policy was violated, these assertions do not establish any level of depraved heart malice consistent with the evidence in any other case of second degree murder charged anywhere.

Officer Sutton submits that the Court will draw helpful guidance on the facts from the testimony of Sgt. John J. Brennan on behalf of Officer Sutton. During his testimony, the Court accepted into evidence Sutton Exhibit 800KK, a summary exhibit prepared by Sgt. Brennan which recorded the speed of Officer Sutton's CST vehicle based on periodic views of Sutton's BWC video of the speedometer in his vehicle. Tr. Trans. Dec. 8, 2022, pm, at 53. This exhibit will be provided as an exhibit to this reply and reflects speeds which would not merit comment in and of themselves in any litigation civil or criminal. For purposes of this memorandum, we will depict some of the speeds, including the highest speeds, from Exhibit 800KK on a Government overhead map of the area created by SA Ricardi, and provide it as an exhibit to this memorandum.

In connection with the Government's histrionic insistence that Officer Sutton recklessly accelerated in the final alley, the Court should consider the testimony of Officer Sutton's accident reconstructionist Thomas Langley. Mr. Langley testified that at the time Hylton-Brown's front wheel impacted the right front bumper of the Scion, Officer Sutton's CST vehicle was 42 feet behind Hylton-Brown. Officer Sutton stopped in seconds, coming to rest in the alley 24 feet away from the initial point of

impact.  Tr. Trans., Nov. 30, 2022, pm, at 11-13.  Further examination of Sutton Exhibits 900A, 900B, and 900C permits one to view the BWC of Officers Tejera and Sutton one frame at a time at a rate of 30 frames per second.  We suggest that examination of those frames in sequence actually shows Hylton-Brown increasing the distance from the CST vehicle as he flees up the alley on the moped.

The Court may conclude that Officer Sutton was acting in good faith when he disagreed with Lt. Zabavsky's and Porter's conclusions there was a pursuit.  After all, there had been no administrative determination of whether a pursuit actually had taken place by the authorities with MPD.  Nor was the jury asked to determine whether there was a pursuit.  Nevertheless, if it were a pursuit, Officer Sutton's Field Supervisor Lt. Zabavsky was on the street with the CST Units.  Under the MPD General Order, the Field Supervisor on the scene is the authority to determine whether a vehicular pursuit should be continued or discontinued.  Sutton Exhibit 303B at 13; Tr. Trans., Nov. 16, 2022, pm, 21-26  (Totaro).  The Government's own evidence established that Lt. Zabavsky came over the ops channel and reported to other CST members that they were chasing Hylton-Brown.  *Id*.  After hearing Officer Pitt's report of Hylton-Brown's behavior earlier in the day, Lt. Zabavsky said "Let's go see" and then led the effort to stop Hylton-Brown as he fled down 5th Street.

Watch Commander Capt. Porter was the first arbiter of whether there might have been a pursuit.[11]  At the same time, he testified accurately that the 2003 General

---

[11]  Porter concluded it was an unauthorized pursuit because he saw the CST Unit traveling down a one-way street.  Porter was wrong.  DCMR 2002 provides that the driver of an emergency vehicle may disregard regulations "governing direction of

Order on Vehicular Pursuits permitted pursuit of a suspect based on the parameters of *Terry v. Ohio*:

> Reasonable Cause – A combination of specific facts and circumstances that would justify a reasonable officer to believe that a certain person had committed, is committing, or is about to commit a criminal act; more than a hunch or mere speculation but less than probable cause necessary to arrest; sometimes referred to as reasonable suspicion.

Sutton Exhibit 303B at 2; Tr. Trans., Nov 7, 2022, pm, at 22).

This evidence is emphasized to note that the Government has not presented the Court with any similar criminal cases for consideration by the Court in applying the sentencing factors from 18 U.S.C. § 3553(a), whether based on the finding of a pursuit or based on the speed of Officer Sutton's vehicle.

### 2.      Events Following the Crash

The Government in its reply memorandum says yet again, "As Hylton-Brown lay unconscious in the street in a pool of his own blood, Sutton and his co-defendant, MPD lieutenant Andrew Zabavsky, *agreed to cover up* what Sutton had done to prevent any further investigation of the incident." [ECF No. 642] at 1.  In considering the sentencing factors from 18 U.S.C. § 3553(a), the Court focuses on the facts rather than the Government's conclusions.

The Government's reply memorandum also asks the Court to disregard the information Officer Sutton is providing to the Court for sentencing purposes under 18 U.S.C. § 3553(a).  "He [Ofc. Sutton] does not regret blaming Hylton-Brown's

---

movement or turning" when "in pursuit of an actual or suspected violator of the law."

murder on Hylton-Brown through *baseless accusations and speculation* about what his victim might have been doing the night of his death – information we will never know, and *which is not relevant to the elements of the crimes* for which the defendant was convicted." *Id*. (Emphasis supplied).  If sentencing were based exclusively on the elements of the crime as the Government says, Congress would never have enacted 18 U.S.C. § 3553(a).[12]   Government regularly obtains enhanced sentences because "many facts that result in an increase to a defendant's sentence are not considered elements of a crime and can be found by a sentencing judge relying on a preponderance of the evidence standard."  *United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015), citing *Rita v. United States,* 551 U.S. 338, 352 (2007).  The same is true for a defendant seeking a lesser sentence.

The Government also ignores the only "finding" of the jury on the charge of conspiracy to obstruct justice reported in the Verdict Form [ECF No. 420] at 2:

If you find either defendant Terence Sutton or defendant Andrew Zabavsky guilty of this offense, please identify in the following blank which overt act(s) listed in the Appendix to the jury instructions that you unanimously agree were committed by either of the defendants.  Please identify the overt act(s) by paragraph number:

Overt Act #13

Overt Act #13 consisted of the following:

13. *At the Fourth District* police station, SUTTON and ZABAVSKY met with the Watch Commander, the senior-most official in charge, and provided him with a misleading account of the incident:

---

[12]  The Court should note in this regard that the reply memorandum suggests that the Court may look to the guidelines for involuntary manslaughter for sentencing purposes.  [ECF No. 642] at 11 n.3.

a. SUTTON and ZABAVSKY portrayed the incident as a brief attempted traffic stop from which a moped driver took off and was then hit by a vehicle;

b. *SUTTON minimized his conduct, saying that he did not engage in a vehicular pursuit*;

c. ZABAVSKY said that he did not know if SUTTON had engaged in a vehicular pursuit;

d. ZABAVSKY withheld information concerning his own involvement in the pursuit;

e. ZABAVSKY said that Hylton-Brown had been drunk and had been slurring his words; and,

f. *SUTTON* and ZABAVSKY withheld all information about Hylton-*Brown's serious injuries.*

Jury Instructions [ECF No. 435] at 37-38 (emphasis supplied).

The jury made no findings of *any* obstructive conduct that occurred *at the scene of the crash*, though amply listed in the Appendix to the jury instructions. Moreover, the Government cannot say with any confidence which of the  5 subparagraphs of Overt Act #13 the jury found with unanimity because of the manner in which the Government chose to list Overt Act 13 with subsections.  And the only subsections related to Ofc Sutton state: "b. SUTTON minimized his conduct, saying that he did not engage in a vehicular pursuit;" and, "f. SUTTON and ZABAVSKY withheld all information about Hylton-Brown's serious injuries."

### The Events at the Scene of the Crash

For the Court's evaluation of Officer Sutton's actual conduct at the scene of the crash, we commend once again to the Court a review of Officer Sutton's BWC video

which we will provide to the Court as an exhibit to this reply.  The Court can determine whether Officer Sutton is conducting himself in the highly professional manner his many colleagues in the Metropolitan Police Department have witnessed firsthand.  The jury made no findings of misconduct by Officer Sutton at the scene of the crash.

### The Events at the 4th District

The jury's determination that Officer Sutton conspired to obstruct justice upon his return to the 4th District, based on the charge that he denied participating in a pursuit and "withheld all information about Hylton-Brown's serious injuries," is difficult to square with the evidence.  All four officers in the CST Unit earnestly believed they had not engaged in a pursuit and said so.

Nevertheless, Officer Sutton asks the Court to review the events at the 4th District to ascertain whether his actual conduct compares with that of any other defendant sentenced under the federal conspiracy and obstruction statutes.  Capt. Porter testified that when Lt. Zabavsky and Officer Sutton came into his office, Lt. Zabavsky specifically said he wanted to discuss whether the conduct with Hylton-Brown was a chase.  Tr. Trans., Nov. 17, 2022, am, at 55 (Porter).  The only thing Officer Sutton said to Porter was they were following Hylton-Brown for two minutes. *Id*. at 57.  Then the two left the office.  This was the only conversation that Capt. Porter had with Officer Sutton.  *Id*. at 64.  Porter assumed the two were coming to him because Officer Sutton had reported the event to his "manager" Lt. Zabavsky, and that Lt. Zabavsky accordingly was bringing the issue to Porter for review.  *Id*. at

55.  Porter assumed Hylton-Brown was injured because he had been taken to the hospital accompanied by an officer, as required by the MPD Traffic Crash Reports general order.  *Id.* at 56; Sutton Exhibit 303D V.C.2.o.(2) at 14.  These events occurred while everyone was waiting on word from Medstar Hospital regarding the condition of Hylton-Brown.

The facts also establish that members of the 4th District followed the MPD Traffic Crash Reports general order by the book.  An ambulance was called by Ofc. Tyler Toth before he even arrived at the side of Hylton-Brown, and Toth alerted all other officers to the crash by radio.  Tr. Trans., Nov. 2, 2022, am, at 21-25.  Ofc. Ernie Davis was sent to the hospital to interview medical personnel to assess the nature of Hylton-Brown's injuries.  That information was relayed to the 4th District – where Officer Sutton with the assistance of Ofc. Novick – was preparing the PD-10 report. When it was learned that Hylton-Brown was unlikely to survive, Lt. Zabavsky promptly notified Porter as well as Major Crash.[13]  Porter then called the Field Commander Brian Bray.   Tr. Trans., Nov. 17, 2022, am, at 70 and 80 (Porter). Jeffrey Folts with Major Crash received his first notification of the collision about 90 minutes after it had occurred.  Tr. Trans., Nov. 9, 2022, am at 27.  He received a page around 12:20 a.m. and immediately called Lt. Zabavsky.  *Id.* at 33.  Folts went first to the hospital to join Ofc. Davis to ascertain the condition of Hylton-Brown.  *Id.* at

---

[13]  Novick recalled that he relayed to Lt. Zabavsky that Hylton-Brown had no brain activity.  Novick testified that Zabavsky "was a bit taken back by that information and then wanted to talk to Officer Davis himself.  So I utilized my phone and called Officer Davis and handed my phone to the lieutenant."  Tr. Trans., Dec. 1, 2022, pm at 27:1-4.

31.  At 12:50 a.m., Folts arrived at the hospital, where he learned from Dr. Street that Hylton-Brown likely would die.  Folts then notified Sgt. Terry Thorne of Major Crash and IAD Inv. Della Camera.  *Id.* at 68.  Consequently, both Major Crash and IAD were advised of the collision within 3 hours of the event.

Lt. Zabavsky later printed out Officer Sutton's DRAFT PD-10 at 2:16 a.m., after Officer Sutton had been relieved of his duties.  At 2:22 a.m., Lt. Zabavsky then emailed the DRAFT PD-10 to Sgt. Thorne of Major Crash, with cc: to Folts and Victor DePeralta.  The email was also forwarded by Folts to the email of  Assistant United States Attorney Kendra Briggs at 3:51 a.m., which was Saturday, October 24.  Gov't. Ex. 223 [unredacted version].    Therefore, the "federal authority" identified anonymously in the Indictment [AUSA Briggs] received word of the collision just over 5 hours after it occurred and over two days before Monday October 26, the next workday for Ms. Briggs.  Major Crash Inv. Victor Della Camera testified that IAD always sends potential death cases to the same unit of the U.S. Attorney's Office regardless of the nature of the underlying facts.  Tr. Trans., Nov. 7, 2022, pm, at 98-99.

DePeralta also testified that MPD officers call Major Crash too soon, too late, not at all, or in order to avoid preparing a report.  Tr. Trans., Dec. 6, 2022, am, at 50-51 and 74-75.  DePeralta made clear that supervisors at a crash have no duty immediately to call Major Crash even where the victim is unconscious, bleeding and vomiting:

> MR. ZAMPOGNA: Q. . . . . Is the decision to call major crash discretionary upon those officers responding to the scene?

29

INV. DEPERALTA: A Yes –

Q And –

A -- if –

Q I'm sorry. Go ahead.

A If it's not a death, like an on-scene death where, you know, somebody is pronounced on scene, that's correct.

Q Okay. And so even in the case of potentially a serious injury, it's still discretionary?

A The time when we are notified of those, it does vary, so I would say it's discretionary, yes.

* * * * *

Q And, of course, there are times -- or usually they are called for a critical injury as well, is that accurate to say?

A Yes.

*Id.* at 50-51.

Porter confirmed DePeralta's testimony.  As Capt. Porter testified:

That's [*sic*] an obvious death [a decapitation] that anybody would be reasonable to understand this is going to be a fatality accident. The officer would automatically come over the air and tell the dispatcher we need Major Crash on this. If it's not as obvious, then they would call for a supervisor. They first would call for a sergeant. Probably -- any supervisor, if it's a sergeant that show up or a lieutenant or a captain. But most of the time, it's going to be a sergeant that would show up. And they would say we have an accident and that person has gotten serious head injuries and so we're not sure if it's a Major Crash scene.

Tr. Trans., Nov. 17, 2022, am, at 68.

None of this smacks of intentional obstructive acts.

III.   **The Government's Sentencing Proposal Fails to Account for the Need To Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty Of Similar Conduct**

1.   **Recent Uncharged Pursuits**

For purposes of sentencing, the Court should consider the following tragedies which did not result in the criminal prosecution of a law enforcement officer.

On June 27, 2022, United States Park Police, members of the Metropolitan Police Department, and units of the Prince Georges County Police Department were involved in the  chase of a three-wheel motorcyclist.  The chase began when an MPD unit believed the motorcyclist was wanted in a homicide.  Many units participated in a lengthy pursuit in the early morning hours at high speeds.  The motorcyclist eventually crashed and died on Benning Road.  In reality, the actual look out in the computer system identified the motorcyclist as only a witness to the homicide, which was mistakenly transmitted as wanted for homicide. A lengthy grand jury investigation was conducted by AUSA Risa A. Berkower supported by USAO Investigator Special Agent Ricardi.  The grand jury investigation was eventually concluded with an announcement that no charges against any law enforcement officer would be filed.

Other pursuits that were not prosecuted include the following:

November 17, 2017:       George Washington Memorial Parkway, VA – US Park Police Officers pursue hit and run vehicle, conducting four stops of the vehicle. During fourth stop, Officers fatally shot the driver.  DOJ investigation resulted in no charges.

July 2020:   Prince George's County, MD - Sgt Shaun Urbina was indicted for misdemeanor misconduct in office for unauthorized pursuit resulting in death of

mother and son. He was the supervisor and the only officer charged.  Sgt Urbina received probation before judgment.

https://wjla.com/news/local/prince-georges-county-police-officer-indicted-misconduct-clinton-maryland-sergeant-shaun-urbina-states-attorney-aisha-braveboy-lynda-richard-jones-july-9-2020

August 2022:      Minneapolis, MN - Officer Brian Cummings pursued stolen vehicle at speeds of 100 mph.  Officer's car slammed into side of jeep at 80 mph killing the driver of the jeep.  Officer was charged with second degree manslaughter and criminal vehicular homicide.  Officer pled guilty and received 9 months county workhouse and was eligible for release on ankle monitor after 3 months.

https://www.cbsnews.com/minnesota/news/mpd-officer-brian-cummings-charged-in-collision-that-killed-leneal-frazier/

March 2023:      Baltimore, MD - Officers Bradley Roberson and Menachem Rosenbloom attempted a traffic stop of a "wanted vehicle in reference to an armed robbery."  The vehicle fled and officers pursued vehicle.  The driver crashed into parked vehicles then collided with a tree killing the driver's wife age 74. NO CHARGES

https://www.wbaltv.com/article/no-charges-against-officers-fatal-pursuit-2023-baltimore/46845086

September 2023:    Hickory NC – Ofc. Aria Shamseldin attempted to stop motorcycle for careless and reckless driving.  Motorcyclist refused to stop.  During the pursuit Ofc. Shamseldin slammed into a minivan killing a woman and her 12 year-old son.  OFFICER WAS FIRED but NO CHARGES.

https://www.wcnc.com/article/news/crime/hickory-police-officer-in-deadly-chase-no-longer-employed/275-d000be67-a4b1-4b15-9cb0-b8de04f7f839

July 31, 2023:      Minneapolis, MN – State trooper charged with second-degree unintentional murder during traffic stop.  Trooper returned to work after charges dropped by prosecutors.

https://www.cbsnews.com/minnesota/news/ryan-londregan-ricky-cobb-ii-returns-to-work-minnesota-state-patrol/

February 2024:      Prince George County, VA - attempted traffic stop for speeding; pursuit reached speeds over 100mph, suspect ran red light and collided with vehicle killing 1 man.  Suspect charged with second degree murder.  OFFICER WAS NOT

CHARGED

https://www.wtvr.com/news/local-news/rosa-bassette-lawsuit-feb-13-2024

May 2024:   Henry County, Indiana - Deputy Tanner Strelecky attempted traffic stop of possibly intoxicated driver.  Driver fled at speeds reaching 100 mph, ran multiple red lights, and collided into another vehicle.  Passenger in suspect car died. No charges against the officer at this time.

https://fox59.com/indiana-news/deadly-police-chase-involving-rookie-henry-county-sheriffs-deputy-was-unsupervised/

May 2024:   Michigan – Officer engaged in high speed chase of stolen car, crashing into parked cars.  Passenger in stolen car fled on foot.  Officer pursued passenger in his vehicle while the passenger was on foot.  Officer struck the suspect with vehicle causing death.  NO CHARGES

https://apnews.com/article/michigan-teen-killed-police-chase-c013460cff41539be3bbcf2a39037ab6

May 2024:   Fayetteville NC - Officer chased stolen vehicle which crossed into oncoming traffic colliding head on with a civilian vehicle.  Passenger in stolen car died.  No charges for officer to date.

https://www.wral.com/story/driver-charged-with-manslaughter-after-chase-crash-that-killed-16-year-old-passenger/21457049/

## 2.    The Government's Single Comparator Case

The Government reports to the Court a "comparator case" for sentencing on the Murder II count, *United States v. David Jones*, affirmed by the D.C. Court of Appeals in Case No. 19-CF-744 (DCCA, Oct. 14, 2021).  Jones was convicted by a jury before the Honorable Rhona Lee Beck of drunk driving and second degree murder for causing the death of pedestrian Carolyn Ellis as she crossed the street in the U Street corridor.  The Court of Appeals affirmed the second degree murder conviction finding sufficient evidence of conscious disregard of an extreme risk of death or serious bodily harm.  Surveillance video showed that just seconds before the fatal impact, Jones ran

a red light and almost collided with two cars in oncoming traffic.  Those drivers honked at Jones, who made a "confrontational gesture" in response to one.  Jones then accelerated towards the intersection where he struck Ms. Ellis.  Thereafter, Jones sped off at a high rate of speed, swerving and eventually crashing.  Jones abandoned his car.  When police found him, he denied being the driver, tried to hide his keys but admitted he was drunk.

The Government in its memorandum reported this case to the Court to address the factor of avoiding unwarranted disparity in sentences.  The Government reports that the majority of vehicular homicides charged in Superior Court as second degree murder resolve with guilty pleas to voluntary or involuntary manslaughter.  [ECF No. 630] at 18.  It is unclear why the Government mentioned the Jones case, as it promptly abandons that case as a valid comparator, to which we agree.  Then, however, the Government goes on to argue how much more egregious the behavior of Officer Sutton was than Jones, primarily because he is a police officer.  This theme that permeates the Government's sentencing memoranda is both illogical and impermissible in sentencing.

First, status in law enforcement under the federal guidelines is only taken into consideration under USSG § 2H1.1 (Offenses Involving Individual Rights) where the offense level may be increased 6 levels for a public official.  Sentencing guidelines do not permit the Government to punish a law enforcement officer more severely than a drunk driver because of his vocation to law enforcement.  Second, vitriol towards law enforcement officers *per se* is not particularly persuasive.

34

The Government's unfavorably contrasting Officer Sutton to David Jones simply cannot mask the relevant differences.   No matter how dramatic the Government's rhetoric, Officer Sutton's driving on the night of October 23, 2020, was not reckless and a stark contrast to that of a drunken David Jones.   The proof is in the pudding.   Officer Sutton's driving harmed no one, nor did he come close to harming anyone.   That is so because he is a professional at his vocation.   Unlike David Jones, when Hylton-Brown lay injured on the street, Officer Sutton did his job while some others like Ofc. Tejera were  paralyzed.

### 3.   The Unprecedented Nature of the Obstruction Charge

The Government is also unable to present the Court with a case of conspiracy to obstruct justice like this one.   The Supreme Court in *United States v. Fowler*, 563 U.S. 668 (2011) requires proof that a defendant's obstructive conduct be directed towards an investigation of a federal offense.   In Officer Sutton's Reply in Support of His Motion for Arrest of Judgment and New Trial, we introduced the Court to the case of Timothy R. Flaherty, a prominent criminal defense attorney in Boston and the son of former Massachusetts House Speaker Charles Flaherty.   Mr. Flaherty was indicted by the United States Attorney in Boston for obstruction of justice in an indictment which did not also include a charge for the targeted offense of obstruction, just as there is no civil rights charge in the case against Officer Sutton.   The case was dropped when Mr. Flaherty argued that the obstruction charge was pretextual and sought discovery from the Government of "*Fowler* evidence."   We reported in that pleading that an electronic survey of reported cases charging obstruction of justice

under 18 U.S.C. § 1512(b)(3) produced 588 cases.  Of those 588 cases, only 1 did not include a federal target offense accompanying the obstruction count.  That singular case was that of Thomas R. Flaherty.  [ECF No. 467] at 5-6.

Counsel for Lt. Zabavsky has also produced to the Court a 98-page report from the Department of Justice of over 30 years of federal cases charging defendants under 18 U.S.C. § 1512(b)(3).  [ECF No. 544-1].  A non-exhaustive review of many of those cases demonstrates the same pattern: obstruction charges include a count for the target offense the defendant sought to obstruct.

In determining how to avoid unwarranted sentencing disparities to the detriment of Officer Sutton, the Court should take into consideration that the Government is the architect of this very peculiar case.  The Government has never addressed this additional peculiarity and has not provided any comparators to justify a sentence at the top of the guidelines.

### 4.    Report on 52 Murder II Cases in Superior Court

The D.C. Sentencing Commission makes available online the murder cases from which the Commission derived its sentencing ranges for various forms of murder.  Among these cases were 52 in which the top count for sentencing was second degree murder.  With some difficulty, counsel were able to obtain from the Superior Court the case numbers for these 52 cases.  Obtaining documents from the older cases which reflect the facts and the final sentences has been very difficult due to imperfections in the Superior Court online system.  Obviously, this data more easily is available to the United States Attorney's Office.  This information has been

assembled for presentation to the Court to review the actual Superior Court Murder II sentenced that were utilized by the D.C. Sentencing Commission for creation of the D.C. Voluntary Guidelines.  This document shall be provided to the Court as an exhibit to this memorandum.  None of the cases bear any resemblance to that of Officer Sutton.

### 5.   Consideration by the Court of Whether the Government Engaged in an Overzealous Prosecution[14]

The government's theory of criminal liability in this case is unprecedented in both federal courts and state courts nationwide, and the Government conceded the point until the filing of its Reply to Defendant Sutton's Sentencing Memorandum [ECF No. 642] on August 16, 2024.  Now the Government must explain to the Court how a sentence of 18 years in prison does not amount to a grossly unwarranted disparity from other sentences, where there is no other case like this.  In an effort to meet this burden, the Government again turns sentencing on its head stating the following:

> Throughout the course of this case, including in his sentencing memo (ECF 632, at 5), the defendant has asserted that this case is based on unique facts, and that this warrants special treatment and consideration from the Court. *While the government disputes this characterization*, as the defendant was convicted of violating laws of general applicability, for purposes of sentencing the case law is clear that this Court should impose a *sentence consistent with the applicable guidelines to avoid any unwarranted sentencing disparity across cases*.

---

[14] See *United States v. Thao*, Crim. No. 21-108 (PAM/TN), 2022 WL 1468455, at *4 (D.Minn. May 10, 2022).

[ECF No. 642] at 9.  The Government has had the opportunity to explain to the Court since this case was indicted how this case is not unique.  Now on the eve of sentencing, the Government "disputes this characterization" but for what purpose?  There is no dispute about the characterization, and the Government offers no counter.

Then in attempting to convince the Court to sentence at the top of the Guidelines, the Government truly loses it way, stating:  "[T]he failure of the defendant to identify persons *exactly similarly situated* is a reason to impose, not divert from, a Guidelines compliant sentence."  [ECF No. 642] at 9-10 (emphasis supplied).  Officer Sutton, ironically, has identified officers who acted similarly; however, none of them were criminally prosecuted.  *See Lange v. California*, 141 S.Ct. 2011 (2021); *County of Los Angeles, Calif. v. Mendez*, 137 S.Ct. 1539 (2017); *Mullenix v. Luna*, 577 U.S. 7 (2015); *Plumhoff v. Rickard*, 572 U.S. 765 (2014); *Scott v. Harris*, 550 U.S. 372, 383 (2007); and *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). While this evidence was excluded by the Court, as a law enforcement officer, Officer Sutton is surely entitled to have the Court consider these cases.  These cases stress that the paramount job of an officer is the protection of the public from crime.

The Government also has never addressed the illogic of its charge of conspiracy to obstruct justice, and the jury appears to have rejected its theory.  The obstructive conduct is alleged to have begun while Officer Sutton and Lt. Zabavsky were at the scene of the crash and continued until Capt. Porter reviewed the BWC footage and called IAD himself.  The "obstructive" conduct was based upon an unstated assumption that Officer Sutton knew he had engaged in a criminal act and knew that

Hylton-Brown had suffered life threatening injuries and would die as a result of those injuries. With that premise, there was no possibility that both Major Crash and IAD would not be notified. The same is true regarding the *mens rea* of the defendants: had they believed in the Government's premise that Hylton-Brown would die, they would have had no interest in attempting to cover it up.

Finally, for purposes of sentencing it is not unfair for Officer Sutton to rely on the Government's own arguments for sentencing purposes. "Law enforcement officers are a central part of maintaining the rule of law in this country." The same is true of the United States Attorney. This prosecution does not reflect the prudential preparation for such a game-changing theory of prosecution, not only for law enforcement officers in the District of Columbia but nationwide. The Government seems to have gambled everything on whether the Court would allow it to use MPD general orders as a standard for both murder and obstruction. The Government gambled that the defendants would not be permitted to utilize a defense typically available in a civil rights prosecution. The Government gambled that the Court would adopt the jury instruction from *Fleming v. United States*, 224 A.3d 213 (D.C. 2020) (*en banc*). The Government gambled that Hylton-Brown's criminal history would not come before the jury.

## IV.   Guidelines Calculation

### 1.   Second Degree Murder

The Government's charge of second degree murder presents a serious

predicament to the Court for sentencing purposes: there are no comparator cases. Sentencing is fundamentally a discretionary determination by the Court.

A remedy at this stage is therefore very problematic.  Sentencing guidelines are a core part of the criminal law, and all persons are entitled to clear notice of not only conduct which constitutes a crime but also the sentence that may result.  Where notice is ambiguous, the rule of lenity may be applied.  Resolving ambiguity in favor of the accused ensures "fair warning [,] ... in language that the common world will understand, of what the law intends to do if a certain line is passed." *United States v. Bass,* 404 U.S. 336, 348 (1971) (internal quotation marks omitted).  The rule applies "not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose." *Bifulco v. United States,* 447 U.S. 381, 387 (1980).

Without surrendering our emphasis on the lack of comparators, the Court may find resolution in the "catch-all" provision contained in the D.C. Sentencing Guidelines:

> (10) There is any other substantial and compelling basis, as articulated by the sentencing judge, comparable in gravity to those listed in 1 to 9 above, which does not amount to a defense, but which substantially mitigates the seriousness of the offense or the defendant's culpability.

A sentence must be imposed.  The Court should impose a noncustodial sentence on the count of second degree murder.

### 2.      Conspiracy to Obstruct Justice

The same argument we present on the second degree murder sentencing quandary applies to the federal guidelines.  That argument, however, is compounded by the Government's proposed guideline score for conspiracy to obstruct justice.  As

discussed in our initial sentencing memorandum, the Government errs by ignoring the initial requirement of USSG § 2X1.1. Attempt, Solicitation, or Conspiracy (Not Covered by a Specific Offense Guideline), subsection (a) which states that the base offense level is to be obtained "from *the guideline for the substantive offense."* That offense, as the Government concedes, is obstruction of justice.

The Government then moves to USSG 2X3.1(a)(1), which they say leads to an "underlying offense" of a civil rights violation which under their analysis turns to the D.C. Code offense of second degree murder.  The federal sentencing guidelines and the case law do not permit this mix and match process between federal offenses and D.C. Code offenses.

Moreover, counsel for Lt. Zabavsky makes a very good argument that the Government's use of the federal guideline for second degree murder as the target offense for obstruction is mired in ambiguity.  *See* Zabavsky Reply Memorandum [ECF No. 645] at 9-11.  The Government told the Presentence Report Writer that the "substantive offense" from USSG § 2X1.1(a) is obstruction of justice.  There was indeed a conviction for obstruction of justice; however, there was no charge or conviction for any other federal offense.[15]  The Government's guideline calculation requires the Court to use instead Accessory  After the Fact USSG § 2X3.1(a)(1)to go to the "underlying offense" which is a far more factually based language than the "substantive offense" as used in USSG § 2X1.1(a).  Using that language, the

---

15  Nor was there a charge of obstruction of justice under D.C. Code § 22–722 because the language of that statute does not apply to the conduct alleged in this case.

Government gets to USSG § 2H1.1 Offenses Involving Individual Rights as a vehicle to launch into federal murder. This is where the Court should apply the rule of lenity. The Supreme Court describes the application of the rule of lenity in sentencing as follows:

> The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. See *United States v. Gradwell,* 243 U.S. 476, 485 (1917); *McBoyle v. United States,* 283 U.S. 25, 27 (1931); *United States v. Bass,* 404 U.S. 336, 347–349 (1971). This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead.

*United States v. Santos*, 553 U.S. 507, 514 (2008) (cleaned up).

The rule of lenity applies to sentencing under the guidelines "if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute.'" *Barber v. Thomas*, 560 U.S. 474, 488 (2010), quoting *Muscarello v. United States,* 524 U.S. 125, 139 (1998). The issue then is whether the guidelines use of "substantive offense" precludes the Government's resort to "underlying offense" under the facts of this case. If there is doubt, it should be resolved in favor of Officer Sutton.

Even if the Court is required to look to Accessory After the Fact USSG § 2X3.1(a)(1) to go to the "underlying offense," that language would not help the Government. Application Note 9 to USSG § 1B1.3 states:

> **Solicitation, Misprision, or Accessory After the Fact.**—In the case of solicitation, misprision, or *accessory after the fact*, the conduct for which the defendant is accountable includes all conduct relevant to

> determining the offense level *for the underlying offense that was known, or reasonably should have been known*, by the defendant.

(Emphasis supplied). This language returns the Court to the notice issue which underlies sentencing guidelines. Officer Sutton had no notice that his conduct would amount to a civil rights violation. The Government has conceded that there was no force or seizure involved in Officer Sutton's conduct. Therefore, Officer Sutton had no reason to believe his conduct would be measured by a Court as second degree murder.

Finally, the Government in its initial sentencing memorandum says, as if entirely undisputed, "Subsection (a)(1) of U.S.S.G. § 2H1.1 requires application of the offense level from the offense guideline applicable to any underlying offense. Here, the underlying offense was *second degree murder*, which, under § 2A1.2 has a base level offense of 38." (ECF No. 630) at 10. Officer Sutton in his sentencing memorandum (ECF No. 632) at pages 31-35 discussed extensively why this assumption of the Government's is incorrect. Yet, in their reply memorandum (ECF No. 642), the Government entirely ignores the issue. The Government does not explain how the Court can mix the D.C. Code offense with federal sentencing guidelines. The Government reassures the Court, without any evidence, that the *Fleming* causation instruction would be given in a federal murder prosecution as well. The Government also ignores the fundamental underlying requirement of the federal sentencing guidelines, that the Court must examine the underlying facts of a state offense, not the label. They ignore our constitutional argument "the Government's

43

unprecedented use of the D.C. Code offense of Second Degree Murder violates his constitutional rights with respect to receiving a fair sentence." *Id*. at 35.

The Government's charging strategy, now that it has resulted in a conviction, constitutes a form of sentencing manipulation. Long ago, Judge Harold H. Greene observed of the guidelines:

> Because the sentencing guidelines remain relatively new, courts continue to struggle with their implications. With new legal mandates, such as the guidelines, come the development of new legal concepts to deal with potentially abusive applications. Two such concepts that have been discussed by some courts and that continue to evolve are the related doctrines of "sentencing entrapment" and "sentencing manipulation."

*United States v. Shepherd*, 857 F.Supp. 105, 109 (D.D.C. 1994), 102 F.3d 558, (D.C.Cir. 1996), as amended (Jan 31, 1997), as amended (Mar 04, 1997), rehearing denied (#94-3143) (Mar 04, 1997). Sentencing manipulation at its core is a violation of due process. The Government's course in this case set the stage for it to achieve a conviction for second degree murder, where it could not achieve a conviction on a federal civil rights violation. Now the Government insists that the local murder conviction serve as the pre-requisite for a federal guideline score of 30 for obstruction it could never have achieved in this case or in this Court.

After *Booker*, this Circuit concluded that a sentencing court must consider meritorious claims of sentencing manipulation. *United States v. Bigley*, 786 F.3d 11, 12 (D.C. Cir. 2015). Sentencing factor manipulation may serve as grounds for downward departure under 18 U.S.C. § 3553(a). *Id*. 15. The Government's strategy – like the undercover officer who provides a handgun to a suspect – there is now no

reasons to believe that the Government's charging strategy was directed at achieving the irrational sentence it seeks.

For all of these reasons, Officer Sutton respectfully requests that the Court impose a noncustodial sentence.

Respectfully submitted,

HANNON LAW, PLLC

*s/J. Michael Hannon*
J. Michael Hannon, 352526
2101 L Street, NW
Suite 300
Washington, DC 20037
Tel: (202) 365-5561
jhannon@hannonlawpllc.com


/s/
**CARMEN D. HERNANDEZ**
Bar No. MD 03366
7166 Mink Hollow Rd
Highland, MD  20777
(240) 472-3391
Chernan7@aol.com

*Attorneys for Defendant Terence Sutton, Jr*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Memorandum was served via ECF on all counsel of record this 29th day of August, 2024.

/s/
**CARMEN D. HERNANDEZ**